## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

| | |
|---|---|
| SUSAN TINCHER, JOHN BIESTMAN, JANET LEE, LUCIA WEBB, ABDIKADIR NOOR, and ALAN CRENSHAW, o*n behalf of themselves and other similarly situated individuals,* | Court File No. _____ |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT AND DEMAND FOR A JURY TRIAL** |
| KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive Associate Director, Enforcement and Removal Operations (ERO), ICE; DAVID EASTERWOOD, Acting Field Office Director, ERO, ICE Saint Paul Field Office; JOHN A. CONDON, Acting Executive Associate Director, Homeland Security Investigations (HSI); The Department of Homeland Security; Unidentified Federal Agencies; and Unidentified Federal Agents; *in their official capacities*, | |
| Defendants. | |

For their Complaint, Plaintiffs state and allege as follows:

## INTRODUCTION

In recent weeks, ordinary Minnesotans have banded together to engage in our nation's most cherished and protected activity: speech. In response to Defendants' cruel, arbitrary, and unlawful campaign of immigration enforcement in our State, people have stepped up to bear witness and express their disdain for Defendants' misconduct. But Defendants cannot tolerate the thought of being recorded, observed, or criticized. They have acted to suppress this dissent by abducting United States citizens and holding them incommunicado for hours like the masked secret police of pre-World War II Germany or Pinochet's Chile. They have pepper sprayed, violently subdued, and aimed assault rifles at protesters and observers, and even followed observers home to scare them in a tactic lifted straight from the mafia. This repression of speech is just one more instance of the federal campaign to besiege cities across the United States in an unprecedented attack on civil liberties.

This lawsuit aims to vindicate the rights of the Minnesotans who have been victimized by their own government simply for exercising their First Amendment rights, to end the false sense of impunity that fuels the worst of Defendants' misconduct, and to ensure that Minnesotans can assemble, observe, document, and criticize Defendants' activities, safely and unburdened by the fear of retaliation.

## PARTIES

1.      Plaintiff Susan Tincher is a resident of the Near North neighborhood, Minneapolis, Hennepin County, in the state of Minnesota. She has lived in Minneapolis for

30 years. She and her husband Jim have two adult children and a small consulting business. On December 9, 2025, Tincher woke up to alerts on her phone that ICE arrests were happening in her neighborhood. She drove over, got out of her car, and stood on a public sidewalk. She saw several agents in masks and bullet-proof vests standing in a loose perimeter around a house, talking calmly to each other. She stood approximately six feet from one female officer, outside their perimeter and on the public sidewalk and asked, "Are you ICE?" Mere seconds later, several agents forced her to the ground, handcuffed her, and brought her to the Bishop Henry Whipple Federal Building ("Whipple Building") in Minneapolis, where federal immigration activities are headquartered. Agents cut off some of her clothes and her wedding ring, shackled her, and left her in a cell for hours. She was released without charge. Mrs. Tincher believes ICE was retaliating against her for seeking information about and observing and protesting their activities in her community.

2.      Plaintiff John Biestman lives in the Linden Hills neighborhood of Minneapolis with his wife Janet Lee. He is 69 years old and retired from a career as a banker. On Sunday, December 7, 2025, at around 11:30 a.m., Biestman and Lee heard that ICE vehicles were circling the Church of the Assumption of the Blessed Mary in Richfield, Minnesota, and, in protest against federal agents' disruption of Minnesotans' sacred religious practices, drove to the church to observe and to express their disapproval. From outside the church, they observed an ICE vehicle and followed the vehicle from a safe distance. They eventually turned into the parking lot of nearby Roosevelt Park. Immediately, ICE cars boxed them in, masked officers surrounded their car, pointed semiautomatic weapons at them, and threatened them with arrest. One agent said "we have

your license plate, we know where to find you." Biestman is a patriot who is now afraid that his own government might further retaliate against him or his family because of his engagement in observation and protest of ICE's actions. But he believes he owes it to his grandchildren, his country, and his community to continue to exercise his constitutional rights.

3.      Plaintiff Janet Lee is a 67-year-old resident of the Linden Hills neighborhood of Minneapolis, along with her husband John Biestman. She is a speech-language pathologist. On Sunday, December 7, 2025, at around 11:30 a.m., Lee and Biestman heard that ICE was planning a raid of some kind at the Church of the Assumption of the Blessed Mary in Richfield, Minnesota, and–horrified that federal agents would arrest people at their place of worship–drove to the church to observe and to express their disapproval. Upon arriving in Richfield, they observed an ICE vehicle, and followed as it turned into the parking lot of nearby Roosevelt Park. Immediately, ICE cars boxed them in, masked officers surrounded their car, pointed semiautomatic weapons at them, and threatened them with arrest. One agent said, "We have your license plate, we know where to find you." Lee felt too scared to record the encounter, but she believes it is her obligation to continue to bear witness to ICE actions and disseminate the information.

4.      Plaintiff Lucia Webb is a 31-year-old resident of the Powderhorn neighborhood of Minneapolis. She is the Operations Director at a local non-profit. On December 3, 2025, she was monitoring the neighborhood chat for opportunities to help document the ICE activities that have disrupted her community. She got in her car and eventually began to observe the movements of two ICE vehicles in South Minneapolis. The

two cars led her to the park and ride near the Whipple Building in Minneapolis and boxed her in. About five masked and armed agents surrounded the car. One threatened her with arrest for "impeding officers." Their conduct frightened her, and while she is worried that she will be stopped or arrested again, she will continue to exercise her rights to be on public streets and observe and protest ICE activity.

5.    Plaintiff Alan Crenshaw is a 35-year-old resident of Uptown in Minneapolis, Minnesota, and a student in the Urban Studies department at the University of Minnesota. On December 9, 2025, Crenshaw heard there was ICE activity in the Cedar Riverside neighborhood in Minneapolis. He arrived in time to see ICE agents violently arrest a United States citizen. He and several other observers and protesters filmed ICE agents in the area and voiced displeasure with their presence in Minneapolis and their unlawful detentions of Minnesota community members. As the ICE vehicles were leaving, several of the cars stopped, and agents leaned out of the windows to pepper spray people standing on the side of the road, including Crenshaw. Crenshaw believes ICE retaliated against him for exercising his right to observe, record, assemble, and protest but he will continue to do so.

6.    Plaintiff Abdikadir Abdi Noor is a 43-year-old resident of Fridley, Minnesota. He is Somali American and has been a United States citizen for approximately 20 years. On December 15, 2025, he was going to get coffee at Karmel Mall in Minneapolis, when his car and another car were stopped by ICE vehicles. Noor asserted his constitutional rights and advised the other car to do the same. As ICE officers detained three people, several protesters and observers, including Noor, objected to and protested ICE's presence and conduct. They told ICE to stop what they were doing and leave. Noor was peacefully

encouraging people in the street to remain calm when he was suddenly tackled and arrested by ICE. They drove him to the Whipple Building in Minneapolis where he was detained and disparaged for his national origin as a Somali American. He will continue to exercise his rights and encourage others to do the same.

7.      Defendant Kristi Noem is Secretary of United States Department of Homeland Security (DHS). DHS is a Cabinet-level Department of the United States government. Its stated missions include anti-terrorism, border security, immigration, and customs. On information and belief, Secretary Noem directed ICE, ERO, and HSI to engage in enforcement actions in the Twin Cities metro area in an action dubbed "Operation Metro Surge," and authorized agents to use dangerous militarized methods that have targeted protesters and observers exercising their First Amendment rights.

8.      Defendant Todd Lyons is the Acting Director and the senior official currently performing the duties of the Director of the United States Immigration and Customs Enforcement (ICE) agency housed within DHS. Its stated purpose is to "[p]rotect America through criminal investigations and enforcing immigration laws to preserve national security and public safety." ICE has three operational components: (1) ERO, which arrests and removes non-citizens who present a danger to public safety or national security, as well as those who enter the country illegally; (2) HSI, which investigates federal crimes; and (3) the Office of the Principal Legal Advisor, which litigates immigration removal cases.

9.      Defendant Marcos Charles is Acting Executive Associate Director of Enforcement and Removal Operations within ICE. ICE employees are among the federal officers who have used excessive force against protesters, observers, and journalists.

6

10.     Defendant David Easterwood is the Saint Paul Field Office Acting Director of Enforcement and Removal Operations within ICE. ICE employees are among the federal officers who have used excessive force against protesters, observers, and journalists.

11.     Defendant John A. Condon is the Acting Executive Associate Director for Homeland Security Investigations (HSI). HSI is described as "the principal investigative component of the Department of Homeland Security (DHS)."[1] HSI agents are among the federal officers who have used excessive force against protesters, observers, and journalists.

12.     Defendant United States Department of Homeland Security is a department of the executive branch of the United States government, responsible for coordinating immigration enforcement actions. ICE is a component agency within the Department of Homeland Security. Homeland Security Investigations (HSI) is a subordinate agency housed within ICE.

13.     Unidentified Federal Agencies are unidentified agencies or departments of the U.S. government whose employees or agents, acting under color of federal law and within the scope of their employment and duties with the respective agencies by which they are employed or for which they are agents, are participating in the unlawful conduct described in this Complaint.

14.     Unidentified Federal Officer Defendants are unidentified agents and officers of federal agencies, including DHS, ICE, ERO, HSI, acting under color of federal law and

---

[1] *ICE Leadership*, U.S. Immigration and Customs Enforcement (last visited Dec. 17, 2025), https://www.ice.gov/leadership.

within the scope of their employment and duties with the respective agencies by which they are employed or for which they are agents, are participating in the unlawful conduct described in this Complaint.

15.    Each of the defendants is sued in their official capacity.

## JURISDICTION

16.    This Court has subject matter jurisdiction over Plaintiffs' claims of violation of federal constitutional rights under 28 U.S.C. §§ 1331 and 1343 because Plaintiffs' causes of action arise under the United States Constitution and 28 U.S.C. §§ 2201 and 2202.

## FACTUAL ALLEGATIONS

## I.    DEFENDANTS HAVE BEEN ENGAGED IN A CAMPAIGN OF CONSTITUTIONAL VIOLATIONS AGAINST PROTESTERS, OBSERVERS AND JOURNALISTS IN CITIES AROUND THE COUNTRY.

17.    In the summer of 2025, the Trump Administration began deploying federal forces, including ICE agents and other federal law enforcement officers, to cities across the United States as part of the Trump Administration's ramped-up efforts to deport individuals from the United States.

