UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

SUSAN TINCHER, JOHN BIESTMAN,
JANET LEE, LUCIA WEBB,
ABDIKADIR NOOR, and ALAN
CRENSHAW, *on behalf of themselves and
other similarly situated individuals*,

          Plaintiffs,

v.

KRISTI NOEM, Secretary, U.S.
Department of Homeland Security (DHS);
TODD LYONS, Acting Director, U.S.
Immigration and Customs Enforcement
(ICE); MARCOS CHARLES, Acting
Executive Associate Director,
Enforcement and Removal Operations
(ERO), ICE; DAVID EASTERWOOD,
Acting Field Office Director, ERO, ICE
Saint Paul Field Office; JOHN A.
CONDON, Acting Executive Associate
Director, Homeland Security
Investigations (HSI); The Department of
Homeland Security; Unidentified Federal
Agencies; and Unidentified Federal
Agents; *in their official capacities*,

          Defendants.

Case No. 25-cv-04669 KMM/DTS

**MEMORANDUM OF LAW IN
SUPPORT OF
PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING
ORDER**

---

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................ ii

TABLE OF AUTHORITIES ................................................................................... iv

INTRODUCTION .................................................................................................... 1

FACTS ...................................................................................................................... 2

I.    Defendants have been engaged in a campaign of violence and intimidation against protesters, observers, and journalists in cities across the country. ........................... 2

II.   Defendants have extended their campaign to the District of Minnesota, where their unlawful tactics have violated residents' First and Fourth Amendment rights. ....... 3

III.  Plaintiffs and the Plaintiff Class are among those whose rights have been violated and will continue to be violated without preliminary injunctive relief. ................... 4

LEGAL STANDARD ............................................................................................... 4

ARGUMENT ............................................................................................................. 5

I.    Plaintiffs are likely to succeed on the merits on their claims. ................................. 5

A.   Plaintiffs are likely to succeed on their First Amendment retaliation claim. .......... 6

1.   Plaintiffs and the putative class are engaged in protected First Amendment activity. ........................................................................................................... 6

a.   Individuals have a constitutionally protected right to assemble in public and to object to and voice disapproval of ICE's actions. ............................ 7

b.   Individuals have a protectable First Amendment interest to access information about how public servants operate in public. ........................... 9

c.   Individuals have a constitutionally protected right to record and disseminate videos of ICE agents in the field. .......................................... 12

2.   Defendants have engaged in adverse actions that would chill individuals of ordinary firmness from continuing to engage in First Amendment protected activity. ........................................................................................................... 14

a.   Defendants using retaliatory force and drawing guns to threaten peaceful observers and protesters has a chilling effect on First Amendment freedoms. ..................................................................................................... 15

b.   Defendants using retaliatory force and deploying pepper spray on peaceful observers and protesters has a chilling effect on First Amendment freedoms. ..................................................................................................... 17

      c.     Defendants using retaliatory force and hitting peaceful observers and protesters with vehicles has a chilling effect on First Amendment freedoms. ................................................................. 18

      d.     Defendants arresting or detaining peaceful observers and protesters has a chilling effect on First Amendment freedoms. ......................................... 19

      e.     Defendants threatening observers and protesters with arrest and other intimidation tactics has a chilling effect on First Amendment freedoms. . 21

     3.    The observers' and protesters' protected First Amendment activity was the but-for cause of Defendants' adverse actions. .................................................. 23

B.    Plaintiffs are likely to prevail on their claims of First Amendment content and viewpoint-based discrimination. ........................................................................... 29

C.    Plaintiffs and the putative class members are likely to succeed on the merits of their Fourth Amendment claims ............................................................................ 30

     1.    Plaintiffs have experienced a spectrum of Fourth Amendment seizures......... 31

     2.    The seizures are unreasonable. ...................................................................... 34

II.    Plaintiffs will be irreparably harmed if a temporary restraining order is not issued and Defendants are allowed to continue their unconstitutional conduct............... 37

III.    The balance of harms favors the plaintiffs, and a TRO is in the public interest. ... 42

CONCLUSION ............................................................................................................ 43

## <u>TABLE OF AUTHORITIES</u>

Page

**Cases**

*Am. Civil Liberties Union of Illinois v. Alvarez*,
679 F.3d 583 (7th Cir. 2012) ........................................................................ 12

*Andrews v. Fuoss*,
417 F.3d 813 (8th Cir. 2005) ........................................................................ 30

*Backpage.com, LLC v. Dart*,
807 F.3d 229 (7th Cir. 2015) ........................................................................ 21

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ........................................................................................ 22

*Branzburg v. Hayes*,
408 U.S. 665 (1972) ...................................................................................... 10

*Brown v. State of La.*,
383 U.S. 131 (1966) ........................................................................................ 9

*Burton v. Livingston*,
791 F.2d 97 (8th Cir. 1986) .......................................................................... 16

*California v. Hodari D.*,
499 U.S. 621 (1991) ................................................................................ 31, 32

*Cerro Metal Prods. v. Marshall*,
620 F.2d 964 (3d Cir. 1980) ......................................................................... 38

*Chavez v. United States*,
226 F. App'x 732 (9th Cir. 2007) ................................................................. 38

*Chestnut v. Wallace*,
947 F.3d 1085 (8th Cir. 2020) .......................................................... 34, 36, 37

*Chicago Headline Club v. Noem*,
No. 25 C 12173, at *1-2 (N.D. Ill. Nov. 20, 2025) .................................. *passim*

*Cigna Corp. v. Bricker*,
103 F.4th 1336 (8th Cir. 2024) ................................................................... 4, 5

*Citizens United v. Fed. Election Comm'n*,
  558 U.S. 310 (2010) ................................................................ 11

*City of Houston, Tex. v. Hill*,
  482 U.S. 451 (1987) ................................................................. 8

*Covino v. Patrissi*,
  967 F.2d 73 (2d Cir. 1992) ...................................................... 38

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
  640 F.2d 109 (8th Cir. 1981) ............................................. 5, 42

*Dreith v. City of St. Louis, Missouri*,
  55 F.4th 1145 (8th Cir. 2022) ......................................... *passim*

*Elrod v. Burns*,
  427 U.S. 347 (1976) ............................................................... 38

*Fields v. City of Philadelphia*,
  862 F.3d 353 (3d Cir. 2017) ....................................... 10, 13, 14

*First Nat. Bank of Boston v. Bellotti*,
  435 U.S. 765 (1978) ........................................................... 9, 30

*Florida v. Royer*,
  460 U.S. 491 (1983) ............................................................... 34

*Ford v. City of Yakima*,
  706 F.3d 1188 (9th Cir. 2013) ............................................... 20

*Frederick Douglass Found., Inc. v. Dist. of Columbia*,
  82 F.4th 1122 (D.C. Cir. 2023) .............................................. 30

*Garcia v. City of New Hope*,
  984 F.3d 655 (8th Cir. 2021) ................................................. 20

*Garcia v. City of Trenton*,
  348 F.3d 726 (8th Cir. 2003) ........................................... 14, 15

*Garcia v. Montgomery Cty., Maryland*,
  145 F. Supp. 3d 492 (D. Md. 2015) ....................................... 22

*Gericke v. Begin*,
  753 F.3d 1 (1st Cir. 2014) ...................................................... 10

*Glik v. Cunniffe*,
    655 F.3d 78 (1st Cir. 2011) ........................................................................... 10

*Goyette v. City of Minneapolis*,
    338 F.R.D. 109 (D. Minn. 2021) ............................................................... *passim*

*Graham v. Connor*,
    490 U.S. 386 (1989) ...................................................................................... 34

*Green v. City of St. Louis*,
    52 F.4th 734 (8th Cir. 2022) ........................................................................... 8

*Hannah v. City of Overland, Mo.*,
    795 F.2d 1385 (8th Cir. 1986) ....................................................................... 34

*Hartman v. Moore*,
    547 U.S. 250 (2006) ........................................................................................ 6

*Heffernan v. City of Paterson, N.J.*,
    578 U.S. 266 (2016) ...................................................................................... 11

*Hodgkins ex rel. Hodgkins v. Peterson*,
    355 F.3d 1048 (7th Cir. 2004) ....................................................................... 22

*Hoyland v. McMenomy*,
    869 F.3d 644 (8th Cir. 2017) .................................................................... *passim*

*Index Newspapers LLC v. City of Portland*,
    480 F. Supp. 3d 1120 (D. Or. 2020) ............................................................. 41

*Index Newspapers LLC v. United States Marshals Service*,
    977 F.3d 817 (9th Cir. 2020) ......................................................................... 42

*Iowa Right to Life Comm., Inc. v. Williams*,
    187 F.3d 963 (8th Cir. 1999) ......................................................................... 42

*Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*,
    109 F.3d 418 (8th Cir. 1996) ......................................................................... 37

*Irizarry v. Yehia*,
    38 F.4th 1282 (10th Cir. 2022) ..................................................................... 19

*Jacobs v. City of Chicago*,
    215 F.3d 758 (7th Cir. 2000) ......................................................................... 32

*Joseph Burstyn, Inc. v. Wilson*,
    343 U.S. 495 (1952) ..................................................................................12

*Keenan v. Tejeda*,
    290 F.3d 252 (5th Cir. 2002) .............................................................16, 17

*L.A. Press Club v. Noem*,
    2025 WL 2658327 (C.D. Cal. Sept. 10, 2025) .......................................3, 33

*Lambert v. Polk County*,
    723 F. Supp. 128 (S.D. Iowa 1989) .........................................................13

*Laney v. City of St. Louis, Missouri*,
    56 F.4th 1153 (8th Cir. 2023) ..................................................................17

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ..................................................................................29

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) .............................................................38, 39

*Mills v. Alabama*,
    384 U.S. 214 (1966) ..................................................................................10

*Mohammed H. v. Trump*,
    2025 WL 1170448 (D. Minn. Apr. 22, 2025) ........................................5, 42

*Multimedia Holdings Corp. v. Cir. Ct. of Fla., St. Johns Cty.*,
    544 U.S. 1301 (2005) ................................................................................21

*Naucke v. City of Park Hills*,
    284 F.3d 923 (8th Cir. 2002) .....................................................................8

*Ness v. City of Bloomington*,
    11 F.4th 914 (8th Cir. 2021) ...............................................................12, 13

*Nieves v. Bartlett*,
    587 U.S. 391 (2019) ..............................................................13, 18, 20, 21

