# Exhibit 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| SUSAN TINCHER, JOHN BIESTMAN, JANET LEE, LUCIA WEBB, ABDIKADIR NOOR, and ALAN CRENSHAW, on behalf of themselves and other similarly situated individuals,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive Associate Director, Enforcement and Removal Operations (ERO), ICE; DAVID EASTERWOOD, Acting Field Office Director, ERO, ICE Saint Paul Field Office; JOHN A. CONDON, Acting Executive Associate Director, Homeland Security Investigations (HSI); The Department of Homeland Security; Unidentified Federal Agencies; and Unidentified Federal Agents; in their official capacities,<br><br>　　　　Defendants. | Case No: 25-cv-04669 (KMM/DTS)<br><br><br><br><br><br>**CITY OF MINNEAPOLIS, CITY OF SAINT PAUL, HENNEPIN COUNTY ATTORNEY'S OFFICE, AND STATE OF MINNESOTA AMICUS MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

1

## STATEMENT OF INTEREST OF THE AMICUS CURIAE[1]

For years, the agents of Immigration and Customs Enforcement ("ICE") have operated in the Twin Cities metro area without raising widespread public outcry.  However, in early December, the federal government announced additional ICE agents would be deployed to the area for "Operation Metro Surge." This "surge" announcement corresponded with truly shocking vitriol from the President of the United States against the Somali population in Minnesota.

ICE agents began to engage in the kind of tactics that have been witnessed around the country: seizing individuals off the street without being clearly identifiable as ICE agents, driving vehicles that are unidentifiable as law enforcement, covering their faces, and refusing to identify themselves as they make arrests.  These tactics are meant to provoke fear. When coupled with the cruel and vicious rhetoric of the federal administration, they have inspired many members of the public "peaceably to assemble, and to petition the Government for a redress of grievances" and to otherwise express their disapproval of the tactics being used by the federal government.  However, ICE agents have

---

[1] No party has opposed the filing of this memorandum. No counsel for a party authored this memorandum in whole or in part, no counsel for a party made a monetary contribution intended to fund the preparation or submission of this memorandum, and no person other than *amicus curiae* and its counsel made a monetary contribution to its preparation or submission.

responded to criticism and protest with unreasonable force, unlawful arrests, or other tactics meant to intimidate and quell free speech and assembly.

The City of Minneapolis, the City of Saint Paul, the Hennepin County Attorney's Office, and the State of Minnesota have an interest in protecting the wellbeing of all those who reside, work in, or visit their jurisdictions. ICE's tactics endanger all Minnesotans' public safety and welfare. They also harm the First and Fourth Amendment rights of Minnesotans who are monitoring and protesting ICE's conduct. The threat to constitutional rights is significant because ICE's own inflammatory and unconstitutional policing tactics are provoking the protests.

ICE's unlawful tactics are also undermining public trust in state and local law enforcement because individuals cannot distinguish between ICE activities and local police actions. Deteriorating public trust has consequences: it suppresses the reporting and prosecuting of serious crimes, especially those that affect the immigrant population. Finally, ICE's tactics sap local resources when local officers need to be called away from their work to respond to ICE incidents. To take just one example, ICE's tactics have resulted in several 911 calls reporting suspected kidnappings because individuals do not know who is taking people off the street at gunpoint.

This amicus brief focuses on why the equities and the public interests discussed above and below support a preliminary injunction. A preliminary injunction will serve the public interest by protecting Minnesotans' rights to hold the federal government accountable.  When observers and protesters, such as Plaintiffs, are free to lawfully observe and document the activities of ICE, transparency and accountability will follow.  The accountability measures requested by Plaintiffs will deescalate tensions on the scenes of immigration enforcement and enhance public safety by reining in ICE's inflammatory First and Fourth Amendment violations against observers and protesters.  Moreover, amici are certain that federal agents will retain the ability to defend themselves and stay safe if the Court grants Plaintiffs' motion for a preliminary injunction because, for years, Minnesota law enforcement officers have been operating under limits similar to those in the proposed preliminary injunction.

