# Exhibit 2

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| SUSAN TINCHER, JOHN BIESTMAN, JANET LEE, LUCIA WEBB, ABDIKADIR NOOR, and ALAN CRENSHAW, on behalf of themselves and other similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive Associate Director, Enforcement and Removal Operations (ERO), ICE; DAVID EASTERWOOD, Acting Field Office Director, ERO, ICE Saint Paul Field Office; JOHN A. CONDON, Acting Executive Associate Director, Homeland Security Investigations (HSI); The Department of Homeland Security; Unidentified Federal Agencies; and Unidentified Federal Agents; in their official capacities,<br><br>Defendants. | Case No: 25-cv-04669 (KMM/DTS)<br><br><br>**DECLARATION OF HEATHER ROBERTSON IN SUPPORT OF MEMORANDUM OF AMICUS CURIE** |

1

Your Declarant is Heather Robertson, and she submits the following declaration:

1. I am an Assistant City Attorney with the Minneapolis City Attorney's Office. I submit this declaration in support of the Memorandum of Amicus Curie.

2. Attached as Exhibit A is a true and accurate excerpt from the Minneapolis Police Department Policy and Procedure Manual ("MPD P&P Manual"), consisting of Section 7-805 Crowd Management, last updated on January 1, 2023.

3. Attached as Exhibit B is a true and accurate excerpt from the MPD P&P Manual, consisting of Section 5-304(III)(L) Use of Force Control Options - Firearms, last updated May 12, 2025.

4. Attached as Exhibit C is a true and accurate excerpt from the MPD P&P Manual, consisting of Section 4-233(IV)(A)(6)(a) Body Worn Cameras – Procedures/Rules/Regulations – Employee Responsibilities – Activation – Required Activation, last updated December 30, 2024.

5. Attached as Exhibit D is a true and accurate excerpt from the MPD P&P Manual, consisting of Section 5-102(III)(A) Professional Conduct - Procedures/Regulations – Obey Laws (Principle One), last updated September 15, 2023.

6.      Attached as Exhibit E is a chart that compares many proposed terms of the proposed injunction (ECF 19) to policies of the Minneapolis and Saint Paul Police Departments which are contained in Exhibits A-D of this declaration, and Exhibits A-D of the Declaration of Kelsey McElveen.

7.      Attached as Exhibit F is a true and correct copy of the news media article *Police Walk a Tightrope to Maintain Community Relations amid Twin Cities ICE arrests*, published in the Minnesota Star Tribune, December 21, 2025, authored by Liz Sawyer, downloaded on December 29, 2025, and is available at https://www.startribune.com/police-are-walking-a-tightrope-to-maintain-community-relations-amid-twin-cities-ice-arrests/601546661

8.      Attached as Exhibit G is a true and correct copy of the news media article *Trump says he doesn't want Somalis in the US, urges them to go back to their homeland and fix it*, published by the Associated Press on December 2, 2025, authored by Aamer Madhani, downloaded on December 29, 2025, and is available at https://apnews.com/article/trump-somalia-immigration-afghanistan-421eaa7ff218c43ccaed3cbab8ed37f5

9.      Attached as Exhibit H is a true and correct copy of the news media article *Protesters Condemn Trump's Targeting of Minnesota's Somali Community: 'This Is Our Country, Not His,'* published in Time Magazine on December 4, 2025, authored by Olivia-Anne Clearly, downloaded on December 29, 2025, and

3

available at https://time.com/7338580/anti-trump-protesters-immigration-crackdown-somali-community/

10.    Attached as Exhibit I is a true and correct copy of a printout from the official website of the United States Census Bureau which allows the user to access census data, *U.S. Foreign-Born Population: 2019-2023*, United States Census Bureau (December 12, 2024), downloaded on December 29, 2025, and is available at: https://www.census.gov/library/visualizations/interactive/foreign-born-population-2019-2023.html

11.    Attached as Exhibit J is a true and correct copy of the news media article *WATCH: 20-year old U.S. citizen detained by ICE on Tuesday draws condemnation from Minneapolis' mayor and police chief*, published by WCCO News, on December 10, 2025, authored by Ari Bergeron and Susie Jones, downloaded on December 31, 2025, and available at https://www.audacy.com/wccoradio/news/local/us-citizen-detained-ice-draws-condemnation-minneapolis.

12.    On December 9, 2025, Minneapolis received a 911 call from a concerned citizen who informed dispatchers that people who announced themselves as federal agents grabbed an American Citizen and then drove away with the citizen at a high rate of speed. They told 911 that the agents had refused to look at the detained individual's identification.

13. Attached as Exhibit K is a true and correct copy of a letter from Pong Xiong, Director of Minnesota Driver and Vehicle Services to Department of Homeland Security Secretary Kristi Noem, regarding "Misuse of Minnesota License Plates on Unmarked DHS Vehicles" sent on December 23, 2025, and downloaded on December 31, 2025 from

https://www.mprnews.org/story/2025/12/24/ice-agents-in-minnesota-are-violating-state-law-by-switching-license-plates.

14. Attached as Exhibit L is a true and correct copy of the news media article *Minnesota DVS warns ICE agents they're violating state law by switching license plates*, published by MPR News on December 24, 2025, authored by Jon Collins, downloaded on December 29, 2025, and available at

https://www.mprnews.org/story/2025/12/24/ice-agents-in-minnesota-are-violating-state-law-by-switching-license-plates

15. Attached as Exhibit M is a true and correct copy of the news media article *New Location for Domestic Abuse Service Center*, published by KARE 11 News on December 10, 2024, authored by Raya Quttaineh, downloaded on December 31, 2025, and available at

https://www.kare11.com/article/news/local/domestic-abuse-service-center-hennepin-county-minnesota-new-location/89-6f90d223-f550-4498-94e7-c3d0cfc8c053.

16.     Attached as Exhibit N is a true and correct printout of the page

*Domestic Abuse Service Center* from the Hennepin County Attorney's official

website, printed on December 31, 2025, and available at

https://www.hennepinattorney.org/en/get-help/crime/domestic-abuse-

service-center.

17.     Attached as Exhibit O is a true and correct printout of the page *U*

*Visa and T Visa Milestone*, from the Hennepin County Attorney's official website,

originally posted in July 2025, printed on December 31, 2025 and available at

https://www.hennepinattorney.org/news/news/2025/july/u-t-visa-milestone.

18.     Attached as Exhibit P is a true and correct copy of the news media

article *ICE Arrests Target Immigrants at Hennepin County Courthouse*, published by

the Sahan Journal on January 28, 2025, authored by Katrina Pross, downloaded

on December 31, 2025, and available at https://sahanjournal.com/public-

safety/ice-arrests-minneapolis-hennepin-county-courthouse.

19.     Attached as Exhibit Q is a true and correct copy of the news media

article *Federal Immigration Actions are Affecting Hennepin County Prosecutions*,

published by the Sahan Journal on August 18, 2025, authored by Katrina Pross,

downloaded on December 31, 2025, and available at

https://sahanjournal.com/public-safety/immigration-arrests-impact-hennepin-

county-court-cases.

6

20. Minneapolis 911 received six calls between December 11 and December 15, 2025, from concerned citizens who have seen individuals being kidnapped by unidentified people or people they were not sure were ICE agents. Upon investigation the Minneapolis Police have been able to confirm later that these individuals were detained by ICE as part of immigration enforcement.

21. Attached as Exhibit R is a true and correct copy of the news media article *ICE put themselves, others at risk during south Minneapolis operation, former agent says*, published by CBS News on December 18, 2025, authored by Conor Wight, downloaded on December 29, 2025, and available at

https://www.cbsnews.com/minnesota/news/ice-operation-minneapolis-former-agent-reviews-video/.

22. Attached as Exhibit S is a true and correct copy of the news media article *Witness, ICE offer conflicting accounts of chaotic clash in Minneapolis*, published by Fox 9 on December 16, 2025, authored by Mike Manzoni, downloaded on December 29, 2025, and available at

https://www.fox9.com/news/witness-ice-offer-conflicting-accounts-chaotic-clash-minneapolis.

23. Minneapolis 911 received six calls between December 11 and December 14, 2025, of vehicles that have been left abandoned on the public right of way after ICE has detained the individual(s) in the car.

24.     On December 9, and December 15, 2025, Minneapolis 911 received calls from ICE agents requesting Minneapolis Police Support with tense protestor situations.

25.     From December 9 to December 22, 2025, Minneapolis 911 received nineteen calls related to ICE operations where officers have had to respond to investigate the situation as a crime, deal with vehicles left in a public right-of-way by ICE agents after they have detained an individual or deescalate a tense situation.

26.     Attached as Exhibit T is a true and correct copy of the news media article *Police in Twin Cities pitted between competing demands of protesters and federal agents*, published by MinnPost on December 23, 2025, authored by Trevor Mitchell, downloaded on December 29, 2025, and available at

https://www.minnpost.com/metro/2025/12/police-in-twin-cities-pitted-between-competing-demands-of-protesters-and-federal-agents-in-debate-over-separation-ordinance/.

27.     Attached as Exhibit U is a true and correct copy of the news media article *ICE agents in Twin Cities open fire after an undocumented man allegedly hit them with his SUV*, published by CNN on December 22, 2025, authored by Chelsea Bailey, downloaded on December 29, 2025, and available at

https://www.cnn.com/2025/12/22/us/ice-agents-open-fire-st-paul-minnesota.

28.     Attached as Exhibit V is a true and correct copy of the article from the Cato Institute *65 Percent of People Taken by ICE Had No Convictions, 93 Percent No Violent Convictions*, posted on June 20, 2025, authored by David J. Bier, downloaded on December 29, 2025 and available at

https://www.cato.org/blog/65-people-taken-ice-had-no-convictions-93-no-violent-convictions.

29.     Attached as Exhibit W is a true and correct copy of the news media article *An ever-larger share of ICE's arrested immigrants have no criminal record*, published by Stateline on December 12, 2025, authored by Tim Henderson, downloaded on December 31, 2025 and available at

https://stateline.org/2025/12/12/an-ever-larger-share-of-ices-arrested-immigrants-have-no-criminal-record/

30.     On December 19, 2025, Minneapolis 911 received a phone call where the caller had to be assured that ICE agents would not arrive with the paramedics if an ambulance was sent to his house to respond to a medical event.

31.     Attached as Exhibit X is a true and correct copy of a publication from the Minnesota Department of Employment and Economic Development, *The Growth and Impact of Minnesota's Foreign-Born Workforce* posted in March of 2025, authored by Carson Gorecki, Tim O'Neill and Amanda Blaschko, downloaded on December 31, 2025, and available at

9

https://mn.gov/deed/newscenter/publications/trends/mar-2025/foreign-born.jsp.

32.     Attached as Exhibit Y is a true and correct printout of the transcript of a the Minnesota Business podcast, episode titled *The Economic Contributions of New Americans in Minnesota*, from the Minnesota Chamber of Commerce, the podcast was hosted by Doug Loon and the transcript posted on February 28, 2025, downloaded on December 31, 2025, and available at

https://www.mnchamber.com/blog/economic-contributions-new-americans-minnesota.

I declare under penalty of perjury that everything I have stated in this declaration is true and correct to the best of my knowledge.  Signed in Ramsey County, Minnesota.

Dated: December 31, 2025                    */s Heather P. Robertson*
                                            Heather P. Robertson
                                            Assistant City Attorney
                                            Minneapolis City Attorney's Office

- Chemical bomb
- Military ordnance
- Clandestine lab
- Explosion

Sworn personnel shall not handle or open any device, or utilize a canine to survey any suspicious package. Responding officers shall establish a perimeter and evacuate all persons (including EMS personnel) to a minimum distance of 500 feet. Portable radios and cell phones shall not be used in the immediate vicinity of the suspected threat. Only personnel assigned to the Bomb Squad shall cross the established perimeter.

Officers shall complete a CAPRS report coded BOMB.

## 7-805    Crowd Management
(01/05/23)
Revisions to prior policies: (04/20/01) (08/17/07) (06/16/20) (08/21/20) (09/08/20) (10/31/20) (03/12/21) (01/01/23)

I.    **Purpose**

    **A.** The First Amendment to the Constitution of the United States of America states, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech or of the press, or the right of the people peaceably to assemble and to petition the Government for a redress of grievances."

    **B.** The Bill of Rights in Article 1 of the Minnesota Constitution addresses the rights of free speech and the liberty of the press. However, neither the state nor federal constitutions protect criminal activity or threats against citizens, businesses, or critical infrastructure.

    **C.** The Minneapolis Police Department supports all people's fundamental right to peaceably assemble and their right to freedom of speech and expression.

    **D.** The purpose of this policy is to provide guidelines to MPD employees regarding the application and operation of law enforcement actions during public assemblies and First Amendment Activity.

II.    **Definitions**

**Assembly:** An assembly is a group of people gathered together in one place for a common purpose.

**Civil Disturbance:** A civil disturbance, also known as civil disorder or civil unrest, is when a gathering or assembly becomes violent or involves a collective threat of imminent violence, including but not limited to, assaults, significant property damage, arson fires, and bodily injury to people.

Ex. A

| | |
|---|---|
| Volume Seven – Field Operations | 7-800 |
| Tactical Response | Page 5 of 46 |

**Control Holds:** Control holds are soft empty hand control techniques as they do not involve striking.

**Crowd Control:** Techniques used to address unlawful public assemblies.

**Crowd Control Purposes:** Using tactics or weapons to contain, control or disperse a crowd or assembly.

**Crowd Control Weapons:** Crowd control weapons include any weapon (or tool used as a weapon) used to address a civil disturbance or other unlawful public assembly. These include chemical aerosols, chemical munitions or projectiles (CS or OC), smoke munitions or projectiles, marking rounds (40mm direct, exact or blunt impact projectiles or rounds), rubber bullets, impact weapons (ASP batons, riot sticks, bicycles or other items used as impact weapons), and light sound distraction devices (inert, CS or OC blast balls). Authorization for use of crowd control weapons is set forth in section [D] below.

**Crowd Escort Actions:** Actions to escort crowds, moving or directing them back, with contact that does not rise to the level of a forceful shove or strike.

**Crowd Management:** Techniques used to manage lawful public assemblies before, during, and after an event. Crowd management can be accomplished in part through coordination with event planners and group leaders, permit monitoring, and based on the specific circumstances presented and in light of prior crowd events.

**Deadly Force:** Force used by an officer that the officer knows, or reasonably should know, creates a substantial risk of causing death or great bodily harm.

**Demonstration:** An assembly of people organized primarily to engage in First Amendment activity. They include, but are not limited to, marches, protests, and other assemblies intended to attract attention.

**First Amendment Activities:** First Amendment activities include all forms of speech and expressive conduct used to convey ideas and/or information, express grievances, or otherwise communicate with others and include both verbal and non-verbal expression.

1. Common First Amendment activities include, but are not limited to:

   - Speeches
   - Demonstrations
   - Vigils
   - Picketing
   - Distribution of literature
   - Displaying banners or signs
   - Street theater, and
   - Other artistic forms of expression.

Ex. A

2. All these activities involve the freedom of speech, association, and assembly and the right to petition the government, as guaranteed by the United States Constitution and the Minnesota State Constitution.

3. The government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.

**Great Bodily Harm:** Bodily injury which creates a high probability of death, or which causes serious, permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily harm.

**Legal Observers:** Individuals, usually representatives of civilian human rights agencies, who attend public demonstrations, protests and other activities. The following may be indicia of a legal observer: Wearing a green National Lawyers' Guild issued or authorized Legal Observer hat and/or vest (a green NLG hat and/or black vest with green labels) or wearing a blue ACLU issued or authorized legal observer vest.

**Media:** Media means any person who is an employee, agent, or independent contractor of any newspaper, magazine or other periodical, book publisher, news agency, wire service, radio or television station or network, cable or satellite station or network, or audio or audiovisual production company, or any entity that is in the regular business of news gathering and disseminating news or information to the public by any means, including, but not limited to, print, broadcast, photographic, mechanical, internet, or electronic distribution. For purposes of this policy, the following are indicia of being a member of the media: visual identification as a member of the press, such as by displaying a professional or authorized press pass or wearing a professional or authorized press badge or some distinctive clothing that identifies the wearer as a member of the press.

**Munitions:**

   **Chemical Agent Munitions:** Munitions designed to deliver chemical agents from a launcher or be propelled by hand.

   **Less-Lethal Impact Munitions:** Impact munitions which can be fired, launched, or otherwise propelled.

      **Direct Fired Munitions:** Less-lethal impact munitions that are designed to be direct fired at a specific target.

      **Indirect-Fired Muntions:** Less-lethal non-direct impact munitions that are discharged toward a surface in front of a target, intended to impact the subject following contact with the surface.

Ex. A

**Unlawful Assembly:** According to MN Statute section 609.714, "When three or more persons assemble, each participant is guilty of unlawful assembly, which is a misdemeanor, if the assembly is:

1.  with intent to commit any unlawful act by force; or

2.  with intent to carry out any purpose in such manner as will disturb or threaten the public peace; or

3.  without unlawful purpose, but the participants so conduct themselves in a disorderly manner as to disturb or threaten the public peace."

### III.  Policy

#### A.  Facilitating Exercise of Rights

1.  MPD employees shall not unlawfully interfere with people engaged in the lawful exercise of their rights.

2.  The MPD will uphold the constitutional rights of free speech and assembly while using the minimum amount of physical force and authority required to address a crowd management or crowd control issue.

3.  The policy of the MPD regarding crowd management and crowd control is to apply the appropriate level of direction and control to protect life, property, and vital facilities while maintaining public peace and order during a public assembly or First Amendment activity.

#### B.  Policy Application

This policy concerning crowd management, crowd control, crowd dispersal, and police responses to violence and disorder applies to:

- Spontaneous demonstrations,
- Spontaneous crowd event situations, and
- Planned demonstration or crowd events regardless of the permit status of the event.

#### C.  Use of Force

1.  Nothing in this policy prohibits officers' abilities to use appropriate force options to defend themselves or others as defined in P&P 5-300.

2.  Use of any crowd control weapons shall be reported and reviewed in accordance with the sections on Force Reporting and Supervisor Force Reviews in P&P 5-301.

#### D.  Supervisor Responsibility for Oversight

Supervisors shall be responsible for:

| Volume Seven – Field Operations | 7-800 |
|---|---|
| Tactical Response | Page 8 of 46 |

1. Ensuring that officers assigned launchers or munitions have completed relevant training and certification as applicable.

2. Describing to on-scene officers the rules of engagement for the deployment of munitions, including a review of the applicable use-of-force policy sections.

3. Maintaining responsibility for the munitions issued and deployed.

4. Ensuring appropriate radio notification of deployments where practical and ensuring subsequent reporting.

5. Ensuring officers complete proper written documentation for the deployment of less-lethal weapons after deploying such tools.

**E. Incident Commander**

In some cases, the Incident Commander role in this policy may be the same person as the on-scene supervisor.

**F. Annual Policy Review**

This policy is to be reviewed annually.

**IV. Procedures/Regulations**

**A. Uniform**

1. All officers responding to public assemblies shall at all times, including when wearing protective gear, display their agency name and a unique personal identifier in accordance with P&P 3-100.

2. The Chief or the Chief's designee shall maintain a record of any officer at the scene who are not in compliance with this requirement due to exigent circumstances.

**B. Officer conduct**

1. Officers shall maintain professional demeanor and remain neutral in word and deed despite unlawful or anti-social behavior on the part of crowd members.

2. Verbal abuse against officers does not constitute a reason for an arrest or for any use of force against such individuals.

3. Officers shall not take action or fail to take action based on the opinions being expressed.

4. Officers shall not interfere with the rights of members of the public to observe and document police conduct via video, photographs, or other methods unless doing so interferes with on-going police activity (P&P 9-202).

Ex. A

| | |
|---|---|
| Volume Seven – Field Operations | 7-800 |
| Tactical Response | Page 9 of 46 |

5.  Officers shall not use a weapon or munition unless the officer has been trained in the use and qualified in deployment of the weapon/munition (P&P 5-302).

6.  This policy does not preclude officers from taking appropriate action to direct crowd and vehicular movement; enforce ordinances and statutes; and to maintain the safety of the crowd, the general public, law enforcement personnel, and emergency personnel.

**C.  Responses to Crowd Situations**

1.  Spontaneous disturbances

    Officers responding to large-scale disturbances, or those that are likely to become violent, shall notify their supervisor. The responding supervisor shall assume the role of Incident Commander and determine the need for additional assistance, equipment, and tactics to be used.

    a.  The Incident Commander shall inform the Watch Commander, who shall contact MECC with information of the situation. MECC shall contact the Chief of Police and the appropriate Bureau Head, with information of the situation.

    b.  The first level of additional assistance shall be precinct officers and designated response cars. The Incident Commander shall establish a field command post with a designated staging area. The Incident Commander shall designate officers for security details for police vehicles and equipment.

    c.  The Incident Commander may request the activation of the SWAT team to provide additional demonstration management resources. Upon activation, the SWAT team will be deployed and directed by the SWAT Lieutenant in consultation with the Incident Commander.

    d.  The Incident Commander shall be in charge of the incident as a whole, however, the SWAT Lieutenant shall direct the specific actions of SWAT members once they have been activated, consistent with the mission outlined by the Incident Commander.

2.  Lawful assembly

    Individuals or groups present on the public way, such as public facilities, streets or walkways, generally have the right to assemble, rally, demonstrate, protest, or otherwise express their views and opinions through varying forms of communication including the distribution of printed matter. These rights may be limited by laws or ordinances regulating such matters as the obstruction of individual or vehicle access or egress, trespass, noise, picketing, distribution of handbills, leafleting and loitering.

3.  Unlawful assembly

    a.  The mere failure to obtain a permit, such as a parade permit or sound permit, is not a sufficient basis to declare an unlawful assembly.

