# Exhibit 3

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| SUSAN TINCHER, JOHN BIESTMAN, JANET LEE, LUCIA WEBB, ABDIKADIR NOOR, and ALAN CRENSHAW, on behalf of themselves and other similarly situated individuals, | Case No: 25-cv-04669 (KMM/DTS) |
| Plaintiffs, | |
| v. | **DECLARATION OF KELSEY MCELVEEN IN SUPPORT OF THE CITY OF MINNEAPOLIS, CITY OF SAINT PAUL, HENNEPIN COUNTY ATTORNEY'S OFFICE, AND STATE OF MINNESOTA AMICUS MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive Associate Director, Enforcement and Removal Operations (ERO), ICE; DAVID EASTERWOOD, Acting Field Office Director, ERO, ICE Saint Paul Field Office; JOHN A. CONDON, Acting Executive Associate Director, Homeland Security Investigations (HSI); The Department of Homeland Security; Unidentified Federal Agencies; and Unidentified Federal Agents; in their official capacities, | |
| Defendants. | |

1

## DECLARATION OF KELSEY MCELVEEN

I, Kelsey McElveen, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.    I am an attorney admitted to practice law with the bars of the State of Minnesota, the United States District Court for the District of Minnesota, and the United States Court of Appeals for the Federal Circuit. I am an Assistant City Attorney in the Civil Litigation Division of the Saint Paul City Attorney's Office, which is counsel of record for Amicus City of Saint Paul. If called on to do so, I could and would testify to the matters stated here.

2.    Attached hereto as Exhibit A is a true and correct copy of Section 438.19 of the Saint Paul Police Department Policy Manual entitled "Crowd Management," effective as of April 14, 2023.

3.    Attached hereto as Exhibit B is a true and correct copy of Section 246.02 of the Saint Paul Police Department Policy Manual entitled "Authorized Force Tools, Description, Training Requirements, Uses and Consideration," effective as of April 4, 2025.

4.    Attached hereto as Exhibit C is a true and correct copy of Section 202.00 of the Saint Paul Police Department Policy Manual entitled "Personal Appearance, Uniforms and Equipment," effective as of November 14, 2025.

5.    Attached hereto as Exhibit D is a true and correct copy of Section

2

442.18 of the Saint Paul Police Department Policy Manual entitled "Body Worn Camera Policy," effective as of December 12, 2025.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on December 31, 2025, at Saint Paul, Minnesota.

_____
KELSEY MCELVEEN

3

# EXHIBIT A

# 438.19 Crowd Management

**1.) PURPOSE**

The First Amendment to the Constitution of the United States of America states, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech or of the press, or the right of the people peaceably to assemble and to petition the Government for a redress of grievances."

The Bill of Rights in Article 1 of the Minnesota Constitution addresses the rights of free speech and the liberty of the press. However, neither the state nor federal constitutions protect criminal activity or threats against citizens, businesses, or critical infrastructure.

The Saint Paul Police Department supports all people's fundamental right to peaceably assemble and their right to freedom of speech and expression.

The purpose of this policy is to provide guidelines to the officers regarding the application and operation of acceptable law enforcement actions addressing public assemblies and First Amendment activity.

**2.) POLICY**

The Saint Paul Police Department will uphold the constitutional rights of free speech and assembly while using the minimum use of physical force and authority required to address a crowd management or crowd control issue.

The policy of the Saint Paul Police Department regarding crowd management and crowd control is to apply the appropriate level of direction and control to protect life, property, and vital facilities while maintaining public peace and order during a public assembly or First Amendment activity. Department personnel must not harass, intimidate, or discriminate against or unreasonably interfere with persons engaged in the lawful exercise of their rights.

This policy concerning crowd management, crowd control, crowd dispersal, and police responses to violence and disorder applies to spontaneous demonstrations, crowd event situations, and planned demonstration or crowd events regardless of the permit status of the event.

**3.) DEFINITIONS**

    A. <u>Chemical Agent Munitions</u>: Munitions designed to deliver chemical agents from a launcher or hand thrown.

    B. <u>Civil Disturbance</u>: An event in which one or more people who wish to express an opinion on a topic in a public place causes a disruption to someone else.

C. <u>Civil Disturbance with Criminal Actions</u>: An event in which one or more people who wish to express an opinion on a topic in a public place causes a disruption to someone else and the actions of the group are non-violent crimes.

D. <u>Civil Disturbance with Threats of Violence or Violent Actions</u>: An event in which one or more people who wish to express an opinion on a topic in a public place causes a disruption to someone else and the actions of the group threaten violence or commit violent crimes.

E. <u>Crowd Control</u>: Techniques used to address unlawful public assemblies.

F. <u>Crowd Management</u>: Techniques used to manage lawful public assemblies before, during, and after an event. Crowd management can be accomplished in part through coordination with event planners and group leaders, permit monitoring, and past event critiques.

G. <u>Deadly Force</u>: Force used by an officer that the officer knows, or reasonably should know, creates a substantial risk of causing death or great bodily harm. (Reference: Saint Paul Police Department's Response to Resistance & Aggression Policy GO 246.00, MN Statutes 609.06 and 609. 066)

H. <u>Demonstration</u>: An event in which one or more people wish to express an opinion on a topic in a public place.

I. <u>Direct Fired Munitions</u>: Less-lethal impact munitions that are designed to be direct fired at a specific target.

J. <u>First Amendment Activities</u>: First Amendment activities include all forms of speech and expressive conduct used to convey ideas and/or information, express grievances, or otherwise communicate with others and include both verbal and non-verbal expression. Common First Amendment activities include, but are not limited to, speeches, demonstrations, vigils, picketing, distribution of literature, displaying banners or signs, street theater, and other artistic forms of expression. All these activities involve the freedom of speech, association, and assembly and the right to petition the government, as guaranteed by the United States Constitution and the Minnesota State Constitution.

The government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.

K. <u>Great Bodily Harm</u>: Bodily injury which creates a high probability of death, or which causes serious, permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily harm. (Reference: Saint Paul Police Department's Response to Resistance & Aggression Policy GO 246.00, MN Statutes **609.06 and 609. 066**)

L.  Legal Observers: Individuals, usually representatives of civilian human rights agencies, who attend public demonstrations, protests and other activities. The following may be indicia of a legal observer: Wearing a green National Lawyers' Guild issued or authorized Legal Observer hat and/or vest (a green NLG hat and/or black vest with green labels) or wearing a blue ACLU issued or authorized legal observer vest.

M.  Less-Lethal Impact Munitions: Impact munitions which can be fired, launched, or otherwise propelled for the purpose of encouraging compliance, overcoming resistance or preventing serious injury without posing significant potential of causing death.

N.  Media: Media means any person who is an employee, agent, or independent contractor of any newspaper, magazine or other periodical, book publisher, news agency, wire service, radio or television station or network, cable or satellite station or network, or audio or audiovisual production company, or any entity that is in the regular business of news gathering and disseminating news or information to the public by any means, including, but not limited to, print, broadcast, photographic, mechanical, internet, or electronic distribution. For purposes of this policy, the following are indicia of being a member of the media: visual identification as a member of the press, such as by displaying a professional or authorized press pass or wearing a professional or authorized press badge or some distinctive clothing that identifies the wearer as a member of the press.

O.  MFF Line Vehicle: **[Redacted]**.

P.  Unlawful Assembly: Per MN Statute 609.705 – When three or more persons assemble, each participant is guilty of unlawful assembly, which is a misdemeanor, if the assembly is: (1) with intent to commit any unlawful act by force; or (2) with intent to carry out any purpose in such manner as will disturb or threaten the public peace; or (3) without unlawful purpose, but the participants so conduct themselves in a disorderly manner as to disturb or threaten the public peace.

## 4.) LAW ENFORCEMENT PROCEDURES

A.  **Uniform**: All officers responding to public assemblies must at all times, including when wearing protective gear, display their agency name and a unique personal identifier in compliance with this department's uniform policy. The chief law enforcement officer must maintain a record of any officer(s) at the scene who is not in compliance with this requirement due to exigent circumstances.

B.  **Officer Conduct**:

1.  Officers shall avoid negative verbal engagement with members of the crowd.

Verbal abuse against officers does not constitute a reason for an arrest or for any use of force against such individuals.

2. Officers must maintain professional demeanor and remain neutral in word and deed despite unlawful or anti-social behavior on the part of crowd members.

3. Officers must not take action or fail to take action based on the opinions being expressed.

4. Officers must not interfere with the rights of members of the public to observe and document police conduct via video, photographs, or other methods unless doing so interferes with on-going police activity.

5. Officers must not use a weapon or munition unless the officer has been trained in the use and qualified in deployment of the weapon/munition.

6. This policy does not preclude officers from taking appropriate action to direct crowd and vehicular movement; enforce ordinances and statutes; and to maintain the safety of the crowd, the general public, law enforcement personnel, and emergency personnel.

## 5.) RESPONSES TO CROWD SITUATIONS

A. **Lawful Assembly:** Individuals or groups present on the public way, such as public facilities, streets or walkways, generally have the right to assemble, rally, demonstrate, protest, or otherwise express their views and opinions through varying forms of communication including the distribution of printed matter. These rights may be limited by laws or ordinances regulating such matters as the obstruction of individual or vehicle access or egress, trespass, noise, picketing, distribution of handbills, leafleting and loitering.

B. **Unlawful Assembly**

1. The definition of an unlawful assembly has been set forth in Minnesota Statute 609.705.

2. The mere failure to obtain a permit, such as a parade permit or sound permit, is not a sufficient basis to declare an unlawful assembly.

3. The fact that some of the demonstrators or organizing groups have engaged in violent or unlawful acts on prior occasions or demonstrations is not grounds for declaring an assembly unlawful.

4. Whenever possible, the unlawful behavior of a few participants must not result in the majority of peaceful protestors being deprived of their First Amendment rights, unless other participants or officer(s) are threatened with dangerous circumstances.

5. Unless emergency or dangerous circumstances prevent negotiation, crowd dispersal techniques should not be initiated until after attempts have been made through contacts with the police liaisons and demonstration or crowd event leaders to negotiate a resolution of the situation so that the unlawful activity will cease, and the First Amendment activity can continue.

C. **Declaration of Unlawful Assembly**

1. If the on-scene supervisor/incident commander has declared an unlawful assembly, the reasons for the declaration and the names of the decision maker(s) must be documented. The declaration and dispersal order must be announced to the assembly. The name(s) of the officers announcing the declaration should be documented, with the time(s) and date(s) documented.
2. The dispersal order should include:
   a) Name, rank of person, and agency giving the order
   b) A declaration of unlawful assembly and reason(s) for declaration
   c) Egress or escape routes that may be used
   d) Specific consequences of failure to comply with dispersal order
   e) How long the group has to comply
3. Whenever possible, dispersal orders should also be given in other languages that are appropriate for the audience. Officers must recognize that not all crowd members may be fluent in the language(s) used in the dispersal order.
4. Dispersal announcements must be made in a manner that will ensure that they are audible over a sufficient area. Dispersal announcements should be made from different locations when the demonstration is large and noisy. The dispersal announcements should be repeated after commencement of the dispersal operation so that persons not present at the original broadcast will understand that they must leave the area. The announcements must also specify adequate egress or escape routes. Whenever possible, a minimum of two escape/egress routes shall be identified and announced.

D. **Crowd Dispersal**

1. Crowd dispersal techniques should not be initiated until officers have made repeated announcements to the crowd, or are aware that repeated announcements have been made, asking members of the crowd to voluntarily disperse, and informing them that, if they do not disperse, they will be subject to arrest.
2. Unless an immediate risk to public safety exists or significant property damage is occurring, sufficient time will be allowed for a crowd to comply with officer commands before action is taken.
3. If negotiations and verbal announcements to disperse do not result in voluntary movement of the crowd, officers may employ additional crowd dispersal tactics, but only after orders from the on-scene supervisor/incident commander. The use of these crowd dispersal tactics shall be consistent with the department policy of using the minimal officer intervention needed to address a crowd management or control issue.
4. If, after a crowd disperses pursuant to a declaration of unlawful assembly and subsequently participants assemble at a different geographic location where the participants are engaged in non-violent and lawful First Amendment activity, such an assembly cannot be dispersed unless it has been determined that it is an unlawful assembly, and a new declaration of unlawful assembly has been made.

**6.) TACTICS AND WEAPONS TO DISPERSE OR CONTROL A NON-COMPLIANT CROWD**

Nothing in this policy prohibits officers' abilities to use appropriate force options to defend themselves or others as defined in the Saint Paul Police Department's Response to Resistance & Aggression policy (GO 246.00).

**A. Use of Batons**

1. Batons must not be used for crowd control, crowd containment, or crowd dispersal except as specified below.
2. Batons may be visibly displayed and held in a ready position during squad or platoon formations.
3. When reasonably necessary for protection of the officers or to disperse individuals in the crowd pursuant to the procedures of this policy, batons may be used in a push or pulling motion, using the length of the baton.
4. Officers must use the baton in compliance with the Saint Paul Police Department's Response to Resistance & Aggression (GO 246.00 and GO 246.02) policy and state law.

**B. Restrictions on Crowd Control and Crowd Dispersal**

1. Canines must not be used for crowd control, crowd containment, or crowd dispersal.

2. Fire hoses must not be used for crowd control, crowd containment, or crowd dispersal.
3. Electronic Control Devices (ECDs) must not be used for crowd control, crowd containment, or crowd dispersal.
4. Police vehicles should not be used for crowd dispersal, but may be used for purposes of observation, visible deterrence, traffic control, vehicle intrusion mitigation, transportation, and area control during a crowd event.
5. Direct fired munitions may never be used indiscriminately against a crowd or group of persons even if some members of the crowd or group are violent or disruptive.
   a) Except for exigent circumstances, a Deputy Chief or higher rank must authorize the deployment of direct fired munitions. Direct fired munitions must be used only against a specific individual who is engaging in conduct that poses an immediate threat of loss of life or serious bodily injury to themself, officers, or the general public; or is creating an imminent risk to the lives or safety of other persons through the substantial destruction of property.
   b) Officers must use direct fired munitions in compliance with the Saint Paul Police Department's Response to Resistance & Aggression (GO 246.00 and GO 246.02) policy and state law.

    c) When circumstances permit, the on-scene supervisor/incident commander must make an attempt to accomplish the policing goal without the use of direct fired munitions as described above, and, if practical, an audible warning shall be given to the subject before deployment of the weapon.

6. Aerosol Subject Restraint (ASR) must not be used in a demonstration or crowd situation or other civil disorders without the approval of a Deputy Chief or above.

    a) ASR may not be used indiscriminately against a crowd or group of persons, but only against specific individuals who are engaged in specific acts of serious unlawful conduct or who are actively resisting arrest.

    b) Officers shall use the minimum amount of the chemical agent necessary to overcome the subject's resistance.

    c) When possible, persons should be removed quickly from any area where hand-held chemical agents have been used. Officers must monitor the subject and pay particular attention to the subject's ability to breathe following the application of a chemical agent.

    d) A subject who has been sprayed with a hand-held chemical agent shall not be left lying on their stomach once handcuffed or restrained with any device.

7. Chemical munitions use in a crowd situation is subject to the following:

    a) Chemical munitions must be used only when:
        1) a threat of imminent harm or serious property damage is present, or other crowd dispersal techniques have failed or did not accomplish the public safety goal as determined by the Deputy Chief or above,
        2) sufficient egress to safely allow the crowd to disperse exists, and
        3) the use of chemical munitions is approved by the Deputy Chief or above

    b) When feasible, additional announcements should be made prior to the use of chemical munitions in a crowd situation warning of the imminent use of chemical munitions.

    c) CN chemical munitions are prohibited.

    d) The use of each chemical munition must be documented, and the following information must be made available by the department on request:
        1) the name of each chemical munition used in an incident,
        2) the location and time of use for each munition deployment,
        3) access to the safety data sheet (SDS) for the chemical munition

    e) Where extensive use of chemical munitions would reasonably be anticipated to impact nearby residents or businesses, agencies should consider proactively notifying impacted individuals of safety information related to the munitions use as soon as possible, even if after the event.

    f) When chemical munitions are used, an emergency responder will be

on standby at a safe distance near the target area when feasible.
g) Chemical munitions are subject to the same procedural requirements as outlined in the Saint Paul Police Department's Response to Resistance & Aggression policy (GO 246.02).

## C. Arrest and Booking

The department may arrest individuals when reasonable and necessary. When a determination has been made to arrest those engaged in a civil disturbance, and where time and circumstances permit, a warning shall be given prior to the commencement of arrest(s). The incident commander is responsible to ensure adequate mass arrest warnings are issued before arrests begin.

In accordance with applicable law, reasonable force may be employed to arrest those engaged in civil disturbance. The department will employ only objectively reasonable crowd management and/or crowd control tactics with the intent to de-escalate the situation.

The incident commander will identify a booking team sergeant to oversee the booking process. The booking team sergeant is responsible for documenting each arrestee's pertinent information, secure any property, arrange arrestee transportation, and ensure that appropriate paperwork is completed by the arresting officers, and processed with arrested individuals.

The booking team sergeant will report to the incident commander during the incident. The booking team sergeant will work collaboratively to ensure that appropriate resources are identified to process and transport arrestees from the field to a remote processing site, booking site, or the Ramsey County Law Enforcement Center. The booking team sergeant will follow the automated booking procedures and coordinate with the supervisor at the processing site.

1) Arrest Procedures:
   a) **[Redacted]**.
   b) Persons who make it clear (e.g., by non-violent civil disobedience) that they seek to be arrested may be arrested and must not be subjected to other dispersal techniques such as the use of batons or chemical agents. Persons refusing to comply with arrest procedures may be subject to the reasonable use of force.
   c) Arrests of non-violent persons shall be accomplished by verbal commands and persuasion, handcuffing, lifting, carrying, the use of stretchers, and/or the use of soft empty hand control techniques.
   d) Officers must document any injuries reported by an arrestee, and as soon as practical, officers must obtain professional medical treatment for the arrestee. Juveniles arrested in demonstrations shall be handled consistent with department policy on arrest, transportation, and detention of juveniles.

e) Officers arresting a person with a disability affecting mobility or communication must follow the department policy on arrest, transportation, and detention of persons with disabilities.

### D. MFF Line Vehicle

The purpose of the MFF Line Vehicle is to provide MFF personnel with an additional resource and options to aid in crowd management and the control or dispersal of non-compliant crowds, as well as provide a measure of safety for officers. The MFF Line Vehicle may be used in the following manners:

1. The MFF Line Vehicle may be utilized for increased visual observation
   a) **[Redacted]**.
2. The MFF Line Vehicle can provide an additional element of safety for officers on the line in the following manners:
   a) **[Redacted]**.
   b) **[Redacted]**.
   c) **[Redacted]**.
   d) **[Redacted]**.
3. **[Redacted]**
   a) **[Redacted]**.
   b) **[Redacted]**.
   c) **[Redacted]**.
4. All members of the MFF team will be trained in the use of the MFF Line Vehicle and will be authorized to deploy the vehicle.
5. **[Redacted]**
   a) **[Redacted]**.
   b) **[Redacted]**.

## 7.) HANDCUFFS

A. All persons subject to arrest during a demonstration or crowd event shall be handcuffed in accordance with department policy, orders, and training bulletins.
B. **[Redacted]**.
C. **[Redacted]**.
D. **[Redacted]**.

## 8.) MEDIA

A. The media have a First Amendment right to cover public activity, including the right to record video or film, livestream, photograph, or use other mediums.
B. The media must not be restricted to an identified area, must be permitted to observe and must be permitted close enough access to view the crowd event and any arrests. An onsite supervisor/incident commander may identify an area where media may choose to assemble.

C. Officers will not arrest members of the media unless they are physically obstructing lawful efforts to disperse the crowd, or efforts to arrest participants, or engaged in criminal activity.
D. The media must not be targeted for dispersal or enforcement action because of their media status.
E. Even after a dispersal order has been given, clearly identified media must be permitted to carry out their professional duties unless their presence would unduly interfere with the enforcement action.

## 9.) LEGAL OBSERVERS

A. Legal observers, including unaffiliated self-identified legal observers and crowd monitors, do not have the same legal status as the media, and are subject to laws and orders similar to any other person or citizen.
B. Legal observers and monitors must comply with all dispersal orders unless the on-site supervisor/incident commander chooses to allow such legal observers and monitors to remain in an area after a dispersal order.
C. Legal observers and crowd monitors must not be targeted for dispersal or enforcement action because of their status.

## 10.) DOCUMENTATION OF PUBLIC ASSEMBLY AND FIRST AMENDMENT ACTIVITY

A. The purpose of any visual documentation by the Saint Paul Police Department of a public assembly or First Amendment activity must be related only to:
   1) Documentation of the event for the purposes of debriefing,
   2) Documentation to establish a visual record for the purposes of responding to citizen complaints or legal challenges, or
   3) Creating visual records for training purposes.
B. If the incident commander deems it necessary to capture video recording outside of body-worn camera/in-car camera (BWC/ICC) recordings and/or photographs, it must be done in a manner that minimizes interference with people lawfully participating in First Amendment activities. Videotaping and photographing of First Amendment activities must take place only when authorized by the Incident Commander.
C. Individuals should not be singled out for photographing or recording simply because they appear to be leaders, organizers, or speakers.
D. Unless evidence of criminal activity is recorded or there is a specific training purpose identified, the videos or photographs of demonstrations shall not be disseminated to other government agencies, including federal, state, and local law enforcement agencies. If videos or photographs are disseminated or shared with another law enforcement agency, a record should be created and maintained noting the date and recipient of the information.
E. If there are no pending criminal prosecutions or training needs arising from the demonstration or if the video recording or photographing is not relevant to an Internal Affairs or citizen complaint investigation or proceedings or to civil litigation arising from police conduct at the demonstration, the video recording and/or photographs shall be

retained in accordance with department policies and state law.


