UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

SUSAN TINCHER, JOHN BIESTMAN,
JANET LEE, LUCIA WEBB,
ABDIKADIR NOOR, and ALAN
CRENSHW, *on behalf of themselves and
Other similarly situated individuals,*

      Plaintiffs,

v.

KRISTI NOEM, Secretary, U.S.
Department of Homeland Security (DHS);
TODD LYONS, Acting Director, U.S.
Immigration and Customs Enforcement
(ICE); MARCOS CHARLES, Acting
Executive Associate Director,
Enforcement and Removal Operations
(ERO), ICE; DAVID EASTERWOOD,
Acting Field Office Director, ERO, ICE
Saint Paul Field Office; JOHN A.
CONDON, Acting Executive Associate
Director, Homeland Security
Investigations (HSI); The Department of
Homeland Security; Unidentified Federal
Agencies; and Unidentified Federal
Agents; *in their official capacities,*

      Defendants.

Case No. 25-cv-04669

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

_____

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 3

    1.    Congress Has Conferred Authority on DHS (Including ICE) to Enforce Federal Immigration Laws and Protect Federal Property ..... 3

    2.    Violence Against DHS Officers Across the Nation and in Minnesota ................................................................................... 7

    3.    DHS Officers Have Responded Lawfully and Appropriately to Recent Attacks and Riots on Federal Personnel and Property in Minnesota ................................................................................... 9

    4.    Plaintiff Tincher Arrest .................................................... 10

    5.    Plaintiff Crenshaw Incident ............................................. 12

    6.    Plaintiff Noor Arrest ....................................................... 11

    7.    Pursuit of officers in their vehicles Plaintiffs Biestman, Lee, and Webb ....................................................................... 12

LEGAL STANDARD ......................................................................................... 12

ARGUMENT ...................................................................................................... 13

I.    Plaintiffs are unlikely to prevail on the merits of any of their asserted claims. ............................................................................................... 13

    A.    Plaintiffs lack standing to seek prospective relief. ..................... 13

    B.    Plaintiffs are unlikely to prevail on their First Amendment retaliation claims. ............................................................................... 19

        1.    *Susan Tincher* ...................................................... 20

        2.    *Abdikadir Noor* .................................................. 23

        3.    *Individuals following ICE vehicles in their cars* .............. 25

        4.    *Alan Crenshaw* .................................................. 28

        5.    *Incidents involving non-parties* ............................... 30

    C.    Plaintiffs are unlikely to succeed on their viewpoint and content discrimination claim .................................................. 32

    D.    Plaintiffs are unlikely to succeed on their Fourth Amendment claims ....... 33

        1.    *Susan Tincher* ................................................ 34

        2.    *Abdikadir Noor* ............................................. 35

        3.    *Individuals Following ICE Vehicles in Cars* ..................... 36

        4.    *Alan Crenshaw* ............................................. 38

        5.    *Other non-parties* ........................................... 40

II.    The Remaining Equitable Factors Decisively Favor the Government. ................. 40

III.    The Proposed Injunction is Overbroad and Unworkable ......................... 42

    A.    The Injunction Is Overboard Because It Applies To Non-Parties Who Are Not Plaintiffs In This Case ............................... 43

    B.    The Proposed Injunction is an Improperly Prescriptive "Follow the Law" Injunction that Violates the Separation of Powers ........... 48

    C.    The Proposed Injunction Is Unworkable ...................... 52

IV.    Stay Pending Appeal ................................................. 56

CONCLUSION ............................................................. 57

# TABLE OF AUTHORITIES

## Cases

*Aldridge v. City of St. Louis*,
    75 F.4th 895 (8th Cir. 2023) ..................................................................*passim*

*Arizona v. Biden*,
    40 F.4th 375 (6th Cir. 2022) ............................................................................. 48

*Arizona v. United States*,
    567 U.S. 387 (2012) .......................................................................................... 3, 4

*Associated Press v. Budowich*,
    No. 25-5109, 2025 WL 1649265 (D.C. Cir. June 6, 2025), *reconsideration en banc denied*, 2025 WL 2047025 (D.C. Cir. July 22, 2025).  ................................. 32

*Avritt v. Reliastar Life Ins. Co.*,
    615 F.3d 1023 (8th Cir. 2010) ........................................................................... 19

*Baird v. Renbarger*,
    576 F.3d 340 (7th Cir. 2009) ............................................................................. 51

*Baltimore Sun Co. v. Ehrlich*,
    437 F.3d 410 (4th Cir. 2006) ............................................................................. 33

*Barnes v. Felix*,
    605 U.S. 73 (2025) ............................................................................................. 49

*Bell v. Neukirch*,
    979 F.3d 594 (8th Cir. 2020) ........................................................................ 33, 34

*Calvin Klein Cosms, Corp, v. Parfums de Coeur, Ltd.*,
    824 F.2d 665 (8th Cir. 1987) ............................................................................. 50

*Cantwell v. Connecticut*,
    310 U.S. 296 (1940) ........................................................................................... 24

*Chestnut v. Wallace*,
    947 F.3d (8th Cir. 2020) ............................................................................... 36, 37

*Chicago Headline Club v. Noem*,
    --- F. Supp. 3d ---, 2025 WL 3240782 (N.D. Ill. Nov. 20, 2025) ................... 39

*Cigna Corp. v. Bricker*,
    103 F.4th 1336 (8th Cir. 2024) ................................................................. 13

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ...................................................................... *passim*

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ........................................................................ 13

*Cnty. of Sacramento v. Lewis*,
    523 U.S. 833 (1998) ........................................................................ 56

*Colten v. Kentucky*,
    407 U.S. 104 (1972) ........................................................................ 27

*Daniels v. Woodbury Cnty.*,
    742 F.2d 1128 (8th Cir. 1984) ............................................................. 50

*Edwards v. Giles*,
    51 F.3d 155 (8th Cir. 1995) ................................................................ 51

*Frison ex rel. Frison v. Zebro*,
    Civ. A. No. 00-2688, 2002 WL 539069 (D. Minn. Apr. 5, 2002) ...................... 51

*Furlow v. Belmar*,
    52 F.4th 393 (8th Cir. 2022) ............................................................... 33

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982) ........................................................................ 48

*Gill v. Whitford*,
    585 U.S. 48 (2018) ......................................................................... 43

*Gilligan v. Morgan*,
    413 U.S. 1 (1973) .......................................................................... 44

*Graham v. Connor*,
    490 U.S. 386 (1989) ............................................................... 40, 41, 49

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ........................................................................ 24

*Heien v. North Carolina*,
　574 U.S. 54 (2014) ...................................................................34, 36, 38

*In re Neagle*,
　135 U.S. 1 (1890) ............................................................................. 5

*Just v. City of St. Louis*,
　7 F.4th 761 (8th Cir. 2021) .......................................................... 33, 36

*Kaleta v. Johnson*,
　12-cv-170, 2013 WL 3448148 (D. Minn. July 9, 2013) ............................... 51

*Kaley v. United States*,
　571 U.S. 320 (2014) ....................................................................... 34

*Laney v. City of St. Louis*,
　56 F.4th 1153 (8th Cir. 2023) ....................................................... 30, 40

*Lange v. California*,
　594 U.S. 295 (2021) ....................................................................... 33

*Lewis v. Casey*,
　518 U.S. 343 (1996) ....................................................................... 45

*Los Angeles Press Club v. Noem*,
　799 F. Supp. 3d 1036 (C.D. Cal. 2025) ............................................... 17

*Mazurek v. Armstrong*,
　520 U.S. 968 (1997) ....................................................................... 12

*Missouri v. McNeely*,
　569 U.S. 141 (2013) ....................................................................... 51

*Mitchell v. Kirchmeier*,
　28 F.4th 888 (8th Cir. 2022) ............................................................ 23

*Molina v. City of St. Louis*,
　59 F.4th 334 (8th Cir. 2023) ....................................................... 26, 27

*Nieves v. Bartlett*,
　587 U.S. 391 (2019) ................................................................. 20, 23

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................ 57

*Noem v. Vasquez Perdomo,*
    222 L.Ed.2d  1213(2025) ............................................... 13, 41, 56

*North Carolina v. Covington,*
    581 U.S. 486 (2017) ........................................................... 52

*O'Shea v. Littleton,*
    414 U.S. 488 (1974) ................................................... 13, 15, 16

*Park v. Forest Serv. of U.S.,*
    205 F.3d 1034 (8th Cir. 2000)........................................... 14, 18

*Puente v. City of Phoenix,*
    123 F.4th 1035 (9th Cir. 2024) .................................... *passim*

*Reporters Comm. for Freedom of Press v. AT&T,*
    593 F.2d 1030 (D.C. Cir. 1978) ............................................ 17
*Rinne v. Camden Cnty,*
    65 F.4th 378 (8th Cir. 2023) ......................................... 13, 16, 17

*Rizzo v. Goode,*
    423 U.S. 362 (1976) ..................................................... *passim*

*Ryburn v. Huff,*
    565 U.S. 469 (2012) ........................................................... 49

*Smook v. Minnehaha Cnty.,*
    457 F.3d 806 (8th Cir. 2006)............................................... 14

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ...................................................... 19, 30

*St. Louis Effort for AIDS v. Huff,*
    782 F.3d 1016 (8th Cir. 2015)............................................ 43

*Stearns v. Wagner,*
    122 F.4th 699 (8th Cir. 2024) ........................................ 22, 29

*Torres v. Madrid*,
   592 U.S. 306 (2021) ........................................................................... 39

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ........................................................................... 49

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025) ...................................................................... *passim*

*TruStone Fin. Fed. Credit Union v. Fiserv, Inc.*,
   No. 14-CV-424 (SRN/SER), 2014 WL 12603061 (D. Minn. Feb. 24, 2014) .............. 52

*Tyler v. Univ. of Ark. Bd. of Trs.*,
   628 F.3d 980 (8th Cir. 2011) ............................................................. 22

*United States v. Arvizu*,
   534 U.S. 266 (2002) ........................................................................... 34

*United States v. Betts*,
   99 F.4th 1048 (7th Cir. 2024) ......................................................... 24

*United States v. Patane*,
   542 U.S. 630 (2004) ........................................................................... 52

*United States v. Sokolow*,
   490 U.S. 1 (1989) ............................................................................... 34

*Updike v. Multnomah Cnty*,
   870 F.3d 939 (9th Cir. 2017) ........................................................... 18

*Walker v. City of Pine Bluff*,
   414 F.3d 989 (8th Cir. 2005) ........................................................... 37

*Wash. Mobilization Comm. v. Cullinane*,
   566 F.2d 107 (D.C. Cir. 1977) ..................................................... 24, 30

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982) ........................................................................... 45

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................. 12, 13, 41

**Constitutional Provisions**

U.S. Const. art. II, § 1, cl. 1 ........................................................................ 5

U.S. Const. art. II, § 3 ................................................................................. 5

**Statutes**

6 U.S.C. § 202 ............................................................................................. 4

6 U.S.C. § 252 ............................................................................................. 4

8 U.S.C. § 1103 ........................................................................................... 4

8 U.S.C. § 1226 ........................................................................................... 4

8 U.S.C. § 1231 ........................................................................................... 4

8 U.S.C. § 1357 ........................................................................................... 4

18 U.S.C. § 111 .................................................................................... *passim*

18 U.S.C. § 373 ......................................................................................... 35

19 U.S.C. § 1589a ....................................................................................... 4

40 U.S.C. § 1315 ......................................................................................... 5

Minn. Stat. § 169.011 ............................................................................... 38

Minn. Stat. § 169.18 ................................................................................. 38

**Rules**

Fed. R. Civ. P. 23 ................................................................................ 47, 48

Fed. R. Civ. P. 65 ................................................................................ 53, 57

**Other Authorities**

*Chicago Headline Club v. Noem*,
   No. 25-3023, Dkt. No. 28 (7th Cir. Nov. 19, 2025) ................................ *passim*

DHS Policy...................................................................................................6, 7

DHS, Press Release, Bounties Originating From Mexico Offered to Shoot ICE and CBP
    Officers in Chicago (October 14, 2025),
    https://www.dhs.gov/news/2025/10/14/bounties-originating-mexico-offered-shoot-ice-
    and-cbp-officers-chicago...................................................................................9

DHS, Press Release, DHS Condemns Dangerous Doxxing and Escalating Threats
    Against Federal Law Enforcement Officers (October 9, 2025),
    https://www.dhs.gov/news/2025/10/09/dhs-condemns-dangerous-doxxing-and-
    escalating-threats-against-federal-law...............................................................9

DHS, Press Release, Despite 1,000% Increase in Assaults on ICE Officers, Governor
    Newsom Signs Unconstitutional Law to Ban Law Enforcement Officer Protections
    (September 22, 2025), https://www.dhs.gov/news/2025/09/22/despite-1000-increase-
    assaults-ice-officers-governor-newsom-signs-unconstitutional.......................8

DHS, Press Release, DHS Issues Statement on Targeted Attack on Dallas ICE Facility
    (September 24, 2025), https://www.dhs.gov/news/2025/09/24/dhs-issues-statement-
    targeted-attack-dallas-ice-facility. ..................................................................8

