# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MINNESOTA

| | |
|---|---|
| Susan TINCHER, et al., | Case No. 25-cv-4669 |
| *Plaintiffs*, | **DECLARATION OF DAVID EASTERWOOD** |
| v. | |
| Kristi NOEM, et al. | |
| *Defendants*. | |

## DECLARATION OF DAVID EASTERWOOD

I, David Easterwood, hereby declare as follows:

1.    I am employed by the United States Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as the Acting Field Office Director (Acting FOD) of the ERO St. Paul Office. Previously, I served as the Deputy Field Office Director (DFOD) of the ERO St. Paul Office from April 2025 to October 2025.

2.    I have been employed by ICE since September 2015. Since that time, I have held several positions with ICE: Deportation Officer (2015-2019) with experience in all aspects of the identification, arrest, case management, and removal of aliens present in the United States in violation of law; Supervisory Detention and Deportation Officer (2019-2022) responsible for first-line supervision of custody management and fugitive operations teams; and Assistant Field Office Director (2022-2025) managing a portfolio of programs that included the fugitive operations teams, criminal alien program, criminal prosecutions, intelligence, special response team, and sub-offices in South Dakota and North Dakota.

3.      ICE ERO manages and oversees all aspects of the removal process within ICE, including domestic transportation, detention, alternatives to detention programs, bond management, supervised release, and removal to more than 170 countries around the world. As the Acting FOD of the ERO St. Paul Office, I direct and oversee ICE's enforcement of federal immigration laws in the states of Minnesota, Iowa, Nebraska, North Dakota, and South Dakota.

4.      The ERO St. Paul Office has approximately 190 officers covering five states. In the Twin Cities of St. Paul and Minneapolis, ERO has approximately 80 officers. During Operation Metro Surge, approximately 700 additional ERO officers and HSI agents were detailed to the St. Paul Field Office. These details have come at different times and for varying lengths of time.

5.      The mission of Operation Metro Surge is to significantly increase "at-large" arrests of illegal aliens in the Twin Cities metro area, focusing on individuals with executable final orders. This effort is a joint effort between ICE ERO and ICE HSI, with assistance from other federal components. Since commencement of Operation Metro Surge, ICE has arrested more than 1,000 illegal aliens.

6.      This declaration is submitted in support of Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order/Preliminary Injunction.

7.      The statements contained in this declaration are based upon my personal knowledge, reasonable inquiry, and information made available to me in the course of my official duties from information obtained from records, systems, databases, other DHS employees, and/or information portals maintained and relied upon by DHS.

**Background**

8.      ICE is the largest investigative branch of DHS and is charged with enforcement of more than 400 federal statutes. The agency was created after the September 11, 2001, terrorist attacks,

by combining components of the former Immigration and Naturalization Service and the former U.S. Customs Service, among other agencies, to more effectively enforce federal immigration and customs laws and to protect the United States against terrorist attacks. The mission of ICE is to protect the United States from the cross-border crime and illegal immigration that threaten national security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which includes 25 field offices led by FODs; (2) Homeland Security Investigations (HSI), which includes 30 field offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor, which includes 25 field locations led by Chief Counsel.

9.      ERO deportation officers are immigration officers under 8 U.S.C. § 1357 and customs officers under 19 U.S.C. § 1589a. It is the mission of ERO to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally—including those who cross the border illegally, which is a federal misdemeanor, 8 U.S.C. § 1325, and those who illegally reenter after having been removed, which is a federal felony, 8 U.S.C. § 1326—or otherwise undermine the integrity of our immigration laws and our border control efforts.

10.     The majority of ERO's immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the course of immigration proceedings and pending physical removal from the United States. This includes locating and taking into custody fugitive aliens and at-large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE

custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

**DHS Use of Force Policy**

11. In responding to public safety threats, ICE officers and special agents are bound by the DHS use of force policy titled, *Update to the Department Policy on the Use of Force* (Feb. 6, 2023) (Use of Force Policy), available at https://www.dhs.gov/sites/default/files/2023-04/23_0206_s1_use-of-force-policy-update.pdf. The general principle undergirding the Use of Force Policy is the respect for human life and the communities served. To that end, the Use of Force Policy requires that law enforcement officers only use force when no reasonably effective, safe, and feasible alternative appears to exist and may use only the level of force that is objectively reasonable in light of the facts and circumstances confronting the law enforcement officer at the time force is applied. Further, physical force must be discontinued when resistance ceases or when the incident is under control.