18.    Every city that has been besieged by an influx of federal immigration agents has responded with widespread protests. Fueled by displeasure with the administration's tactics and a desire to speak up, everyday citizens have dedicated themselves to observing and documenting ICE activities. As discussed below, in city after city, these protesters and observers have been met with gratuitous uses of force, threats, detention, and intimidation by Defendants and their agents, all in an attempt to chill, discourage, prevent, and retaliate against protesters' and observers' exercise of their First Amendment rights.

8

A.      **Defendants Violated the First Amendment Rights of Protesters, Observers, and Journalists in Los Angeles.**

19.     ICE and other federal agents deployed to Los Angeles in June 2025. When residents of Los Angeles rallied en masse to observe, document, and protest, this stepped-up immigration enforcement activity, federal forces responded with tear gas, pepper balls, chemical spray, less-lethal weapons, and other tools and tactics of force, fear and intimidation. For example, an ICE agent shot legal observer Charles Xu with a pepper ball while he was filming an immigration arrest.

21.     A coalition of journalists, citizen observers, and protesters sued to stop ICE and other federal agencies' unlawful use of force against them.  On September 10, 2025, the court granted their motion for a preliminary injunction.  *See Los Angeles Press Club et al. v. Noem, et al.*, Case No. 25-cv-05563, 2025 WL 2658327 (C.D. Cal. Sep. 10, 2025).

22.     The court wrote: "officers from the Federal Protective Services, Immigration and Customs Enforcement, and U.S. Customs and Border Protection unleashed crowd control weapons [on journalists, observers, and protesters] with surprising savagery." *Id.* at *2.

23.     The preliminary injunction order found that Defendants had been targeting "journalists and peaceful legal observers far from any protestors or bad actors." *Id.* at *30. It also found that the plaintiffs' expert witness "convincingly opines that deploying force against individuals who are ostensibly journalists or legal observers, 'standing to the side, not interfering with law enforcement, is not necessary to restrain violent protestors." *Id.*

24.     The court stated: "[T]he avalanche of evidence before the Court – along with

federal officials' statements – suggests that federal agents acted pursuant to a common and widespread practice of violating the First Amendment rights of journalists, legal observers, and protesters. . . . The record also suggests that Defendant Noem ratified Defendants' practice of meeting First Amendment protected activities with force." *Id.* at *33-34.

25.     The court concluded: "federal agents' indiscriminate use of force . . . will undoubtedly chill the media's efforts to cover these public events and protesters seeking to express peacefully their views on national policy. . . . Indeed, under the guise of protecting the public, federal agents have endangered large numbers of peaceful protesters, legal observers, and journalists – as well as the public that relies on them to hold their government accountable.  The First Amendment demands better."

**B.     Defendants Violated the First Amendment Rights of Protesters, Observers, and Journalists in Portland.**

26.     In June 2025, as federal civil immigration enforcement was intensifying nationwide, the Portland, Oregon, ICE facility became the focal point of over 100 days of sustained, nonviolent protest. Despite peaceful conduct by protesters and observers, Defendants portrayed the building as "under siege," authorizing "full force" to suppress dissent.

27.     Thereafter, the Trump Administration drove an escalating false narrative about Portland protesters as "antifa terrorists." For example, DHS posted a false video claiming that "antifa terrorists" had stormed the Portland ICE building using video footage

from Chicago.[2] On September 4, 2025, Fox News aired a report about protests in Portland which included clips from the 2020 Portland protests near the federal courthouse. The next day, President Trump appeared to reference this misleading news report, relying on reporting from 2020 rather than current circumstances when telling a reporter he was considering targeting Portland with troop deployment.[3] None of this was surprising because long before the 2025 protests, President Trump signaled his antipathy towards Portland and other so-called "sanctuary jurisdictions," telegraphing his intent to deploy federal agents—and, in some cases, military troops—into America's Democratic-led cities.

28.     But protests in response to ICE activities in Portland are best characterized as creative nonviolence, incorporating art, humor, music, dancing, inflatable costumes, fleece animal onesies, semi-naked bike rides, neon-clad aerobics classes, prayer, pizza delivery, and even knitting. Nevertheless, on September 27, 2025, President Trump used his false narrative to justify a "full force" assault against protesters. Federal officers, including DHS, ICE, and CBP agents, unleashed violence against protesters—deploying dangerous and aggressive tactics including exploding tear gas canisters, pepper-ball rifles, flash-bang grenades, impact munitions and even "snatch-and-grab" tactics—all intended to

---

[2] Drew Harwell and Joyce Sohyun Lee, *We Checked DHS's Videos of Chaos and Protests. Here's What They Leave Out*, Wash. Post (Oct. 29, 2025), https://www.washingtonpost.com/investigations/2025/10/29/trump-administration-misleading-videos/.

[3] The Oregonian, "*It Is Like Living in Hell": Trump Discusses Portland as He Considers Sending the National Guard*, YouTube (Sept. 5, 2025), https://www.youtube.com/watch?v=6tP9QqDmu74.

subdue and suppress people and to retaliate against them for exercising their First Amendment rights.[4]

29.    The rampaging federal officers injured protesters and journalists in Portland,- and prevented them from continuing to engage in their constitutionally-protected dissent and truthful reporting.

30.    On November 21, 2025, a group of protesters and journalists filed a federal civil action seeking to stop DHS and ICE's pattern and practice of violating their First Amendment rights. As detailed in their complaint, each plaintiff was targeted and injured by federal force.[5]

31.    Jack Dickinson ("the Portland Chicken"), a peaceful protester who regularly wore a chicken costume, was repeatedly targeted and injured by federal force including repeated exposure to chemical munitions and being hit by projectiles on multiple occasions.[6]

32.    Local veterans Laurie Eckman (84) and her husband, Richard Eckman (83), were nonviolently marching with neighbors when Laurie was shot in the head with an

---

[4] Court Cases, *Dickinson (a.k.a. "the Portland Chicken") et al. v. Trump et al.*, ACLU Oregon (Nov. 21, 2025), https://www.aclu-or.org/cases/dickinson-et-al-v-trump-et-al/.

[5] Complaint, *Dickinson, et al. v. Trump, et al.* No. 3:25-cv-02170-SB (D. Or. Filed Nov. 21, 2025) *available online at* https://www.aclu-or.org/cases/dickinson-et-al-v-trump-et-al/?document=Dickinson-%28aka-the-Portland-Chicken%29-et-al-v-Trump-et-al#.

[6] *Id.*

impact munition containing chemical irritant, and Richard was gassed, struck with a munition, and physically rammed.[7]

33.    Mason Lake, a freelance video journalist who extensively covered the protests, was targeted with physical force and tactics aimed at suppressing media coverage.[8]

34.    Freelance journalist Hugo Rios was covering a dance protest at the Portland ICE facility when he was pushed from behind by federal agents with no warning. Agents then ordered him to move and shoved him so hard that his video equipment was damaged. Minutes later he was attacked with a barrage of tear gas, pepper balls and other impact munitions with no warning.[9]

### C.    Defendants Violated the First Amendment Rights of Protesters, Observers, and Journalists in Chicago.

35.    On September 6, 2025, President Trump posted on social media a photograph of the Chicago skyline on fire and with military helicopters, titled "Chipocalypse Now," The post said: "I love the smell of deportations in the morning…" and "Chicago [is] about to find out why it's called the Department of WAR." Later that week, DHS announced the launch of Operation Midway Blitz, the agency's heightened immigration enforcement operation in Chicago.

---

[7] *Id.*

[8] *Id.*

[9] *Id.*

36.     ICE operations in Chicago were characterized by casual cruelty, disregard for local laws and the wishes of the citizens of that city, and a raft of unlawful and unconstitutional conduct.

37.     Contrary to ICE's initial statements that it intended to target dangerous criminals for deportation in Chicago, the vast majority of individuals arrested had no criminal record. ICE often simply stopped and arrested people walking down the street, going to or from work, or otherwise going about their day lawfully and peacefully.

38.     ICE showed a complete disregard—indeed a widespread, open and violent hostility to—individuals who exercised their First Amendment right to protest ICE's activities in Chicago.

39.     ICE's own body-worn camera ("BWC") footage submitted in conjunction with litigation addressing its misconduct shows ICE agents violently attacking peaceful, law-abiding protesters with flashbang grenades, tear gas, and pepper balls. *See, e.g., Chicago Headline Club, et al. v. Noem, et al.*, No. 25 cv 12173, 2025 WL 3240782, at *6 (N.D. Ill. Nov. 20, 2025).

40.     Multiple federal judges who heard testimony and received evidence related to Defendants' First Amendment violations in Chicago determined that Defendants lacked credibility when denying responsibility for those violations. *See, e.g.*, *Illinois v. Trump,* No. 25-cv-12174, 2025 WL 2886645, at *5 (N.D. Ill. Oct. 10, 2025) (noting a "troubling trend of Defendants' declarants equating protests with riots and a lack of appreciation for the wide spectrum that exists between citizens who are observing, questioning, and criticizing their government, and those who are obstructing, assaulting, or doing violence"); *Chicago*

*Headline Club* at *9-13 (documenting numerous false statements by ICE agents and officials).

41.     Judge Sara Ellis issued this scathing assessment: "Overall, after reviewing all the evidence, the Court finds that Defendants' widespread misrepresentations call into question everything that Defendants say they are doing in their characterization of what is happening at the Broadview facility or out in the streets of the Chicagoland area during law enforcement activities." *Id.* at *13

42.     In Chicago, Defendants seized and threatened legal observers who were merely following ICE vehicles in a lawful and careful manner and not impeding those vehicles. At one point, an ICE agent threatened an observer with federal charges based on this protected First Amendment activity: "You know what you're doing is illegal and you could be arrested for impeding law enforcement . . . following law enforcement, honking and harassing agents is impeding law enforcement." *Id.* at *9, fn 8.

43.     ICE also attacked clergy, in prayer, outside the Broadview facility in Chicago. "In a scene captured on video, Rev. Black extended his arms toward the officers with palms outstretched in a traditional Christian posture of prayer and blessing. Rev. Black urged the ICE officers to repent and to 'believe the Good News that the Kingdom of God is near.' Without warning or any orders or requests to disperse, agents fired on Rev. Black, hitting him with exploding pellets of pepper spray on his arms, face, and torso." *Id.* at *59.

44.     Judge Ellis identified numerous other incidents of uses of force on peacefully protesting clergy, often while clergy was engaged in prayer. *See id.* at *59-61. Notably, the DHS official who reviewed footage of these attacks concluded that the uses of force against

clergy described above: "were within policy and were effective in controlling the crowd." *Id.* at *64.