*Nken v. Holder*,
    556 U.S. 418 (2009) ..................................................................................42

*Occupy Minneapolis v. County of Hennepin*,
    866 F. Supp. 2d 1062 (D. Minn. 2011)......................................................5

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n,*
 460 U.S. 37 (1983) ........................................................................................... 7

*Peterson v. Kopp,*
 754 F.3d 594 (8th Cir. 2014) ....................................................................... 18, 35

*Phelps-Roper v. Ricketts,*
 867 F.3d 883 (8th Cir. 2017) .............................................................................. 29

*Ramirez v. Webb,*
 787 F.2d 592, 1986 WL 16752 (6th Cir. 1986) ............................................... 38

*Rodgers v. Bryant,*
 942 F.3d 451 (8th Cir. 2019) ....................................................................... 38, 42

*Rosenberger v. Rector & Visitors of Univ. of Virginia,*
 515 U.S. 819 (1995) ........................................................................................... 29

*Santiago v. Blair,*
 707 F.3d 984 (8th Cir. 2013) .............................................................................. 16

*Telescope Media Group v. Lucero,*
 936 F.3d 740 (8th Cir. 2019) .............................................................................. 12

*Terry v. Ohio,*
 392 U.S. 1 (1968) ............................................................................................... 31

*Thomas v. Barze,*
 57 F. Supp. 3d 1040 (D. Minn. 2014) ................................................................ 30

*Thomas v. Chi. Park Dist.,*
 534 U.S. 316 (2002) ........................................................................................... 29

*Thurairajah v. City of Fort Smith, Arkansas,*
 925 F.3d 979 (8th Cir. 2019) ................................................................................ 8

*Torres v. Madrid,*
 592 U.S. 306 (2021) ........................................................................................... 31

*Turner v. Lieutenant Driver,*
 848 F.3d 678 (5th Cir. 2017) .............................................................................. 11

*United States v. Chapman,*
 528 F.3d 1215 (9th Cir. 2008) ............................................................................ 36

*United States v. Dolson*,
   673 F. Supp. 2d 842 (D. Minn. 2009)...........................................................31

*United States v. Dortch*,
   868 F.3d 674 (8th Cir. 2019) .........................................................................32

*United States v. Jones*,
   678 F.3d 293 (4th Cir. 2012) .........................................................................32

*United States v. Schrader*,
   10 F.3d 1345 (8th Cir. 1993) ....................................................................35, 36

*United States v. Tuley*,
   161 F.3d 513 (8th Cir. 1998) .........................................................................32

*Walker v. City of Pine Bluff*,
   414 F.3d 989 (8th Cir. 2005) ....................................................................36, 37

*Watson v. Boyd*,
   119 F.4th 539 (8th Cir. 2024) ...............................................................*passim*

*Welch v. Dempsey*,
   51 F.4th 809 (8th Cir. 2022) ..........................................................................18

*White v. Lee*,
   227 F.3d 1214 (9th Cir. 2000) .......................................................................21

## Constitutions

U.S. Const. amend. I.............................................................................................6

U.S. Const. amend. IV........................................................................................30

## Statutes

18 U.S.C. § 111.......................................................................................35, 36, 37

## Rules

Fed. R. Civ. P. 65 .................................................................................................4

## **INTRODUCTION**

Plaintiffs, a group of peaceful observers and protesters of Immigration and Customs Enforcement ("ICE") activity, bring this motion for a temporary restraining order to prevent Defendants from abusing Minnesotans for exercising their fundamental rights. When exercising their First Amendment freedoms to assemble, observe, gather information, record, and protest ICE activity, Plaintiffs have been uniformly peaceful and law abiding. They have not impeded any activity of Defendants. They have been present in public places to serve as watchdogs against the government that is supposed to serve them.

In response, Defendants have employed the awesome power of the state to rain terror upon them, with the transparent goal to break the will of free people to observe and protest. They have waged wanton violence upon peaceful observers and protesters: threatening them with guns, attacking them with pepper spray and chemical agents, hitting them with vehicles. They have sought to intimidate through unlawful stops and seizures, threatened and actual arrests, and more. Relief from this Court is needed immediately because law-abiding Minnesotans can bear these indignities no longer.

Minnesota, tragically, has taken its place in a long line of states beleaguered by Defendants' campaign to intimidate and harass any who dare to hold them to account. Like the everyday people in Portland, Chicago, New Orleans, and elsewhere who heroically stood up for their communities and the rights of all, Plaintiffs now turn to the Court to seek protection. Plaintiffs' goal is a simple one: to be able to observe and protest ICE activity,

peacefully and without interference, without facing reprisal, violence, and arrest.  In other words, Plaintiffs seek nothing more than the liberty promised them in the Constitution.

Defendants have retaliated against Plaintiffs and made mockery of their First and Fourth Amendment rights. Because Plaintiffs refuse to forego exercising their constitutional rights and because Defendants have given no indication they will change their ways, Plaintiffs are likely to succeed in showing that a temporary restraining order is the only way to avert future irreparable harm at Defendants' hands. The Court should grant Plaintiffs' motion for a temporary restraining order.

## FACTS

Over the course of six months, Defendants have undertaken an aggressive immigration enforcement campaign that has resulted in constitutional violations across several states. Minnesota is their latest target, and Plaintiffs and the Plaintiff Class are regrettably the most recent in a line of victims.

**I.    Defendants have been engaged in a campaign of violence and intimidation against protesters, observers, and journalists in cities across the country.**

In the summer of 2025, federal officers began to deploy to cities across the country as part of a nationwide campaign to deport and terrorize immigrants and discourage migration to the United States. ECF 1 (Compl.) ¶ 17. In each city that has been targeted by the campaign, residents have exercised their rights to assemble, observe, record, and protest the officers' unconstitutional conduct. *Id.* ¶ 18. And in each city, federal officers have met peaceable protesters, legal observers, and members of the press with indiscriminate, excessive, and unrepentant force. In Los Angeles, federal officers targeted protesters with

2

tear gas, pepper bullets, chemical sprays, and other less-lethal weapons and intimidation tactics. *Id.* ¶ 19. In Portland, federal officers employed these and other tactics, including flash-bang grenades, impact munitions, and "snatch-and-grab" techniques. *Id.* ¶ 28. And in Chicago, federal officers unleashed all of these tactics on peaceful protesters with unconscionable cruelty and indifference. *Id.* ¶¶ 36-39.

In the face of federal officers' callous disregard of civil rights, those engaging in protected First Amendment activity filed suit. *Id.* ¶¶ 21. In response, several district courts granted preliminary injunctive relief requiring federal officers to do the bare minimum: stop violating people's constitutional rights. *See, e.g.*, *L.A. Press Club v. Noem*, 2025 WL 2658327, at *1-2 (C.D. Cal. Sept. 10, 2025); *Chicago Headline Club v. Noem*, No. 25 C 12173, at *1-2 (N.D. Ill. Nov. 20, 2025).[1]

## II.    Defendants have extended their campaign to the District of Minnesota, where their unlawful tactics have violated residents' First and Fourth Amendment rights.

A mere two weeks ago, the Trump Administration extended its deportation campaign to Minnesota in a plan that has been referred to as "Operation Metro Surge." *Id.* ¶ 62. As part of this "operation," at least 100 federal law enforcement agents have entered the state, bringing with them the same aggressive, unlawful tactics that they have employed in so many other American cities. *Id.* In that short time, federal officers have berated,

---

[1] Although the *Chicago Headline Club* preliminary injunction was stayed pending appeal for overbreadth, the Seventh Circuit cautioned not to "overread" the order granting the stay and stated that the district court's "voluminous and robust factual findings . . . may support entry of a more tailored and appropriate preliminary injunction that directly addresses the First and Fourth Amendment claims raised by these plaintiffs." Order Granting Stay Pending Appeal, ECF No. 28, No. 25-3023 (7th Cir. Nov. 19, 2025).

beaten, and abducted Minnesota residents—many of them citizens—for nothing more than exercising their First Amendment rights to assemble, observe, record, and protest. *Id.* ¶¶ 62-178.

### III. Plaintiffs and the Plaintiff Class are among those whose rights have been violated and will continue to be violated without preliminary injunctive relief.

As concerned community members who are committed to upholding the Constitution, Plaintiffs have joined many of their neighbors in assembling, observing, recording, reporting on, and protesting federal officials' unlawful actions. Predictably, given their prior violations, federal officials have violated Plaintiffs' constitutional rights, but Plaintiffs and others remain resolute that they must continue to observe, gather information, and protest Defendants' conduct. *See, e.g.*, ECF 1-1 (Tincher Decl.) ¶ 19; ECF 1-2 (Biestman Decl.) ¶ 14; ECF 1-3 (Lee Decl.) ¶ 17; ECF 1-4 (Webb Decl.) ¶¶ 12-13; ECF 1-7 (Engelhart Decl.) ¶ 11.

Plaintiffs now seek to protect themselves and other similarly situated persons from experiencing future irreparable harm.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 65, a district court may authorize injunctive relief in the form of a temporary restraining order. Fed. R. Civ. P. 65(b). The primary function of preliminary injunctive relief "is to preserve the status quo until, upon final hearing, a court may grant full, effective relief." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1342 (8th Cir. 2024) (cleaned up).

The court applies the four *Dataphase* factors to determine whether a temporary restraining order should issue: (1) the movant's likelihood of success on the merits; (2) the threat that the movant will be irreparably harmed in the absence of injunctive relief; (3) the balance between this harm and the harm the non-moving party would face if an injunction were to issue; and (4) the public interest. *Goyette v. City of Minneapolis*, 338 F.R.D. 109, 115 (D. Minn. 2021) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)). "When analyzing these factors, the Court must flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." *Occupy Minneapolis v. County of Hennepin*, 866 F. Supp. 2d 1062, 1067 (D. Minn. 2011) (cleaned up). The "core question is whether justice requires preserving the status quo until the merits are determined." *Mohammed H. v. Trump*, 2025 WL 1170448, at *2 (D. Minn. Apr. 22, 2025) (citing *Dataphase*, 640 F.2d at 113).