## ARGUMENT

Plaintiffs have requested an injunction to enforce constitutional limits on ICE's conduct against observers and protesters. Among other things, the proposed injunction requires ICE agents to be identifiable, and it requires them to wear and operate body-worn cameras in accordance with ICE policy.  These requirements are consistent with the Constitution and what law enforcement officers in Minnesota already practice, and therefore are proven, workable

4

measures that enhance public safety and are in the public interest. ICE's current modus operandi is an active detriment to the public interest because it:

- Generates a culture of fear that keeps individuals from going out into the community lest they be targeted;

- Depresses economic activity;

- Allows criminal activity to go unreported or unprosecuted; and

- Wastes the time and resources of local police officers who could be better used responding to emergencies that were not created by ICE's unconstitutional tactics.

A preliminary injunction will be granted if the moving party can demonstrate: (1) the moving party's probability of success on the merits; (2) the threat of irreparable harm to the moving party; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) the public interest in the issuance of the injunction. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). The balance-of-harms and public-interest factors "merge when the Government" is the non-moving party. *Eggers v. Evnen*, 48 F.4th 561, 564 (8th Cir. 2022). Courts must "consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Additionally, the Court must "pay particular regard for the public consequences in employing the extraordinary

remedy of injunction." *Id.* (quoted in *D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019)).

Here, the balance of harms and the public interest weigh in favor of the proposed injunction.

**I.    Minnesota law enforcement agencies have been safely and effectively policing under similar parameters proposed in Plaintiffs' preliminary injunction.**

The equities and public interest favor Plaintiffs because the proposed injunction terms are very similar to what law enforcement agencies operating in the Twin Cities already require of their own officers, without negative effects on public safety or officer safety. Defendants may assert that the tactics used by ICE agents are necessary to protect themselves, and that it would be dangerous for ICE agents to be working under a court order or for ICE agents to be identifiable by the public. But that is not how measures similar to Plaintiffs' requested injunctive relief have played out for local law enforcement.

True, much of the public disapproves of dragnet-style immigration enforcement, and citizens have expressed that disapproval by blowing whistles and criticizing ICE agents. A handful have thrown objects or blocked vehicles. And some have followed ICE vehicles or protested outside hotels where ICE agents are staying.

Amici agree that the safety of law enforcement is important. But local and

state law enforcement in Minnesota have dealt with significant and far more violent public protests than anything ICE agents are facing here. Nevertheless, Minnesota law enforcement agencies have adopted new policies and entered voluntarily into injunctions related to protest response that largely mirror what Plaintiffs are asking for in the proposed injunction. Amici's experience confirms that effective policing of protests and officer safety are not undermined by the types of restrictions Plaintiffs are seeking in this case.

After the murder of George Floyd on May 25, 2020, there was widespread rioting in the City of Minneapolis which also spread to Saint Paul. A large contingent of State Troopers and other state law enforcement personnel also responded to these protests. In 2022, the City of Minneapolis settled a consolidated pair of class action lawsuits brought by protestors from the May 2020 riots in Minneapolis who alleged that the protest-policing tactics used by Minneapolis Police Department officers had violated their First and Fourth Amendment rights.

In settling the lawsuit, the City stipulated to an injunction which prohibited Minneapolis Police Officers from "arresting, threatening to arrest, or using physical force … against persons engaging in lawful protests, lawful public assemblies, or lawful demonstrations who are not posing an immediate threat to the safety of others, officers, or the public safety." *Samaha, et al v. City of*