Ex. A

b.  The fact that some of the demonstrators or organizing groups have engaged in violent or unlawful acts on prior occasions or demonstrations is not grounds for declaring an assembly unlawful.

c.  Whenever possible, the unlawful behavior of a few participants shall not result in the time, place or manner of expression being impacted for majority of peaceful protestors, unless other participants or officers are threatened with dangerous circumstances.

d.  Unless emergency or dangerous circumstances prevent negotiation, crowd dispersal techniques shall not be initiated until after attempts have been made through contacts with the police liaisons and demonstration or crowd event leaders to negotiate a resolution of the situation so that the unlawful activity will cease, and the First Amendment activity can continue.

4.  Declaration of Unlawful Assembly

a.  If the Incident Commander has declared an unlawful assembly, the reasons for the declaration and the names of the decision maker(s) shall be recorded.

  i.  The declaration and dispersal order shall be announced to the assembly.

  ii.  The name(s) of the officers announcing the declaration should be recorded, with the time(s) and date(s) documented.

b.  The dispersal order shall include:

  iii.  Name, rank of person, and agency giving the order.

  iv.  Declaration of Unlawful Assembly and reason(s) for declaration.

  v.  A minimum of two egress routes that may be used.

  vi.  Specific consequences of failure to comply with dispersal order.

  vii.  How long the group has to comply.

c.  Whenever possible, dispersal orders should also be given in other languages that are appropriate for the audience. Officers shall recognize that not all crowd members may be fluent in the language(s) used in the dispersal order.

d.  Dispersal announcements shall be made in a manner that will ensure that they are audible over a sufficient area.

  i.  Dispersal announcements shall be made from different locations when the demonstration is large and noisy.

    ii.  The dispersal announcements should be repeated after commencement of the dispersal operation so that people not present at the original broadcast will understand that they must leave the area.

5. Crowd Dispersal

    a.  Crowd dispersal techniques should not be initiated until officers have made repeated announcements to the crowd, or are aware that repeated announcements have been made, asking members of the crowd to voluntarily disperse and informing them that, if they do not disperse, they will be subject to arrest.

    b.  Unless an immediate risk to public safety exists or significant property damage is occurring, sufficient time will be allowed for a crowd to comply with officer commands before action is taken.

    c.  If negotiations and verbal announcements to disperse do not result in voluntary movement of the crowd, officers may employ additional crowd dispersal tactics, but only after orders from the Incident Commander, and by using the minimum amount of physical force and authority needed to address the issue.

    d.  If, after a crowd disperses pursuant to a declaration of unlawful assembly and subsequently participants assemble at a different geographic location where the participants are engaged in non-violent and lawful First Amendment activity, such an assembly cannot be dispersed unless it has been determined that it is an unlawful assembly, and a new declaration of unlawful assembly has been made.

**D. Authorization for Crowd Control Weapon Use**

1. Except as provided in [E] below, during civil disturbances or assemblies (as defined in this policy), authorization for use of crowd control weapons shall only come from the Chief of Police, or if the Chief is unavailable, the Chief's designee at the rank of Deputy Chief or above.

    a.  Such authorization shall be given over the police radio via radio transmission to personnel on scene, whenever possible.

    b.  The Incident Commander shall ensure that any authorization for crowd control weapons (which must come from the Chief of Police or if the Chief is unavailable, the Chief's designee at the rank of Deputy Chief or above) is documented in the Police Report, including the person who authorized the use of crowd control weapons. MPD shall retain such documentation for a period of not less than seven years.

    c.  Sworn MPD employees shall not use crowd-control weapons in a civil disturbance or an assembly until they have been authorized under this policy, unless there is an immediate need to protect oneself or another from objectively imminent physical harm, as detailed in [E] below.

| Volume Seven – Field Operations | 7-800 |
|---|---|
| Tactical Response | Page 12 of 46 |

2. Crowd control weapons shall not be authorized for peaceful gatherings or assemblies (such as peaceful protests and demonstrations).

3. In situations not involving civil disturbances or assemblies, the use of weapons listed in this policy shall be in accordance with the other sections in P&P 5-300 specific to those weapons.

**E. Objectively Imminent Physical Harm to Oneself or Another**

1. If there is an immediate need to protect oneself or another from objectively imminent physical harm and crowd control weapons have not been authorized under [D] above:

   a. Crowd control weapons, excluding chemical munitions, smoke munitions and light sound distraction devices, may be used without prior authorization in order to stop the assaultive conduct or act of violence.

   b. In these circumstances, crowd control weapons may only be used against specific people who are posing a threat of objectively imminent physical harm to another person.

   c. Chemical munitions, smoke munitions and light sound distraction devices may not be used in these circumstances.

2. The sworn officer using crowd control weapons under such circumstances must notify their supervisor of the use of crowd control weapons as soon as it is safe to do so.

3. The supervisor shall notify the Incident Commander or Watch Commander as soon as it is safe to do so.

4. Any sworn officer who uses crowd control weapons under this section (against specific people in an assembly without prior authorization) shall document and detail in the Police Report the specific circumstances establishing that there was an immediate need to protect themselves or another from objectively imminent physical harm. MPD shall retain such documentation for a period of not less than seven years.

5. The Incident Commander or Watch Commander who is notified shall email a brief notification before the end of their shift that an officer used crowd control weapons without prior authorization, including the case number and circumstances establishing the need to use the weapon, to the Chief of Police, Assistant Chief, Deputy Chiefs, and the Commander of Internal Affairs, for further review and handling.

**F. Crowd Control and Crowd Dispersal Tactics**

Crowd control weapons may only be authorized and used during civil disturbances and assemblies in accordance with P&P 5-300 and the conditions set forth in this policy, including the authorization requirements in section [D].

Ex. A

| | |
|---|---|
| Volume Seven – Field Operations | 7-800 |
| Tactical Response | Page 13 of 46 |

1. Canine use prohibited

   Canines shall not be used for crowd control, crowd containment, or crowd dispersal.

2. Fire hoses prohibited

   Fire hoses shall not be used for crowd control, crowd containment, or crowd dispersal.

3. FSDDs prohibited

   FSDDs (also known as "flash-bangs") shall not be used for crowd control, crowd containment, or crowd dispersal.

4. Electronic Control Weapons (ECWs) prohibited

   Electronic Control Weapons (ECWs) shall not be used for crowd control, crowd containment, or crowd dispersal. This provision does not limit the use of ECWs under the conditions of [E] regarding objectively imminent physical harm.

5. Vehicles

   a. Motorcycles and police vehicles shall not be used for crowd dispersal.

   b. Vehicles may be used for purposes of observation, visible deterrence, traffic control, transportation, and area control during a crowd event.

6. Bicycles

   a. Bicycles may be used to control and move people as appropriate. Bicycles may be authorized for crowd escorts by the Incident Commander.

   b. Strikes with bicycles and other uses of a bicycle as a weapon shall follow the policies and procedures for impact weapon use.

7. Horses

   a. When authorized by the Incident Commander, horses may be used to contain, control, and direct groups in nonviolent demonstrations as appropriate.

   b. Horses shall not be used against passively resistant demonstrators, including those who are sitting or lying down.

   c. Unless exigent circumstances exist, horses should not be used when chemical agents are used or use is anticipated, or in icy or snowy conditions or when similar lack of footing may jeopardize the animal, rider, or others.

Ex. A

| | |
|---|---|
| Volume Seven – Field Operations | 7-800 |
| Tactical Response | Page 14 of 46 |

8. Munitions and 40mm Launchers

   a. 40mm launchers

   In accordance with the section on 40mm launchers in P&P 5-302, during civil disturbances or assemblies:

     i. Carrying 40mm launchers

     Only officers working in a certified SWAT capacity shall carry 40mm launchers, unless authorization is given by the Chief of Police, or when the Chief is unavailable, the Chief's designee at the rank of Deputy Chief or above, for other officers who have been trained in the use of 40mm launchers to carry them.

     ii. Coordination of 40mm launcher use

     Once use of 40mm launchers is authorized in accordance with section [D], and the SWAT supervisor is on scene, the supervisor shall coordinate all use of 40mm launchers on scene, including by any officers who were authorized to carry prior to the SWAT supervisor's arrival. Nothing in this provision limits the use of 40mm launchers authorized by section [E] regarding objectively imminent physical harm.

   b. Less-lethal impact munitions

     i. Use of less-lethal impact munitions

       aa. Less-lethal impact fired munitions shall never be used indiscriminately against a crowd or group of people.

       ab. Less-lethal impact munitions shall be used only against a specific individual who is engaging in conduct that poses an immediate threat of objectively imminent physical harm (as covered by section [E]).

       ac. When circumstances permit, the Incident Commander shall make an attempt to accomplish the policing goal without the use of less-lethal impact munitions as described above, and, if practical, an audible warning shall be given to the subject before use of the weapon.

     ii. Areas to avoid targeting

     In accordance with the P&P 5-302, officers shall intentionally not discharge less-lethal impact munitions at a person's head, neck, throat, face, armpit, spine, kidneys, or groin unless deadly force would be justified.

Ex. A

| Volume Seven – Field Operations | 7-800 |
| --- | --- |
| Tactical Response | Page 15 of 46 |

    c.  Chemical munitions

        i.  Sufficient egress

Chemical munitions may not be used unless sufficient egress exists to safely allow the crowd to disperse.

        ii.  Prohibition on CN chemical munitions

CN chemical munitions are prohibited.

        iii.  Announcements and area notifications

            aa.  When feasible, additional announcements warning of the imminent use of chemical munition should be made prior to the use of chemical munitions in a crowd situation.

            ab.  Where extensive use of chemical munitions would reasonably be anticipated to impact nearby residents or businesses, the MPD should consider proactively notifying impacted individuals of safety information related to the munitions use as soon as possible, even if after the event.

        iv.  Emergency medical services available

When chemical munitions are used, emergency medical services will be on standby at a safe distance near the target area when feasible.

        v.  Documenting chemical munition use

In addition to the use of force and de-escalation documentation requirements in P&P 5-301, the following information shall be documented for all chemical munition use:

        aa.  The name of each chemical munition used in an incident.

        ab.  The location and time of use for each munition use (as accurately as possible).

        vi.  Safety data sheet

The safety data sheet (SDS) shall be saved and maintained for all chemical munitions used by the MPD.

    9.  Impact weapons

        a.  Display of batons or riot sticks

Batons and riot sticks may be visibly displayed and held in a ready position during squad or platoon formations.

Ex. A

b.  Crowd movement

Impact weapons (such as batons, riot sticks and riot shields) may be used as tools for crowd escorts when authorized by the Incident Commander.

c.  Use of impact weapons

i.  Impact weapon strikes shall not be used indiscriminately against a crowd or group of people, but only against specific individuals who are physically aggressive or actively resisting arrest.

ii.  Impact weapon strikes should not be used in a crowd control situation against an individual who is attempting to comply but is physically unable to disperse or move because of the press of the crowd or some other fixed obstacle.

d.  Areas to avoid targeting

Officers shall not strike a person with any baton to the head, neck, throat, kidneys, spine, or groin, or strike with force to the armpit unless the person has created an imminent threat of great bodily harm to another.

e.  Use against a person in handcuffs

Impact weapons shall not be used against a person who is handcuffed except when permissible under P&P 5-300 and state law.

10. Aerosol hand-held chemical agents

a.  Use of aerosol hand-held chemical agents

i.  Aerosol hand-held chemical agents shall only be used against specific individuals who are engaged in conduct that poses an immediate threat of objectively imminent physical harm. Aerosol, hand-held, pressurized, containerized chemical agents that emit a stream shall not be used indiscriminately for crowd management, crowd control, or crowd dispersal.

ii.  Officers shall use the minimum amount of the chemical agent necessary to overcome the subject's resistance.

b.  Subject exposure treatment

i.  When possible, people should be removed quickly from any area where hand-held chemical agents have been used. Officers shall monitor the subject and pay particular attention to the subject's ability to breathe following the application of a chemical agent.

ii.  A subject who has been sprayed with a hand-held chemical agent shall not be left lying on their stomach once handcuffed or while restrained with any device.

Ex. A

| | |
|---|---|
| Volume Seven – Field Operations | 7-800 |
| Tactical Response | Page 17 of 46 |

**G. Arrests**

1. Encircle crowd

   If the crowd has failed to disperse after the required announcements and sufficient time to disperse, officers may encircle the crowd or a portion of the crowd to make multiple simultaneous arrests.

2. People seeking to be arrested

   a. People who make it clear (e.g., by non-violent civil disobedience) that they seek to be arrested may be arrested and shall not be subjected to other dispersal techniques, such as the use of impact weapons or chemical agents.

   b. People refusing to comply with arrest procedures may be subject to the reasonable use of force.

3. Arrests of non-violent people

   Arrests of non-violent people shall be accomplished by verbal commands and persuasion, handcuffing, lifting, carrying, the use of dollies and/or stretchers, and/or the use of soft empty hand control holds.

4. Arrestee injuries

   a. Officers shall document any injuries reported by an arrestee, in accordance with P&P 5-301.

   b. As soon as practical, officers shall obtain professional medical treatment for the arrestee, in accordance with P&P 5-301 and P&P 7-350.

5. Juvenile arrests

   Juveniles arrested in demonstrations shall be handled consistent with MPD policy on arrest, transportation, and detention of juveniles (P&P 8-300).

6. Arrests of people with disabilities and Limited English Proficiency

   a. Officers arresting a person with a disability affecting mobility or communication shall follow the MPD policy on arrest, transportation, and detention of people with disabilities (P&P 7-1002 and P&P 7-1003).

   b. Officers shall follow P&P 7-1001 for providing services to people who are Limited English Proficiency.

Ex. A

7. Handcuffing arrestees

   a. Handcuff policies

   All people subject to arrest during a demonstration or crowd event shall be handcuffed in accordance with MPD policy, orders, and training bulletins (including P&P 5-301, P&P 5-302 and P&P 9-109).

   b. Flex-cuffs

      i. Officers should be cognizant that flex-cuffs may tighten when arrestees hands swell or move, sometimes simply in response to pain from the cuffs themselves.

      ii. When an arrestee complains of pain from overly tight flex cuffs, officers shall examine the cuffs and ensure proper fit.

      iii. Arrestees in flex-cuffs shall be monitored to prevent injury.

      iv. Each unit involved in detention or transportation of arrestees with flex-cuffs should have a flex-cuff cutter and adequate supplies of extra flex-cuffs readily available.

**H. Media.**

The media have a First Amendment right to cover public activity, including the right to record video or film, livestream, photograph, or use other mediums.

1. The media shall not be restricted to an identified area, and shall be permitted to observe and shall be permitted close enough access to view the crowd event and any arrests. An on-scene supervisor or the Incident Commander may identify an area where media may choose to assemble.

2. Officers shall not arrest members of the media unless they are physically obstructing lawful efforts to disperse the crowd, or efforts to arrest participants, or engaged in criminal activity.

3. The media shall not be targeted for dispersal or enforcement action because of their media status.

4. Even after a dispersal order has been given, clearly identified media shall be permitted to carry out their professional duties unless their presence would unduly interfere with the enforcement action.

**I. Legal Observers**

1. Legal observers, including unaffiliated self-identified legal observers and crowd monitors, do not have the same legal status as the media, and are subject to laws and orders similar to any other person or citizen.

15                                                                    Ex. A

| Volume Seven – Field Operations | 7-800 |
|---|---|
| Tactical Response | Page 19 of 46 |

2. Legal observers and monitors must comply with all dispersal orders unless an on-scene supervisor or the Incident Commander chooses to allow such legal observers and monitors to remain in an area after a dispersal order.

3. Legal observers and crowd monitors shall not be targeted for dispersal or enforcement action because of their status.

**J. Documentation of Public Assembly and First Amendment Activity**

1. Public assembly or first amendment activity shall not be visually documented, except under the following circumstances:

   a. Documentation of the event for the purposes of debriefing,

   b. Documentation to establish a visual record for the purposes of responding to citizen complaints or legal challenges (including through required BWC or MVR activations in accordance with P&P 4-223 and P&P 4-218), or

   c. Creating visual records for training purposes.

   d. When authorized under MN Statute section 626.19 Subd. 4 regarding UAV use.

2. Any authorized video or photo documentation shall be done in a manner that minimizes interference with people lawfully participating in First Amendment activities.

3. Videotaping and photographing of First Amendment activities shall take place only when authorized by an on-scene supervisor or the Incident Commander.

4. Individuals should not be singled out for photographing or recording simply because they appear to be leaders, organizers, or speakers.

5. Unless evidence of criminal activity is provided, videos or photographs of demonstrations shall not be disseminated to other government agencies, including federal, state, and local law enforcement agencies. If videos or photographs are disseminated or shared with another law enforcement agency, a record should be created and maintained noting the date and recipient of the information.

6. If there are no pending criminal prosecutions arising from the demonstration or if the video recording or photographing is not relevant to an Internal Affairs or citizen complaint investigation or proceedings or to civil litigation arising from police conduct at the demonstration, the video recording and photographs shall be destroyed in accordance with MPD policies, City Retention Guidelines and State law.

7. This policy shall not prohibit employees from using these videos or footage from such videos as part of training materials for officers in crowd control and crowd dispersal techniques and procedures.

Ex. A

**K. Training**

1. Initial and ongoing training

   a. All officers should receive yearly training on appropriate responses to crowd control and crowd management.

   b. Officers assigned to specialty units that respond to crowd control situations should receive additional training on appropriate responses to crowd control and crowd management, in addition to the yearly department-wide training.

2. Joint training

   Joint training should also be conducted with all agencies who are involved in crowd management activities.

3. Less-lethal 40mm launcher and munition training

   a. The MPD shall ensure that officers assigned the weapons or munition have completed relevant training and certification as applicable, ideally well in advance of an incident.

   b. The training shall describe the rules of engagement for the deployment of munitions, including a review of the applicable use-of-force policy sections.

# 7-806    Canine (K9) Unit

(A)

The Canine Unit will be available on a 24 hour basis. K9 personnel will perform regular police duties between calls for assistance from other officers.

Requests for canine assistance shall be made by officers in charge of a scene via MECC. The situation shall be explained to the canine officer and area secured of all personnel to preserve evidence and scent.

Requests for canine assistance by outside agencies will be referred to an on duty canine supervisor or senior canine officer in the canine supervisor is not available. The agencies will be advised of Department policies and procedures, and that there is a fee for canine use outside Hennepin County and St. Paul. The canine officer will make a written report of the incident. (05/21/96)

# 7-807    Authorized Use of Canines
(05/21/96) (02/16/23)

17                                                                            Ex. A

| Volume Five – Code of Conduct and Use of Force | 5-300 |
| --- | --- |
| Use of Force | Page 39 of 41 |

**L. Firearms**

1. Firearm discharges- when authorized

   An MPD sworn employee may lawfully discharge a firearm in accordance with policy in the following circumstances:

   a. In deadly force situations, in strict compliance with the Use of Force policy (P&P 5-301), and with a high degree of restraint. Firearm use shall never be considered routine and is permissible only when alternative means do not work, would not work or are too unsafe to try (in accordance with the section in P&P 5-301 on Objectively Reasonable Force Consistent with Policy, Law and Training).

   b. To dispatch an animal that is dangerous, or one that humane treatment requires its removal from further suffering and alternative methods of disposition are impractical.

   c. To participate in authorized training.

   d. To participate in any authorized competition or legitimate sporting activity.

2. Firearm discharges- when prohibited

   Officers shall not discharge firearms under the following conditions:

   a. As a warning or to command attention.

   b. Against persons who present a danger only to themselves.

   c. Solely to protect property.

3. Shooting at motor vehicles

   a. Firearms shall not be discharged at a moving or fleeing vehicle, unless:

      i. The officer or another person is currently being threatened with deadly force by an occupant by means other than the moving vehicle and the officer reasonably believes there are no other reasonable means available to avert the threat, or

      ii. In the extreme case of a 'vehicle ramming attack' where a vehicle is being used as a weapon to target people to cause great bodily harm or death, or

      iii. In the extreme case when an officer is stuck in the path of a vehicle, and:

           - has no means of escape, and
           - the officer reasonably believes there are no other reasonable means available to avert the threat, and
           - the officer is unable to issue commands or the driver is disregarding commands to stop.

1                                                                                    Ex. B

      aa. Officers shall consider their positioning and avoid placing themselves in the path of a vehicle whenever possible. If officers find themselves positioned in the path of a vehicle, they shall attempt to move safely out of the path of the vehicle instead of discharging a firearm at it or any of its occupants.

      ab. Being in the path of a moving vehicle shall not be the sole reason for discharging a firearm at the vehicle or any occupant.

  b. This prohibition includes attempting to disable the vehicle by discharging at it.

  c. Considerations in this prohibition:

    i. A vehicle may be occupied by additional passengers and it may not be readily apparent how many occupants are in the vehicle.

    ii. Bullets discharged at moving motor vehicles are extremely unlikely to immediately cease the movement of the vehicle or successfully disable it.

    iii. Bullets discharged at or from moving motor vehicles have a higher probability of missing the intended target or ricocheting and possibly injuring officers or other innocent persons, including passengers in the vehicle.

    iv. Bullets discharged at moving motor vehicles may disable or disorient the driver, causing the vehicle to crash and possibly injuring officers or other innocent persons, including passengers in the vehicle.

4. Drawing and displaying a firearm

  a. An officer's decision to draw or display a firearm will be based on the tactical situation and the officer's reasonable belief that lethal force is necessary, or that there are indicators of a substantial risk the situation may escalate to the point where lethal force may be necessary.

  b. Unnecessarily or prematurely drawing or displaying a firearm may limit an officer's alternatives in controlling a situation and may inhibit or limit communication between the officer and the subject.