Effective April 14, 2023

# EXHIBIT B

**246.02 Authorized Force Tools, Description, Training Requirements, Uses and Consideration**

    I.    TRAINING REQUIREMENTS
    II.    PRESENCE & VERBAL COMMUNICATION
    III.    RESTRAINTS
    IV.    EMPTY HAND TACTICS
    V.    AEROSOL SUBJECT RESTRAINT/ **[REDACTED]**
    VI.    ELECTRONIC CONTROL DEVICE (ECD)
    VII.    BATON/IMPACT TOOLS
    VIII.    LESS LETHAL IMPACT MUNITIONS (LLIMs)
    IX.    PEPPERBALL
    X.    CANINE
    XI.    CHOKEHOLDS AND STRANGLEHOLDS – NOT AUTHORIZED
    XII.    FIREARMS
    XIII.    VEHICLE INTERDICTION TACTIC (VIT) – SWAT PERSONNEL ONLY

## I.    TRAINING REQUIREMENTS

Officers will receive initial and continued training and instruction (and, where necessary, must qualify for certification and recertification) regarding the appropriate use of any response to resistance or aggression authorized by this department. This policy supersedes any and all previous policies and training related to response to resistance or aggression and the use of force.

The department will train officers on approved responses to resistance or aggression quarterly. Academy instruction and in-service training will include, but not be limited to, a review of department policies and laws regarding responses to resistance or aggression and any changes to applicable laws, regulations, policies, practices, procedures, or techniques. Officers will also receive training on de-escalation principles and skills, their duty to intervene, the sanctity of life, prompt rendering of first aid, and simulated actual shooting situations. Annual training will be scheduled according to department requirements. Officers are only authorized to use currently trained or authorized techniques and tools as designated by the training unit.

With minimal exception in exigent circumstances, only department-approved tools and techniques may be used. The training unit is responsible to maintain documentation of department- authorized tools and techniques. Uniformed officers will only carry department-authorized tools and equipment as required by these General Orders.

All officers, regardless of rank, will participate fully in training and put forth effort. If an officer has an injury or disability that would prevent them from training, they will be required to supply police human resources with documentation of the injury or disability prior to any training.

It is the responsibility of any officer who misses required training due to injury or disability, or leave, including sick, medical, or other leave of absence, to make arrangements with training staff to receive the training missed prior to resuming duty. Failure to do so may result in

discipline. Supervisors will ensure that officers under their supervision complete the minimum training required by the department and these General Orders.

If an employee fails to demonstrate proficiency during training, the training unit will contact the employee and the employee's supervisor as soon as practical to formulate a remedial training program.

The following are authorized techniques and tools that may be used when objectively reasonable and otherwise permitted under this policy and General Order 246.00. Specialized units may have additional tools that are not covered in this policy.

**II.    PRESENCE & VERBAL COMMUNICATION:**  Level of Control:

1.  Low-Level Force

Approved Use:

2.  Officers will, when and to the extent reasonably possible, attempt to use verbal communication to resolve an encounter.

**III.    RESTRAINTS:**  Level of Control:

1.  Low-Level Force – Handcuffs, Flexible Handcuffs, EZ Leg Restraints.

**State Law**

1.  Except in cases where deadly force is authorized as articulated in MN STAT. 609.066 to protect the peace officer or another from death or great bodily harm, officers are prohibited from:
    a.  Tying all of a person's limbs together behind a person's back to render the person immobile, or
    b.  Securing a person in any way that results in transporting the person face down in a vehicle.

Description:

1.  Officers use restraints for the protection of subjects, third parties, and themselves. Appropriate restraint prevents individuals from damaging property, and more importantly, from injuring themselves or others.
2.  Officers will only use department-authorized or approved handcuffs and leg restraints, disposable plastic/fabric restraints, hospital-style leather or fabric human restraints, and equipment specifically designed to secure the legs of a subject.

**General Order**

Certification/Training Requirements:

1. Entry level training is taught during academy.
2. Included in Annual Defensive Skills Training.

Inspection Requirement:

1. Handcuffs will be maintained in clean and working order.
2. District Administration Sergeants will equip the district squad cars with one approved leg restraint and will be a part of their quarterly inventory duties.

Handcuffing Procedure:

Approved Use:

1. This tool may only be used according to department policy and training.
2. In an attempt to minimize the risk of injury to officers and others during arrest situations, officers will handcuff all persons arrested as soon as reasonably possible.
3. Officers may handcuff an individual during investigative detentions ("Terry Stops") where one or more of the following factors are present:
   a. Articulable facts that the subject is physically uncooperative
   b. Articulable facts that a subject's actions at the scene may present physical danger to themselves or others if not restrained
   c. Reasonable probability of flight based on the action of the subject;
   d. Information that the subject is currently armed
   e. The stop closely follows a violent crime and the subject matches specific parts of a description
   f. When there are articulable facts that a crime of violence is about to occur
   g. Care and discretion should be used when the subject is at extremes of age (elderly and young children) or physically disabled
   h. The authority to handcuff during investigatory stops continues only as long as the circumstances above exist
4. Suicidal persons may be restrained if they are a danger to themselves or others.
5. During a search warrant service:
   a. At a private residence as reasonably necessary to execute the warrant in safety
   b. At a commercial business open to the public if it reasonably appears that handcuffing is necessary to protect an officer or others from physical harm
   c. Circumstances that justify initial handcuffing may change and eliminate continued justification
6. Persons being transported to detoxification facilities may be handcuffed for safety.
7. Handcuffs should only be removed once the subject is in a secure area and escape and non-compliance is no longer a concern.
8. Whenever possible, for added security, restrained subjects should be seat belted in the rear of a squad car after handcuffing and before transport.

(See General Order 409.06: Transportation of Prisoners and Victims)

Disapproved Use:

1. If officers know or reasonably believe that medical circumstances make it unreasonable to handcuff an individual, officers should refrain from handcuffing.
2. When responding to a security office where a subject has already been placed in handcuffs prior to arriving to the scene, officers shall not place SPPD handcuffs on the subject until they have reasonable suspicion for detention or probable cause for arrest based on their independent investigation and findings.

Tactical Considerations:

1. Officers will check handcuffs for tightness and double lock handcuffs as soon as it is safe to do so prior to transport.
2. When a handcuffed subject first complains that handcuffs are too tight and/or are hurting the subject, the officer having custody of the handcuffed person will, as soon as reasonably possible, check the handcuffs to make sure that they are not too tight. If they are too tight, they will be loosened and double locked.

EZ Leg Restraint Procedure:

Deployment Requirements:

1. This tool may only be used according to department policy and training.
2. Only officers who have received department approved training on the EZ Leg Restraint are authorized in its use.
3. When practical, officers should notify a supervisor of their intent to apply the EZ leg Restraint. In all incidents, supervisors must be notified as soon as practical after the application of the leg restraint.
4. Prior to applying the leg restraint, the subject should first be secured in handcuffs.
5. At NO time should the carabiner or the lead of the harness be connected to a suspect's handcuffs or belt.
6. After the application, subjects will have limited ability to move, maintain their balance, or stop themselves from falling. Officers are responsible to control the subject in a manner to prevent an accidental fall.
7. When secured in a squad car, the subject should be placed in a seated or upright position, secured with a seat belt, and closely monitored. Subjects must not be placed on their stomach for an extended period as this could reduce the person's ability to breathe.
8. The officers deploying the EZ Leg Restraint must ensure the subject is monitored during the entire time they are restrained by the device. The officer should look for signs of labored breathing and medical distress. When practical the officer should take appropriate steps to relieve and minimize the factors contributing to this condition.
9. Summon medical attention when a subject is injured and/or complains of injury.
10. When the subject exhibits the signs and symptoms of a medical emergency such as, but not limited to, extreme agitation, irrational behavior accompanied by profuse sweating. Subjects exhibiting signs and symptoms of a medical emergency should be examined by

fire medical personnel as soon as possible. Any individual exhibiting signs of distress after such as encounter must be medically cleared prior to booking.

Approved Use:

When officers reasonably believe that a higher level of restraint is required beyond handcuffing:

1. To protect the subject from self-injurious behavior
   a. Ex. The subject is hitting their head against the interior of the squad car or other objects or attempts to run away in handcuffs.
2. To protect the officers from harm
   a. Ex. The subject continues to attempt to hit, kick, or use other physical force to prevent detention.
3. To prevent destruction of property
   a. Ex. The subject attempts to damage interior of squad car by kicking doors, windows, etc.

Disapproved Use:

1. If officers know or reasonably believe that medical circumstances make it unreasonable to place an individual in leg restraints, officers should refrain from using the device.
2. The EZ leg restraint should not be used in the following circumstance unless there are compelling reasons to do so that can be clearly articulated.
   a. When the subject is at extremes of age (elderly and young children) or physically disabled,
   b. When officers reasonable believe the subject is pregnant,
   c. When the subject appears to be in a behavioral health crisis and requires a higher level of restraint to prevent injuries to themselves or others. The subject must be transported by SPFD ambulance and restrained by appropriate personnel on a gurney unless situations reasonably dictate otherwise.

Tactical Considerations:

1. When practical, officers should bring the transport vehicle in close proximity to where the subject is restrained.
2. Officers should make a reasonable attempt to avoid having a subject in leg restraints walk long distances or navigate challenging terrain (stairs, unstable surfaces, etc.).
3. After application, if the subject needs to be carried, a minimum of two officers is preferred. At no time should the EZ Leg Restraint be used to carry the person.
4. Officers should avoid carrying subjects face down to mitigate the chance of injury to the subject from an unintended fall.
5. Officers should continue to attempt to de-escalation the situation even when using the EZ Leg Restraint.

Documentation Requirements:

1. Any incident where a subject is injured or complains of injury is a reportable use of force.
2. Any application of the EZ Leg Restraint will require proper documentation. In addition to documenting all required use of force related information per department policy, the officer should include the following in their police report:
   a. The amount of time the subject was in the EZ Leg Restraint.
   b. Observations of the subject's physical and physiological actions and or medical problems.
3. In rare circumstances the EZ Leg Restraint may become a bio-hazard concern. In this situation while using universal safety precautions it should be taken to HQ, placed in one of the supplied red bio-hazard bags, and put in the uniform's bio-hazard collection can. This should be noted in the officer's report.

Approved Use:

The preferred transportation method for all subjects requiring leg restraint is by SPFD ambulance. In the rare circumstance where this is not possible, and leg restraint is necessary the following procedure will be followed:

1. If practicable, officers should notify a supervisor of their intent to apply a leg restraint.
2. In all cases, a supervisor must be notified as soon as possible after the application of the leg restraint device.
3. Only leg restraint devices approved by the department may be used.
4. Once secured, the subject should be placed in a seated or upright position, secured with a seat belt, closely monitored, and must not be placed on his/her stomach for an extended period as this could reduce the person's ability to breathe.
5. The leg restraint device must not be attached in any way to the subject's handcuffs.
6. Officers must monitor restrained subjects and should look for signs of labored breathing and take appropriate steps to relieve and minimize any obvious factors contributing to this condition.

Disapproved Use:

Suspects or persons who appear to be mentally or emotionally impaired and who must be totally restrained must be transported by SPFD ambulance and restrained by appropriate personnel on a gurney unless situations reasonably dictate otherwise.

Additional Considerations:

1. Summon medical attention when a subject is injured and/or complains of injury.
2. Any incident where a subject is injured or complains of injury is a reportable use of force.

**IV.    EMPTY HAND TACTICS:**  Level of Control:

1. Low-Level Force – Soft empty hand tactics, escorts, takedowns less likely to cause injury, including controlled takedowns.
2. Intermediate Force – Hard empty hand tactics, strikes, knees, kicks, takedowns that are likely to cause potential injury,
3. Deadly Force – takedowns, strikes, kicks that are done in a manner likely to cause great bodily harm.

Certification/Training Requirements:

1. Entry level training is taught during academy.
2. Included in Defensive Skills Training.

Approved Use:

1. These tactics may only be used according to department policy and training.
2. Officers should only use tactics appropriate to the situation and that have been authorized by department RRA tactics instructors.
3. Officers may only use hard empty hand tactics as authorized and trained by the department. Hard empty hand tactics must be limited to only the level of force that is reasonable in the context of the encounter and as authorized by the department RRA tactics instructors. The use must be objectively reasonable under the totality of the circumstances.

Disapproved Use:

1. Strikes and kicks, are not authorized against individuals who are not physically aggressive or who pose no imminent threat of harm to the officer or others.
2. Strikes, kicks and takedowns likely to cause injury are not authorized to be used on nonviolent, nonthreatening misdemeanant who is not actively resisting arrest or attempting to flee.

Additional Considerations:

1. Summon medical attention in any incident where an individual is injured or complains of injury.
2. Any hard-empty hand tactics is a reportable use of force.

**V.    AEROSOL SUBJECT RESTRAINT (ASR) / [REDACTED]:**

Level of Control:

1.   Low-level Force (active resistance)

Description:

1.  **[Redacted]**. ASR application will cause inflammation of the skin and mucus membranes of a subject. The intended effects are temporary and are used to control or restrain an actively resisting person. ASR currently deployed by the Saint Paul Police Department ("SPPD") is **[redacted]**.

2.  **[Redacted]**.  MK-9 will cause inflammation of the skin and mucus membranes of a subject. The intended effects are temporary and to be used when an officer is confronted with a group of people and reasonably needs to preserve life safety or stabilize an incident.  **[Redacted]**.

3.  All sworn police personnel must be certified in the use of **[redacted]** and carry the device when in an approved SPPD uniform.

NOTE: SWAT and MFF personnel are exempt from these provisions during tactical operations and will follow their own training and authorized procedures.

Certification/POST Requirements:

1.    Entry level training is taught during academy.
2.    In-service training included in Response to Resistance and Aggression Training.

Inspection Requirement:

1.  [**Redacted**] expiration date and serviceability will be checked annually.
2.  If the container is damaged, malfunctions, nears empty, or the date on the canister is illegible or expired, a new canister will be issued ASR may be replaced at the Property Room.  **[Redacted]** may be replaced by a supervisor from the Special Operations Unit.
3.  Should an officer lose an **[redacted]**, details of the loss should be documented in a written report and signed by a supervisor.

Deployment Requirement:

1.  When deploying, an officer will, if practical, announce a warning to the subject and other officers of their intent to deploy ASR if the subject does not comply with commands. Example, "Do what I am telling you to do, or I will spray you with pepper spray."

2. Officers must give the subject a reasonable opportunity to voluntarily comply when safe to do so.

Approved Use:

1. **[Redacted]** may only be used according to department policy and training.
2. **[Redacted]** may be used when a subject is engaging in or displays the intent to engage in active resistant behavior.
3. **[Redacted]** may be used on vicious or aggressive animals when those animals interfere with the safety of the officers or citizens.
4. **[Redacted]** may only be used to address a group violence or disorder when authorized by a supervisor or without command approval if there are circumstances where immediate dispersal is needed to protect officers, the group, or others from imminent harm.

This provision does not apply to Mobile Field Force operations, which are subject to the regulations established by the Special Operations Unit Senior Commander pursuant to General Order 438.19.

Disapproved Use:

1. **[Redacted]** may not be used on passive resistant individuals.
2. **[Redacted]** may not be used other than as an aerosol, stream or vapor.
3. **[Redacted]** may not be used on a handcuffed subject unless the subject is displaying Aggressive Resistance.

Tactical Considerations:

1. Whenever possible, ASR should be used upwind and relatively close to the subject. **[Redacted]** may only be deployed with a minimum of 6-feet of distance between the canister and subject.
2. **[Redacted]** may be used as an intermediate level of control; however, officers should consider the effect the device will have on subjects and others in the general area due to the volume of agent dispersed.
3. ASR may not be used on a subject inside a closed vehicle (this provision does not apply to an officer attempting to secure an aggressive resistant subject in a patrol vehicle).
4. ASR is not intended to be used to force extraction from an enclosed area.

Additional Considerations:

1. Call for medical attention in any incident where a subject is injured or complains of injury beyond expected effects.
2. Begin the decontamination process as soon as it is safe and reasonable to do so.

3. For the purposes of monitoring, an officer must remain with an exposed person from the time of exposure through decontamination.
4. Notify a supervisor when ASR Spray has been used.
5. Inform detention personnel when a subject has been exposed to ASR Spray and ensure they have been screened by the detention facility medical staff.
6. The use of ASR Spray on a subject is a reportable use of force. Officers must document the decontamination process in their use-of-force report.
7. The department allows certain classifications of civilian employees to carry chemical aerosol spray while on duty. Civilian employees have no power of arrest and therefore may only use force consistent with Minnesota law on self-defense or defense of others. When ASR Spray is used by a civilian member of the department, a patrol officer and supervisor will respond to the scene to assist with enforcement action.

## VI.   ELECTRONIC CONTROL DEVICE (ECD)

Level of Control:

1. Intermediate Force

Description:

1. Minnesota Statutes section 624.731 authorizes peace officers to use Electronic Control Devices.
2. The ECD is a Neuro-Muscular Incapacitation (NMI) device that disrupts the body's ability to communicate messages from the brain to the muscles thereby causing temporary NMI.
3. An air cartridge is a replaceable ECD cartridge that uses compressed nitrogen to fire two barbed probes on thin connecting wires, sending a high voltage/low current signal.

Certification/POST Requirements:

1. Entry level Training is taught during academy.
2. RRA Tactics instructors who have been certified as ECD instructors are the only individuals authorized to instruct on the ECD.
3. Officers authorized to use an ECD must successfully complete an initial six-hour certification course, to include written and practical tests.
4. Once certified, all officers must annually attend recertification training taught by the department training staff.

5. If an employee fails to demonstrate proficiency at any time, the employee and/or the employee's supervisor will contact the training unit for assistance in formulating a remedial training program.

Inspection Requirement:

1. Officers will only use authorized ECD equipment issued by the SPPD. The ECD will be inspected for damage and cleanliness, and batteries and cartridges replaced by the officer when required. The ECD will be inspected and maintained in accordance with training protocols. When not being carried, ECDs must be stored and secured in a climate-controlled area (i.e. locker), not in a vehicle.
2. Officers should conduct a spark check, outside the public view, at the beginning of shift to ensure the ECD will function properly. This spark check does not require completion of a use-of-force report.
3. Uniformed officers will carry the ECD. It shall be carried in a department-approved holster. The holster will be carried on the duty belt or LBV, on the side opposite the duty firearm.
4. Cross-draw position is optional. Plain clothes officers, if carrying an ECD, will carry the device on their weak side.
5. The training unit staff will maintain an inventory of all department issued ECDs, including an accurate record of the location of the weapon and maintenance history.

Deployment Requirement:

1. When displaying an ECD, officers will give a warning, when practical, to the subject and other officers before firing the ECD. Example: "Do what I am telling you to do, or I will Tase you and it will hurt."
2. Officers must give the subject a reasonable opportunity to voluntarily comply when safe to do so.

Note: Once a subject has received an ECD application; officers should be aware of the potential for impaired breathing during restraint procedures. Once a subject is controlled, they should be placed in the recovery position to reduce the risk of aspiration and medical attention should be summoned. Severely impaired breathing could result in death.

Approved Use:

An ECD may only be used to mitigate the threat of imminent physical harm presented by an aggressive or aggravated aggressive subject. In addition to this general requirement, ECD may only be used on a person officers know or reasonably believe to be mentally or emotionally impaired if the individual is:

1. A threat to an officer's or another individual's safety, or
2. A significant and at least proportional threat to themselves.

Disapproved Use:

1. Officers are not authorized to draw or display the ECD except for training and inspection, unless the circumstances create a reasonable belief that use may be necessary.
2. The intentional use of more than one ECD simultaneously on the same subject is prohibited without reasonable justification.

3. The ECD will not be used:
   a. When the officer knows a subject has come in contact with flammable liquids or is in a flammable atmosphere,
   b. When the subject is in a position where a fall may result in serious bodily harm or death;
   c. Punitively for purposes of coercion or in an unjustified manner;
   d. To escort or jab individuals;
   e. To awaken unconscious or intoxicated individuals;
   f. When officers know or reasonably believe the subject is pregnant, unless deadly force is the only other option;
   g. When a subject displays solely Passive or Active Resistance (e.g., peaceful protest, refusal to stand, non-aggressive verbal resistance, etc.);
   h. When a subject is fleeing as the sole justification for use of the ECD. This does not prohibit use of an ECD on a subject who is aggressive or aggravated aggressive who is also attempting to flee.

4. The ECD should not be used in the following circumstances unless there are compelling reasons to do so that can be clearly articulated:
   a. When the subject is in handcuffs or waist restraints;
   b. When the subject is in control of a motor vehicle;
   c. When the subject is holding a firearm, unless there is an additional officer providing lethal cover;
   d. When the subject is at the extremes of age (elderly and young children), physically disabled, or is a low body mass person;
   e. In a situation where deadly force is clearly justifiable unless another officer is present and capable of providing deadly force to protect the officers and others as necessary.

Tactical Considerations:

1. There are three types of reportable ECD applications:
   a. Spark Display - A non-contact demonstration of the ECD's ability to discharge electricity.
   b. Drive Stun - A pain compliance application of the ECD without a cartridge intended to gain compliance of a subject or used to complete a circuit by making direct contact with the body after the air cartridge has been expended or removed.
   c. Probe Mode - When the ECD cartridge is fired at a subject with the intent that the subject will be temporarily immobilized for the period of time the ECD is cycled. Proper application will result in temporary immobilization of the subject and provide the officer a "window of opportunity" in which to take the subject safely into custody.
2. Officers should target an individual's back for ECD application when practical. For a frontal application, a reasonable effort should be made to target lower center mass and avoid intentionally targeting the head, neck, groin and chest. It is recognized that the

dynamics of each situation and officer safety may not permit the officer to limit the application of the ECD probes to a precise target area.