DHS Press Release, DHS Releases Statement on Violent Rioters Assaulting ICE Officers
    in Los Angeles, CA and Calls on Democrat Politicians to Tone Down Dangerous
    Rhetoric About ICE (June 7, 2025), https://www.dhs.gov/news/2025/06/07/dhs-
    releases-statement-violent-rioters-assaulting-ice-officers-los-angeles-ca-and. ...............8

DHS, Press Release, Law Enforcement Arrests Suspect Who Made Bomb Threat on ICE
    Dallas Facility (August 26, 2025), https://www.dhs.gov/news/2025/08/26/law-
    enforcement-arrests-suspect-who-made-bomb-threat-ice-dallas-facility; ....................8

DHS Statement on Sanctuary Politicians' Obstruction of Law Enforcement and Bomb
    Threat at 26 Federal Plaza in New York City (September 18, 2025),
    https://www.dhs.gov/news/2025/09/18/dhs-statement-sanctuary-politicians-
    obstruction-law-enforcement-and-bomb-threat-26. .........................................8

ICE Newsroom, ICE Reports Second Death from Dallas Sniper Attack After Detainee
    Succumbs to Injuries (Oct. 2, 2025), https://www.ice.gov/news/releases/ice-reports-
    second-death-dallas-sniper-attack-after-detainee-succumbs-injuries. ............8

Jon Collins, *ICE agents call for backup during Minneapolis traffic stop, bystanders hurl
    insults and snowballs*, MPRnews (updated Dec. 17, 2025, at 10:50 AM)

https://www.mprnews.org/story/2025/12/15/ice-agents-call-for-backup-during-minneapolis-traffic-stop ................................................................................. 36

*Los Angeles Press Club v. Noem*,
No. 25-5975 (Dec. 18, 2025). ................................................................. 43, 46

MPR News "Federal agents arrest citizens observer watching ICE detain neighbors on her north Minneapolis block" (Dec. 9, 2025)
https://www.mprnews.org/story/2025/12/09/federal-agents-arrest-citizen-observer-watching-ice-north-minneapolis ...................................................... 10

Susan Du, Star Tribune, Inside the organized resistance to ICE in Minnesota ............... 26

Video footage and recorded 911 call from the December 15, 2025, incident available at
https://www.mprnews.org/story/2025/12/15/ice-agents-call-for-backup-during-minneapolis-traffic-stop (last visited Jan. 4, 2025). ............................................ 12, 24

**INTRODUCTION**

Immigration and Customs Enforcement (ICE) officers in Minnesota have been enforcing federal immigration laws by locating, arresting, and detaining aliens unlawfully present in the country, including many criminals who pose a threat to public safety.

Unfortunately, these public servants have faced threats and violence in performing their work. Large crowds have surrounded ICE officers in the process of making an arrest and individuals have hurled projectiles at them to the point where the officers were "panicked" and had to call for backup. Declaration of Abdikair Noor, (Noor Decl.) ¶ 10, ECF No. 1-5. One person approached ICE officers who had established a perimeter to arrest aliens believed to be dangerous, refused multiple orders to get back, and when being arrested for this conduct, yelled to urge onlookers to physically interfere with her arrest, on the dubious basis that an arrest by a federal law enforcement officer is the same thing as a kidnapping. Declaration of Susan Tincher (Tincher Decl.) Decl. ¶¶ 5, 7, 10 ECF No. 1-1. Some have aggressively chased ICE vehicles down Minnesota's roadways, such as by following a vehicle through multiple loops through an area while honking, Declaration of Imogen Page (Page Decl.) ¶¶ 3-4 ECF No. 1-9, or by chasing an ICE vehicle back to ICE's Minneapolis office and then driving into a crowd of ICE vehicles gathered outside the building. Declaration of Lucia Webb, (Webb Decl.) ¶¶ 6-8, ECF No. 1-4. Others have formed crowds that have stopped or hindered officers from leaving the scene of a law enforcement operation, thrown objects at officers or their cars, and disobeyed orders to move out of the way. Declaration of Alan Crenshaw (Crenshaw Decl.) ¶¶ 10, 13 ECF No.

1-6; Declaration of Moriah O'Malley (O'Malley Decl.) ¶ 5, ECF No. 1-13.  All of these examples come not from Defendants' evidence but from the testimony of Plaintiffs and their supporting declarants.

In the midst of this epidemic of violent, obstructive, dangerous, and often criminal behavior, ICE officers have occasionally arrested individuals for forcibly assaulting or impeding officers.  They have occasionally stopped the vehicles chasing them and admonished the drivers that they are interfering with federal law enforcement or causing a safety hazard.  They have occasionally warned crowds (including some protestors engaged in violence) in their way to disperse, and when crowds have refused, used pepper spray or other non-lethal force to secure a safe exit.

Plaintiffs claim in this lawsuit that this conduct violates the First Amendment and Fourth Amendment.  They are wrong.  No one doubts that the First Amendment protects the right to argue that federal laws should go unenforced, to oppose the federal government's efforts to enforce federal law, and to express that opposition.  But assaulting federal officers, damaging federal property, blocking officers from leaving a volatile scene where such assaults are occurring, or chasing a law enforcement vehicle is not protected speech.  Defendants' measured responses to such conduct are neither retaliation for protected speech, nor unreasonable seizures.

Plaintiffs' request for a preliminary injunction fails for many other additional reasons.  That a plaintiff claims to have been harmed by an allegedly unlawful encounter with law enforcement in the past does not give the plaintiff standing to obtain an injunction against such conduct in the future.  To have standing for such prospective relief, a plaintiff

must show an immediate threat that he or she will suffer from similar wrongful conduct in the future. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). Even if Plaintiffs' claims based on past incidents had merit (and they do not), it is entirely speculative that the Plaintiffs will experience similar incidents in the future. For similar reasons, Plaintiffs cannot show a threat of imminent irreparable harm, as necessary to sustain injunctive relief.

Finally, Plaintiffs' requested injunction is substantially overbroad and improper. It would place this Court in the business of micromanaging DHS officers' conduct throughout Minnesota, including when and how officers can use force, display their firearms, make arrests, and use crowd control mechanisms. It applies far beyond the six named Plaintiffs who live in and around Minneapolis to each of the more than 5 million Minnesotans from the Canadian border to the Iowa state line, and everywhere in between, far exceeding the limit of federal courts' equity power to "offer complete relief *to the plaintiffs before the court*." *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025). And Plaintiffs' proposed injunction contains undefined terms and vague standards that would prove as unworkable to officers in the field attempting to comply as it would to this Court in seeking to enforce.

The Court should deny Plaintiffs' Motion for Preliminary Injunction.

## **BACKGROUND**

### 1. **Congress Has Conferred Authority on DHS (Including ICE) to Enforce Federal Immigration Laws and Protect Federal Property**

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394

(2012). In a series of immigration laws mainly codified in Title 8 of the United States Code, Congress has established an "extensive and complex" framework for the "governance of immigration and alien status." *Id.* at 395. "A principal feature" of this congressionally established "removal system is the broad discretion exercised by immigration officials." *Id.* at 396.

Congress has charged the Secretary of Homeland Security with "administration and enforcement" of immigration laws, including vesting immigration officers and agents with broad authority to arrest, detain, and remove aliens who are unlawfully present or otherwise removable. 8 U.S.C. §§ 1103(a)(1), 1226(a) (permitting arrest and detention upon a warrant issued by the Secretary); *id.* § 1226(c)(1) (the Secretary "shall take into custody any alien" who has committed certain crimes); *id.* 1231(a)(1)(A), (2) (authorizing detention of aliens with final removal orders); *see also id.* § 1357(a) (listing powers of immigration officers, including interrogation without a warrant of "any alien or person believed to be an alien as to his right to be or to remain in the United States").

DHS is empowered to "control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5). U.S. Immigration and Customs Enforcement (ICE), an agency within DHS, is charged with enforcing and administering federal immigration laws, preventing terrorism, and combating transnational criminal threats. *See, e.g.*, 6 U.S.C. §§ 202, 252(a)(3). ICE law enforcement personnel have criminal and civil arrest authority. *See, e.g.*, 8 U.S.C. § 1357(a)(2), (4), (5); 19 U.S.C. § 1589a. ICE's mission includes arresting aliens unlawfully present in the country and, when appropriate, detaining them during immigration proceedings and ultimately

removing them from the country.  Ex. 1,[1] Decl. of David Easterwood ("Easterwood Decl.") ¶¶ 8-10.

The federal government also has broad authority to protect federal property, personnel, and government functions.  Congress has authorized DHS to "protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government."  40 U.S.C. § 1315(a).  In addition, the Constitution grants the President the "executive Power," U.S. Const. art. II, § 1, cl. 1, and affords him both the authority and the responsibility to "take care that the Laws be faithfully executed."  U.S. Const. Art. II, § 3. These provisions authorize the President to enforce federal statutes as well as to protect federal officials, federal property, and the performance of federal functions. *See In re Neagle*, 135 U.S. 1, 64–68 (1890).

In exercising this authority, DHS has issued policy guidance on the use of force by its personnel.  *See* Easterwood Decl. ¶ 11; Update to the Department Policy on the Use of Force (Feb. 6, 2023), available at https://www.dhs.gov/sites/default/files/2023-04/23_0206_s1_use-of-force-policy-update.pdf ("DHS Policy").  "The general principle undergirding the [DHS] Use of Force Policy is the respect for human life and the communities served.  To that end, the Use of Force Policy requires that law enforcement officers only use force when no reasonably effective, safe, and feasible alternative appears to exist and may use only the level of force that is objectively reasonable in light of the

---

[1] Citations to "Ex. __" are to the exhibits attached to this brief.

facts and circumstances confronting the law enforcement officer at the time force is applied." Easterwood Decl. ¶ 11.

DHS policy authorizes officers and agents to "use only the level of force that is objectively reasonable in light of the facts and circumstances confronting the law enforcement officer at the time force is applied," recognizing that officers and agents are "often forced to make split-second judgments, in circumstances that are tense, uncertain, and rapidly evolving." DHS Policy §§ II.B & C.2. The policy states that law enforcement personnel should "should seek to employ tactics and techniques that effectively bring an incident under control while promoting the safety of [the officer] and the public, and that minimize the risk of unintended injury or serious property damage." *Id.* § III.C. But this does not mean that law enforcement officers must "meet force with equal or lesser force," nor that law enforcement officers "have a duty to retreat to avoid the reasonable use of force, nor are they required to wait for an attack before using reasonable force to stop a threat." *Id.* § III.D.

Accordingly, "law enforcement officers are trained in a variety of techniques to aid in appropriately resolving encounters, to include de-escalation," employing "tactics and techniques that effectively bring an incident under control while promoting public safety and minimizing the risk of unintended injury." Easterwood Decl. ¶ 12. Moreover, the DHS Policy "requires ICE law enforcement officers, when feasible, prior to the application of force, to attempt to identify themselves and issue a verbal warning to comply with instructions." *Id.* ¶ 13; *see also* DHS Policy § III.E. Although, whether a warning is feasible, the officer is "guided by several considerations, including but not limited to,

whether resulting delay is likely to increase danger to the ICE law enforcement officer or others, result in the destruction of evidence, allow for a subject's escape, or result in the commission of a crime." *Id.*

But use of force standards are guidelines not to be mechanically applied. DHS Policy § II.C.1. When exigent circumstances arise, "for self-defense or the defense of another, DHS [officers or agents] are authorized to use any available object or technique in a manner that is objectively reasonable in light of the circumstances." *Id.* § III.F; *see also id.* § XII.E. (defining "exigent circumstances"); *see also* Easterwood Decl. ¶ 13.

In all events, DHS policy emphasizes "respect for human life," "de-escalation," and "use of safe tactics." *Id.* at. III. DHS also has instructed its employees about the importance of respecting activities protected by the First Amendment. *See* DHS Memo re: Information Regarding First Amendment Protected Activities (May 17, 2019) (attached as Exhibit 2). "DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights." *Id.* at 1.

Beginning in early December, Operation Metro Surge was initiated to "significantly increase "at-large" arrests of illegal aliens in the Twin Cities metro area. Easterwood Decl. ¶ 5. This operation focuses on "individuals with executable final orders." Since commencement of this operation, ICE has arrested more than 1,000 illegal aliens. *Id.*

### 2. Violence Against DHS Officers Across the Nation and in Minnesota

Unfortunately, opposition to this administration's vigorous enforcement of federal immigration law has taken the form of violence against federal law enforcement. Violence against ICE officers and agents has increased approximately 1,000 percent across the

United States.[2]  The attacks against immigration enforcement personnel are widespread, take on many forms, and are occurring across the United States.  An "Anti-ICE" sniper attempted to assassinate ICE officers in the Dallas, Texas area by shooting indiscriminately into an ICE facility.[3]  No ICE personnel were struck, but three detainees were shot and two were killed.[4]  This incident tragically illustrates that violence targeted at immigration enforcement officers and agents also threatens the safety of detainees and members of the public. ICE facilities have faced multiple bomb threats.[5]  Federal officers and agents face violent attacks at federal buildings,[6] at immigration processing facilities, and while on patrol conducting immigration enforcement operations.  Foreign criminal organizations have offered thousands of dollars as bounties for the murder of federal immigration

---

[2]  DHS, Press Release, Despite 1,000% Increase in Assaults on ICE Officers, Governor Newsom Signs Unconstitutional Law to Ban Law Enforcement Officer Protections (September 22, 2025), https://www.dhs.gov/news/2025/09/22/despite-1000-increase-assaults-ice-officers-governor-newsom-signs-unconstitutional.