12. ICE law enforcement officers are trained in a variety of techniques to aid in appropriately resolving encounters, to include de-escalation where possible. ICE law enforcement officers are encouraged to employ tactics and techniques that effectively bring an incident under control while promoting public safety and minimizing the risk of unintended injury or serious property damage. However, recognizing the seriousness of public safety threats that ICE law enforcement officers may encounter, the Use of Force Policy does not impose a duty to retreat to avoid the reasonable use of force, nor does it require ICE law enforcement officers to wait for an attack before using reasonable force to stop a threat.

13. The Use of Force Policy requires ICE law enforcement officers, when feasible, prior to the

application of force, to attempt to identify themselves and issue a verbal warning to comply with instructions. However, whether a warning is feasible under the circumstances requires the ICE law enforcement officer to be guided by several considerations, including, but not limited to, whether the resulting delay is likely to increase danger to the ICE law enforcement officer or others, result in the destruction of evidence, allow for a subject's escape, or result in the commission of a crime. However, when circumstances allow for a warning to be issued, ICE law enforcement officers are trained to afford subjects a reasonable opportunity to voluntarily comply before applying force. In an exigent circumstance, for self-defense or defense of another, ICE law enforcement officers are authorized to use any available object or technique in a manner that is objectively reasonable in light of the circumstances. In short, every circumstance is unique and requires a review of all information on the ground. However, the Use of Force Policy strictly prohibits the use of excessive force and warns its officers that DHS does not tolerate excessive force and constitutes it as misconduct. Under the policy, engaging in excessive force or failing to report the use of excessive force will subject the officer to administrative and criminal penalties.

## <u>Restrictions on Minnesota's State and Local Cooperation with Federal Officials</u>

14.     Many Minnesotan municipalities and counties no longer cooperate with ICE or honor ICE's immigration detainers.

15.     On February 6, 2025, the Office of the Minnesota Attorney General issued an opinion concluding that Minnesota law prohibits state and local law enforcement agencies from holding someone based on an immigration detainer if the person would otherwise be released from custody.[1] The Minnesota Attorney General's opinion explicitly details that (1) the continued detention of a person who would otherwise be released from custody is an arrest, (2) neither

---

[1] Opinion available at https://www.ag.state.mn.us/office/Opinions/3a-20250206.pdf (last visited Dec. 29, 2025).

Minnesota law nor federal law gives state and local officials the authority to arrest someone based on an immigration detainer, and (3) Minnesota law enforcement agencies risk significant civil liability if they enforce immigration detainers.

16.    On December 3, 2025, the Mayor of the City of Minneapolis signed Executive Order 2025-02, Refusing Authorization for City Parking Lots, Parking Ramps, Vacant Lots, and Garages To Be Used for Civil Immigration Enforcement Activities.[2] The Executive Order explicitly prohibits any government entity from using a city-owned or city-controlled parking lot, ramp, vacant lot, or garage for civil immigration enforcement purposes.

17.    On December 19, 2025, the City Attorney for the City of St. Paul sent a cease-and-desist letter to the ERO St. Paul Office advising that DHS's use of parking lots for law enforcement reasons at St. Paul parks is unlawful and constitutes as encroachment.[3] The City Attorney's letter orders the ERO St. Paul Office to immediately cease and desist further use of parks' parking lots.

18.    On December 23, 2025, the Minnesota Department of Public Safety sent a letter to DHS advising that DHS's participation with Minnesota's undercover vehicle registration program was at risk due to alleged reports of DHS agents swapping license plates between DHS unmarked vehicles. Minnesota's undercover vehicle registration program allows participants to preserve anonymity of law enforcement personnel performing sensitive work in unmarked vehicles.[4]

19.    Further, Minnesota's Driver's License for All Initiative, passed in 2023, allows for a standard driver's license to be issued without proof of immigration status.[5] The Initiative further

---

[2] Signed copy available at https://www.minneapolismn.gov/government/mayor/executive-orders/executive-order-2025-02/.