45.     The preliminary injunction order ultimately issued by Judge Ellis to restrain Defendants from their ongoing and widespread constitutional violations documented dozens of incidents of ICE using force, including chemical irritants like pepper spray and pepper balls, as well as less lethal weapons, on peaceful protesters. *See, e.g., id.* at **69-70, 102, 105, 109.  ICE also planned to and did tear gas peaceful protesters without warning.  *Id.* at 122.  ICE agents used pepper spray on journalists and non-violent observers in obvious retaliation for, and to impede, their documentation of ICE activities. *See, e.g.*, *id.* at 102. ICE agents pointed weapons at observers who went to the scenes of ICE raids to intimidate them into stopping their protected conduct. ICE also shot non-violent, lawful observers with pepper balls.  *Id.* at 108-110.

46.     An expert witness who opined on ICE's use of force against observers and protesters in Chicago concluded that there were, "many instances of federal agents using force and less-lethal munitions against protesters and journalists . . . that significantly departs from the standard practices and accepted training for policing in a protest setting." ECF No. 77-2, *Chicago Headline Club, et al. v. Noem, et al.*, Case No. 25-cv-12173 (N.D. Ill., filed October 21, 2025) at 2-3.

**D.**     **Defendants' Public Statements Confirm Their Disregard for the First Amendment and Fuel Agents' Unconstitutional Conduct.**

47.     Time and time again, Defendants have made statements critical of the First Amendment right to protest, to speak critically, to assemble, to gather information, and to access a public forum.

48.     On the afternoon of June 7, 2025, Defendant Noem addressed the non-violent protesters, legal observers, and journalists exercising their First Amendment rights in Los Angeles in a post on X, stating: "A message to the LA rioters: you will not stop us or slow us down."

49.     On the evening of June 7, 2025, President Trump authorized the deployment of 2,000 National Guard troops to Los Angeles. In a Truth Social post that same evening, he wrote: "These Radical Left protests, by instigators and often paid troublemakers, will NOT BE TOLERATED."

50.     When talking about the military parade held on June 14, 2025, President Trump said that any protestors would be "met with very big force." He described protestors as "people who hate our country."[10]

51.     In June 2025, U.S. diplomats were officially directed to screen the social media and online presence of all foreign nationals applying for student and other educational visas. Consular officers were directed to review applicants' online presence for "any

---

[10] TIME, *Trump Warns, Military Parade Protests Will Face 'Very Big Force*,' YouTube (June 10, 2025), https://www.youtube.com/watch?v=kuKjAIBP8go&t=52s.

indications of hostility towards the citizens, culture, government, institutions or founding principles of the United States."[11]

52.     On June 10, 2025, in response to the rising protests in Los Angeles regarding ICE and DHS abuses, Defendant Noem stated: "The more that they protest and commit acts of violence against law enforcement officers, the harder ICE is going to come after them."[12]

53.     On July 11, 2025, Defendant Lyons gave an interview in which he stated that by criticizing ICE, individuals on "the left" were "putting a bullseye on ICE."

54.     In a July 12, 2025 press conference, Defendant Noem stated that "violence is anything that threatens [ICE officers] and their safety. So it is doxing them, it's videotaping them, where they're at when they're out on operations . . . ."[13]

55.     Defendant Noem further falsely described reporting on locations of immigration enforcement agents as illegal because it "is actively encouraging people to avoid law enforcement activities and operations."[14]

---

[11] Nahal Toosi, *State Department unveils social media screening rules for all student visa applicants*, Politico (June 18, 2025), https://www.politico.com/news/2025/06/18/social-media-screening-student-visas-00413160

[12] Fox News, *Train Wreck Mayor": Kristi Noem Slams LA Official*, Fox News (June 10, 2025) https://www.youtube.com/watch?v=ymYIXrH9pjg

[13] Forbes Breaking News, *Kristi Noem Claims Videotaping ICE Agents is 'Violence' Following Camarillo, California Farm Raids*, YouTube (July 15, 2025), https://www.youtube.com/watch?v=uDFX4q6huH8.

[14] Edward Helmore, *Trump is waging war against the media – and winning*, The Guardian (July 5, 2025), https://www.theguardian.com/us-news/ng-interactive/2025/jul/05/trump-attack-us-media.

56.     On September 25, 2025, President Trump issued a presidential memorandum directing the National Joint Terrorism Task Force to investigate, prosecute, and disrupt individuals and groups that criticize law enforcement and border control policies and actions because such actions are "anti-American."

57.     On October 4, 2025, Defendant Lyons gave an interview to Fox News in which he falsely stated that anti-ICE protesters were "ready to do battle."  In a separate interview on November 14, 2025, discussing the protests in Chicago, Defendant Lyons stated, "We're not going to be stopped by these anarchists, these violent protesters that are protesting our law enforcement mission."

58.     On December 4, 2025, the Department of Justice (DOJ) issued a memorandum to all federal prosecutors creating a strategy for arresting and charging individuals supposedly aligned with "Antifa."[15] Specifically, the document defines domestic terrorism broadly to include "doxing" and "impeding" immigration and other law enforcement. Doxing is not defined, but the memo references calls to require Immigration and Customs Enforcement (ICE) agents to give their names and to operate unmasked. Individuals who donate to organizations that "impede" or "dox" will be investigated and deemed to have supported "domestic terrorism."

---

[15] *Memorandum from Atty. Gen. Pam Bondi*, Implementing National Security Presidential Memorandum-7: Countering Domestic Terrorism and Organized Political Violence, Dec. 4, 2025; Ken Klippenstein, *FBI Making List of American "Extremists," Leaked Memo Reveals* (Dec. 06, 2025), https://www.kenklippenstein.com/p/leak-fbi-list-of-extremists-is-coming.

59.     President Trump has used his immigration enforcement power to specifically target his political opponents, conducting immigration operation surges in "blue" states and cities, now including Operation Metro Surge in Minnesota. DHS recently posted a report on ICE arrests in Minnesota, describing them as occurring in "Tim Walz's Sanctuary Minnesota.""

60.     On December 10, 2025, Present Trump explicitly suggested that he is using Operation Metro Surge to target the Somali population in Minnesota at least in part to suppress and silence Congresswoman Omar:

> You know, that's called the Great Big Minnesota scam with one of the dumbest governors ever in history. I love this Ilhan Omar, whatever the hell her name is, a little turban. I love her, she comes in, does nothing but bitch. She's always complaining. … She comes to our country and she's always complaining about the constitution allows me to do this. We ought to get her the hell out.[16]

61.     In sum, Defendants have a well-documented pattern and practice of unrepentant retaliatory abuse of people who are exercising their First Amendment rights to watch, document, and criticize ICE.  It is thus no surprise that Defendants' stepped-up enforcement presence in Minnesota has been accompanied by widespread First Amendment violations.

---

[16] Jeff Wald, *President Trump Blasts Ilhan Omar, Gov. Walz at Pennsylvania Rally*, Fox9 (Dec. 10, 2025), https://www.fox9.com/news/president-trump-blasts-ilhan-omar-gov-walz-pennsylvania-rally.

## II. DEFENDANTS' CRUEL, ARBITRARY, AND OFTEN UNLAWFUL IMMIGRATION ENFORCEMENT IN MINNESOTA HAS SPURRED PROTESTORS AND OBSERVERS TO ACT.

62. Defendants' stepped-up enforcement operations in Minnesota—dubbed "Operation Metro Surge"—began on December 4, 2025. As part of this so-called "operation," at least 100 ICE and HSI agents from out of state flooded into the Twin Cities. The beginning of the operation was marked by racist, inflammatory rhetoric from President Trump and other administration officials, including false claims that Somali immigrants have been diverting government funding to terrorist organizations.[17]

63. The day before Operation Metro Surge commenced, President Trump called Somali Americans "garbage," stating: "When they come from hell and they complain and do nothing but bitch, we don't want them in our country. Let them go back to where they came from and fix it." During this rant, Vice President J.D. Vance banged on a table in encouragement. Trump continued, "We could go one way or the other, and we're going to go the wrong way if we keep taking in garbage into our country. [Congresswoman Ilhan Omar] is garbage. Her friends are garbage. These aren't people who work. These aren't people who say, 'Let's go, come on, let's make this place great.' They contribute nothing. I don't want them in our country, to be honest."

64. Similarly, immediately before commencing Operation Metro Surge, Defendant Noem claimed, without any evidence, that 50% of the visas issued to Somalis in

---

[17] Ryan Faircloth, *Are Minnesota fraudsters funneling money to terrorists? Explosive claim has little evidence*, The Minnesota Star Tribune (Nov. 26, 2025), https://www.startribune.com/mn-somali-fraud-money-terrorism-evidence/601532958.

Minnesota were "fraudulent." She made this false claim even though, in September 2025, under her leadership, United States Citizenship and Immigration Services ("USCIS") announced an operation in the Twin Cities to investigate 1,000 cases of potential immigration fraud. Those investigations yielded 42 referrals to USCIS and just four for arrest, which is roughly 0.5% of those cases.[18]

65.    Consistent with their behavior in Los Angeles, Portland, Chicago, New Orleans,[19] and elsewhere, ICE agents conducting immigration enforcement activities in Minnesota have engaged in a wide swath of unlawful conduct against Minnesotans, including everything from racial profiling and unlawful, warrantless arrests of United States citizens to rampant traffic violations (not to mention the widespread First and Fourth Amendment violations detailed in this Complaint.)

66.    ICE agents have been racially profiling Somali Americans, Latinos, and other people, resulting in unconstitutional and unlawful detention of numerous United States citizens. On December 10, 2025, federal immigration agents tackled and arrested a young Somali American man named Mubashir in Minneapolis and detained him for several hours. Mubashir was not suspected of any crime. The agents—who were masked and

---

[18]  Caroline Cummings, *DHS Sec. Kristi Noem claimed 50% of visas in Minnesota are "fraudulent." But is that claim accurate?*, CBS News (Dec. 4, 2025), https://www.cbsnews.com/minnesota/news/kristi-noem-claims-half-visas-minnesota-fraudulent/

[19] Associated Press, *Records reviewed by AP detail online monitoring, arrests in New Orleans immigration crackdown*, CNN US (Dec. 7, 2025), https://www.cnn.com/2025/12/07/us/new-orleans-immigration-ice-agents.

wearing no identification—followed Mubashir into a restaurant, dragged him outside, tackled him, handcuffed him, pushed him face down in the snow, and put him in a chokehold. Mubashir repeatedly shouted to the agents that he had his ID, but they ignored him. One witness reported:

> [I saw] two agents were violently slamming a young black man against the wall. He was yelling in pain and saying that he was a U.S. citizen. The agents didn't seem to care. They dragged him outside. He wasn't trying to get away from them or anything, he just kept screaming and telling them he was a citizen. . . . Once we were outside, I saw the agents violently push the young man into the snow for no apparent reason.