## <u>ARGUMENT</u>

### I.    **Plaintiffs are likely to succeed on the merits on their claims.**

When deciding whether to grant preliminary injunctive relief, the movant's likelihood of success is the most significant factor. *Cigna Corp.*, 103 F.4th at 1342. This is especially so in cases implicating constitutional rights, "because the remaining factors necessarily turn on whether there has been a showing that the plaintiff's constitutional rights have been violated." *Occupy Minneapolis*, 866 F. Supp. at 1067.

**A.  Plaintiffs are likely to succeed on their First Amendment retaliation claim.**

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). Thus, the First Amendment forbids the government from taking retaliatory actions against individuals to punish them for exercising their constitutionally protected freedoms.

To establish a cause of action for retaliation under the First Amendment, a plaintiff must show that: 1) "he engaged in protected First Amendment activity;" 2) the government "took an adverse action that would chill a person of ordinary firmness from continuing in that protected activity" and 3) "there was a but-for causal connection between" the "injury" and the "retaliatory animus." *Watson v. Boyd*, 119 F.4th 539, 550 (8th Cir. 2024), *cert. denied*, No. 24-998, 2025 WL 2824543 (U.S. Oct. 6, 2025).

Given Plaintiffs' universally unobtrusive protected activity, and Defendants' unprovoked threats, harassment, detentions, arrests, and uses of force to preclude Plaintiffs from observing and protesting ICE activity, Plaintiffs are likely to prevail on each element of their retaliation claim.

> **1.  Plaintiffs and the putative class are engaged in protected First Amendment activity.**

Plaintiffs and the putative class are each observers and/or protesters of ICE activity. Both binding Supreme Court and Eighth Circuit precedent, as well as persuasive authority, confirm that the observers and protesters are exercising their protected rights

under the First Amendment. As such, Plaintiffs have engaged in a variety of protected activity and are likely to prevail on this element.

      **a. Individuals have a constitutionally protected right to assemble in public and to object to and voice disapproval of ICE's actions.**

"In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). The public streets, where Plaintiffs and putative class members have interacted with ICE, "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Id.* Plaintiffs and the putative class have engaged in a wide variety of protest activity in these quintessential public fora. *See, e.g.*, ECF 1-7 (Engelhart Decl.) ¶ 3 ("[An officer] asked why I was following them. I told him something like 'You're breaking the law, creating harm and pain in our community, and we're going to watch you.'"), ¶ 6 ("I also told him what I thought of him, and I wasn't nice about it."), ¶ 7 ("We followed the agents and their film crew out the door and around the buildings. A crowd had gathered, and people were blowing whistles and yelling at them to leave. I was yelling at them. I wasn't very polite."); ECF No. 1-5 (Noor Decl.) ¶ 5 ("I got out of my car and said something like, 'I'm not going to let you do this. I'm not going to show you anything or tell you anything.'"); ECF 1-4 (Webb Decl.) ¶ 10 ("I told them I was ashamed of them for kidnapping people."); ECF 1-2 (Biestman Decl.) ¶ 6 ("I told the ICE agents . . . 'what you're doing is illegal, this is like Germany 1938.'").

"[T]he First Amendment recognizes . . . that a certain amount of expressive disorder not only is inevitable in a society committed to individual freedom, but must itself be protected if that freedom would survive." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 471–72 (1987). "[I]n the face of verbal challenges to police action, officers and municipalities must respond with restraint." *Id.* "[C]riticism of public officials lies at the very core of speech protected by the First Amendment." *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002) (citations omitted). To ensure the realization of this core constitutional right, the Eighth Circuit has recognized that participation "in protests to express frustration with a police department is protected First Amendment expression." *Green v. City of St. Louis*, 52 F.4th 734, 739 (8th Cir. 2022). Thus, law enforcement cannot retaliate against individuals for "exercising [their] First Amendment right[s] at [] protests." *Id.*; *see also Thurairajah v. City of Fort Smith, Arkansas*, 925 F.3d 979, 982 (8th Cir. 2019) (plaintiff who yelled an expletive out of his car window at a police officer conducting a traffic stop was engaged in protected speech).

Surely, the protesters who directly criticize and even insult ICE, like Ms. Webb, Mr. Biestman, Mr. Engelhardt, and Mr. Noor did, are engaged in protected speech under the First Amendment, but protest and criticism of government officials may also take a variety of forms. In *Watson*, the Eighth Circuit held that merely asking for an officer's name and badge number was protected speech, noting that "[c]riticism of public officials lies at the very core of speech protected by the First Amendment." 119 F.4th at 550. The facts in *Watson* showed that, during a lawful stop, the driver of the vehicle asked for the officer's identifying information; on that basis, standing alone, the Eighth Circuit easily concluded

8

that the driver had met the "protected activity" element of his retaliation claim. *Id.* at 557 ("Here, [plaintiff] asked [the officer for] his name and his badge number, [but] he refused. The first element of a retaliatory use-of-force claim is satisfied." (internal quotation marks and citation omitted).) The request in *Watson* for identification is akin to Plaintiff Tincher's request, made from a public sidewalk, that Defendants identify themselves. *See* ECF 1-1 (Tincher Decl.) ¶ 7 ("Are you ICE?"). Plaintiff Tincher's expression therefore qualifies as protected protest speech, in addition to protected information gathering under the First Amendment.

Moreover, the First Amendment does not only protect words. The First Amendment rights "guaranteeing freedom of speech and of assembly . . . . are not confined to verbal expression." *Brown v. State of La.*, 383 U.S. 131, 141–42 (1966). "They embrace appropriate types of action which certainly include the right in a peaceable and orderly manner to protest by silent and reproachful presence, in a place where the protestant has every right to be . . . ." *Id.* at 142. The mere act of gathering with neighbors to bear witness to ICE's misconduct is core First Amendment protected activity. By assembling with their neighbors in peaceful groups and in places where they have the lawful right to be, the plaintiffs and putative class have engaged in First Amendment activity.

### b. Individuals have a protectable First Amendment interest to access information about how public servants operate in public.

As the Supreme Court has explained, the First Amendment is concerned not only with "fostering individual self-expression," but also with "affording the public access to discussion, debate, and the dissemination of information and ideas." *First Nat. Bank of*

*Boston v. Bellotti*, 435 U.S. 765, 783 (1978). Accordingly, the observers are engaged in protected First Amendment activity when they observe ICE agents' activities because the First Amendment "protects the public's right of access to information about their officials' public activities." *Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3d Cir. 2017).

The reason is simple: "[g]athering information about government officials in a form that can be readily disseminated to others serves a cardinal First Amendment interest in protecting and promoting the 'free discussion of governmental affairs.'" *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) (quoting *Mills v. Alabama,* 384 U.S. 214, 218 (1966)). "Ensuring the public's right to gather information about their officials not only aids in the uncovering of abuses, but also may have a salutary effect on the functioning of government more generally." *Id.* at 82–83 (internal citations omitted). Further, the First Amendment protects news-gathering, because "without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). Just like members of the traditional media, the observers have a First Amendment right to observe, to bear witness to, and to share information about ICE's actions in their community.

That is precisely what the observers are doing here. When Susan Tincher heard that there was an early-morning ICE raid in her neighborhood, she drove to the scene "with the intent to observe and record what [she] saw happening." ECF 1-1 (Tincher Decl.) ¶ 3. Ms. Tincher stood on a public sidewalk and asked one of the officers "Are you ICE?" *Id.* ¶ 7. This is core information gathering protected by the First Amendment. *See, e.g.*, *Gericke v. Begin* 753 F.3d 1, 7 (1st Cir. 2014) (reversing the district court's determination that the act

10

of silently observing and recording police activity was insufficiently expressive to merit First Amendment protection). The First Amendment protects Ms. Tincher's right to gather this information and use it to hold officers and the federal government to account. *See Turner v. Lieutenant Driver*, 848 F.3d 678, 689 (5th Cir. 2017) ("The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010)). This is even more so when, as here, officials are not clearly identified.

Likewise, many of the observers were targeted after following ICE vehicles around their neighborhoods. ECF 1-2 (Biestman Decl.) ¶ 3; ECF 1-3 (Lee Decl.) ¶¶ 7-8; ECF 1-9 (Page Decl.) ¶ 2; ECF 1-4 (Webb Decl.) ¶ 4.[2] The observers were following the ICE vehicle, in order to share information with their neighbors about the presence of ICE. *See, e.g.*, ECF 1-4 (Webb Decl.) ¶ 4 (explaining Webb followed the ICE vehicles "with the idea of letting other people know where they were headed."); ECF 1-9 (Page Decl. ¶¶ 2-3) (explaining that Page was communicating with her group chat about the ICE vehicles and "honking [her] horn to alert neighbors to the presence of ICE in the area."). So long as they do not impede or violate traffic laws, the observers have a constitutional right to follow ICE agents, to observe where they are and what they are doing, and to share that

---

[2] Similarly, Flannery Clark was targeted by ICE because ICE believed, incorrectly, that she was following them. ECF 1-8 (Clark Decl.) ¶¶ 20-21. *See generally Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 273 (2016) (First Amendment retaliation claim can succeed where the defendant has a mistaken belief that the plaintiff engaged in protected First Amendment activity).

information with other members of their community.

### c. Individuals have a constitutionally protected right to record and disseminate videos of ICE agents in the field.

The observers and protesters are also engaged in constitutionally protected First Amendment activity when they record ICE's actions. It is blackletter law that video is speech protected by the First Amendment. *See Telescope Media Group v. Lucero*, 936 F.3d 740, 750 (8th Cir. 2019). The Supreme Court recognized nearly 75 years ago that video is "a significant medium for the communication of ideas . . . affect[ing] public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression." *Id.* at 751 (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952)).

Just as individuals have a First Amendment right to *disseminate* video recordings, "[t]he act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." *Am. Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) (emphasis in original). The Eighth Circuit has come to the same conclusion. *See Ness v. City of Bloomington*, 11 F.4th 914, 923 (8th Cir. 2021) ("The acts of taking photographs and recording videos are entitled to First Amendment protection because they are an important stage of the speech process that ends with the dissemination of information about a public controversy.").

In *Ness*, the plaintiff challenged a City of Bloomington ordinance that prohibited photographing or recording a child without the consent of the child's parent or guardian.