*Minneapolis, et al*, and *Levy Armstrong, et al v. City of Minneapolis, et al*,  20-cv-01715 (KMM/DTS), ECF Doc. 145 at 2, Order for Injunction (D. Minn. Nov. 22, 2022).  Additionally, it provided that, "Chemical agents shall not be used to disperse a protest … where no members of the protest … are engaging in behavior that is a threat to the safety of an officer, others, or the public safety, unless (1) the protest … is unlawful, and (2) an officer(s) first verbally orders dispersal in a manner designed to be audible for the intended audience and gives a reasonable time for the group to disperse."  *Id.* at 3.  Finally, it added that "All officers deployed to protests, public assemblies, or demonstrations must have their body worn cameras recording per Minneapolis Police Department policy, and may not intentionally obstruct the camera, either partially or entirely."  *Id.*

Similarly, the agencies and officers of the State of Minnesota consented to the entry of a permanent injunction, based on a preliminary injunction entered earlier in the case in *Goyette, et al v. Harrington, et al*, 20-cv-01302 (WMW/DTS), ECF Doc. 316 at 1, Order Granting Plaintiff's Motion for Monitored Injunction (D. Minn. Feb. 8, 2022).  Though that injunction primarily dealt with journalists, it also required that "State Defendants' agents and employees responding to civil unrest or protests … shall prominently display their agency name and badge number readable from a distance of twenty feet" and "State Defendants shall maintain a record of all agents or employees deployed to respond to civil unrest

or protests." *Id.* at 9.

Since those injunctions were entered over three years ago, neither the State nor the City of Minneapolis have been in violation of the terms. At the same time, neither the State nor the City of Minneapolis has found itself unable to appropriately and safely respond to a protest or other First Amendment-protected activity.

Additionally, the Minneapolis Police Department, at the time the injunction was entered, was already in the process of updating its policies on crowd management. In January of 2023, the MPD adopted its new policies which state that:

> 1. MPD employees shall not unlawfully interfere with people engaged in the lawful exercise of their rights.
>
> 2. The MPD will uphold the constitutional rights of free speech and assembly while using the minimum amount of physical force and authority required to address a crowd management or crowd control issue.
>
> 3. The policy of the MPD regarding crowd management and crowd control is to apply the appropriate level of direction and control to protect life, property, and vital facilities while maintaining public peace and order during a public assembly or First Amendment activity.

(Robertson Decl. Ex. A at 4.) Similarly, the Saint Paul Police Department implemented an updated crowd management policy in April of 2023 with nearly identical objectives as the MPD policies. (McElveen Decl. Ex. A at 1.)

To implement these overarching goals, the MPD and SPPD already have

policies requiring many of the same things that Plaintiffs are requesting in their proposed injunction. For example, Plaintiffs' proposed injunction prohibits ICE agents from using crowd control weapons on class members who are not posing a threat of imminent harm to law enforcement.  (ECF 19 at 2.) MPD and SPPD policies also place prohibitions on using these types of crowd control tools with respect to peaceful protesters. (Robertson Decl. Ex. A at 9-11, 13; McElveen Decl. Ex. A at 6-7.) The proposed injunction requires announcements before use of crowd control weapons.  (ECF 19 at 2.)  MPD and SPPD policies also require officers to make announcements to the crowd before deploying crowd control weapons. (Robertson Decl. Ex. A at 11; McElveen Decl. Ex. A at 5-7.) Plaintiffs' proposed injunction requires ICE agents to wear agency and personal identifiers and turn on body-worn cameras. (ECF 19 at 3-6.)  MPD and SPPD policies require this of law enforcement officers. (Robertson Decl. Ex. A at 5, C at 2; McElveen Decl. Ex. A at 3, C at 5, D at 10-11);  Plaintiffs' injunction is not asking ICE agents to do anything meaningfully different than what MPD and SPPD policies require. (*See* Robertson Decl. Ex. E (chart showing proposed PI language versus MPD and SPPD policy).)

The balance of harms and public interest in this case clearly favor Plaintiffs as the terms of the proposed injunction are measures that have been voluntarily adopted by other law enforcement agencies and have caused no harm to the

public or officer safety.