5. Notification of firearm discharges

  a. Employee responsibility

    Any employee who discharges a firearm, whether on or off duty, shall make direct contact with their immediate supervisor or the on-duty Watch Commander and the local jurisdiction as soon as possible **except**:

      • While at an established target range;
      • While conducting authorized ballistics tests;

a. A Startup check consists of activating the camera to ensure it properly enters Record Mode, and does not display any error indicators. Any problems shall be handled in accordance with the section on Problems with the BWC Equipment.

b. Once the BWC is activated for the startup check, the employee shall state the following information prior to deactivating:

- Name
- Badge number (or Employee ID for civilians)
- Call sign

4. Problems with the BWC Equipment

a. Employees shall directly notify their immediate supervisor as soon as practical of any:

- Missing equipment.
- Damaged equipment.
- Malfunctioning equipment (including when either or both of the audio or video recording functions is malfunctioning).
- A loss of BWC battery power (including if the BWC does not maintain a charge for a full regularly assigned shift).

b. The notification to the supervisor must be made without unnecessary delay.

c. As soon as practical, employees shall submit a ticket with the IT Service Desk to report the problems (in accordance with P&P 4-219).

d. Employees shall document in the Police Report any problems they encountered with their primary BWC while responding to an incident. The employee shall also note if they are using a replacement BWC. If a Police Report is not required, the employee shall document the problems in CAD.

5. BWCs and Mobile Video Recording (MVR) equipment

a. Employees equipped with a BWC who are operating a squad car equipped with Mobile Video Recording (MVR) equipment shall activate the MVR equipment as required by policy and shall also activate the BWC in compliance with this policy.

b. Employees wearing a BWC are not required to wear an MVR microphone.

6. Activation

a. Required Activation

Employees shall activate their BWC for the following circumstances:

Ex. C

| Volume Four – Administrative Procedures | 4-200 |
|---|---|
| Equipment and Supplies | Page 34 of 63 |

i. When dispatched or assigned to a call, activation shall occur at least two city blocks away from the call for service location. If dispatched or assigned to a call less than two city blocks away, activation shall occur immediately. This includes assisting squads.

ii. When self-initiating a call, as soon as possible and prior to contacting a person or exiting a squad.

iii. Prior to taking any law enforcement action.

iv. Prior to making an investigatory contact.

v. When any situation becomes adversarial.

vi. Prior to assisting a citizen during in-person encounters, other than when providing basic verbal assistance (such as giving directions).

vii. When directed to activate the BWC by a supervisor.

Examples of situations that require activation include, but are not limited to:

- Any in-person contact (including at a precinct front desk, during a business check or while on a foot beat) involving allegations of criminal activity, suspicious or unlawful behavior, a complaint of misconduct or another situation requiring activation. This includes any contact with a reporting person, victim, suspect or witness, subject to the exceptions listed in the deactivation section.
- Traffic stops.
- Suspicious Person stops.
- Suspicious Vehicle stops.
- Any vehicular response requiring emergency driving or emergency response as defined by MPD P&P 7-401.
- Vehicle pursuits.
- Work-related transports not involving a ride-along or another City employee in their official capacity as a City employee.
- Any search, including but not limited to searches of vehicles, persons, and buildings. This excludes searches that could reasonably involve the presence of explosives, and also excludes protective sweeps for explosive devices.
- Any contact involving physical or verbal confrontations.
- When advising a person of their Miranda rights, if not inside of a secure law enforcement facility where the MPD is already creating a recording through another approved method.
- Any use of force situation. If a BWC is not activated prior to a use of force, it shall be activated as soon as it is safe to do so.
- Any tactical entry or forced entry into a building.
- Supervisors responding to a scene.

Ex. C

| Volume Five – Code of Conduct and Use of Force | 5-100 |
|---|---|
| Code of Conduct | Page 2 of 22 |

### B. Use of Discretion

The police profession is one that requires officers to use considerable judgment and discretion in the performance of their daily duties. Officers have a large body of knowledge from Department policies and procedures, training, their own professional police experience and the experiences of their fellow officers to guide them in exercising proper judgment and discretion in situations not specifically addressed by Department rules and regulations. When exercising such discretion, officers must always adhere to the following principles in the course of their employment with the Minneapolis Police Department:

1. All investigative detentions, pedestrian and vehicle stops, arrests, searches and seizures of property by officers shall be based on a standard of reasonable suspicion or probable cause in accordance with the Fourth Amendment of the U.S. Constitution, Section 10 of the MN Constitution, MN statutes and MPD policies (such as P&P 9-200, P&P 7-601 and P&P 10-400).

2. Officers must be able to articulate specific facts, circumstances and conclusions that support reasonable suspicion or probable cause.

### C. Conduct that Detracts from the Public's Faith (Principle Two)

1. Employees shall refrain from any conduct in an official capacity that detracts from the public's faith in the integrity of the criminal justice system.

2. Employees shall carry out their duties with integrity, fairness and impartiality.

## III. Procedures/Regulations

### A. Obey Laws (Principle One)

Employees shall conduct themselves, whether on or off duty, in accordance with the Constitution of the United States, the Minnesota Constitution, and all applicable laws, ordinances and rules enacted or established pursuant to legal authority.

1. Rationale

   Peace officers conduct their duties pursuant to a grant of limited authority from the community. Therefore, officers must understand the laws defining the scope of their enforcement powers. Peace officers may only act in accordance with the powers granted to them.

2. Rules

   a. Peace officers shall not knowingly exceed their authority in the enforcement of the law.

Ex. D

| Volume Five – Code of Conduct and Use of Force | 5-100 |
|---|---|
| Code of Conduct | Page 3 of 22 |

    i.    Officers shall not arrest any person or search any premises except with a warrant or where such arrest or search is authorized without warrant under the laws of Minnesota and the United States.

b. Employees shall not knowingly disobey the law or rules of criminal procedure in such areas as interrogation, arrest, detention, searches, seizures, use of informants, and preservation of evidence, except where permitted in the performance of duty under proper authority.

c. Employees shall not knowingly restrict the freedom of individuals, whether by arrest or detention, in violation of the Constitutions and laws of the United States and the State of Minnesota.

    i.    Officers shall not falsely arrest or direct any malicious prosecution against any person.

d. Employees, whether on or off duty, shall not knowingly commit any criminal offense under any laws of the United States or any state or local jurisdiction.

e. Employees must obey lawful orders, but an employee must refuse to obey any order the employee knows would require the officer to commit an illegal act. If in doubt as to the clarity of an order the employee shall, if feasible, request the issuing employee to clarify the order. An employee refusing to obey an order shall be required to justify their actions.

f. Employees will not, according to MN Statute section 626.863, knowingly allow a person who is not a peace officer to make a representation of being a peace officer or perform any act, duty or responsibility reserved by law for a peace officer.

## B. Truthfulness

1. Rationale

Community cooperation with the police is a product of its trust that officers will act honestly and with impartiality. The peace officer, as the public's initial contact with the criminal justice system, must act in a manner that instills such trust.

2. Scope

a. These requirements apply to any report or communication, whether verbal or written, concerning official MPD or City business.

    i.    This includes information given to or intended for others.

    ii.    This includes information before courts or hearings.

Ex. D

**Exhibit __: Comparison of Requested Preliminary Injunction Language and MPD and SPPD Policies**

| Proposed Preliminary Injunction | MPD Policy | SPPD Policy |
|---|---|---|
| Prohibiting ICE agents from "[u]sing crowd control weapons including kinetic impact projectiles, chemical irritants, batons, and flash-bang grenades) on members of the class who are not themselves posing a threat of imminent harm to a law enforcement officer or another person;" | • "Crowd control weapons shall not be authorized for peaceful gatherings or assemblies (such as peaceful protests and demonstrations)". (Ex. A at 9)<br>• "Less-lethal impact munitions shall be used only against a specific individual who is engaging in conduct that poses an immediate threat of objectively imminent physical harm." (Ex. A at 11.)<br>• FSDDs (also known as "flash-bangs") shall not be used for crowd control, crowd containment, or crowd dispersal. (Ex. A at 10)<br>• "Impact weapon [ie, baton] strikes shall not be used indiscriminately against a crowd or group of people, but only against specific individuals who are physically aggressive or actively resisting arrest." (Ex. A at 13.) | • "Direct fired munitions may never be used indiscriminately against a crowd or group of persons even if some members of the crowd are violent and disruptive." (McElveen Ex. A at 6).<br>• "Batons must not be used for crowd control, crowd containment, or crowd dispersal." (McElveen Ex. A at 6).<br>• "Aerosol Subject Restraint (ASR) must not be used in a demonstration or crowd situation or other civil disorders without the approval of a Deputy Chief." (McElveen Ex. A at 7).<br>• "Chemical munitions must be used only when: (1) a threat of imminent harm or serious property damage is present, or other crowd dispersal techniques have failed or did |

1

| | | |
|---|---|---|
| | • "Aerosol hand-held chemical agents shall only be used against specific individuals who are engaged in conduct that poses an immediate threat of objectively imminent physical harm." (Ex. A at 13.) | not accomplish the public safety goal as determined by the Deputy Chief; (2) sufficient egress to safely allow the crowd to disperse exists, and, (3) the use of chemical munitions is approved by the Deputy Chief." (McElveen Ex. A at 7). |
| Prohibiting ICE agents from "[f]iring kinetic impact projectiles or flash-bang grenades at identified targets, if doing so could foreseeably result in injury to members of the class who are not posing a threat of imminent harm to a law enforcement officer or another person, unless such force is necessary to stop an immediate and serious threat of physical harm to a person;" | See previous | See previous |
| Prohibiting ICE agents from "[u]sing any crowd control weapon without giving at least two separate warnings in a manner and at a sound level where it can be heard by the targeted individuals, unless the threat is so serious and imminent that a | "When circumstances permit, the Incident Commander shall make an attempt to accomplish the policing goal without the use of less-lethal impact munitions as described above, and, if practical, an audible warning shall be given to the | • "When circumstances permit, the on-scene supervisor/incident commander must make an attempt to accomplish the policing goal without the use of direct fired munitions as described above, and, if |

2

| | | |
|---|---|---|
| warning is infeasible. Such warnings shall explain that Defendants may employ crowd control weapons and must give the targeted individuals sufficient time to avoid the use of force;" | subject before use of the weapon." (Ex. A at 11.) | practical, an audible warning shall be given to the subject before deployment of the weapon." (McElveen Ex. A at 6). <br><br> • "When feasible, additional announcements should be made prior to the use of chemical munitions in a crowd situation warning of the imminent use of chemical munitions." (McElveen Ex. A at 7). <br><br> • "Crowd dispersal techniques should not be initiated until officers have made repeated announcements to the crowd, or are aware that repeated announcements have been made." (McElveen Ex. A at 5). |
| Prohibiting ICE agents from "[f]iring tear gas canisters or flash-bang grenades so as to strike any members of the class, or firing kinetic impact projectiles or other crowd control weapons at the head, neck, groin, back, or other | • "In accordance with the P&P 5-302, officers shall intentionally not discharge less-lethal impact munitions at a person's head, neck, throat, face, armpit, spine, kidneys, or groin unless deadly force would be justified." (Ex. A | • "Officers must use direct fired munitions in compliance with the Saint Paul Police Department's Response to Resistance & Aggression (GO 246.00 and GO 246.02) policy and state law." (McElveen Ex. A |

3

| sensitive areas members of the class, unless that person poses an immediate threat of death or serious bodily injury" | at 11.)<br>• FSDDs (also known as "flash-bangs") shall not be used for crowd control, crowd containment, or crowd dispersal. (Ex. A at 10) | at 6).<br>• "During non-deadly force incidents, officers will use reasonable care to avoid striking subjects on the head, neck, sternum, spine, groin, or kidneys, as these strikes may constitute deadly force." (McElveen Ex. B at 14). |
|---|---|---|
| Prohibiting ICE agents from "[p]ointing firearms at members of the class who are not posing an immediate threat of death or serious bodily injury to another person;" | "An officer's decision to draw or display a firearm will be based on the tactical situation and the officer's reasonable belief that lethal force is necessary, or that there are indicators of a substantial risk the situation may escalate to the point where lethal force may be necessary." (Ex. B at 2.) | "Officers should not use their firearm as an impact tool in non-deadly force incidents due to the possibility of an unintentional discharge." (McElveen Ex. B at 14). |
| Prohibiting ICE agents from "[d]irecting any member of the class to stop making any audio or visual recordings of federal law enforcement activity or agents;" | "Officers shall not interfere with the rights of members of the public to observe and document police conduct via video, photographs, or other methods unless doing so interferes with on-going police activity (P&P 9-202)." (Ex. A at 5.) | "Officers must not interfere with the rights of members of the public to observe and document police conduct via video, photographs, or other methods unless doing so interferes with on-going police activity." (McElveen Ex. A at 4.) |
| Prohibiting ICE agents from | • "Verbal abuse against officers | • "Verbal abuse against officers |

| | | |
|---|---|---|
| "[s]eizing or arresting any members of the class who is not resisting a lawful crowd dispersal order, unless there is specific probable cause to believe that the individual has committed a crime for which a custodial arrest is warranted and for which the law enforcement officer has lawful authority to make an arrest." | does not constitute a reason for an arrest or for any use of force against such individuals." (Ex. A at 5.)<br><br>• "Declaration of Unlawful Assembly<br>a. If the Incident Commander has declared an unlawful assembly, the reasons for the declaration and the names of the decision maker(s) shall be recorded.<br>i. The declaration and dispersal order shall be announced to the assembly.<br>ii. The name(s) of the officers announcing the declaration should be recorded, with the time(s) and date(s) documented.<br>b. The dispersal order shall include:<br>iii. Name, rank of person, and agency giving the order.<br>iv. Declaration of Unlawful Assembly and reason(s) for declaration.<br>v. A minimum of two egress routes that may be used. | does not constitute a reason for an arrest or for any use of force against such individuals." (McElveen Ex. A at 3).<br><br>• "Declaration of Unlawful Assembly 1. If the on-scene supervisor/incident commander has declared an unlawful assembly, the reasons for the declaration and the names of the decision maker(s) must be documented. The declaration and dispersal order must be announced to the assembly. The name(s) of the officers announcing the declaration should be documented, with the time(s) and date(s) documented. 2. The dispersal order should include: a) Name, rank of person, and agency giving the order b) A declaration of unlawful assembly and reason(s) for declaration c) Egress or escape routes that may be used d) Specific consequences of failure to comply with dispersal order |

5

| | | |
|---|---|---|
| | vi. Specific consequences of failure to comply with dispersal order.<br>vii. How long the group has to comply." (Ex. A at 7.)<br><br>• MPD Officers "shall not knowingly restrict the freedom of individuals, whether by arrest or detention, in violation of the Constitutions and laws of the United States and the State of Minnesota."  (Ex. D at 2.) | e) How long the group has to comply." (McElveen Ex. A at 4-5).<br><br>• "The department may arrest individuals when reasonable and necessary. When a determination has been made to arrest those engaged in a civil disturbance, and where time and circumstances permit, a warning shall be given prior to the commencement of arrest(s). The incident commander is responsible to ensure adequate mass arrest warnings are issued before arrests begin." (McElveen Ex. A at 8).<br><br>• "Persons who make it clear (e.g. by non-violent civil disobedience) that they seek to be arrested may be arrested and must not be subjected to other dispersal techniques such as the use of batons or chemical agents." (McElveen Ex. A at 8). |
| "Federal Agents, … must have visible identification of a unique, personally assigned, and | "All officers responding to public assemblies shall at all times, including when wearing protective | "All officers responding to public assemblies must at all times, including when wearing protective |

| | | |
|---|---|---|
| recognizable alphanumeric identifier sequence affixed to their uniforms and conspicuously displayed in two separate places. The same unique and personally assigned identifier sequence must remain conspicuously displayed in two separate places despite changes to a Federal Agent's uniform or tactical gear." | gear, display their agency name and a unique personal identifier in accordance with P&P 3-100." (Ex. A at 5.) | gear, display their agency name and a unique personal identifier in compliance with this department's uniform policy." (McElveen Ex. A at 3.)<br><br>"All sworn members of the department will wear the appropriate designated uniform of the day while on duty, unless exempted in section V. Non-Uniform Personnel – Attire and Rules." (McElveen Ex. C at 5). |
| "Federal Agents who are conducting immigration enforcement operations in the District of Minnesota … that are currently equipped and trained with body-worn cameras ("BWCs") shall activate them when engaged in enforcement activity unless exempted by CBP, ICE, or DHS policy." | MPD officers must activate BWCs "[p]rior to taking any law enforcement action" or "[w]hen any situation becomes adversarial." (Ex. C at 2 (referenced by Ex. A at 16.)) | "Understanding that officers encounter tense, uncertain, and rapidly evolving situations, officers must activate their BWC at their earliest opportunity and before arriving on scene when recording is required by this policy." (McElveen Ex. D at 10).<br><br>SPPD officers must activate BWCs "[w]hen an officer is dispatched to or investigating any call or incident," "[w]hen encountering resistance or aggression," or "[w]hen any situation becomes |

7

| | | adversarial, including situations which are either verbally or physically adversarial." (McElveen Ex. D at 11). |
|---|---|---|

✦ **The Minnesota Star Tribune**

**NEWS & POLITICS**

# Police walk a tightrope to maintain community relations amid Twin Cities ICE arrests

Minneapolis Police Chief Brian O'Hara has emerged as one of the most outspoken law enforcement leaders in the nation criticizing ICE tactics.

**By Liz Sawyer**
The Minnesota Star Tribune

DECEMBER 21, 2025 AT 5:00AM



Minneapolis Police chief Brian O'Hara speaks during a press conference to address the media following reports?that the Trump administration will be targeting Somali immigrants in the Twin Cities, held at City Hall in Minneapolis on Tuesday, Dec. 2, 2025. (Leila Navidi/The Minnesota Star Tribune)

Hours after news of an impending federal immigration crackdown <u>sent shock waves</u> through the Somali community, Chief Brian O'Hara stood in solidarity with vulnerable

Ex. F

residents.

At a news conference, he reiterated that his officers do not cooperate with immigration enforcement and that his agency is not notified in advance about ICE raids. He also encouraged people to call 911 if they questioned whether masked men grabbing people on the street were, in fact, law enforcement.

The backlash was swift.

People mocked O'Hara on social media for what they interpreted as permission to call the police on the police. Tom Homan, the Trump administration's border czar, decried his comments as "shameful" on Fox News, saying: "He oughta put his badge in the desk drawer and walk away."

Amid President Donald Trump's attacks on the Somali diaspora and ramped-up deportation efforts in the Twin Cities, O'Hara has emerged as among the most outspoken law enforcement leaders in the nation condemning ICE tactics. Other chiefs have opted to side-step politics.

Across the Twin Cities, local police officials are grappling with how to navigate immigration enforcement. Many departments have policies preventing them from cooperating with federal immigration authorities, and they view that work as outside the bounds of their public safety mission. But that is opening them up to criticism from some corners where they typically enjoy support and creating difficult decisions about when to intervene to keep the peace when protesters clash with ICE agents.

Avowed law enforcement supporters, some of whom proudly post Blue Lives Matter flags in their bios, have berated police departments online for refusing to partner with ICE. Meanwhile, the presence of local cops on the perimeter of an immigration operation can inflame tensions and lead to accusations of collaboration.

The balancing act is especially delicate in Minneapolis, a city that has been struggling to rebuild community trust since the murder of George Floyd.

"They're getting drawn into this," said Jeff Potts, executive director of the Minnesota Chiefs of Police Association, "and their role at the scene is to keep everyone safe."

While local authorities will not aid ICE actions, he said, federal law forbids them from impeding an immigration arrest. Instead, police officers seek to prevent violence and the destruction of property when large demonstrations erupt in response to raids.

Ex. F

But responding to those chaotic scenes means risking the use of force during clashes with their own citizens. That happened during an ICE raid at a St. Paul home last month where officers used chemical irritants and rubber-coated bullets on protesters, <u>triggering a city probe into their actions.</u>



Law enforcement officers retreat south on Payne Avenue in a cloud of chemical irritants after an apparent federal raid at a home in St. Paul on Nov. 25, 2025. LEILA NAVIDI • leila.navidi@startribune.com (Leila Navidi/The Minnesota Star Tribune)

In Minneapolis, a vocal contingent of residents – and some elected officials – don't want their police force to show up all.

"Why are we putting money into any of this?" asked Miguel Hernandez, an organizer with Minnesota Immigrant Rights Action Committee (MIRAC). Federal agents should be forced to conduct their own operations, he said, otherwise local authorities risk further deteriorating their own fragile relationship with the community.

"MPD should stay out of it."

## ICE tactics 'a real contrast' to policing

Earlier this month, dozens of federal agents flooded the Twin Cities at the direction of the Trump administration, intending to target immigrants who are in the country illegally or

Ex. F

who have committed violent crimes.

The Department of Homeland Security claims the operation has netted more than 400 arrests so far, but those numbers are hard to verify because the agency doesn't release a list of those detained.

Whatever the figure, advocates say fears of deportation have sent swaths of the Latino community into the shadows, shuttered immigrant businesses and terrorized Somali residents, many of whom now carry their passports everywhere they go.

At various raids throughout the Twin Cities, video and bystander accounts depict masked ICE agents reaching into vehicles, breaking windows and stopping bystanders seemingly at random, regardless of their immigration status – aggressive tactics not typically deployed by Minnesota police officers.

"It's a real contrast to the direction American police have been going," said Chuck Wexler, executive director of the Police Executive Research Forum, a think tank based in Washington, D.C.

Some of those tactics, like jumping out of unmarked cars with masks, "fly in the face of what local police have been trying to do for the last five to 10 years" to make themselves more transparent and accountable, he said.

That forces city departments to walk a difficult tightrope.

In public appearances, O'Hara has chided outside agencies for employing "questionable methods" that threaten the safety of everyone involved and don't appear to be a good use of resources.

On Dec. 10, he stood shoulder-to-shoulder with Mayor Jacob Frey to denounce the treatment of a Somali American citizen detained by federal agents during "Operation Metro Surge."

He apologized to the 20-year-old, Mubashir, calling it "embarrassing" that people wearing vests emblazoned with "police" had disregarded his rights.