3. When deploying an ECD:
    a. Initial use of the ECD will be a standard five-second cycle. The officer must then evaluate the need to apply a second five-second cycle after providing the subject a reasonable opportunity to comply. Each subsequent five-second cycle requires separate justification based on the objectively reasonable standard of Graham v. Connor, 490 U.S. 386 (1989).
    b. Once the subject has been exposed to three cycles, ECD will be deemed ineffective and another use-of-force option must be considered, unless exigent circumstances exist.
    c. Officers should begin control and restraint procedures, including cuffing under power as soon as it is reasonably safe and practical to do so in order to minimize the total duration of ECD exposure. The device user, and those assisting the user, should avoid touching the probes, wires, and the areas between the probes to avoid accidental shock during the electrical discharge.
    d. The use of the "drive stun" mode should only be used to supplement Probe Mode to complete the Neuro-Muscular Incapacitation (NMI) effect. The ECD "drive stun" mode requires the same level of justification and reporting as probe deployment.

Additional Considerations:

1. Summon medical attention in any incident where a person is injured or complains of injury, or when there has been probe impact.
2. Notify a supervisor when ECD has been used (Spark Display, Probe or Drive Stun).
3. Inform detention personnel when an ECD has been used on the subject (Probe or Drive Stun) and ensure the individual is screened by the detention facility medical staff.
4. Any use of ECD on a subject is a reportable use of force, with the only exception being a spark check out of public view. Note: Any accidental discharge of an ECD other than at a subject will be documented on an officer's report.
5. If the subject is thought to be experiencing impaired breathing, they should be placed on their side to reduce the risk of aspiration.
6. ECD batteries should be docked for the duration of a full charge at least once every 90 days.

## VII.   RIGID BATON/ IMPACT TOOLS:

Level of Control:

1. Low-Level Force - when used as an escort tool.
2. Intermediate Force - when used for jabbing or striking.
3. Deadly Force - striking subjects on the head, neck, sternum, spine, or groin.

Description:

1. A baton is a department-authorized rigid baton.

Certification/Training Requirements:

1. Entry level training is taught during academy mobile field force training.
2. All officers must complete the following requirements:
    a. Initial baton training in the academy; or
    b. During a department approved mobile field force training event.

Inspection Requirement:

1. Batons will be maintained in clean and working order.
2. Should an officer damage or lose a baton, details of the loss should be documented in a written report and signed by a supervisor.
3. Officers may only purchase and carry a replacement baton that is authorized by the department.

Deployment Requirement:

1. Before using a baton, an officer will, if practical, announce a warning to the subject and other officers of their intent to use a baton/impact tool if the subject does not comply with commands. Example, "Do what I am telling you to do, or I will strike you with my baton."
2. Officers must give the subject a reasonable opportunity to voluntarily comply.

Approved Use:

1. This tool may only be used according to department policy and training.

Disapproved Use:

1. Batons are not authorized to be used as impact weapons with individuals who are not physically aggressive or who pose no imminent threat of harm to the officer or others.
2. During non-deadly force incidents, officers will use reasonable care to avoid striking subjects on the head, neck, sternum, spine, groin, or kidneys, as these strikes may constitute deadly force.
3. Officers should not strike the abdomen of a woman that they know or reasonably believe is pregnant.
4. Officers should not use their firearm as an impact tool in non-deadly force incidents due to the possibility of an unintentional discharge.
5. Officers must be able to articulate a compelling need to use any other device or object other than an authorized baton as an impact tool.

Additional Considerations:

1. Call for medical attention on all strikes with a Baton/Impact tool and any incident where a subject is injured or complains of injury.
2. Notify a supervisor when a Baton/Impact tool has been used.
3. All strikes or any incident where a subject is injured and/or complains of injury is a reportable use of force.
4. The use of instruments (flashlights, radio, etc.), as a weapon for the purpose of striking or jabbing, other than department-authorized batons is strongly discouraged and acceptable only when exigent circumstances exist or other authorized force responses have been exhausted and are either unavailable or ineffective.

## VIII.   Less Lethal Impact Munitions (LLIMs)

Level of Control:

1. Intermediate Force

Description:

2. The department provides officers access to less-lethal launchers equipped with specialty munitions to increase officer, suspect, and bystander safety.
3. LLIMs for this policy refers to the 40mm launching platform blue foam tip exact impact rounds.
4. "Less lethal munitions" or Less Lethal Impact Munitions (LLIMs) means projectiles designed to cause injury, stun, temporarily incapacitate, or cause temporary discomfort to a person.
5. No part of this policy restricts the issuing, training, and deployment of LLIMs by members of S.W.A.T. when authorized by the S.W.A.T. commander during a S.W.A.T operation or by members of Mobile Field Force when authorized by the M.F.F. commander during a M.F.F. operation.

Certification/POST Requirements:

1. The S.W.A.T. Team and Training Unit will conduct annual LLIMS qualifications and training to ensure that officers maintain proficiency with the weapon. Any officer who misses an annual qualification or training without prior approval will be subject to removal from the LLIMS operators list.
2. Sergeants assigned to the operations division as patrol supervisors will be required to attend training and qualifications for LLIMS as conditions of this assignment. Within a reasonable period of time newly appointed patrol supervisors will be required to attend this training which is provided by the Training Unit.

Inspection Requirement:

1.  LLIMS operators must meet the following criteria:
    · Attend an initial operators LLIMS course.
    · Annually attend all department qualifications and maintains proficiency with the use of LLIMS.
    · The LLIMS coordinator retains the master list of all LLIMS operators. The Deputy Chief of Support Services, Commander of Training Unit, or LLIMS program coordinator may remove any officer from the LLIMS authorized operators list who has violated any part of this policy or failed to maintain proficiency with LLIMS

2.  The Training Unit will issue LLIMS to the patrol districts, downtown patrol unit, ACOP and any other unit as authorized by the deputy chief of support services. District and unit commanders are responsible for the assigned LLIMS at all times. An annual inventory will be conducted by the district/unit commander to ensure all LLIMS assigned to their unit remain in the department's possession at all times. Annual inventory sheets shall be forwarded to the LLIMS program coordinator in the Training Unit; additional inventory requests may be made by the LLIMS program coordinator at any time.

3.  **[Redacted]**.

4.  The department will track munitions issued and discharged by unit. If a unit discharges LLIMS, that unit must document that use in an incident report and use-of-force report. Units must replace deployed munitions and will request replacement munitions from the Training Unit. The LLIMs program coordinator must record the number of blue foam exact impact rounds LLIMS munitions issued, the complaint number for each discharge, the requesting unit and sergeant's name requesting the munition. The number of munitions dispersed to each unit will be verified by the inspections unit semi-annually and reported to the deputy chief of Operations and Support Services.

5.  Unit and district commanders will ensure that their units follow department procedures for checking out and returning LLIMS. The LLIMS must be signed out from storage and returned to storage by a sergeant who will be required to record the serial number of the 40mm launcher and the designation of blue foam tip exact impact round munitions, date and time of check out, and return. The Training Unit will work with district and unit commanders to develop methods for securing LLIMS when they are not deployed.

6.  The department will issue 40mm launchers to each patrol district, downtown patrol unit, and ACOP. Each 40mm launcher deployment is to include: 40mm launcher, patrol munitions bag, sling, and optic.

7. The 40 mm launchers are assigned to the Training Unit and may be required for MFF operations; thus, all launchers are subject to recall to MFF/SOU at any time until they are no longer needed for MFF/SOU operations.

8. **[Redacted]**.

Deployment Requirement:

Operators in a patrol assignment who have met the requirements of this policy may deploy with LLIMS.   Officers deploying LLIMS shall broadcast their intent to deploy these devices over the radio.  Supervisors must take special care to ensure the proper deployment of tactical options occurs.

The deployment of the LLIMS is considered an impact weapon; however, discharge of LLIMS falls above other impact weapons and below deadly force levels of response to resistance or aggression and should only be deployed when the requirements of this policy have been met.

Approved Use:

Deployment of LLIMS is authorized and should only be deployed when objectively reasonable under the circumstance.  A supervisor should be notified as soon as possible after any application of force in accordance with department policy.

LLIMS are only authorized in response to a subject's aggressive resistance (meaning the subject is displaying by their behavior the perceived intent to harm the officer, themselves, or another person and prevent the officer from placing them in custody and/or rendering the situation safe) or aggravated aggressive resistance (meaning the subject's actions are likely to result in the death or serious bodily harm to the officer, themselves, or another).  Examples of the reasonable deployment of LLIMS includes, but are not limited to the following types of situations where the subject:

1. Is presenting behavior where less lethal force is reasonable, and the behavior of the suspect has limited an officer's ability to safely use other less lethal force options.
2. Is armed with a weapon and the tactical circumstances allow for safe application of the LLIMS.
3. Has made credible threats to harm themselves; and the current situation creates a reasonable concern for the safety of the officer(s) or others.
4. Is engaging in behavior that threatens the safety of officers or others.
5. There is probable cause to believe that the suspect has already committed a felony crime of violence and is refusing to comply with lawful orders.

Tactical Considerations:

1. This policy does not require officers or supervisors to use or direct the use of LLIMS in place of other response options authorized by these General Orders. The safety of victims, hostages, uninvolved persons, and officers takes priority over the safety of subjects engaged in violent criminal or suicidal behavior.

2. LLIMS should only be deployed when there is a cover officer specifically assigned to the LLIMS operator for the duration of the LLIMS deployment.
3. Prior to deployment, if possible, LLIMS operators deploying with LLIMS will notify the dispatcher and other officers by radio that they are deploying a LLIMS at their location.
4. Prior to deployment of LLIMS the operator of less lethal should, when practical to do so, give clear instructions to the subjects.

   · Establish authority "Police."
   · Legal directive of what you want them to do.
   · What will happen if they do not comply.
   · Verbalize "less lethal, less lethal, less lethal"

Similar but not limited or specific to: "SAINT PAUL POLICE DROP THE WEAPON, DROP THE WEAPON AND GET DOWN ON THE GROUND. IF YOU DO NOT DROP THE WEAPON, I WILL USE FORCE AGAINST YOU." Prior to discharging a LLIMS the operator will announce in a loud voice "less lethal, less lethal, less lethal" to alert all officers present to the discharge.

Additional Requirements:

Procedure for First Aid

- Officers must follow G.O. 246.00 Section IV for medical attention.

Documenting

- Use of LLIMS is a reportable use of force subject to the reporting requirements of G.O. 246.03. All necessary reports must be completed, and photographs taken of all subject(s) injuries on scene by the LLIMS operator for all incidents involving the deployment of munitions.

Evidence

- [Blue foam tip exact impact rounds and components may have evidentiary value. Collect all portions of used munitions (spent cartridges case and projectile). Turn these components into the property room (see General Order 439.02: Submitting Property/Evidence). Projectile(s) collected may be destroyed six years from date of deployment, unless needed as evidence in a criminal or civil proceeding.

## IX. PepperBall

Level of Control:

1. Low-Level Force (active resistance) – Area Denial
2. Intermediate Force – Direct impact
3. Deadly Force – Direct impact to deadly force target areas.

Description

1. Minnesota Statutes section 624.731 authorizes peace officers to use an "authorized tear gas compound" in their official duties.

   **[Redacted]**.

2. **[Redacted]**.

Definitions

Display – Pointing the PepperBall launcher in the direction of another person with no deployment of the PepperBall projectiles.

Area denial or area saturation – A use of **[redacted]** to deny access to an area or gain compliance of movement from an area. In this deployment, PepperBall projectiles will be launched to impact surrounding objects like walls, ground, automobile and trees and must not be launched directly at a suspect.

Direct impact – with **[redacted]** to an individual. Certification/POST Requirements:

1. Entry level PepperBall Training will be taught during the academy.
2. Instructors who have been certified as PepperBall instructors by PepperBall Inc. are the only individuals authorized to instruct on the PepperBall system.
3. Officers authorized to use the PepperBall system must successfully complete an initial certification course, to include written exams and practical range qualification.
4. Once certified, all officers must annually attend recertification training taught by the department training staff.
5. If an employee fails to demonstrate proficiency at any time, the employee and/or the employee's supervisor will contact the training unit for assistance in formulating a remedial training program.

Inspection Requirement

1. Officers will only use authorized PepperBall equipment issued by the SPPD. Officers will inspect the PepperBall launcher, projectiles and components for damage and cleanliness. The PepperBall launcher, projectiles and components will be inspected and maintained in accordance with training protocols. When not in service, the PepperBall launcher, components and projectiles must be stored and secured in a designated storage locker in a climate-controlled area. Launchers may not be stored in a vehicle.
2. Each district, unit or patrol office will be responsible the issuing and inventory of the issued launchers and projectiles.
3. **[Redacted]**.
4. One PepperBall launcher and PepperBall patrol bag shall be in each patrol vehicle on tour. If the patrol vehicle is a partner car only one PepperBall launcher and patrol bag is required.

5. The districts and units shall maintain an inventory of all department-issued PepperBall launchers, including an accurate record of the location of the launcher and maintenance history.
6. All PepperBall launchers will undergo an annual inspection by a certified PepperBall technician.

Deployment Requirement

1. This policy does not require officers or sergeants to use or direct the use of PepperBall in place of other response options authorized by these General Orders. The safety of victims, hostages, uninvolved persons and officers takes priority over the safety of subjects engaged in violent criminal or suicidal behavior.
2. Before deployment, if possible, PepperBall operators deploying with PepperBall will notify the dispatcher and other officers by radio that they are deploying a PepperBall at their location.
3. Before deployment of PepperBall, the PepperBall operator should, when practical to do so, give clear instructions to the subject(s) similar but not limited or specific to: "SAINT PAUL POLICE DROP THE WEAPON, DROP THE WEAPON AND GET DOWN ON THE GROUND. IF YOU DO NOT DROP THE WEAPON, I MAY USE FORCE AGAINST YOU."
4. Officers must give the subject a reasonable opportunity to voluntarily comply when safe to do so.

Approved Use

1. Officers may only use PepperBall as authorized under these General Orders, including G.O. 246.00.
2. While the deployment of PepperBall as an Area Denial or saturation option is classified as a low-level force, it is only authorized in response to resistance or aggression that meets the definition of active resistance.
3. Deployment of PepperBall in a manner intended to impact a subject is
   a. An intermediate level of force
   b. Regulated under these General Orders as a less-lethal weapon, and
   c. Only authorized in response to resistance or aggression that meets the definition of aggressive or aggravated aggressive resistance.
4. The deployment of PepperBall in a manner intended to impact areas designated as deadly force areas for the purposes of less lethal weapons is only authorized if deadly force would be authorized under the totality of the circumstances and the department's General Orders.

Disapproved use:

1. Officers are not authorized to draw or display the PepperBall launcher except for training and inspection unless the circumstances create a reasonable belief that use of PepperBall may be necessary.
2. Use of PepperBall is prohibited:
    a. When the subject is in a position where a fall may result in serious bodily harm or death;
    b. Punitively for purposes of coercion;
    c. When a subject is cooperative or displays solely Passive Resistance (e.g. standing stationary and not moving upon lawful direction falling limply, refusing to use their own power to move).
3. PepperBall should not be used in the following circumstances unless there are compelling reasons to do so that can be clearly articulated:

When the subject is in handcuffs or authorized restraints;

    a. When the subject is in control of a motor vehicle;
    b. When the subject is holding a firearm or deadly force is clearly justified, unless additional officer(s) are present to provide lethal cover to the officer and others present;
    c. When the subject is at the extremes of age (elderly and young children), physically disabled, or obviously pregnant;

Tactical Considerations

1. There are two types of reportable PepperBall applications:
    a. Area denial or area saturation – A use of **[redacted]** to deny access to an area or gain compliance of movement from an area. In this deployment, PepperBall projectiles will be launched to impact surrounding objects like walls, ground, automobile and trees and shall not be launched directly at a suspect.
    b. Direct impact with **[redacted]** to an individual.
        i. Officers should target the upper abdomen area for the primary impact area with **[redacted]** projectiles.
        ii. Officers will not target at the head, neck or spine unless a deadly force situation exists, and the use of force is within department policy and state statute. It is recognized that the dynamics of each situation and officer safety may not permit the officer to limit the application of the PepperBall projectiles to a precise target area.
        iii. Consider area saturation first by impacting surrounding objects like walls, ground, automobile and trees.
        iv. Justify each use of force.
        v. Always have a backup plan.

Additional Considerations

1. When deploying PepperBall:

a. Each and every deployment of **[redacted]** projectiles must be objectively reasonable. Graham v. Connor, 490 U.S. 386 (1989).
b. Officers should begin control and restraint procedures, including cuffing, as soon as it is reasonably safe and practical to do so to minimize the need for additional deployment of PepperBall. The PepperBall operator and those assisting the operator should be aware that cross-contamination of **[redacted]** is likely and use PPE to reduce cross-contamination;

c. Each PepperBall deployment requires an on-going assessment of:
  i. Responder safety
  ii. Subject(s) compliance
  iii. Chemical agent effectiveness
  iv. The need to transition to another force level, tool or tactic
  v. If reapplication of PepperBall (s) is indicated, an alternate impact location should be considered.

2. First Aid
  Officers must follow G.O. 246.00 Section IV for Medical Attention.

3. Monitoring
  a. Officers should remove all persons exposed to PepperBall from the affected area as soon as it is safe and reasonable to do so.
  b. For the purposes of monitoring, an officer must remain with an exposed person from the time of exposure until the officer reasonably observes or believes that the person is no longer physically affected by the exposure.
  c. Notify a supervisor when PepperBall has been used.
  d. Inform detention personnel when a subject has been exposed to PepperBall and ensure they have been screened by the detention facility medical staff.
  e. Officers must document the decontamination process in their use of force report.

4. Documentation/Reporting
  a. Use of PepperBall is a reportable use of force subject to the reporting requirements of G.O. 246.03. An incident report and use of force report must be completed by the PepperBall operator for all incidents involving the deployment of PepperBall.
  b. Any accidental discharge of PepperBall will be documented in the PepperBall operator's report.

## X.    CANINE

Level of Control

1. Low – Canine presence

    \* Because police canines are also living partners, have physical needs, and engage with humans, they may be peacefully present in circumstances that do not call for any response to resistance or aggression.

2.       Intermediate – when used as a physical apprehension tool.

Description

A police canine is a dog that is specifically trained to assist law enforcement. The canine's primary purpose is to be used as a locating tool, other duties include searching for drugs and explosives, finding crime scene evidence, and physically apprehending individuals when objectively reasonable and authorized by the department's general orders.

Certification/Training Requirements

1.   All canine handlers must complete the following requirements:

      a.  St. Paul Police Basic Canine Handlers Course
      b.  Annual certification with the United States Police Canine Association Regional PD1 Field Trials or similar organization
      c.  Annual certification with the United States Police Canine Association Regional PD2 Trial or similar organization.
      d.  A minimum of sixteen (16) hours of monthly handler training during work hours with a department trainer or approved third-party trainer.

Inspection Requirement

1.  Handlers will only use authorized canine equipment issued by the department.

2.  The equipment will be inspected daily for damage and maintained in working order.

Deployment Requirement

1.  The canine officer must give a loud police canine announcement prior to deploying the canine for searching or apprehension. The canine announcement must include the officer's authority, what the officers want the suspect to do, and what will happen if the suspect does not comply. The canine announcement must be substantially similar to, "Saint Paul Police canine, come out to the sound of my voice with your hands up or my dog will find you and may bite you."
2.  Only if there is no affirmative response following a reasonable amount of time for the person to hear, respond, and comply should the canine search begin.
3.  When searching the canine announcement must be given at least one time on every floor while inside a building, when the environment changes, and every time the canine team has moved to an area where the previous canine warning may not have been heard. During searching and tracking when a canine indicates the presence of a person additional canine warnings must be given.

Approved Use

1. The police canine may only be used according to department policy and training.
2. A police canine may only be used to physically apprehend suspects who officers reasonably believe have committed certain violent felony crimes and who pose an imminent threat of physical harm to officers or others, or if violent criminal activity is not known or reasonably believed, individuals who pose an imminent threat of significant physical harm to officers or others.
3. A canine officer may deploy a police canine to physically apprehend a person who is fleeing, and who officers have cause to believe the person has committed or attempted to commit one of the following violent crimes.
   a. Murder
   b. Manslaughter
   c. Aggravated robbery in the first degree
   d. Kidnapping
   e. Criminal sexual conduct
   f. Aggravated assault with a firearm or weapon capable of causing great bodily harm or death

Disapproved Use

1. Police canines are not authorized to physically apprehend suspects of other felony, misdemeanor or gross misdemeanor crimes unless the suspect poses an imminent threat of physical harm to officers or others.
2. Police canines will not be used for crowd control or to move groups of people in civil disturbances, peaceful demonstrations, crowd control formations, or labor strikes.

Procedure for First Aid

Whenever there is any suspected injury from physical contact between a Saint Paul Police canine and a person, the canine handler must call for emergency medical services to evaluate the person as soon as it is safe to do so.

Additional Considerations

1. The handler must also do the following:
   a. Immediately notify a supervisor.
   b. Brief the first responding supervisor of the incident when they arrive.
   c. Document the incident as directed in G.O 246.03.
   d. If a canine supervisor is not on-duty at the time of the incident, the handler will inform their supervisor about the incident upon the supervisor's return to duty.