[3]  DHS, Press Release, DHS Issues Statement on Targeted Attack on Dallas ICE Facility (September 24, 2025), https://www.dhs.gov/news/2025/09/24/dhs-issues-statement-targeted-attack-dallas-ice-facility.

[4]  *Id.*; ICE Newsroom, ICE Reports Second Death from Dallas Sniper Attack After Detainee Succumbs to Injuries (Oct. 2, 2025), https://www.ice.gov/news/releases/ice-reports-second-death-dallas-sniper-attack-after-detainee-succumbs-injuries.

[5]  *See, e.g.*, DHS, Press Release, Law Enforcement Arrests Suspect Who Made Bomb Threat on ICE Dallas Facility (August 26, 2025), https://www.dhs.gov/news/2025/08/26/law-enforcement-arrests-suspect-who-made-bomb-threat-ice-dallas-facility; DHS Statement on Sanctuary Politicians' Obstruction of Law Enforcement and Bomb Threat at 26 Federal Plaza in New York City (September 18, 2025), https://www.dhs.gov/news/2025/09/18/dhs-statement-sanctuary-politicians-obstruction-law-enforcement-and-bomb-threat-26.

[6]  DHS Press Release, DHS Releases Statement on Violent Rioters Assaulting ICE Officers in Los Angeles, CA and Calls on Democrat Politicians to Tone Down Dangerous Rhetoric About ICE (June 7, 2025), https://www.dhs.gov/news/2025/06/07/dhs-releases-statement-violent-rioters-assaulting-ice-officers-los-angeles-ca-and.

enforcement officers and agents.[7]  Because federal immigration officers and agents have faced doxing, including revelation of their home addresses, these threats extend to their families.[8]

In and around Minneapolis, ICE officers operating out of the St. Paul Office have been confronted with "increased threats, violence, aggression, attacks, vehicle block-ins, and obstruction of immigration enforcement operations." Easterwood Decl. ¶ 21. These attacks include officers being violently pushed, hit, body slammed, objects thrown, pathways obstructed, and property damaged. *Id.* ¶¶ 21-30.  There have also been numerous accounts of vehicles being rammed, hit, and vandalized. *Id.* ¶ 31.

### 3. DHS Officers Have Responded Lawfully and Appropriately to Recent Attacks and Riots on Federal Personnel and Property in Minnesota

Plaintiffs' motion seeks relief based on several violent attacks and dangerous riots directed against federal personnel and property that occurred in the Twin Cities metro area beginning in mid-November 2025.  Plaintiffs can essentially be divided into two categories (1) individuals on the ground attempting to deter, interfere, and obstruct active immigration enforcement operations and (2) individuals attempting to deter, intimidate, chase and follow immigration enforcement officers in their vehicles.  These alleged forms of "protest" or "observation" actually consist of varying degrees of obstruction and

[7] DHS, Press Release, Bounties Originating From Mexico Offered to Shoot ICE and CBP Officers in Chicago (October 14, 2025), https://www.dhs.gov/news/2025/10/14/bounties-originating-mexico-offered-shoot-ice-and-cbp-officers-chicago.
[8] DHS, Press Release, DHS Condemns Dangerous Doxxing and Escalating Threats Against Federal Law Enforcement Officers (October 9, 2025), https://www.dhs.gov/news/2025/10/09/dhs-condemns-dangerous-doxxing-and-escalating-threats-against-federal-law.

interference with law enforcement operations. Defendants' evidence presents a far more complete picture of these interferences and attacks, demonstrating that federal officers responded lawfully and appropriately in each of these dangerous situations.

Plaintiff Tincher Arrest. On December 9, 2025, while ICE officers were conducting a criminal investigation in North Minneapolis, Plaintiff Tincher, despite acknowledging that others were observing from a safe distance (Tincher Decl. ¶¶ 6-7), attempted to enter the established perimeter of the law enforcement operation. *See* Easterwood Decl. ¶ 24. Tincher was instructed multiple times to step back from the perimeter but "verbally refused and expressed her continued intent to cross into the established perimeter." *Id*. Tincher repeatedly attempted to enter the perimeter and even tried to push an officer out of the way. *Id*. Thereafter, when advised she was going to be placed under arrest, Tincher was so resistant she had to be taken to the ground, she continuously attempted to pull away, and even had to be lifted into the vehicle after refusing to get in. *Id*. Once inside the vehicle, Tincher continued to attempt to free herself of the handcuffs and unbuckle herself. *Id*. Tincher later acknowledged in an interview that when an ICE officer told her to get back – she said, "I didn't get back." *See* MPR News "Federal agents arrest citizens observer watching ICE detain neighbors on her north Minneapolis block" (Dec. 9, 2025) https://www.mprnews.org/story/2025/12/09/federal-agents-arrest-citizen-observer-watching-ice-north-minneapolis. The video of Tincher's arrest completes the picture of resistance where she can be seen pulling away from officers and yelling for "help." *Id*.

Plaintiff Crenshaw Incident. On December 9, 2025, ICE officers were conducting enforcement operations in Cedar-Riverside, Minneapolis when a group of individuals,

including Plaintiff Crenshaw, "gathered and began obstructing traffic and impeding government vehicle progress." Easterwood Decl. ¶ 25. The group honked their horns; blew whistles; threw snowballs, threw ice, threw other projectiles; kicked and hit government vehicles; and shouted insults and obscenities at officers. *Id.* Despite multiple commands over a public address system and by officers, protestors refused to comply and continued the assaults. *Id.* As a result, "[t]o safely advance, ICE officers deployed OC sprays to disperse the crowds blocking the street" and "[a]s a tactic to deter further aggression and advancement from protestors, ICE officers kept their OC sprayers aimed at the crowds." *Id.* In his own narrative, Plaintiff Crenshaw describes impediment of officers' vehicles and their attempts with less lethal munitions to clear the area, yet also admits he remained "standing in the muck on the side of the road in the crosswalk," i.e., on the street while officers were trying to exit out of a violent crowd. *See* Crenshaw Decl. ¶ 13.

Plaintiff Noor Arrest. On December 15, 2025, there was a particularly violent swarming of federal law enforcement officials by Plaintiff Noor as well as 60-70 others. Easterwood Decl. ¶ 27. Once Noor arrived, he identified individuals in a vehicle who appeared to be the subjects of a possible immigration operation. Noor Decl. ¶¶ 4-5. Noor approached the scene, yelled to the subjects instructing them not to cooperate with law enforcement, including, keeping their doors locked and refusing to roll their windows down. *Id.* ¶ 6. This targeted arrest resulted in small number of officers being surrounded by 60-70 people throwing items and assaulting officers. Easterwood Decl. ¶ 27; *see also* https://www.mprnews.org/story/2025/12/15/ice-agents-call-for-backup-during-

minneapolis-traffic-stop (last visited Jan. 4, 2025) (video footage and recorded 911 call). Plaintiff Noor "threatened to interfere, acted aggressively, pushed up into ICE officers' faces, shouted obscenities, and threw rocks and ice at ICE officers." Easterwood Decl. ¶ 27. The crowd was incredibly violent resulting in officers being forced to discontinue the targeted arrest, return to their vehicles, and call for assistance since they were blocked in by violent individuals. *Id.* ICE officers sustained bodily injuries, and government vehicles sustained property damage. *Id.* Plaintiff Noor was one of two individuals arrested following this incident. *Id.*

Pursuit of officers in their vehicles Plaintiffs Biestman, Lee, and Webb. Similar to the unprecedented swarming of law enforcement operations, there has been a rise in pursuit of government vehicles. Easterwood Decl. ¶ 29. Virtually nonexistent prior to 2025, pursuit of ICE vehicles occurs almost daily. *Id.* Such pursuits have resulted in vehicular crashes, endangerment of officer and public safety, harassment, and even at least one arrest by local authorities. *Id.*

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), which should only be granted when "the movant, by a clear showing, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation and emphasis omitted). To obtain such a remedy, Plaintiffs must show "'[1] that his is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Cigna Corp.*

*v. Bricker*, 103 F.4th 1336, 1342 (8th Cir. 2024) (quoting *Winter*, 555 U.S. at 20). Likelihood of success on the merits, while not singularly controlling, "is the most significant." *Id.* (citation omitted).

## ARGUMENT

**I.    Plaintiffs are unlikely to prevail on the merits of any of their asserted claims.**

    **A.    Plaintiffs lack standing to seek prospective relief.**

Plaintiffs lack standing to seek prospective injunctive relief based on past allegations that certain individual officers violated their First Amendment and their Fourth Amendment rights. *See Lyons*, 461 U.S. at 111. Such standing "does not exist merely because plaintiffs experienced past harm and fear its recurrence." *Perdomo*, 222 L.Ed.2d at 1215 (Kavanaugh, J., concurring in grant of stay application) (citing *Lyons*, 461 U.S. 95). Plaintiffs must instead demonstrate a "real or immediate threat that [they] will be wronged again—a 'likelihood of substantial and immediate irreparable injury.'" *Rinne v. Camden Cnty*, 65 F.4th 378, 386 (8th Cir. 2023) (quoting *Lyons*, 461 U.S. at 111). In fact, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief … if unaccompanied by any continuing present adverse effects." *Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974). Thus, Plaintiffs must establish that they themselves face an immediate threat of future harm and may not rely on a "speculative chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

The Supreme Court has consistently held that individual plaintiffs lack standing to seek forward-looking and programmatic relief based on isolated incidents of alleged

unlawful behavior by law enforcement.  In *Lyons*, police officers stopped the plaintiff for a traffic violation, seized him, and placed him in a chokehold.  461 U.S. at 97.  The Court held that the plaintiff had not shown that "he was likely to suffer future injury from the use of the chokeholds" because no "immediate threat" existed that the plaintiff would be subjected to another chokehold "without any provocation or resistance on his part," even though the police department allegedly had a policy of "routinely apply[ing] chokeholds in situations where they are not threatened by the use of deadly force."  *Id.* at 105.

Applying *Lyons*, the Eighth Circuit has repeatedly recognized that plaintiffs lack standing to seek prospective injunctive relief merely because they were subject to allegedly improper law-enforcement conduct in the past.  *See Smook v. Minnehaha Cnty.*, 457 F.3d 806, 816 (8th Cir. 2006) (finding no standing to obtain an injunction against future arrest and strip search based on speculation and conjecture); *Park v. Forest Serv. of U.S.*, 205 F.3d 1034, 1038–39 (8th Cir. 2000) (holding no standing to seek an injunction because there was "no indication in the record in our case that the Forest Service maintained an official policy of using unlawful checkpoints").

Similarly, in *Rizzo v. Goode*, 423 U.S. 362 (1976), the Supreme Court held that Article III standing concerns precluded a broad injunction in a class action lawsuit against the city of Philadelphia to reform the conduct of the city police.  The plaintiffs alleged widescale illegal and unconstitutional behavior by the police "against all Philadelphia residents in general."  *Id.* at 367.  The district court issued a sweeping injunction imposing "a comprehensive program for dealing adequately with civilian complaints" about police misconduct.  *Id.* at 369.  The Supreme Court reversed, holding that the district court's order

14

was "an unwarranted intrusion by the federal judiciary into the discretionary authority committed to them by state and local law to perform their official functions." *Id.* at 366. The Supreme Court criticized the district court for transforming isolated disputes between "individual citizens and certain policemen" into an "attempt by the federal judiciary to resolve a 'controversy' between the entire citizenry of Philadelphia and the petitioning elected and appointed officials" about the way to address police misconduct. *Id.* at 371. The Supreme Court found the lawsuit presented Article III standing concerns because plaintiffs' asserted basis for injunctive relief was speculation about what a "small, unnamed minority of policemen might do to them in the future." *Id.* at 372. The Supreme Court also emphasized that the district court's certification of a class of all Philadelphia residents could not cure the standing problem. *Id.* at 373–77. The district court had no Article III power to enter injunctive relief because Plaintiffs' support for an Article III case or controversy was based on about 20 past incidents in a city with 3 million inhabitants. *Id.* at 373.

These precedents foreclose Plaintiffs' standing on all claims. The chances of Plaintiffs' alleged injuries recurring would take the Court "into the area of speculation and conjecture," *O'Shea*, 414 U.S. at 497, the antithesis of a sufficiently "imminent" injury. Unlike traditional protests, such as those largely centered around specific locations at predictable times, the so-called protests at issue in this case involve ad-hoc attempts to track, deter, and interfere with federal officers engaged in immigration and law enforcement operations. Plaintiffs allege that on one-off occasions they were confronted by officers for following them in vehicles (Plaintiffs Biestman, Lee, and Webb), arrested

15

while actively attempting to impede a criminal investigation (Plaintiff Tincher), arrested in the midst of a violent swarm of protestors (Plaintiff Noor), and/or subject to crowd-control devices during a violent swarm of protestors (Plaintiff Crenshaw). Thus, given these one-off proximity dependent occurrences, the likelihood of the same Plaintiffs' alleged injuries recurring is even more tenuous than Plaintiffs making similar claims in other jurisdictions. *See Chicago Headline Club v. Noem*, No. 25-3023, Dkt. No. 28 (7th Cir. Nov. 19, 2025) (Order, Chicago Headline Club) (granting stay of injunction and expressing reservations about Article III standing under *Lyons*). Simply put, there is no indication that "the same" events will occur or that any Plaintiff would be present if they did. *See Rinne*, 65 F.4th at 386 ("[A] plaintiff must show real or immediate threat that *he* will be wronged again" (quoting *Lyons*, 461 U.S. at 111) (emphasis added)). Thus, any standing theory based on immigration enforcement operations generally in Minnesota would require the Court to venture "into the area of speculation and conjecture": that one of the named Plaintiffs, out of over 5.5 million residents in the state, is likely and imminently to encounter an immigration official and face an unlawful use of force from DHS. *O'Shea*, 414 U.S. at 497; *see Lyons*, 461 U.S. at 105-06.