[3] Copy of letter available at https://www.stpaul.gov/sites/default/files/city-attorney/cease-and-desist-federal-immigration-enforcement-use-park-parking-lots.pdf (last visited Dec. 29, 2025).

[4] Copy of letter available at https://kstp.com/wp-content/uploads/2025/12/DVS-Letter-to-DHS-re-use-of-license-plates-12.23.25.pdf (last visited Dec. 29, 2025).

[5] Driver's License for All, Minnesota Department of Public Safety, Driver & Vehicle Services, https://dps.mn.gov/divisions/dvs/license-and-id/dl-all (last visited Dec. 31, 2025).

prohibits Minnesota's Department of Transportation from sharing information provided on license and ID card applications with state or federal agencies that primarily enforce immigration laws. Providing such information to state or federal agencies that primarily enforce immigration laws could lead to criminal penalties. *See* MINN. STAT. § 171.12.

20.     In the City of Minneapolis, city employees are prohibited from questioning, arresting, detaining, or undertaking any law enforcement action for the purpose of detecting violations of federal civil immigration laws and verifying immigration status. MINNEAPOLIS CODE OF ORDINANCES, Title 2, Ch. 19.30. The City of St. Paul likewise enforces similar prohibitions on its public safety officials. *See* ST. PAUL CODE OF ORDINANCES, Part III, Title III, Ch. 44.03.

**Increased Violence Against Federal Officers**

21.     For the past year, ICE officers operating out of the ERO St. Paul Office have been confronted with increased threats, violence, aggression, attacks, vehicle block-ins, and obstruction of immigration enforcement operations from members of the public. The increase in these types of incidents has obstructed enforcement operations, interfered with officers' official duties, and posed significant safety risks to not only ICE officers but also the public. Noticeably, these incidents have further increased since Operation Metro Surge launched in early December 2025.

22.     For instance, on November 18, 2025, when serving a federal search warrant at the Bro-Tex business located at 800 North Hampden Avenue in St. Paul, federal law enforcement officials with ICE HSI; ICE ERO; the Federal Bureau of Investigation (FBI); the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF); and the Drug Enforcement Agency (DEA) were met with significant protester presence attempting to disrupt the operation. A crowd of approximately two hundred protesters yelled obscenities at the federal officials; violently pushed, hit, threw objects at, and body slammed into the officials; obstructed the path of government vehicles; and caused

property damage to at least seven government vehicles.[6] Despite federal officials advising the protesters on numerous occasions to move back and stop blocking traffic, protesters refused to comply and even intruded past secured perimeters marked with police caution tape. With both the public and federal officials' safety at risk, federal officials attempted to physically push protesters back. When these techniques failed to make a clearing, federal officials deployed non-lethal munitions to help disperse crowds and make way for vehicular traffic. Execution of the search warrant on the Bro-Tex business led to the arrest of thirteen illegal aliens, as well as one protester.



---

[6] Video footage from the November 18, 2025, operation available at https://www.facebook.com/KARE11/videos/family-members-speak-out-after-federal-action-in-st-paul/25653503927587560/ (last visited Dec. 29, 2025).





Photos available at https://minnesotareformer.com/2025/11/18/dozens-of-federal-agents-raid-st-paul-business-sparking-protest/ (last visited Dec. 29, 2025).

23.    On November 25, 2025, ICE officers were conducting a law enforcement operation near the area of Rose Avenue and Payne Avenue in St. Paul when a government vehicle was deliberately rammed into. ICE officers observed the driver run into a residential building. As ICE officers began to secure a perimeter around the residence, a crowd of protesters began to gather. Some of the protesters became disruptive and repeatedly crossed police caution lines, entering into the secured perimeter. Despite ICE officers giving multiple instructions to step back, protesters continued to defy ICE officers' instructions. One protester sprayed multiple ICE officers with what appeared to be a can of mase. Another protester kicked an ICE officer in the groin area twice, while a third protester struck an ICE officer in the arm and was seen carrying around a pointed wooden board with a sharp edge. All three disruptive protesters were charged for assaulting a federal officer.