Crenshaw Dec., ¶ 4.

67.     The agents handcuffed Mubashir and put him into an unmarked SUV. They refused his offer to show them his passport card on his phone, instead driving him to the Whipple Building where he was held for a period until he was finally released. During the drive, the agents told the man that he was their first "takedown," indicating that poorly trained, inexperienced, and unsupervised ICE agents had been turned loose on the streets of Minneapolis to terrorize Minnesotans.

68.     At a press conference that the next day, with Mayor Jacob Frey and Minneapolis Police Chief Brian O'Hara, O'Hara apologized to Mubashir and said he was embarrassed that someone with a vest that says "POLICE" treated Mubashir with such racist disdain.

69.     In another incident of racial profiling, ICE agents went to an East African restaurant in Minneapolis, closed the doors and demanded peoples' IDs. They had no warrant, no probable cause, nor any reason to think they had authority to detain or arrest

anyone. The absence of any legal justification indicates that agents were motivated by nothing more than the color of the customers' skin.

70.    Notably, in contradiction to ICE's public statements that its agents in Minneapolis are arresting the "worst of the worst criminal aliens," child molesters and violent criminals, ICE has actually been raiding job sites, businesses, and even targeting work trucks with ladders and other construction gear, in order to arrest and deport individuals from their place of employment while they are engaged in work activities directly beneficial to our community.

71.    For example, one crew of roofers in Chanhassen, Minnesota (with the fortitude to be working on the morning of Saturday, December 13, 2025, when windchills were well below -10 degrees Fahrenheit), was surrounded by a group of ICE agents that lacked any warrant to enter the property or conduct an arrest but nonetheless trapped the workers on the roof of the home under construction. One worker who eventually came down off the roof suffered such severe harm that he had to be taken to the hospital in an ambulance.[20]

---

[20] Fox 9 Minneapolis-St. Paul, *ICE raid in Chanhassen prompts large community response*, YouTube (Dec. 14, 2025), https://www.youtube.com/watch?v=0Ztkf4QGfpk

72.    In another incident, on December 15, 2025, ICE agents in Minneapolis detained a woman, dragging her, handcuffed, across a frozen road and kneeling on her back despite being told by numerous bystanders that she was pregnant.[21]

73.    ICE agents called law enforcement during this arrest, claiming that bystanders were attacking them as they assaulted and detained this woman who was reportedly pregnant. In a call to the Hennepin County Sheriff's Office, an ICE supervisor pleaded for help: "we only have a few officers, but we have 60 to 70 agitators that are fighting us."[22] This hyperbolic statement was patently false.  Both the Minneapolis Police Department and the Hennepin County Sheriff's Office responded to ICE's calls, but left the scene within minutes after confirming that no bystanders were attacking agents and no one was being assaulted.[23]

74.    Agents have also conducted, or attempted to conduct, warrantless arrests. For example, on December 5, 2025, ICE agents entered the Hola Arepa restaurant without a warrant and attempted to obtain access to the restaurant's kitchen, apparently to effectuate an arrest, when restaurant staff demanded that if the agents had no warrant that they leave

---

[21] WCCO Staff, *ICE agents clash with dozens of residents in streets of south Minneapolis*, CBS News (Dec. 15, 2025), https://www.cbsnews.com/minnesota/news/ice-agents-south-minneapolis-clash-protests/.

[22] Hennepin County Sheriff's Office, *Audio from Call to Non-Emergency Line 12-15-2025*, Facebook, https://www.facebook.com/reel/1866499360622494.

[23] Jon Collins, *ICE agents call for backup during Minneapolis traffic stop, bystanders hurl insults and snowballs*, MPR News (Dec. 16, 2025), https://www.mprnews.org/story/2025/12/15/ice-agents-call-for-backup-during-minneapolis-traffic-stop.

the property immediately.  Because the agents lacked a warrant to do what they were trying to do, they left.[24]

75.     On December 9, 2025, Augsburg University President Paul Pribbenow reported that ICE arrested an Augsburg University student on the Augsburg campus without a warrant to enter the property.  President Pribbenow stated: "It was done on private property, without a warrant.  From our perspective, it's illegal."[25]  While agents were arresting the individual, they aimed weapons at and threatened students and staff who had gathered to observe and document ICE's warrantless arrest.

76.     ICE agents have also put the health and safety of Minnesota children at risk with their overzealous enforcement activities.  On December 6, 2025, ICE agents pulled a Minneapolis man from his car minutes after he picked up his three young children from daycare. The children cried as the ICE agents left them alone in their car without their father. Fortunately, a family member was several blocks away, learned about the incident and was able to come and assist the children.  While they waited for help, the agents demanded that

---

[24]Brianna Kelly, *Minneapolis Restaurant Hola Arepa Resists Attempted ICE Raid*, Bring Me The News (Dec. 5, 2025), https://bringmethenews.com/minnesota-news/minneapolis-restaurant-hola-arepa-resists-attempted-ice-raid.

[25] Brianna Kelly, *Augsburg University President Decries 'Illegal' Arrest of Student by Ice Agents*, Bring Me The News (Dec. 9, 2025), https://bringmethenews.com/minnesota-news/augsburg-university-president-decries-illegal-arrest-of-student-by-ice-agents.

the oldest child, "put your hands where I can see them so I know that you are not a threat to me."[26]

77.    ICE agents tackled and handcuffed a 13-year-old boy while they arrested and drove off with his father. The father and son had left their house to move the family car due to a snow emergency. The boy suffered from the medical condition of abnormal heartbeat and had to receive care at St. Francis Regional Medical Center after the incident. Medical records document the boy's "chest wall pain" and abrasions of both wrists.[27]

78.    ICE agents have been making movies documenting their performative cruelty in our community, disrupting our lives and traumatizing children and adults alike. For example, on the morning of December 11, 2025, armed ICE agents filming one of their propaganda videos blocked a school bus full of children who had to sit on their bus, wait, and watch as ICE agents filmed themselves in some purported "operation."[28]

79.    Finally, ICE vehicles have been driving throughout the Twin Cities in a dangerous manner, with reckless disregard for traffic laws and for the safety of Minnesotans on the streets.

---

[26] Progressive Power, *ICE Officer Feels Threatened By Children Crying Minneapolis 12-06-25*, Facebook (Dec. 8, 2025), https://www.facebook.com/usaprogressive/videos/ice-agent-in-an-american-flag-mask-orders-crying-children-to-/2993495500821843/.

[27] Conor Wight, *Video captures 13-year-old boy being detained by ICE in Eden Prairie*, CBS News (Dec. 11, 2025), https://www.cbsnews.com/minnesota/news/eden-prairie-ice-teen-detained-with-dad/.

[28] Peter Wagenius, *My daughter's school bus was delayed this morning because armed ICE* agents, Bluesky (Dec. 11, 2025 8:06 AM), https://bsky.app/profile/peterwagenius.bsky.social/post/3m7pqn3cbls2p.

80. For example, on the morning of December 7, 2025, an ICE vehicle (a Ford Explorer) cruising around the Church of the Assumption of the Blessed Virgin Mary, apparently waiting to arrest churchgoers as they left morning services at the church, drove erratically and ran a red light.

81. On Dec. 11, 2025, two ICE vehicles with identical license plates were spotted next to each other, suggesting that the front plate of one vehicle had been removed and placed on the back of the other vehicle.[29] That same day, another ICE vehicle was spotted with different front and back license plates. On December 16, 2025, observers near the Whipple Building observed officers changing license plates on their cars.[30]

82. On December 16, 2025, observers witnessed at least two ICE vehicles with fake snow covering their license plate numbers, and at least one ICE vehicle with no license plates on the front or back.

83. Federal agents' unlawful, unconstitutional, and distasteful conduct has inspired widespread protests throughout the Twin Cities Metro area, as well as a surge in people observing and documenting ICE activity in their cities and neighborhoods. Defendants have met this upswell of First Amendment protected conduct and expression with an explosion of constitutional violations.

---

[29] Kelly Rogers, *ICE w identical plates at Cedar this morning*, Blue Sky (Dec. 11, 2025 10:02 AM), https://bsky.app/profile/kellyrogers.bsky.social/post/3m7px3vwf6k25.

[30] twin.cities.dsa, *ICE caught swapping license plates*, Instagram (Dec. 16, 2025), https://www.instagram.com/reel/DSVtSJukVnh/?igsh=b25sN3l3b3lvaTNt.

### III. DEFENDANTS HAVE RESPONDED TO SCRUTINY AND CRITICISM WITH RETALIATORY VIOLENCE, SEIZURES, AND ARRESTS.

84.     As detailed below, consistent with their behavior in Portland, Chicago, New Orleans, and elsewhere, ICE agents have engaged in a wide swath of unconstitutional conduct toward protesters and observers in Minneapolis. This unconstitutional conduct includes, among other things:

   a.   unlawful seizures and arrests of individuals engaged in First Amendment-protected speech and conduct;
   b.   use of pepper spray to retaliate against individuals engaged in protected speech and conduct;
   c.   the pointing of firearms and other weapons at individuals engaged in protected speech and conduct;
   d.   threats and intimidation tactics, including trailing individuals to their homes; and
   e.   physical assault of observers and protesters.

85.     The obvious and only possible purpose of these behaviors is the chilling and prevention of the exercise of First Amendment activity.

86.     On November 18, 2025, protesters and observers gathered at the Bro-Tex business in Saint Paul, Minnesota, to document and protest an ICE raid occurring there. During the protest, ICE agents threw peaceful protesters and observers to the ground, shot them with pepper balls, and pepper sprayed them, sometimes indiscriminately and without warning.[31] ICE agents rammed one observer, Moriah O'Malley, with their car as she filmed the raid, knocking her to the ground. From the ground, O'Malley managed to record the same car running into another observer. Luck alone saved O'Malley and the other individual from serious injury as a result of this gratuitous, illegal, and unjustified use of force.

---

[31] *See generally* Declaration of Moriah O'Malley.