*Id.* at 922. The plaintiff wanted to videotape and photograph in a local park in order to document "overuse" of the park by a youth center and charter school. *Id.* at 923. The Eighth Circuit explained that "[i]f the act of making a photograph or recording is to facilitate speech that will follow, the act is a step in the 'speech process,' and thus qualifies itself as speech protected by the First Amendment." *Id.* at 923. Because the plaintiff intended to post her photos and videos on the internet "'in order to inform the public'" about the "controversy," the Eighth Circuit concluded that her photography and recording was speech "analogous to news gathering." *Id.* The Eighth Circuit further explained that "acts of taking photographs and recording videos are entitled to First Amendment protection because they are an important stage of the speech process." *Id.*

Here, too, the observers are recording ICE agents in order to inform other members of the public about the actions taken, and the abuses, by ICE.[3]  In the current milieu, a reasonable officer would understand that civilian recording of ICE is intended to document and critique law enforcement activity. Thus, when the observers photograph or videotape ICE, they are self-evidently engaged in protected First Amendment Activity. *See also Hoyland v. McMenomy*, 869 F.3d 644, 656 (8th Cir. 2017) (concluding a plaintiff who confronted and recorded police officers was engaged in protected First Amendment activity), *abrogated in part on other grounds* by *Nieves v. Bartlett*, 587 U.S. 391 (2019).

---

[3] Of course, it makes no difference that the observers are citizen journalists and not members of the traditional media. *See, e.g.*, *Fields*, 862 F.3d at 359 ("As no doubt the press has this right, so does the public."); *Lambert v. Polk County,* 723 F. Supp. 128, 133 (S.D. Iowa 1989) ("[I]t is not just news organizations . . . who have First Amendment rights to make and display videotapes of events—all of us . . . have that right.").

Even if it was not abundantly clear from context that the observers intended to share their recordings of ICE with their neighbors and their community, however, the observers' recording of ICE operations would still be constitutionally protected activity. *Fields* is on all fours. Mr. Fields was a college student who recorded officers breaking up a house party merely because he "wanted to take a picture of an 'interesting' and 'cool' scene." *Fields*, 862 F.3d at 357. There was no testimony that he intended to share his photos or videos. *Id.* Even so, the Third Circuit held that Mr. Fields's activity was protected under the First Amendment. *Id.* at 360. As the Third Circuit explained, there is "no practical difference between allowing police to prevent people from taking recordings and actually banning the possession or distribution of them." *Id.* at 358. If officers are permitted to prevent the observers from recording, then they guarantee that the information will never be disseminated. The First Amendment prevents the Government from interfering with the free flow of information in this manner.

### 2. Defendants have engaged in adverse actions that would chill individuals of ordinary firmness from continuing to engage in First Amendment protected activity.

Plaintiffs are likely to prevail in showing that Defendants' actions would chill a person of "ordinary firmness." The "ordinary firmness" test is objective, not subjective. *Watson*, 119 F.4th at 557. Thus, the "question is not whether the plaintiff herself was deterred," but rather the Court must ask "[w]hat would a person of 'ordinary firmness' have done in reaction to the" actions of the government? *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003). In applying this test, Eighth Circuit precedent requires courts to "remain mindful that the effect on freedom of speech may be small, but since there is no

justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." *Watson*, 119 F.4th at 557 (cleaned up). This low bar can manifest itself in a variety of ways: through uses of force, intimidation tactics, and otherwise. Indeed, the Eighth Circuit has recognized that receiving retaliatory parking tickets totaling just $35.00 would chill a person of ordinary firmness. *City of Trenton*, 348 F.3d at 729. Plaintiffs address the various types of adverse actions Defendants have undertaken to chill protected activity below.

### a. Defendants using retaliatory force and drawing guns to threaten peaceful observers and protesters has a chilling effect on First Amendment freedoms.

Regrettably, multiple observers and protesters have had guns drawn on them by federal agents. Defendants "boxed in and stopped" and threatened Plaintiffs Janet Lee and John Biestman with deadly semiautomatic weapons at close range. ECF 1-2 (Biestman Decl.) ¶ 4; ECF 1-3 (Lee Decl.) ¶ 9 ("Agents quickly came toward our car, some with weapons drawn including semi-automatic guns."); ECF 1-2 (Biestman Decl.) ¶ 5 ("The agents pointed semiautomatic weapons at us at close range"). Others have experienced similar treatment. *See* ECF 1-4 (Webb Decl.) ¶ 13; *see also* ECF 1-8 (Clark Decl.) ¶¶ 16-17.

It should go without saying that such threats of lethal force are sufficiently severe to chill individuals of ordinary firmness. Unsurprisingly then, the Eighth Circuit and other courts have routinely concluded that pointing guns at individuals exercising their First Amendment rights would chill a person a person of ordinary firmness.

In *Watson*, an officer, who was patrolling a park, questioned plaintiff after noticing his car idling "with excessively tinted windows and no front license plate." *Watson*, 119 F.4that 544. Granting summary judgment for the officer, the district court concluded that the officer had probable cause to initiate the stop and indeed had arguable probable cause to arrest the driver for various citations. *Id.* at 546-49.  The Eighth Circuit reversed, holding that plaintiff had "presented sufficient evidence . . . to withstand summary judgment" on his First Amendment claim based on retaliatory use of force by a police officer during a vehicle stop. 119 F.4th at 557.

During the stop, after the citizen asked the officer for his name and badge number, the officer "pull[ed] his gun" and told "him that he could 'shoot you right here' '[a]nd nobody will give a s**t.'" *Id.* at 557. The Eighth Circuit concluded that such conduct "easily satisfies the ordinary firmness test." *Id.*; *see also Santiago v. Blair*, 707 F.3d 984, 992 (8th Cir. 2013) ("threats of death would chill a [person] of ordinary firmness" from engaging in protected activity); *Burton v. Livingston*, 791 F.2d 97, 100 (8th Cir. 1986) (allegations that prison guard "pointed a lethal weapon at the prisoner, cocked it, and threatened him with instant death . . . [with] no provocation for the guard's action other than the prisoner's attempting to exercise his due-process and First Amendment right[s]" were sufficient to state retaliation claim).

Other circuits have reached the same conclusion. In *Keenan v. Tejeda*, 290 F.3d 252, 259 (5th Cir. 2002), allegations of "two disturbing incidents involving an undercurrent of violence" were found to chill a person of ordinary firmness, including one in which several law enforcement officers stopped plaintiff's car with "with their guns drawn during part of

the traffic stop." *Id.* The court held such "ominous events" are "concrete intimidating tactics" that "would have deterred ordinary persons from criticizing government officials." *Id.* (collecting cases). The Eighth Circuit has cited favorably to *Keenan* when conducting its own "ordinary firmness" analysis. *See Watson*, 119 F.4th at 557 (citing *Keenan*, 290 F.3d at 258).[4]

This binding precedent compels the obvious, common sense conclusion: Plaintiffs are likely to prevail on this element because individuals of ordinary firmness, when confronted face to face with guns or other deadly weapons, would be chilled from continuing to monitor and protest ICE activity.

> ### b. Defendants using retaliatory force and deploying pepper spray on peaceful observers and protesters has a chilling effect on First Amendment freedoms.

Observers and protesters have been subjected to retaliatory force in the form of pepper spray and/or other chemical irritants. ECF 1-6 (Crenshaw Decl.) ¶¶ 9, 11, 13; ECF 1-14 (Mitchell Decl.) ¶¶ 28, 34; ECF 1-13 (O'Malley Decl.) ¶ 5; ECF 1-11 (Kellermeyer Decl.) ¶ 13.

The Eighth Circuit has repeatedly found there to be no debate that the use of pepper spray would "chill" a person of ordinary firmness. *See Laney v. City of St. Louis, Missouri*, 56 F.4th 1153, 1157 (8th Cir. 2023) (finding no "dispute that the use of pepper spray would chill a person of ordinary firmness from speaking out" (internal quotation marks omitted));

---

[4] Relatedly, at least one other court has concluded that ICE officers' actions in pointing guns at individuals exercising their First Amendment rights "shocks the conscience." *See Chicago Headline Club*, 2025 WL 3240782, at *86 ("Pointing a gun at someone for exercising their First Amendment rights shocks the conscience.").

*Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014) (noting the government defendants did "not deny that pepper spraying someone in the face would chill a person of ordinary firmness" (cleaned up)), *abrogated in part on other grounds by Nieves*, 587 U.S. 391.

Numerous cases confirm this well-established principle. In *Welch v. Dempsey*, 51 F.4th 809, 813 (8th Cir. 2022), the Eighth Circuit affirmed a denial of qualified immunity for retaliatory use of force in violation of the First Amendment. The defendant police officer used pepper spray on a protester; at the time of the use of force, the protester "was standing alone on a public sidewalk streaming a live video on her phone." *Id.* at 813. In light of that fact, defendants' arguments that the protester had earlier engaged in a "riot" or an "unlawful assembly" could not "undermine the district court's conclusion that [the protester's] right to be free from a retaliatory use of force was clearly established at the time of the incident." *Id.*

Under this binding precedent, Plaintiffs are likely to prevail on this element because individuals of ordinary firmness, when attacked with pepper spray and other chemical irritants, would be chilled from continuing to monitor and protest ICE activity.

### c. Defendants using retaliatory force and hitting peaceful observers and protesters with vehicles has a chilling effect on First Amendment freedoms.

Observers and protesters have been subjected to unlawful force in the form of being physically struck by vehicles driven by a Defendant. Declarant O'Malley was present at the Bro-Tex facility in St. Paul with a "group of observers and protesters." ECF 1-13 (O'Malley Decl.) ¶ 2. While Declarant O'Malley attempted "to film and observe as much as possible," a Dodge Charger driven by a federal officer "rammed right into [her],

knocking [her] to the ground." ECF 1-13 (O'Malley Decl.) ¶ 6. After gathering herself, O'Malley "filmed the same car hitting another person and knocking them to the ground." *Id.* ¶ 7.

Using force through hitting individuals with a vehicle is sufficient to chill a person of ordinary firmness; indeed, many Courts have held that merely coming close to hitting someone with a vehicle is sufficient. The recent case of *Irizarry v. Yehia*, 38 F.4th 1282 (10th Cir. 2022), involved peaceful and non-obstructive observers recording a police interaction during a DUI stop. *Id.* at 1286. In order to interfere with the filming, an officer got into his police cruiser, drove right towards plaintiff, then "sped away." *Id.* He came back around, "gunned his cruiser" at another individual, and then "swerved around him." *Id.* Noting that "[p]hysical and verbal intimidation can chill speech," the Tenth Circuit had little trouble concluding that such actions would chill a person of ordinary firmness. *Id.* at 1293.