**II.    When federal agents escalate crowds with unlawful tactics, they actively harm local law enforcement officers and public safety.**

The public interest is enhanced by the proposed preliminary injunction because ICE's unlawful tactics actively harm local law enforcement and public safety.[2]

A. Undermining trust in local law enforcement

Public trust in local law enforcement is paramount to effective community policing – including trust between law enforcement and immigrant communities. ICE's tactics undermine public trust in local law enforcement because ICE agents are engaging in unnecessarily provocative and at times unlawful behavior while clothed in garb and using resources that makes them look like local law enforcement.   For example, the Complaint documents how federal agents have used deceptive tactics to resemble local police, like using vests that say "POLICE," vehicles with police lights, and yellow police tape. (ECF 1 ¶¶ 68, 97, 98, 103.) Notably, Plaintiff Abdikadir Noor initially thought the federal agents who violently arrested him were local police and Plaintiff Susan Tincher had to ask federal agents whether they were ICE agents. (*Id.* at ¶¶ 1, 165.)

---

[2] *See, e.g.,* Robertson Decl. Ex. F (Liz Sawyer, *Police Walk a Tightrope to Maintain Community Relations amid Twin Cities ICE arrests*, Minnesota Star Tribune, Dec. 21, 2025).

Additionally, the disgraceful invectives of the President of the United States about Somalia, and amici's Somali residents, at the very outset of "Operation Metro Surge," give an even more sinister appearance to all of ICE's activities in the Twin Cities metro area.[3] Such statements understandably angered and upset the local population.[4]

ICE agents then descended upon the Somali population of the Twin Cities metro area, the home to the largest Somali diaspora in the country.[5] In conducting their "surge" ICE agents have allegedly stopped, and sometimes arrested, individuals who are citizens and have legal status.[6] (Robertson Decl. ¶ 12.) The President's rhetoric, coupled with ICE's tactics, clearly meant to provoke anger and fear, are undermining trust in local law enforcement.

---

[3] At a December 2, 2025, televised cabinet meeting the President stated that Somalia "stinks and we don't want [Somalis] in our country" and, "we're going to go the wrong way if we keep taking in garbage into our country." Robertson Decl. Ex. G (Aamer Madhani, *Trump says he doesn't want Somalis in the US, urges them to go back to their homeland and fix it*, Associated Press, Dec. 2, 2025).

[4] Robertson Decl. Ex. H (Olivia-Anne Clearly, *Protesters Condemn Trump's Targeting of Minnesota's Somali Community: 'This Is Our Country, Not His,'* Time Magazine, Dec. 4, 2025).

[5] Robertson Decl. Ex. I (*U.S. Foreign-Born Population: 2019-2023*, United States Census Bureau (December 12, 2024)).

[6] *See e.g.* Robertson Decl. Ex. J (Ari Bergeron and Susie Jones, *WATCH: 20-year old U.S. citizen detained by ICE on Tuesday draws condemnation from Minneapolis' mayor and police chief*, WCCO News, Dec. 10, 2025).

Because ICE agents are not clearly identifying themselves as federal agents, community members frequently cannot distinguish between ICE activities, possible criminal activities, and local law enforcement officers. Local law enforcement has been working for years to improve police-community relations, and the apparently intentional lack of agency identification by ICE agents sets back that progress and confuses the public.

ICE agents have been observed traveling in unmarked vehicles and switching vehicles' license plates.[7] Hidden identities combined with the apparently unlawful tactics makes it difficult for community members to know what agency the agents represent, which in turn erodes hard-earned community trust being rebuilt by local law enforcement day by day-- particularly where the tactics being used by ICE agents are at odds with the carefully developed, trained, and enforced local policies designed to increase that trust.