Ex. F

Mubashir, a Somali 20-year-old Minneapolis resident and U.S. citizen, speaks about his detainment by ICE. With him at the press conference on Dec. 10, 2025, are Minneapolis Police Chief Brian O'Hara, center, and Minneapolis Mayor Jacob Frey. (Jerry Holt/The Minnesota Star Tribune)

"Random efforts in which individuals who are American citizens are being stopped because they appear to be Latino or appear to be Somali is wrong," said O'Hara, who declined an interview request for this story.

Days later, after O'Hara drew a biblical parallel to Mary and Joseph as he spoke about the devastating impact of immigration enforcement on daily life and commerce in the city, DHS spokesperson Tricia McLaughlin hit back on social media.

"How abhorrent and humiliating this Minneapolis Police Chief refuses to do his job and has allowed these pedophiles and rapists [to] terrorize Minneapolis and hurt the very people he swore an oath to protect," she posted on X.

O'Hara isn't the only one speaking out. Hennepin County Sheriff Dawanna Witt also voiced concerns about a lack of professionalism during some arrests, telling WCCO Radio that "doing this job doesn't mean you have to be an asshole."

Potts, from the Minnesota Chiefs Association, said he opened a dialogue with Department of Homeland Security officials to provide feedback and ensure "they understand the ramifications of their tactics, and how the perception of that can bleed over into perceptions of local law enforcement." He said those conversations so far have been productive, but declined to elaborate.

## Proactive engagement

Trump's sweeping immigration crackdown came in the aftermath of an FBI memo urging federal authorities to clearly identify themselves in the field following a string of incidents in different states where criminals donned masks, posing as immigration officers to rob, kidnap and sexually assault people.

The New Orleans mayor and police superintendent echoed the request to remove face coverings ahead of operations in their city, but the agency ignored them.

The inability to verify law enforcement's identity is of particular sensitivity in Minnesota, six months after the assassination of former House Speaker Melissa Hortman and her husband Mark Hortman by a man impersonating a police officer.

Minneapolis police officers have made appearances at area mosques and community centers to inform Somali residents of their rights and encourage them to call 911 if they

Ex. F

are unsure whether someone is a licensed officer.

Abdirizak Bihi, a Somali community activist and longtime Cedar-Riverside resident, told the Minnesota Star Tribune that he recently recorded a man, known to work security in the East African neighborhood, flashing a DHS badge – apparently pretending to be a federal agent.

Bihi praised MPD and O'Hara for investing so much time building inroads inside the community, which paid dividends when ICE descended upon their neighbors.

"That work prior to the [crackdown] has protected us, protected the relationship, and the community still trusts the police," he said.

## A delicate balance

As immigration enforcement spilled into the suburbs, smaller agencies got roped into the fray.

When Maplewood Police posted an innocuous statement on Facebook notifying residents that their officers were "not involved" in two separate ICE apprehensions that day, hundreds flooded their comment section. Many appeared to troll the agency for refusing to assist fellow law enforcement officers.

In Bloomington, Chief Booker Hodges filmed a public service message for the city's webpage explaining why his agency does not enforce immigration law. But he emphasized that, should a federal partner call for backup, "we're going to help them."

Hodges ended the message with a call to action, urging community members to give immigration officers the "dignity and respect they deserve" because "it's a tough job."

In an interview, he acknowledged that many are disgruntled by the Trump administration's efforts but said he doesn't want protesters to get saddled with federal charges for attempting to physically interfere.

"Any American citizen that's been arrested by these folks should get a lawyer and get ready to sue them," Hodges said. "You can't arrest American citizens, man. You can't do that. So these folks who have been arrested [should] let the federal government open up their checkbook and pay them."

Ex. F

**✦ The Minnesota Star Tribune**

© 2025 StarTribune.All rights reserved.

Ex. F

# Trump says he doesn't want Somalis in the US, urges them to go back to their homeland and fix it

WASHINGTON (AP) — President Donald Trump on Tuesday said he did not want Somali immigrants in the U.S., saying residents of the war-ravaged eastern African country are too reliant on U.S. social safety net and add little to the United States.

Trump's contemptuous description of the entire immigrant community is the latest example of him pointedly attacking the Somali diaspora in the United States. Somalis have been coming to Minnesota and other states, often as refugees, since the 1990s. The president made no distinction between citizens and non-citizens.

The president's comment came days after his administration announced it is halting all asylum decisions following the shooting of two National Guard soldiers in Washington. The suspect in last week's incident is originally from Afghanistan but Trump has used the moment to raise questions about immigrants from other nations, including Somalia.

"They contribute nothing. I don't want them in our country," Trump told reporters near the end of a lengthy Cabinet meeting. He added: "Their country is no good for a reason. Your country stinks and we don't want them in our country."

Ex. G

Related Stories

Trump for years has criticized Rep. Ilhan Omar, a Minnesota Democrat who emigrated from Somalia in 1995 as a child. But he picked up the pace of his attacks on Somalis on social media last week after Christopher Rufo, a conservative activist, published unsubstantiated allegations in a magazine called City Journal, citing unnamed sources, that money stolen from Minnesota programs has gone to al-Shabab, an al-Qaida-linked militant group that controls parts of Somalia.

Trump vowed last week in a social media post to send Somalis "back to where they came from," and alleged Minnesota, home to the largest Somali community in the United States, is "a hub of fraudulent money laundering activity." On Tuesday, the president said Somalis in the U.S. should "go back to where they came from and fix it."

He specifically pledged to terminate temporary legal protections for Somalis living in Minnesota, a move that is triggering fear in the state's deeply-rooted immigrant community, along with doubts about whether the White House has the legal authority to enact the directive as described.

The announcement drew immediate pushback from some state leaders and immigration experts, who characterized Trump's declaration as a legally dubious effort to sow suspicion toward Minnesota's Somali community.

The move would affect only a tiny fraction of the tens of thousands of Somalis living in Minnesota. A report produced for Congress in August put the number of Somalis covered by Temporary Protected Status at

Ex. G

just 705 nationwide.

Trump also renewed his criticism of Omar, whose family fled the civil war in Somalia and spent several years in a refugee camp in Kenya before coming to the U.S.

"We can go one way or the other, and we're going to go the wrong way, if we keep taking in garbage into our country," Trump said. "Ilhan Omar is garbage. She's garbage. Her friends are garbage."

On Tuesday, Omar punched back at Trump on social media, saying: "His obsession with me is creepy. I hope he gets the help he desperately needs."

Trump added about Somali immigrants: "These aren't people that work. These aren't people that say, 'Let's go, c'mon. Let's make this place great.' These are people that do nothing but complain."

Minneapolis Mayor Jacob Frey called Trump's message "wrong" and said Somali immigrants have helped improve his community.

"They have started businesses and created jobs. They have added to the cultural fabric of what Minneapolis is," Frey said. "To again, villainize an entire group is ridiculous under any circumstances. And the way that Donald Trump is consistent in doing it, I think calls into question major constitutional violations. And it certainly violates the moral fabric of what we stand by in this country as Americans."

——

AP writer Steve Karnowski in Minneapolis contributed reporting.

Ex. G

# Trump Condemned For Calling Somali Immigrants 'Garbage' | TIME

[Olivia-Anne Cleary](#)

Protesters gathered outside the Signature Aviation base near the Minneapolis–Saint Paul International Airport on Wednesday to decry President Donald Trump's targeting of Minnesota's [Somali](#) community.

Supported by the union groups Minnesota 50501, Service Employees International Union (SEIU), and UNITE HERE, protesters held signs that read "Stop deporting our neighbors" and "No ICE, No troops, No Kings." Others directly called out the President, brandishing placards with statements such as "Dump Trump" and "This is our country, not his."

The rally was held at the airport facility which some demonstrators identified as a flying base for deportation flights. TIME has been unable to independently verify if this is the case.

Amid calls to "de-ICE our planes," one of the organizers from UNITE HERE Local 17, Minnesota's hospitality union, told dozens of protesters the "labor movement is proud to be here today with members of our communities to fight for immigrant workers rights."

Defending the extensive Somali community in Minnesota, when asked what they will do now that "[Somalis are under attack](#)," the crowd vowed to "fight back."

Ex. H

Said Mohamed, an Uber and Lyft driver who attended the protest, said the President's recent remarks about Somalis have "hurt" the community. "They really feel real disgusted that he [Trump] is dividing us by Somalis, Mexicans, Asians, Black, white. And that's not what America is about," Mohamed told Associated Press. He added that some members of the community are "very scared."

*Advertisement*



*Tom Baker—AP*

Demonstrators are pictured near the Minneapolis–Saint Paul International Airport on Dec. 3, 2025. *Tom Baker—AP*

Trump has significantly ramped up his immigration crackdown in the wake of the Nov. 26 D.C. shooting that killed West Virginia National Guard Specialist Sarah Beckstrom, 20, and left her colleague, Staff Sgt. Andrew Wolfe, 24, in critical condition.

Ex. H

The lone suspect in the shooting has been identified as Rahmanullah Lakanwal, 29, an Afghan national who traveled to the U.S. in 2021 under "Operation Allies Welcome." Lakanwal qualified for the resettlement program as he worked for various U.S. government agencies in Afghanistan, including a CIA-backed unit in Kandahar, a stronghold of the Taliban. Although a motive for his crime has yet to be established, the incident has become a touchstone in the debate surrounding immigration-related policies, with Trump and his Administration announcing a series of new security measures—many of which have been criticized as collective punishments that single out vulnerable communities.

Although there is no indication that the suspect in the shooting had any connection to Somalia, Trump has renewed his targeting of the community by making a series of inflammatory, anti-Somali remarks.

Last week, U.S. Citizenship and Immigration Services (USCIS) announced that under Trump's direction they will be reexamining all green cards issued to people from 19 countries "of concern." Somalia was among the countries listed. There have since been unconfirmed reports that a new ICE operation is set to target Somalis in the Minneapolis-St. Paul region.

The Minneapolis-St. Paul area is home to around 84,000 people of Somali descent, making it the largest population in the U.S., according to data from the U.S. Census Bureau.

After claiming during a Thanksgiving call with service members that Somalis "have caused a lot of trouble" for the U.S., Trump has since doubled down on his stance.

Ex. H

In the Oval Office on Wednesday, Trump called the Mayor of Minneapolis, Jacob Frey, a "fool" for saying he is proud to have the largest Somali population in the country. He then accused the Somali community of "destroying" Minnesota.

"These Somalians have taken billions of dollars out of our country," he claimed, before personally targeting Rep. Ilhan Omar, a Democratic Congresswoman for Minnesota, who was born in Somalia. "She shouldn't be allowed to be a Congresswoman," said Trump, arguing that she should leave the U.S.

Trump went on to claim that Somalia is "considered by many to be the worst country on Earth."

The President has long pointed to instances of "corruption" and "fraud" in Minnesota involving Somalis and welfare programs, seemingly blaming the community as a whole rather than the individuals involved.

Yusuf Abdulle, executive director and Imam of the Islamic association of North America, leads a prayer of Muslim men as protesters gather at a rally for immigrants and workers near the Minneapolis–Saint Paul International Airport on Dec 3, 2025. *Tom Baker—AP*

The nonprofit organization Feeding Our Future, which had [reported ties to the Somali community](#), was implicated in an alleged $300 million fraud scheme with more than [70 defendants](#) during an investigation into COVID-19 relief fraud. The federally-funded program was meant to feed children during the pandemic, but instead, according to prosecutors, individuals billed Minnesota agencies for meals that did not exist. Federal prosecutors said the company owners kept the money for themselves. In August, Abdiaziz Shafii

Ex. H

Farah, who was born in Somalia, was sentenced to 28 years in prison for his role in the scheme.

The midwestern state has also been rocked by what the United States Attorney's Office is calling the "Autism Fraud Scheme." In September, Asha Farhan Hassan was charged with wire fraud for her role in the $14 million scheme. According to federal investigators, Hassan and others "devised and carried out a scheme to defraud the Early Intensive Developmental and Behavioral Intervention benefit, a publicly-funded Minnesota Health Care Program that offers medically necessary services to people under the age of 21 with autism spectrum disorder."

Hassan was also charged with participating in the Feeding Our Future scheme, highlighting concerns that the cases of fraud within the state are linked.

"To be clear, this is not an isolated scheme. From Feeding Our Future to Housing Stabilization Services and now Autism Services, these massive fraud schemes form a web that has stolen billions of dollars in taxpayer money. Each case we bring exposes another strand of this network. The challenge is immense, but our work continues," read a statement from the U.S. Attorney's Office.

Meanwhile, during a Cabinet meeting on Tuesday, Trump once again targeted members of the Somali community, saying their home nation is "barely a country" and calling them "garbage."

"I don't want them in our country," said Trump, adding that he doesn't care if his statements are "not politically correct."

Ex. H

"Our country's at a tipping point, we could go bad, one way or the other, and we're going to go the wrong way if we keep taking garbage into our country," he claimed.

Minnesota Gov. Tim Walz, who ran against the Trump-Vance ticket as Kamala Harris' pick for Vice President during the 2024 presidential campaign, has strongly condemned Trump's inflammatory remarks against the Somali community in his state.

"He's demonzing an entire community, folks who are in the professions—educators, artists, doctors, lawyers—they bring the diversity and energy to a place like Minnesota," said Walz during a Nov. 30 appearance on NBC's *Meet the Press.*

Walz argued that anyone involved in fraudulent schemes should be held to account, but urged against targeting Somalis as a whole. They have "created a vibrant community that makes Minnesota and this country better," he said.

Rep. Omar echoed Walz's stance, telling CNN on Wednesday that Trump's rhetoric against her and other Somalis is an example of him "trying to scapegoat and deflect" from his own "failures."

Democratic Representatives Gregory W. Meeks of New York and Sara Jacobs of California, along with Senators Jeanne Shaheen of New Hampshire and Cory Booker of New Jersey have also condemned Trump's remarks about Somali immigrants in the U.S.

"Instead of using the power of the presidency to bring our country together, President Trump chose to attack an American immigrant community, the overwhelming majority of whom are law-abiding and

have made many positive contributions to the United States," they said on Wednesday in a joint statement, which labeled Trump's rhetoric as "xenophobic and unacceptable."

Ex. H



Ex. I

⭐ 2 Favorites     👁 28,956 Views

U.S. Foreign-Born Population: 2019-2023 #CensusData #CensusDataViz

**Published on:** www.census.gov

**First Published Date:** Dec 12, 2024     **Last Published Date:** Dec 12, 2024

English (US)

Trust   Blog   FAQ   About   Tableau Products   Careers   Contact Us

LEGAL     TERMS OF SERVICE     PRIVACY INFORMATION     DATA POLICY     RESPONSIBLE DISCLOSURE     UNINSTALL     COOKIE PREFERENCES          YOUR PRIVACY CHOICES

in   f   X

© 2025 SALESFORCE, INC.

Ex. I

# WATCH: 20-year old U.S. citizen detained by ICE on Tuesday draws condemnation from Minneapolis' mayor and police chief

*Ari Bergeron, Susie Jones*

Dramatic video being released Wednesday of a 20-year old Somali-American man who was taken into custody in the Cedar Riverside neighborhood in Minneapolis.

"What you very clearly saw in that video was Mubashir, an American citizen, someone who has been here nearly his entire life, tackled, handcuffed, taken into custody for no reason at all, in clear violation of law and the Constitution of the United States," Minneapolis Mayor Jacob described. "For simply walking down the street and looking like he's Somali. This should make every single person in America, whether you are a Democrat or Republican, livid."

It happened on Tuesday evening during an ICE raid where a number of agents checked ID's of numerous people who all turned out to be U.S. citizens.

The young man, Mubashir, didn't want to give his last name, but stood with Frey and Minneapolis Police Chief Brian O'Hara who condemned the operation.

"I felt like I was getting assaulted," says Mubashir. "Like I was getting kidnapped, and that's exactly what it was. And the way they were treating me, it was inhumane. They dragged me across the road, they slammed me to the ground, choked me - that was uncalled for."

Mubashir told reporters he was kept at a facility on Fort Snelling for several hours. He claims he showed his passport several times before ultimately being released, adding they "didn't seem to care."

"Minneapolis is not going to stand by this kind of crap," said Frey.

"Like the mayor, I apologize that this happened to you in my city, with people wearing vests that say police. That's embarrassing," says Chief O'Hara. "But what really gets me is that this is just one story today. And it's a little overwhelming. Just the volume of stories we're trying to sift through, and figure out what's true and what's not, and kind of what may be happening."

Federal agents used pepper spray to push through an angry crowd that blocked their vehicles as they checked identifications in a heavily Somali neighborhood of Minneapolis on Tuesday, amid the Trump administration's ongoing crackdown targeting the community.

"Random efforts in which individuals, who are including American citizens, are being stopped because they appear to be Latino or because they appear to be Somali is wrong," says O'Hara who says the situation is 'not safe.'

City Council Member Jamal Osman, a Somali American who represents the neighborhood, said armed ICE agents went to East African restaurants in the neighborhood Tuesday, closed the doors and demanded people's IDs. They found only U.S. citizens and made no arrests, Osman said.

O'Hara added he was proud of the actions from his department who were dealing with the

Ex. J

aftermath, and monitoring the situation in Cedar-Riverside.

"We would just hope that at least from a tactical perspective, things could be well planned beforehand, both for the safety of law enforcement as well as for the safety of people in our community," O'Hara explained. "And that we wouldn't have to deal with so many stories after the fact, of what at the very least are just questionable methods and clearly a use of resources that doesn't appear to be getting a return on investment."

Frey, who has a background as a civil rights attorney, noted that the particular action that led to Mubashir being held are illegal.

"Under any law and under the United States Constitution, you can't tackle somebody because they look Somali without knowing who they are, what their name is, and you can't then detain them for purposes of immigration when they're a complete legal American citizen. When they have tried to provide information showing that they're an American citizen. Where you have declined to receive that information which you saw in this video," Frey explained.

Ex. J

# MINNESOTA DEPARTMENT OF PUBLIC SAFETY



## Driver and Vehicle Services

445 Minnesota Street • Saint Paul, Minnesota 55101
Driver Services Phone: 651.297.3298 • Vehicle Services Phone: 651.297.2126
Fax: 651.797.1205 • TTY: 651.282.6555
dps.mn.gov

December 23, 2025

Alcohol
and Gambling
Enforcement

Bureau of
Criminal
Apprehension

Driver
and Vehicle
Services

Emergency
Communication
Networks

Homeland
Security and
Emergency
Management

Minnesota
State Patrol

Office of
Communications

Office of
Justice Programs

Office of
Pipeline Safety

Office of
Traffic Safety

State Fire
Marshal

**<u>Sent via Electronic Mail and US Mail</u>**

The Honorable Kristi Noem
Office of the Executive Secretary
MS 0525 Department of Homeland Security
2707 Martin Luther King Jr Ave SE
Washington, DC 20528-0525
publicaffairs.iceofficeof@dhs.gov

Re:     Misuse of Minnesota License Plates on Unmarked DHS Vehicles

Dear Secretary Noem:

The Minnesota Department of Public Safety – Driver and Vehicle Services division (DVS) has received numerous reports from concerned citizens that Department of Homeland Security (DHS) immigration enforcement agents are misusing Minnesota license plates that are assigned to unmarked DHS vehicles.  For example, DVS has received reports that DHS agents are swapping license plates between DHS unmarked vehicles.  DVS has also received reports that that identical license plates have been observed on the rear of two separate DHS vehicles.

The above-described conduct violates Minnesota law and will not be tolerated.  To be clear, Minnesota law prohibits anyone, including the driver of an unmarked law enforcement vehicle, from displaying a Minnesota license plate other than the license plate assigned to that vehicle by DVS.  Minn. Stat. § 168.36, subd. 2.  Use of Minnesota license plates on a vehicle other than the vehicle to which the license plate is assigned unnecessarily puts DHS agents at risk of being stopped and cited under this section.

As you are aware, DVS has a robust undercover vehicle registration program used by DHS and other state and federal law enforcement agencies operating in Minnesota. This program, authorized by Minnesota Statutes, section 168.012, subdivision 1(c), allows law enforcement agencies to receive Minnesota license plates for use on their unmarked vehicles. This program ensures that vehicles driven on Minnesota roads are titled and registered as required by law while preserving the anonymity of law enforcement personnel performing sensitive work.

Ex. K

December 23, 2025
Page 2

Historically, DHS has used this program to protect the anonymity of law enforcement personnel performing sensitive work in Minnesota while adhering to state law and providing a mechanism for accountability in the event an unmarked vehicle is misused. There is nothing in the undercover license plate program or Minnesota law that allows DHS to transfer license plates between vehicles as has been reported to DVS.  DPS expects that DHS leadership will take affirmative steps to: (i) ensure that any such conduct is immediately ceased; and (ii) confirm that all DHS undercover vehicles with Minnesota license plates bear the proper DVS-issued plate that is assigned to the particular vehicle.

If DHS is unwilling or unable to abide by these legal requirements, the agency's continued participation in the unmarked vehicle program will be jeopardized.  Additionally, DVS may exercise its authority to revoke the registrations and license plates of the vehicles in question and to seize the license plates.  Minn. Stat. § 168.17.

If you have any questions about the contents of this letter or about DHS's legal obligations with regard to unmarked vehicles registered in Minnesota, please feel free to contact me.

Respectfully,

Pong Xiong
Director, Driver and Vehicle Services
Minnesota Department of Public Safety
445 Minnesota Street, Suite 190
Town Square Building
St. Paul, MN 55101
Pong.Xiong@state.mn.us

cc:     Brian Hyer
        Brian.Hyer@hq.dhs.gov

        Kim Johnson
        Kim.Johnson@hq.dhs.gov

        ASAC Tonya Price
        Tonya.M.Price@ice.dhs.gov

Ex. K

# Minnesota DVS warns ICE agents they're violating state law by switching license plates

Jon Collins    December 24, 2025 2:22 PM



U.S. Immigration and Customs Enforcement agents changing the license plate on one of their vehicles in Minneapolis.