Tactical Considerations

Canine handlers must comply with the department's general orders for officer responses to resistance or aggression and general order 462.00 when determining to deploy a canine as an intermediate force option.

## XI.   CHOKEHOLDS AND STRANGLEHOLDS – Not Authorized

Level of Control:

1. Deadly Force Description:
   Chokeholds are when pressure is applied on the front of the neck and throat, cutting off air flow (breathing).

Strangleholds include carotid restraints, where pressure is applied to the vascular veins on the side of the neck to temporarily cut off blood flow to the brain, rendering the person unconscious

Chokeholds and strangleholds are not trained or authorized by the department.

## XII.   FIREARMS

Level of Control:

2. Deadly Force Description:
   As long as members of the general public remain potential victims of violent crime and officers, in the performance of their duties, continue to be confronted with deadly force, will remain necessary for peace officers to be armed.
   Officers are equipped with a firearm to defend the public and the officer against great bodily harm and deadly force.

Deadly Force:

Minnesota Statutes section 609.066 defines "deadly force" as "force which the actor uses with the purpose of causing, or which the actor should reasonably know creates a substantial risk of causing, death or great bodily harm. The intentional discharge of a firearm, other than a firearm loaded with less lethal munitions and used by a peace officer within the scope of official duties, in the direction of another person, or at a vehicle in which another person is believed to be, constitutes deadly force."

Statutory Authorization for Use of Deadly Force: Minnesota Statute 609.066, subd. 2:

The use of deadly force by a peace officer in the line of duty is justified only if an objectively reasonable officer would believe, based on the totality of the circumstances known to the officer

at the time and without the benefit of hindsight, that such force is necessary: Protect the peace officer or another from death or great bodily harm, provided that the threat:

    (i)   can be articulated with specificity by the law enforcement officer,

    (ii)  is reasonably likely to occur absent action by the law enforcement officer; and

    (iii) must be addressed through the use of deadly force without unreasonable delay; or

2.    To effect the arrest or capture, or prevent the escape of, a person whom the officer knows or has reasonable grounds to believe has committed or attempted to commit a felony and the officer reasonably believes that the person will cause death or great bodily harm to another person under the threat criteria in clause 1, items (i) to (iii), unless immediately apprehended.

3.    A peace officer shall not use deadly force against a person based on the danger the person poses to self if an objectively reasonable officer would believe, based on the totality of the circumstances known to the officer at the time and without the benefit of hindsight, that the person does not pose a threat of death or great bodily harm to the peace officer or to another under the threat criteria in clause 1, items (i) to (iii).

Certification/POST Requirements:

Before being authorized to carry a firearm, all officers will receive training and instruction with regard to the proper use of deadly force, the department's policies regarding officer response to resistance or aggression, and applicable state statutes and regulations. Such training and instruction will continue throughout the officer's career.

Authorization to Use Deadly Force:

The Saint Paul Police Department honors the sanctity of life. Accordingly, an officer may resort to deadly force only when objectively reasonable under a totality of the circumstances as authorized by Minnesota Statutes section 609.066.

When Deadly Force is Not Authorized:

1. It is unlawful to use deadly force against nonviolent, suspected misdemeanants who are not fleeing or resisting arrest, and pose little or no threat to the officer or public. Johnson v. City of Ferguson, Missouri, No. 16-1697, 2017 WL 3139437, at *6 (8th Cir. July 25, 2017).
2. Officers are not authorized to discharge a firearm in circumstances where deadly force is not authorized by Minnesota Statutes section 609.066.

Additional Considerations:

1. An officer may threaten the discharge of a firearm only when reasonable and necessary under the circumstances.
2. Where reasonable, some type of warning should be given by the officer prior to using deadly force.
3. Officers may discharge service weapons during target practice or competition on an approved target range.
4. Officers may discharge a firearm to dispatch an apparently dangerous animal or one that is so sick or so badly injured that humanitarian concerns dictate this action (G.O. 402.00 Animal Bites, Injured, Deceased, or Dangerous Animals).
5. Should an officer use any force that results in the death of a person, for administrative and investigative purposes, the officer will be temporarily removed from line-duty assignment in accordance with General Order 246.09. The officer's unit or division commander, or EAP, may make recommendations to the chief of police concerning this restriction, but the chief of police has all final authority. (See General Order 246.09: Investigations – Incidents Where Serious Injury or Death Result During Police Custody or Involvement)

**Use of Firearm at/or from a Moving Vehicle**

Officers should not shoot from a moving vehicle at a fleeing vehicle unless it is in response to a threat of great bodily harm or death. It is best to attempt apprehension from a position of superior tactical advantage, if possible, by using police communications and cooperative police work rather than by firing at a moving vehicle.

Firearms must not be discharged at a moving vehicle unless a person in the vehicle is immediately threatening the officer or another person with great bodily harm or deadly force. The moving vehicle itself does not presumptively constitute a threat that justifies an officer's use of deadly force. An officer threatened by an oncoming vehicle should make every attempt to move out of the path of the oncoming vehicle unless such an attempt would unreasonably expose the officer or another to the risk of death or great bodily harm. The officer must consider the obvious danger of firing at a moving vehicle, since bullets may miss their target and/or the driver may lose control. Such risks, in most cases, weigh against firing at a moving vehicle.

**Holster Requirement**

All department-issued handguns and any handgun carried while on duty must be carried in a holster designed for that handgun. Officers wishing to carry a handgun without a holster may only do so with the permission of their unit head and the training unit commander.

## XIII.    VEHICLE INTERDICTION TACTIC (VIT) – SWAT PERSONNEL ONLY

Level of Control:
1. Intermediate Force (Requiring approval from the Chief of Police or his/her designee)

Description:
1. Vehicle Interdiction Tactic (VIT) is a pre-planned containment tactic that employs low-speeds and potential intentional vehicle contact with a subject's vehicle.

2. The purpose of a VIT is to stop/contain/capture a vehicle and to render the vehicle immobile or unable to bring further harm (present or potential) to human lives.
3. **[Redacted]**.
4. A VIT maneuver is NOT a PIT maneuver (Pursuit Intervention Tactic – a maneuver in which a vehicle is intentionally and abruptly turned sideways by a pursuing vehicle to cause it to lose control/stop). PIT maneuvers are not authorized.

Certification/Training Requirements:
1. Restricted for use only by S.W.A.T. (Not approved for patrol division).
   a. Annual training required.

Deployment Requirement:
1. Requires approval from the Chief of Police or his/her designee.

Approved Use:
1. The use of a VIT is approved to effect the arrest of a person wanted for a violent felony who may pose a flight risk or an immediate risk to the safety of others; or if not immediately apprehended, may pose further/continual risk of harm to others.

Disapproved use:
1. The use of a VIT is not approved for use outside of a SWAT operation or by an officer not assigned to SWAT.
2. A VIT is not allowed in any situation that due to speed and driving behavior of the subject any attempt to deploy this tactic would create additional unreasonable risk to those involved and/or the general public.

Additional Considerations:
Factors to consider when determining to use or not use a VIT:
1. Areas with pedestrians.
2. Other vehicle traffic.
3. Parked vehicles.
4. Telephone/utility poles.
5. Bridges/overpasses.
6. Areas adjacent to paved roads with a significant elevation change.
7. Significant curves in the roadway.
8. Weather and road conditions.
9. Size/weight of the subject's vehicle compared to the police vehicle.

This policy does not prohibit an officer from using their squad car as a means to confront an immediate deadly force situation.

*Effective April 4, 2025*

# EXHIBIT C

# 202.00 Personal Appearance, Uniforms and Equipment

  I.  **Introduction and Definitions**
  II.  **Personal Appearance**
  III.  **Uniform Rules - General**
  IV.  **Uniform Classes and Rules**
  V.  **Non-Uniform Personnel –Attire and Rules**
  VI.  **Duty Equipment**
  VII.  **Disposal of Uniforms**
  VIII.  **Damaged Clothing and Equipment Claims**
  IX.  **Uniform – Clothing Allowance**

## I.  Introduction and Definitions

The Saint Paul Police Department is a uniformed organization and has a long tradition of upholding a meticulous and purposeful uniform appearance.  This personal appearance and uniform policy is not only for the safety of the officers, but also to project a professional and positive image to the public.  Properly wearing the uniform enhances the department's public image, and fosters individual officer pride, self-esteem, and professionalism.

It is the responsibility of all supervisors to ensure the grooming, personal appearance, uniform, and equipment standards are upheld.  Supervisors should be conducting informal inspections on a daily basis to ensure compliance.

**Definitions:**

 A.  Business Casual: Relating to or denoting a style of clothing and attire that is less formal than business professional wear but is still intended to give a professional and businesslike impression.

 B.  Business Professional:  Relating to or denoting a traditional style of clothing and attire used in conservative and professional settings and companies, as well as formal events, courtroom proceedings, ceremonies, and special events.  Business Professional is more formal than Business Casual and includes suits and formal wear.

 C.  Casual Attire:  A relaxed attire or dress code for everyday use in a pre-approved specialty unit that is not forward facing and the Deputy Chief has allowed wear for informal day-to-day activities.  Less formal than business casual, but still appropriate for a workplace setting. Casual attire does not include torn or dirty apparel, athletic wear, open-toed shoes, or offensive/graphic messages.

 D.  Chit:  A Department-issued note or voucher, enabling an employee to purchase a replacement item at the cost of the Department.

 E.  Class A:  The most formal police uniform, used for special events, ceremonies, funerals, and other events as dictated by the Chief of Police.

 F.  Covert Attire:  Non-uniformed attire and apparel allowing officers to routinely blend into their surroundings, ensuring they are not readily or easily identifiable as police officers.

1

G. Deployable Uniform:  A uniform configuration that includes the traditional configuration, EVC configuration, or LBV configuration, allowing the officer to meet all requirements for patrol or police response.  Deployable uniforms include all required duty gear and body armor.

H. EVC:  External Vest Carrier, made to safely and properly store body armor, as well as mirror the traditional SPPD uniform shirt.  Worn as an outer garment over a uniform shirt.

I. LBV:  Load Bearing Vest, made to safely and properly store body armor, as well as other traditional duty gear.  It is worn over a uniform shirt and replaces the need for a traditional, full-duty belt.

J. Light Duty:  A designation by police Human Resources, given to officers that are not able to deploy on the street or in a full-duty capacity.  This includes officers that are injured but reporting to work.

K. Traditional Configuration:  Historic police uniform configuration that includes concealable body armor, full-duty belt, and traditional police shirt.

L. Undercover:  Undercover officers perform regular, ongoing law enforcement activities in attire other than a police uniform and must dress appropriately to the environment. Undercover officers operate in a non-uniform and covert capacity, generally concealing their identity as a police officer.

M. Uniform of the Day:  Police uniform that is allowed and authorized for sworn staff in a uniformed assignment.  The Uniform of the Day has four configurations, based upon the role and assignment of the officer.

N. Visible Police Markings (VPM):  An authorized jacket and/or shirt with visible police markings to be worn by non-uniformed officers.  Approved jackets and shirts will be navy blue, and include clearly identifiable police markings on the front, rear, and both shoulders.

## II.  Personal Appearance

Employees shall be well-groomed and exhibit a business appearance while conducting and performing official duties, including through virtual or remote meetings. This personal appearance policy will apply to all officers with the exception of those engaged in actual, ongoing undercover work and authorized by the division deputy chief.

Officers must be in compliance with the personal appearance standards during any overtime employment, regardless of their primary assignment. This requirement does not apply when an employee is working a non-uniformed assignment and continues working in an overtime capacity in the same non-uniformed assignment (example – an employee assigned to the Narcotics Unit works additional overtime hours, in a non-uniformed Narcotics Unit assignment.)

The following will provide reasonable guidelines for sworn personnel relating to personal appearance and grooming in the areas listed below.

**Hairstyle and Grooming Standards:**

1. All employees will keep their hair clean, neatly trimmed, and well-groomed. Employees' hair shall always present a professional image.  The length and/or bulk of the hair will not be excessive or present a ragged, unkempt, or extreme appearance.  The bulk or length of hair must not interfere with officer safety or with the normal wear of standard police headgear;hair extending beyond the collar or over the face will be pulled back/up and secured away from the face while in uniform.
2. Haircuts or styles presenting an "unusual appearance" that detracts from a professional and business image are prohibited.
3. Dyed, tinted or bleached hair must be within a naturally occurring color range and must be professional in appearance.  This would not include colors such as pink, blue, purple, or green.
4. Wigs or hairpieces which conform to this policy are permitted, as long as they are neat, clean, and natural in appearance.
5. No decorations or ornaments may be worn in the hair.  Items used to hold hair in place will be concealed as much as possible and not overt in color or design.

**Beards, sideburns, and mustaches:**

This section will apply to officers wishing to present/wear a beard, sideburns, or mustache.

1. Mustaches shall be neatly kept and trimmed and shall not extend below the upper lip or cover the mouth. Mustaches should be flush to the face, and the ends should not extend below the lower lip.
2. Sideburns shall be neatly trimmed and extend in a clean-shaven, horizontal line. Sideburns will not extend downward beyond the bottom of the earlobe and shall not protrude forward more than one inch from the front of the ear.
3. Beards and goatees:  A neatly groomed beard with mustache or goatee with mustache is allowed.  The total length must not extend beyond ¾" in length and must be uniform in length and appearance.  No portion of the beard may be noticeably longer than the rest, and it may not be unusual in appearance.  A beard must be worn "full" and must include hair on the chin area and shall cover the complete jaw line.  Cheeks shall be shaved on and above the cheekbone. The neck shall be clean-shaven on and below the Adam's apple.  "Designer" beards(stubble) shorter than 1/16" are not permitted.  The beard/goatee is to be grown during an absence from duty or while assigned to non-uniform duty for a period sufficiently long enough to grow the beard or goatee to meet the above standards.  Upon returning to duty, the officers shall present themselves to a supervisor for verbal approval, to ensure the above standards have been met.
4. Officers are required to keep a means to shave (shave kit, razor, etc.) available in their workplace should the need arise; or an order be given for the purposes of responding to a civil disturbance, MFF call out, or other departmental priority.  Sworn employees must still be able to pass the gas mask fit testing, which may require adjusting or shaving facial hair. Sworn personnel who are

3

members of the SWAT team are not permitted to wear a beard or goatee. Sworn personnel who are members of the Honor Guard are not permitted to wear a beard or goatee while performing functions of the Honor Guard. The Chief of Police or their designee may also prohibit beards/goatees from special events and under special temporary circumstances.



Fig 1: Clean Shaven

Fig 3: Goatee

Fig 2: Mustache

Fig 4: Natural Beard

**Cosmetics, grooming, and tattoos:**

1. Makeup/cosmetics may be worn by employees but shall not detract from a neat, professional appearance.
2. Fingernails will be neatly manicured and must not extend to a length more than ¼ of an inch beyond the end of the finger or to a length that jeopardizes officer safety or firearm use. Nail polish is permitted.
3. Branding, intentional scarring, or any form of intentional mutilation; to include objects inserted under the skin, and split or forked tongue, are also prohibited.
4. Tattoos:  Tattoos that may be considered racist, sexist, gang related, obscene or sexually explicit, vulgar, indecent, extremist, prejudicial, anti-American, anti-social, or prejudicial to the good of the order, discipline, or morale must not be visible at any time.  The Chief of Police or their designee will make the final determination as to what is or is not offensive.  Tattoos on the neck, face, head, or scalp are prohibited, unless specifically approved in writing by the Chief of Police.  Tattoos not prohibited in this section are permissible and do not require covering while on duty.

**Jewelry:**

Employees may wear jewelry that is clean, neat, and of a professional style and appearance consistent with assignment and job duties.  Jewelry that presents a safety hazard is not allowed.

1. A watch, or an equivalent way to detect time, is required.
2. A medical alert bracelet may be worn.

4

3.  Rings may be worn, no more than two on each hand.
4.  Neck jewelry must be worn underneath the shirt collar and not be visible
5.  Earrings: Post, stud, hug hoop style only, are permitted.  Earrings shall not have loose or dangling parts. Plugs (used to enlarge the piercing holes in the ear lobes) are prohibited.
6.  Facial/Body piercing: No facial piercings, including tongue studs or visible facial/body piercings, shall be worn, other than as described in #5 (earrings) above.
7.  No dental accessories (tooth jewelry) shall be worn unless deemed necessary by a medical or dental professional.

Any exceptions to the above sections will be considered on a case-by-case basis and must be approved by the Chief of Police or their designee.  This would include temporary exceptions for special assignments or details.

## III.  Uniform Rules - General

All sworn members of the department will wear the appropriate designated uniform of the day while on duty, unless exempted in section V. Non-Uniform Personnel – Attire and Rules.

Officers of all ranks designated as a Uniformed class shall remain in the Uniform of the Day throughout their shift.  For purposes of safety and security, uniformed officers shall be permitted to cover their uniform with a non-uniform top or jacket while driving or commuting.

**Use of Uniforms for Outside Employment or Off-Duty Activities**
Employees are prohibited from wearing their uniform for the following activities, unless written permission has been granted by the Chief of Police or their designee:

1.  Outside employment activities
2.  Off-duty activities, other than during travel to/from employment, or "de minimis" use in conjunction with travel to/from employment
3.  While appearing in any political ad or commercial
4.  While appearing in any movie or commercial production

Employees are prohibited from engaging in any of the above activities while wearing a uniform that, despite any alterations, is substantially similar in appearance to the uniform of the Saint Paul Police Department. Officers are also prohibited from engaging in any of the above activities while displaying the SPPD badge.

The prohibitions listed above do not apply to department sanctioned community engagement activities which have been approved by the Chief of Police or their designee.

**Roles and Responsibilities:**
Individual officers are responsible for the maintenance and upkeep of their uniform items.  Uniforms will be neat, clean, and in good condition at all times.  Uniforms will be inspected periodically to ensure conformity with general orders.

Supervisors shall be responsible for the appearance of those officers within their span of control.  It is also the responsibility of all police supervisors, regardless of their assignment, to address and correct any observed uniform or appearance related deficiency of a subordinate.

The Deputy Chief of Operations is responsible for compliance with the city ordinance and union contract with regard to the purchasing of uniforms.  Therefore, any requests for changes to the uniform or unit specific uniform/attire must be routed through the office of the Deputy Chief of Operations.  No change may be implemented prior to approval.  The policy and uniform guide must be updated to reflect the change of the new attire.

The rules and regulations will establish standards, designate uniform items and delineate how, where, when, and by whom the uniform shall be worn. (See Saint Paul Administrative Code 35.01 - 35.08 & 36.01 – 36.05 )

## IV.  Uniform Classes and Rules

**Uniform Classes:**

The regular Saint Paul Police uniform will be configured as Class A or Uniform of the Day.  The Uniform Guide (found on the department intranet) lists all approved uniforms and configurations.  The Class A uniform will be designated for special details, events, funerals, and other circumstances as dictated by the Chief of Police or their designee.  The Uniform of the Day will be designated at all other times.

The Special Operations Unit, at the direction of the Deputy Chief of Support Services, has the ability to designate the Uniform of the Day as "Traditional uniform configuration," should the need arise for a response to civil unrest.

Officers assigned to ODU, MFF/BRT or SWAT, while performing under that assignment, will wear uniforms/gear as directed by their supervisor.

**Designated Class A**

**Class A: Command Staff:**

1. Command Staff Garrison hat, hat wreath and gold hat band
2. Blouse dress coat with metal badge, gold name bar, rank pins, and award ribbons
3. White shirt (long sleeve, under blouse coat), gold name bar, gold buttons, rank pins on collar, and navy-blue tie
4. Four-pocket navy-blue trouser pants
5. Black shoes or boots with polishable toe
6. Navy-blue uniform overcoat (if worn)
    a. Rain jacket allowed for inclement weather
7. Concealable body armor is optional under the blouse coat
8. Duty belt:  Black basket weave with holster/firearm only

**Class A: Sergeants and Officers:**

1. Garrison hat, and hat wreath:

6

    a. Gold hat band (sergeants) or
    b. Black hat band (officers)

2. Navy-blue shirt, long sleeve (the Blauer "SuperShirt" with side mesh panels is not allowed), gold buttons, and navy-blue tie
3. Metal badge, gold colored embroidered name, award ribbons
4. Four-pocket navy-blue trouser pants
5. Duty belt and required equipment
6. Black shoes or boots with polishable toes
7. Concealable body armor
8. Navy-blue Blauer-style Gore-Tex jacket (if worn)
    a. Leather, fleece, or other jackets are not permitted with Class A
    b. Rain jacket allowed for inclement weather
9. Body Worn Camera (BWC)
    a. Exception: The Chief of Police or their designee may authorize an exemption to wearing BWC during special events where the Class A uniform is worn.
10. *Optional Class A Uniform for Sergeants/Officers*
    a. Blouse dress coat with metal badge, gold name bar, gold buttons, rank pins, and award ribbons
    b. White shirt (long sleeve, under blouse coat), gold name bar, gold buttons, rank pins on collar, and navy-blue tie
    c. Four-pocket navy-blue trousers pants
    d. Black shoes or boots with polishable toes
    e. Duty belt - black basket-weave finish with holster/firearm only
    f. Navy-blue uniform overcoat (if worn)
    g. Rain jacket allowed for inclement weather
    h. Concealable body armor

### Designated Uniform of the Day

There are four approved configurations for the Uniform of the Day, depending on assignment and duty, officer preference, training, and circumstances. Officers of all ranks may switch between configurations, depending on assignment and required duty.

The traditional uniform configuration, EVC configuration, and LBV configuration are all considered a Deployable Uniform, as they meet the requirements for patrol and police response. The Administrative configuration would not qualify as a Deployable Uniform unless it was accompanied by an EVC and full duty belt, or LBV and duty belt with holster.