Plaintiffs' request for a similar preliminary injunction suffers from the same flaws as the injunctive relief that the Supreme Court vacated in *Rizzo*. Plaintiffs have attempted to bring overly broad class-wide claims on behalf of "all persons who do or will in the future record, observe, and/or protest against the DHS immigration operations that have been ongoing in this District since December 4, 2025" based on speculative allegations that someone might one day be subjected to an unlawful use of force while protesting an

immigration arrest. *See* Compl. ECF No. 1. Notably, "this District" encompasses the entire state of Minnesota. As in *Rizzo*, the small handful of incidents Plaintiffs highlight— out of the 5.5 million people in the District of Minnesota—are insufficient to establish that an "injury in fact" is "actual or imminent." The mere possibility of future misconduct cannot support such sweeping "judicial supervision of [law enforcement] activity." *Reporters Comm. for Freedom of Press v. AT&T*, 593 F.2 d 1030, 1068, 1069-70 (D.C. Cir. 1978) (citing *Rizzo*, 423 U.S. at 373-75). Where, as here, Plaintiffs seek relief from generalized and unspecified future injury, they are unable to "show a real or immediate threat that [they] will be wronged again—a 'likelihood of substantial and immediate irreparable injury.'" *Rinne*, 65 F.4th at 386 (quoting *Lyons*, 461 U.S. at 111).

Plaintiffs' standing theory is even weaker than the plaintiffs in *Rizzo* and *Lyons*, as Plaintiffs have not shown that DHS has a general policy of retaliation or excessive force. To the contrary, DHS expressly prohibits law enforcement personnel from "target[ing], or discriminat[ing] against individuals for exercising their rights to protest, record, or legally observe." Easterwood Decl. ¶¶ 11-13. Moreover DHS's policies "correctly set out the bounds for the use of less lethal munitions and crowd-control weapons." *Los Angeles Press Club v. Noem*, 799 F. Supp. 3d 1036, 1067 (C.D. Cal. 2025), *appeal filed,* No. 25-5975 (9th Cir., Sep. 2025); *see also* Easterwood Decl. ¶¶ 11-13. Plaintiffs have not even alleged that DHS has a general policy of retaliation or excessive force. *See Lyons*, 461 U.S. at 104 ("[P]laintiffs' showing at trial of a relatively few instances of violations by individual police officers, without any showing of a deliberate policy on behalf of the named defendants, did not provide a basis for equitable relief"); *Park*, 205 F.3d at 1029 (no

17

standing because Forest Service did not have official policy of unlawful check points). Since the beginning of Operation Metro Surge, ICE has arrested more than 1,000 illegal aliens. Easterwood Decl. ¶ 5. DHS officers have used force only on limited occasions and only when necessary. Plaintiffs have not and cannot colorably claim that retaliatory or excessive force has been used at *all* such protests, as presumably would have occurred if a DHS policy condoning retaliation or excessive force existed.

Moreover, Plaintiffs' evidence does not establish that they would again be subjected to retaliatory force even if such a policy existed. *See Lyons*, 461 U.S. at 105. As explained, there have been over 1,000 arrests of illegal aliens since Operation Metro Surge began, yet plaintiffs have identified only a comparatively small number of allegedly retaliatory incidents involving such arrests; most alleged incidents did not involve plaintiffs at all. *See* Class Action Compl. ECF No. 1 (only 6 named Plaintiffs were among the 14 declarants, with two being in the same car at the time of the alleged retaliation). Thus, even if Plaintiffs intend to continue their activities as observers, there is nothing to suggest that they will be retaliated against in the future. *See Lyons*, 461 U.S. at 105-06, 108; *Updike v. Multnomah Cnty,* 870 F.3d 939, 948 (9th Cir. 2017) (rejecting plaintiff's argument that, because officers had denied him interpretive services during five prior arrests, he was at risk of being denied interpretive services in the future).

Finally, Plaintiffs' class claims do not save them. Fundamentally, the fact that Plaintiffs are attempting to bring a class action suit "adds nothing to the question of standing" here, "for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified

members of the class to which they belong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 n.6 (2016) (cleaned up and citations omitted). That some unnamed class members might hypothetically be able to demonstrate that *they* have standing is irrelevant to whether *Plaintiffs themselves* do. *Id.* And class action or not, Plaintiffs' lack of standing necessarily precludes the Court from adjudicating their claims. *See Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023 (8th Cir. 2010).

**B.    Plaintiffs are unlikely to prevail on their First Amendment retaliation claims.**

Plaintiffs are unlikely to succeed on their claim that Defendants violated the First Amendment by retaliating against them for protected First Amendment activity. Plaintiffs making a retaliation claim must make three showings:

> To prevail on their retaliation claim, the plaintiffs must show that they engaged in protected First Amendment activity. If they can make that showing, then the focus shifts to whether the officers took an adverse action that would chill a person of ordinary firmness from continuing in the protected activity. Finally, the plaintiffs must prove the officers would not have taken the adverse action but for harboring retaliatory animus against the plaintiffs because of the exercise of their First Amendment rights.

*Aldridge v. City of St. Louis*, 75 F.4th 895, 898-99 (8th Cir. 2023) (cleaned up). Each Plaintiff fails to make at least one of these showings. In large part, Plaintiffs were not engaged in protected First Amendment activity but instead were engaged in conduct such as chasing ICE vehicles in their cars or assaulting federal officers. To the extent they were engaged in First Amendment activity, any adverse actions taken by officers were motivated not by retaliatory animus but by officers attempting to fulfill their official duties in

enforcing the immigration laws while protestors often engaged in obstructive, violent, or dangerous activity.

### 1.    *Susan Tincher*

Plaintiff Tincher's First Amendment retaliation claim is unlikely to succeed because officers had probable cause to arrest her for forcibly assaulting or impeding federal officers under 18 U.S.C. § 111.  For First Amendment retaliatory arrest claims, a general "no-probable cause rule" applies.  *Nieves v. Bartlett*, 587 U.S. 391, 404 (2019).  Under this rule, "[a]bsent . . . a showing" that officers lacked probable cause for the arrest, "a retaliatory arrest claim fails."  *Id.*[9]  Here, Easterwood's declaration establishes that Tincher approached the perimeter that ICE had established to perform a law enforcement operation, was asked "multiple times to step back from the established perimeter," and "verbally refused and expressed her continued intent to cross into the established perimeter." Easterwood Decl. ¶ 24.  Then, she "kept walking into the established perimeter, she put her hands up and attempted to push the ICE officer out of the way."  *Id.*  This conduct — attempting to physically assault an officer and impede a law enforcement operation by broaching the perimeter established by officers — gave the officers probable cause to arrest her for forcibly assaulting, impeding, or obstructing under 18 U.S.C. § 111.

---

[9] A "narrow" exception to this rule applies in situations where officers "typically exercise their discretion not to" make arrests, such as situations in which "jaywalking is endemic but rarely results in arrest."  *Nieves, 587 U.S.* at 406-07.  But Plaintiffs do not and cannot claim that federal officers rarely make arrests under 18 U.S.C. § 111, for assaulting, impeding, or interfering with federal officers.

To be sure, Tincher asserts that she "was just standing there," Tincher Decl. ¶ 9, and does not acknowledge attempting to physically push past an ICE officer into the perimeter. But even if the Court credits her declaration and the declaration of two witnesses submitted by Plaintiffs, those declarations tend to undermine rather than support her retaliatory arrest claim. It is undisputed that officers formed a perimeter around a house, *see* Tincher Decl. ¶ 5; Declaration of Nicole Sorensen, (Sorenson Decl.) ¶ 9, ECF No. 1-12, where they were attempting to arrest and detain individuals that officers believed to be dangerous, *see* Declaration of Katherine Rollins, (Rollins Decl.) ¶ 8, ECF No. 1-10, (officers suspected "weapons or violence" at the house). Tincher approached very close to the perimeter. Tincher Decl. ¶ 7 (about 6 feet from the perimeter); Sorensen Decl. ¶ 10 ("at least several feet" from the perimeter). Tincher claims that the only words she spoke before being arrested were "Are you ICE?", Tincher Decl. ¶ 7, and she did not express any opposition to ICE. She disobeyed commands from multiple officers to "get back." *See id.*; Woman observing ICE arrested during early morning action in north Minneapolis (0:22) ("I approached one of one of the officers I saw there and asked if she was ICE, and she told me to get back, and I didn't get back."). Then several officers pulled her to the ground and handcuffed her. Tincher Decl. ¶¶ 8-9; Rollins Decl. ¶ 12.

By contrast, other individuals on the scene expressed more vocal opposition to ICE, but did not disobey orders, and ICE did not arrest or use force against those individuals. For example, Rollins blew a whistle to alert neighbors to ICE activity and asked if they had a judicial warrant. Rollins Decl. ¶ 8. Officers allegedly spoke "mockingly" to her but did not use force. *Id.* Sorensen approached an officer and asked, "Is that a US citizen you

21

have?" and started recording.  Sorensen Decl. ¶ 12.  An officer asked her to "get back" or "stay back"; unlike Tincher, she "took a step back," obeying the command.  *Id.*  The officers did not arrest her or interfere with her recording.  *Id.* ¶ 18.

Even crediting Plaintiffs' version of events, the most plausible inference is that Tincher was arrested because she ignored multiple commands to back up from the perimeter that the officers had established to arrest individuals they believed to be dangerous.  Further supporting that inference is that Sorensen, who also approached the perimeter and expressed vocal opposition to ICE, was not arrested after she obeyed a command to back up.

Plaintiffs argue that Tincher's arrest was retaliatory "[g]iven the closeness in time between Tincher's expression and arrest, and the lack of any legitimate law enforcement purpose for arresting her."  Mem. Of Law in Supp. Of Pls.' Mot. For TRO, (Pls.' Mem.) 26, ECF No. 18.  But "more than a temporal connection is required to present a genuine factual issue on retaliation."  *Aldridge*, 75 F.4th at 899 (quoting *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 986 (8th Cir. 2011)); *accord Stearns v. Wagner*, 122 F.4th 699, 703 (8th Cir. 2024), *reh'g and reh'g en banc denied*, No. 23-3448, 2025 WL 82375 (8th Cir. Jan 13, 2025).  Tincher's arrest was close in time to her asking, "Are you ICE?", but it was also close in time to her (undisputedly) approaching the perimeter and disobeying multiple orders to back up, and (according to ICE) attempting to physically push past an officer into the perimeter.  Second, as shown above, Defendants had a legitimate law enforcement purpose for arresting her, to stop her efforts to impede their operations.  And even if one posits that the officers were mistaken that she was impeding their efforts or was committing

a violation of 18 U.S.C. § 111, that would not establish a retaliation claim. "If the response was driven not by 'animus' but by the defendant's understanding—however mistaken—of his official duties, then it was not 'retaliatory.'" *Aldridge*, 75 F.4th at 899 (quoting *Mitchell v. Kirchmeier*, 28 F.4th 888, 896 (8th Cir. 2022)). Tincher is not likely to succeed in showing that her arrest was motivated by retaliatory animus to her innocuous question, rather than officers' efforts to perform their official duties by arresting someone they believed was impeding their operations.

### 2. *Abdikadir Noor*

Noor is unlikely to succeed in his retaliation claim because he was arrested for assaulting officers by throwing projectiles at them as part of a large, violent crowd that surrounded officers and tried to impede them from effectuating an immigration arrest. As ICE officers attempted to arrest an alien, a crowd of 60-70 protestors surrounded the officers. Easterwood Decl. ¶ 27. The crowd blocked them from leaving and threw rocks and snowballs at the officers, injuring the officers and damaging ICE vehicles. *Id.* ICE officers observed Noor "[l]eading some of these protesters, . . . push[ing] up into ICE officers' faces, . . . and thr[o]w[ing] rocks and ice at ICE officers." *Id.* That violent conduct gave the officers probable cause to arrest Noor under 18 U.S.C. § 111 for forcibly assaulting or impeding federal officers, defeating his retaliatory arrest claim, *see Nieves*, 581 U.S. at 404.

Furthermore, even if Noor was also engaged in speech criticizing ICE, participating in a violent protest is not protected First Amendment activity. "[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment."

*Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972). "When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious." *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940). Thus, demonstrations can be curtailed and dispersed consistent with the First Amendment when they either become violent, become obstructive, pose a clear and present danger of imminent violence, or are violating some other law in the process. *See Puente v. City of Phoenix*, 123 F.4th 1035, 1062–63 (9th Cir. 2024); *United States v. Betts*, 99 F.4th 1048, 1054 (7th Cir. 2024); *Wash. Mobilization Comm. v. Cullinane*, 566 F.2d 107, 119 (D.C. Cir. 1977).