24.    On December 9, 2025, ICE officers were conducting a criminal investigation at the 2100 block of Oliver Avenue North in Minneapolis when a small number of protesters started to gather, blow whistles, and record on their phones.[7] One of these protesters attempted to enter the established perimeter of the operation. An ICE officer instructed the female protester multiple times to step back from the established perimeter as a criminal investigation was ongoing, but the female protester verbally refused and expressed her continued intent to cross into the established perimeter. The ICE officer positioned her body to prevent the female protester from entering the perimeter, but the female protester continued to defy instructions to move back. As the female protester kept walking into the established perimeter, she put her hands up and attempted to push

---

[7] Angel Edwin Quiquintuna Capuz, a criminal illegal alien convicted for robbery and previously arrested for assaulting a police officer, disarming a peace officer, and driving while intoxicated, was the subject of this criminal investigation. *See* DHS Press Release, *ICE Arrests the Worst of the Worst Criminal Illegal Aliens Including Pedophiles, Rapists, and Violent Thugs in Tim Walz's Sanctuary Minnesota*, Dec. 12, 2025, https://www.dhs.gov/news/2025/12/12/ice-arrests-worst-worst-criminal-illegal-aliens-including-pedophiles-rapists-and (last visited Jan. 2, 2026).

the ICE officer out of the way. The ICE officer explained to the female protester that she would be placed under arrest for impeding a federal officer. ICE officers attempted to handcuff the female protester in the standing position, but the female protester continued to actively resist. Only once the ICE officers placed the female protester on the ground were they able to successfully handcuff her. While being escorted to a government vehicle, the female protester continued to try to pull away from the ICE officers and refused to get into the government vehicle. Due to continued resistance, ICE officers had to pick her up and lift her into the government vehicle. Inside the government vehicle, the female protester unbuckled her seatbelt and attempted to uncuff herself. The female protester was taken to an ICE ERO processing center and identified as Plaintiff Susan Tincher.[8]

25.    Also on December 9, 2025, ICE officers were conducting enforcement operations in Cedar-Riverside, Minneapolis when protesters gathered and began obstructing traffic and impeding government vehicle progress. Protesters honked their horns; blew whistles; threw snowballs, ice, and other projectiles; kicked and hit government vehicles; and shouted insults and obscenities at the ICE officers. ICE officers issued multiple verbal commands and over the public address system for protesters to move back or ICE officers would have to resort to the use of chemical munitions if protesters continued to impede vehicular traffic. Protesters refused to comply. To safely advance, ICE officers deployed OC sprays to disperse the crowds blocking the street. As a tactic to deter further aggression and advancement from protesters, ICE officers kept their OC sprayers aimed at the crowds.

26.    On December 10, 2025, while ICE officers were carrying out a law enforcement operation

---

[8] Video footage from the December 9, 2025, operation available at
https://www.mprnews.org/story/2025/12/09/federal-agents-arrest-citizen-observer-watching-ice-north-minneapolis
(last visited Dec. 29, 2025).

and arresting an alien out of the backseat of a vehicle near Plymouth, Minnesota, the alien and another individual actively resisted the arrest and fought with the ICE officers. While an ICE officer was still seated in the front passenger seat of the individual's vehicle attempting to arrest the alien, the individual began to drive away as the alien got out of the moving vehicle. The alien ran away on foot but was soon caught and arrested. As for the driver and the ICE officer still in the front passenger seat, the driver finally came to a stop in front of a local police station after driving for two miles. Despite multiple commands to exit the vehicle, the individual refused to comply with the ICE officer's commands and was later arrested for assaulting, resisting, and impeding federal officers while carrying out their duties. The FBI opened an investigation following the incident.