87.     Agents have used their vehicles to box-in and seize the vehicles of observers and protesters as a means of intimidating them into ceasing their First Amendment protected activity. For example, on December 7, 2025, Minneapolis social worker Imogen Page was driving alone near Columbus Ave and 35th St. in South Minneapolis. She saw two black SUVs with tinted windows and Illinois plates, which she believed belonged to ICE or other immigration agents. She began to follow one of the SUVs and told her neighborhood group chat about the vehicles. Shortly thereafter, another SUV started to follow Page. She started honking her horn to alert neighbors to the presence of ICE in the area. After a few loops through the area, Page and the ICE vehicles got to Minnehaha Parkway under the 35W freeway overpass. The first ICE SUV pulled to the side of the road and stopped. As Page tried to drive around that SUV, the second SUV pulled diagonally in front of her and boxed her in so she could not go forward or backward.[32]

88.     After a few minutes, an agent got out of one of the cars and walked up to Page's driver's side window. He had a combat vest on but did not identify himself or show a badge or any identification. The agent filmed Page with his phone. The agent screamed at Page and told her she was impeding his work, that it was illegal to impede federal agents, and that Page was breaking the law. Then another agent approached Page's car window and yelled at her. This agent also filmed Page's face. The incident lasted roughly ten minutes.[33] The trauma of this encounter has affected Page, disrupted her sleep, and caused an inability

---

[32] *See generally* Declaration of Imogen Page ("Page Dec.").
[33] *See generally* Page Dec.

to focus. Nonetheless, she continues to observe despite the trauma, fear, and chill to her First Amendment rights.[34]

89.     To threaten and intimidate observers, ICE agents have repeatedly obtained the home addresses of individuals who are following them to document their misconduct, apparently by running their license plates through a law enforcement database. Agents then drive to the observer's home while the observer is following them to demonstrate they know where the observer lives. This threat and intimidation tactic is straight out of organized crime and has an obvious chilling effect on observers' and protesters' exercise of their First Amendment rights.

90.     On December 7, 2025, Minneapolis resident Riley Kellermeyer, a thirty-two-year-old biologist, was in South Minneapolis to observe and document ICE activity. Kellermeyer saw an SUV with dark black windows and Texas plates that she believed to belong to immigration agents. She decided to follow the car to report its whereabouts and activities to the community.[35]

91.     Kellermeyer followed the car for a few blocks, and then another SUV with Indiana plates and dark tinted windows started following behind her very closely. Kellermeyer pulled over to let that car pass. Both SUVs drove back toward 35W. She decided to just go home, which meant she also drove towards 35W. The vehicle with Indiana plates got off the freeway at Kellermeyer's exit before she did.[36]

---

[34] *See generally* Page Dec.
[35] *See generally* Declaration of Riley Kellermeyer ("Kellermeyer Dec.")
[36] Kellermeyer Dec.

92.     When Kellermeyer got home, the ICE vehicle with Indiana plates was pulled up next to her house like the agents were waiting for her. Afraid for her safety, she decided not to stop at her home and kept driving. The ICE vehicle pulled away from Kellermeyer's home and began following her. She decided to drive to a public place for safety and went to the nearby Quarry Shopping Center parking lot. Once she was in the parking lot, the ICE vehicle pulled in front of her to block her path and an agent rolled down the driver's side window. The agent screamed at Kellermeyer to "stop fucking following" them and that if Kellermeyer continued to observe them, she would be arrested.[37]

93.     Also on December 7, Eagan resident Beatriz Leon was attempting to gather information from a public sidewalk across a four-lane road from federal agents as they detained two observer protestors. When the agents began honking and yelling at her from across the street, she was nervous that they were going to come after her, so she stopped taking photos and returned to her car. Three or four vehicles pulled up. Masked, federal agents came up to her car and held assault weapons at Leon and her husband. They ordered Leon and her husband to roll down their windows and to put up their hands, which they did, dropping their phones to comply with the direction. The agents threatened them with detention, and one agent said: "Record this. Now get out your little phone and record this."[38]

94.     On December 9, 2025, Minneapolis resident Joseph Mitchell learned that ICE was conducting a raid two blocks from his house. Mitchell walked over to observe the

---

[37] Kellermeyer Dec.

ICE activity, which was occurring in the Cedar Riverside neighborhood. When Mitchell arrived at the scene, he saw numerous ICE vehicles with flashing lights, and a group of protesters gathered, including some of his neighbors, who were blowing whistles and shouting at the ICE agents. Mitchell saw an ICE agent repeatedly brandish a pepper spray canister out her car window at protesters and observers who were not impeding or interfering with the ICE activity. The car began to pull away, then after driving about 20 feet it stopped. Agents got out of the car and gratuitously pepper sprayed protesters and observers who were standing on the sidewalk exercising their First Amendment rights and not impeding or interfering with the agents, who had a clear roadway to drive away from the area if they wanted to do so. Mitchell saw numerous protesters with pepper spray caking their faces, and a broad swath of snow in which the protesters were standing was stained orange from the pepper spray. Even though Mitchell was several feet back from this group of protesters, his exposure to the pepper spray left him doubled over, coughing, and with digestive trouble and other pain that lasted through the day.[39]

95.    On December 10, 2025, Minneapolis Park Board member-elect Dan Engelhart was observing ICE activity at the Cedar-Riverside neighborhood. Agents mocked Engelhart and the other observers. Engelhart saw agents harassing his friend, a Somali community leader named Bihi. Bihi has been a U.S. citizen for 30 years. Nonetheless, agents were harassing Bihi, asking him where he was born and to see his I.D. Shortly thereafter,

---

[39] *See generally* Declaration of Joe Mitchell.

Bihi, Engelhart and others were following agents around the Cedar-Riverside apartment building complex, documenting, observing, and protesting ICE activity.

96.     The protesters and observers followed agents as the agents got into their cars to leave. Engelhart saw Bihi standing at the edge of the road – not in the road – as agents drove away. As one white SUV drove past Bihi, an agent in the truck pepper sprayed Bihi in the face.[40] Riley Kellermeyer also witnessed this assault. She states: "As he stood there, another ICE vehicle drove by (a white SUV with Florida plates) and sprayed him right in the face. You could see the blast of orange so clearly against the white of the car and the snow. He wasn't in the way of the car or throwing anything or doing anything but protesting."[41]

97.     Similarly, on December 11, 2025, Minneapolis resident Flannery Clark was following several ICE vehicles to observe and document their activity. She was driving a safe, normal distance behind the vehicles on Cedar Avenue when one vehicle slammed on its brakes, coming to a complete stop in the middle of the road for no reason. This caused Clark to stop abruptly as well. The ICE vehicle then restarted travel, and Clark resumed following it at a safe distance. Shortly thereafter, a black pickup truck driving behind Clark activated its police lights. Clark pulled over to the side of the road in compliance with the lights. Suddenly, the vehicle that had been in front of her reversed direction, raced backward, and slammed to a stop right in front of Clark's car. She was terrified. Agents poured out of the vehicles and surrounded Clark's car, yelling at her with their hands

---

[40] *See* Declaration of Dan Engelhart.
[41] Kellermeyer Dec., ¶ 13.

positioned on their service weapons. One agent yelled at Clark that she was violating the law by following them. Then the agents piled back into their vehicles and left. Clark was deeply shaken up by this interaction. Other drivers who witnessed what had happened stopped to check and make sure she was okay, and one helped Clark by driving her to a safer place, where Clark sat in her car and sobbed.[42]

98.    On the frigid morning of December 13, 2025, numerous observers and protesters responded to a Chanhassen construction site where ICE agents had trapped two individuals who had been doing construction work on a new home on the unfinished roof of the home.  ICE established a "perimeter" of yellow police line tape around the property and insisted, without any authority to do so, that protesters and observers not cross the caution tape line.  Protesters and observers generally respected this request.  At one point, an ICE agent ducked under the perimeter tape and walked toward a port-a-potty, aggressively shoving one of the observers – a woman much smaller than him – out of his way.[43]

99.    On December 15, 2025, ICE agents attempting to detain a woman sprayed a crowd of observers and protesters with pepper spray, even though the observers and protesters were behaving lawfully and not impeding the ICE agents. One legislator— Minnesota State Representative Aisha Gomez—was pepper sprayed, along with a CBS

---

[42] Declaration of Flannery Clark.
[43] TrumpMania, *ICE Agent Moves to ANTI-ICE Protestors Blocking the Porta* John, Facebook, https://www.facebook.com/share/r/1FAkRk7ziq/?mibextid=wwXIfr.

news crew.[44] As discussed above, when ICE summoned MPD and the Hennepin County Sheriff to the scene, claiming that protesters were attacking them, MPD and HCSO quickly ascertained that no one was harming the ICE agents and promptly left the scene. Another agent tased an observer peacefully trying to document this casual cruelty.[45]

## IV.   DEFENDANTS RETALIATED AGAINST PLAINTIFFS AND VIOLATED THEIR FIRST AND FOURTH AMENDMENT RIGHTS.

### A.   Plaintiff Susan Tincher

100.    Susan Tincher is a resident of the Near North neighborhood in Minneapolis. She has lived in Minneapolis for 30 years. Tincher and her husband Jim have two children, and together they run a small consulting business.

101.    On December 9, 2025, Tincher woke up a little before 6:30 a.m. when she heard alerts on her phone that an ICE arrest was happening in her neighborhood.

102.    Tincher drove a few minutes over to the intersection of 21st and Oliver Avenues in North Minneapolis with the intent to observe and record what she saw happening.

103.    When she arrived, she saw several people she believed to be ICE agents standing outside a house. They were wearing bullet-proof vests, some of which said

---

[44] WCCO Staff, *ICE Agents Clash with Dozens of Residents in Streets of South Minneapolis*, CBS News (Dec. 15, 2025), https://www.cbsnews.com/minnesota/news/ice-agents-south-minneapolis-clash-protests/.

[45] *Id.*

"POLICE" and "ERO." Several agents were wearing masks. Tincher could not see any names or badge numbers on the individuals' clothing.

104.    Tincher did not see the ICE agents arresting anyone or doing anything more than talking to each other. It looked like they had set up a perimeter around the house.

105.    There were no protesters in the area. There were a few other people observing at a safe distance from the agents, on the sidewalk or in the street.

106.    Tincher got out of her car and walked toward the house, just trying to get a sense of what was happening. While Tincher was about 6 feet from the officers on the perimeter—and still on the public sidewalk—she asked one of the agents, "Are you ICE?" The agent walked towards her. When the agent had closed most of the gap between them and was about one or two feet from Tincher, she told Tincher to "get back." Tincher then heard few other officers nearby say something to the effect of "Get back!" and "Take her down!"

107.    Within seconds, agents hustled toward Tincher, grabbed her, and pulled her to the ground. While she was on the ground, face down in the snow, agents handcuffed her. The agents told her that she was being arrested for obstructing a federal officer. But she had not been obstructing anyone and was just standing there. She had not even taken out her phone to record yet.