Plaintiffs are likely to prevail on this element because individuals of ordinary firmness, when confronted, assaulted, or battered by Defendants' vehicles, would be chilled from continuing to monitor and protest ICE activity.

### d. Defendants arresting or detaining peaceful observers and protesters has a chilling effect on First Amendment freedoms.

Plaintiff Tincher was violently arrested by Defendants after exercising her constitutional rights to gather information and protest ICE activity. ECF 1-1 (Tincher Decl.) ¶¶ 8-9 ("About 15 seconds after I first spoke with the female officer, several agents came toward me, grabbed me, and pulled me to the ground."). Following the arrest, Plaintiff

Tincher was subjected to cruel treatment, including having undergarments and a wedding ring forcibly cut off her body. ECF 1-1 (Tincher Decl.) ¶¶ 13-15. Plaintiff Noor was likewise arrested without probable cause, shackled, and detained for hours. ECF 1-5 (Noor Decl.) ¶¶ 13-16.

The law is settled that when officers arrest an individual based on the "forbidden motive" of retaliation, "the injured person may generally seek relief by bringing a First Amendment claim." *Nieves*, 587 U.S. at 398.[5]  The Eighth Circuit has held that the adverse state action of arrest would chill an individual of ordinary firmness. *See Hoyland*, 869 F.3d at 657. The Eighth Circuit applied common sense to recognize the severity of arrest and the chilling effect such an action necessarily entails, explaining: "Circuit precedent shows that receiving multiple parking tickets would impermissibly chill protected activity. So there can be little doubt that being arrested for exercising the right to free speech would chill a person of ordinary firmness from exercising that right in the future." *Id.* (cleaned up). So too would a traffic stop or other seizure short of an arrest chill a person of ordinary firmness. *See, e.g.*, *Garcia v. City of New Hope*, 984 F.3d 655, 669 (8th Cir. 2021) ("Officer Baker's stopping Garcia, detaining him in a police car, and issuing him a citation would chill an ordinary person from continuing the activity."), *abrogated in part on other grounds by Nieves*, 587 U.S. 391. Other courts have reached the same conclusion. *See, e.g.*, *Ford v.*

---

[5] *Nieves* imposed a fourth element in retaliatory arrest cases: "The plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest." 587 U.S. at 402. Even assuming that this element applies to Plaintiffs' claims for prospective relief, Plaintiffs satisfy it here, as they have pled and are likely to prevail on the fact that Defendants lacked probable cause to arrest Ms. Tincher and Mr. Noor. *See infra* at I.C.2.

*City of Yakima*, 706 F.3d 1188, 1194 (9th Cir. 2013) ("[A] retaliatory police action such as an arrest or search and seizure would chill a person of ordinary firmness from engaging in future First Amendment activity."), *abrogated in part on other grounds by Nieves*, 587 U.S. 391.

Plaintiffs are likely to prevail on this element because individuals of ordinary firmness, when arrested or detained for having exercised constitutional freedoms, would be chilled from continuing to monitor and protest ICE activity.

### e. Defendants threatening observers and protesters with arrest and other intimidation tactics has a chilling effect on First Amendment freedoms.

Observers and protesters have been threatened with arrest countless times. *See, e.g.*, ECF 1-2 (Biestman Decl.) ¶ 5; ECF 1-3 (Lee Decl.) ¶ 10; ECF 1-4 (Webb Decl.) ¶ 9; ECF 1-11 (Kellermeyer Decl.) ¶ 5. They also have been subjected to intimidation tactics in other ways, such as Defendants looking up their home address, traveling there, and waiting for individuals to arrive to yell at them. ECF 1-11 (Kellermeyer Decl.) ¶¶ 3-5.

"A public official who tries to shut down an avenue of expression of ideas and opinions through actual or threatened imposition of government power or sanction is violating the First Amendment." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) (cleaned up); *see also Multimedia Holdings Corp. v. Cir. Ct. of Fla., St. Johns Cty.*, 544 U.S. 1301, 1304 (2005) ("A threat of prosecution or criminal contempt against a specific publication raises special First Amendment concerns, for it may chill protected speech much like an injunction against speech by putting that party at an added risk of liability."); *White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000) ("Informal measures, such as

21

the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation, can violate the First Amendment." (cleaned up)).

That general rule applies to an officer making a threat of arrest, which the Supreme Court has noted "is enough to chill First Amendment rights." *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1056 (7th Cir. 2004) (collecting cases) (invalidating curfew law for minors faced with threat of arrest for violations). This is so because, as the Supreme Court recognized in *Bantam Books, Inc. v. Sullivan*, "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around . . . ." 372 U.S. 58, 68 (1963); *see also Hodgkins*, 355 F.3d at 1063 ("The prospect of an arrest is intimidating in and of itself[.]"). Therefore, "[t]hreats of prosecution . . . on the part of chiefs of police or prosecutors, have been enjoined in a number of cases." *Bantam*, 372 U.S. at 67 n.8 (collecting cases).

More subtle flexing of government power in the form of surveillance has likewise been held to chill First Amendment activity. In *Garcia v. Montgomery Cty., Maryland*, an award-winning photojournalist alleged that after he filed a complaint regarding Montgomery County Police Department ("MCPD") officers, he observed MCPD officers periodically "park near his house to observe and intimidate him." 145 F. Supp. 3d 492, 502 (D. Md. 2015). One officer remarked to plaintiff "that he was there to 'check up' on him." *Id.* at 515. The court found that "this gratuitous show of uninvited law enforcement interest, if true, would certainly be enough to chill others from lodging complaints against police officers." *Id.* Just as in *Montgomery County*, observers and protesters have been subjected to "gratuitous show[s] of uninvited law enforcement interest," *id.*, as when an ICE agent

drove ahead of Ms. Kellermeyer and waited for her to arrive at her own house. ECF 1-11 (Kellermeyer Decl.) ¶¶ 3-5. The undeniable implication of these tactics is that ICE knows where the target lives and is watching them.

Accordingly, Plaintiffs are likely to prevail on this element because individuals of ordinary firmness, when confronted with threats of arrest or another intimidating demonstration of governmental power (such as unwanted surveillance by officials following protected speech), would be chilled from continuing to monitor and protest ICE activity.

### 3. The observers' and protesters' protected First Amendment activity was the but-for cause of Defendants' adverse actions.

The Eighth Circuit looks to a variety of factors when determining whether retaliatory motive was the but-for cause of an adverse action. Often, "[t]emporal proximity" between the constitutionally protected activity and the adverse action "is relevant [even if] not dispositive." *Hoyland*, 869 F.3d at 657 (alteration in original). Other factors the Eighth Circuit looks to include whether the individual injured by government conduct was peaceful, had violated any laws, or had disobeyed any lawful orders. *See Dreith v. City of St. Louis, Missouri*, 55 F.4th 1145, 1149 (8th Cir. 2022).

In *Dreith*, following the acquittal of a former police officer on murder charges, protesters clashed with police outside the St. Louis police academy. *Id.* at 1147. Police contended the "protestors were violent, threw rocks and bottles at [police] buses and the officers, and broke at least one bus window." *Id.* A "Bicycle Response Team" was deployed to assist the buses depart the area, with police contending protesters refused to leave the

area when instructed and grabbed officer's bicycles. *Id.* In this context, the plaintiff (Dreith) "observed an officer hitting a woman with his bicycle and saw a protestor being pepper-sprayed. She came within 'a couple of feet' of an officer," at which point "without warning," the officer pepper sprayed her. *Id.* at 1148. The district court denied qualified immunity, finding a genuine issue of fact on whether the officer's "use of force against [plaintiff] resulted from her engagement in" First Amendment activity. *Id.* at 1148-49.

Accepting the facts the district court found were adequately supported, the Eighth Circuit found no error in denial of qualified immunity for the use of force. *Id.* at 1148-49. It considered several key factors that are relevant here: plaintiff did not physically engage with the officers, did not fail to comply with lawful orders, and defendants "identified no law that [she] was arguably violating." *Id*. at 1149. Because plaintiff could show she was "merely participating in a peaceful protest and had come within a couple feet of an officer," the retaliation claim raised triable issues of fact related to whether the use of force was motivated to suppress plaintiff's First Amendment rights. *Id.*

In *Hoyland*, the Eighth Circuit again affirmed a denial of qualified immunity on a First Amendment retaliation claim. In the early morning hours, the plaintiff (Hoyland) noticed officers arresting his wife in their driveway. 869 F.3d at 649. He turned on his front lights, opened his front door, and held his phone to record what was happening:

> Within seconds, an officer shouted, "Drop the camera!" [Officer] McMenomy yelled at Hoyland to go back inside the house. Hoyland remained where he stood and began screaming at the officers. . . . McMenomy again ordered Hoyland to "stay inside." Immediately following this command, with Hoyland remaining in the doorway, "the arrest decision was made" by McMenomy who shouted "you are under arrest," and ordered Hoyland to raise his hands. About thirty seconds of time

24

elapsed between Hoyland's emergence from his house into the doorway and McMenomy's pronouncement that he was under arrest.

*Id.* at 649-650. On those facts, the district court denied the officers' qualified immunity defense for both the First Amendment retaliation and Fourth Amendment claims. *Id.* at 651.

The Eighth Circuit affirmed, concluding the plaintiff had raised a triable issue as to whether a retaliatory motive caused Hoyland's arrest. *Id.* at 658. It did not matter that the officers had told Hoyland to go back inside or to stop recording on camera, because the decision to arrest came only after Hoyland shouted criticisms at the officers. *Id.* at 657. Critically, the fact that the officers purported to order Hoyland inside (and the fact that he ignored this order) did not shield the officers from an inference that his expression caused the arrest.

Applying these principles here, Plaintiffs are likely to prevail on the merits in showing Defendants' adverse actions are motivated by a desire to suppress the lawful exercise of First Amendment rights. The observers and protesters are universally peaceful and law abiding: none broke any laws, threatened, attacked, or used violence against any officers, nor "physically intervened, and never attempted to physically intervene, in the arrest of anyone." *See Hoyland*, 869 F.3d at 650, 657 (detailing and considering similar facts to conclude causal element met); *see also Dreith*, 55 F.4th at 1148-49 (similar).