Decreased trust in law enforcement also erodes public safety because the community is less likely to report criminal activity, and less likely to cooperate as witnesses. For example, in Hennepin County there has been a marked decrease

---

[7] *See* Robertson Decl. Ex. K (Pong Xiong, Director, Minnesota Driver and Vehicle Services, *Letter to Secretary Kristi Noem, Re: Misuse of Minnesota License Plates on Unmarked DHS Vehicles*, December 23, 2025); *See also,* Robertson Decl. Ex. L (Jon Collins, *Minnesota DVS warns ICE agents they're violating state law by switching license plates*, MPR News, Dec. 24, 2025).

13

in individuals who are cooperating in prosecution of violent crimes. (Castillo Declaration ¶ 5).[8]

While the Hennepin County Attorney's Office (HCAO) has a nationally recognized U Visa and T Visa Certification Policy to help victims feel safe enough to report crimes and testify, the deceptive tactics of federal agents alleged in the Complaint are eroding community trust, forcing noncitizen crime victims into the shadows.[9]

This year, victims of domestic violence have called the Domestic Abuse Service Center (DASC), saying they are too afraid to receive victim services at the Hennepin County Government Center because ICE has been entering government buildings. (Castillo Declaration ¶ 4).[10] The HCAO also needs victims, regardless of their citizenship status, to testify in criminal trials, and victims have a right to be present at plea and sentencing hearings. *See* Minn. Stat. § 611A.03, subd. 1(2) (2025). But crime victims and witnesses, including an eyewitness to a murder, have

---

[8] Robertson Decl. Ex. M (Raya Quttaineh, *New Location for Domestic Abuse Service Center*, KARE 11 News, Dec. 10, 2024); Robertson Decl. Ex. N (HCAO, *Domestic Abuse Service Center*).

[9] *See* Robertson Decl. Ex. O (HCAO, *U Visa and T Visa Milestone*, July 2025).

[10] *See* Robertson Decl. Ex. P (Katrina Pross, *ICE Arrests Target Immigrants at Hennepin County Courthouse*, Sahan Journal, Jan. 28, 2025).

told the HCAO that they are afraid to visit the courthouse over fears that ICE may detain them there. (Castillo Declaration ¶ 4).[11]

When victims remain silent, whether by not reporting crimes or refusing to testify, criminal offenders escape accountability, and every unreported crime emboldens offenders, undermines justice, and puts the public at risk.

      B.  <u>Redirection of local resources</u>

In December 2025, the City of Minneapolis has received multiple 911 calls regarding unidentified individuals kidnapping residents. (Robertson Decl. ¶ 20.) Upon investigation by the Minneapolis police, it was discovered that the suspected kidnappers were ICE agents who told Minneapolis officers that the individual was detained as part of immigration enforcement.  (*Id.*)

Likewise, ICE's heavy-handed and unlawful tactics unsurprisingly escalate tensions at the scene among observers and protesters.  For instance, in the recent documented incident where an ICE agent dragged a reportedly pregnant individual on the ground by one handcuff at the site of an immigration operation in Minneapolis, many individuals present were loudly objecting.[12] From just

---

[11] *See* Robertson Decl. Ex. Q (Katrina Pross, *Federal Immigration Actions are Affecting Hennepin County Prosecutions*, Sahan Journal, Aug. 18, 2025).

[12] *See* Robertson Decl. Ex. R (Conor Wight, *ICE put themselves, others at risk during south Minneapolis operation, former agent says*, CBS News, Dec. 18, 2025); Robertson Decl. Ex. S (Mike Manzoni, *Witness, ICE offer conflicting accounts of chaotic clash in Minneapolis*, Fox 9, Dec. 16, 2025).

December 9-December 22, 2025, Minneapolis received nineteen 911 calls related to ICE operations where officers have had to respond to investigate the situation as a crime, deal with vehicles left in a public right-of-way by ICE agents after they have detained an individual, or deescalate a tense situation.  (Robertson Decl. ¶¶ 23, 24, 25.)  Such calls take the time and attention of local officers who are needed to respond to non-ICE-related 911 calls from their community.