Courtesy photo

The director of Minnesota's Driver and Vehicle Services is warning U.S. Immigration and Customs Enforcement agents that they're violating state law and could be cited if they switch out or remove license plates on their unmarked vehicles.

The move comes after multiple reports from observers that ICE and

Ex. L

Department of Homeland Security agents have been seen changing or removing the license plates in the vehicles they have been using to patrol the state during the ongoing immigration crackdown in the Twin Cities.

Luke Mielke has been observing ICE agents outside the Whipple Federal Building since the agency's immigration enforcement surge started earlier this month. On the morning of Dec. 14, he and a friend filmed federal agents appearing to blatantly change license plates on vehicles they were using.

"We witnessed several ICE agents gathered in the back of a car, with a stack of license plates they were sorting through, then taking a plate off the car and putting a new license plate on the car," Mielke said.

Video shared with MPR News appears to confirm Mielke's account. ICE officials didn't immediately answer a request for comment.

The conduct that's been reported to the state "violates Minnesota law and will not be tolerated," said Pong Xiong, director of Minnesota Driver and Vehicle Services, in a letter to Department of Homeland Security Secretary Kristi Noem and the local ICE office on Tuesday.

"Use of Minnesota license plates on a vehicle other than the vehicle to which the license plate is assigned unnecessarily puts DHS agents at risk of being stopped and cited under this section," Xiong wrote.

Xiong told federal homeland security officials to stop license plate switching immediately and confirm that all vehicles being used by federal agents bear their assigned license plates.

Ex. L

Minnesota has an ongoing program to allow undercover law enforcement vehicles to receive license plates for unmarked vehicles. Xiong warned that the federal agency's participation in that program could be jeopardized if the behavior continues. He also said in the letter that the state also has the right to revoke the registrations and seize license plates of vehicles with misused plates.

In a statement to MPR News, Xiong said behavior like switching plates causes understandable concerns for Minnesotans: "Our responsibility is to ensure Minnesota laws are followed and that everyone using our roads can do so safely."

Gov. Tim Walz said earlier this week that agents should stop the practice and criticized federal officials for showing a lack of transparency during recent Minnesota operations.

"They're doing what criminals do. They're putting license plates on vehicles they're not registered to, so they're renting vehicles and putting on fake plates," Walz said. "That's not law enforcement, that's criminal activity."

Department of Public Safety Commissioner Bob Jacobson said observers who suspect plate swapping is occurring can lodge complaints with the U.S. Department of Homeland Security.

Activists have been sharing information and tracking ICE vehicles throughout the Twin Cities, partly by using their license plate numbers and the models of the vehicles.

"ICE does not like their activity being tracked or observed by the public," Mielke said. "They're trying to avoid scrutiny and be able to

Ex. L

operate in the shadows, without public transparency, so one of the ways they're doing that is driving vehicles without license plates or exchanging license plates on the vehicles."

Mielke said he's especially concerned about the precedent it sets to allow federal agents to go around without identification or to violate state laws. He's worried it could embolden copycats to pose as law enforcement agents and commit crimes against the public just a few months after Minnesota lawmaker [Melissa Hortman and her husband Mark Hortman](#) were assassinated by a man posing as law enforcement.

License swapping has been reported in other states that experienced immigration enforcement surges. [In Illinois, Secretary of State Alexi Giannoulias has launched a public hotline](#) to report license tampering and warned that penalties for violating state law could include jail time.

*MPR News reporter Dana Ferguson contributed to this report.*

Ex. L

# Hennepin County opens new location for Domestic Abuse Service Center

*Raya Quttaineh*

The center offers a number of resources including legal assistance, orders of protection and advocacy.

MINNEAPOLIS — In 1994, Hennepin County opened a center dedicated to helping people experiencing domestic abuse.

Thirty years later, staff members of the [Domestic Abuse Service Center (DASC)](#) unveiled a new space on the 14th floor of the Hennepin County Government Center. DASC was previously located in the basement.

"The mission remains the same," the center's director Siri Lokensgard said Tuesday morning during a press conference. "To respond to the needs of victims of domestic violence through a trauma-informed lens delivered by a diverse and inclusive staff that reflect the communities we serve."

Violence Free Minnesota, a statewide coalition dedicated to ending relationship abuse, documented 40 intimate partner homicides across the state in 2023. That is the highest number documented by the organization in its 35 years of tracking this data. According to [Safe Haven Shelter and Resource Center](#), one in four Minnesota women experience domestic violence.

Throughout the pandemic and over the past three years, staff members at DASC had more than 20,000 interactions with people seeking services.

Hennepin County's new center on the 14th floor officially opened on Nov. 22 and offers a modern and more secure environment, according to staff members. Lokensgard said DASC offers a safe space for people to receive trauma-informed and culturally inclusive services. That includes legal assistance, orders of protection and advocacy to help break cycles of violence.

"Our job as advocates is to build trust and rapport with the ultimate goal of harm reduction and stopping the violence," Lokensgard explained.

At the ribbon cutting, Hennepin County Attorney Mary Moriarty spoke about the significance of the center's mission, noting that while the occasion was one of celebration, it's essential to remember the struggles of those who turn to DASC for help.

"Although we celebrate today, we must remember why people come to DASC," Moriarty said. "They're frightened, angry, and unsure of the future. They're looking for help."

Lokensgard said the center's mission would be not be possible without community partners. Titilayo Bediako, founder and executive director of We Win Insititute, donated 50 books to the center, helping create a space where children affected by domestic violence can feel safe and supported.

"I work with children whose families have been affected by domestic abuse, and we do everything

Ex. M

that we can in terms of supporting our families. I dream of a time when this will never be an issue in our society anymore," Bediako said.

DASC offers in-person and online services.

*If you or someone you know is experiencing domestic violence and needs help, call 800-799-7233 or text START to 88788 to be connected with someone from the National Domestic Violence Hotline. The hotline includes more options for support and identifiers of abuse [on its website](#).*

*For Minnesota residents, [Cornerstone MN](#) offers resources and safe housing for domestic abuse survivors and crime victims. Call 1-866-223-1111 or chat online with the [crisis hotline](#).*

Ex. M

# Domestic Abuse Service Center

**IMPORTANT UPDATE**:

All services including advocacy, Orders for Protection, and safety planning, can be accessed by calling **(612) 348-5073** or on-site at the Domestic Abuse Service Center located on floor A-14 in the Government Center. Hours of operation are Monday – Friday from 8:00 a.m. to 4:30 p.m.

If assistance is needed beyond hours of operation, please contact Day One via phone at 1-866-223-1111 or text at (612) 399-9995.

---

DASC has evolved, through always proudly adhering to their mission statement "to respond to the needs of victims of domestic violence through a trauma informed lens delivered by a diverse and inclusive staff that reflect the community we serve."

Victims come to DASC daily seeking help, guidance and support. They can receive multiple services in one centralized location, such as, advocacy, filing order for protections, connecting with a prosecution team, and seeking legal consultation and representation from pro-bono attorneys.

DASC is located on floor A-14 of the Hennepin County Government Center. It is served by multiple bus routes and the Government Plaza Station on the METRO Blue Line.

It is open from 8:00 a.m. to 4:30 p.m. Monday-Friday and closed on legal holidays.

Open all

## About DASC

The DASC office and staff reflect a unique collaboration among law enforcement agencies and domestic abuse service providers. The Hennepin County Attorney's Office, Minneapolis City Attorney's Office, Fourth District Court, Hennepin County Sherriff's Department, and a range of social service organizations all have regular office hours.

Advocates from these community agencies are available:

- Asian Women United
- Esperanza United
- Division of Indian Work
- SEWA-AIFW
- Domestic Abuse Project

The staff provides culturally specific and trauma informed services. DASC has advocates that speak the following languages: English, Spanish, Hmong, Somali, Hindi, Newari, Nepali, Telugu, Tamil, and Sanskrit.

Central Minnesota Legal Services provides pro bono legal consultation and representation to individuals at DASC. CMLS strives to provide culturally responsive and trauma informed lawyering. Referrals for legal consultation are made by advocates.

Ex. N

# History of DASC

In October 2019, the Domestic Abuse Service Center (DASC) celebrated its 25th anniversary. Since 1994, DASC has helped more than 1.5 million victims, filed 90,000 Orders for Protection, and charged more than 60,000 Gone on Arrivals.

# Domestic Violence During the Pandemic

The former Director of the Domestic Abuse Service Center DeAna Smith, spoke with the University of Minnesota School of Public Health about domestic violence during the pandemic. Listen to the podcast here.

Strong advocacy is a critical piece of effective intervention and prevention at DASC. Advocates help individuals navigate the system by filling out paperwork and filing for Orders for Protection.

Advocates can explain the civil and criminal court processes. They can help make referrals and may be able to go to court with you. They will help you develop a safety plan and explore other concerns.

If a family, household member or someone with whom you had a significant/romantic relationship has physically hurt you or threatened to physically to hurt you or your children, you can ask the court for an Order for Protection (OFP).

Advocates can help you apply for and file an OFP.

There is no fee to file an OFP.

If you want to make sure your order was served, call the Hennepin County Sheriff's Office at 612-348-3801.

An OFP can protect you by:

- Ordering the Respondent not to harm you or others listed in the order, such as children, other family members or pets
- Ordering the Respondent to stay away from your home and areas specified in the order, such as your place of work, school, daycare or other locations
- Ordering the Respondent to not contact you in person, over the phone, by mail, email or electronic messaging, through a third party, or by any other means such as social media

Additional information about OFPs from District Court.

The safety of staff and visitors is taken very seriously. A Hennepin County Sheriff's deputy is always on site to provide security.

If needed, safety escorts are provided.

Advocates can provide referrals to housing resources and emergency shelter.

If you are in need of emergency shelter or crisis support after hours, please contact Day One via phone at 1-866-223-1111 or text at 612-399-9995.

Domestic abuse impacts entire families. DASC was designed with families in mind.

There is a playroom so children can accompany their parent/guardian to the center and have a safe,

Ex. N

age-appropriate place to wait.

Staff can also provide referrals to agencies that specialize in children and family services.

DASC has advocates that speak the following languages:

- English
- Spanish
- Hmong
- Somali
- Hindi
- Newari
- Nepali
- Telugu
- Tamil
- Sanskrit

Additional interpreters are provided if needed.

[Open all](#)

[Top](#)

Ex. N

**Hennepin County, Minnesota**

# Hennepin County Attorney's Office passes milestone in U and T visa certifications

The Hennepin County Attorney's Office (HCAO) has surpassed 500 U or T visa certifications for crime victims and their families since Jan. 1, 2024, under a policy introduced last year that victim advocates have called a "model for the country."

From 2008-2023, the HCAO issued just over 400 certifications.

Removing obstacles to reporting crime assists law enforcement and prosecutors in the detection, investigation, and prosecution of crime. U and T visas are a proven tool to ensure crimes are reported among immigrant communities. U and T visas are issued by United States Citizenship and Immigration Services (USCIS) after being certified by local authorities, like the County Attorney's Office, and are designed to increase crime reporting among immigrant communities. The HCAO does not grant immigration relief.

The federal statute that created these visas was signed into law by President Bush in 2000 and its programming was reauthorized under Presidents Obama and Trump.

- U Visa: provides immigration relief for victims who were helpful, are being helpful, or are likely to be helpful in the detection, investigation, prosecution, conviction, or sentencing of 28 different qualifying crimes. The categories of qualifying crimes include violent crimes, domestic violence, sexual assault, trafficking crimes, and crimes that obstruct law enforcement officers.
- T Visa: provides immigration relief for victims of sex trafficking, labor trafficking, and forced labor.

"Under previous administrations, this office has not used this public safety tool to its greatest extent. It was one of my major priorities to change that and we have absolutely succeeded," **Hennepin County Attorney Mary Moriarty said.** "We adjusted the policy to strengthen law enforcement's ability to detect and solve crimes and to increase trust with vulnerable populations. As successful as it has been, our community is still suffering from the effects of the Trump administration's disastrous, militaristic overreach. Victims and witnesses have declined to cooperate with our prosecutions of dangerous individuals due to their fear of being abducted by federal agents."

The full policy is available here: **U/T visa policy (PDF, 1MB)**

Additional information and resources are available on the office's website: **U/T Visa**

Ex. O

     DONATE

## PUBLIC SAFETY

# ICE arrests target immigrants at Hennepin County courthouse, causing 'immense' anxiety

Chief Hennepin County Public Defender Mike Berger says ICE is likely checking court calendars for undocumented immigrants who are due in court for a hearing.

 by **Katrina Pross**
January 28, 2025   Updated January 29, 2025

The Hennepin County Government Center, which houses Hennepin County District Court, pictured on January 28, 2025. Credit: Dymanh Chhoun | Sahan Journal

Federal agents are arresting immigrants reporting to court and potentially impacting the criminal justice system in Minnesota, say local authorities.

Ex. P

Undocumented people have been **arrested** in Hennepin County, and one sheriff who oversees a jail that houses U.S. Customs and Immigration Enforcement (ICE) arrestees is seeing an increase in detainees. Some worry that undocumented people may be less likely to show up to court or report crimes for fear of becoming ICE targets.

ICE agents arrested defendants at Hennepin County District Court in the past week, said Hennepin County Chief Public Defender Mike Berger. At least one arrest has taken place at the Hennepin County Government Center in downtown Minneapolis, said Berger, who could not specify how many people have been arrested or the exact location. He said they happened either inside or nearby the government center, which houses the courthouse.

"We have seen ICE agents taking folks into custody for immigration matters in the courthouse," Berger said.

Berger said whether the arrests took place in the lobby of the government center, or right outside the building, the arrests target people who are attending court.

"In the mind of a public defender, in the courthouse and at the courthouse is a distinction without a difference," he said.

An individual was also arrested by ICE at their home before a scheduled court appearance at a Hennepin County courthouse, Berger said. There are several Hennepin County courthouse locations, including in downtown Minneapolis and in Minnetonka.

Bonney Bowman, communications manager for Hennepin County District Court, said her office has not been able to verify if any ICE arrests have taken place. ICE does not notify Hennepin County District Court if they make an arrest, she said.

## RELATED STORIES

**Somali family reunites in Minneapolis as President Trump strands refugees across the world**

**'I came here to be safe': Minnesota journalists who fled Somalia, Ethiopia fear deportation under Trump**

Ex. P

## Inside Donald Trump's immigration plans: mass deportations, tighter borders, workplace raids

According to the **Immigration Policy Tracking Project**, which publishes President Donald Trump's immigration policies online, ICE agents can target undocumented people for various reasons, including if the person is deemed a national security or public safety threat, is a gang member, or if they were ordered to leave the United States but failed to.

ICE agents can enter a courthouse to conduct an arrest if they have "credible information" that the targeted person will be there and "where such action is not precluded by laws imposed by the jurisdiction in which the civil immigration enforcement action will take place," according to **ICE's website**.

Arrests of undocumented people who accompany defendants to court will be evaluated on a case-by-case basis, according to the Immigration Policy Tracking Project.

Berger said the Hennepin County Public Defender's Office frequently works with clients who are undocumented. The arrests are not raids, he said, but rather, are targeting specific people. He said that in order to find people with immigration issues, ICE agents are likely looking at public calendars issued by the court showing when defendants must report to court.



Ex. P



A daily schedule of who is appearing in court, pictured on January 28, 2025, is displayed on screens at Hennepin County District Court, which is located inside the Hennepin County Government Center in downtown Minneapolis. Credit: Dymanh Chhoun | Sahan Journal

"I think what we're dealing with is probably the new reality, which is if there is an undocumented individual on the [court] calendar … there's now a more likely than not chance that ICE is going to be there at their court hearing, because that's a way they can find someone," Berger said.

The people most likely to be impacted by courthouse arrests are mostly charged with lower level offenses, he said, because defendants charged with more serious crimes are likely in jail already.

Berger's concerned that fear of ICE arrests could deter undocumented defendants from appearing in court for their cases.

"They are trying to integrate into our society and are trying to do the right thing, and are trying to participate in the court system and make amends for a mistake they made," Berger said of undocumented defendants with court cases.

Hennepin County public defenders who represent undocumented clients have been feeling an "immense" amount of anxiety, he said, but are limited in what they can do because the arrests are executed under federal law. Berger said his office can advise clients about the potential outcomes if they appear in court.

"I can't stress that enough — we're doing everything we can to mitigate this impact. But because it is federal law, there's nothing we actually can do to fight it," he said.  "So we're sort of stuck."

Dakota County Sheriff Joe Leko said he hasn't seen an increase in people being arrested by ICE in the Dakota County courthouse. The sheriff's office provides security in the courthouse. He said ICE arrests occur outside the courthouse a few times a month with uniformed agents.

"They monitor our jail booking sheets to determine who's in custody and they know when people are being released. If they want to detain them, they can, but they can't come into our jail and they don't come into our courts to do that," Leko said.

Ex. P

ICE contracts with three jails in Minnesota to house detainees: the Sherburne County jail in Elk River, the Freeborn County jail in Albert Lea and the Kandiyohi County jail in Willmar.

Freeborn County Sheriff Ryan Shea said the jails that ICE contracts with can't provide information about the number of ICE detainees they're housing. But he confirmed that the Freeborn County jail has seen an increase in detainees in the past week.

"We kind of expected that there we would see something like this," Shea said.

Kandiyohi County Sheriff Eric Tollefson said his jail has not seen an increase in ICE detainees, and that the number of detainees has been mostly stable over the past year.

Tollefson said he's worried that the current political climate will make undocumented residents less likely to call 911 to report a crime due to immigration fears.

"They've always been hesitant to call us … which is really unfortunate, and this rhetoric now has just increased that fear, I suppose," he said.

*This story has been updated with information from a Hennepin County District Court spokesperson.*

*Correction: This story has been updated to reflect that an arrest happened at an individual's home, not at the Ridgedale Hennepin County courthouse in Minnetonka.*

## READ MORE

Ex. P

# 'It makes us … less safe': How federal immigration actions are affecting local prosecutions in Hennepin County

*Katrina Pross*

Hennepin County prosecutors say President Donald Trump's immigration policies are hindering their pursuit of justice, in some cases because defendants are deported before they get their day in court, and in others because witnesses or defendants may be too fearful to appear.

Since January, when Trump took office for the second time, fear that U.S. Immigration and Customs Enforcement (ICE) agents may detain them if they appear for a court date makes it difficult to ensure justice for undocumented people, be they victims or alleged perpetrators, prosecutors and immigration experts say.

"Our goal is public safety," said Eder Castillo, a senior assistant Hennepin County attorney. "So when we have these interruptions, interference, that just makes achieving that goal really difficult."

## Some defendants abruptly detained and deported by ICE before case concludes

The attorney's office pointed to several recent cases in which a defendant was either deported or likely deported before their case was resolved.

In one case, a defendant charged with killing a woman while driving drunk was deported during prosecution.

A victim in a different case told the attorney's office that they were contacted and threatened by a defendant, who had been deported before the case was finished, despite the attorney's office filing a legal document for the defendant to appear in court.

In a third case, a defendant accused of sexually abusing his girlfriend's daughter disappeared during prosecution. The victim's family told the attorney's office that the defendant had likely been in ICE custody, and potentially deported.

It can be challenging for local prosecutors to get information from ICE. The Hennepin County Attorney's Office often does not receive communications from the agency before their actions.

"We are learning sometimes from the news that someone got apprehended," Castillo said. "That uncertainty and lack of communication makes it difficult for us to maintain public safety in our community."

While the Trump administration has said that deporting someone is justice, those in the local legal system disagree.

Victims who report crimes don't get the closure or resolution that a criminal conviction could provide, Castillo said.

"They've been so vulnerable with our office, showing up to hearings, putting in restitution claims, doing all of these things, sometimes grieving the crime that they've been impacted by, and then to suddenly have the case end out of nowhere with no result?" Castillo said. "In terms of justice, it's hard for me to see that as a just outcome."

For Hennepin County Attorney Mary Moriarty, deporting someone before they face accountability for a crime is not consistent with public safety.

"It's a danger," Moriarty said. "It deprives our victims and our community of accountability for what happened here, but also, I think, endangers the people in that community where they're sent."

Mike Berger, the chief public defender in Hennepin County, whose office frequently represents undocumented clients, said that deporting someone before they are found guilty of a crime doesn't allow for evidence to prove that the accused actually committed the crime.

Ex. Q

 "If you're short-circuiting that system, you're not allowing due process to unfold, and you're deporting people on accusations," he said.

Emanual Williams, an attorney doing criminal defense work for the Legal Rights Center, a nonprofit law firm, said deporting someone before their case is resolved leaves community members in the dark if the crime actually happened. It also deprives people of the right to have their day in court.

"To me, that's the worst thing that can happen in our legal system," Williams said. "I don't think that's what this country was founded on."

## Fear about coming to courthouses, testifying in hearings

Victims and witnesses of crimes have expressed fear of attending court proceedings in person at the courthouse over fears that ICE may be present and detain them, and some defendants have missed hearings, according to the Hennepin County Attorney's Office.

Under the Trump administration, ICE issued guidance that agents can conduct civil immigration enforcement actions in or near courthouses.

Julia Decker, the policy director of the Immigrant Law Center of Minnesota, said that created "immediate concern" for lawyers and community members.

The guidance also says that ICE can detain undocumented witnesses participating in a court proceeding or family members and friends accompanying someone to court.

"Some of our witnesses as well as victims, are immigrants, and they're afraid to come down to the courthouse, that they might get snatched by ICE," Moriarty said. "Even though we do not work with ICE or cooperate with them, we can't guarantee that anybody's going to be safe if they are helping us."

ICE has also told agents that they are not required to proactively determine if the person they are detaining might be a victim of a crime.

"This is not something that we've ever seen before," Castillo said. 'This isn't just targeting people who have criminal histories or convictions or are suspects. This is explicitly talking about witnesses and victims that ICE is no longer going to treat the same way they've treated before."