The configurations are as follows:

### Traditional uniform configuration:

1. Garrison, fur, or watch cap (appropriate to season); hat wreath and hat band if applicable
    a. Department-authorized baseball-style caps may be worn while staff are assigned to a special event from May 1st through November 1st, and only while assigned to external or outdoor assignments.

7

2. Navy-blue button-down traditional shirt and gold buttons
    a. Long-sleeve or short-sleeve optional year-round
    b. Top button only to remain unbuttoned (unless worn with a tie)
    c. Shirts for command staff will have appropriate rank designation of gold-colored pins or embroidered rank on the collar.
    d. Sergeants will have gold chevrons on the shoulders
    e. Officers may wear the FTO insignia on the collar
    f. Navy-blue undershirt/t-shirt, SPPD embroidered turtleneck, or navy-blue tie required
3. Metal badge, award ribbons (optional), and gold colored embroidered name
4. Four-pocket or six-pocket navy-blue trouser pants
5. Duty belt and required equipment
    a. Duty belt not required when inside a police building while working a command or administrative assignment
6. Black shoes or boots
7. Blauer style jacket, leather jacket, high-visibility jacket, rain gear, or fleece jacket (if worn)
8. Sweater:  Pullover or cardigan style (if worn)
9. Body Worn Camera (BWC)

**External Vest Carrier (EVC) configuration:**

1. Garrison, fur, or watch cap (appropriate to season); hat wreath and hat band if applicable
2. Navy-blue shirt (short or long-sleeve Armorskin polo-style) with plain shirt front (no embroidered name or embroidered badge).
    a. Long-sleeve or short-sleeve optional year-round
    b. Top button only to remain unbuttoned
    c. Shirts for sergeants and command will have appropriate rank designation of gold-colored pins, embroidered rank, or gold chevrons
    d. Navy-blue undershirt/t-shirt required
    e. May be worn with SPPD embroidered turtleneck
3. Four-pocket or six-pocket navy-blue trouser pants
4. Duty belt and required equipment
    a. Duty belt not required when inside a police building while working a command or administrative assignment
5. Black shoes or boots
6. Blauer style jacket, leather jacket, high-visibility jacket, rain gear, or fleece jacket (if worn).
7. Body Worn Camera (BWC)

**Load Bearing Vest (LBV) configuration:**

The LBV can be worn as a Uniform of the Day after the officer has received the required training as established by the SPPD Training Unit.  The LBV gear, placement, and configuration must be approved by the SPPD Training Unit prior to deployment.

8

1. Garrison, fur, or watch cap (appropriate to season); hat wreath and hat band if applicable
   a. Department authorized baseball-style caps may be worn while SWORN staff are assigned to a special event from May 1 through November 1, and only while assigned to external or outdoor assignments.
2. Navy-blue shirt (short or long sleeve)
   a. Top button only to remain unbuttoned
   b. Shirts for command staff will have appropriate rank designation of gold-colored pins or embroidered rank on the collar. Sergeants will have gold chevrons on the shoulders
      navy-blue undershirt/t-shirt required
   c. May be worn with SPPD embroidered turtleneck
3. Four-pocket or six-pocket navy-blue trouser pants
4. Duty belt with handgun and holster
   a. Other equipment can be worn on the duty belt or LBV to include ECD
5. Load bearing vest with required equipment
6. Black shoes or boots
7. Blauer style jacket, leather jacket, high-visibility jacket, rain gear, or fleece jacket (if worn).
   a. Jackets when worn over the LBV must be worn open front with zipper unsecured unless severe inclement weather/rain exists
8. Navy-blue jacket may be worn under the LBV
9. Body Worn Camera (BWC)

**Administrative configuration**

This configuration applies primarily to sworn staff in administrative roles, command ranks, office assignments, training/range staff, and any other assignment as designated by the appropriate division deputy chief.  When leaving a secure police facility in the administrative configuration, sworn staff must wear body armor, a BWC, and possess a less lethal option.

1. Garrison, fur, or watch cap (appropriate to season); hat wreath and hat band if applicable
2. Navy-blue shirt with embroidered name and embroidered badge on front.
   a. Top button only to remain unbuttoned
   b. Shirts for sergeants and command will have appropriate rank designation of gold-colored pins, embroidered rank, or gold chevrons
   c. Navy-blue undershirt/t-shirt required
   d. May be worn with SPPD embroidered turtleneck
3. Four-pocket or six-pocket navy-blue trouser pants
4. Duty belt or alternate black belt (2" or greater) with handgun and holster
5. Black shoes or boots
6. Blauer style jacket, leather jacket, high-visibility, rain gear, or fleece jacket (if worn).
7. Sweater:  Pullover or cardigan style (if worn)
8. Body Worn Camera (BWC) is required under circumstances dictated by G.O. 442.18.

9

Sworn staff approved for the administrative configuration may utilize an LBV or EVC when leaving a secure police facility.

**Uniform Related Items and Rules**

**Hats and headwear:**

1. Garrison hat with hat wreath and hat band (color of band as designated above) authorized all year.
2. Department-authorized baseball-style caps may be worn while staff are assigned to a special event from May 1st through November 1st, and only while assigned to external or outdoor assignments.
3. Winter fur hat with hat wreath (authorized between October 1st – April 1st, and during other times when the outdoor temperature is below 32 degrees Fahrenheit).
4. The watch cap with Saint Paul Police patch. The watch cap, or behind-the-head ear warmer, may only be worn between October 1st and April 1st, and during other times when the outdoor temperature is below 32 degrees Fahrenheit. The watch cap or behind-the-head ear warmer may not be worn indoors. The watch cap will be worn with the Saint Paul Police patch facing front and visible at all times.
5. The behind-the-head ear warmer may be worn during cold weather, or in addition to the garrison hat during cold weather Class A uniform functions.
6. Designated Saint Paul Police Department unit-specific baseball cap – only for officers assigned to bicycle patrol when not wearing protective helmet.
7. The Deputy Chief of Operations may authorize alternative headwear as appropriate.

Hats will be worn square on the head with the hat band parallel to the ground (if applicable). The hat wreath will be attached to the cap using the pre-punched holes with the hat band facing forward.

The authorized Garrison hat will be worn under the following circumstances:

1. While working at special events and stadium events, the wearing of the hats will be at the discretion of the commander of the detail unless otherwise directed by the Chief of Police or their designee. (From October 1st to April 1st, and during other times when the outdoor temperature is below 32 degrees Fahrenheit, officers may wear the fur hat or watch cap in place of the Garrison hat while working outdoors at these events.)
2. Ceremonial details.
3. When directed to do so by a supervisor.

**Ballistic Helmets:**

1. Officers are only authorized to wear department-issued ballistic helmets.

10

2.  Officers shall maintain a department provided badge number sticker on the back of the helmet. If a new sticker is needed, officers will contact SOU staff for a replacement sticker.
3.  Officers shall not alter the helmets in any manner (e.g., no added equipment, no additional stickers, no etching) beyond removing/adding the department-issued face shield when appropriate.
4.  Exceptions: Officers assigned to SWAT, K9, ODU, and Crisis Negotiation Team may be issued a ballistic helmet different from that issued to the remainder of the department, depending upon assignment/need. These officers may be authorized to add additional equipment to their helmets and may be exempt from the badge sticker requirement with prior approval from the Chief of Police or their designee.
5.  Availability:
    a.  Patrol officers should have their helmet (with face shield) with them during their shift or immediately available to them in the event of an emergency situation or department recall.
    b. Officers assigned to  Investigations/Specialty positions must have their helmet (with face shield) immediately available to them in the event of an emergency situation or department recall.
6.  Authorized Use:
    a.  The use of/wearing of the ballistic helmet is only authorized during tactical situations or incidents where there is a known or high risk of potential injury from a firearm or other projectile.
        i.  Examples (not limiting/not all-encompassing): barricaded subject with reported firearm(s), conducting searches or holding perimeters where suspect is potentially armed, etc.
        ii.  If used in this capacity, officers should first remove the face shield as it offers no ballistic protection and is designed for civil unrest applications.
        iii. Officers deployed in a Mobile Field Force capacity and as directed by a supervisor are authorized to and shall use their ballistic helmet as part of their uniform/gear. Officers will receive instructions from MFF command as to when they may wear the helmet while participating in MFF activities.

**Coats and Jackets:**

1.  Overcoat (Class A only) - commanders, sergeants, and officers wearing the blouse coat.
2.  "Blauer" style jacket – all ranks
3.  Leather jacket – all ranks
4.  Fleece or softshell jacket – all ranks
5.  High visibility jacket – all ranks
6.  Rain jacket – all ranks
7.  LBV-approved jackets – authorized to be worn underneath the LBV
8.  Blauer-style winter parka – all ranks

11

**Footwear:**

1. Uniformed officers will wear approved black shoes or boots with black laces; the Class A uniform requires boots with a polishable toe.
2. Shoes or boots will be clean and in good condition.
3. Footwear should be designed to protect the wearer from potential work hazards and provide sturdy support for working conditions and slippery surfaces.
4. Footwear with open toes, buckles or straps, sandals, moccasins, canvas or low-top sneakers, or cowboy boots is prohibited.
5. Socks will be dark blue or black, if visible.
6. Employees will only wear approved footwear as designated by the Deputy Chief of Operations.

**Uniform Shirts, Accessories, and Awards:**

**General Rules:**

1. Uniform shirt pockets will be fastened and not bulging.
2. Collars will be buttoned when wearing a tie. Only the top button will remain unbuttoned when no tie is worn.
3. Long-sleeve shirts will be fully extended with all wrist buttons fastened.
4. A navy-blue t-shirt will be worn under uniform shirts when no tie is worn.  For short-sleeved shirts, the t-shirt sleeve shall not extend beyond the length of the uniform shirt sleeve.
5. All officers, regardless of rank or assignment, will be required to maintain a full Class A uniform and full duty belt, and have them available at all times in case a uniform change is directed.

**Name Insignia**

For required uniform shirts, officers will display their name as follows: gold colored metal name bar or gold colored embroidered, dependent upon rank and class, one-quarter inch above and parallel to the top of the right uniform shirt pocket.

**Patches:**

The Department patch will be worn on both sleeves of all Department uniform shirts, outerwear (except for rainwear) and sweaters. Patches will be centered one inch below the shoulder seam**.**
Exception: Officers currently assigned to the Bomb (ODU) or Canine Units may wear the applicable unit patch on the right sleeve. The Department patch will be worn on the left sleeve.

**Gold Buttons:**

Gold buttons are required to be worn on the regular button down traditional uniform shirt (and variations of the traditional shirt such as the Blauer "SuperShirt" with zipper), Class A blouse coat, EVC, and LBV, and are available at no cost in the Inspections Unit.

**Whistle and Whistle Chain:**

Whistles may be worn, secured to the rear of the right uniform shirt pocket

1. Silver colored whistle: officer rank.
2. Gold colored whistle: sergeants and above.
3. A whistle chain may be worn, secured both to the rear of the right uniform shirt pocket, and to the right-side shirt epaulet (gold colored for sergeants and above, silver colored for officers).

**Pins and Tie Tacks/Tie Bars:**

This section applies to uniform shifts, the EVC, as well as the LBV.

1. A United States flag pin may be worn one-quarter inch above the name tag or embroidered name, or one-quarter inch above award ribbons if worn.
2. One law enforcement-related pin may be worn on the right pocket flap of shirts and jackets.
3. One tie bar or tie tack may be worn with a tie. The tie bar or tie tack must be plain or display a law enforcement-related representation and must be worn parallel to the gold buttons.
4. The City of Saint Paul longevity pin may be worn on the right-side shirt collar.

**Rank Insignia:**

Designated insignias:

- Chief of Police
- Assistant Chief
- Deputy Chief
- District Chief
- Senior Commander
- Commander
- Sergeant
- Field Training Officer

- 4 gold-colored stars
- 3 gold-colored stars
- 2 gold-colored stars
- 1 gold-colored star
- gold-colored eagle
- gold-colored oak leaf
- gold-colored chevrons
- gold Field Training insignia

Insignia display:

- Commander and above: gold pin or gold insignia embroidered on the collar of uniform shirts and outerwear (rain gear exempt).
- Sergeants: gold chevrons on both sleeves, centered 4 ¼ inches below the shoulder seam of uniform shirts and outerwear (rain gear exempt).
- Field Training Officers, currently assigned to that role by their commander, may wear the FTO insignia on the collar of their uniform shirt and outerwear (rain gear exempt).

13

**Service Stripes:**

Service Stripes (gold in color) are authorized to be worn on the long-sleeved shirt. Each stripe will represent five years of service. Stripes are not mandatory and are optional for all ranks.  Stripes will be worn on the left sleeve, centered between the natural bend of the elbow and the top seam of the sleeve cuff. Service stripes will not be worn on any other garment, including outer jackets or dress jackets.

**Other Outerwear:**

The following may be worn during appropriate weather conditions or as designated:

1. Rain gear: raincoat and garrison hat cover, and rain pants (rain pants may be worn when exposed to rain for an extended period of time)
2. Cold weather pants: department approved cold weather pants and bibs can be worn when exposed to inclement weather for extended periods of time.
3. Gloves and mittens: solid black
4. Sweater: department-approved pullover-style or cardigan, with appropriate insignia (patches, name, rank, etc.)
5. Balaclava (garment that covers head and neck): Department-approved balaclava may be worn as a cold-weather option during traffic direction details or when exposed to inclement weather for extended periods of time.

**Watch:**

All sworn personnel must have a watch or equivalent timekeeping device while on duty.

**Award Ribbons:**

Commendation ribbons are required when wearing the Class A uniform. Ribbons are optional when wearing the Uniform of the Day, which include the LBV and EVC.

Commendation ribbons will be worn with the bottom edge of the commendation ribbon parallel to the top edge of the right shirt pocket and one-quarter inch above the name tag or embroidered name. The commendation(s) will be centered on the shirt button. The commendations will be worn with the highest award worn closest to the badge side and on the top-most row, if two or more rows are displayed. At no time will more than three awards be displayed in a single row.

Order of precedence for awards approved for uniform wear:

1. Medal of Valor
2. Medal of Merit
3. Chief's Shield
4. Distinguished Service Award
5. Lifesaving Award
6. Officer / Detective / Professional Employee of the Year
7. Rowan Award
8. Chief's Award for valor or merit (if awarded to uniformed officers)

14

9.  Medal of Commendation
10.  Unit Citation
11.  Achievement Award
12.  Bomb Squad, S.W.A.T. and Negotiator
13.  Mobile Field Force
14.  Top Gun
15.  RNC Service Ribbon
16.  2020 Service Ribbon
17.  35W Bridge Collapse
18.  Military Service Ribbon
19.  Longevity Ribbon
20.  Field Training Officer Service Bar
21.  District Designation Bar
22.  Non-departmental awards (as approved by the Chief of Police)

Commendation ribbons and awards should be neatly aligned. If more than three are worn, a commendation bar holder must be utilized.

**Mourning Band:**

The wearing of the mourning band will be at the discretion of the Chief of Police or their designee.

**Other Rules and Equipment:**

**Body Armor and Body Worn Camera (BWC):**

Body armor is an essential safety tool.  Uniformed officers must wear body armor anytime they are away from a secure police facility and in a public place.

All sworn personnel regardless of uniform/attire, are required to wear bullet-resistant body armor and their Body Worn Camera (BWC) while performing any of the following:

1.  All uniform patrol duties, including district squads, beats, traffic, canine, and special events.
2.  Working surveillance details or operations which involve the potential arrest of suspects.
3.  Execution of search or arrest warrants. The exception to this would be search warrants where there is no potential of a threat or officer safety issue, such as bank warrants, cell phone warrants, vehicle warrants for searches at the impound lot or police facility, etc.
4.  All uniformed overtime employment.
5.  Any other assignment deemed to be of a high-risk nature as determined by a supervisor or commanding officer.

Any exceptions to the above requirements must be in writing from the Chief of Police or their designee.

15

The wearing of bullet-resistant body armor is optional when assigned to an administrative office assignment and not working any of the above-listed duties.

Any sworn personnel not required to wear bullet-resistant body armor or BWC will have it readily available at their primary assignment location.

Bullet-resistant body armor will be composed of materials that meet or exceed the National Institute of Justice standards for threat level II.

**External Vest Carrier (EVC):**

The External Vest Carrier (EVC) is made to mirror the traditional navy-blue SPPD uniform shirt. It has epaulets and pocket flaps that match the current uniform shirt. The external vest carrier may only be worn over the approved SPPD short-sleeve or long-sleeve shirt. A metal Department badge and SPPD polished brass buttons must be worn on the EVC at all times. Officers will display their names on their EVC. Names will be gold-colored, embroidered, one-quarter inch above, and parallel to the top of the right EVC shirt pocket.

The external vest carrier must be kept clean and laundered. The external vest carrier may not be worn when the Class A uniform is required.

**Load Bearing Vest (LBV):**

The Load Bearing Vest (LBV) is made in an attempt to mirror the standard navy-blue SPPD uniform shirt. It has epaulets and pocket flaps that match the traditional uniform shirt. The LBV may only be worn over the approved SPPD short-sleeve or long-sleeve shirt or approved LBV jackets. A metal Department badge or cloth badge and SPPD polished brass buttons must be worn on the LBV at all times. Officers will display their name on their LBV by way of gold-colored Velcro.

The LBV must be kept clean and laundered. The LBV may not be worn when the Class A uniform is required.

Personnel wearing the EVC or LBV may remove the ballistic carrier when in a secure facility and out of public view (e.g., writing reports in a report writing room) but must immediately put the LBV/EVC back on upon leaving.

## V. Non-Uniform Personnel – Attire and Rules

The Chief of Police or their designee may authorize certain assignments to operate in a non-uniformed capacity. The Division Deputy Chief will dictate the appropriate attire classification. The appropriate non-uniformed attire will depend upon both the officer's current assignment and the officer's current duties/details related to that assignment.

Officers of all ranks will generally be authorized to wear non-uniform attire for specific details, as well as educational classes and ongoing in-service training requirements. Officers designated as light duty will generally be permitted to wear non-uniform attire, as approved by

16

the Unit Commander. Certain non-uniformed assignments require officers to operate in varied attire, dependent upon their present task or assignment. The appropriate attire may change from day to day.

Permanent non-uniformed personnel will typically include the following:

1. Chief of Police
2. Assistant Chief
3. Deputy Chiefs
4. Command staff
5. Investigators and officers assigned to investigations
6. Executive and administrative sergeants
7. Officers or sergeants, for a specific temporary assignment or detail, when authorized by the unit commander

### Non-Uniformed Attire:

#### Business Professional:

Business professional attire includes, but is not limited to, suits, sport coats, blazers, collared dress shirts, dress pants, and dress shoes.

#### Business Casual:

Business casual is less formal than business professional.  Business casual includes, but is not limited to khaki pants, chino pants, slacks, colored-denim pants, sweaters, dress shirts (with collar), blouses, and closed-toe shoes.

#### Casual:

Casual attire includes denim, polo-type shirts, flannel shirts, sweatshirts, tennis shoes, and other attire described as "comfortable" or relaxed.  Casual attire does not include attire that is dirty or tattered, shorts or athletic apparel, or open-toed shoes.

#### Visible Police Markings (VPM):

Non-uniformed personnel may encounter situations which require the addition of police markings.  Visible Police Markings are defined as approved navy-blue jackets or polo-style shirts which are screen printed with "POLICE" or "St. Paul Police" on the front and back in large gold lettering.  These shirts and jackets must have department patches sewn on both shoulders.  These jackets and shirts are designed to provide officers, in non-uniformed attire, with additional markings which assist in identifying them as law enforcement. Authorized jackets or polo-style shirts with Visible Police Markings are only to be worn with non-uniformed attire.

The usage of authorized jackets or shirts with Visible Police Markings can be divided into two scenarios, administrative and operational.

17

Administrative examples of the usage of Visible Police Markings include, but are not limited to:  Chiefs, commanders, or investigative sergeants, wearing non-uniformed attire, entering a secure crime scene or an investigator encountering a property damage accident while driving to the BCA.  These scenarios are not deemed as high-risk and, in both situations, the non-uniformed personnel felt it useful to have additional police markings to be more easily identifiable as law enforcement. In these situations, BWCs must be worn, but the use of bullet-resistant body armor or an LBV is optional.

Operational examples of the use of Visible Police Markings include, but are not limited to, investigators entering a volatile crime scene or members of the Narcotics Unit purchasing controlled substances and making an arrest. These situations have elevated risk. When wearing authorized jackets or shirts with Visible Police Markings in these situations, BWCs and bullet-resistant body armor or an LBV must be worn.

### Covert:

Officers that need to blend into their surroundings will operate in Covert attire, so they are not readily identifiable as a police officer.  An officer's appearance will be dictated by the surroundings/environment. Unless exigent circumstances require immediate action, Unit Commander approval is needed for Covert attire. An officer operating in a Covert capacity shall have police identification (i.e., badge, authorized jacket or shirt with VPM), bullet-resistant body armor and BWC readily available.

### Undercover:

An officer's appearance when working undercover will be dictated by the environment in which the officer operates. Any officer working in an undercover role must have pre-authorization from the division deputy chief.  An undercover officer must conceal their identity to avoid detection or identification as a law enforcement officer.  The undercover officer's ability to conceal their identity is fundamental to the ability to perform their job duties.