Although Noor denies that he participated in the crowd's violence, his declaration otherwise largely confirms that a crowd gathered, Noor Decl. ¶¶ 6-8, with some in the crowd throwing "snow" and other unspecified "things" at the officers, *id.* ¶ 10, which caused an officer to look "panicked" and call for backup, *id.* Noor acknowledges that he was at the front of the crowd vocally directing it. *Id.* ¶ 12. The principal factual dispute is that he claims that he "told the people not to throw things," *id.* ¶ 10, and "was trying to keep people back, trying to keep people calm," *id.* ¶ 12, while ICE officers on the scene observed him throwing objects at them, Easterwood Decl. ¶ 27.

Even under Noor's account, the most plausible inference is not that the officers arrested Noor in retaliation for his speech but because they believed that he was assaulting them and leading others in such assaults. A video of the incident cited in the Easterwood Declaration, https://www.mprnews.org/story/2025/12/15/ice-agents-call-for-backup-during-minneapolis-traffic-stop (last visited Jan. 4, 2025), shows officers surrounded and

chunks of snow and ice flying at them from all directions. If one credits Noor's declaration, then that would establish only that officers were mistaken in their belief that he was instigating the violence, rather than trying unsuccessfully to keep the peace. But even under such a scenario, Noor's arrest would have been motivated by officers' "mistaken" "understanding" of their "official duties," rather than "retaliatory" "animus." *Aldridge*, 75 F.4th at 899.

### 3.    *Individuals following ICE vehicles in their cars*

Three Plaintiffs (Biestman, Lee, and Webb) and several non-Plaintiff declarants (Clark, Page, Kellermeyer, Leon) describe scenes in which they followed ICE vehicles in their cars, and ICE officers eventually approached them in their vehicles and admonished them. These incidents differ in many respects, but they share some broad outlines. The drivers frequently engaged in behavior that showed some indicia of aggression and harassment or that they were attempting to impede, rather than merely observe, ICE operations. This includes following ICE vehicles on the freeway and driving faster than surrounding traffic (though purportedly "not significantly faster"), Webb Decl. ¶¶ 5-6, following ICE vehicles back to ICE's Minneapolis office, *id.* ¶ 7, following ICE vehicles along with a group of other cars, *id.* ¶ 13, lying in wait for a caravan of three ICE vehicles to begin driving and then driving in the middle of the caravan, Declaration of Flannery Clark (Clark Decl.) ¶¶ 5-6, ECF No. 1-8,[10] and honking at and following the same vehicle

---

[10] Clark avers that she was not intending to follow ICE vehicles but just happened to be "driving home" in "the same direction" as the ICE vehicles. Clark Decl. ¶ 7. However, the press has reported that she regularly "patrols" Minneapolis streets "for hours at once"

for several loops through the same area, Page Decl. ¶¶ 3-4.  In each incident, after the drivers stopped, ICE officers approached those vehicles.  *See* Declaration of John Biestman, (Biestman Decl.) ¶ 4, ECF No. 1-2; Declaration of Janet Lee (Lee Decl.) ¶ 9, ECF No. 1-3; Webb Decl. ¶ 8; Clark Decl. ¶¶ 11, 16; Page Decl. ¶ 4; Declaration of Riley Kellermeyer, (Kellermeyer Decl.) ¶ 5, ECF No. 1-11; Declaration of Beatriz Rudolph Leon (Leon Decl.) ¶ 18, ECF No. 14.  In several incidents, ICE officers warned the drivers that they had been impeding or interfering with their law enforcement efforts or putting officers at risk.  Webb Decl. ¶ 9 (officer "accused me of impeding officers"); Clark Decl. ¶ 20 ("You're putting my agents at risk."); Page Decl. ¶ 6 (officer was "telling me I was interfering"); Kellermeyer Decl. ¶ 5 (officer "said I was 'impeding' them"); Leon Decl. ¶ 29 (admonishing driver for "interfering with our investigation").  In every instance, after a short time, the ICE vehicles left the scene or allowed the drivers to leave the scene without arresting anyone in the car.  Lee Decl. ¶ 13; Webb Decl. ¶ 11; Clark Decl. ¶ 23; Page Decl. ¶ 8; Kellermeyer Decl. ¶ 5.[11]

Plaintiffs' retaliation claim fails at the threshold because the Eighth Circuit has not recognized a "*First Amendment* right to observe police officers."  *Molina*, 59 F.4th at 340. The Eighth Circuit noted that a Supreme Court case explained that "individuals '[have] no

---

to follow ICE vehicles, as part of "an increasingly sophisticated effort" described as "the organized resistance to ICE in Minnesota."  Susan Du, Star Tribune, *Inside the Organized resistance to ICE in Minnesota*, https://www.msn.com/en-us/society-culture-and-history/human-rights/inside-the-organized-resistance-to-ice-in-minnesota/ar-AA1Thyuo?ocid=BingNewsSerp.

[11] Plaintiffs claim that officers "boxed in" Plaintiffs Biestman and Lee, Pls.' Mem. 15, but Lee acknowledges that although "the ICE vehicles were blocking our car," Biestman was able "to back into the street to escape" the scene, Lee Decl. ¶ 13.

constitutional right to observe the issuance of a traffic ticket or to engage the issuing officer in conversation,'" which "suggests that observing police conduct is not expressive." *Id.* (quoting *Colten v. Kentucky*, 407 U.S. 104, 109 (1972)).  Plaintiffs cite cases holding, in vastly different circumstances, that there is a First Amendment right to gather information about government activities, or to record or disseminate videos. *See* Pls.' Mem. 10-14. But none of those cases support a First Amendment right to observe officers engaged in law enforcement operations, let alone to chase them in a vehicle.  Thus, the Plaintiffs following ICE vehicles have failed to "show that they engaged in protected First Amendment activity." *Aldridge*, 75 F.4th at 898.[12]

Finally, Plaintiffs cannot show that any adverse action was caused by retaliatory animus toward protected First Amendment activity, rather than officers' genuine concern that the drivers were impeding their law enforcement efforts and causing a safety hazard by following them.  Drivers in the Twin Cities area have frequently followed ICE vehicles aggressively in recent months, often driving erratically, and occasionally causing vehicular crashes.  Easterwood Decl. ¶ 29.  "This behavior is not safe and impedes ICE officers from effecting arrests.  Prior to 2025, this type of behavior was virtually nonexistent.  Now, it occurs almost daily." *Id.*

---

[12] Some, but not all, of the drivers who followed ICE vehicles criticized the ICE officers after the ICE officers approached the drivers and began admonishing them. *Compare* Biestman Decl. ¶ 6 (driver told ICE officer that his actions were "illegal, . . . like Germany 1938"), *with* Page Decl. ¶¶ 6-8 (driver kept window rolled up and did not say anything). Even in those cases, it is clear that the ICE officers approached the drivers to admonish them because of the following conduct, not any words that the drivers uttered after the encounters began.

In the incidents raised by Plaintiffs, after approaching the following vehicles, officers consistently advised the drivers that through their conduct of following ICE vehicles, they were impeding, interfering, or causing a safety hazard. *See supra*, p. 26. This demonstrates that the officers approached and admonished the drivers because they believed that the drivers' conduct impeded law enforcement or caused a danger, not because of any retaliatory animus toward protected First Amendment activity.

Plaintiffs may quibble with whether any particular following action crossed the line from lawful observation to dangerous or illegal activity. But again, retaliation claims turn on the officers' motives. The record makes clear that the officers were motivated by their "understanding" of their "official duties," rather than "retaliatory" "animus," *Aldridge*, 75 F.4th at 899, which defeats the retaliation claim.

### 4.    *Alan Crenshaw*

Plaintiff Alan Crenshaw is unlikely to succeed on his First Amendment retaliation claim because the record shows that officers deployed chemical irritants as a measured crowd control mechanism in response to a crowd that was physically obstructing officers trying to leave a scene and assaulting officers by throwing projectiles at them. The record does not support the inference that officers deployed irritants against Crenshaw because of retaliatory animus toward his speech. Rather, Crenshaw was incidentally exposed to irritants because he was intermixed with an unruly, violent, and obstructive crowd.

The Easterwood Declaration describes a scene in the Cedar-Riverside area on December 9, 2025, that appears to be the same scene described in Crenshaw's declaration.

28

[P]rotesters gathered and began obstructing traffic and impeding government vehicle progress. Protesters honked their horns; blew whistles; threw snowballs, ice, and other projectiles; kicked and hit government vehicles; and shouted insults and obscenities at the ICE officers. ICE officers issued multiple verbal commands and over the public address system for protesters to move back or ICE officers would have to resort to the use of chemical munitions if protesters continued to impede vehicular traffic. Protesters refused to comply. To safely advance, ICE officers deployed OC sprays to disperse the crowds blocking the street. As a tactic to deter further aggression and advancement from protesters, ICE officers kept their OC sprayers aimed at the crowds.

Easterwood Decl. ¶ 25.

Crenshaw's declaration, while different in some particulars from ICE's account, essentially confirms that the crowd was obstructive and violent. Crenshaw acknowledges that a group of protestors approached a group of ICE vehicles, leading to a "traffic jam" in which it "took about 20 minutes for them to exit the area." Crenshaw Decl. ¶ 10. He acknowledged that in some instances, he saw "some agents warn people to move before spraying them." *Id.* He also observed a protestor holding his arms out toward an officer before getting sprayed, *id.* ¶ 11, and observed "[s]ome people threw snowballs at" ICE vehicles, *id.* ¶ 12, before ICE officers again deployed spray, *id.* ¶ 13.

The record thus establishes the "obvious alternative explanation" that officers "utiliz[ed] the pepper spray as a crowd control mechanism rather than retaliating against a particular protestor." *Aldridge*, 75 F.4th at 900. Further, "[t]here is no evidence in the record of [ICE officers] indicating animus toward [Crenshaw] or singling him out." *Id.* at 899. "[U]s[ing] pepper spray indiscriminately as a crowd control technique" is not retaliatory because it does not "'single out' anyone" for their speech. *Stearns*, 122 F.4th at 703. Notably, Crenshaw does not allege that he engaged in any speech protesting ICE

when any of the officers who deployed spray were in earshot. But if the officers who deployed force were "out of earshot," then Crenshaw's "criticism could not have played a role in the decision to use force," and "causation is missing." *Laney v. City of St. Louis*, 56 F.4th 1153, 1157-58 (8th Cir. 2023).

Furthermore, it does not matter that Crenshaw purportedly did not personally engage in the obstructive and violent activity of others in the crowd. *See* Crenshaw Decl. ¶ 12 ("Some people threw snowballs at the car wheels as it drove away, though I didn't."). "[I]n assessing whether a sufficient clear and present danger justifies dispersal of a crowd, '[i]t is the tenor of the demonstration as a whole that determines whether the police may intervene; and if it is substantially infected with violence or obstruction the police may act to control it *as a unit*.'" *Puente*, 123 F.4th at 1062-63 (emphases added) (citing *Cullinane*, 566 F.2d at 120). Thus, when "[c]onfronted with a mob the police cannot be expected to single out individuals; they may deal with the crowd as a unit." *Cullinane*, 566 F.2d at 120.

### 5.    *Incidents involving non-parties*

Plaintiffs have submitted declarations from non-parties detailing their alleged interactions with ICE officers. The Court should give these declarations no weight because they do not shed light on whether *Plaintiffs* are likely to succeed on the merits of their claims. *See Spokeo*, 578 U.S. at 338 n.6. In any event, as summarized below, the declarations regarding incidents involving non-parties show that these non-parties would not have any stronger claims than the named Plaintiffs.

Beyond the declarations involving following ICE vehicles in cars, addressed above, *see supra*, pp. 25-28, other declarations relate to incidents, as with the incident involving Plaintiff Crenshaw, where pepper spray or other force was used to disperse a crowd engaged in obstructive or violent conduct. Dan Engelhart details an incident where a large crowd gathered with officers in an enclosed space so tight that protestors and officers were bumping up against each other. Declaration of Dan Engelhart, (Engelhart Decl.) ¶ 6, ECF No. 1-7. The crowd then followed the officers to their cars, contributing to a traffic jam. *Id.* ¶ 9. Only then, when the officers were trying to leave the scene, did they use pepper spray. *Id.* ¶ 10. As with the incident involving Crenshaw, the "obvious alternative explanation" is that officers "utiliz[ed] the pepper spray as a crowd control mechanism rather than retaliating against a particular protestor." *Aldridge*, 75 F.4th at 899-00.

Moriah O'Malley describes an incident at the Bro-Tex business where a large crowd "escalate[d]" matters as ICE vehicles were trying to leave the scene where they had made immigration arrests. O'Malley Decl. ¶ 4. Officers used force such as pepper spray and tear gas "to get people to move." *Id.* ¶ 5. O'Malley also claims that an ICE vehicle drove into her while she was focused on the scene behind her, apparently at an extremely slow speed because she does not claim she suffered any injuries. *Id.* ¶¶ 6-7. The Easterwood Declaration details that protestors "violently pushed, hit, threw objects at, and body slammed into [federal] officials; obstructed the path of government vehicles; and caused property damage to at least seven government vehicles." Easterwood Decl. ¶ 22; *see also id.* (photographs of crowd obstructing and striking ICE vehicles). After "protestors refused to comply" with numerous orders "to move back and stop blocking traffic, . . . federal

31

officials deployed non-lethal munitions to help disperse crowds and make way for vehicular traffic." *Id.* The record supports the inference that force was used to disperse an obstructive and violent crowd, not to retaliate against protected speech.