27.    On December 15, 2025, ICE officers attempted to arrest an alien near Pillsbury Avenue and 26th Street West in Minneapolis. During the arrest, a group of 60-70 protesters surrounded the officers and began throwing rocks and snowballs, assaulting, taunting, challenging, and yelling "kill yourself" and other obscenities at the ICE officers. ICE officers witnessed one female protester attempting to spray paint one of the government vehicles and attempted an arrest. Due to the female protester's continued resistance during the arrest attempt, and another protester pulling her away from ICE officers, the female protester successfully absconded.[9] Leading some of these protesters was Plaintiff Abdikadir Noor, who threatened to interfere, acted aggressively, pushed up into ICE officers' faces, shouted obscenities, and threw rocks and ice at ICE officers.[10] Greatly outnumbered, the ICE officers attempted to leave the scene but were blocked in by a growing

---

[9] Video footage from the December 15, 2025, incident available at https://www.mprnews.org/story/2025/12/15/ice-agents-call-for-backup-during-minneapolis-traffic-stop (last visited Jan. 2, 2026).

[10] Video footage and recorded 911 call from the December 15, 2025, incident available at https://www.mprnews.org/story/2025/12/15/ice-agents-call-for-backup-during-minneapolis-traffic-stop (last visited Jan. 2, 2026).

crowd of protesters and their vehicles. ICE officers requested immediate backup and assistance from local authorities.[11] Local authorities arrived to briefly assist with crowd control and help some ICE officers leave the area. However, lacking what they perceived to be an emergency, local authorities left soon thereafter despite the crowd's escalating hostility against ICE officers. ICE officers sustained bodily injuries, and government vehicles sustained property damage because of this incident. Two protesters were arrested following this incident, including Plaintiff Abdikadir Noor.[12]

28.     On December 22, 2025, ICE officers conducting surveillance in a marked government vehicle in West St. Paul noticed a vehicle following them. After performing a U-turn and confirming that the vehicle continued to pursue the government vehicle, the ICE officers made a stop, at which point the other vehicle pulled up alongside the stopped government vehicle. The driver rolled down his window and began yelling and blowing a whistle. The driver then began to draw a holstered firearm from his waistband. The ICE officers drew their service weapons and ordered the driver to drop his gun. The driver placed his firearm on his dashboard then drove into a nearby driveway. Local authorities arrived and took the driver into custody. ICE officers did not discharge their firearms.

29.     I understand that Plaintiffs make several allegations of ICE officers being involved in multiple confrontations with protesters following the protesters pursuing after government vehicles. ICE officers are trained and instructed to follow all traffic laws. When protesters' pursuit of government vehicles, however, cross into erratic, aggressive driving and risk the officers or the public's safety, ICE officers may try to lose the pursuing vehicle, call for assistance from local

---

[11] Video footage and recorded 911 call from the December 15, 2025, incident available at
https://www.mprnews.org/story/2025/12/15/ice-agents-call-for-backup-during-minneapolis-traffic-stop (last visited Dec. 30, 2025).
[12] Video available at https://www.facebook.com/reel/25466791863009518 (last visited Jan. 2, 2026).

authorities, or they may stop the pursuing vehicle and issue a warning that continued aggressive driving could lead to a federal arrest. In at least one instance, local authorities arrested for harassment one driver who followed government vehicles erratically, thereby endangering public safety. There have also been instances where individuals caused vehicular crashes, endangering both ICE officers and the public's safety, due to erratic driving behaviors – photos of some of the damage provided below. Sometimes people following ICE vehicles will run red lights and cut off other vehicles in order to stay behind ICE vehicles. In other instances, the followers use their vehicles to block the road and to box in ICE vehicles as soon as they are able. This behavior is not safe and impedes ICE officers from effecting arrests. Prior to 2025, this type of behavior was virtually nonexistent. Now, it occurs almost daily.

30.     ICE officers have also had to deal with false reports of ICE arrests and false allegations of retaliation. For instance, on December 5, 2025, a local media outlet reported that federal agents arrested a U.S. citizen during an "immigration crackdown."[13] Allegedly, federal agents mocked the U.S. citizen's hijab and touched her inappropriately. A thorough search, however, showed no indication that ICE officers had been involved in the alleged encounter with the U.S. citizen or that even an arrest had occurred.

31.     While carrying out their official duties, ICE officers have faced increasing acts of aggression and violence against them, not only from protesters, but also from those subject to targeted arrests. These acts of aggression have often led to significant damage to government property and vehicles. Below are photographs illustrating some of the damage.