108.    While Tincher was still on the ground, she told nearby observers her name and then started yelling for help because she was afraid she was being kidnapped by the agents. They were arresting her for no reason.

109.    A camera crew embedded with the ICE agents filmed her arrest.

110.    The agents put Tincher in the truck that she had seen earlier and they drove away just a few minutes after 6:30 a.m. While she was in the truck, agents pulled on her jacket so hard it left a red mark on her neck.

111.    There were three agents in the truck with Tincher. One, a woman they called "Daisy," was wearing a medic patch with the Texas flag on it. Another man was wearing a patch that said "HOU 16."

112.    The agents took Tincher to the Whipple Building near Fort Snelling. They entered through the garage, Bay 2. When agents pulled Tincher out of the truck, and walked her through the garage to be processed, the same film crew that had been recording her arrest on the street was filming her removal from the truck in handcuffs. The crew was clearly coordinating with the ICE agents that had arrested her to gather footage of the arrest and Whipple garage "perp walk" for their own propaganda purposes.

113.    Daisy and another agent extensively patted Tincher down. They told her to take off her sweater. One felt her bra underwire and cut her bra off. They removed Tincher's boots and socks, removed the handcuffs, shackled her legs, and searched her belongings. Tincher saw them examining her driver's license. Her purse had already been cut free from her body. They cut her boot laces and ordered her to pull them out of her boots. The agents then cut Tincher's wedding ring off her finger. It was the original wedding band from her marriage 32 years ago, a treasured symbol of her relationship with her husband, and the agents showed no concern or compunction about destroying it.

38

114.    The agents put Tincher in leg shackles and left her in a cell for five hours. She passed the time humming spirituals and Christmas songs. "The Storm Is Passing Over" carried her through her hours of confinement.

115.    After more than five hours, the agents released Tincher. They did not give her any paperwork, but they did tell her she would be charged with obstructing a federal officer.

116.    As a result of the arrest, Tincher has bruising from the handcuffs and some swelling on her neck and bruising on her finger from being pinched by the cut ring. Her wedding ring was damaged and the agents never even returned her gloves, hat, or headband.

117.    Since Tincher's arrest, she has continued to monitor the neighborhood chat. While it was a frightening experience that would scare anybody, she plans to observe again when future ICE actions occur in her neighborhood: she wants to protect her neighborhood and her neighbors.

118.    On December 12, 2025, Minnesota Governor Tim Walz sent a letter to Defendants Noem and Lyons.  In the letter, Walz states: "Residents who document law-enforcement activity, including immigration enforcement, play an essential role in transparency, accountability, and safeguarding the civil liberties of all in Minnesota," and he chastised Noem for the "unlawful practices displayed by your agents."  The letter specifically criticizes ICE's arrest of Tincher, stating: "It is appalling to witness this unlawful behavior by ICE agents, which echoes some of the darkest chapters in our nation's history."

119.    Unsurprisingly, given its history of making statements that federal judges have determined to lack credibility, DHS spokeswoman Tricia McLaughlin provided this false and defamatory statement about Tincher: "Susan Tincher was arrested after she assaulted a federal agent, tried to break through a security perimeter set up for public safety, ignored lawful commands, and became violent." These statements are all lies, and pernicious ones at that, as they falsely accuse Tincher of a federal crime and invite online retaliation and doxxing by right wing internet trolls that constitute ICE's biggest supporters.

### B.    Plaintiffs John Biestman and Janet Lee

120.    John Biestman and Janet Lee live in the Linden Hills neighborhood of Minnesota. Biestman is sixty-nine-years old and retired from a career as a banker. Lee is sixty-seven years old and has worked for the past 39 years as a speech-language pathologist.

121.    On Sunday morning, December 7, 2025, Biestman and Lee heard that ICE vehicles were circling the Church of the Assumption of the Blessed Virgin Mary, a Catholic church whose morning service was just finishing up. The ICE agents apparently planned to arrest and deport people leaving church services that Sunday morning. Biestman and Lee drove to the church to observe and document ICE activity, and to express their strong disapproval of such cruel and callous behavior.

122.    When Biestman and Lee arrived at the Church, there were fewer than a dozen people present who had also arrived to act as observers.  They heard cars honking and whistles, which alerted them that ICE agents were in the area.

123.    They saw an unmarked vehicle, which they suspected might belong to ICE, speeding on the street adjacent to the church. They observed this vehicle run a red light,

make a U-turn and flip on interior flashing lights. They saw ICE vehicles speeding through side streets adjacent to the church, running red lights, and just generally driving recklessly.

124.    Biestman and Lee decided to follow the speeding vehicle from a safe distance in their car. Biestman was driving lawfully and carefully, including stopping at the red light, which put some distance between the vehicle with the flashing lights and their own car. When the light turned green, they followed the vehicle. They were not following too closely, they were not blocking, impeding or interfering with anyone, and they were driving carefully and lawfully.

125.    They followed the vehicle to nearby Roosevelt Park and made a lawful right turn into the park's parking lot. They were not blocking, obstructing or interfering with anyone. No other observers or protestors were present in the park at that time.

126.    Immediately, they were boxed in and stopped by four unmarked ICE vehicles. Masked, argumentative, and unmarked ICE agents surrounded their car.

127.    The agents pointed semiautomatic weapons at them at close range, demanded that they roll down their windows, and threatened them multiple times with arrest. Biestman told the ICE agents that he and Lee are United States citizens. The agents responded that it did not matter, that they would be handcuffed and arrested. Biestman said, "What you're doing is illegal, this is like Germany 1938."

128.    One of the agents reached through the driver's side window into our car and pointed at Lee. He said, "We're going to arrest her too, we have handcuffs." Biestman asked if they had a warrant for their arrest. The agents responded that they did not need one.

129.    Lee wanted to record the interaction on her cell phone, but she was too afraid to do so.  She had never had a gun pointed at her in her life, let alone multiple guns pointed at her by representatives of her own government. Instead of recording, Lee called another observer so that she would be able to hear what was happening. Lee's hands were shaking, and she could barely operate her phone.

130.    The agents continued to threaten Biestman and Lee, pointing rifles in their faces and mocking them. Several agents filmed the encounter, including Biestman and Lee's faces and license plate. One agent commented, "We have your license plate, we know where to find you." Biestman and Lee were terrified and angry that the government would treat them this way. The agents had the professional demeanor of criminals and thugs.

131.    An ICE agent wearing a bandana with stars on it came up to the driver's side window and told Biestman and Lee that they had to leave the park immediately and not to follow the agents again.  Because the ICE vehicles were blocking their car, they had to back into the street to escape further lethal threats, harassment and intimidation.

132.    The agents did not, at any point, explain to Biestman and Lee what justified pointing guns at them and threatening them with arrest.  The agents appeared angry because Biestman and Lee were watching them and because Biestman and Lee communicated by their presence that they did not approve of the agents' conduct.

133.    Neither Biestman nor Lee were physically aggressive at any time during this interaction.  During this incident, Lee was acutely aware that she was smaller, weaker, and older than the agents.  She specifically recalls thinking that if they made one false move, the agents would shoot and kill them. Lee is traumatized by the memory of this encounter. Since

it occurred, she has felt hypersensitive to her surroundings and suspicious that she is being followed. Every time she sees a black SUV, she experiences a flash of anxiety because the ICE agents know who she is and have her license plate number.

134.    The agents' cruel, reckless and unprofessional conduct intimidated and terrified Biestman and Lee. But they plan to continue to observe, document, and express their displeasure and disgust with ICE despite the agents' threats and intimidation.

135.    Biestman states: "I am a patriot and a proud American. I love my country as a place where I have been able to thrive and raise a productive family in peace until this incident. The behavior of these agents made me ashamed for my country. My own government is now acting like my enemy. I am traumatized about the incident and how my own government pointed lethal weapons at me and my wife, point blank, for no justifiable reason."

136.    Lee states: "Despite this traumatic experience, I have continued to engage in constitutional observation activities. Even though I am frightened for my safety, I feel an obligation to protest, to bear witness to ICE's cruelty and to disseminate information about what I observe. Even so, I have been more cautious since this experience because I fear that ICE agents will physically harm me. I wish that I was braver but I have faith that my courage will grow to meet this dire occasion."

### C.    Plaintiff Lucia Webb

137.    Webb is a 31-year-old resident of the Powderhorn neighborhood in Minneapolis, Minnesota. She has lived here since 2016. She is the operations director at a local non-profit.

138.   On December 3, 2025, Webb was monitoring a neighborhood chat for news of ICE activity because she was upset at how ICE had been treating her neighbors. Webb believed it would be important to document all the things ICE has been doing to disrupt life in Minneapolis, so she decided to get in her car and help observe and alert people to ICE's presence.

139.   Webb heard that ICE might be near Portland Ave. and 42nd St. in South Minneapolis, so she drove to that location. When she got there, she saw some vehicles that had very dark tinted windows and Virginia license plates. Some other observers were there looking in the windows of the cars, and they let Webb know the cars contained ICE agents.

140.   The ICE cars pulled away, so Webb followed them. They drove west on 42nd and headed toward 35W. Webb stayed a few car lengths behind the ICE vehicles – a normal driving distance. Webb did not run any red lights or ignore any traffic signals.

141.   When Webb saw ICE getting on the freeway, she reminded herself to stay calm and to be careful. She was worried because she had heard stories that day and the day before of ICE vehicles performing dangerous and evasive maneuvers, illegal turns, running red lights, and maybe even trying to get followers to get in car crashes.

142.   After Webb got on the freeway, following the ICE vehicles, she was going a reasonable speed, not faster than traffic, to keep up with the vehicles. The vehicles went south on 35W and took the exit onto Hwy 62. Webb followed them off the freeway at Bloomington and realized they were near the Whipple Building where ICE's local operations are headquartered.

143.    Webb then noticed that there were more ICE vehicles around, and an agent was standing in the middle of the road like he was directing traffic at a construction site. Webb slowed and stopped and wasn't quite sure what to do or where to go. She felt scared because the ICE agents were starting to interact with her and she was alone.

144.    She continued forward, though, because it seemed like the ICE agent in the road was waving her through. She followed one of the ICE vehicles into the Metro Transit Park and Ride parking lot across the street from the Whipple Building. Just then, she was surrounded by four cars. One was in front of her and the rest were to the side. Approximately five agents walked toward Webb's car and surrounded it. She started filming.