Observers and protesters have universally been on public roads and sidewalks – places they have a right to be. And while they admittedly were exercising First Amendment rights to observe, record, and object to ICE activity, that is not a basis for taking actions against them such as threatening arrest, using force (through raising guns, pepper spray, or

otherwise), or arresting them. *See Dreith*, 55 F.4th at 1149 (sufficient evidence to show causation because plaintiff was "merely participating in a peaceful protest and had come within a couple feet of an officer.").

Moreover, the temporal connection and lack of a legitimate law enforcement purpose of the adverse actions further support a conclusion that Defendants' actions were taken to suppress First Amendment activity:

### *Plaintiff Tincher*

Tincher was forcefully seized and arrested "[a]bout 15 seconds after [she] first spoke with the female officer". ECF 1-1 (Tincher Decl.) ¶ 8. She remained outside the officer established perimeter, on a "public sidewalk/street" when she sought information from an officer. *Id.* ¶ 5, 7. Given the closeness in time between Tincher's expression and arrest, and the lack of any legitimate law enforcement purpose for arresting her, Plaintiffs are likely to succeed in showing she was retaliated against for questioning the officers' actions.

### *Plaintiff Noor*

Noor was forcibly seized and arrested after he had repeatedly objected to officer actions. ECF 1-5 (Noor Decl.) ¶¶ 5, 10, 13. Noor had not interfered, had not disobeyed any lawful order, and not violated any law. Upon his release hours later, Noor was not charged. *Id.* ¶ 17. Noor's arrest while he was objecting to officer activity, only to be released without charges, lacks any viable legitimate justification other than Defendants' desire to suppress Noor's speech.

*Plaintiff Crenshaw*

Crenshaw engaged in extensive criticism and protest of officers, part of a crowd of protesters and observers who were objecting to ICE's actions. ECF 1-6 (Crenshaw Decl.) ¶ 5, 7. Crenshaw had not interfered, had not disobeyed any lawful order, and not violated any law. Without warning, a Defendant in a car "drove past and sprayed [him] right in the face" with pepper spray. *Id.* ¶ 13. Just as the peaceful protester in *Dreith* had evidence sufficient to prove she was pepper sprayed in retaliation for participating in a protest, so has Crenshaw. *See* 55 F.4th at 1148-49. Further, there is no legitimate law enforcement purpose for a vehicle (driving by protesters unimpeded) to use force on those protesters while exiting the area. Defendants' retaliatory motive is solidified by their repeated use of the drive-by pepper-spray tactic on peaceful, non-obstructing observers and protesters – the only explanation for such a practice is to suppress dissent. *See* Doc. 1-6 (Crenshaw Decl.) ¶ 9 ("No one was getting in the way of the agency cars, which were moving slowly. But as they were leaving, a window rolled down, an arm came out and pepper sprayed the crowd with no warning."); ECF 1-11 (Kellermeyer Decl.) ¶ 13 ("As [a protester] stood there, another ICE vehicle drove by (a white SUV with Florida plates) and sprayed him right in the face . . . . He wasn't in the way of the car or throwing anything or doing anything but protesting.").

*Plaintiffs Biestman, Lee, and Webb*

Biestman, Lee and Webb were unlawfully seized, threatened with arrest, and Biestman and Lee were threatened with force by having guns drawn on them, after gathering information about ICE's public movements by driving their cars lawfully, at safe

distances, on public roads. ECF 1-2 (Biestman Decl.) ¶ 3. Defendants straightforwardly confessed their motive was to prevent Plaintiffs from gathering information about ICE's activities: they told them so. *See* ECF 1-3 (Lee Decl.) ¶ 13 ("An ICE agent wearing a bandana . . . told us that we had to leave now and do not follow us again."); ECF 1-4 (Webb Decl.) ¶ 9 (ICE officer "said, 'You will be arrested for impeding' if I don't stop following them."). Given this direct evidence of retaliatory motive, Plaintiffs are likely to succeed in showing they were retaliated against for gathering information about ICE's actions.

Relatedly, Declarant Kellermeyer gathered information about ICE activity, and in response ICE drove to her home to wait for her arrival, after which they threatened her with arrest if she did not "'stop fucking following them.'" ECF 1-11 (Kellermeyer Decl.) ¶¶ 3-5. Again, this is direct evidence that the adverse activity of intimidating a law-abiding citizen by showing up at her house was caused by Defendants' desire to prevent Kellermeyer from gathering information about ICE in the future.

Finally, Declarant Leon was retaliated against for recording ICE activity, specifically taking a pictures of ICE on a public road and a the ICE stop of Plaintiffs Biestman and Lee. ECF 14 (Leon Decl.) ¶¶ 9, 13, 15. Immediately thereafter, Defendants pointed AR-15 style assault weapons at Leon and her husband. *Id.* ¶ 18. With guns raised, a Defendant officer disclosed the motive for seizing Leon was to retaliate for her photographing ICE, telling her "'Record this. Now get out your little phone and record this.'" *Id.* ¶ 28. The timing, lack of unlawful activity by Leon, lack of law enforcement need to point guns at peaceful observers, and direct references to Leon's earlier phone use

all establish that the motive of officers' threatened force and threats of arrest were caused by Leon's expressive activity.

**B. Plaintiffs are likely to prevail on their claims of First Amendment content and viewpoint-based discrimination.**

As the Supreme Court has explained, it is "axiomatic" that the government is forbidden from "regulat[ing] speech based on its substantive content or the message it contains." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995). Further, viewpoint discrimination is a particularly "egregious" form of content discrimination, because "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* Thus, the government "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* To succeed on a claim for viewpoint discrimination, a plaintiff must "establish a 'pattern of unlawful favoritism' by showing that she 'was prevented from speaking while someone espousing another viewpoint was permitted to do so.'" *Phelps-Roper v. Ricketts*, 867 F.3d 883, 897 (8th Cir. 2017) (quoting *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 325 (2002); *McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014)).

Plaintiffs are likely to succeed on their claim for content and viewpoint discrimination, because Defendants have favored certain speakers who endorse ICE's objectives at the expense of others. For instance, Dan Engelhart explains that while he was being harassed by ICE agents for following and recording them, the agents were simultaneously being followed by a pro-ICE media outlet, "Real America's Voice." ECF

1-7 (Engelhart Decl.) ¶ 4; *see also* ECF 1-12 (Sorenson Decl.) ¶ 18 (describing a film crew getting into a vehicle with federal agents); ECF 1-10 (Rollins Decl.) ¶ 17 (same). That ICE has invited press that are favorable to the administration's message to record the ICE enforcement actions while retaliating against anti-ICE activists who are recording them is the paradigm of viewpoint discrimination. See *Frederick Douglass Found., Inc. v. Dist. of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023) ("It is antithetical to a free society for the government to give 'one side of a debatable public question an advantage in expressing its views to the people.'" (quoting *First Nat'l Bank of Bos.*, 435 U.S. at 785).

### C. Plaintiffs and the putative class members are likely to succeed on the merits of their Fourth Amendment claims

Defendants have unconstitutionally seized (and are seizing) peaceful, law-abiding observers and demonstrators. The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. To establish a violation of this constitutional amendment, a plaintiff must show that law enforcement "seized her within the meaning of the Fourth Amendment and that the seizure was unreasonable." *Thomas v. Barze*, 57 F. Supp. 3d 1040, 1068 (D. Minn. 2014) (quoting *Andrews v. Fuoss*, 417 F.3d 813, 816 (8th Cir. 2005)).

Plaintiffs make both showings. The Northern District of Illinois has already found that tactics employed by DHS, substantially similar to those here, violate the Fourth Amendment. And for good reason. "[U]nder the Fourth Amendment . . . [p]ointing guns, pulling out pepper spray, throwing tear gas, shooting pepper balls, and using other less lethal munitions do not appear to be appropriate uses of force" against ICE observers and

peaceful protesters. *Chicago Headline Club v. Noem*, No. 25 C 12173, 2025 WL 3240782, at *86 (N.D. Ill. Nov. 20, 2025). The seizures here include those described in *Chicago Headline Club* and others of greater severity, including the quintessential unlawful seizure of an arrest without probable cause. This Court should reach the same conclusion as the Northern District of Illinois and hold that Plaintiffs are likely to prevail on their Fourth Amendment claims.

### 1. Plaintiffs have experienced a spectrum of Fourth Amendment seizures.

Defendants have employed a variety of tactics and types of force to seize Plaintiffs and the putative class members. A Fourth Amendment seizure occurs when there is "meaningful interference, however brief, with an individual's freedom of movement." *United States v. Dolson*, 673 F. Supp. 2d 842, 864–65 (D. Minn. 2009). An arrest is "the quintessential 'seizure of a person' under [] Fourth Amendment jurisprudence." *California v. Hodari D.*, 499 U.S. 621, 624 (1991). A seizure can also "take the form of 'physical force' or a 'show of authority' that 'in some way restrain[s] the liberty' of the person." *Torres v. Madrid*, 592 U.S. 306, 311 (2021) (alteration in original) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).

Plaintiffs and the putative class members have been seized within the meaning of the Fourth Amendment. Start with Ms. Tincher. She was subjected to a full custodial arrest—agents forcibly took her to the ground, handcuffed her, and transported her to the Whipple building. ECF 1-1 (Tincher Decl.) ¶¶ 8-13. There, she was patted down, shackled, placed in a cell for five hours, and read her *Miranda* rights. *Id*. ¶¶ 13-16. Mr. Noor was likewise thrown to the ground, handcuffed, taken to the Whipple building, and shackled

and placed in a cell for hours. ECF 1-5 (Noor Decl.) ¶¶ 13-17. Ms. Tincher's and Mr. Noor's

arrests are "quintessential" seizures under the Fourth Amendment. *Hodari D.*, 499 U.S. at

624.

Others have been seized as well:

- A federal agent pointing a semiautomatic firearm into a citizen's car at close range
  is a use of force and sort of show of authority that would lead a reasonable person
  to "believe[] that he was not free to leave." *See United States v. Dortch*, 868 F.3d
  674, 677 (8th Cir. 2019); *see also Jacobs v. City of Chicago*, 215 F.3d 758, 774 (7th
  Cir. 2000) ("[H]olding the gun to a person's head and threatening to pull the trigger
  is a use of deadly force.").

  o That is precisely what Mr. Biestman and Ms. Lee experienced when agents
    surrounded their car, demanded they roll down their windows, "pointed
    semiautomatic weapons at [them] at close range," and threatened them with
    arrest. ECF 1-2 (Biestman Decl.) ¶¶ 4-5; ECF 1-3 (Lee Decl.) ¶¶ 9-10.