Being called to the scene of these tense situations creates difficulties for local officers as they are often wrongly perceived as assisting ICE agents, even when they are just trying to maintain public safety.[13] Additionally, ICE agents carry and brandish weapons and use firearms and may use deadly force to apprehend suspects, and the presence of numerous weapons on an already-tense scene increases the complexity and potential danger for local police who may need to respond to a scene.[14] The preliminary injunction requested by Plaintiffs will take down the temperature for the public and for local police at these scenes

---

[13] *See, e.g.*, Robertson Decl. Ex. T (Trevor Mitchell, *Police in Twin Cities pitted between competing demands of protesters and federal agents*, MinnPost Dec. 23, 2025).
[14] *See* Robertson Decl. Ex. U (Chelsea Bailey, *ICE agents in Twin Cities open fire after an undocumented man allegedly hit them with his SUV*, CNN Dec. 22, 2025 ("But Sunday's pursuit points to a troubling trend that's emerged during the administration's immigration enforcement efforts, which left some officials warning about the potential for escalation and violence.")).

16

and make them less likely to need a local law enforcement response and less

dangerous should local law enforcement need to respond.

Should Defendants attempt to argue that the balance of harms favors them

because they are upholding the law and attempting to capture dangerous

criminals, this argument loses all force when held up to scrutiny.  According to

libertarian think-tank Cato Institute's analysis of ICE data, as of June 14, of the

more than 200,000 individuals who had been arrested by ICE at that point in

fiscal year 2025, 65% had no criminal convictions and more than 93% had no

violent convictions.[15]   The Court should contrast this with the harm to the public

from ICE's violent arrests quelling First Amendment activity, violations of

Minnesota Law (for example, displaying license plates other than the license

plate assigned to the vehicle), making the work of local law enforcement more

difficult, and diverting the resources of local law enforcement away from

preventing, investigating, and prosecuting crimes. The balance of harms

overwhelmingly favors Plaintiffs.

---

[15] ICE had booked into detention 204,297 individuals (since October 1, 2024, the start of fiscal year 2025).  Robertson Decl. Ex. V (David J. Bier, *65 Percent of People Taken by ICE Had No Convictions, 93 Percent No Violent Convictions*, Cato Institute June 20, 2025); *see also*, Robertson Decl. Ex. W (Tim Henderson, *An ever-larger share of ICE's arrested immigrants have no criminal record*, Stateline, Dec. 12, 2025 (The share of immigration arrests of violent criminals from January through October 2025 has actually dropped relative to the same period in 2024.)).

### III.    The culture of fear created when lawful protest is met with retaliation and unreasonable force harms the entire community and cannot be in the public interest.

As Plaintiffs point out, it is always in the public interest to prevent violations of constitutional rights. *See D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019). The fraught situation created by "Operation Metro Surge" shows how very important that principle is. When ICE agents arrest or use force on those criticizing them, it creates a culture of fear that pervades the entire community. Individuals are afraid to call 911 for medical aid for fear that ICE will show up with the paramedics. (Robertson Decl. ¶ 30.) Community members are not certain if an individual has been arrested, detained by ICE, or kidnapped. (Robertson Decl. ¶ 20.) Community members, including citizens and legal residents, especially of ethnicities or national origins apparently disfavored by the current federal administration, are afraid to go outside, go to work, send their kids to school, or go shopping, lest their entire lives are upended because they get stopped by an ICE agent.

ICE's targeting of Minnesota's immigrant communities, apparently regardless of immigration status, also threatens significant economic impact. According to the Minnesota Department of Employment and Economic Development, foreign-born workers made up 10.9% of Minnesota's labor force as of 2023, and "provide healthcare and childcare, produce needed goods, provide

vital services, start their own companies and contribute in many other ways. Certain sectors such as Manufacturing and Transportation, and occupations like Nursing Assistants, Drivers, Software Developers and Production Workers rely more upon foreign-born workers."[16] And the Minnesota Chamber of Commerce earlier this year concluded, based on its research, "that new Americans contribute significantly—not only as workers but also as entrepreneurs, consumers, taxpayers, and connections to the global economy," with immigration "account[ing] for about 60% of total [Minnesota] job and labor force growth so far this decade."[17]  ICE's harassment of immigrant communities threatens Minnesota economically, and the State cannot sufficiently counter this threat if ICE is allowed to chill reporting on its activities.