Ex. Q



Senior Assistant HennepinCounty attorney Eder Castillo, seen on Aug. 5, 2025, at the Hennepin County Government Center in Minneapolis. Credit: Dymanh Chhoun | Sahan Journal

Berger said that several arrests have taken place near Hennepin County courthouses since January. He also said that it appears that ICE's presence near Hennepin County court buildings has decreased since the beginning of the year.

"Now I think we're in a place where they're picking them up at all kinds of places, and not so much at the courthouse," Berger said.

A spokesperson from Hennepin County District Court said that the court is unable to confirm actions taken by another agency like ICE.

A spokesperson for ICE did not respond to a request for comment before publication.

Castillo said crime victims have expressed hesitation to testify in person at the courthouse. Some have asked the attorney's office if they can testify virtually or in writing, but Castillo said that testimony in criminal cases has to take place in person.

In addition to victims and witnesses expressing fear of coming to the courthouse, the Hennepin County Attorney's Office has 13 cases in which a warrant has been issued in recent months because the defendants, who have immigration concerns, have missed a court appearance.

Berger said his office has not seen an increase in people failing to appear for their hearings so far this year.

But the fear among undocumented people to enter government buildings remains. While the Hennepin County Attorney's Office does not inquire about someone's immigration status, court proceedings take place in public courthouses.

Abigail Wahl, an immigration attorney who represents clients in Minnesota, said she's heard concerns from undocumented people about attending any court proceeding, even for minor cases.

"People are definitely scared to go for even just a family court proceeding, or something to do with custody or child

Ex. Q

support, or even minor traffic crimes, which normally wouldn't be something people are worried about," Wahl said.

Williams said that he thinks ICE agents should be barred from courthouses to allow cases to move forward without fear or lack of due process.

"Not only does it make it harder for us to do our jobs, harder for clients to be able to exercise their rights and harder for victims to be able to find resolution, I think it wholeheartedly makes us a less safe country," he said.

## One solution to help undocumented crime victims

Amid these concerns, the Hennepin County Attorney's Office has been working to make it easier for crime victims who are not U.S. citizens to obtain legal residency.

About a year and a half ago, the office announced a new policy that eases the process for people to apply for U and T visas, which were introduced by the federal government about 25 years ago. U visas give legal status to crime victims who have been subjected to mental or physical abuse, and who can help investigators. T visas apply to victims of serious trafficking crimes.

The visas aim to give some protection to those who may fear deportation if they report a crime.

"The whole idea is, you want somebody … who is an immigrant who's been a victim, to cooperate with us so that we can hold the person accountable for the harm that they've done," Moriarty said.

To apply for a U or T visa, the applicant needs a certification from a law enforcement agency, such as the Hennepin County Attorney's Office. Previously, the county attorney's office would only certify cases that were referred to for prosecution. Now the office certifies all cases for qualifying victims in Hennepin County, regardless of whether the crime results in a criminal case.

This summer, the office surpassed 500 U or T visa certifications since January 2024. From 2008 to 2023, the office issued just over 400 certifications, according to the attorney's office.

"It's been incredible to work with them. And I would say what they've done at Hennepin County is revolutionary and very helpful to the community overall," Wahl said.

While getting a certification is an essential part of the application process, it can take years to actually get a U visa. The federal government has a cap of issuing 10,000 a year, and a significant backlog leaves new applicants with an estimated wait time of about 15 to 20 years to get a visa, said Lenore Millibergity, an attorney who recently retired from the Immigrant Law Center of Minnesota.

While applicants wait for their visa, an immigration officer can review their case and issue a work card if they meet criteria. Millibergity said that she's heard of recent cases nationally in which applicants who have old removal orders have been detained by ICE, even if they have documentation that they might be issued a U visa in the future.

"It's a few cases, but it's definitely a cause for concern," she said.

In addition to certifying U or T visas, the attorney's office has been working to do more community engagement and build trust with immigrants who may be victims of crimes.

"We try to emphasize as much as we can, we care about you, you matter to this community, and we're doing what we can do to help," Moriarty said.

Ex. Q

# ICE put themselves, others at risk during south Minneapolis operation, former agent says

By

Updated on: December 18, 2025 / 6:42 PM CST

During an ICE operation on Monday, WCCO's cameras caught the stunning moment that an Immigration and Customs Enforcement agent [dragged a woman along the ground by her arm](#), with her wrist seemingly attached to that of the federal officer's by a restraint.

At WCCO's request, Eric Balliet reviewed the footage. He spent 25 years with the agency now known as ICE, serving as a special agent who would go on to lead the ICE equivalent of internal affairs.

"I've arrested dozens upon dozens of human traffickers, human smugglers, child molesters, you name it. I've never dragged a suspect one-handed across a street," Balliet said.

According to ICE, agents found themselves in what they are calling a "riot" in south Minneapolis after pulling over a car with two people facing immigration charges. Officers allege in court documents that a woman attempted to vandalize ICE vehicles with spray paint — the crowd began forming as ICE attempted to detain her.

WCCO's cameras arrived with two officers surrounded by protesters; one of them was waving around a weapon that deploys chemical spray. The other was kneeling on top of the woman, his wrist attached

Ex. R

to hers with the restraint, using his other arm to wave around a Taser. Both of the officers fired their respective weapons; after using his Taser, that officer taunted the crowd, asking "who wants more?"

It was after this incident that the woman got up and tried to run. She was then dragged across the floor by the agent with the Taser before he detached from her; some in the crowd threw snowballs while his partner fired chemical spray in return.

Balliet said that these use-of-force tactics should be under review. He said that the agents appeared overwhelmed, highlighting what to him seemed to be poor operational planning and execution.

Balliet said that too often he sees agents unable to safely handle situations that they should never have put themselves in in the first place.

"There seems to be either a blatant disregard for training or a lack thereof, either of which is troubling and puts the agents and the general public at risk," Balliet said.

In a lengthy statement released on Thursday, an unnamed ICE spokesperson said that officers are showing restraint against "rioters." ICE did not respond to WCCO's questions about whether dragging someone along the floor by a restraint or verbally taunting a crowd of protesters is standard protocol. The agency also failed to say if any of the agents involved on Monday face internal discipline.

"ICE and CBP are trained to use the minimum amount of force necessary to resolve dangerous situations to prioritize the safety of the public and themselves. Our officers are highly trained in de-

escalation tactics and regularly receive ongoing use of force training," the statement reads in part.

In an interview with 60 Minutes in October, President Trump endorsed ICE agents using force in residential neighborhoods in cities throughout the country. This came after an incident in Illinois where cell phone video showed federal agents standing several stories above protesters and shooting less-than-lethal munitions towards their heads and torsos.

Protesters and media organizations in Chicago filed a complaint in federal court about tactics in the Chicago area as well as those captured on video recordings in Portland, Oregon; Los Angeles and other cities. In early November, U.S. District Court Judge Sara L. Ellis issued an order blocking federal agents from deploying chemical spray, tear gas or any other less-lethal weapon "unless such force is necessary to stop the immediate threat of physical harm to another."

The Trump administration has filed an appeal.

On Monday, ICE confirmed the arrest of four people. WCCO learned that the two people detained on immigration charges are an Ecuadorian couple in their early 20s; agents shattered their car window before detaining the pair. The other two arrested are U.S. citizens who ICE alleges assaulted officers; however, WCCO could only find evidence that one of the men is actually facing criminal charges.

According to ICE, a man named Noor Abdikadir is still in custody for assaulting an officer. WCCO could not find any publicly available

Ex. R

information regarding any kind of charges; ICE is ignoring clarifying questions about his whereabouts and alleged crimes.

A man with a very similar name, Abdikadir Noor, is among six people who are suing ICE for civil rights violations with the assistance of the [American Civil Liberties Union of Minnesota](#). In the lawsuit, the Somali-American said that ICE tackled him during Monday's operation without provocation, leaving him with injuries. He stated that he was among the first on scene, driving to the nearby Karmel Mall when he noticed ICE pull over the car behind him. He said that once the crowd began to form he tried to keep the peace.

Noor said that once he was released from the Whipple Federal Building at Fort Snelling, where ICE operates from, he was given no documentation or explanation for why he was arrested in the first place.

While ICE failed to identify whether they have a different man still in custody, WCCO could identify documentation for the other man, Maxwell Collyard. In a complaint written by HSI Special Agent Michael Raiff, agents accuse Collyard of being part of the "mob" throwing ice, snow, rocks and other objects following Monday's vehicle stop.

Collyard allegedly repeatedly ignored commands from ICE officers to back up and instead threatened officers on scene.

At one point, an officer sprayed Collyard with "oleoresin capsicum" spray, a chemical agent. After this, the complaint alleges that Collyard and others tackled one of the officers while they were attempting to detain the woman seen pinned on the floor. From here, the complaint

Ex. R

states that Collyard followed the agents involved away from the scene in his pickup truck; this is where officers arrested him. According to court records, he's now under house arrest.

In audio released by the Hennepin County Sheriff's Office, a supervisor with the ICE operation based in St. Paul called for help from local law enforcement. Deputies with the Hennepin County Sheriff's Office and officers with the Minneapolis Police Department responded, only to find no evidence that agents were in life-threatening danger.

Balliet said from what he saw, there is evidence that ICE agents are deploying to cities like Minneapolis without being properly equipped to handle the public backlash.

"I feel like it falls on the lack of leadership, the lack of accountability, poor training, poor operational planning, poor execution," Balliet said.

## More from CBS News

Ex. R

# Witness, ICE offer conflicting accounts of chaotic clash in Minneapolis

**FOX 9** **www.fox9.com/**news/witness-ice-offer-conflicting-accounts-chaotic-clash-minneapolis

By Mike Manzoni



## [Witnesses conflict with ICE account](#)

Protesters clashed with immigration authorities in south Minneapolis on Monday afternoon, but a day later both sides offered conflicting accounts of how the chaos unfolded.

**The Brief**

- Protesters and immigration authorities clashed near Karmel Mall on Monday afternoon.
- Video that circulated online shows agents dragging a pregnant woman across a street.
- The Department of Homeland Security on Tuesday said protesters attacked agents and shouted death threats.

**MINNEAPOLIS (FOX 9)** - Protesters clashed with [immigration authorities](#) in south Minneapolis on Monday afternoon, but a day later both sides offered conflicting accounts of how the chaos unfolded.

## ICE agents drag woman across street

What happened:

Federal immigration authorities conducted a targeted operation near Karmel Mall on Monday, where dozens of protesters started throwing chunks of ice at them and shouted death threats, according to the Department of Homeland Security (DHS).

Ex. S

Video that circulated online shows agents dragging a woman across a street. The crowd said she was pregnant. The woman, who was not identified, was released over safety concerns, authorities said.

The other side:

DHS officials say the woman who was dragged tried to vandalize a squad car.

The agency said officers abandoned their attempt to arrest her over safety concerns after protesters hurled chunks of ice and rocks at agents and deployed pepper spray against them.

## Witness recounts chaos in south Minneapolis

What a witness says:

A witness who recorded some of the melee disputed a key portion of the government's account.

"They chased her down to the corner, and they took her, and they were really forceful and brutal with her," recalled Taneka Dortch. "That's a lie. She didn't rush. She didn't try to vandalize any of their vehicles."

Dig deeper:

Two U.S. citizens were arrested after they assaulted agents during the clash, according to authorities. Both remain in custody.

ImmigrationCrime and Public SafetyMinneapolisMinnesota

Ex. S



**MINNPOST**

Metro

# Police in Twin Cities pitted between competing demands of protesters and federal agents

*Amid the ongoing "Operation Metro Surge," city leaders in Minneapolis and St. Paul are seeking to strengthen local laws about when and how police interact with federal agents.*

by **Trevor Mitchell**
12/23/2025

Ex. T



An attendee holds up a sign reading "no support for ICE" during a city council meeting at the Minneapolis Public Service Center on Tuesday, Dec. 9, 2025, in Minneapolis, Minn. The council unanimously approved changes to the city's separation ordinance at the meeting, including restricting Minneapolis police from helping ICE with immigration enforcement. Credit: Ellen Schmidt/MinnPost/CatchLight Local/Report for America

Federal immigration actions targeting the Twin Cities have put local police at the center of a tug-of-war.

More than 670 people have been arrested so far amid the feds' "Operation Metro Surge." In response, many residents have pushed back, from **individuals 3D-printing "anti-ICE whistles"** to thousands of **protesters marching down Lake Street** in the bitter cold on Dec. 20.

Ex. T

But as federal enforcement has stepped up, the role of local law enforcement has proven contentious. In both Minneapolis and St. Paul, rules state clearly that police departments may not assist in enforcing federal immigration laws.

In recent instances, however, ICE has called local police not overtly for assistance with immigration actions, but citing threats to agents' safety. The distinction is raising debate about where to draw the line between protecting federal agents and actively helping them.

## Existing rules about cooperation were 'outdated'

On Dec. 11, the Minneapolis City Council unanimously voted to strengthen the city's separation ordinance — a 22-year-old law, passed shortly after the 2003 launch of the U.S. Department of Homeland Security, designed to prevent city involvement in the enforcement of federal immigration laws.

And while that was just days after federal authorities launched an **immigration enforcement campaign** in the Twin Cities, the push to clarify and reinforce the ordinance goes back to at least June 3.

*Related: **Minneapolis council members taking on update of city's separation ordinance***

That's when federal law enforcement, including ICE agents, **led a search** at Minneapolis' Taqueria y Birrieria Las Cuatro Milpas, drawing crowds of protesters and leading to violent interactions. The Minneapolis Police Department arrived to manage the scene and were perceived by some to be aiding ICE.

A **city audit** found that MPD did not violate the separation ordinance, but also called it "outdated" and recommended updates.

Ex. T

## What changed in the separation ordinance?

Minneapolis' **revised ordinance** aims in part to eliminate gray areas in its language. For example, in the section disallowing the use of "city resources" to enforce immigration law, it now says "city facilities, property, moneys, equipment, data, technology (e.g. license plate recognition, surveillance video, computers)."

It also offers more detail about its purpose, saying that to aid federal authorities would squander city resources and have a "chilling effect" on immigrants' willingness to call the police or report crimes.



Organizations against federal immigration enforcement pack the room during a city council meeting at the

Ex. T

Minneapolis Public Service Center on Tuesday, Dec. 9, 2025, in Minneapolis, Minn. The council unanimously approved changes to the city's separation ordinance at the meeting, including restricting Minneapolis police from helping ICE with immigration enforcement. Credit: Ellen Schmidt/MinnPost/CatchLight Local/Report for America

Like an **executive order** signed on Dec. 3 by Mayor Jacob Frey, the revisions specify that city-owned parking lots, ramps and garages may not be used as staging areas to enforce federal immigration laws. This **mirrors actions taken by Chicago's mayor** after federal agents used city property for those purposes.

MPD may still assist federal law enforcement in investigating criminal activity, but if they become aware that the subject of an investigation may be violating immigration law, they must make a detailed, publicly available report to the mayor and city council regarding the investigation.

## A familiar situation in St. Paul

Saint Paul is poised to take similar actions following a Nov. 25 arrest by federal agents in the Payne-Phalen neighborhood that drew crowds of protesters.

Saint Paul Police Chief Axel Henry **said in a statement** that his officers were called to assist when a "federal perimeter was broken by protesters," and that officers stood between them and federal agents "so protestors could express their First Amendment rights and federal agents could complete their legal objectives."

Henry also said his officers became aware of reports that people had begun to arm themselves with rocks and sticks. Amid the events, he said, officers used chemical irritants.

"I understand that our public is greatly frustrated by these issues, but be clear, Saint Paul

Ex. T

police officers are not doing immigration enforcement," Henry said, "but we do have a responsibility to make sure that laws aren't broken in our city."

The Saint Paul City Council responded at a Dec. 10 meeting, voting unanimously to pass a resolution promising to perform a financial audit of the police department's actions, investigate the use of force alongside the state's Board of Peace Officer Standards and Training and consider whether **the city's separation ordinance**, passed in 2004, should be strengthened.

## How have others responded?

Dieu Do, a community organizer with the Minnesota Immigrant Rights Action Committee (MIRAC) and a policy associate for outgoing Ward 5 Council member Jeremiah Ellison, expressed optimism about Minneapolis' revised ordinance. The hope, she said, is to avoid a repeat of the June 3 fracas at Las Quatro Milpas, which she called a "clear picture of what it looks like when our local law enforcement collaborate with federal agents."

But even following the council's passage of the revised ordinance, tensions remain.

On Dec. 15, four days after its passage, the Hennepin County Sheriff's Office received a **911 call from the Department of Homeland Security** saying they were "being attacked" by 60-70 people, resulting  in an "officer needs help" call to local law enforcement.

Ex. T



An ICE agent has a protester handcuffed in the snow while his taser is deployed as agents attempt to detain two people in a vehicle at the intersection of West 29th Street and Pillsbury Avenue on Monday, Dec. 15, 2025, in Minneapolis, Minn. Credit: Ellen Schmidt/MinnPost/CatchLight Local/Report for America

Ex. T

O'Hara, speaking at a **Dec. 16 press conference** alongside Frey, said that when MPD officers arrived, "they did not observe any life safety issues on the scene" and quickly left. HCSO made similar comments, noting that their officers "do not take part in civil immigration enforcement, and we do not assist any other agencies in their civil immigration enforcement."

Ward 9 Council member Jason Chavez, who co-authored the ordinance, **wasn't buying it**. "Then why did you assist and create a pathway for ICE to kidnap our neighbors?" he wrote on social media.

The police chief stated that officers would not cooperate with ICE, but added that the job of the police was to keep everyone in the city safe.

"We are trying to do the best we can to protect everyone's life and to try and deescalate things whenever we can," he said. "But at the same time, we don't control the unsafe or questionable tactics by other agencies that are here."

Ex. T



A Minneapolis Police Department officer asks protesters to step back while ICE agents detain people near the intersection of Pillsbury Avenue S. and W. 29th Street on Monday, Dec. 15, 2025, in Minneapolis, Minn. Credit: Ellen Schmidt/MinnPost/CatchLight Local/Report for America

**Related**

Ex. T

## Protesters, law enforcement clash in St. Paul

Plus: Businesses ready for snow, and Anoka loosens up on sidewalk chalk.

In "News"

## Minneapolis council members taking on update of city's separation ordinance

Three progressive Minneapolis City Council members are quietly working to strengthen the city's 22-year-old separation ordinance that limits coordination between the city's police department and federal immigration authorities.

Ex. T

# ICE agents in Twin Cities open fire after an undocumented man allegedly hit them with his SUV

Chelsea Bailey



The chaotic apprehension of an undocumented man in St. Paul, Minnesota, ended violently Sunday after the man allegedly struck two federal officers with his vehicle during a stop – causing one officer to fire "defensive shots" – before the man was ultimately apprehended, according to the Department of Homeland Security.

The arrest comes as the Trump administration continues its immigration enforcement efforts across the Twin Cities, which have stoked controversy in recent weeks over Immigration and Customs

Ex. U

Enforcement tactics and concerns over racial profiling.

But Sunday's pursuit points to a troubling trend that's emerged during the administration's immigration enforcement efforts, which left some officials warning about the potential for escalation and violence.

It began when agents tried to detain a man DHS later identified as Juan Carlos Rodrigues Romero, an undocumented Cuban immigrant, during a stop.

"Romero was noncompliant and refused to roll down his window, causing officers to warn that they would have to break the window if he continued to not comply with lawful orders," the agency said in a statement posted online.

That's when Romero drove off, DHS said, and a chaotic chase began.

## An attempt to flee ends with shots fired

As Romero fled the scene, he allegedly struck one of the ICE officers with his vehicle. He then drove into a nearby parking lot and hit two parked cars, according to DHS.

As officers commanded Romero to exit the vehicle, he allegedly "began ramming his car into an ICE vehicle and struck another ICE officer," DHS said in a statement.

"The officer who was struck by Romero's car defensively fired two rounds from his service weapon, causing Romero to drive off again," the agency said. "No one was struck by any of the defensive shots fired."

Ex. U

Romero, however, continued to try to elude apprehension, according to the agency. He allegedly rammed another ICE vehicle before attempting to flee into his apartment on foot.

The agency said ICE officers brought Romero to the ground as he "continued to violently resist arrest and bit one of the officers."

The officers involved sustained non-life-threatening injuries during the pursuit and were taken to a nearby hospital for evaluation, according to DHS.

Romero was also evaluated at a hospital and is currently in ICE custody pending further charges, the agency said.

It was not immediately clear if Romero had obtained legal representation.

CNN has reached out to ICE for further comment on the arrest.

Ex. U

Ex. U

In a statement posted on social media, Saint Paul Police said they arrived at the scene after the incident and learned the federal agent had been struck and fired his service weapon.

"No Saint Paul police officers were involved in the arrest or use of force," the department said.

Police use of force has become a lightning rod in Minnesota following the murder of George Floyd. In the aftermath, local police have spent years trying to reform department protocols during police encounters.

Minneapolis Police Chief Brian O'Hara alluded to how the federal police presence has at times complicated those efforts during a news conference Tuesday.

"We have been training our officers for the last five years very, very intensely on de-escalation," O'Hara said. "But unfortunately, that is not, that is often not what we are seeing from other agencies in the city."

Related article

Car crashes and rammings take center stage in immigration crackdown

## Immigration stops spark violence, charges

Dramatic – and occasionally violent – traffic stops have become something of a fixture during the Trump administration's ongoing immigration crackdown.

Ex. U

Traffic stops are often considered among the most dangerous police interactions because of their potential for escalation and injury.

In October, Emily Covington, ICE Assistant Director of Public Affairs, told CNN "aggressors are now purposefully running into officers, boxing in law enforcement vehicles, running ICE law enforcement off the roads, and ramming their cars into law enforcement vehicles."

But the agency has also faced criticism over the tactics it uses during apprehensions, including controversial "precision immobilization technique" or "PIT" maneuvers, which forces a car to spin out and stop.