**Equipment for Non-Uniformed Officers:**

All non-uniformed officers will be equipped with the following:

1. Department-issued firearm in a holster designed for that handgun. The holster must be range-approved and concealable.
   a. Officers operating in non-uniformed attire must have their weapon concealed when away from a secured police facility unless they are displaying Visible Police Markings (VPM).
   b.  Undercover officers may carry a handgun without a holster only with pre-authorization from the Unit Commander.
2. Department-issued badge
3. Department-issued identification card
4. Department-authorized ammunition
5. Less lethal option (ASR, ECD)
6. Handcuffs and handcuff key

7. Method of communication (e.g., cellular phone, department radio, or both)
8. Body Worn Camera (BWC) is required under circumstances as dictated by G.O. 442.18

While operating in Covert or Undercover, non-uniformed officers can be exempted from carrying any or all of the above items for a specific detail in order to conceal their identity with approval from their Unit Commander.

**Body Armor:**

It is the policy of the department that body armor is an essential safety tool. All non-uniform officers should wear body armor whenever possible while working out in the community or in the field. Specifically, non-uniformed sworn personnel are required to wear bullet-resistant body armor while performing any of the following:

1. Operations or surveillance details involving the potential arrest of suspects
2. Any assignment deemed to be of a high-risk nature as determined by a supervisor or commanding officer

The wearing of bullet resistant body armor is optional for non-uniformed personnel when not working any of the above listed duties. Any sworn personnel not required to wear bullet-resistant body armor will have it readily available at their primary assignment location. See Section 4. Uniform Classes and Rules for specifics on body armor requirements.

## VI. Duty Equipment

Equipment, duty gear, and tools authorized for all officers have been specifically selected and approved based upon a variety of factors, including training standards and durability. Periodically, vendors and supplies change, which will result in some items being discontinued or phased out, with others being approved as replacements. The operations division is responsible for maintaining a current list of all approved items, which will correlate to the uniform allowance contract and uniform guide. If officers are unsure about any piece of equipment or gear, they should contact a supervisor for clarification.

Unless otherwise specified, any equipment, tool, or gear issued by the department is the property of the department and the City of Saint Paul and must be returned upon separation of employment or leave of absence.

Unless otherwise specified, any piece of department-issued equipment must be reported as lost/missing/stolen immediately upon discovery. This includes but is not limited to a firearm, a badge, a hat wreath, a ballistic helmet, a cellular phone, an ECD, a portable radio, and a department identification card. Officers will complete an incident or supplemental report, notify their direct supervisor, and contact the Inspection Unit.

**Duty Belt and Load Bearing Vest Equipment for Uniformed Officers:**

Uniformed officers have the option of wearing a traditional duty belt or Load Bearing Vest (LBV). Only approved and authorized equipment may be worn, to include the duty belts and Load Bearing Vest itself. Any changes to the approved list will be facilitated through the Deputy Chief of Operations.

19

All duty belt gear will be the black basket weave design. Duty belt gear may be manufactured of leather, simulated leather, or other approved materials.

For officers wearing the LBV or Administrative configuration, authorized flat black belts are also approved for wear.

Duty belt or Load Bearing Vest will include the following:

1. Magazine and Magazine Pouch(s): Officers shall wear an approved magazine pouch(s) mounted on the duty belt or LBV in a manner and location that is authorized by the Range. Officers must carry at least one additional handgun magazine.
2. Handcuffs and Handcuff Pouch(s): pouch or loop (loop on belt only); mounted on duty belt or LBV.
3. Flashlight and Flashlight Pouch or loop (pouch or loop optional): mounted on duty belt or LBV.
4. Holster: Only those holsters currently approved by the range are authorized. All officers are required to use a level 2 or higher retention holster as approved by the range. Holsters will be worn as the manufacturer designed on the duty belt only.
5. Aerosol Subject Restraint (ASR) and ASR Pouch: mounted on duty belt or LBV.

**Additional:**

6. Key strap (Optional): mounted on the duty belt.
7. Buckles: Original design belt buckles, models approved in writing by the Operations Division Deputy Chief, or department-approved historical replica belt buckles may be worn with the duty belt.
8. Knife Pouch (Optional): mounted on the duty belt only
9. Electronic Control Device (ECD) Holster: May be worn on the duty belt or LBV for authorized and trained officers. Holster may be mounted traditional or cross-draw and must be on the weak side (opposite firearm).

**Badge:**

Badge color/design is dependent upon rank/assignment.
1. Badge will be worn on the portion of the uniform (shirt or outerwear, except for a raincoat) that has been specially prepared to support the badge.
2. Cloth badge patches may be worn on outer garments in place of the metal badge, with the exception of the external vest carrier and Class A dress jacket.

**High Visibility Personal Protective Equipment:**

(See General Order 640.01: Traffic Direction and Control Procedures )

All department staff exposed to or working adjacent to moving motor vehicles as part of their assignment(s) are required to purchase at the expense of the department a reflective (traffic) vest. The vests shall be worn in accordance with Minnesota Rule 5207.0100 (2009), which states: "Each employee exposed to or working adjacent to moving motor vehicles as part of the

employee's assigned job shall be provided with and required to wear a high visibility warning vest or other high visibility garment."

**Firearms:**

(See General Order 247.02: Firearms Proficiency Program )
1. The main on-duty firearm authorized for use will be the department-issued handgun(s). Modifications to either the handgun or grip are not permitted without prior authorization from the training unit commander.
2. Handguns will be carried fully loaded in an approved holster, designed for that handgun.
3. All officers will carry a minimum of one additional fully loaded magazine. All magazines must be loaded with department-issued duty ammunition.
4. Officers assigned to headquarters or a district building interior may remove their duty belts/firearm while in the building, except the desk officer and watch commander shall always be armed.
5. Officers may only carry a secondary weapon while on duty if they have met the requirements of General Order 247.02.
6. If officers so choose, they may carry their on-duty firearm, or other approved firearm, while off-duty. Said weapon will remain concealed at all times. (See General Order 247.02 Firearms Proficiency Program )

**Ammunition:**

The department will furnish the necessary rounds for the authorized handgun. The furnished rounds are the only ammunition approved for use while on duty. Alteration of the furnished ammunition is prohibited. Fresh ammunition will be issued on a timely basis by the Range.

Officers will provide their own ammunition for any backup or off-duty weapon they possess and carry.  Any officer who carries a back-up firearm on-duty or off-duty firearm will use only factory ammunition that is approved by the range staff.

**Handcuffs:**

 Handcuffs must include a double locking device. Sworn personnel must carry a handcuff key.

**Batons:**
The rigid baton ("straight" baton) may only be worn as a part of the Mobile Field Force uniform or when authorized by the Mobile Field Force or Incident Commander. A rigid baton carrier ring may be purchased and worn on the duty belt.

**Electronic Control Device and Holster:**

Officers certified in the electronic control device (ECD) will only carry the department-issued electronic control device and approved holster.

## VII.  Disposal of Uniforms

All department personnel who dispose of uniforms will remove the Saint Paul Police patch from both sleeves and remove any name that has been permanently sewn or embroidered.  If the department has a designated collection point(s) for uniforms, removal of the patches and name is not necessary, as proper disposal will be handled by the Operations Division Deputy Chief or their designee.

## VIII.  Damaged Clothing and Equipment Claims

There is an established fund which will be used to satisfy claims of officers who, during their course of duty, incur damage to their clothing or equipment, requiring repair or replacement of the item. In submitting a claim, the following procedures will be used:

1.  The officer sustaining damage will document the information with an incident or supplemental report.  The report must contain the name and address of the party causing the damage (if known) for billing purposes. The officer will then fill out the Damaged Uniform/Equipment Form found on the SPPD Intranet under Uniform Information. Submitting this form will start the process to have the damaged clothing or equipment replaced. If the item is available from the contract uniform supplier and if the item is damaged beyond repair, a "chit" will be provided to the officer authorizing replacement by the uniform supplier. Chits must be submitted to the uniform supplier within 30 days of receiving the chit from the executive assistant in the Assistant Chief's Office.
2.  If the item is not available from the contract uniform supplier, the executive assistant to the Assistant Chief, with city attorney approval, may authorize the officer to repair or replace the item and submit the original bill to the Assistant Chief's Office for reimbursement. Some items may also need to have Assistant Chief approval for reimbursement.
3.  The fund will not be used for reimbursement to officers for dry cleaning costs unless the situation is applicable under G.O. 409.04 Decontamination Sites and Procedures.

**[Saint Paul Administrative Code 35.08](#) specifies information about damaged clothing and equipment claims:**
The fund includes restitution for other unspecified damaged items. "For items of wearing apparel and accessories, including wristwatches and eyeglasses, not specified in this chapter, but required or reasonably anticipated to be worn by police officers in the performance of their duties, there shall be restitution to the officers of the value of the replacement of such wearing apparel and accessories, including wristwatches and eyeglasses, providing the wearing apparel and accessories, including wristwatches and eyeglasses are damaged in the course and scope of the officer's employment. Any claim for restitution must be made to the assistant chief of police and, upon their recommendation, may be approved for payment by the city attorney."

## IX.  Uniform – Clothing Allowance

On the first day of January of each year, officers authorized to use clothing allowance will receive a credit amount as established by the Saint Paul City Ordinance.  The allowance will be accumulated from one year to the next, but is capped at $2,000.00. Officers will not be allowed to carry over any funds in excess of $2,000.00.  ***Allowance is <u>not</u> transferable between officers***.

Officers are responsible for purchasing and replacing any necessary uniform items to ensure they are in compliance with the uniform rules, ensuring they comply with the uniform rules and continually present a clean, neat, and well-kept appearance.

Officers separating from the department will receive full credit for each month employed during the year of their separation. Officers will also receive credit if they are employed for at least 15 days of their final month with the department.

Officers on any LOA, extended leave, or military leave are not permitted to use uniform/clothing allowance without pre-approval from their Unit Commander.  A prorated allowance will be immediately available to them upon return to normal duty status.

Officers purchasing authorized items on the uniform list must obtain them from the current uniform contract holder.  The receipt (paper or electronic) will be signed at the time of purchase of the item(s) and left with the contractor.

Flashlights are limited to two per year, and binoculars are limited to one per year.  Knives/Multi-tools are limited to two per year. Only the approved folding knives and multi-tools may be purchased. These items must be purchased from the uniform contract holder.

Procedures for purchasing items not available through the contract vendor(s) are as follows:

1.  The officer may purchase the approved clothing items either in-store or from an online vendor.
2.  A detailed, itemized receipt, **showing proof of purchase** with the officer's name and assignment printed legibly, must be submitted to the executive assistant to the Assistant Chief.
3.  Receipts can be submitted in hard copy or electronically via email to the executive assistant to the Assistant Chief.
4.  If you are submitting a receipt via email, it must be scanned as a PDF document and sent as an attachment. Forwarded email chains will not be accepted.
5.  If the itemized receipt does not specify, make sure to note what was purchased, i.e., shirt, pants, gym clothes, etc.
6.  Only those items on the approved list or items that have been approved prior to purchase by the Deputy Chief of Operations will be allowable for reimbursement.  Exceptions to

23

this policy may be made for extraordinary reasons with **prior approval** by the Deputy Chief of Operations.

Approved item list for sworn staff in plain clothes assignments only:
- Dress shoes or boots            Limit $200.00 per year
- Overcoat/Jacket            Limit one per year
- Business Professional Attire        based on individual allowance per year

Approved item list for all sworn staff:
- All athletic apparel, including shoes      Limit $350.00 per year
- Court clothing for Officers        One suit/dress outfit per year
- Boots (not purchased from contracted vendor)    Limit $200.00 per year

Personnel unsure about reimbursement eligibility should call the executive assistant to the Assistant Chief at 651-266-5500 before making any purchases.

*Effective November 14, 2025*

24

# EXHIBIT D

---
## 442.18 Body Worn Camera Policy
---

1.  INTRODUCTION AND DEFINITIONS

2.  OVERVIEW

3.  OPERATIONAL OBJECTIVES

4.  ISSUANCE OF BODY-WORN CAMERAS (BWC)

5.  BWC USE BY OFFICERS ISSUED A CAMERA

6.  BWC USE BY OFFICERS NOT ISSUED A CAMERA

7.  INVENTORY CONTROL

8.  BWC TESTING AND MECHANICAL FAILURES

9.  BWC MOUNTS AND WEARING THE BWC

10. MANDATORY, DISCRETIONARY AND PROHIBITED RECORDING

11. FAILURE TO RECORD

12. MUTING

13. WHEN RECORDING MAY BE DEACTIVATED

14. WEARING A BWC INSIDE A COURT BUILDING

15. DUTY TO NOTIFY PERSONS OF BWC RECORDING

16. DATA CATEGORIZATION AND DEPARTMENT ISSUED PHONES

17. UPLOADING DATA

18. CRITICAL OR SIGNIFICANT INCIDENTS

19. PRIVATE, CONFIDENTIAL AND PUBLIC BWC DATA

20. ACCESS BY DATA SUBJECTS

21. WHEN BWC DATA MAY BE WATCHED OR REVIEWED

22. SHOWING BWC DATA WITH WITNESSES OR THE PUBLIC

23. COPYING OF BWC DATA

24. PROTECTION OF BWC DATA/AUDIT

25. RELEASE TO THE PUBLIC

26. CASE NUMBERS AND DOCUMENTING EXISTENCE OF BWC DATA

27. REPORT WRITING- DOCUMENTING BWC DATA CONTENT IN A NON-CRITICAL INCIDENT

28. BWC DATA RETENTION

29. HANDLING OF EVIDENCE

30. POLICY COMPLIANCE AND QUALITY CONTROL PROCESS

31. TRAINING

32. BWCs AND THE ICC SYSTEM

33. DISCOVERY OF POTENTIAL MISCONDUCT

34. ACCESS TO SENSITIVE PERSONAL RECORDINGS

35. SUMMARY VARIED REPORTING REQUIREMENTS

36. SECURITY ACCESS CONTROL PROCEDURES

37. DATA BREACH POLICY AND PROCEDURES

38. NOTIFICATION TO THE BCA

## **INTRODUCTION**

This General Order provides guidelines for the Saint Paul Police Department (SPPD) Body Worn Camera (BWC) system. This includes use of the BWC system, storage and retention, and review and dissemination of data. General Order 442.17 governs the In Car Camera System (ICC). The rights and requirements of Minnesota Statutes section 13.825 are incorporated by reference into this policy and personnel should review and follow the current statute when there are policy conflicts or questions. (MN Statute 13.825)

## **SECTION 1. DEFINITIONS**

A. Axon - The vendor selected by the department to provide BWCs and evidence.com, a cloud-based system for uploading, managing and storing BWC data.

2

B. Activate - To manually begin recording. Department BWCs do not automatically record. Officers must intentionally start the recording. If the camera is powered on prior to the activation of recording, it will create a 30-second buffer of video only.

C. BWC Quality Control Sergeant - Sergeant assigned to the technology unit responsible for auditing BWC use to confirm compliance with the requirements of this policy. General Order 442.19 governs the Quality Control Process.

D. Buffer - A vendor-configured component of the BWC that records 30 seconds of video only, without audio, prior to a BWC activation. The buffer records only when the BWC is powered on. Audio recording begins when an officer activates recording.

E. BWC Data - Audio and/or video data as defined by Minnesota Statute 13.825 collected by a department BWC.

F. BWC Data Technicians - Video management unit (VMU) and closed circuit television (CCTV) staff trained in the operational use of BWCs, data copying methods, data storage and retrieval methods and procedures, and who possess a working knowledge of video forensics, evidentiary procedures and the MGDPA.

G. BWC Modes of Operation [Off, On-Buffering, On-Recording]

  1) Off - The switch of the BWC is in the off position, indicated by the switch positioned towards the outside of the camera with no orange mark visible. The camera does not buffer or record in the off mode.

  2) On - Buffering. The switch is positioned towards the center of the camera. An orange mark is visible. The camera is powered on, in standby mode, and buffering in a 30-second loop. The buffer records video only, no audio. The camera must typically be worn in the on-buffering position.

  3) On - Recording. The BWC has been activated by the officer to record. Audio joins the buffer at the point the BWC is activated by the officer. Recording continues until the officer stops recording by returning the BWC to on-buffering mode or by turning the BWC off.

H. Categories - Labels given to BWC Data relating to predetermined retention schedules:

3

1) Misc./Equip Maint./ Training

2) Civil/ Morgan Plan

3) General Citizen Contact

4) Traffic Stop (Non-Arrest)

5) Squad Accident / AWI

6) Vehicle Pursuit

7) Arrest / Evidence / RRA

8) CSC

9) Investigation of a Death/Admin Hold

I.  Critical Incident - Defined by General Order 246.09: Investigations – Incidents Where Serious Injury or Death Result during Police Custody or Involvement.

J.  Deactivate - to stop recording.

K.  Discretionary recording - when officers have the discretion to activate their BWC.

L.  Evidence.com - A cloud-based system provided by Axon to upload, manage and store BWC data. Accounts, permissions and roles within evidence.com are administered by the technology unit.

M.  ICC - In Car Camera - See General Order 442.17.

N.  Inventory control - The process whereby a BWC is issued to a specific officer and a collection of spare cameras is maintained for officers not assigned a camera. The radio shop will manage the overall inventory of all department BWCs and docking stations. The designated district or unit administrative sergeant is responsible for BWCs assigned to their district or unit and must report district BWC inventories to the radio shop.

O.  MGDPA - Minnesota Government Data Practices Act defined by Minnesota State Statute chapter 13.

P.  Memorandum of Understanding (MOU) – An agreement outlining the terms and conditions of any assignment or deputizing of Saint Paul Officers to a federal task force.

Q.  Metadata - Information related to BWC data. This includes the date, time, case number, and name of the officer to whom the camera is assigned. Metadata also includes categorization of the video, which sets video retention. Officers may also add optional searchable notes as metadata.

R.  Mandatory Recording - When the BWC must be activated under this policy.

S.  Mute - Using the capability of the BWC to stop audio recording while continuing to record video.

T.  Officer - the term officer is used generically throughout this policy for ease of reference. For unity of purpose it is important to note that within this policy "officer" refers to all sworn members of the Saint Paul Police Department who are issued a camera or authorized to wear one and who have been properly trained in its use.

U.  Prohibited recording - When an officer is prohibited from recording under this policy. A recording may be prohibited in a situation (i.e.: interacting with a CSC victim) or in a physical location (i.e.: in a police facility). Inadvertent prohibited recordings will be managed by the video management unit.

V.  Raid Gear Uniform – See [General Order 202.04 Non-Uniformed Personnel-Classes and Rules](#).

W.  Task Force Officer- A St. Paul Police officer assigned to a federal law enforcement agency as a federally deputized task force officer.

X.  Technology Unit Commander - Oversees the technical aspects of the BWC program. This includes but is not limited to oversight of evidence.com, the video management unit, technology updates related to BWCs, Quality Control Process, as well as working with the Training Commander to ensure proper ongoing training of all officers assigned BWCs.

5

Y. Temporary Tactical Uniform: See General Order 202.04 Non-Uniformed Personnel-Classes and Rules.

Z. Training Unit Commander - Works with the Technology Unit Commander to ensure proper and ongoing training of officers related to BWCs.

AA. Video Management Unit (VMU) - Led by a sergeant and assigned under the technology unit. Responsible for BWC/ICC/CCTV data. Staffed with Data Release Technicians who possess a working knowledge of video forensics and evidentiary procedure. This unit will have responsibility for all BWC data released.

## SECTION 2. OVERVIEW

This policy sets out guidelines governing the use of BWCs and administration of BWC Data. Compliance with this policy is mandatory. This policy recognizes that officers must also attend to other primary duties and the safety of all concerned, sometimes in circumstances that are tense, uncertain and rapidly evolving.

BWC Data may be used for law enforcement purposes, internal review and use pursuant to this policy, or public access pursuant to the MGDPA and Minnesota Statutes section 626.8473.

## SECTION 3. OPERATIONAL OBJECTIVES.

Operational objectives include the list below:

- Use of best practices in the rapidly evolving field of law enforcement

- Enhance officer and public safety

- Enhance officers' ability to document and review statements and actions for reporting requirements and for courtroom preparation

- Promote transparency, accountability, and build community trust

- Collect evidence for use in criminal investigations and prosecutions

- Deter criminal activity and uncooperative behavior

- Aid in the documentation of statements and events during the course of an incident

- Provide additional information for training

- Assist in the investigation and reviewing of complaints

## SECTION 4. ISSUANCE OF BODY-WORN CAMERAS (BWCs)

6

As determined by the Chief of Police, BWCs will be issued to officers in the following assignments:

- ACOP

- Code Enforcement

- FORCE

- Gang Unit

- K9

- Patrol (including downtown beat)

- All Federally Deputized Task Force Officers

- School Resource Officers (SROs)

- SWAT

- Traffic and Pedestrian Safety

Additionally, any officer who routinely works off-duty, defined as working more than once a week as ongoing employment, will be issued a BWC.

## SECTION 5. BWC USE BY OFFICERS ISSUED A CAMERA

Officers must use the device according to this policy and as trained, and may not interfere with the proper functioning of the BWC. Officers who have been issued a BWC and have been trained in its use are required to wear the BWC as described in this policy. Only Department issued and maintained body worn cameras may be used by officers.

A. Working on-duty, regular or overtime.

Officers must wear their BWC as part of the uniform when working on-duty (regular or overtime) and wearing the uniform of the day as defined by General Order 202.03 or raid gear or temporary tactical gear as defined by General Order 202.04 Non-Uniformed Personnel-Classes and Rules.

B. Working off-duty in a uniform.

Officers must wear their BWC as part of the uniform when working off-duty in the uniform of the day as defined by General Order 202.03 or raid gear or temporary tactical gear as defined by General Order 202.04 Non-Uniformed Personnel-Classes and Rules.