Finally, Joe Mitchell appears to have witnessed the same incident on Cedar Avenue and 6th Street on December 9, 2025, as Crenshaw. *See* Declaration of Joe Mitchell, (Mitchell Decl.), ¶ 2, 9 ECF No. 1-14. He admits that he was "several rows back and not particularly close to the deployment of the pepper spray." *Id.* ¶ 32. Nothing in his declaration alters the conclusion that the officers used pepper spray as a reasonable crowd control mechanism rather than in retaliation for protected speech. *See supra*, pp. 28-30.

### C. Plaintiffs are unlikely to succeed on their viewpoint and content discrimination claim.

Plaintiffs halfheartedly argue that Defendants violated the First Amendment by discriminating against them based on the viewpoint or content of their speech. *See* Pls.' Mem. 29-30. But apart from recasting their failed retaliation claim as a First Amendment discrimination claim, *see id.* at 30 (accusing Defendants of "retaliating against anti-ICE activists who are recording them"), Plaintiffs' sole contention is that Defendants have engaged in viewpoint discrimination by "invit[ing] press that are favorable to the administration's message to record the ICE enforcement actions," *id.*

Even assuming that Defendants occasionally gave exclusive or preferable access to journalists whose viewpoints align with the administration, that would not violate the First Amendment. As the Associated Press rightly conceded in a recent high-profile challenge to the White House's press access practices, the government "can discriminate on the basis

of viewpoint in granting exclusive interviews, answering journalists' questions, or selecting journalists to attend an event about a particular subject matter." *Associated Press v. Budowich*, No. 25-5109, 2025 WL 1649265, at *9 (D.C. Cir. June 6, 2025), *reconsideration en banc denied*, 2025 WL 2047025 (D.C. Cir. July 22, 2025). "Public officials routinely select among reporters when granting interviews or providing access to nonpublic information. They evaluate reporters and choose to communicate with those who they believe will deliver their desired messages to the public." *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 417-18 (4th Cir. 2006). But "a public official's selective preferential communication to his favorite reporter or reporters" does not support a First Amendment claim for "the much larger class of unrewarded reporters." *Id.* at 418. Therefore, Plaintiffs are unlikely to succeed on their claim that Defendants violated the First Amendment by granting preferred access to favored journalists rather than concerned residents.

### D. Plaintiffs are unlikely to succeed on their Fourth Amendment claims.

Plaintiffs are unlikely to succeed in their claims that Defendants have unreasonably seized them in violation of the Fourth Amendment. "[T]he ultimate touchstone of the Fourth Amendment is reasonableness." *Furlow v. Belmar*, 52 F.4th 393, 400 (8th Cir. 2022) (quoting *Lange v. California*, 594 U.S. 295, 301 (2021)). The record shows that to the extent Defendants seized Plaintiffs, those seizures were reasonable and satisfied applicable legal standards.

Different legal standards apply depending on the type of seizure at issue. "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there

is probable cause to believe that a criminal offense has been or is being committed." *Just v. City of St. Louis*, 7 F.4th 761, 767 (8th Cir. 2021) (quoting *Bell v. Neukirch*, 979 F.3d 594, 603 (8th Cir. 2020)). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest. Probable cause is an objective standard. [Courts] afford officers substantial latitude in interpreting and drawing inferences from factual circumstances." *Id.* (cleaned up). "Probable cause . . . is not a high bar: It requires only the kind of fair probability on which reasonable and prudent people, not legal technicians act." *Bell*, 979 F.3d at 603 (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)).

For "brief investigatory stops of persons or vehicles that fall short of traditional arrest, . . . a standard less than probable cause" applies, under which "the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Sokolow,* 490 U.S. 1, 7 (1989)). The reasonable suspicion standard applies to brief traffic stops. *Heien v. North Carolina*, 574 U.S. 54, 60 (2014). Even if such a stop is based on an officer's "reasonable mistake" of fact or law, the officer has not violated the First Amendment. *Id.* at 57.

To the extent that officers' interactions with Plaintiffs constituted seizures at all, such seizures were reasonable under governing legal standards.

### 1.    *Susan Tincher*

As explained above, officers had probable cause to arrest Tincher for forcibly assaulting, impeding, or interfering with federal officers in violation of 18 U.S.C. § 111,

when she approached a law enforcement perimeter, disobeyed multiple orders to get back, and instead tried to physically push past an officer into the perimeter. *See supra*, pp. 20-23; Easterwood Decl. ¶ 24. Furthermore, she admits that after the officers handcuffed her and informed her she was under arrest, rather than quietly submitting to the arrest, she "started yelling for help" to a crowd of "observers around [her]" because she viewed her arrest as a "kidnapp[ing]." Tincher Decl. ¶¶ 9-10. The natural import of her cry for help is that she was urging the crowd to physically engage with the officers to prevent the officers from effectuating her arrest. Such conduct provided additional probable cause to arrest her for soliciting assault or interference with federal officers. *See* 18 U.S.C. § 373. In addition, her resistance justified the officers in using some force to effectuate her arrest. *See* Easterwood Decl. ¶ 24 ("ICE officers attempted to handcuff [Tincher] in the standing position, but [she] continued to actively resist," which led officers to bring her to the ground to handcuff her; she "continued to try to pull away from the ICE officers" who were attempting to bring her to a government vehicle, so "ICE officers had to pick her up and lift her into the government vehicle").

### 2. *Abdikadir Noor*

As explained above, officers had probable cause to arrest Noor for violating 18 U.S.C. § 111 for throwing projectiles at federal officers and instigating a violent crowd that was assaulting the officers and damaging federal property. *See supra*, pp. 23-25; Easterwood Decl. ¶ 27. It can hardly be disputed that such violent conduct directed at ICE officers trying to effectuate an immigration arrest constitutes "forcibly assault[ing],

resist[ing], oppos[ing], imped[ing], intimidat[ing], or interfer[ing] with" federal officers. 18 U.S.C. § 111.

Noor claims that he was urging the crowd to keep calm and that he did not throw anything, though he admits that he was at the front of the violent crowd and was vocally directing them, and that on officer looked "panicked" by the violent onslaught of projectiles from the crowd. Noor Decl. ¶¶ 10, 12. Video from the scene corroborates that chunks of ice and snow were flying at the surrounded officers from all directions. Jon Collins, *ICE agents call for backup during Minneapolis traffic stop, bystanders hurl insults and snowballs*, MPRnews (updated Dec. 17, 2025, at 10:50 AM) https://www.mprnews.org/story/2025/12/15/ice-agents-call-for-backup-during-minneapolis-traffic-stop (last visited Dec. 30, 2025). Probable cause "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest," and officers have "substantial latitude in interpreting and drawing inferences from factual circumstances[.]" *Just*, 7 F.4th at 767 (citations omitted). Regardless of whether the Court credits Noor's declaration that he was not engaged in violence, the arresting officers' inference was reasonable that probable cause existed to arrest Noor, the individual who was at the front of and vocally leading a crowd engaged in violent conduct that left the surrounded officers panicked.

### 3.    *Individuals Following ICE Vehicles in Cars*

Several Plaintiffs and non-party declarants describe incidents in which they followed ICE vehicles in their cars and then ICE officers approached them to admonish them. *See supra*, pp. 25-28. To the extent these interactions involve seizures, they are

36

brief seizures that fall short of arrest, such that the reasonable suspicion standard, rather than probable cause, applies. *See Heien*, 574 U.S. at 60 (reasonable suspicion sufficient for a traffic stop); *Chestnut v. Wallace*, 947 F.3d at 1085, 1088 (8th Cir. 2020) (a twenty-minute seizure by police fell short of an arrest, such that reasonable suspicion standard applied).

In recent months, drivers in the Twin Cities area have frequently followed ICE vehicles aggressively or erratically. Easterwood Decl. ¶ 29. This conduct creates risk to public safety and risks impeding or interfering with law enforcement operations. *Id.* Many of the Plaintiffs and non-party declarants have driven aggressively or in a manner that suggests potential interference, such as driving faster than traffic on the freeway, following ICE vehicles to their headquarters, following in a group, driving in the middle of an ICE caravan, and following an ICE vehicle in multiple loops through an area while honking. *See supra*, pp. 25-26; Webb Decl. ¶¶ 5-7, 13; Clark Decl. ¶¶ 5-6; Page Decl. ¶¶ 3-4. This conduct gave officers reasonable suspicion that the drivers could be violating 18 U.S.C. § 111 by interfering or impeding law enforcement through the forcible operation of an automobile. Indeed, officers consistently raised concerns of impeding, interfering, or creating a safety hazard when they stopped drivers. *See supra*, p. 26; Webb Decl. ¶ 9; Clark Decl. ¶ 20; Page Decl. ¶ 6; Kellermeyer Decl. ¶ 5; Leon Decl. ¶ 29.

In arguing that any seizures were unreasonable, Plaintiffs rely on *Chestnut*, 947 F.3d at 1090, and *Walker v. City of Pine Bluff*, 414 F.3d 989, 992-993 (8th Cir. 2005), which held that it would not be reasonable to seize individuals who were simply watching police

while standing at a distance. But chasing ICE vehicles in cars is hardly analogous to merely standing and watching.[13]

Plaintiffs and non-party declarants assert that they were following traffic laws and driving reasonably, in such a way that would not impede law enforcement. For example, Webb avers that the officer who accused her of running red lights was incorrect, and she was actually following traffic laws. Webb Decl. ¶ 9. Even if credited, those assertions at most suggest that officers may have been reasonably mistaken in believing that the drivers were impeding or interfering with law enforcement or endangering officers or public safety by violating traffic laws. But a "reasonable mistake" of either fact or law does not defeat reasonable suspicion for a traffic stop. *Heien*, 574 U.S. at 57.

### 4.    *Alan Crenshaw*

Crenshaw avers that he was exposed to pepper spray from ICE officers when ICE officers were attempting to leave a scene, and he was among a crowd that was yelling, blowing whistles, contributing to a traffic jam that impeded officers' exit, and throwing snowballs at ICE vehicles. Crenshaw Decl. ¶¶ 7-13.

As an initial matter, he is not likely to succeed on his Fourth Amendment claim because he was not seized. The "seizure" of a "person" follows from either some physical force or show of authority that "in some way restrains the liberty of the person." *Torres v.*

---

[13] Minnesota law criminalizes a motorist following within 500 feet of a police vehicle that is responding to an emergency. *See* Minn. Stat. § 169.18, subdiv. 8(c); *id.* § 169.011, subdiv. 3. This statute may not directly apply here if the ICE vehicles were not responding to an emergency, but the statute underscores that following a police vehicle creates dangers that are distinct from standing and observing police officers at a distance.

*Madrid*, 592 U.S.306, 311 (2021) (cleaned up).  As the Ninth Circuit explained, dispersal of an uncompliant crowd by airborne chemical irritants (e.g., tear gas and pepper spray) is not a "seizure" within the meaning of the Fourth Amendment because "an application of force with an objective intent merely to *disperse* or *exclude* persons from an area—and *without* any measures objectively aimed at detaining or confining them in the process—does not involve the necessary 'intent to *restrain*' that might give rise to a 'seizure.'" *Puente*, 123 F.4th at 1052 (emphasis in original).[14]

Even if the use of pepper spray was a seizure, it was a reasonable crowd control mechanism given the obstructive and violent behavior of the crowd.  Crenshaw acknowledges that while the ICE vehicles were trying to leave, "some agents warn[ed] people to move before spraying them," Crenshaw Decl. ¶ 10, and that "[s]ome people threw snowballs" at the ICE vehicles, *id.* ¶ 12.  Mr. Easterwood's declaration further details that protestors were "obstructing traffic and impeding government vehicle progress," "threw snowballs, ice, and other projectiles; kicked and hit government vehicles," and "refused to comply" with "multiple verbal commands and over the public address system for protesters to move back or ICE officers would have to resort to the use of chemical munitions if protesters continued to impede vehicular traffic."  Easterwood Decl. ¶ 25.  During an

_____

[14] In arguing that Crenshaw was seized, Plaintiff relies on a district court preliminary injunction decision that was stayed by the Seventh Circuit, *Chicago Headline Club v. Noem*, --- F. Supp. 3d ---, 2025 WL 3240782, at *84 (N.D. Ill. Nov. 20, 2025), *stayed by* Order Granting Stay Pending Appeal, *Chicago Headline Club v. Noem*, No. 25-3023, (7th Cir. Nov. 19, 2025), ECF No. 28.  Defendants submit that *Puente* is more persuasive on this point, but even *Chicago Headline Club* acknowledged that conduct must "objectively manifest[] an intent to restrain" to constitute a seizure.  *Id.* (emphasis omitted).