---

[13] Mike Manzoni, *U.S. citizen arrested during immigration crackdown, family says*, Fox 9, Dec. 5, 2025, https://www.fox9.com/news/u-s-citizen-arrested-during-immigration-crackdown-family-says (last visited Dec. 30, 2025).



















**Impact of Plaintiffs' Requested Relief**

32.    If the Court grants Plaintiffs' motion for temporary restraining order/preliminary injunction, such an injunction would be unworkable, unnecessary, and further endanger the safety of law enforcement personnel and the public.

33.    ICE uses crowd control devices generally after crowds have been ordered to disperse, fail to do so, and engage in criminal and assaultive behavior towards law enforcement officers and the public. Due to the nature of some crowd control devices, such as CS gas and flash-bangs, persons who fail to disperse pursuant to lawful orders, but are not posing an immediate threat to law enforcement officers, may be impacted due to their proximity to persons who are engaged in

violent and/or criminal behavior. These crowd control devices are designed and used not to cause physical injury but to protect law enforcement officers and the public from violent attacks.

34.    Moreover, consistent with the DHS Use of Force Policy, ICE law enforcement officers only use force that is necessary and reasonable based on the totality of the circumstances. ICE law enforcement officers are trained to engage those individuals who pose the greatest threat based on the reasonableness standard. ICE law enforcement officers are trained to give verbal commands, and individuals who do not comply with these commands may be perceived as potential threats. ICE law enforcement officers' responsibility is to ensure the scene is safe for law enforcement personnel and the community, and anyone who does not comply with lawful dispersal commands may be considered a potential threat to law enforcement depending on subsequent actions and continued refusal to leave a restricted area. Also consistent with the DHS Use of Force Policy, ICE law enforcement officers are trained to utilize direct impact munitions only on those individuals who pose a direct threat to law enforcement. If a dispersal order is given and subjects do not comply with this directive, they may be subject to necessary and reasonable uses of force to include the utilization of kinetic impact or chemical munitions and/or diversionary devices. ICE law enforcement officers are trained to give dispersal orders prior to the utilization of any of the aforementioned law enforcement tools when feasible, and those individuals who do not heed these orders may be exposed to any or all of these. In short, those individuals who do not disperse when receiving the command to do so, identify themselves as a potential threat to law enforcement.

35.    Consistent with the DHS Use of Force Policy, ICE law enforcement officers are trained to give warnings when operationally feasible. A blanket requirement for two separate warnings would prevent officers from responding to exigent circumstances where the utilization of these tools could prevent harm to the public or officers. It is the subject's behavior that dictates the timeline of the

utilization of these tools and if the subject or crowd behavior requires a more immediate response, officers cannot and should not compromise safety to meet an arbitrary two-warning standard. In short, ICE law enforcement officers will give commands and warnings to avoid unnecessary exposure; however, ICE law enforcement officers are permitted to use necessary force as appropriate based on the totality of circumstances.

36.     In addition, situations where the use of less-lethal measures are needed are often loud, chaotic, and spread over a large area. Plaintiffs' requested injunction relies on a subjective standard of whether protestors, legal observers, or others can hear verbal warnings before any use of force is employed, which is beyond the control of federal officers. Indeed, it is partly within the control of the crowd. While ICE officers can provide verbal commands and warnings, when possible to do so as explained previously, they cannot guarantee or prove every single person in the crowd was able to hear and understand these warnings.

37.     Immigration enforcement operations that attract protestors can present ICE officers with the challenge of controlling a chaotic and rapidly evolving situation that creates potential dangers to the public and officers themselves. In such circumstances, ICE officers may be unable to differentiate between "protesters" or "observers," on the one hand, and members of the public, on the other hand, especially while in the midst of a violent situation where there is imminent physical danger to officers and members of the public. When ICE officers give a dispersal command for safety reasons, all persons are expected to comply. Any delay in compliance or the ability to respond to a lack of compliance poses a risk to officer safety and public safety.