145.    The ICE agent closest to Webb told her she had been chasing the ICE vehicle, breaking traffic laws, and running red lights. The agent said they had Webb on video breaking the law. But that was untrue—Webb had not been chasing the ICE cars and she had not broken traffic laws. Webb told the agent that she was just trying to protect her neighbors. He accused Webb of impeding officers and said she would "be arrested for impeding" if she did not stop following the agents.

146.    Webb told the agents that she was ashamed of them for kidnapping people. It was a stressful situation for Webb to be surrounded by armed and masked agents threatening to arrest her. They insulted and mocked her.

147.    At that point, Webb was really shaken. She was physically shaking and her whole body felt red. It took her a while to collect herself before she could begin driving home. She drove home crying and upset—upset at herself for letting the agents intimidate her.

148.     Since the incident, Webb has had trouble concentrating and sleeping. She is filled with fear whenever she sees tinted windows behind her while driving. But she will continue to observe, preferably only if she has a partner to accompany her.

149.     In fact, the day after agents threatened Webb, she was out observing again, though this time in a friend's car. At around 4:00 p.m. on December 4, 2025, Webb and her friend were driving on Park Avenue following some ICE vehicles with Texas plates as part of a group of observers. Just after they turned onto 31st St., they saw another car pull a U-turn ahead of them and stop in the middle of the road, impeding traffic generally, but specifically blocking the other cars who had been following the ICE vehicles. One or two agents in masks got out of the car and aimed a gun at people who were observing on foot and then at the people in the cars that had been following the ICE vehicles. As one of the agents went back to his vehicle, he smacked one of the observer cars and it appeared that the front end of his gun went inside that car's window.

### D.     Plaintiff Alan Crenshaw

150.     Crenshaw is a 35-year-old resident of Uptown in Minneapolis, Minnesota. He is a student in the Urban Studies department at the University of Minnesota.

151.     On December 9, 2025, Crenshaw learned that ICE was in the area of Cedar Riverside. He had heard that the Somali community was hoping to have people observe what the government has been doing to their community and he was happy to offer that. It also felt important for him to be able to make people aware of ICE's presence in the neighborhood.

152.    Crenshaw walked to the Cedar Riverside area from campus. A person told him that ICE had just gone inside Sagal Restaurant and Coffee at 326 Cedar Ave. He followed to document what they were doing.

153.    Crenshaw got inside the restaurant just as two agents were violently slamming a young black man against the wall. He was yelling in pain and saying that he was a U.S. citizen. The agents ignored his pleas. They dragged him outside. He wasn't trying to get away from them or resisting, he just kept screaming and telling them he was a citizen.

154.    Crenshaw and some other protesters and observers followed the agents outside. One agent slammed the door on them. The agents displayed frustration with observers for watching and filming them and for telling them that what they were doing was wrong by slamming the door on the Crenshaw and his fellow observers.

155.    Once Crenshaw was outside the restaurant, he saw the agents violently push the young man into the snow for no apparent reason. They put the young man in handcuffs and put him in one of the cars. It had black windows and Florida plate number QFP1709.

156.    As the observers watched ICE kidnap a United States citizen for no reason and with no warrant, they shouted at the agents and blew their whistles. Crenshaw could not believe that the agents were doing this in plain view of the observers. The agents repeatedly ignored observers' requests for their badge numbers or any identifying information.

157.    Some individuals came out of the restaurant with pictures of the young man's ID and held it up to the car to show the agents. The agents ignored them.

158. Instead, the car pulled away. Protesters and observers followed the car, recording, blowing their whistles, and yelling. Crenshaw went to make sure he got a shot of the license plate. No one was getting in the way of the agency cars, which were moving slowly. But as they were leaving, a window rolled down, and an arm came out and pepper sprayed the crowd with no warning. Crenshaw was about 10-15 feet away when they sprayed. The snow where they were standing was stained bright orange from the pepper spray.

159. After those cars drove away, Crenshaw headed over to a group of people observing other ICE activity and ended up on the sidewalk at 6th St., just west of Cedar Ave. When he got there, he saw about nine ICE vehicles with lights on attempting to leave the parking lot, causing a traffic jam. It took about 20 minutes for them to exit the area. In the meantime, observers were recording, chanting, blowing whistles, and telling ICE to leave. Crenshaw saw multiple incidents of people being pepper sprayed with no warning.

160. In one instance, a person in a brown coat and black hat was standing on the edge of the road, and a black SUV of some kind drove past, slowed, and opened the door. The person in the brown coat held their arms out to their sides, and an agent got out and sprayed them directly. The person moved away from the car, but another agent on foot came from behind them and sprayed them directly in the face again. Then the agents sprayed into the small crowd. This use of chemical weapons against observers was gratuitous: agents could have left the scene instead of retaliating against the observers, who were not blocking or impeding them.

161.    As Crenshaw stood in the muck on the side of the road in the crosswalk, another ICE car without its lights on drove past and sprayed him right in the face. He was immediately overtaken by intense pain and could no longer keep his eyes open. He felt like he couldn't breathe and was coughing very hard. He had red swelling and spots on his eyes for about 24 hours, and he had skin tingling for a few hours. When he took a shower, the pepper spray ran back into his eyes and caused more pain and swelling.

162.    Crenshaw explains: "It is important to me that the abuses that are occurring at the hands of ICE in my community are documented. I am ashamed to live in a country where violent and angry law enforcement agents can arrest people with such brutality and for obviously racially motivated reasons."

### E.    Plaintiff Abdikadir Abdi Noor

163.    Noor is a 43-year-old resident of Fridley, Minnesota and an owner/operator of a trucking company. He is a Somali Minnesotan and has been a United States citizen for about 20 years.

164.    On December 15, 2025, Noor was with his wife Farhiya and a friend having lunch at Marhaba, a restaurant on Nicollet Ave. and 28th St. in Minneapolis. Afterwards, they went to Karmel Mall for coffee.

165.    Noor was driving on Pillsbury Ave. and had almost arrived at the mall, when he noticed some cars behind him. At first, he thought they were police and that he was being pulled over, so he stopped and pulled into a safe spot. When agents got out of the car, however, he realized they were from ICE because they were in plain clothes, wearing military vests and masks.

166.    There was another car behind the first ICE vehicle that was also stopped, with two Latinos in it. There was another ICE SUV behind them, boxing in the Latinos.

167.    Noor got out of the car and said something like "I'm not going to let you do this. I'm not going to show you anything or tell you anything." The ICE agents didn't approach Noor or his car. Instead, they went up to the other car that was boxed in, with the Latinos in it. Four agents in vests and masks surrounded the car.

168.    Noor called out to the Latino people to tell them about their constitutional rights, saying something like: "You don't have to show them anything. Don't roll down your window or unlock your door!"

169.    Another woman showed up at around that time. She also started telling the Latino people to exercise their rights and telling ICE to leave the area. After she arrived, a crowd started to gather.

170.    As the woman was standing on the sidewalk, an ICE agent grabbed her hand. Someone in the crowd grabbed her other hand and they started to tussle. The agent managed to throw her on the ground and then kneeled on her back. Someone in the crowd said she was pregnant. The crowd started yelling at ICE to let her go. Noor also told ICE to let her go.

171.    While she was pinned to the ground, other agents broke the windows of the car the Latinos were in and pulled them out. Noor did not see an arrest warrant for the people in the car.

172.    Meanwhile, the woman was still face down on the ground in the snow with an agent kneeling on her back. Noor estimates she remained in this restraint for 30 minutes.

The crowd continued to tell ICE to stop hurting the woman, to let her go, and to leave. Officers looked increasingly panicked and called for backup. The majority of people there were simply yelling, but some threw snow at the other agents. Noor attempted to calm the crowd and to prevent them from throwing more snow. According to Noor, "I told the people not to throw things, we needed to save the lady, and we needed to save the agent from himself. We needed to be peaceful." Noor attempted to keep people away from the officers several times, although he continued to tell ICE to leave the woman alone.

173.    Suddenly, the agent kneeling on the woman's back dragged her violently towards his car. Protesters and observers followed, including Noor, who was trying to keep people back and trying to keep people calm. He was also telling the agents that what they were doing was wrong because he couldn't understand why they were treating the woman like that or why they would treat anyone like that.

174.    After backup arrived and the woman who had been on the ground for half an hour had managed to leave, the agents turned back toward the crowd and focused in on Noor. One of them said something like "let's get this guy" to the other agents and they advanced upon Noor. Noor heard one of them say something about ICE but wasn't sure exactly what he was referring to. The agents grabbed Noor, threw him on the ground, and handcuffed him, causing bruises on his knees and head.

175.    At approximately 1:40 p.m., agents put Noor into a car and left the area. The agent driving, a bald man, sped at about 85 miles per hour down 35W towards the Whipple Building. He refused to allow Noor to put on a seatbelt.

176.    When they got to the Whipple Building, the agent looked at Noor's passport and said to another officer: "They all come here fraudulently. 50% are here fraudulently," echoing the racist comments made by Defendant Noem at the commencement of Operation Metro Surge.  He continued to say things like "Somalis drained Minnesota" and "Somalis should go back home."

177.    Noor was shackled and left alone in a cell. At one point, officers read him his rights, which he exercised. He was released without charge, paperwork, or explanation at about 6:00 p.m.

178.    According to Noor:

If I were these people, I would figure out another way to detain people they need to detain—set an appointment, something orderly.  But they're just trying to make our cities look chaotic, like World War III. People call me from Europe, from Africa, asking me "Is this really America? It looks like a third world country." The whole time I was there at the scene, I just wanted to tell the government that what they were doing to the woman, to the Latinos, to all of us, is wrong. I just wanted to tell people what their rights are in this country and under our Constitution.

## CLASS ALLEGATIONS

179.    Under Rules 23(a) and 23(b)(1) and (2) of the Federal Rules of Civil Procedure, Plaintiffs bring this action for prospective relief on behalf of themselves and other similarly situated people who will in the future observe, record, and/or protest the conduct of ICE, ERO, HSI, and other officers enforcing immigration laws in public places within the District of Minnesota. The Plaintiff Class is defined as:

All persons who do or will in the future record, observe, and/or protest against the DHS immigration operations that have been ongoing in this District since December 4, 2025.

180.     Hundreds of ordinary Minnesotans have participated in observing and documenting immigration activity in the Twin Cities metro area over the past several weeks. The Plaintiff Class is so numerous, and is constantly growing, such that joinder of all the members is impracticable.

181.     As a result of the Defendants' customs and policies of arresting observers and protestors; targeting them with chemical irritants without constitutionally adequate justification or warning; denying them freedom of movement to assemble, protest, and observe and record public demonstrations and law enforcement officers on duty; and intimidating them by threats of violence, the Plaintiff Class have been and will continue to be deprived of their constitutional rights under the First and Fourth Amendments.