- A group of agents boxing in a car and preventing a person from driving away is a
  seizure. *See United States v. Tuley*, 161 F.3d 513, 515 (8th Cir. 1998); *see also*
  *United States v. Jones*, 678 F.3d 293, 301-02 (4th Cir. 2012) (collecting cases).

  o That is precisely what Ms. Webb experienced, when she was surrounded by
    four cars and approached by at least five federal agents. ECF 1-4 (Webb.
    Decl.) ¶ 8.

- The use of constitutionally excessive force is likewise "a form of unreasonable seizure in violation of the Fourth Amendment," as the Northern District of Illinois recognized *Chicago Headline Club*, 2025 WL 3240782, at *84.

    - That is precisely what Mr. Crenshaw experienced, when he was pepper sprayed in the face while standing on the side of a public road and peacefully protesting. ECF 1-6 (Crenshaw Decl.) ¶ 13.

These varying detention tactics have been employed systemically by DHS agents across the county. In the summer of 2025, Defendants began deploying to cities across the country as part of a mass deportation campaign. *See, e.g.*, *L.A. Press Club v. Noem*, 2025 WL 2658327, at *1 (C.D. Cal. Sept. 10, 2025); Kaleah Haddock & Diana Roy, *ICE and Deportations: How Trump Is Reshaping Immigration Enforcement*, Council on Foreign Relations (Dec. 1, 2025), https://www.cfr.org/article/ice-and-deportations-how-trump-reshaping-immigration-enforcement. ECF 1 (Compl.) ¶ 17. In each city, officers have been met with widespread, peaceful protest. *Id*. ¶ 18. Despite their peaceful nature, officers have responded to these protests with increasing and coordinated aggression. *See, e.g.*, *L.A. Press Club*, 2025 WL 2658327, at *1; *Chicago Headline Club*, 2025 WL 3240782, at *1; Ali Rogan & Claire Mufson, *Federal Agents Escalate Tactics as Trump Administration Pushes for More Migrant Arrests*, PBS News (Nov. 23, 2025), https://www.pbs.org/newshour/show/federal-agents-escalate-tactics-as-trump-administration-pushes-for-more-migrant-arrests. ECF 1 (Compl.) ¶¶ 19 (Los Angeles); ¶¶ 26, 28 (Portland); ¶¶ 36, 38-39, 43-44 (Chicago).

Over the past six months, officers have developed a recognizable playbook for smothering free speech. This playbook heavily relies on seizures, including boxing in vehicles, pointing weapons at individuals, and arresting individuals—all without reasonable suspicion, probable cause, or due process. Given the declarants' statements, this playbook is being implemented here. ECF 1-2 (Biestman Decl.) ¶¶ 3-5; ECF 1-6 (Crenshaw Decl.) ¶¶ 4, 7; ECF 14 (Leon Decl.) ¶ 18; ECF 1-5 (Noor Decl.) ¶¶ 10, 13; ECF 1-9 (Page Decl.) ¶ 4; ECF 1-1 (Tincher Decl.) ¶¶ 7-11, 13-15; ECF 1-4 (Webb Decl.) ¶¶ 7-9. And given federal officials' statements, these seizures will not stop unless and until Defendants are enjoined. *See, e.g.*, ECF 1 (Compl.) ¶¶ 47-61.

### 2. The seizures are unreasonable.

The question, then, is whether these seizures are unreasonable. The answer is a resounding yes. Whether a seizure is reasonable varies with the "particular facts and circumstances of each case," including the nature of the intrusion into a person's liberty. *Florida v. Royer*, 460 U.S. 491, 500 (1983). In the case of a "warrantless arrest," the Fourth Amendment requires that there be "probable cause" that a crime has been or will be committed. *Hannah v. City of Overland, Mo.*, 795 F.2d 1385, 1389 (8th Cir. 1986). In the case of a brief investigatory stop, law enforcement must have "reasonable suspicion that criminal activity is afoot." *Chestnut v. Wallace*, 947 F.3d 1085, 1088 (8th Cir. 2020). An individual may not "be detained even momentarily without reasonable, objective grounds" to do so. *Royer*, 460 U.S. at 498. Nor may an agent use force that is objectively unreasonable in the course of a seizure. *Graham v. Connor*, 490 U.S. 386, 397 (1989).

The seizures Plaintiffs have experienced and face in the future are unreasonable, across the board. There has been no need for *any* of these seizures. Plaintiffs and putative class members are peaceful observers and demonstrators who have been exercising their First Amendment rights—not engaging in illegal conduct. ECF 1-2 (Biestman Decl.) ¶ 2; ECF 1-6 (Crenshaw Decl.) ¶ 2; ECF 1-7 (Engelhart Decl.) ¶¶ 2-4; ECF 1-3 (Lee Decl.) ¶¶ 3-4; ECF 1-11 (Kellermeyer Decl.) ¶ 2; ECF 14 (Leon Decl.) ¶ 5; ECF 1-14 (Mitchell Decl.) ¶¶ 6-8; ECF 1-5 (Noor Decl.) ¶¶ 5-6, 10; ECF 1-13 (O'Malley Decl.) ¶ 2; ECF 1-9 (Page Decl.) ¶¶ 2-3; ECF 1-10 (Rollins Decl.) ¶ 6; ECF 1-12 (Sorenson Decl.) ¶ 12; ECF 1-1 (Tincher Decl.) ¶ 7; ECF 1-4 (Webb Decl.) ¶ 4. Yet, they have experienced arrests, detentions, and the threatened and actual use of force.

These seizures have not been reasonable or, in the case of the custodial arrests, justified by probable cause. Start with Ms. Tincher's arrest. Ms. Tincher was standing outside of a law-enforcement perimeter, exhibiting "neutral body language" and "not doing anything indicating she was a threat of any kind." ECF 1-12 (Sorenson Decl.) ¶ 10; *see also* ECF 1-1 (Tincher Decl.) ¶ 10. Akin to someone asking for a badge number, she asked one of the agents "Are you ICE?" *See Peterson*, 754 F.3d at 597; ECF 1-1 (Tincher Decl.) ¶ 7. In response, an ICE officer walked toward her and told her to "Get back!" while another gave the instruction to "Take her down!" ECF 1-1 (Tincher Decl.) ¶ 7. Within 15 seconds she was forced to the ground, handcuffed, arrested, and told she was obstructing a federal officer. *Id*. ¶ 8-9. Like Ms. Tincher, other Plaintiffs were engaging in peaceful observation and protest at the time they were seized. ECF 1-2 (Biestman Decl.) ¶¶ 3-5; ECF 1-3 (Lee Decl.) ¶¶ 3-4, 6-10; 1-5 (Noor Decl.) ¶¶ 10, 13; ECF 1-4 (Webb Decl.) ¶¶ 3, 7-9.

Officers did not have probable cause, let alone reasonable suspicion, to believe that any Plaintiff had violated 18 U.S.C. § 111 or comparable statutes. Section 111 applies only to those who "*forcibly* . . . resist[], oppose[], impede[], intimidate[], or interfere[]" with a federal officer. 18 U.S.C. § 111(a)(1) (emphasis added). The adverb "forcibly" modifies "each of the verbs" that follow. *United States v. Schrader*, 10 F.3d 1345, 1349 (8th Cir. 1993). The use of force is accordingly "a necessary element of any § 111 violation," and can be satisfied by "proof of actual physical contact" or "a threat or display of physical aggression toward the officer as to inspire fear of pain, bodily harm, or death." *Id.* at 1348 (internal quotation marks omitted); *see also United States v. Chapman*, 528 F.3d 1215, 1219 (9th Cir. 2008) (stating that 18 U.S.C. § 111 requires proof of assault).

Peacefully observing, recording, and protesting is not a use of "force." *Cf. Chestnut,*, 947 F.3d at 1090 ("no reasonable officer could conclude that a citizen's passive observation of a police-citizen interaction from a distance was criminal."). Nor is following federal agents to observe their behavior. These obvious facts are confirmed by Eighth Circuit precedent. In *Walker v. City of Pine Bluff*, an individual stood silently, observing police as they conducted a traffic stop. 414 F.3d 989 (8th Cir. 2005). When the police noticed that they were being observed, they asked the observer what he was doing, and the observer identified himself and responded that he was watching the town's "finest in action," and he was subsequently arrested. *Id.* at 992. The Eighth Circuit found this arrest unlawful, specifically rejecting an argument that the observer's presence and observation had obstructed governmental operations. *Id.* at 993. "[T]he assertion that one more silent on-looker . . . created a distraction that prevented [the officers] from safely completing the

36

traffic stop is, in a word, preposterous." *Id.; see also Chapman*, 528 F.3d at 1216 (holding that "nonviolent civil disobedience did not" violate 18 U.S.C. § 111).

Defendants here similarly lacked any reasonable basis (or probable cause) to seize Plaintiffs, whether through boxing in cars, pointing guns at law-abiding individuals exercising constitutional rights, arresting observers, or otherwise. Members of the public have the "right to watch police-citizen interactions at a distance and without interfering." *Chestnut,* 947 F.3d at 1090. And on the flip side, "[i]n a democracy, public officials have no general privilege to avoid publicity and embarrassment by preventing public scrutiny of their actions." *Walker*, 414 F.3d at 992. The seizures here are part of a pattern of impeding public scrutiny of DHS's actions at the expense of Plaintiffs' Fourth Amendment rights. Plaintiffs and the putative class have the constitutional right to observe law enforcement in a non-obstructive manner. *Chestnut*, 947 F.3d at 1090. That is what Plaintiffs have done. Defendants cannot recast this constitutionally protected activity as unlawfully impeding law enforcement. To so conclude would render the term "forcibly" in 18 U.S.C. § 111 a nullity and eviscerate the Fourth Amendment rights of those who want to observe, report on, and protest the conduct of government officials.

## II.   Plaintiffs will be irreparably harmed if a temporary restraining order is not issued and Defendants are allowed to continue their unconstitutional conduct.

Plaintiffs have also established that they and the putative class will face imminent and irreparable harm if a temporary restraining order is not issued. *See Goyette*, 338 F.R.D. at 119.