The Court can mitigate these harms by granting the injunction. The injunction requested by Plaintiffs, particularly the terms requiring identification and body-worn cameras, will allow anyone whose rights have been violated to seek vindication of those rights against the specific federal agent who violated them. Where observers and protesters such as Plaintiffs are free to lawfully observe and document the activities of ICE, transparency and accountability can

---

[16] Robertson Decl. Ex. X (Carson Gorecki, Tim O'Neill and Amanda Blaschko, *The Growth and Impact of Minnesota's Foreign-Born Workforce* (March 2025)).
[17] Robertson Decl. Ex. Y (Doug Loon, *The Economic Contributions of New Americans in Minnesota* (February 28, 2025)).

follow.  The accountability measures requested by Plaintiffs will deescalate
tensions on the scenes of immigration enforcement and enhance public safety by
reining in the inflammatory First and Fourth Amendment violations against
observers and protesters.  If the public is able to hold individual federal agents
accountable, that will help deter any unconstitutional conduct.  This requirement
would provide benefits to Defendants as well because it would protect ICE
agents from any unfounded claims.  Both the balance of harms and the public
interest clearly favor Plaintiffs' preliminary injunction.

## CONCLUSION

The incendiary tactics being used by ICE agents are provoking an
understandable community outcry, which ICE agents respond to with
unconstitutional and retaliatory force and arrests.  These actions create harms to
local law enforcement and the community and are not in the public interest.
There would be no harm to ICE agents from the reasonable restrictions requested
by Plaintiffs here as they are largely what local law enforcement agencies already
practice.  The undersigned government entities ask that the Court enter a
preliminary injunction enforcing constitutional limits on ICE's conduct against
observers and protesters, to require that ICE agents be identifiable, and to
require that ICE agents wear and operate body-worn cameras.

Dated: December 31, 2025          Respectfully submitted,

KRISTYN ANDERSON
City Attorney
By */s Heather P. Robertson*
HEATHER ROBERTSON (#0390470)
SARA LATHROP (#0310232)
Assistant City Attorneys
350 South Fifth Street, Room 210
Minneapolis, MN 55415
(612) 299-2742
heather.robertson@minneapolismn.gov
sara.lathrop@minneapolismn.gov
*Attorneys for Amicus City of Minneapolis*

LYNDSEY OLSON
Saint Paul City Attorney
By:  */s Kelsey McElveen*
KELSEY MCELVEEN (#0396744)
Assistant City Attorney
15 W. Kellogg Boulevard #750
Saint Paul, Minnesota 55102
(651) 266-8710
Kelsey.McElveen@ci.stpaul.mn.us
*Attorneys for Amicus City of Saint Paul*

MARY F. MORIARTY
Hennepin County Attorney
By */s Clare Diegel*
CLARE DIEGEL (#0400758)
EDER CASTILLO (#0402051)
Assistant County Attorneys
300 S 6th St, Mail Code 153
Minneapolis, MN 55487
(612) 348-6764
Clare.Diegel@hennepin.us
Eder.Castillo@hennepin.us
*Attorneys for Amicus Hennepin County
Attorney's Office*

21

**KEITH ELLISON**
Attorney General
State of Minnesota
By: */s/ Pete Farrell*
Peter J. Farrell
Deputy Solicitor General (MN #0393071)
Aaron Winter
Assistant Attorney General (MN #0390914)
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 757-1010
Peter.Farrell@ag.state.mn.us
Aaron.Winter@ag.state.mn.us
*Attorneys for Amicus State of Minnesota*