The tactic is considered a use of deadly force, experts have told CNN.

In September, ICE officers fatally shot a man during a traffic stop in a Chicago suburb. The following month, a car crash involving federal agents drew widespread backlash and protests in the city after video of the incident went viral.

Ex. U

Ex. U

And last month, the high-profile case against Marimar Martinez – a Chicago woman accused of ramming a Customs and Border Protection agent with her vehicle before agents repeatedly shot her – ended dramatically when a federal judge dismissed the charges against her.

Throughout the trial, US District Judge Georgia Alexakis repeatedly raised concerns about how the government handled the investigation and ultimately said discrepancies in the government's case made her "question the narrative being put forward."

During the trial, Martinez's defense attorney had accused the government of potentially trying to destroy evidence after Charles Exum, the agent involved in the case, was allowed to drive his

damaged vehicle 1,000 miles to his home state of Maine.

The defense also produced [text messages](#) at trial in which Exum appeared to brag about his marksmanship after shooting Martinez.

After the ruling, Martinez [told CNN](#) although she will carry the physical scars of the shooting, she refuses to be a victim.

"I'm actually a survivor from all of this injustice that's going on," she said.

*CNN's Niquel Terry Ellis, Dalia Faheid, Eric Levenson and Omar Jimenez contributed to this report.*

Ex. U



**JUNE 20, 2025** 11:19AM

# 65 Percent of People Taken by ICE Had No Convictions, 93 Percent No Violent Convictions

By **David J. Bier**

New nonpublic data from Immigration and Customs Enforcement (ICE) indicate that the government is primarily detaining individuals with no criminal convictions of any kind. Also, among those with criminal convictions, they are overwhelmingly not the violent offenses that ICE continuously uses to justify its deportation agenda. ICE has shared this data with people outside the agency, who shared the numbers with the Cato Institute.

As of June 14, ICE had booked into detention 204,297 individuals (since October 1, 2024, the start of fiscal year 2025). Of those book-ins, 65 percent, or 133,687 individuals, had no criminal convictions. Moreover, more than 93 percent of ICE book-ins were never convicted of any violent offenses. About nine in ten had no convictions for violent or property offenses. Most convictions (53 percent) fell into three main categories: immigration, traffic, or nonviolent vice crimes. The appendix table at the end of this post has data by detailed crime and broad crime categorization.

Ex. V

## ICE book-ins are primarily noncriminals and nonviolent offenders

ICE Book-Ins by Criminal Conviction Type, FY 2025 as of June 14

| Conviction | ICE Book-Ins | Share of Book-Ins |
|---|---|---|
| Property | 7,606 | 3.7% |
| Violent | 14,068 | 6.9% |
| Nonviolent Vice | 9,218 | 4.5% |
| Immigration | 14,227 | 7.0% |
| Traffic | 14,056 | 6.9% |
| Other | 11,435 | 5.6% |
| None | 133,687 | 65.4% |
| **Total** | **204,297** | **100.0%** |

Ex. V

## ICE detains very few serious public safety threats

ICE Book-Ins by Criminal Conviction, FY 2025 as of June 14

Property    Vice    Other    Violent    Traffic    Immigration    None



Source: Immigration and Customs Enforcement, "ICE Initial Book-Ins by Criminality and MSC: FY2025 YTD," June 16, 2025 • Get the data • Created with Datawrapper

Using **public data** from Customs and Border Protection (CBP)—which does not include details of criminal convictions—we can see the trend in ICE book-ins from the start of the Trump administration. During the first two weeks of June, ICE brought into its custody nearly 927 non-criminals. That represents a roughly threefold increase compared to the rate of non-criminals booked in during the first week of this administration.

This shift in policy resulted from White House Deputy Chief of Staff **Stephen Miller's meeting** at the end of May, when he ordered ICE to start arresting more non-criminals. "What do you mean you're going after criminals?" he said. "Why aren't you at Home Depot? Why aren't you at 7-Eleven?" Since then, ICE and Border Patrol have shifted to roaming US streets and workplaces to round up immigrants, regardless of the public threat they may pose.

Ex. V

## ICE is booking in many more noncriminals in recent weeks

ICE daily average book-ins of people with no criminal convictions

This understates the change in interior enforcement against non-criminals. This is mainly because ICE also books some people into custody who were originally detained by Border Patrol. Hence, the pre-Trump numbers include many non-criminals who had never lived in the United States before. Since then, the Trump administration has put Border Patrol in charge of mass deportation in California, and it is making interior arrests all along both the Mexican and Canadian borders. This means that the pre-Trump and post-Trump numbers are not directly comparable. We cannot say for certain how many peaceful individuals are being whisked off America's streets by government agents.

That said, when examining total ICE book-ins of individuals arrested by ICE, we can see a more extreme increase in interior enforcement. Since the beginning of this year, ICE book-ins based on ICE arrests have increased nearly sixfold, from a daily average of 215 to over 1,100 per day.

4                                                                    Ex. V

# ICE is arresting inside the United States vastly greater numbers of people

ICE daily average book-ins from ICE interior arrests

ICE also books individuals who have pending criminal charges into custody. As of June 14, the agency had booked 44,897 individuals with only a pending charge. The agency sometimes erroneously calls these people "criminals," even without a conviction. This is wrong. We believe in due process in America because many people charged are never ultimately convicted.

ICE admitted in court that it considers even people whose charges were dismissed to still be a "criminal" for purposes of removal, and many immigrants with pending charges are never convicted. For instance, ICE terminated the legal status of international student Suguru Onda for a dismissed fishing-related citation. The same thing happened to Akshar Patel, another international student, with a dismissed reckless driving charge. When ICE deports people without giving them their day in court, it not only deprives them of their right to clear their name but also denies justice to victims if they are guilty.

Regardless, ICE also hasn't listed what the charges are for, and we know that it is slapping thousands of "illegal entry" charges on long-time residents to brand them as criminals and force California and other states to help deport them.

Nonetheless, focusing on people without pending charges or convictions, the difference in policy is indescribable. ICE doesn't separately report the

5                                                                Ex. V

criminal status of book-in specifically from ICE arrests. But ICE's public numbers on its currently detained population reveal a ninefold increase in immigrants being arrested by ICE and locked up by ICE for no other reason than their immigration status.

## ICE is detaining far more immigrants who have no convictions or criminal charges

Immigrants in detention (at that point in time) arrested in the interior by ICE who have no criminal convictions or charges, as of June 1



Source: Immigration and Customs Enforcement, "Detention Management," June 4, 2025 (and archived versions). • Get the data • Created with Datawrapper

If we look at the net increase in immigrants detained by ICE after an ICE arrest, 70 percent of the increase in detention has come from people without criminal convictions.

6                                                           Ex. V

## Convicted criminals account for just 29% of the increase in people detained by ICE since January

People in ICE detention who were arrested by ICE, net increase since January 11, 2025 by conviction status



Source: Immigration and Customs Enforcement, "Detention Management" June 4, 2025 (and archived

My back-of-the-envelope calculation **based on the public numbers** is that in early January, ICE was arresting about 32 immigrants per day in the interior who had no criminal conviction or pending charge. By early June, these arrests were approximately 453 per day—a 14-fold increase. That is about 50 percent more than the daily average for ICE arrests of immigrants of all types in FY 2024.

This was the predictable result of President Trump's **executive order** rescinding ICE guidance, which required ICE to focus on public safety threats. As a consequence, the overall capacity of ICE to make arrests has grown thanks to shifting many resources from the military and other law enforcement agencies into ICE. It is also borrowing from end-of-the-year appropriations to pay for operations today, leaving it **$1 billion in the hole**. ICE is also detaining more people than ever in squalid, inhumane

7                                                        Ex. V

conditions that are worse than those permitted in prisons where serious violent offenders are serving their sentences.

The White House has ordered ICE to meet an unreasonable quota of **3,000 arrests per day**, a target they were nowhere near achieving as of June 14. Agents are complaining about how the quota is undermining public safety in interviews with conservative outlets like the *New York Post* and *Washington Examiner*. The White House is focused on "quantity over quality," one agent **told** the *New York Post*. The agents told the *Post* that ICE's quota was forcing them to leave "some dangerous criminal illegal migrants on the streets." ICE shifted away from fugitive operations to focus on asylum seekers at courthouses, immigrants who regularly check in with ICE, and other non-threats.

ICE's deportation agenda is not what is being advertised to the American public. ICE is not interested in prioritizing public safety, yet it constantly pretends that anyone who objects to its tactics and priorities is defending violent criminals. But violent criminals are not ICE's primary focus. Indeed, it now has no focus altogether. That's the essence of *mass* deportation: it is indiscriminate, unfocused, and chaotic. Congress should mandate more transparent reporting from ICE and require that it target only those who pose genuine threats to public safety.

8                                                              Ex. V

# Appendix Table: ICE book-ins are primarily noncriminals and nonviolent offenders

ICE Book-Ins by Criminal Conviction Type, FY 2025 as of June 14

Page 1 of 3  >

| Criminal Charge (ICE detailed category) | Crime Broad Classification (Cato) | Book-ins |
|---|---|---|
| **Total** | **N/A** | **204,297** |
| No conviction | None | 133,687 |
| Arson | Property | 122 |
| Assault | Violent | 9,700 |
| Bribery | Other | 18 |
| Burglary | Property | 1,658 |
| Civil Rights | Other | 1 |
| Commercialized Sexual Offenses | Vice | 209 |
| Conservation | Other | 47 |
| Damage Property | Property | 289 |
| Dangerous Drugs | Vice | 8,741 |
| Embezzlement | Property | 17 |
| Extortion | Violent | 38 |
| Family Offenses | Other | 668 |
| Flight / Escape | Other | 617 |
| Forgery | Property | 691 |
| Fraudulent Activities | Property | 1,646 |
| Gambling | Vice | 13 |
| General Crimes | Other | 1,731 |
| Health / Safety | Other | 39 |

9

Ex. V

Source: Immigration and Customs Enforcement, "ICE Initial Book-Ins by Criminality and MSC: FY2025

**RELATED TAGS**

**Immigration**


This work is licensed under a **Creative Commons Attribution-NonCommercial-ShareAlike 4.0 International License**.

# Stateline

## An ever-larger share of ICE's arrested immigrants have no criminal record

But arrests are up, more than doubling in 45 states, a Stateline analysis finds.

BY: **TIM HENDERSON** - DECEMBER 12, 2025    5:00 AM



📷 There were 105 immigration arrests in October at a horse racetrack in Wilder, Idaho. Idaho saw one of the country's largest increases in immigration arrests this year through mid-October compared with the same period in the Biden administration. (Photo courtesy of ACLU of Idaho)

Immigration arrests under the Trump administration continued to increase through mid-October, reaching rates of more than 30,000 a month. But, rather than the convicted criminals the administration has said it's focused on, an ever-larger share of those arrests were for solely immigration violations.

In 45 states, immigration arrests more than doubled compared with the same period last year, during the Biden administration. The largest increases: There were 1,190 arrests in the District of Columbia compared with just seven last year under the Biden administration. Arrests were also more than five times higher in New Mexico, Idaho, Oregon and Virginia.

"The result stands in contrast to the administration's objective of arresting the 'worst of the worst,'" said Ariel Ruiz Soto, a senior policy analyst at the nonpartisan Migration Policy

Ex. W

Institute. Heightened enforcement is likely increasing "collateral" arrests of people found during searches for convicted criminals, he said.

Comparisons between the Trump and Biden administrations were calculated by Stateline in an analysis of data released by the Deportation Data Project, a research initiative by the universities of California at Berkeley and Los Angeles. About 93% of arrests could be identified by state.

While more people were arrested this year, a lower percentage are convicted criminals.

The share of arrested immigrants who had been convicted of violent crimes has dropped from 9% in January to less than 5% in October. The share under Biden was consistently between 10% and 11% during the same period in 2024.

The same trend applies to people arrested solely on immigration violations: Immigration violations alone were behind 20% in April, then rose to 44% of arrests in October, according to Stateline's analysis.

In some states and the District of Columbia, a majority of arrests were for immigration violations alone: the District of Columbia (80%), New York (61%), Virginia (57%), Illinois (53%), West Virginia (51%) and Maryland (50%).

States with high immigrant populations also saw the most arrests this year. The largest numeric increases were in Texas (up 29,403, triple last year's figure), Florida (up 14,693, a fourfold increase) and California (up 13,345, a fourfold increase).

The two states with the largest arrest rate increases have responded very differently to President Donald Trump's deportation mission.

"We're going to resist like all of the Democratic states," New Mexico Democratic Gov. Michelle Lujan Grisham said in an interview with The Santa Fe New Mexican after last year's election, referring to mass deportation plans. She proposed legislation to ban U.S. Immigration and Customs Enforcement detention facilities in the state. The legislation failed this year, but Lujan Grisham urged the state legislature to reconsider next year. The state has three privately run ICE detention centers with the capacity for 2,000 people.

Idaho's Republican governor, Brad Little, is helping ICE under a 287(g) agreement by transporting what his office calls "highly dangerous illegal alien criminals" from county jails to federal custody. The 53 men pictured on the governor's website have charges ranging from drug possession to sexual assault.

In a news release, the office says the program is intended to take people "after the completion of their sentences," though an October review by the Idaho Capital Sun found

Ex. W

some were transported despite dismissed or still-pending charges.

Nationally, arrests have increased this year from around 17,000 in February, the first full month of President Donald Trump's current term, to more than 30,000 in September and October. The share of convicted criminals has dropped from 46% to 30%, though the number of convicted criminals arrested still has been higher each month than under President Joe Biden.

Some of the policies that have fed increased arrest numbers face new court battles. This month, a federal judge blocked the administration from making immigration arrests in the District of Columbia without warrants or probable cause.

In August, a federal court blocked the administration's expansion of expedited removal, which itself allows fast deportations without judicial review. The administration has appealed, arguing that immigrants who have been in the country for less than two years without legal authorization are not guaranteed due process.

Such fast deportations could be used on 2.5 million people, according to a Migration Policy Institute estimate published in September, including 1 million people released at the border with Mexico with court dates and 1.5 million people with temporary protections such as humanitarian parole.

This fall, the share of arrested immigrants with criminal convictions continued to decrease just before and during the federal government shutdown, with only 3% of those arrested and detained having convictions between Sept. 21 and Nov. 16, according to national information analyzed by Transactional Records Access Clearinghouse (TRAC), a data research organization at Syracuse University.

"While ICE is detaining more and more individuals, targeting has shifted sharply to individuals without any criminal convictions," the TRAC report noted.

*Editor's note: This story has been updated to clarify a reference to October detention statistics analyzed by Transactional Records Access Clearinghouse.*

*Stateline reporter Tim Henderson can be reached at thenderson@stateline.org.*

Ex. W

CASE 0:25-cv-04669-KMM-DTS     Doc. 42-2     Filed 12/31/25     Page 123 of 139

![Minnesota Employment and Economic Development logo] EMPLOYMENT AND ECONOMIC DEVELOPMENT

# The Growth and Impact of Minnesota's Foreign-Born Workforce

  

by Carson Gorecki (/deed/data/lmi-help/labor-market-experts/carson-gorecki.jsp), Tim O'Neill (/deed/data/lmi-help/labor-market-experts/tim-oneill.jsp) and Amanda Blaschko (/deed/data/lmi-help/labor-market-experts/amanda-blaschko.jsp)

March 2025

## Minnesota's Foreign-Born Population

Minnesota's foreign-born[1] population has grown significantly over the past decade, reaching nearly 490,000 residents in 2023 and comprising 8.6% of the state's total population, according to the U.S. Census Bureau's American Community Survey (https://data.census.gov/table/ACSST5Y2023.S0501?q=S0501:%20Selected%20Characteristics%20of%20the%20Native%20and%20Foreign-Born%20Populations&g=040XX00US27)[2]. This represents a 24.7% increase from 2013, highlighting the state's growing diversity and the important role immigrants play in Minnesota's demographic makeup. Additionally, foreign-born Minnesotans play an outsize role in the state labor force, relative to the total population. As of 2023, almost 11% of Minnesota's workers were immigrants.

While Minnesota's share of foreign-born residents (8.6%) remains below the national share of 13.9%, the state has seen more rapid growth in its immigrant population, with distinct patterns emerging between the Twin Cities metro area and Greater Minnesota. Among these foreign-born residents, 58.2% have become naturalized U.S. citizens, while 41.8% are not U.S. citizens.

Ex. X

Foreign-born population growth and settlement patterns vary significantly across the state. The seven-county Twin Cities metro area serves as the primary hub, housing 77.8% of the state's foreign-born population (380,516 residents). That is much higher than the 55% of the state's total population living in the region. The Twin Cities metro area has more established immigrant communities, with 38.6% having arrived before 2000, and this stability is reflected in the metro area's higher naturalization rate of 60.6%. In contrast, Greater Minnesota, which contains 22.2% of the state's foreign-born population (108,381 residents), has a different demographic profile with lower naturalization rates at 49.9%, and a larger share of recent arrivals, with 40.5% having entered since 2010.



Looking at origin, Asia represents the largest share at 35.7% of foreign-born residents, followed by Africa at 28.3%, and the Americas at 26.7% (24.2% from Latin America and 2.5% from Northern America) (see Figure 1). This distribution differs notably from national patterns, where the Americas, particularly Latin America, represent over 50% of the foreign-born population.

Minnesota's African immigrant population has been particularly dynamic, showing the most dramatic growth with a 78.8% increase (+61,035 people) between 2013 and 2023. These patterns vary between the Twin Cities metro area and Greater Minnesota. The Twin Cities metro area shows a higher concentration of Asian immigrants (38.1%) and African immigrants (29.2%), while immigrants from the Americas make up 23.7% of the metro's foreign-born population - with 21.5% from Latin America and 2.1% from Northern America.

In contrast, Greater Minnesota shows a different pattern, with immigrants from the Americas comprising the largest share at 37.4% of the region's foreign-born population (33.5% from Latin America and 3.9% from Northern America), followed by Asia at 27.3% and Africa at 25.3%. The share of European immigrants remains similar between the Twin Cities Metro and Greater Minnesota at around 9%.

Ex. X

The age demographics of Minnesota's growing foreign-born population create valuable opportunities for the state's workforce. The foreign-born population is heavily concentrated in prime working ages, with 61.4% between the ages of 25 and 54 years, compared to just 38.2% of the total population in these age categories. This concentration is particularly pronounced in the 35- to 44-year-old age range, where foreign-born residents make up 24.1% compared to 13.4% of the total population. As Minnesota faces the challenges of an aging population, these demographic patterns position foreign-born residents as a vital source of current and future workforce growth.

## The Growing Foreign-Born Workforce

As of 2023, more than 344,000 foreign-born workers accounted for 10.9% of the Minnesota's labor force (see Figure 3). The national foreign-born labor force (FBLF) share was higher, at 17.9%. Of the 43 states with foreign-born worker data available, Minnesota had the 24th highest share. Additionally, the foreign-born labor force participation rate (74.4%) was notably higher than the native-born participation rate (67.7%) in Minnesota.

Ex. X



Figure 2. Foreign-Born Share of Labor Force by State, 2023

Source: U.S. Census American Community Survey 1 Yr Estimates

Ex. X

From 2013 to 2023 every state saw its FBLF grow. Only four states saw their overall labor force grow faster than their FBLFs: Arizona, California, Nevada and Oregon. Between 2019 and 2023, the FBLF grew faster than the total labor force in all but nine states. Nationally, the FBLF (+7.0%) grew more than twice as fast as the overall labor force (+3.3%).

In 2013, the foreign-born worker share in Minnesota was 9.0% (see Figure 3). Since then, 74,450 foreign-born workers joined the labor force, equivalent to a 27.6% increase. Over the same period, the overall labor force added 151,400 workers, a 5.1% growth. Foreign-born additions accounted for nearly half of Minnesota's labor force growth from 2013 to 2023. Furthermore, Minnesota's foreign-born workforce grew 10.8 percentage points faster than the nation's over the last decade. Despite this robust numeric growth, the state retained its foreign-born workforce share ranking.

Our neighbors to the east and south have relatively smaller foreign-born labor forces. Both Iowa's and Wisconsin's foreign-born population account for around 7% (see Figure 3). Since 2013, Wisconsin's FBLF grew 20.3% and Iowa's increased 28.7%, while Minnesota's growth equaled 27.6%. Among other states, the fastest FBLF growth occurred in Indiana (+51%), Delaware (+47%), Utah (+42%) and Tennessee (+41%). On the low end were California (+2.2%), New York (+2.4%), Illinois (+3.9%) and Oregon (+5.4%).

Minnesota's FBLF growth over this period ranked 18th fastest in the U.S., representing a slow-down from the years following the Great Recession. From 2010 to 2015, Minnesota had the fastest growing foreign-born labor force in the nation at +23%, as more than 56,000 foreign-born workers joined. More recently, FBLF growth in Minnesota slowed. From 2019 to 2023, the state FBLF grew 6.2%, or an average of 1.5% per year. National FBLF growth remained relatively steady, ticking up a tenth of a percentage point during the 2019-2023 period to an annual average of 1.7%.

Ex. X

Figure 3. Foreign-Born Share of Labor Force by State, 2010-2023

Source: U.S. Census American Community Survey 1 Yr Estimates

# Foreign-Born Labor Force Characteristics

As was mentioned earlier, foreign-born residents are more likely to be in the labor force. Both nationally and in Minnesota, the foreign-born population has higher labor force participation. In Minnesota in 2023 the foreign-born labor force participation rate (FBLFPR) of 74.4% was six percentage points higher than the statewide labor force participation rate, which itself was the 6th highest among all states[3]. From 2013 to 2023, the FBLFPR increased while the overall LFPR decreased, meaning the labor force participation gap between the two groups grew in magnitude. In 2013, the average unemployment rate for the foreign-born workforce was 6%, more than two percentage points higher than the overall statewide rate. By 2023, this gap had closed to virtually zero as the foreign-born rate to fell to 2.2%, right above the 2.1% overall rate and within the margin of error.