C.  Plain clothes officer.

7

The supervisor of a plain clothes or undercover officer may dictate whether an on-duty officer, who has been issued a BWC, will use a BWC when working in plain clothes. An officer in a plain clothes or undercover assignment must use an issued BWC when wearing the uniform of the day, raid gear or temporary tactical gear.

D.  Task Force Officers

All St. Paul Police Officers assigned to a task force with federal law enforcement agencies are required to wear a BWC pursuant to G.O. 442.18, whether acting under authorization of their deputation or as a SPPD officer.

## SECTION 6. BWC USE BY OFFICERS NOT ISSUED A CAMERA.

Officers must use the device according to this policy and as trained and may not interfere with the proper functioning of the BWC. Officers not issued a BWC, but who have been trained in its use, must obtain a BWC from the records unit and wear it as described in this policy.

A. Working off-duty.
Officers not issued a BWC, working off-duty in uniform of the day as described by General Order 202.03 or raid gear or temporary tactical gear as defined by General Order 202.04 must obtain a BWC for use from the records unit.

B. Working a specialty or overtime assignment in a uniform.
Officers not issued a BWC working a specialty or overtime on-duty assignment in uniform of the day as described by General Order 202.03 or raid gear or temporary tactical gear as defined by General Order 202.04 must obtain a BWC from the records unit prior to working such an assignment or off duty.

The Chief of Police or his/her designee may grant exemptions to this requirement. Additionally, Ordinance Disposal Unit (Bomb Squad) personnel are exempted from wearing a BWC over their protective gear when performing Bomb Squad functions under G.O. 463.01.

C. Working on duty
Officers not issued a BWC who are working on-duty and want a camera temporarily as part of their on-duty assignment may also obtain a BWC from the records unit.  A BWC obtained from a spare bank must be assigned to an officer before use in the field. A camera must be unassigned when returning the camera to the bank. Review officers will assign and un-assign BWCs from the records unit.

An officer may not work off-duty in uniform of the day as described by General Order 202.03 or raid gear or temporary tactical gear as defined by General Order 202.04 without a BWC. If a BWC is not available in the records unit an officer needing a camera should contact their supervisor, or if their supervisor is unavailable, any on-duty supervisor can be contacted.

## SECTION 7. INVENTORY CONTROL

8

The radio shop will manage the department inventory of BWC devices. The district or unit administrative sergeant will work with the radio shop for accurate accounting of BWCs assigned to district or unit personnel.

Upon transfer to a new assignment an officer will retain their BWC, unless the position is not normally issued a BWC and the officer doesn't routinely work off-duty. If an officer will no longer be issued a BWC due to a transfer, they must return their BWC to the radio shop.

## SECTION 8. BWC TESTING AND MECHANICAL FAILURES

Officers wearing a BWC must test the functioning of the BWC in accordance with their training at the beginning of each shift. Officers may not wear a BWC that fails the daily test. If an officer becomes aware of a BWC malfunction during their shift, they must exchange the BWC as soon as practically possible.

Regardless of whether a malfunctioning BWC is believed to contain evidence, all BWCs requiring repair must be treated as if they contain evidence. Malfunctioning BWCs will be turned into the property room. Officers with a malfunctioning BWC will:

- Contact a supervisor to facilitate obtaining a new BWC from the spares available to their district or unit.

- The supervisor will ensure that the new BWC is assigned to the officer in the Axon evidence.com system.

- The malfunctioning camera will remain assigned to the officer until all data has been uploaded from the malfunctioning camera as part of the repair process.

- Create a separate case number for Service to Body Camera (SBC).

- Complete an original report under the SBC case number describing:

  o The malfunctioning BWC serial number.

  o The new BWC serial number.

  o A brief description of the malfunction.

  o Whether the malfunctioning BWC is known or believed to contain data.

- Turn the malfunctioning BWC into a property locker or the property room following the same procedures applicable to all other evidence as outlined in General Order 439.02

9

## SECTION 9. BWC MOUNTS AND WEARING THE BWC

A.  Mounts

    a.  Officers shall wear the BWC using one of the mounts provided by the department or available for purchase from Axon.com/buy.

    b.  Two magnetic mounts and a Z-clip mount are issued with the BWC. Officers may replace damaged or lost mounts, or purchase additional at Axon.com/buy after creating an account at Axon.com/buy.

    c.  Mounts which have been damaged during the course of duty may be reimbursed per General Order 202.08.

    d.  Officers wishing to order additional mounts beyond the magnetic and Z-clip mounts will be reimbursed for up to 3 mounts per year from any available funds in the officer's uniform allowance.

B.  Wearing the BWC

    a.  Officers must wear the BWC above the midline of their torso, facing forward on the out-most clothing or jacket. Officers shall not intentionally obscure the view of their BWC. Those officers issued the Axon Flex camera will mount the camera in accordance with their training, the camera facing forward to replicate the direction and view of the torso-mounted cameras.

    b.  BWCs must only be used for their intended operational objectives. During such use, it may be advantageous to temporarily remove the camera, including when clearing a corner or attic or some other legitimate purpose. Any use of a BWC other than on an officer's uniform should be documented in a police report, or if a report is not otherwise necessary, CAD comments or citation notes.

## SECTION 10. MANDATORY, DISCRETIONARY, AND PROHIBITED RECORDING

A. Mandatory Recording

Understanding that officers encounter tense, uncertain, and rapidly evolving situations, officers must activate their BWC at their earliest opportunity and before arriving on scene when recording is required by this policy.

Activating a BWC early, before an officer arrives on scene, allows an officer to safely turn on the BWC before reacting to or dealing with the circumstances of a particular call, incident, investigation or event. This also helps document important information from a view closer to that

10

of the officer's perspective. Therefore, officers must activate their BWCs when preparing for or initiating any law enforcement action, when responding to any call or incident, and before arriving on scene in the following circumstances and conditions:

- When an officer is dispatched to or investigating any call or incident.

- When an officer is assisting another officer at a call or incident.

- When an officer is participating in any of the following police actions:

    o Any vehicle stop including traffic and investigative stops.

    o Vehicle pursuits.

    o Investigative stops of individuals.

    o Initiating any arrest.

    o All frisks and searches (e.g., suspect, vehicle, structure, physical area).

    o All strip searches must be conducted in accordance with General Order 409.08 and will only be audio recorded with the BWC.

    o When encountering or responding to resistance or aggression. See General Orders 246.00, 246.01

    o When any situation becomes adversarial, including situations which are either verbally or physically adversarial

    o In-custody transports.

    o Suspect interviews in the field, including in-custody interviews occurring in the field when the Miranda warning is required.

    o When directed by a supervisor.

    o While operating a vehicle under General Order 444.01 Emergency Runs.

If an officer is at a location or in any situation where an event occurs or develops where this policy mandates recording and their BWC is not already activated, the officer must activate the BWC as soon as activation is possible and safe.

B. Discretionary Recording

This policy does not describe every possible situation where the BWC may be activated. Beyond the mandated scenarios described above, an officer may activate the BWC when they believe it should be activated based on their training, experience, and judgement, except when recording is prohibited under this policy. If an officer is involved in a situation and they are unsure if the activation is mandatory, discretionary or prohibited, they should activate the BWC.

C. Prohibited Recording

11

- Interactions solely among other department employees when not actively investigating or assigned to a call or incident.

- Non-work-related activity.

- Within areas of a police facility restricted to personnel-only access, including roll call rooms, locker rooms, break rooms, and report rooms. BWCs should only record citizen contacts inside a police facility if relevant to an investigation or to comply with the Mandatory Recording situations described in this policy.

- When interacting with undercover officers or confidential informants, or persons providing information based on confidentiality, unless necessary for a law enforcement investigation or to comply with the Mandatory Recording situations described in this policy.

- During a work break.

- At any location where a reasonable expectation of privacy exists, such as a bathroom or locker room, unless necessary for a law enforcement investigation or to comply with the Mandatory Recording situations described in this policy.

- In patient care areas of a hospital, sexual assault treatment center, or other healthcare facility unless necessary for a law enforcement investigation or to comply with the Mandatory Recording situations described in this policy.

This policy recognizes that officers encounter tense, uncertain, and rapidly evolving situations regardless of location. Given this fact, officers may unintentionally create a prohibited recording or may intentionally record to comply with the Mandatory Recording requirements of this policy. The VMU will manage all data recorded in scenarios which this policy prohibits.

Officers who are aware an undercover officer has been recorded on a BWC shall email the VMU with specific information at SPPD-VMU@ci.stpaul.mn.us. UC officers include those assigned to the narcotics unit, SIU, FBI Safe Street task force, etc.

Officers may also communicate any other information to the VMU regarding prohibited recordings or other BWC information by e-mail.

D. Victim or witness interviews must also be recorded, unless the officer becomes aware of the following:

- The identity of a victim or witness is protected by the MGDPA individuals whose identities are protected under the MGDPA include victims or alleged victims of criminal sexual conduct or sex trafficking.

12

- An officer may deactivate recording to protect the identity of someone afforded protection under the MGDPA, provided the request does not conflict with any other Mandatory Recording requirement under this policy.

- A victim or witness has requested the officer deactivate recording, provided the request does not conflict with any other Mandatory Recording requirement under this policy.

Officers should consider the totality of the circumstances before deactivating recording and determine the best approach for a particular circumstance. For example, deactivation may be the best option if the situation is not adversarial and a BWC inhibits a victim or witness from providing information. Nothing precludes an officer who has deactivated recording under these circumstances from reactivating it should mandatory recording circumstances emerge or the officer chooses to reactivate recording in their discretion.

Deactivation under these circumstances must be documented in an incident report, or if no incident report is otherwise required it must be documented in CAD comments.

This policy recognizes officers cannot or will not always know of or have time or opportunity to account for protections afforded under the MGDPA. An officer may also intentionally record an individual with MGDPA protections, or any witness or victim who has requested recording be deactivated, in order to comply with other sections of this policy. Compliance with the other Mandatory Recording requirements under this policy is the higher priority.

The VMU provides the final review to ensure appropriate management of data and compliance with the MGDPA.

Officers may communicate any information to the VMU regarding witness/victim recordings or BWC information by e-mail at SPPD-VMU@ci.stpaul.mn.us

## SECTION 11. FAILURE TO RECORD

Officer and public safety are the department's highest priorities. If an officer is unable to activate his or her BWC before one of the mandatory recording scenarios described in this policy, the BWC must be activated as soon as it is possible and safe.

Facts surrounding a failure to record must be reported to a supervisor and documented in an incident report, or if no incident report is required it must be documented in CAD comments. The supervisor notification should be made prior to the officer clearing the call, unless exigent circumstances exist. The officer must also submit a BWC self-reporting form prior to clearing the call, unless exigent circumstances exist. This form will record information about situations involving a failure to record and delayed activations.

If an officer is involved in a critical incident and they were unable or failed to record a mandatory record incident, any stated reason for the failure to record will be documented by an investigator assigned to the incident.

13

Officers involved in a critical incident who are not required to write a report are encouraged to provide any information as to their inability or failure to activate the BWC to the investigator under procedures outline in General Order 246.09 Critical Incident Policy, Responsibilities of Involved Employees.

## SECTION 12. MUTING

Transparency is a critical component of the trust and partnership that the St Paul Police Department maintains with our community. As such, muting is not authorized.

## SECTION 13. WHEN RECORDING MAY BE DEACTIVATED

The rights and requirements of Minnesota Statutes section 13.825 are incorporated by reference into this policy and personnel should review and follow the current statute when there are policy conflicts or questions. (MN Statute 13.825)

Once activated, the BWC must remain on-recording until the incident has concluded; meaning it is reasonable to believe that all arrests are made, arrestees transported, and suspect interviews are completed, unless or until:

1) The incident or event is of such duration that recording is deactivated to conserve power or storage capacity and the officer is not directly involved in activity relating to the incident or event.

2) In a Critical Incident, the supervisor has ordered deactivation – As per G.O. 246.09 Critical Incidents.

3) Deactivation is reasonable and necessary to protect the safety of the officers or others.

4) Deactivation is approved or ordered by a supervisor.

5) BWCs may be deactivated during non-enforcement activities, such as waiting for a tow truck or protecting accident scenes.

6) At search warrant scenes, the cameras may be deactivated once the entry is complete and the scene is safe. This deactivation can **only** occur after all occupants are removed from the warrant location. If removing all occupants is not possible or reasonable, at a minimum the cover officer(s) will have their BWC on. The remaining searching officers may deactivate their BWC's. The BWC does not replace the officer's obligation for photographs of the warrant scene, highlighted under policy 447.

An officer's decision to deactivate recording in a situation that would otherwise be recorded under this policy must be documented verbally on the camera before deactivation. That decision must

14

also be noted in an incident report, or if no incident report is otherwise required the decision must be documented in CAD comments. The report or CAD comments must include factors considered in the decision to deactivate the camera off.

BWCs may also be deactivated after the officer has arrived on scene, assessed and stabilized the call, and if the officer reasonably believes there is no longer necessary audio or visual evidence to capture and that none of the circumstances requiring activation will likely occur.

Nothing in this section is intended to discourage an officer from recording during non-enforcement situations when in his or her judgement the recording may be beneficial.

## SECTION 14. WEARING A BWC INSIDE A COURT BUILDING
The rights and requirements of Minnesota Statutes section 13.825 are incorporated by reference into this policy and personnel should review and follow the current statute when there are policy conflicts or questions. (MN Statute 13.825)


Ramsey County District Court order dated February 17, 2017, states that "Only law enforcement personal may have body cameras in a courtroom. These Electronic Devices may be powered on but must be kept and operated only in silent mode. Any authorized use of these Electronic Devices must not distract the proceedings pursuant to the Rules of Decorum. In addition, voice communication and the recording of pictures, video or audio are prohibited in courtrooms unless specifically approved by the presiding judge or judicial officer pursuant to Rule 4.02 of the Rules of General Practice."

This court order does not preclude an officer responding to an incident in the courthouse from recording as required by this policy.

## SECTION 15. DUTY TO NOTIFY PERSONS OF BWC RECORDING
The rights and requirements of Minnesota Statutes section 13.825 are incorporated by reference into this policy and personnel should review and follow the current statute when there are policy conflicts or questions. (MN Statute 13.825)

If an individual asks an officer if a BWC is on or recording, research and experience shows the best practice is to tell individuals they are being recorded. While not required by law (MN Statute 626A.02, subdivision 2) the Saint Paul Police Department strongly encourages officers to tell people that they are being recorded, unless the officer believes that disclosure would result in a safety issue for the officer or public.

Section 13.04, subdivision 2, does not apply to collection of body worn camera data.

## SECTION 16. DATA CATEGORIZATION AND DEPARTMENT-ISSUED PHONES

A. Categorization

All data collected by BWCs is subject to statutory requirements and may also be considered evidence. The timely and accurate categorization of data is vitally important to determine the

15

retention of data. Officers must ensure all BWC recordings are assigned a case number and correct category by the end of their next duty shift. Officers should contact a supervisor with any questions about appropriate categorization. Officers should assign as many of the following categories as are applicable to each file:

| CATEGORY | RETENTION PERIOD |
|---|---|
| Misc./Equip Maint./Training | 1 year |
| Civil/Morgan Plan | 1 year |
| General Citizen Contact | 1 year |
| None | 1 year |
| Traffic Stop (Non-Arrest) | 1.5 years |
| Squad Accident/AWI | 3 years |
| Vehicle Pursuit | 6 years |
| Arrest/Evidence/RRA | 7 years |
| CSC | 9 years |
| Investigation of a Death/Admin Hold | No Expiration |
| Pending Review | No Expiration |
| *Officer Discharge of a Firearm | No Expiration |

*Excludes training and killing of an animal that is sick, injured or dangerous.

B. BWC recording may be retained for as long as reasonably necessary for possible evidentiary or exculpatory use related to the incident with respect to which the data were collected.

C. CAD/RMS Integration

The CAD/ RMS integration is a feature of the system that will attempt to add a case number and a category to videos recorded by the officer. The CAD/RMS integration data that contains the time a call was dispatched to an officer and the time the officer cleared the call, will be compared to that officer's video in evidence.com. Where there is a match, the integration will add the case number and category to the video. Officers should be aware of instances where they are not assigned to a call at the time a recording is started, as these must be manually updated.

The CAD/RMS integration process only occurs after video has been uploaded to evidence.com. Officers are responsible for verifying that the CAD/RMS integration has updated the recordings with the correct case numbers and categories. Officers shall review their own recordings (using the evidence.com "My Evidence" page) to ensure that every recording they made has a case number and proper category. This shall be done no less than one time per work week.

Officers are responsible for ensuring that the data captured on their BWC is categorized and the correct CN attached to said data. Utilizing audit and search features of evidence.com, supervisors are responsible for ensuring data uploaded by subordinates has been categorized.

Officers shall manually update any call type of Previous Case Number (PCN) with the appropriate related case number and category. Often officers are assigned to a PCN call type in CAD while recovering a stolen car, following up on another call, or arresting someone on a pc pickup. The evidence relates to the original case and needs to be manually updated in order to be visible to investigators and prosecutors. The CAD/RMS integration is unable to properly update these call types.

D. Department Issued cell phones
Officers issued a department cell phone may categorize data in the field using the Axon View application.

Department issued cell phones are subject to General Order 236.02 Internet Access and Email.

Officers may use the camera and video features of their department issued cellphones for scene photography and other legitimate law enforcement purposes as trained. Refer to General Order 440.00 Digital Evidence and 424.01 Photograph, Audio and Video Recordings.

No personal devices may be used to update BWC data.

## SECTION 17. UPLOADING DATA

All BWC data is subject to statutory requirements for retention and dissemination. Data may also be evidentiary. Therefore; officers must upload all data collected by the end of shift according to department BWC training, Axon instructions, and the protocols of the officer's unit and/or assignment. Officers are responsible for ensuring the CN and all categorizations are noted on uploaded videos.

If an officer has recorded video that has no evidentiary value and extenuating circumstances preclude immediate uploading of the data, an officer may obtain permission from their direct supervisor to upload the data no later than the end of the officer's next regular shift. This is an exception and not to be used routinely and under no circumstances should an officer end their shift without downloading BWC data that contains an arrest, traffic stop, or RRA.

Officers who capture BWC data while off-duty or working off-duty must upload the data to evidence.com as trained, if the data is evidentiary or if a police report and/ or citation is required or will be written for the incident for which the data was created. Uploading must be complete before clearing from the incident or at the end of the off-duty shift.

If data recorded off-duty or while working off-duty is not evidentiary (for example a general citizen contact such as providing directions or a police service which is advised) and no police

17

report and/ or citation will be written, that data may be uploaded no later than the end of the officer's next regular duty shift.

## SECTION 18. CRITICAL OR SIGNIFICANT INCIDENTS

A. In the event of a Critical Incident all officers who are involved or who witness the incident shall turn off their BWCs only when instructed by a supervisor or investigator assigned to the incident. It is the responsibility of the scene supervisor to ensure compliance with this section.

   a. Note that General Order 246.09 Critical Incidents requires officers involved in a critical incident to give the first responding non-involved field supervisor a brief, factual, public safety statement of the event for the purpose of focusing the investigative efforts, which will include, but is not necessarily limited to assisting in identifying and locating suspects, victims, witnesses, evidence, and any other information deemed pertinent to public or officer safety.

B. All involved or responding officers must maintain custody of their BWC equipment until the forensic services unit or crime lab of the investigating agency takes custody of the equipment. In the event that an officer will be photographed as part of the investigation, the officer should leave their uniform intact, including BWC equipment, until photographs are completed. The department will ensure that all video is properly uploaded. Once all uploads are complete, BWC equipment will be returned to the officer, or their supervisor, unless the device itself is evidence beyond any data created by the BWC. If the BWC device is evidence it must be handled in the same manner as any other evidence.

C. In the event an outside agency crime lab or the forensic services unit does not respond to a Critical Incident, the supervisor must ensure BWC Data is properly uploaded before returning the BWC to the officer.

## SECTION 19. PRIVATE, CONFIDENTIAL AND PUBLIC BWC DATA

All BWC data is the property of the department and is government data subject to the laws of the State of Minnesota.

Minnesota Statutes Section 13.825, subdivision 2, defines BWC data as presumptively private data about the data subjects unless there is a specific law that makes the BWC data either confidential or public.

BWC data subjects are defined as:

  • Any person or entity whose image or voice is documented in the data.

  • The officer who collected the data.

18

- Any other officer whose voice or image is documented in the data, regardless of whether that officer is or can be identified by the recording.

Confidential BWC data are collected or created as part of an active criminal investigation. Data is classified as confidential while the investigation is active. Inactive investigative data is classified according to rest of section 13.825.

Public BWC Data is defined as:

- Data documenting the discharge of a firearm by an officer in the course of duty, other than for training or the dispatching of an animal that is sick, injured, or dangerous.

- Data that documents the use of force by an officer resulting in substantial bodily harm. Substantial bodily harm is defined in Minnesota Statute section 609.02 as bodily injury which involves a temporary but substantial disfigurement, or which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily member or organ, or which causes a fracture of any bodily member.

- Data that a data subject requests to be made accessible to the public, subject to redaction. Data on any data subject (other than an officer) who has not consented to the public release must be redacted. In addition, data on undercover officers must be redacted.

- Data may be redacted, or access withheld to portions of data that are public, if those portions of data are clearly offensive to common sensibilities. A person seeking access to otherwise public data that have been withheld may bring an action in district court to challenge this determination. The person bringing the action must give notice to the department and the subjects of the data. The department must give notice to any subjects of the data of which the department is aware and that were not provided notice by the person bringing the action for access. The rights of a defendant in a criminal proceeding to obtain access to body worn camera data are not affected by any determination by the department that the data are clearly offensive to common sensibilities.