"unruly protest," officers "are often forced to make split-second judgments." *Laney*, 56 F.4th at 1156 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Because the officers reasonably made the split-second judgment that the crowd's behavior was creating a threat, "a short burst of pepper spray was a reasonable response." *Id.*

### 5.    *Other non-parties*

A similar analysis applies to non-party declarants Engelhart, O'Malley, and Mitchell, who raise allegations of other incidents involving deployment of pepper spray or non-lethal force against crowds. These incidents are not seizures because, as described above, officers deployed force not to restrain but to disperse crowds and allow ICE officers to leave the scenes. *See supra*, pp. 30-32; *Puente*, 123 F.4th at 1052. Even if the Fourth Amendment applied, officers deployed force reasonably against unruly crowds that, in many instances, were obstructing ICE officers from leaving and engaging in violent conduct. *See*, *e.g.*, Easterwood Decl. ¶ 21 (describing and providing photographs of incident at Bro-Tex on November 18, 2025, in which the crowd "violently pushed, hit, threw objects at, and body slammed into the officials; obstructed the path of government vehicles; . . . caused property damage to at least seven government vehicles," and "refused to comply" with "numerous" warnings "to move back and stop blocking traffic"). *Id.*

## II.    The Remaining Equitable Factors Decisively Favor the Government.

The Court should also deny Plaintiffs' motion for preliminary injunction because Plaintiffs face no threat of immediate and irreparable harm, and the balance of the equities decisively favors the government. As explained above, Plaintiffs' claims of past harm do not give them standing to seek sweeping prospective relief, much less demonstrate an

imminent threat of irreparable harm that would justify the "extraordinary remedy" of a preliminary injunction. *Winter*, 555 U.S. at 22. The named Plaintiffs offer only speculation that they will have another encounter with DHS law enforcement officials that will result in an alleged violation of their First or Fourth Amendment rights. The failure of offer anything more than a smattering of one-time isolated past incidents fatally undermines any claim by Plaintiffs that a preliminary injunction is necessary to prevent an immediate threat of harm recurring while the Court resolves the merits of their claims.

By contrast, an injunction would irreparably harm the government and the public interest. *See* Order, *Chicago Headline Club* at 2 ("[D]efendants face irreparable harm." (citing *CASA*, 606 U.S. at 860-61)). As detailed above, the injunction improperly constrains officers' ability to respond to disruptive and violent protests in Minnesota, thereby endangering the safety of officers and the public alike. It also interferes with lawful enforcement of the Nation's immigration laws, and "[a]ny time that the Government is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." Order, *Chicago Headline Club* at 2 (quoting *Perdomo*, 222 L.Ed. at 1216 (Kavanaugh, J., concurring)). And the injunction turns the separation of powers on its head by installing this Court as the overseer of every crowd-control and use-of-force decision that federal law-enforcement officers in Minnesota make in the context of often "tense, uncertain, and rapidly evolving situations." *Graham*, 490 U.S. at 397; *see also CASA*, 145 S. Ct. at 2561-62 (violations of the separation of powers constitute a harm to the Executive Branch). Accordingly, the balance of equities strongly counsels in favor of denying a preliminary injunction.

41

## III.    The Proposed Injunction is Overbroad and Unworkable.

Even if the Court were to grant relief, Plaintiffs' proposed preliminary injunction should be denied. *See* ECF No. 38 (Proposed Order). The injunction suffers from three primary flaws. First, the injunction extends far beyond the named Plaintiffs in the case and applies to any person who might someday observe DHS immigration activity in Minnesota. Second, the injunction is overly prescriptive and offends the separation of powers. Third, the injunction is practically unworkable.

Two Courts of Appeals have recently stayed similar injunctions for these reasons. In *Chicago Headline Club v. Noem*, the Seventh Circuit stayed a sweeping injunction because it was overbroad and offended the separation of powers. *See* Order, *Chicago Headline Club*. As a unanimous motions panel of the Seventh Circuit explained, the injunction there was "overbroad" because its "practical effect is to enjoin all law enforcement officers within the Executive Branch" operating anywhere in the Chicago area. The proposed injunction here would similarly apply to "all law enforcement personnel, officers, and agents . . . currently or subsequently deployed in the District of Minnesota" to include anyone with "supervisory or management authority" through "the chain of command to and including the Secretary of Homeland Security." ECF No. 38 ¶ 2.

Additionally, Plaintiffs' proposed injunction is a highly reticulated yet hopelessly vague series of "follow the law" commands that is "too prescriptive" and "resembles a federal regulation," not a proper exercise of a court's equitable authority targeted to specific plaintiffs. Order, *Chicago Headline Club* at 2. Indeed, the injunction is so granular

it governs everything from the content of warnings before protesters may be dispersed, to when officers may use physical force or display their firearms, to the circumstance under which custodial arrests are permitted, when deploy riot control measures, or how to conduct vehicle stops.

In *Los Angeles Press Club v. Noem*, the Ninth Circuit stayed provisions of an injunction in a similar First Amendment protest case "that by their terms apply to protesters who are not parties to this litigation." *Los Angeles Press Club v. Noem*, No. 25-5975 (Dec. 18, 2025). Similarly, here, the proposed injunction is not tailored to the named Plaintiffs in this case and would extend relief to any non-party protestor or observer in Minnesota.

## A. The Injunction Is Overbroad Because It Applies To Non-Parties Who Are Not Plaintiffs In This Case.

Contrary to well-established principles, Plaintiffs make no effort to tailor their proposed injunction to the six named Plaintiffs in this case. "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). Accordingly, "a preliminary injunction must be narrowly tailored to remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law." *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022-23 (8th Cir. 2015) (cleaned up). As the Supreme Court reiterated in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), injunctions must be no "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at 861.

Instead, Plaintiffs request a far-reaching injunction that operates like a detailed law-enforcement policy manual restraining the actions of federal officers against any person in

43

the world who might someday observe immigration enforcement activity in Minnesota. As inappropriate as the proposed injunction is for ICE officers operating in and around Minneapolis as part of Operation Metro Surge, Plaintiffs have made absolutely no showing that such an injunction is justified as to Border Patrol agents patrolling the border with Canada, Coast Guard officers monitoring Lake Superior from Duluth, Customs and Transportation Security Administration officers operating at airports throughout the state, or the numerous other DHS officers or agents operating throughout Minnesota.

Such micromanagement of federal law-enforcement operations goes well beyond what is required to remedy the named Plaintiffs' alleged harms, in contravention of the limitations on the Court's equitable powers and Article III authority. As the Supreme Court has held, "[t]he scope of federal equity power" cannot "be extended to the fashioning of prophylactic procedures for a [government] agency designed to minimize this kind of [alleged] misconduct on the part of a handful of its employees." *Rizzo*, 423 U.S. at 378 (1976). Article III does not authorize courts to convert a smattering of individual claims alleging excessive force arising from past harms into "a broad call on [the] judicial power to assume continuing regulatory jurisdiction over the activities" of the government. *Gilligan v. Morgan*, 413 U.S. 1, 5 (1973); *accord Rizzo*, 423 U.S. at 371-72 (holding that speculation about what a "small, unnamed minority of policemen might do to [the plaintiffs] in the future" does not justify programmatic relief as to "the entire citizenry of Philadelphia"). Article III's "actual-injury requirement would hardly serve [its] purpose" if, as here, a small number of plaintiffs' allegations of past injury could permit "imposition of systemwide relief." *Lewis v. Casey*, 518 U.S. 343, 357, 359 (1996). Accordingly, this

Court has no authority to transform isolated complaints by six named Plaintiffs into an instrument for ongoing judicial micromanagement of federal law-enforcement operations across the entire state of Minnesota.

This conclusion is reinforced by the Supreme Court's recent landmark holding in *CASA* forbidding the use of universal (*i.e.*, non-party specific) injunctions. In *CASA*, the Supreme Court addressed "universal injunctions," or injunctions that bar the defendant from enforcing "a law or policy against *anyone*," in contrast to injunctions limited to the plaintiff. *CASA, Inc.*, 145 S. Ct. at 2548. The Court found that the statutory grant of jurisdiction over suits "in equity" "encompasses only those sorts of equitable remedies traditionally accorded by courts of equity at our country's inception." *Id.* at 2551 (citation modified). And "[n]either a universal injunction nor any analogous form of relief was available … at the time of the founding." *Id.* Rather, "suits in equity were brought by and against individual parties." *Id.* "Because the universal injunction lacks a historical pedigree, it falls outside the bounds of a federal court's equitable authority under the Judiciary Act." *Id.* at 2554. At most, a court granting equitable relief "may administer complete relief *between the parties*." *Id.* at 2557. "Under this principle, the question is not whether an injunction offers complete relief to everyone potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." *Id.* And even then, "[c]omplete relief is not a guarantee—it is the maximum a court can provide." *Id.* at 2558; *accord Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of

45

injection. . . . [A] federal judge . . . is not mechanically obligated to grant an injunction for every violation of law." (citations omitted)).

Plaintiffs' proposed injunction violates these basic principes by seeking state-wide relief on behalf of any person who happens to observe DHS law enforcement officers in Minnesota. The fact that Plaintiffs seek only statewide, as opposed to nationwide relief, is irrelevant: the injunction violates *CASA* because it goes beyond providing targeted relief to the named *Plaintiffs* specifically. It strains credulity that the injunction's regulation of broad swathes of immigration-enforcement activity in Minnesota is designed merely to grant the six named plaintiffs (each of whom allege they live in Minneapolis or a city bordering Minneapolis, *see* Compl. ¶¶ 1-6) full relief. The injunction does not just "incidentally" grant relief to nonparties, *CASA*, 606 U.S. at 851; it primarily does so. For this reason, the Ninth Circuit recently relied on *CASA* is to stay provisions of similar injunction "that by their terms apply to protesters who are not parties to this litigation." *Los Angeles Press Club* at 1.

To illustrate this overbreadth, the injunction would prohibit any use of "chemical irritants" or "crowd control weapons" against any class member except under narrowly defined circumstances that have no basis in the record. Proposed Order ¶ 1.b-c. Only one Plaintiff (Alan Crenshaw) has alleged he was injured by such devices, and that alleged incident involved a single burst of pepper spray on one isolated occasion. *See* Crenshaw Decl. No other Plaintiff has alleged "chemical irritants" or "crowd control weapons" were either used on them or caused them injury. A single use of pepper spray cannot justify a

sweeping injunction against the use of every possible crowd control device that might be used by every DHS officer in the state.

Further, there is no factual support in the record for an injunction that would prohibit DHS officers from ordering everyone in the state "to stop making any audio or visual recordings of federal law enforcement activities or agents." Proposed Order ¶ 1.e. No Plaintiff has alleged that federal law enforcement officers have directed them to stop recording their interactions. Indeed, the record is replete with examples of observers who have been permitted to record law enforcement officers without any contrary direction. *See*, *e.g.*, Sorensen Decl.; Crenshaw Decl.; Englehart Decl.; O'Malley Decl.

Plaintiffs also cannot base their request for overbroad relief on declarations from non-parties. Most of the non-party declarations concern incidents at which no named Plaintiff was present. *See*, *e.g.*, Clark Decl.; Page Decl.; Kellermeyer Decl.; O'Malley Decl.; Mitchell Decl. Those events have nothing to do with the named Plaintiffs' claims. Reliance on such non-party declarations would contravene the "party-specific principles that permeate [courts'] understanding of equity," *CASA*, 606 U.S. at 844. Plaintiffs also have not moved to certify a class under Rule 23, and in their Preliminary Injunction Motion, they made no attempt to make even a preliminary showing that this will be an appropriate case for class treatment. Nevertheless, the proposed injunction would restrain federal law enforcement actions against "members of the class"—an amorphous group of people that appears to include anyone in the world who might one day observe or protest DHS enforcement activity in Minnesota. Proposed Order; *see* Compl. ¶ 179 (defining putative

47

class). Such an ill-defined group cannot satisfy the "rigorous analysis" required for class relief under Rule 23. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982).

To the extent Plaintiffs contend that a narrower injunction would not provide relief because federal officers cannot distinguish the six named Plaintiffs from citizenry at large, *CASA* rejects that notion. The Supreme Court warned that "[c]omplete relief" is not "synonymous with universal relief," but is instead "a narrower concept: The equitable tradition has long embraced the rule that courts generally 'may administer complete relief *between the parties*.'" *Id.* at 2557. Thus, although "the complete-relief principle has deep roots in equity[,]" it does not "justif[y] award of relief to nonparties." *Id.* In any event, it is up to the government, not this Court, to determine whether complying with a properly limited injunction is sufficiently unworkable in the first instance. *See Arizona v. Biden*, 40 F.4th 375, 398 (6th Cir. 2022) (Sutton, C.J., concurring) ("[T]hat is initially the National Government's problem, not ours . . . ."). The fact that a party-specific injunction might also present implementation burdens on the government does not justify imposing an even broader injunction that flouts Article III and equitable principles.

### B.    The Proposed Injunction is an Improperly Prescriptive "Follow the Law" Injunction that Violates the Separation of Powers.

Compounding these errors, the proposed injunction places the Court in the untenable position of superintending officers' day-to-day decision-making, "impermissibly infringing on principles of separation of powers." Order, *Chicago Headline Club* at 2. It is the role of the Executive, not the federal courts, to oversee the execution of the laws. Federal courts "do not possess a roving commission" to "exercise general legal oversight

of the . . . Executive Branch[].” *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423, 423-24 (2021).  That principle applies with special force to law-enforcement activities responding to safety risks, which inevitably involve “split-second judgments” and a balancing of factors in “tense, uncertain, and rapidly evolving situations.”  *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam) (citation omitted).