38.     Plaintiffs' request to enjoin DHS from using chemical munitions on people who are not posing an imminent threat to law enforcement or another person ignores the realities of protecting officers and the public from violent protestors who use the anonymity of crowds to assault law

enforcement officers. Less-lethal devices, chemical munitions, and/or diversionary devices are used after crowds have already been ordered to disperse (often, multiple times), fail to do so, and/or engage in criminal and assaultive behavior towards law enforcement officers and the public. Due to the nature of some less-lethal devices, chemical munitions, and/or diversionary devices, such as CS (tear) gas, Oleoresin Capsicum (OC) Spray, and flash-bangs, which disperse widely—persons who fail to disperse pursuant to lawful orders, but are not posing an immediate threat to law enforcement officers, may be impacted due to their proximity to persons who are engaged in violent and/or criminal behavior. Enjoining ICE's use of chemical munitions would impair ICE's ability to safely execute both criminal search and arrest warrants, but also to safely conduct immigration enforcement actions.

39.    Plaintiffs' proposed injunction also fails to address situations where the use of less-lethal devices for crowd control is reasonable and necessary. For example, when ICE officers are addressing a crowd or protest that is obstructing transportation, such as ingress or egress to or from a location where lawful immigration arrests are occurring, and the crowd is failing to comply with law enforcement orders, but there is not a specific imminent threat of harm to a person, less-lethal devices can be deployed as an effective and appropriate tool. In this situation, the use of a crowd control device may be necessary to obtain compliance with the lawful order while, at the same time, limiting and minimizing the level of force needed in a given situation.

40.    Only ICE officers who have been provided the proper training and successfully demonstrated proficiency are permitted to carry ICE firearms and other authorized weapons (e.g., batons, OC sprays, CS sprays). The requisite training includes, but is not limited to, guidance over the issuance, use, safeguarding, and maintenance of ICE firearms, other authorized weapons, and related use of force equipment; scenario-based simulations; overview of related legal updates;

medical aid training; as well as overview of de-escalation techniques. As indicated above, ICE officers only use force that is necessary and reasonable based on the totality of the circumstances confronting the officer at the time. Based on the totality of the facts and circumstances, two ICE officers may have two different responses to the same situation, any of which may be considered both reasonable and necessary. When carrying out their duties, ICE officers are often met with fast-evolving scenarios in which they may have to rapidly increase or decrease use of force and employ varying use of force options depending on the totality of the circumstances. In short, a restriction that regulates how ICE officers should carry and handle their firearms and other authorized weapons would cause great operational confusion as such a regulation would conflict with ICE guidelines and trainings and potentially create dangerous scenarios for ICE officers.

41.    ICE does not target or discriminate against individuals for exercising their rights to protest, record, or otherwise legally observe. There are instances, however, where recordings of federal law enforcement activity or officers become inappropriate or unlawful. For instance, recordings inside ICE detention centers or government vehicles are generally prohibited. Further, if the recordings impede law enforcement operations, such as blocking vehicular traffic, blocking entrances/exits to buildings, or intruding into secured perimeters during active law enforcement operations, then ICE officers may find it necessary to direct individuals to cease interfering with and recording ongoing operations.

42.    A blanket requirement prohibiting ICE from instructing members of the public that they must cease driving on public roads significantly restricts ICE's authority to conduct lawful vehicle stops and interferes with ICE's mission as a law enforcement agency. Conducting lawful vehicle stops is a critical tool for ICE officers to identify and apprehend aliens involved in violations of immigration law, as well as to address other criminal activity encountered during enforcement

operations. Limiting this authority in any capacity is simply unworkable as it undermines ICE's abilities to efficiently carry out its law enforcement duties and responsibilities. Further, when conducting enforcement operations, ICE officers must often direct traffic to maintain secured perimeters for the officers and public's safety. As illustrated above, there are also instances where it becomes appropriate for ICE officers to direct other drivers to cease blocking government vehicles' passage.

43.    During my tenure as Acting FOD for ERO St. Paul, I did not witness, nor am I aware of, any ICE employee knowingly targeting or retaliating against peaceful protesters or legal observers with less lethal munitions and/or crowd control devices for exercising their First Amendment rights.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 5th day of January 2026.

David Easterwood
Acting Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security