182.     Plaintiffs' claims for prospective relief are typical of the members of the Plaintiff Class because the government's stepped-up immigration efforts and federal agent deployments in the Twin Cities metro are ongoing, and Plaintiffs and the Plaintiff Class members have a reasonable fear that Defendants will continue to carry out their unconstitutional practices of arrest, deploying chemical irritants without constitutionally adequate warning, denying observers and protestors freedom of movement to assemble, protest, and observe and record public demonstrations and law enforcement officers on duty, and intimidating them by threats of violence. Plaintiffs were all subjected to one or more of the violations previously enumerated, and they seek protection to prevent federal agents from repeating those violations in the future.

183.     Plaintiffs will fairly and adequately protect the interests of the Plaintiff Class. Plaintiffs have no conflicts involving other class members or Defendants. Plaintiffs

understand their role as class representatives and their duties to the class in this litigation. Plaintiffs are represented by competent and skilled counsel whose interests are fully aligned with the interests of the class.

184.    Questions of law or fact are common to the class. These legal and factual questions include but are not limited to:

a.    Whether arrests and targeting of Class Members through a series of common methods violate the First and Fourth Amendments.

b.    Whether Defendants' actions would chill First Amendment speech in a person of ordinary firmness.

c.    Whether Defendants are retaliating against Class Members because of the content of their speech or their activity documenting the conduct of ICE and other law enforcement agencies.

d.    Whether Defendants falsely arrest Class Members in violation of the Fourth Amendment.

e.    Whether Defendants unlawfully seize Class Members in violation of the Fourth Amendment.

185.    Maintaining individual actions would create a risk of "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). Multiple courts issuing multiple injunctions governing the engagement and use-of-force standards for ICE would be untenable. Doing so would only contribute to a state of uncertainty and confusion that allows the constitutional violations described in the complaint to continue.

186.    This case involves "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not

parties to the individual adjudications." Fed. R. Civ. P. 23(b)(1)(A). A ruling with respect to a single Plaintiff in this case would arguably be strong stare decisis—if not necessarily res judicata—with respect to other putative class members and members of the law enforcement community. There is no benefit to allowing the overwhelmingly common issues in this case to be litigated individually. The interests of both class members and defendants requires classwide treatment.

187.    Defendants have acted on grounds generally applicable to the Class.

188.    The questions of law or fact common to the class members predominate over any questions affecting only individual members, and this class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties. Moreover, the interests of class members in individually controlling the prosecution of a separate action is low in that most class members would be unable to individually prosecute any action at all.

189.    Finally, Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate with respect to the class as a whole. There is no allegation that Plaintiffs have been targeted because of anything unique to them as individuals. Rather, they have been repeatedly targeted because of their membership in a class of recorders, observers, and/or protesters. Plaintiffs' targeting exists only by virtue of a broader pattern and practice of unconstitutional conduct directed at recorders, observers, and/or protesters as a class. Logically, injunctive relief for the "class as a whole" is the only mechanism available to afford relief in light of conduct directed specifically to the class.

## CAUSES OF ACTION

### COUNT I:
### First Amendment—Free Speech, Free Press, Free Assembly

190.    Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

191.    Plaintiffs and the Plaintiff Class engaged in constitutionally protected acts of recording, observing, and/or protesting events of public interest, including the conduct of federal agents on duty in public places. Plaintiffs and the Plaintiff Class will continue to do so in the future.

192.    As described more fully above, Defendants, acting under color of law, used excessive force and threats of force and arrest to curb Plaintiffs' and the Plaintiff Class's exercise of their First Amendment rights.

193.    Plaintiffs and the Plaintiff Class reasonably fear the continued deployment of chemical agents without warning; unlawful seizure and arrest; and intimidation through the use of firearms and other means if they continue to engage in constitutionally protected activity.

194.    These acts would chill a reasonable person from continuing to engage in a constitutionally protected activity. These acts did, in fact, chill Plaintiffs and the Plaintiff Class from continuing to observe, record, and/or protest current events of public interest, including the conduct of federal agents on duty in a public place.

195.    Further, the excessive and unlawful use of force, and the rampant constitutional violations, were so widespread, well-known, and obvious to Defendants that

Defendants' continued use of excessive force against Plaintiffs and the Plaintiff Class, and continued violation of their constitutional rights, was willful and recklessly indifferent to the rights of Plaintiffs and the Plaintiff Class.

196.    Defendants are jointly and severally liable to Plaintiffs and the Plaintiff Class.

## COUNT II:
## First Amendment—Retaliation

197.    Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

198.    Plaintiffs and the Plaintiff Class engaged in constitutionally protected acts of recording, observing, and/or events of public interest, including conduct of federal agents on duty in a public place. Plaintiffs and the Plaintiff Class will continue to do so in the future to cover the events related to the protests and law enforcement's response.

199.    Defendants retaliated against Plaintiffs and the Plaintiff Class for engaging in constitutionally protected activity. Defendants' retaliation is part of a pattern or practice of unconstitutional conduct that is certain to continue absent any relief.

200.    Plaintiffs and the Plaintiff Class reasonably fear the continued deployment of chemical agents without warning, unlawful seizure, and excessive force, and other means of repression and retaliation if they continue to engage in constitutionally protected activity.

201.    These acts would chill a reasonable person from continuing to engage in a constitutionally protected activity. On certain occasions, these acts did, in fact, chill Plaintiffs and the Plaintiff Class from continuing to record, observe, and/or protest some

current events of public interest, including conduct of federal agents on duty in a public place.

202.    Plaintiffs' and class members' protected activity caused Defendants' adverse actions against Plaintiffs and class members. Defendants thus retaliated against Plaintiffs and the Plaintiff Class for engaging in constitutionally protected activity. Defendants' retaliation is part of a pattern or practice of unconstitutional conduct that is certain to continue absent any relief.

203.    Plaintiffs' and class members' protected activity caused Defendants' adverse actions against Plaintiffs and class members.

204.    Defendants' ongoing conduct in violation of Plaintiffs' and class members' constitutional rights and liberties has caused and is causing them irreparable harm.

205.    Plaintiffs and the Plaintiff Class reasonably fear further retaliation in the future if they continue to exercise their constitutional right to observe, record, and/or protest.

206.    Defendants' ongoing conduct in violation of Plaintiffs' and class members' constitutional rights and liberties has caused and is causing them irreparable harm.

**COUNT III:**
**Fourth Amendment—Unlawful Seizure and Excessive Force**

207.    Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

208.    In the manner described more fully above, Defendants violated and are violating Plaintiffs' and class members' rights to be free from unreasonable seizures,

specifically, seizure and arrests without probable cause, unreasonable termination of their freedom of movement, and excessive force under the Fourth Amendment.

209.    The force used against Plaintiffs described above was unreasonable.

210.    Plaintiffs and the Plaintiff Class reasonably fear further violation of the Fourth Amendment if they continue to observe, record, or participate in constitutionally protected activity.

211.    Defendants' ongoing conduct in violation of Plaintiffs' and class members' constitutional rights and liberties has caused and is causing them irreparable harm.

212.    In the absence of an injunction, Defendants will continue to use excessive force against and effect unreasonable seizures without probable cause on Plaintiffs and class members in violation of the Fourth Amendment.

### COUNT IV:
### Civil Conspiracy

213.    Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

214.    Defendants conspired, under color of law, to deprive Plaintiffs and the Plaintiff Class of their constitutional rights.

215.    Defendants acted in concert and committed overt acts in furtherance of the conspiracy. Defendants targeted Plaintiffs and members of the Plaintiff Class, and used unlawful, excessive force to interfere with and retaliate against the Plaintiffs' and the Plaintiff Class's exercise of their constitutional rights.

216.    Plaintiffs and the Plaintiff Class reasonably fear Defendants will continue to conspire to violate the constitutional rights of Plaintiff and the Plaintiff Class.

## COUNT V:
### Declaration of Rights, 28 U.S.C. § 2201

217.    Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

218.    In a case of actual controversy within its jurisdiction, any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought, under 28 U.S.C. § 2201.

219.    There is an actual controversy within the jurisdiction of this court, in as much as one or more federal defendants have engaged in actions endangering Plaintiffs and class members protesting federal immigration policy in the area targeted by "Operation Metro Surge." No federal authority has agreed to stop this practice.

220.    Plaintiffs are entitled to a declaration that the acts at issue are unlawful, and an injunction precluding Defendants from continuing them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and as representatives of the class defined herein, pray for relief as follows:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1) or 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representative and designation of Plaintiffs' counsel as class counsel;

C.　　A declaration, pursuant to 28 U.S.C. § 2201, that the federal actions described in this complaint constitute violations of the First and Fourth Amendments;

D.　　A permanent injunction barring Defendants from engaging in unconstitutional conduct and retaliation against class members.

E.　　Immediate expungement of any and all records created by Defendants about Plaintiffs during the course of "Operation Metro Surge";

F.　　An award of such other and further relief as the Court deems equitable and just.

## **JURY DEMAND**

Plaintiffs demand a trial by jury of all issues triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: December 17, 2025

*/s/ Kevin C. Riach*

Kevin C. Riach (#389277)
**THE LAW OFFICE OF KEVIN C. RIACH**
125 Main St. SE, Suite 339
Minneapolis, MN 55414
(612) 203-8555
kevin@riachdefense.com

Teresa Nelson (#269736)
Catherine Ahlin-Halverson (#350473)
Alicia Granse (#400771)
**AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA**
P.O. Box 14720
Minneapolis, MN 55414
Tel: (651) 529-1692
tnelson@aclu-mn.org
cahlin@aclu-mn.org
agranse@aclu-mn.org

Kyle W. Wislocky (#393492)
Jacob F. Siegel (#399615)
**CIRESI CONLIN LLP**
225 S. 6th St., Suite 4600
Minneapolis, MN 55402
Tel: (612) 361-8233
kww@ciresiconlin.com
jfs@ciresiconlin.com

Robert J. Gilbertson (#22361X)
Caitlinrose H. Fisher (#398358)
Virginia R. McCalmont (#399496)
Jackson C. Evert (#402214)
Rebecca R. Rogers (#403827)
**FORSGREN FISHER MCCALMONT DEMAREA TYSVER LLP**
1500 Capella Tower
225 South Sixth Street
Minneapolis, MN 55402
Telephone: (612) 474-3300
bgilbertson@forsgrenfisher.com
cfisher@forsgrenfisher.com
vmccalmont@forsgrenfisher.com

jevert@forsgrenfisher.com
rrogers@forsgrenfisher.com