To demonstrate irreparable harm, the moving party must show that the harm is so certain, great, and imminent that there is a clear and present need for equitable relief. *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996). The moving party must also demonstrate that there is "no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Goyette*, 338 F.R.D. at 119. When a plaintiff alleges a constitutional harm, "demonstrating a likelihood of success ordinarily warrants a finding of irreparable harm." *Id.* (internal quotation marks omitted); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." (internal quotation marks omitted)).

Plaintiffs face a likely and imminent violation of their First Amendment rights, which generally satisfies the irreparable-harm requirement. *Rodgers v. Bryant*, 942 F.3d 451, 456-57 (8th Cir. 2019). This is because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Plaintiffs' imminent and likely Fourth Amendment violations likewise demonstrate irreparable injury. Appellate courts have repeatedly held that Fourth Amendment violations, no less than First Amendment violations, constitute irreparable harm. *See, e.g.*, *See Chavez v. United States*, 226 F. App'x 732, 737 (9th Cir. 2007) (holding there was a likelihood of substantial and immediate irreparable injury based on plaintiffs' allegations of repeated Fourth Amendment violations by immigration enforcement agents); *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992) (holding that Fourth Amendment violations, which

violate "fundamental right[s]," cause irreparable harm); *Ramirez v. Webb*, 787 F.2d 592, 1986 WL 16752, at *2 (6th Cir. 1986) (explaining that Fourth Amendment violations cause irreparable harm because "[u]nreasonable searches and seizures, particularly when premised on race and alienage, are demeaning to such a degree as to be practically uncompensatable"); *Cerro Metal Prods. v. Marshall*, 620 F.2d 964, 974 (3d Cir. 1980) (explaining that "inspection[s] violating the Fourth Amendment . . . constitute irreparable injury for which injunctive relief would be appropriate").

Likewise, district courts have granted preliminary injunctive relief to prevent irreparable Fourth Amendment violations, including in the immigration-enforcement context. *See, e.g.*, *Melendres*, 695 F.3d at 994 (upholding a preliminary injunction prohibiting defendants from committing Fourth Amendment violations "under the auspices of enforcing federal immigration laws"). In another recent case involving federal immigration-enforcement agencies, the district court found that the plaintiffs—members of the press, protesters, and religious practitioners—showed "irreparable harm because of the ongoing nature of the alleged violation of their Fourth Amendment rights, with monetary damages insufficient to compensate them for the repetitive constitutional violations." *Chicago Headline Club*, 2025 WL 3240782, at *87. Although the plaintiffs had some legal remedies, the "limited nature" of these remedies did not "preclude[] injunctive relief." *Id.* The same is true here. The pervasive violations of Plaintiffs' Fourth Amendment rights and the chilling effect of those violations on the exercise of constitutional rights will irreparably harm Plaintiffs and the putative class if not enjoined.

In addition to being irreparable, the harms that Plaintiffs face are imminent. As this sentence is being written, federal law enforcement officials are roving through the Metro area and beyond, indiscriminately stopping and detaining community members—even those who are just trying to drive home. ECF 1-8 (Clark Decl.) ¶¶ 6-14; ECF 1-9 (Page Decl.) ¶¶ 4-7; ECF 1-1 (Tincher Decl.) ¶¶ 7-9; ECF 1-4 (Webb Decl.) ¶¶7-9. They are approaching couples in parked cars, pointing automatic weapons in their faces and demanding answers to unlawful questions. ECF 1-2 (Biestman Decl.) ¶¶ 3-5; ECF 14 (Leon Decl.) ¶¶ 16-18, 22-23. They are pepper spraying peaceful protesters and legal observers—without lawful dispersal orders—for bearing witness to, recording, disseminating, and objecting to officers' egregious conduct. ECF 1-7 (Engelhart Decl.) ¶¶ 9-10; ECF 1-11 (Kellermeyer Decl.) ¶¶ 8, 13; ECF 1-14 (Mitchell Decl.) ¶¶ 27-28; ECF 1-13 (O'Malley Decl.) ¶ 5. They are kneeling on the backs of pregnant people for 30 minutes at a time, stopping only to unlawfully arrest a Somali American citizen who sought to help and advocated for nonviolence. ECF 1-5 (Noor Decl.) ¶¶ 8, 10, 13. And they are following people home to threaten and intimidate those who dare to challenge their actions. ECF 1-11 (Kellermeyer Decl.) ¶¶ 2-4.

Put simply, Defendants' actions are shocking to the conscience. Plaintiffs must be protected, as they view it as their civic duty to assemble, observe, document, communicate, and protest law enforcement abuses, and will continue to exercise these constitutional rights until the abuses no longer occur. ECF 1-1 (Tincher Decl.) ¶ 19; ECF 1-2 (Biestman Decl.) ¶ 14; ECF 1-7 (Engelhart Decl.) ¶ 11; ECF 1-11 (Kellermeyer Decl.) ¶ 7; ECF 1-13 (O'Malley Decl.) ¶ 8.

Relevant caselaw shows that the officers' ongoing misconduct and Plaintiffs' demonstrated commitment to documenting and protesting this misconduct are sufficient to satisfy the imminency requirement. In *Goyette*, this Court held that the plaintiffs— members of the press who were documenting anti-government protests—had satisfied the imminent-harm requirement because (1) the defendant law enforcement officers had repeatedly violated plaintiffs' civil rights during the protests; (2) the protests were ongoing; and (3) the plaintiffs intended to continue covering the protests. 338 F.R.D. at 119-20. Likewise, in *Index Newspapers LLC v. City of Portland*, the district court found that the plaintiffs (legal observers, protesters, and members of the press) were likely to suffer immediate, irreparable harm because the defendant law enforcement officers had already violated the plaintiffs' constitutional rights; the officers had denied wrongdoing; and the protests were ongoing. 480 F. Supp. 3d 1120, 1152 (D. Or. 2020). Finally, in *Chicago Headline Club*, the district court found that the plaintiffs satisfied the imminent harm requirement by showing that the defendant law enforcement officers were targeting and indiscriminately firing on the plaintiffs; the protests were ongoing; and the plaintiffs intended to continue protesting. 2025 WL 3240782, at *73.

The facts of these cases closely mirror what is happening in Minnesota today. As the Complaint and accompanying declarations show, Defendants have repeatedly violated Plaintiffs' civil rights in unspeakable and terrifying ways. Demonstrations against these constitutional violations and abuses of power are ongoing. And Plaintiffs intend to continue to participate in these demonstrations by assembling, observing, recording, disseminating, and protesting Defendants' actions. ECF 1-2 (Biestman Decl.) ¶ 14; ECF 1-7 (Engelhart

Decl.) ¶ 11; ECF 1-11 (Kellermeyer Decl.) ¶ 7; ECF 1-13 (O'Malley Decl.) ¶ 8; ECF 1-1 (Tincher Decl.) ¶ 19. In these circumstances, "the threat of imminent future" constitutional violations "persists," and a TRO is warranted. *See Goyette,* 338 F.R.D. at 119; *see also Index Newspapers LLC*, 480 F. Supp. 3d at 1152; *Chicago Headline Club*, 2025 WL 3240782, at *73.

### III.    The balance of harms favors the plaintiffs, and a TRO is in the public interest.

Finally, plaintiffs have shown that the final two *Dataphase* factors—the balance of harms and the public interest—favor issuing a TRO. *See Dataphase*, 640 F.2d at 114. When a government opposes temporary injunctive relief, the balance-of-harms and public-interest factors merge. *Mohammed H.*, 2025 WL 1170448, at *2 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Again, a party that establishes that they are likely to succeed on the merits of a First Amendment claim has satisfied the balance-of-harms and public-interest elements. *Rodgers*, 942 F.3d at 456-57; *see Iowa Right to Life Comm., Inc. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999) ("[T]he potential harm to independent expression and certainty in public discussion of issues is great and the public interest favors protecting core First Amendment freedoms.").

With regard to Plaintiffs' Fourth Amendment claims, the balance of harms also tips "sharply in the [Plaintiffs'] favor," because Plaintiffs raise "legitimate constitutional question[s]." *Goyette*, 338 F.R.D. at 120. The direct and enduring harm Plaintiffs have suffered because of Defendants' constitutional violations far exceeds any impediment to Defendants' enforcement authority. Indeed, "[t]he government cannot suffer harm from an

injunction that merely ends an unlawful practice or . . . avoid[s] constitutional concerns." *Mohammed H.*, 2025 WL 1170448, at *4.

A TRO is also in the public interest because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Goyette*, 338 F.R.D. at 120 (cleaned up). A well-tailored injunction that balances constitutional rights with the government's enforcement powers "does not irreparably harm the government." *Id.*; *see also Index Newspapers LLC v. United States Marshals Service*, 977 F.3d 817, 835 (9th Cir. 2020) (holding that the government would not be irreparably harmed by a narrowly tailored injunction).

## **CONCLUSION**

For the foregoing reasons, the Plaintiffs respectfully request that this Court grant a temporary restraining order as set forth in the proposed order submitted herewith and grant any other relief that the Court deems just and proper.

Dated:  December 18, 2025

*/s/ Kyle W. Wislocky*

Teresa Nelson (#269736)
Catherine Ahlin-Halverson (#350473)
Alicia Granse (#400771)
**AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA**
P.O. Box 14720
Minneapolis, MN 55414
Tel: (651) 529-1692
tnelson@aclu-mn.org
cahlin@aclu-mn.org
agranse@aclu-mn.org

Kyle W. Wislocky (#393492)
Jacob F. Siegel (#399615)
**CIRESI CONLIN LLP**

225 S. 6th St., Suite 4600
Minneapolis, MN 55402
Tel: (612) 361-8233
kww@ciresiconlin.com
jfs@ciresiconlin.com

Caitlinrose H. Fisher (#398358)
Rebecca Rogers (#403827)
**FORSGREN FISHER MCCALMONT
DEMAREA TYSVER LLP**
225 South Sixth Street
Suite 1500
Minneapolis, MN 55402
Tel: (612)-474-3310
cfisher@forsgrenfisher.com
rrogers@forsgrenfisher.com

Kevin C. Riach (#389277)
**THE LAW OFFICE OF KEVIN C. RIACH**
125 Main St. SE, Suite 339
Minneapolis, MN 55414
(612) 203-8555
kevin@riachdefense.com

***ATTORNEYS FOR PLAINTIFF***

44