Reflecting higher labor force participation, a higher share of foreign-born households recorded having earnings (90% vs. 79% of the total population), which are defined primarily as wages and salaries from employment. However, foreign-born households ($81,600) had lower median incomes than the total population ($85,100). Encouragingly, foreign-born median household incomes equaled 96% of the statewide median in 2023, up from 82% in 2013.

Ex. X

| Table 1. Select Economic Characteristics for Foreign-Born and Total Population in Minnesota, 2023 | | |
|---|---|---|
| Characteristic | Foreign-Born Population | Total Population |
| With Social Security income | 14.8% | 29.9% |
| With Supplemental Security Income | 4.8% | 3.7% |
| With cash public assistance income | 5.2% | 2.7% |
| With retirement income | 9.3% | 24.3% |
| With Food Stamp/SNAP benefits | 16.2% | 7.9% |
| No health insurance coverage | 12.0% | 4.2% |
| In renter-occupied housing units | 48.2% | 28.0% |
| Below poverty threshold | 13.8% | 9.3% |
| Carpooled to work | 15.1% | 8.0% |
| Public transit to work | 3.5% | 1.7% |
| *Source: U.S. Census Bureau ACS, 1-yr Estimates* | | |

Given that foreign-born residents are more likely to be of working age, immigrant households were about half as likely to receive social security income (14.8% vs. 29.9% of all households) and even less likely to have some sort of retirement income (9.3% vs. 24.3%).

Despite being more likely to have earnings, Minnesota's foreign-born population – when compared to the total population – was also more likely to be receiving cash public assistance and/or SNAP benefits. Just over 5% of foreign-born households had cash public assistance income and 16.2% were receiving food stamps or SNAP benefits in 2023 (see Table 1). By comparison, of all Minnesota households, 2.7% received cash public assistance income and 7.9% used food stamps or SNAP benefits.

Correspondingly, Minnesotan foreign-born residents had a higher poverty rate (13.8%) than the total population (9.3%). Finally, 12% of foreign-born residents were without health insurance, compared to 4.2% of the total population. Perhaps reflective of the population's concentration in the metro, foreign-born workers were less likely to drive alone to their jobs and about twice as likely to carpool or take public transportation. Foreign-born residents were also more likely to occupy rental housing units (48.2%) than the total population (28%).

The educational attainment of Minnesota's foreign-born population also shows varying levels of alignment with current job market demands, according to DEED's Job Vacancy Survey (/deed/data/data-tools/job-vacancy/index.jsp). Among foreign-born residents 25 years and older, 35.8% hold a bachelor's degree or higher (with 16% holding advanced degrees), while 20.5% have some college or an associate's degree, 20.7% are high school graduates, and 22.9% have less than a high school education (see Figure 4).

Ex. X



According to the 2023 Job Vacancy Survey results (https://apps.deed.state.mn.us/lmi/jvs/Results.aspx), Minnesota's job openings span across various educational requirements, with 19% of vacancies requiring a bachelor's degree or higher, 11% requiring an associate degree, 7% requiring vocational training, 25% requiring a high school diploma or GED, and 39% having no formal education requirement. As Minnesota's workforce continues to age and retire, foreign-born workers across all education levels are positioned to help fill critical vacancies.

With nearly two-thirds of current openings requiring a high school diploma or less, and many others requiring higher education, foreign-born workers bring valuable skills and experience that align with the state's diverse labor market needs. Their participation is becoming increasingly crucial in industries facing persistent labor shortages, offering a vital solution to the state's evolving workforce needs.

## Foreign-Born Industry and Occupational Employment in Minnesota

The U.S. Census Bureau's American Community Survey's (ACS) 5-year estimates can provide insights into Minnesota's foreign-born employment distribution by industry and occupational employment. This data zeroes in on the civilian employed population 16 years of age and older. Of that population, about one-in-nine of the state's total workforce was foreign-born in 2023.

Ex. X

Broken down by industry sector, Education & Health Services employed the most foreign-born workers in Minnesota. In fact, with more than 83,800 such workers in 2023, over one-quarter (26.1%) of the state's total foreign-born workforce worked in this sector. Manufacturing, with over 65,500 foreign-born workers, accounted for another fifth (20.1%) of the state's total foreign-born workforce. Coming in third with nearly 37,900 foreign-born workers, Professional & Business Services accounts for just over one-ninth (11.8%) of the state's total foreign-born workforce. Altogether, Education & Health Services, Manufacturing and Professional & Business Services accounted for over 186,200 foreign-born workers in 2023, or about three-fifths (58.0%) of the state's total foreign-born workforce. Retail Trade; Leisure & Hospitality; Financial Activities; and Transportation, Warehousing, & Utilities each had over 20,000 foreign-born workers, with both Construction and Other Services each accounting for over 10,000 foreign-born workers (see Figure 5).



Figure 5. Minnesota Foreign-Born Industry Employment by Industry, 2023

Source: U.S. Census Bureau, American Community Survey 5-Year Estimates

Where foreign-born workers make up a significant share of total industry employment in Minnesota, they are especially concentrated in Manufacturing (16.0% of the industry's total employment); Transportation, Warehousing, & Utilities (13.5%); and Professional & Business Services (12.1%). Foreign-born workers are less concentrated in Public Administration (6.4% of the industry's total employment), Information (6.7%), Construction (7.3%), Retail Trade (7.8%), Natural Resources & Mining (8.0%) and Wholesale Trade (8.2%).

Ex. X

Data from the Census Bureau also allows for the analysis of Minnesota's foreign-born employment by occupation. At the broadest level, ACS data shows foreign-born workers to have a much higher share of employment in Production, Transportation, & Material Moving occupations (22.0%) than native-born workers (12.6%). Foreign-born workers also have a higher share of employment in Service occupations (20.6%) than native-born workers (14.3%). This broad occupational group includes Healthcare Support, Protective Service, Food Preparation & Serving, Building & Grounds Cleaning & Maintenance and Personal Care & Service occupations. Meanwhile, ACS data shows foreign-born workers to have lower shares of workers in the following occupational groups: Management, Business, Science, & Arts; Sales & Office; and Natural Resources, Construction & Maintenance (see Figure 6).



According to 2023 ACS 1-year estimates extracted from the Integrated Public Use Microdata Series or IPUMS (https://www.ipums.org/), Minnesota had approximately 366,300 foreign-born workers making up over one-ninth (11.6%) of the state's total workforce, showing a continued increase. Nursing, Psychiatric & Home Health Aides had the most foreign-born workers of any occupation, with over 17,100 such workers in 2023. Other occupations with over 10,000 foreign-born workers included Registered Nurses, Managers and Other Production Workers. Minnesota's foreign-born workers were also significantly employed as Software Developers, Assemblers & Fabricators, Truck Drivers, Janitors & Building Cleaners, Chefs & Cooks and more (see Table 2).

Ex. X

CASE 0:25-cv-04669-KMM-DTS    Doc. 42-2    Filed 12/31/25    Page 133 of 139

Where foreign-born workers made up 11.6% of Minnesota's total employment in 2023, such workers made up significantly higher shares of employment in specific occupations. For example, foreign-born workers accounted for three-quarters (75.0%) of the state's Taxi Drivers & Chauffeurs and nearly three quarters (72.3%) of the state's Postal Service Mail Sorters, Processors & Processing Machine Operators. Foreign-born workers also accounted for over half of the state's total employment in the following occupations: Dancers & Choreographers (64.6%); Roofers (55.1%); Carpet, Floor & Tile Installers & Finishers (52.6%); Laundry & Dry-Cleaning Workers (52.1%); Cutting Workers (51.3%); and Chemists & Materials Scientists (50.1%). There were over 50 specific occupations, accounting for over 100,000 foreign-born workers, where such workers accounted for between one-fifth and one-half of each occupation's respective total employment. These occupations varied from Packers & Packagers, Dentists and Software Developers, to Security Guards, Physicians and Childcare Workers.

These occupations span the breadth of typical education requirements, but roles more-often filled by foreign-born workers tend to occupy the extremes of the educational requirement spectrum. Foreign-born workers are both more likely to fill occupations that have low educational requirements like Drivers and Janitors/Building Cleaners as they are occupations with high educational requirements such as Chemists & Materials Scientists, Computer Scientists and Physicians. These trends reflect the bifurcated nature of educational attainment among foreign-born workers in Minnesota, who are both more likely than the native-born population to have less than high a high school degree and more likely to have attained a graduate or professional degree.

Ex. X

| Table 2. Minnesota Top-Employing Occupations with Foreign-Born Workers, 2023 | | | | |
|---|---|---|---|---|
| Occupational Title | Number of Foreign-Born Workers | Foreign-Born Share of Total Employment | Total, All Employment | |
| | | | 2023 Job Vacancies | 2022-2032 Employment Outlook |
| **Total, All Occupations** | **366,311** | **11.6%** | **139,059** | **1,676,292** |
| Nursing, Psychiatric, & Home Health Aides | 17,154 | 30.3% | 3,374 | 131,628* |
| Registered Nurses | 12,028 | 13.8% | 4,382 | 26,773 |
| Managers | 11,989 | 10.1% | 3,698 | 91,084 |
| Other Production Workers Including Semiconductor Processors & Cooling & Freezing Equipment Operators | 11,307 | 31.9% | 374 | 22,042 |
| Software Developers, Applications & Systems Software | 11,278 | 25.9% | 1,015 | 16,753 |
| Assemblers & Fabricators | 9,971 | 25.4% | 647 | 20,662 |
| Driver/Sales Workers & Truck Drivers | 9,057 | 14.0% | 4,393 | 38,965 |
| Janitors & Building Cleaners | 6,763 | 15.5% | 1,573 | 34,482 |
| Chefs and Cooks | 6,644 | 16.4% | 3,469 | 36,647 |
| Computer Scientists & Systems Analysts/Network Systems Analysts/ Web Developers | 6,598 | 15.4% | 564 | 6,514 |
| Laborers and Freight, Stock, & Material Movers, Hand | 6,351 | 12.9% | 939 | 30,841 |
| Personal Care Aides | 5,509 | 15.1% | 5,669 | 131,628* |
| Customer Service Representatives | 5,434 | 9.4% | 1,664 | 35,082 |
| Taxi Drivers & Chauffeurs | 5,194 | 75.0% | 161 | 5,795 |
| Elementary & Middle School Teachers | 5,087 | 9.0% | 653 | 13,128 |
| Social Workers | 5,047 | 15.2% | 1,044 | 8,187 |
| Childcare Workers | 4,789 | 19.6% | 620 | 12,502 |
| Teacher Assistants | 4,756 | 11.6% | 1,922 | 21,353 |
| Cashiers | 4,670 | 9.4% | 3,334 | 53,901 |
| First-Line Supervisors of Sales Workers | 4,396 | 6.7% | 3,075 | 9,935 |
| *Source: IPUMS USA, DEED Job Vacancy Survey, DEED Employment Outlook* | | | | |
| *\*Includes data for Home Health & Personal Care Aides, Nursing Assistants, and Psychiatric Aides* | | | | |

Ex. X

The 1-year estimates from ACS also reveal significant and rapid growth of foreign-born workers in Minnesota. Between 2013 and 2023, there were over 78,400 additional foreign-born workers in the state. This growth rate of 27.2% far outpaced the growth rate for total employment during this period, at 5.2%. Leading this growth, both Registered Nurses and Nursing, Psychiatric & Home Health Aides had an additional 8,500 foreign-born workers between 2013 and 2023. Manager positions across the state experienced an additional 7,500 foreign-born workers, Other Production positions forged an additional 6,600 foreign-born workers, and Software Developers welcomed an additional 5,200 foreign-born workers (see Figure 7).

All in all, nearly 40 specific occupations added at least 1,000 more foreign-born workers between 2013 and 2023. In terms of growth rates, the following occupations witnessed the most rapid increases in foreign-born workers between 2013 and 2023: Electrical Power Line Installers & Repairers; Chemists & Materials Scientists; Security Guards; Claims Adjusters, Appraisers, Examiners & Investigators; Special Education Teachers; Postal Service Mail Carriers; Construction Managers; Farmers, Ranchers & Other Agricultural Managers; Property, Real Estate & Community Association Managers; and Painting Workers & Dyers. In some of these occupations, the number of foreign-born workers increased by 1,000 to 2,000 percent between 2013 and 2023, though overall numbers of people employed were still relatively small.

Recent growth in the number of foreign-born workers across Minnesota's industries and occupations has proven to be critical, as the state is still experiencing tight labor market conditions. Future growth will be essential as DEED's employment projections (/deed/newscenter/publications/trends/september-2024/projections.jsp) reveal the need to not only fill newly created jobs, but also to fill a much larger number of existing jobs that become available due to retirements and career changes.



Figure 7. Minnesota Change in Foreign-Born Workers by Occupation, 2013-2023

| Occupation | Change |
| --- | --- |
| Registered Nurses | 8,498 |
| Nursing, Psychiatric, and Home Health Aides | 8,463 |
| Managers | 7,552 |
| Other Production Workers | 6,596 |
| Software Developers | 5,207 |
| Driver/Sales Workers and Truck Drivers | 4,689 |
| Teaching Assistants | 3,997 |
| Security Guards and Gaming Surveillance... | 3,304 |
| Taxi Drivers and Chauffeurs | 3,265 |
| Carpenters | 3,028 |
| Computer Systems Analysts and Web... | 2,841 |
| Childcare Workers | 2,754 |

Source: IPUMS USA

Ex. X

Another vital segment of the workforce is those that are self-employed. The 2021 U.S. Census Bureau's Nonemployer Statistics (https://www.census.gov/programs-surveys/nonemployer-statistics.html) show a clear difference between Minnesota and national patterns of foreign-born business owners without employees. While the 66,000 foreign-born individuals operating Minnesota businesses without employees (13.9% of total nonemployers) is proportionally higher than their share of the total workforce, this percentage falls significantly below the national average of 24.0%. From 2018 to 2021, an estimated 12,000 additional foreign-born nonemployer establishments opened in Minnesota, accounting for the entire number of nonemployers added in the state over that three-year period[4].

In terms of foreign-born nonemployer ownership, the data shows that Minnesota lags U.S. averages in every sector except Transportation and Warehousing, where Minnesota's 44% surpassed the national rate of 43.1%. The largest gaps between Minnesota and U.S. rates appear in Construction (MN: 11.0% vs US: 28.2%), Wholesale Trade (MN: 9.1% vs US: 26.0%), and Administrative Services (MN: 12.7% vs US: 28.4%).

Despite foreign-born workers being more likely than native-born Minnesotan workers to be self-employed, these differences suggest significantly lower participation of foreign-born entrepreneurs in Minnesota's nonemployer businesses compared to national patterns. Transportation & Warehousing is a notable exception, where foreign-born independent contractors and gig workers maintain a strong presence, likely in ride-share and delivery services.

# Summary

Minnesota residents born outside of the United States arrive from all corners of the globe to live and work in Minnesota. Once here, foreign-born residents provide healthcare and childcare, produce needed goods, provide vital services, start their own companies and contribute in many other ways. Certain sectors such as Manufacturing and Transportation, and occupations like Nursing Assistants, Drivers, Software Developers and Production Workers rely more upon foreign-born workers. In a tight labor market, foreign-born workers account for almost 11% of Minnesota's labor force and there are 50 diverse occupations where at least one out of every five workers are foreign-born. Immigrants remain an integral and growing part of Minnesota's population and workforce.

# Additional Resources

- **Minnesota State Demographic Center:**
    - Immigration & Language (https://mn.gov/admin/demography/data-by-topic/immigration-language/)
    - Economic Status of Minnesotans (https://mn.gov/admin/assets/Economic%20Status%20of%20Minnesotans%202023_tcm36-569572.pdf)
- **Minnesota Department of Employment and Economic Development:** The Importance of Immigration (/deed/data/lmi-reports/importance-immigration/index.jsp)
    - Includes statewide and regional reports

Ex. X

- **Minnesota Chamber of Commerce:**
  - The Economic Contributions of Immigrants in Minnesota (https://www.mnchamber.com/sites/default/files/The%20Economic%20Contributions%20of%20Immigrants%20in%20Minnesota%203.23.21.pdf)
  - Immigration became the leading component of population growth in Minnesota this decade (https://www.mnchamber.com/blog/immigration-became-leading-component-population-growth-minnesota-decade)
- **The Brookings Institution:** Which US states and occupations are most in need of foreign-born labor? (https://www.brookings.edu/articles/which-us-states-and-occupations-are-most-in-need-of-foreign-born-labor/)
- **U.S. Bureau of Labor Statistics:** Foreign-Born Workers Labor Force Characteristics, 2023 (https://www.bls.gov/news.release/pdf/forbrn.pdf)
- **U.S. Census Bureau:** Foreign-Born Workforce Visualization (https://www.census.gov/library/visualizations/interactive/foreign-born-workforce.html)
- **Center for Migration Studies:** Estimates of Undocumented and Eligible-to-Naturalize Population by State (https://data.cmsny.org/state.html)
- **Burning Glass Institute:** From Tech to Traditions: The Influence of Foreign-born workers on U.S. Jobs (https://www.linkedin.com/pulse/from-tech-traditions-influence-foreign-born-workers-us-gad-levanon-wgpic/)

---

[1]Includes anyone who was not a U.S. citizen at birth, including those who become U.S. citizens through naturalization.

[2]2019-2023 ACS 5-Year Estimates (https://data.census.gov/table/ACSST5Y2023.S0501?q=S0501:%20Selected%20Characteristics%20of%20the%20Native%20and%20Foreign-Born%20Populations&g=040XX00US27https://data.census.gov/table/ACSST5Y2023.S0501?q=S0501:%20Selected%20Characteristics%20of%20the%20Native%20and%20Foreign-Born%20Populations&g=040XX00US27)

[3]ACS 1-year Estimates, Table S0501 (https://data.census.gov/table/ACSST1Y2023.S0501?q=S0501:%20Selected%20Characteristics%20of%20the%20Native%20and%20Foreign-Born%20Populations&g=040XX00US27)

[4]US Census Annual Business Survey Nonemployer Demographic Table 2018 and 2021 (https://data.census.gov/table/ABSNESDO2021.AB2100NESD04?q=AB2100NESD04:%20Nonemployer%20Statistics%20by%20Demographics%20series%20(NES-D):%20Owner%20Characteristics%20of%20Nonemployer%20Firms%20by%20Industry,%20Sex,%20Ethnicity,%20Race,%20and%20Veteran%20Status%20for%20the%20U.S.,%20States,%20Metro%20Areas,%20and%20Counties:%202021&g=040XX00US27)

Ex. X

CASE 0:25-cv-04669-KMM-DTS    Doc. 42-2    Filed 12/31/25    Page 138 of 139

Ã

Ex. X

CASE 0:25-cv-04669-KMM-DTS     Doc. 42-2     Filed 12/31/25     Page 139 of 139

# The economic contributions of New Americans in Minnesota

This week, the Minnesota Chamber held its annual **Workforce Summit**, where we had a terrific turnout and important discussions about the future of our state's workforce. A key highlight was the **release of a new report**—the first in a series—analyzing the economic contributions of new Americans in Minnesota.

You might be wondering, why is the Minnesota Chamber talking about immigration? Simply put, we need more people and skilled workers to move to Minnesota. A growing economy depends on a growing population, and the numbers show that immigration plays a critical role in sustaining our workforce and economic prosperity. To break it all down, I talked with Sean O'Neil, the Chamber's Director of Economic Development and Research, who led this report. See our full conversation below:

**Doug Loon: Sean, give us the key takeaways from the report.**

**Sean O'Neil:** Thanks, Doug. The Chamber has been studying immigration and its impact on Minnesota's economy for over 15 years. Our research shows that new Americans contribute significantly—not only as workers but also as entrepreneurs, consumers, taxpayers, and connections to the global economy.

The data is staggering: 94% of Minnesota's net population growth this decade has come from immigration. This is somewhat unprecedented, with immigration now driving overall population growth in the state. It also accounts for about 60% of total job and labor force growth so far this decade. Over time, immigration is becoming a larger share of our economy and workforce.

**DL:** Let's take a step back and discuss Minnesota's broader workforce and population challenges. As I mentioned earlier, you can't have a growing economy without a growing workforce. While international migration has been a key factor, what do the numbers tell us about domestic migration?

**SO:** Good question. Population growth comes from three main sources: natural change (births minus deaths), domestic migration, and international migration. Over the past 24 years, Minnesota has experienced negative net domestic migration in 20 of those years, meaning we've lost more people to other states than we've gained. That trend has been a major headwind for our population growth.

At the same time, birth rates in Minnesota have declined, further slowing natural population growth. This leaves immigration as the key lever for sustaining healthy growth in our workforce and overall economy.

**DL:** It's clear that immigration is essential to our state's future. What are some of the unique contributions that new Americans bring to Minnesota's economy, particularly in business, innovation, and high-skilled industries?

**SO:** This is where the story gets even more interesting. Our research found that not only are new Americans making up a larger share of our workforce, but their economic impact is evolving. Over time, Minnesota's foreign-born population has become more highly educated and skilled, taking on high-demand jobs in technology, healthcare, and other critical sectors.

Additionally, entrepreneurship rates among new Americans have been rising steadily. Many are launching businesses, creating jobs, and driving innovation. This increased participation in high-productivity industries is accelerating Minnesota's economic growth.

This report is an important product of two Chamber initiatives—our Grow Minnesota! program and the Minnesota Chamber Foundation. If you want to dive deeper, I encourage you to visit our website at mnchamber.com and check out the Workforce Summit materials.

As we plan for the future, we must consider all the factors that contribute to a strong economy. The data is clear: new Americans are a key ingredient in Minnesota's continued economic success.

Thank you for your continued support of the Minnesota Chamber and Chamber Foundation, who puts out these crucial economic reports. You can hear more conversations like this on future **Minnesota Business Podcast** episodes.

Ex. Y