- Data that documents the final disposition of a disciplinary action against a public employee.

- If another provision of the MGDPA classifies data as private or otherwise not public, that data retains the other MGDPA classification.

19

## SECTION 20. ACCESS BY DATA SUBJECTS

A. As required by statute, an individual must be allowed to access BWC data about him/herself as a subject of the recording, however access is not required under the following conditions:

- The data is collected or created as part of an active investigation.

- The data is restricted by law from disclosure to the person seeking access, such as portions that would reveal identities protected by Minnesota Statutes section 13.82, subdivision 17.

B. Unless the data is part of an active investigation, an individual data subject may request said video and must be provided with a copy of the recording redacted as follows:

- Data on other individuals in the recording who do not consent to the release must be redacted.

- The identities and activities of an on-duty peace officer engaged in an investigation or response to an emergency, incident or request for service may not be redacted unless the officer's identity is subject to protection under section 13.82, subdivision 17, clause (a) (when access to the data would reveal the identity of an undercover law enforcement officer).

-  If a subject of the data submits a written request to retain the recording, the data must be retained for the period of time requested, up to an additional 180 days beyond the applicable retention period.

- VMU Sergeant will ensure the request is documented in Gov QA, adjust the category retention period and notify the subject of the new expiration date. VMU Sergeant shall notify the requester that the recording will be destroyed when the requested time elapses (180 days) unless a new request is made.

## SECTION 21. WHEN BWC DATA MAY BE WATCHED OR REVIEWED

A. Officers are authorized to access public and non-public (confidential or private) BWC data for legitimate law enforcement purposes, including but not limited to report writing. Nothing in this policy restricts an officer from reviewing data for law enforcement purposes, including for preparing to give a statement, preparing for court testimony or to respond to allegations of substandard performance or misconduct, excepting department policy under General Order 235.20 Administrative Lockdown.

20

B.  BWC data may not be accessed or reviewed for the purpose of surveillance. Permitted use of BWC Data includes:

1) Case investigation.
  An investigator assigned to a related criminal investigation may review BWC Data relevant to the investigation.

2) Incident debrief and performance review.
  An officer's immediate supervisor may utilize an officer's BWC data for the purpose of coaching and providing feedback to the officer with the purpose of improving performance.

3) Response to Resistance or Aggression Review.
  BWC data may be accessed as part of the department's review of officer response to resistance or aggression. Supervisors and department personnel who have the responsibility to review a response to resistance or aggression may access BWC data pertaining to the incident.

4) Pursuit review.
  BWC data showing a vehicle pursuit may be accessed by supervisors and department personnel who have the responsibility to review the incident.

5)  Accidents involving department vehicles.
  BWC data relating to department vehicle accidents may be disclosed to the Accident Review Board pursuant to General Order 640.07

6)  Quality Control Process
  BWC data may be accessed as part of the BWC Quality Control Process - see G.O. 442.19.

7)  Disclosure to Courts

  a.  BWC data relating to a criminal matter will be disclosed to the appropriate prosecuting authority.

  b.  BWC data may be further disclosed to court personnel as authorized by applicable rules of procedure and Minnesota Statutes sections 13.03, subdivision 6 and 13.825, subdivision 2(d).

8)  Training

  a.  Officers who become aware of BWC data that may contain training value should notify their supervisor. BWC data may be shown to staff for public safety training purposes.

21

b. The Training Unit Commander will communicate with any employees depicted in the BWC data prior to use of the data for training. The Training Unit Commander will evaluate and consider any objections of officers depicted in the data prior to use of the data. In all cases the training value of the data will be the focal point of any consideration for use as part of a training session.

c. Field Training Officers (FTOs) may utilize their own or their recruit's BWC data with their recruit for the purpose of providing coaching and feedback on the recruit's performance.

9) Evaluation of alleged misconduct.

a. Nothing in this policy limits or prohibits the use of BWC Data by the department to evaluate alleged misconduct or as a basis for discipline.

b. BWC data may be accessed by the internal affairs unit or any supervisor investigating a complaint of misconduct. A complaint of misconduct may include any allegation of improper procedure or misconduct, from an informal allegation or question to a formalized internal affairs complaint. Informal allegations or questions should be handled within the unit consistent with the chain of command. Formal complaints should follow the procedure outlined in General Order 230.00.

c. BWC data related to a formal complaint made against an officer during an internal investigation will temporarily be categorized as an Admin Hold under the Investigation of a Death/Admin Hold retention category.

10) Public Release.

Minnesota State Statute section 13.825, subdivision 2 defines instances in which BWC becomes public. Such data will be reviewed by the VMU prior to release.

The department will also at times release BWC data to the public with the goal of demonstrating:
       1) Exceptional work done by officers on a daily basis.
       2) Some of the challenges our officers face on a daily basis.
       3) Things body cameras record and do not record.

The department may also release BWC data in the interest of public safety. Prior to release, all private data as defined by Minnesota Statute section 13.825, subdivision 2 will be redacted.

22

The Public Information Officer (PIO) will communicate with any employees depicted in the BWC data prior to public release under this section. The PIO will evaluate and consider any objections of employees depicted in the data prior to use of the data. The privacy and interests of all data subjects will be the focal point of all data released under this section.

C.  Officers only have permissions in evidence.com to view data created by the BWC assigned to them. Officers needing to review data created by another officer's BWC may:

1)  Ask the officer who created the data to show it.
2)  Ask the officer who created the data to assign rights to view it in evidence.com.
3)  Ask a supervisor to play it.

D.  Critical Incidents and Review of Data.
Officer(s) involved in a Critical Incident may view and/or listen to BWC Data of the incident only after:

1)  The officer has met with legal counsel or the Saint Paul Police Federation representative, if those entities are requested by the officer, and

2)  The officer and legal counsel have met with the investigative entity or designee regarding the process for a Critical Incident set out in General Order 246.09

## SECTION 22. SHOWING BWC DATA WITH WITNESSES OR THE PUBLIC

Officers shall not share BWC recordings with any member of the public or any other employee, unless it is required for the official performance of their duties and consistent with all applicable laws.

Officers may show portions of BWC Data to witnesses as necessary for purposes of investigation as allowed by Minnesota Statutes section 13.82, subdivision 15 which states data may be shown to:

1) Aid the law enforcement process.

23

2) Promote public safety.

3) Dispel widespread rumor or unrest.

## SECTION 23. COPYING OF BWC DATA

Copies of BWC data must be requested through the video management unit. Employees shall not copy or record BWC data with smart phones, video cameras, or by any other means.

## SECTION 24. PROTECTION OF BWC DATA / AUDIT

BWC data will be protected in compliance with state law and this policy. To that end, the department will:

1) Restrict access to BWC data according to an authorized employee's access credentials.

2) Maintain an automated audit/electronic audit trail of the date, time, and person with regard to each access to data. All employees who access BWC Data via evidence.com will be required to document the reason for their access by adding a note describing their reason for accessing the data in the "notes" section of whatever data file is accessed.

   A note should usually be one of the following authorized reasons for review:
   - Report writing
   - Court
   - Internal affairs response
   - Case investigation
   - Debrief
   - RRA review
   - Pursuit review
   - Squad accident
   - Quality Control Process (QCP)
   - Training

- FTO

- Complaint investigation

- VMU review

Any other reason not covered above should be specifically described.

## SECTION 25. RELEASE TO THE PUBLIC

A. Only video management unit (VMU) staff or Internal Affairs Staff trained in data practice and the use of the system for copying such data is authorized to make copies of BWC data. The original data will be retained according to the retention schedule in this policy.

B. Copies made by VMU or IAU staff must be for lawful purposes including, but not limited to, data requests under the MGDPA, department purposes, criminal litigation and civil litigation.

C. Whenever a request for BWC data is made to the department by the media and the department intends to release the video, an email will be sent to all officers assigned to the associated CN in the CAD system, with a 24-hour advance notice of its release for all routine requests if possible.

D. The department may charge its actual cost for providing requested copies of data pursuant to Minnesota Statute sections 13.03 and 13.04.

## SECTION 26. CASE NUMBERS AND DOCUMENTING EXISTENCE OF BWC DATA

A. All BWC data must be associated with a department case number to ensure accurate tracking of BWC data. Therefore, whether on- or off-duty, an officer who has created BWC data must ensure they have logged into the Computer Aided Dispatch system (CAD) with their employee (long) number. Then:

1) If a case number has not already been created to associate with the BWC data, the officer must call for a case number.

2) If a case number has already been created to associate with the BWC data, the officer must ensure they are assigned to that case number in the CAD.

3) If working off-duty or overtime or on-duty special detail (i.e. Xcel or CHS stadium, parade, etc.) and the situation for which the BWC data

25

was created does not require an independent case number, an officer may use the case number created when calling in for the off-duty job or created for the detail.

B.  An officer not assigned to an incident in the CAD system, who arrives on scene and as per policy has activated their BWC, must notify dispatch of their arrival so they will be assigned to the incident in the CAD system.

C.  Each officer completing a report and/or citation must document the existence of their BWC data in their report and/ or citation.

D.  Documentation of BWC footage in a police narrative report and/or citation should follow the same protocol as ICC (442.17 In-Car Camera Policy). The header of the narrative report should read either "NO ICC or ICC, squad 123 (Officer Name)." A BWC data line must follow the ICC line and read either: "No BWC or BWC, Officer Name." If an officer is not otherwise completing a report and/or citation for an incident, the existence of their BWC data must be documented in evidence.com.

E.  Officers who unintentionally or accidentally create a recording may use the blanket CN of the year and 999999. For example, an inadvertent recording in 2019 should have in the ID field the CN 19999999.

## SECTION 27. REPORT WRITING - DOCUMENTING BWC DATA CONTENT IN A NON-CRITICAL INCIDENT

A.  To ensure the accuracy of reports and statements, officers may review audio and video data before making a report or statement.

B.  Officers completing a report for an incident in which the BWC data was created are responsible to ensure the content of relevant BWC data is referenced in narrative form in their reports.

Additionally, a narrative report must describe, beyond the header of "NO BWC or BWC, Officer Name":

1)  If BWC data was created relevant to their report.

2)  Reasons for failing to record when called for by this policy.

3)  Whether officers have reviewed their BWC data before completing a report.

26

4) Whether other officers may have BWC data.

5) Whether the officer completing a report has reviewed the data of other BWCs.

6) The extent of review of any BWC data undertaken by an officer. Some examples of documentation of review:

- "I have not reviewed footage before completing this report."

- "I have conducted a full and detailed review of all data which could function as a transcript."

- "I have conducted a cursory review of video at fast speed without audio review."

- "The footage begins at 21:00:10 hours and ends at 21:20:00 hours. I have conducted a full and detailed review of portions (2105:05 to 2109:30)."

## SECTION 28. BWC DATA RETENTION

BWC Data will be retained in accordance with the MGDPA General Retention Schedule for Minnesota Cities, Ramsey County Evidence Retention Policy, court order, or applicable statute of limitations or preservation period. (The schedule is detailed in Section 16 of this policy)

All BWC Data not covered under the aforementioned provisions will be retained for a minimum period of 1 year. There are no exceptions for erroneously recorded or non-evidentiary data.

Upon written request by a BWC Data subject, the department will retain a recording pertaining to that subject for an additional time period requested by the subject of up to 180 days. The department will notify the requestor at the time of the request that the data will then be destroyed unless a new written request is received. Subsequent requests will be evaluated and based on critical nature of the request may be approved by the Chief of Police or designee.

## SECTION 29. HANDLING OF EVIDENCE

A. BWC Data will be handled as evidence and retained according to the applicable retention period of the categories assigned to the data.

B. When BWC Data contains evidence for a case, whether civil or criminal, that is being investigated by another agency, that agency will be provided a duplicate copy

27

of the recording for a specified law enforcement purpose with the written approval of the Chief of Police or his or her designee.

## SECTION 30. POLICY COMPLIANCE AND QUALITY CONTROL PROCESS.

Minnesota Statutes section 626.8473 requires that police departments put in place "procedures to ensure compliance and address violations of the policy, which must include, at a minimum, supervisory or internal audits and reviews, and the employee discipline standards for unauthorized access to data contained in section 13.09."

To meet these statutory requirements, all supervisors must monitor compliance with this policy.

The department has also created the position of BWC Quality Control Sergeant. The BWC Quality Control Sergeant will be assigned to the technology unit to verify compliance with this policy. G.O. 442.19 details the department's internal Quality Control Process for BWC.

Pursuant to G.O. 442.19, the department has also established the BWC Review Committee which is responsible for reviewing randomly selected videos for compliance with this BWC policy.

## SECTION 31.  TRAINING

Employees must complete the BWC training program before being issued or using a BWC. Ongoing training will be provided as determined by the Training Unit Commander.

## SECTION 32. BWCs AND THE ICC SYSTEM

BWCs do not replace the ICC system. This policy does not replace the ICC policy. ICC continues to be governed by General Order 442.17 In-Car Camera Policy. However, officers wearing a BWC are exempt from the wireless microphone portion of the ICC policy.

## SECTION 33. DISCOVERY OF POTENTIAL MISCONDUCT

The department encourages officers who witness or become aware of violations of department policy to immediately report said violation to their supervisor. If a civilian employee, an officer, or a sergeant reviewing BWC data observes a violation of department policy they should report the violation to their supervisor. A supervisor notified of such a violation shall take the appropriate actions based on the circumstances of the violation.

If a commander or chief reviewing BWC data observes a violation of department policy, they should take the appropriate actions based on the circumstances of the violation.

28

All who review BWC data shall focus their review on the reasons for which they are justified to do so.

### 34. ACCESS TO SENSITIVE PERSONAL RECORDINGS

In the event of unintentional or inadvertent BWC recording, such as a personal conversation that captures sensitive personal information for which access should be restricted, an officer may submit a written request via email to the VMU (SPPD-VMU@ci.stpaul.mn.us) which will restrict access to that portion of BWC data. The VMU sergeant will evaluate the request in conjunction with the Technology Unit Commander. If a restriction is placed on access to such data, that restriction will remain until the data is deleted according to the retention schedule of the data's category.

### 35. SUMMARY OF VARIED REPORTING REQUIREMENTS

| EVENT | POLICY REFERENCE | VERBAL NOTE IN BWC | REPORT, if written, or CAD COMMENTS | SUPERVISOR NOTIFICATION | VMU NOTIFICATION |
|---|---|---|---|---|---|
| Temporary removal of BWC from uniform, i.e. clearing an attic, etc. | Section 9. (B.) Wearing the BWC | | X | | |
| Recording an undercover officer | Section 10. (C.) | | | | X |
| Officer deactivates recording due to MGDPA protections | Section 10. (D.) | | X | | |
| Officer deactivates recording due to victim or witness request | Section 10. (D.) | | X | | |
| Intentional or unintentional recordings under Prohibited Section of policy. | Section 10. (D.) | | | | X |
| Any failure to record | Section 11. | | X | X | |
| | | | | | |
| Stop or pause recording in a situation that would otherwise be recorded. | Section 13. | X | X | | |
| Awareness of BWC data with training value | Section 21. | | | X | |

### 36.    SECURITY ACCESS CONTROL PROCEDURES

A. Access to BWC recordings will be granted only to authorized users pursuant to this policy. It is the responsibility of authorized users to keep their user name and password confidential. Accessing, copying, or releasing any recordings for other than legitimate law enforcement purposes is strictly prohibited, except as required by law.

B. BWC recordings will be accessed and copied from Evidence.com using department-approved equipment only for legitimate law enforcement purposes.

C. BWC recordings can only be erased by the Records Division or System Administrator with authorization from the Records Supervisor, Chief of Police or a Division Commander. Any time a video is redacted for any purpose, the original of the un-redacted video shall also be kept.

30

D. Supervisors will monitor the BWC recorder system for compliance with this policy.

E. Officers must not attempt to intentionally edit, alter, or erase any BWC recording.

F. As required by Minn. Stat. § 13.825, subd. 9, as may be amended from time to time, this agency shall obtain an independent biennial audit of its BWC program. The audit shall determine whether the data is being effectively managed according to Minnesota Statute 13.825 subd 9.

G. The department will maintain records showing the date and time BWC system data were collected and the applicable classification of the data.

F. The department will require in its vendor contracts that the vendor comply with the requirements of this policy and the FBI CJIS security policy, as amended, and that the vendor have in place sufficient security safeguards and policies to ensure appropriate protection of BWC data, including secure backups of BWC data. A portable recording system vendor that stores portable recording system data in the cloud must protect the data in accordance with the security requirements of the United States Federal Bureau of Investigation Criminal Justice Information Services Division Security Policy 5.4 or its successor version.

Security Access Control Procedure (See link on website)

**Outside Law Enforcement Agencies and Attorney Offices:**

Shall use GovQA Request portal (www.stpaul.gov/datarequest) for the purposes of requesting BWC data. In doing so, they are required to fill out the SPPD Video Management Unit form "BWC Request for Data from Outside Agency" (see link on website). The form requires the following acknowledgement: "The recipient of body camera data acknowledges and agrees that they are required by law to fully comply with all requirements of Minnesota Statute section 13.825, subdivision 8, regarding data classification, destruction and security of portable recording system data received for a law enforcement purpose".

BWC data may not be shared with, disseminated to, sold to or traded with any other individual or entity unless explicitly authorized by this section or other applicable law, including explicitly Minnesota Statutes section 13.825, subdivision 7.

**Roles by Job Level/Duty Chart:**

The following SPPD and SPCAO personnel are granted roles/permissions in Evidence.com (cloud storage for BWC video) as indicated upon hire, transfer, promotion or demotion.  All roles/permissions granted must have written permission from the Chief of Police or their designee. The corresponding HR Code (BWC Approval Letter) and Chief's approval are maintained by the SPPD HR Administrator.

31

| HR Code | Evidence.com Role | Role Defined by Assignment |
|---|---|---|
| 01 | Camera Assignment Access | Personnel assigned to the Records Unit tasked with signing out spare BWCs |
| 02 | Officer | Personnel with the rank of Police Officer |
| 03 | SPCAO | Personnel working as an attorney or paralegal assigned to SPCAO criminal prosecution |
| 04 | Officer Trainer (Canine) | Personnel designated by the Canine Unit Commander as Canine Trainer |
| 05 | Training RRA Review | Personnel designated by the Training Unit Commander as a member of the Training Unit RRA Review |
| 06 | Supervisor Role | Personnel with the rank of Sergeant, Commander or Senior Commander NOT assigned to any of the following roles:<br>• ADMIN ROLE<br>• BWC REVIEW COMMITTEE ROLE<br>• INTERNAL AFFAIRS ROLE<br>• SUPERVISOR PLUS ROLE |
| 07 | Supervisor Plus Role | Personnel with the rank of Officer, Sergeant, Commander or Senior Commander assigned to any of the following units:<br>• Gangs<br>• Homicide/Robbery<br>• Human Trafficking/Vice<br>• MN Crimes Against Children<br>• Narcotics<br>• Special Investigations Unit (S.I.U.)<br>• Safe Streets |
| 08 | BWC Review Committee | Personnel, of any rank, assigned to the BWC Review Committee |
| 09 | VMU CCTV | Personnel with the rank of Police Officer assigned to CCTV |
| 10 | VMU Technician | Personnel assigned to the Video Management Unit (VMU) |
| 11 | Internal Affairs | • Personnel with the rank of Commander or Sergeant, assigned to the Internal Affairs Unit<br>• Office Assistant assigned to Internal Affairs |
| 12 | Chief | Personnel with the rank of Chief of Police, Assistant Chief or Deputy Chief |
| 13 | Admin | • Personnel with the rank of Sergeant, assigned to the Technology Unit<br>• Personnel with the rank of Sergeant assigned to the Video Management Unit<br>• Designated OTC Personnel |
| 14 | Super Admin | • Personnel with the rank of Sergeant, assigned to the Video Management Unit<br>• Personnel with the rank of Commander, assigned to the Technology Unit |

Axon roles and permissions checklist which defines each role's access in the evidence.com program is maintained by the Sergeant of VMU.

**37. Data Breach Policy and Procedures: Penalties (Minnesota State Statute 13.09)**

Misuse or improper access to BWC data is subject to penalties under Minnesota Statute section 13.09.

    (a) Any person who willfully violates the standards for unauthorized access to data or whose conduct constitutes the knowing unauthorized acquisition of nonpublic data, as defined in Section 13.055, subdivision 1, is guilty of a misdemeanor.

    (b) Willful violation of Minnesota Statutes chapter 13, including any action subject to a criminal penalty under paragraph (a), by any public employee constitutes just cause for suspension without pay or dismissal of the public employee. See also General Orders 235.00 Data Practices and 236.00 Computer Security.

If there is a breach in security of BWC data maintained by the department, notifications will be made to those affected by the breach and an investigation started by the Property Crimes Administrators and the City of Saint Paul Office of Technology (OTC) staff as provided under Minnesota Statute 13.055.

A government entity that collects, creates, receives, maintains or disseminates private or confidential data on individuals must disclose any breach of the security of the data following discovery or notification of the breach. We will investigate crimes that occur in our jurisdiction and within our authority.

**Data Breach Policy and Procedures**

In the event of a body worn camera data breach, the City of Saint Paul Critical Security Incident Response Procedure will be followed (see Appendix A-G – linked on website).

**38. Notification to the BCA**

Within ten days of obtaining new surveillance technology that expands the type or scope of surveillance capability of a portable recording system device beyond video or audio recording, a law enforcement agency must notify the Bureau of Criminal Apprehension that it has obtained the new surveillance technology. The notice must include a description of the technology and its surveillance capability and intended uses. The notices are accessible to the public and must be available on the bureau's website.

*Revised November 7, 2019*

33