There is no basis for this Court to establish itself as overseer of federal law enforcement operations across Minnesota through compliance monitoring and enforcement of detailed regulations for the use of force and crowd-control devices.  The second-guessing inherent in threatening officers with contempt whenever Plaintiffs disagree with their decisions about exigent circumstances or objective need for law-enforcement action manifestly offends the separation of powers.  Article III does not “transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger.”  *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 453 (1990).  And “the scope of federal equity power” cannot “be extended to the fashioning of prophylactic procedures for a [government] agency designed to minimize this kind of [alleged] misconduct on the part of a handful of its employees.”  *Rizzo*, 423 U.S. at 378.  “[I]t is one thing to dissect and scrutinize an officer’s actions with the ‘20/20 vision of hindsight,’ ‘in the peace of a judge’s chambers.’  It is quite another to make ‘split-second judgments’ on the ground, ‘in circumstances that are tense, uncertain, and rapidly evolving.’”  *Barnes v. Felix*, 605 U.S. 73, 89-90 (2025) (Kavanaugh, J., concurring) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).  The separation of powers and the impropriety of subjecting law-enforcement

49

officers' decisions to judicial second-guessing on pain of contempt weighs heavily against the kind of injunction that Plaintiffs seek here.

These separation of powers problems are magnified by the "follow the law" nature of the proposed injunction. For example, the injunction would prohibit dispersals, seizures, or arrests without probable cause, and enjoin officers from instructing individuals that they must cease lawfully "operating a motor vehicle lawfully on a public roads." *See* Proposed Order. Courts routinely reject such vague "follow the law" injunctions as illusory and inadequate because they do not provide fair notice as to the specific conduct that is enjoined, as required by Rule 65(d). *See, e.g., Calvin Klein Cosms. Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 669 (8th Cir. 1987); *Daniels v. Woodbury Cnty.*, 742 F.2d 1128, 1134 (8th Cir. 1984). The vagueness of the injunction is particularly problematic because it would apply to any interaction between DHS officers and observers or protesters in Minnesota, regardless of the circumstances, leading to second-guessing of officers' in-the-moment decisions and potential contempt allegations. But the lawfulness of an individual officer's response to such interactions under the First and Fourth Amendment doctrines that Plaintiffs have invoked will depend on the specific facts and circumstances, making Plaintiffs' claims ill-suited to remediation by way of a one-size-fits-all injunction that essentially directs officers to follow the Constitution.

In other instances, Plaintiffs simply get the law wrong and attempt to impose heighted legal requirements on DHS officers that exceed the requirements of the Constitution. For example, the injunction would prohibit officers from pointing firearms at class members "who are not posing an immediate threat of death of serious bodily injury

50

to another person." Proposed Order ¶ 1.d. But "courts do not find constitutional violations for gun pointing when there is a reasonable threat of danger or violence to police." *Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009) (citing cases including *Edwards v. Giles*, 51 F.3d 155, 156–57 (8th Cir. 1995)). "An officer is justified in drawing his weapon when he is justifiably concerned for his safety and has not yet been able to ascertain whether the person being seized is armed or poses a danger to himself or others." *Kaleta v. Johnson*, 12-cv-170, 2013 WL 3448148, at *6 (D. Minn. July 9, 2013). And "[t]he mere pointing of a gun does not . . . violate the Fourth Amendment . . . [a]bsent some evidence that the officer held the gun on [the plaintiff] for longer than reasonable." *Frison ex rel. Frison v. Zebro*, Civ. A. No. 00-2688, 2002 WL 539069, at *6 (D. Minn. Apr. 5, 2002), *aff'd sub nom. Frison v. Zebro*, 339 F.3d 994 (8th Cir. 2003). This fact-specific standard is not susceptible to a broad-ranging, categorical injunction. *See Missouri v. McNeely*, 569 U.S. 141, 158 (2013) (stating that "police actions are judged based on fact-intensive, totality of the circumstances analyses rather than according to categorical rules").

Additionally, the proposed injunction would require officers to issue at least two separate warnings at an appropriate sound level before deploying crowd-control devices unless there is a "serious and imminent threat" that such warnings are "infeasible." Proposed Order ¶ 1.c. But the First Amendment contains no such requirement. *See Puente v. City of Phoenix*, 123 F.4th 1035, 1064 (9th Cir. 2024) ("Plaintiffs also argue that their First Amendment rights were violated because Defendants failed to issue a verbal dispersal order before beginning to try to disperse the crowd. We disagree."). In any event, Plaintiffs have not carried their burden to demonstrate why a sweeping mandatory injunction

requiring every DHS officer in the State to give multiple warnings to every person they encounter before using any crowd control devices is required when only one named Plaintiff (Crenshaw) alleges that he was injured by a single burst of pepper spray. *See TruStone Fin. Fed. Credit Union v. Fiserv, Inc.*, No. 14-CV-424 (SRN/SER), 2014 WL 12603061, at *1 (D. Minn. Feb. 24, 2014) (stating that "the burden is higher on a party that seeks a mandatory preliminary injunction—one which alters the status quo by commanding some positive act, as opposed to a prohibitory injunction seeking only to maintain the status quo").

In sum, the proposed injunction is overbroad, has no basis in law, and violates the separation of powers by imposing judicial micromanagement of federal law-enforcement operations throughout the entire state of Minnesota. *See United States v. Patane*, 542 U.S. 630, 642 (2004) ("It is not for this Court to impose its preferred police practices on either federal law enforcement officials or their state counterparts.").

### C. The Proposed Injunction Is Unworkable.

In assessing whether to grant injunctive relief, the Court must consider "what is workable," as foundational principles of equity demand. *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (citation omitted). Plaintiffs' proposed injunction is practically unworkable, drastically limits officers' ability to control dangerous situations with nonlethal force, and places the Court in the position of superintending every DHS officer operating in Minnesota. *See* Easterwood Decl. ¶¶ 32-43. The proposed injunction's vague requirements are "too prescriptive" and "resembles a federal regulation," not a narrowly-tailored party-specific injunction. Order, *Chicago Headline Club* at 2.

To begin, the injunction drastically restricts officers' ability to issue dispersal orders and to deploy crowd-control devices whenever any "member of the class is present." *See* Proposed Order. To the extent the class is anyone in the world who might someday observe or protest immigration enforcement activity in Minnesota, the injunction plainly constitutes an improper universal injunction in violation of *CASA*. If, however, "protesters" or "observers" are intended to constitute a distinct, objectively-identifiable sub-group of people other than any member of the general public, the injunction does nothing to explain how federal officers should differentiate between the two groups. Officers confronted with rapidly evolving and potentially dangerous situations like the riot at the Bro-Tex business, should not have to place their safety at risk to quickly determine whether anyone in a crowd is a protected "protestor" or "observer" using undefined criteria. Such hopelessly vague terms fail to "describe" the people protected by the injunction "specifically" and "in reasonable detail," as the Federal Rules of Civil Procedure require. Fed. R. Civ. P. 65(d)(1)(B)-(C). Further, because the injunction confers a special privilege on certain individuals to disobey lawful dispersal orders or crowd control commands, DHS officers must first determine whether anyone in a rioting or disruptive crowd qualifies as a protected person before issuing such an order. Given the absence of any definitions in the injunction and the nature of such crowds, that task will often be impractical if not impossible.

The injunction is also unworkable in practice. Immigration enforcement actions at which protestors are present can present officers with the challenge of controlling a chaotic and rapidly evolving situation that creates potential dangers to the public and officers themselves. *See* Easterwood Decl. ¶¶ 22-28, 37. In such circumstances, officers may be

53

unable to differentiate between protected "protesters" and other participants, especially while in the midst of a violent situation where there is imminent physical danger to officers and members of the public. *See* Easterwood Decl. ¶ 37.

Worse, the injunction is ripe for abuse. Because the injunction forbids officers from "using chemical irritants" whenever "members of the class who are not themselves posing a threat of imminent harm" are present, Proposed Order ¶ 1.b, the injunction would enable violent protesters and rioters to use the injunction as a shield to position themselves nearby. Violent opportunists could use the anonymity of a crowd or small group of protesters to evade an otherwise lawful dispersal order and assault law enforcement officers. *See* Easterwood Decl. ¶ 38. Officers should not be forced to second guess whether they will be subject to contempt for using crowd-control devices to escape threatening and hostile crowds.

Additionally, the injunction contains no exception allowing officers to use crowd control devices to protect property. The injunction thus prohibits officers faced with imminent threats to federal property—buildings or vehicles—from deploying crowd-control devices in response. The injunction therefore invites destruction of federal property by barring officers from using crowd-control devices prior to the offenses taking place. *See* Easterwood Decl. ¶¶ 22.

The injunction also fails to account for circumstances where protesters block the only ingress or egress points available to federal officers but do not yet pose a "threat of imminent harm to a law enforcement officer or another person." In this situation, the use of a crowd control device may be necessary to obtain compliance with lawful orders to

remove the obstruction and aid officer safety. *See* Easterwood Decl. ¶¶ 22, 39. The injunction nevertheless prohibits the use of crowd-control devices in this manner. That effectively stops officers from pushing back a crowd obstructing federal law enforcement activity.

And there is no safe harbor exception in the injunction for incidental exposure to chemical irritants that might be targeted at others consistent with the law, but nonetheless have inadvertent impacts on others nearby (*e.g.*, tear gas wafts across a crowded area). Federal officers should not face the threat of contempt because someone was collaterally exposed to an otherwise lawful use of a crowd-control device. *See* Easterwood Decl. ¶ 33.

The injunction's arbitrary "two-warning" requirement is similarly unworkable. *See* Easterwood Decl. ¶¶ 13, 35. The injunction would require "two separate" and audible "warnings" and time to disperse before the use of any crowd-control device, "unless the threat is so serious and imminent that a warning is infeasible." Proposed Order ¶ 1.c . This blanket requirement would prevent officers from responding to exigent circumstances where complying with an arbitrary two-warning standard would compromise safety. *See* Easterwood Decl. ¶ 35. Moreover, there is no way for officers to guarantee or prove that everyone who might be affected by crowd-control devices was able to hear and understand these warnings prior to the devices' deployment, as the injunction would require, particularly where crowd members frequently yell and blow loud whistles. *See id.* ¶ 36. Any perceived failure to comply could expose officers to contempt proceedings.

Further, the blanket requirement prohibiting DHS officers from instructing drivers that they must cease lawfully driving on public roads interferes with ICE's ability to

conduct lawful vehicle stops, undermines operational security, and harms officer safety. *See id.* ¶ 42. Conducting lawful vehicle stops is a critical tool for ICE officers to identify and apprehend aliens involved in violations of immigration law, as well as to address other criminal activity encountered during enforcement operations. *Id.* Limiting this authority in any capacity would constrain and impede ICE's law enforcement authority. *Id.*

Finally, the injunction inappropriately places the Court in the position of superintending officers' decisions on how best to disperse violent protests and dangerous crowd control situations. Officers' snap judgments about who is covered by the injunction or whether one of the injunction's legalistic exceptions applies—all in the midst of rapidly unfolding situations—may now be second-guessed in contempt proceedings. Whether or not such charges are ultimately found to be meritorious, the mere threat of protracted contempt litigation imposes a significant additional burden on officers. And given the injunction's practical unworkability and absence of any safe harbor provision, the injunction provides no room for any reasonable exercise of discretionary law enforcement judgment without the chilling fear of contempt. *See Perdomo*, 222 L.Ed.2d at 1216 (Kavanaugh, J., concurring) ("The prospect of . . . after-the-fact judicial second-guessing and contempt proceedings will inevitably chill lawful immigration enforcement efforts."). Officers must "act decisively and . . . show restraint at the same moment, and their decisions have to be made 'in haste, under pressure, and frequently without the luxury of a second chance.'" *Cnty of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998) (citation omitted). The proposed injunction impermissibly undermines officers' ability to perform these vital law-enforcement functions.

IV.    **Stay Pending Appeal**

Finally, if the Court grants an injunction, it should require a bond commensurate with the scope of any injunction pursuant to Rule 65(c).

To the extent the Court issues any injunctive relief, Defendants request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum, administratively stayed for seven days to allow the United States to seek emergency relief if appeal is authorized. Defendants have, at a minimum, satisfied the requirements for a stay of any injunction pending appeal. *See Nken v. Holder*, 556 U.S. 418, 434 (2009); Order, *Chicago Headline Club* at 1.

<u>**CONCLUSION**</u>

For these reasons, the Court should deny Plaintiffs' Motion for Preliminary Injunction.


Dated: January 5, 2026                    Respectfully submitted,

                                          BRETT A. SHUMATE
                                          Assistant Attorney General
                                          Civil Division

                                          ANDREW WARDEN
                                          Assistant Director
                                          Federal Programs Branch


                                           */s/ Kathleen C. Jacobs*
                                          JEREMY S.B. NEWMAN
                                          KATHLEEN C. JACOBS
                                          Trial Attorneys
                                          U.S. Department of Justice
                                          Civil Division, Federal Programs Branch
                                          1100 L Street, N.W.
                                          Washington, D.C. 20005

Telephone: (202) 674-9761
Fax: (202) 616-8470
kathleen.c.jacobs@usdoj.gov

*Counsel for Defendants*