UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| SUSAN TINCHER, JOHN BIESTMAN, JANET LEE, LUCIA WEBB, ABDIKADIR NOOR, and ALAN CRENSHAW, *on behalf of themselves and other similarly situated individuals*, | Case No. 25-cv-04669 |
| Plaintiffs, | **PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER** |
| v. | |
| KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive Associate Director, Enforcement and Removal Operations (ERO), ICE; DAVID EASTERWOOD, Acting Field Office Director, ERO, ICE Saint Paul Field Office; JOHN A. CONDON, Acting Executive Associate Director, Homeland Security Investigations (HSI); The Department of Homeland Security; Unidentified Federal Agencies; and Unidentified Federal Agents; *in their official capacities*, | |
| Defendants. | |

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF CONTENTS.................................................................................................ii

TABLE OF AUTHORITIES .........................................................................................iv

INTRODUCTION ........................................................................................................ 1

ARGUMENT................................................................................................................ 2

I. Plaintiffs are likely to succeed on the merits of their claims ........................................ 2

   A.   Plaintiffs have standing to seek prospective relief. .............................................. 2

      1.   Plaintiffs' intention to continue exercising their First Amendment rights renders Defendants' authorities inapposite........................................................ 2

      2.   Defendants are escalating their presence in Minnesota and imminent harm is likely to result. .................................................................................... 4

      3.   Defendants ignore their own statements and adjudicated examples of their prior unconstitutional acts. ........................................................................ 5

      4.   Defendants fail to engage with large swaths of the record before the Court to argue there is no risk of imminent injury to Plaintiffs........................................ 7

   B.   Plaintiffs are likely to succeed on the merits of their retaliation claim................... 8

      1.   Plaintiff Tincher was retaliated against for her First Amendment activity......... 8

      2.   Plaintiff Noor was retaliated against for his First Amendment activity. .......... 10

      3.   Plaintiffs Biestman, Lee, and Webb, and numerous other declarants were retaliated against for their First Amendment activity. ...................................... 12

      4.   Plaintiff Crenshaw was retaliated against for his First Amendment activity.... 16

   C.   Plaintiffs are likely to succeed on the merits of their viewpoint discrimination claim. ............................................................................................ 18

   D.   Defendants' seizures were unreasonable and therefore violate the Fourth Amendment. ...................................................................................... 20

II.The remaining equitable factors favor Plaintiffs and the putative class........................ 24

   A.   If an injunction is not entered, Plaintiffs and the putative class face imminent and irreparable harm.................................................................................. 24

   B.   The balance of equities favors Plaintiffs and the putative class............................ 26

III. This Court has the power to issue an injunction protecting Plaintiffs and the putative class. .................................................................................................................... 28

    A.  Due to the widespread nature of Defendants' conduct, the requested injunction is necessary to provide complete relief. .................................................................... 29

    B.  Alternatively, this Court can issue relief to protect the putative class. .................. 32

    C.  The scope of the injunction is proper and complies with the requirements of Rule 65. ............................................................................................................................ 33

CONCLUSION ................................................................................................................. 36

## <u>TABLE OF AUTHORITIES</u>

Page

**Cases**

*A.A.R.P. v. Trump,*
605 U.S. 91 (2025) ...................................................................................32, 33

*Aldridge v. City of St. Louis, Missouri,*
75 F.4th 895 (8th Cir. 2023) ...................................................................17

*Allee v. Medrano,*
416 U.S. 802 (1974) ..................................................................................35

*Arizona v. Biden,*
40 F.4th 375 (6th Cir. 2022) ....................................................................31

*Associated Press v. Budowich,*
No. 25-5109, 2025 WL 1649265 (D.C. Cir. June 6, 2025) ...........................19

*Baltimore Sun Co. v. Ehrlich,*
437 F.3d 410 (4th Cir. 2006) ....................................................................19

*Bell v. Neukirch,*
979 F.3d 594 (8th Cir. 2020) ....................................................................21

*Bennie v. Munn,*
822 F.3d 392 (8th Cir. 2016) ....................................................................34

*Brinegar v. United States,*
338 U.S. 160 (1949) ..................................................................................21

*Burson v. Freeman,*
504 U.S. 191 (1992) ..................................................................................19

*Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.,*
824 F.2d 665 (8th Cir. 1987) ....................................................................34

*Castro v. Cnty. of Los Angeles,*
833 F.3d. 1060 (9th Cir. 2016) ...................................................................5

*Chestnut v. Wallace,*
947 F.3d 1085 (8th Cir. 2020) ..................................................................23

*Chicago Headline Club v. Noem*,
No. 25 C, 12173, 2025 WL 3240782 (N.D. Ill. Nov. 20, 2025) .........................3, 4, 25, 30

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .........................................................................................3, 5

*Connection Distrib. Co. v. Reno*,
154 F.3d 281 (6th Cir. 1998) ...........................................................................27

*Daniels v. Woodbury Cnty.*,
742 F.2d 1128 (8th Cir. 1984)...........................................................................33

*Dreith v. City of St. Louis, Missouri*,
55 F.4th 1145 (8th Cir. 2022)...............................................................16, 17, 18

*Furlow v. Belmar*,
52 F.4th 393 (8th Cir. 2022) .............................................................................20

*Gerlich v. Leath*,
861 F.3d 697 (8th Cir. 2017) ...........................................................................19

*Goyette v. City of Minneapolis*,
338 F.R.D. 109 (D. Minn. 2021) ...............................................................*passim*

*Goyette v. City of Minneapolis*,
2021 WL 5003065 (D. Minn. Oct. 28, 2021) ....................................................35

*Howe v. Varity Corp.*,
896 F.2d 1107 (8th Cir. 1990)...........................................................................32

*Hoyland v. McMenomy*,
869 F.3d 644 (8th Cir. 2017) .......................................................................9, 10

*Iowa Migrant Movement for Justice v. Bird*,
157 F.4th 904 (8th Cir. 2025) ............................................................................5

*L.A. Press Club v. Noem*,
799 F. Supp. 3d 1036 (C.D. Cal. 2025) ....................................................*passim*

*L.A. Press Club*,
No. 25-5975 (9th Cir. Dec. 18, 2025) ...............................................................30

*Lackey v. Stinnie*,
604 U.S. 192 (2025) .........................................................................................33

*Marbury v. Madison*,
  5 U.S. 137 (1803) ........................................................................27

*Matal v. Tam*,
  582 U.S. 218 (2017) ......................................................................18

*Mistretta v. United States*,
  488 U.S. 361 (1989) ......................................................................28

*Mohammed H. v. Trump*,
  No. 25-1576, 2025 WL 1170448 (D. Minn. April 22, 2025) ........................................27

*Molina v. City of St. Louis*,
  59 F.4th 334 (8th Cir. 2023) ........................................................13

*Nebraska v. Biden*,
  52 F.4th 1044 (8th Cir. 2022) ......................................................35

*Park v. Forest Serv. of U.S.*,
  205 F.3d 1034 (8th Cir. 2000) ........................................................6

*Perry Educs. Ass'n v. Perry Local Educators' Assn.*,
  460 U.S. 37 (1983) ........................................................................19

*Planned Parenthood v. Rounds*,
  530 F.3d 724 (8th Cir. 2008) ........................................................2

*Puente v. City of Phoenix*,
  123 F.4th 1035 (9th Cir. 2024) ......................................................23

*Rodriguez v. Robbins*,
  715 F.3d 1127 (9th Cir. 2013) ......................................................27

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) ......................................................................20

*Smook v. Minnehaha Cnty.*,
  457 F.3d 806 (8th Cir. 2006) ........................................................3

*Stearns v. Wagner*,
  122 F.4th 699 (8th Cir. 2024) ......................................................17

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ...........................................................................28, 29, 32

*United States v. Arvizu*,
  534 U.S. 266 (2002) ........................................................................................23

*United States v. Korab*,
  893 F.2d 212 (9th Cir. 1989) ...........................................................................21

*United States v. Schrader*,
  10 F.3d 1345 (8th Cir. 1993) ...........................................................................20

*Vassallo ex rel. Brown v. Majeski*,
  842 N.W.2d 456 (Minn. 2014) .........................................................................22

*Walker v. City of Pine Bluff*,
  414 F.3d 989 (8th Cir. 2005) ...........................................................................23

*Whren v. United States*,
  517 U.S. 806 (1996) ........................................................................................20

*Ybarra v. Illinois*,
  444 U.S. 85 (1979) ..........................................................................................22

**Statutes**

18 U.S.C. 111 .......................................................................................................10

18 U.S.C. § 373 ....................................................................................................21

Minn. Stat. § 169.011, subd. 3 .............................................................................22

Minn. Stat. § 169.03, subd. 2 ...............................................................................22

Minn. Stat. § 169.18, subd. 8(c) ...........................................................................22

**Rules**

Fed. R. Civ. P. 65(d)(1) ........................................................................................33

Federal Rule of Civil Procedure 23(b)(2) ............................................................32

Ninth Circuit Rule 36–3(a) ................................................................................. 30

Seventh Circuit Rule 32.1(b) ....................................................................... 30, 31

## **INTRODUCTION**

Unable to justify the torrent of force, retaliation, and intimidation employed against peaceful protesters and observers, Defendants' Opposition does not meaningfully engage with the facts on the ground. Much of the Opposition argues that Defendants' actions are justified because Plaintiffs have been "violent" or "aggressive"—utter fabrications with no evidentiary support that Defendants do not even attempt to support through firsthand knowledge. Lacking a substantive answer to the 14 declarations submitted, which show that there is nothing "isolated" about Defendants' conduct, Defendants largely ignore them. So too do Defendants ignore the adjudicated findings of their having committed substantially similar—and in some cases identical—constitutional violations in Chicago and Los Angeles. Defendants likewise repeatedly ignore binding Eighth Circuit precedent that is unfavorable to them, even where it has been extensively discussed in Plaintiffs' motion.

There is no justification for violating the First and Fourth Amendment rights of peaceful protesters and observers, as Defendants have done and are continuing to do in Minnesota. None of Defendants' arguments on standing, the merits, or the administrability of the narrow injunction Plaintiffs have proposed provides a basis to deny Plaintiffs' requested relief. Plaintiffs respectfully seek this Court's entry of a preliminary injunction to preserve their constitutional rights until this litigation can proceed in the normal course to permanently enjoin Defendants' lawless conduct.

<u>**ARGUMENT**</u>

**I.    Plaintiffs are likely to succeed on the merits of their claims**

Defendants recognize that "[l]ikelihood of success on the merits . . . 'is the most significant'" factor in the preliminary injunction analysis. ECF 46 at 24. Defendants' Opposition does nothing to contradict Plaintiffs' showing that they have a "fair chance of prevailing" on the merits. *See Goyette v. City of Minneapolis*, 338 F.R.D. 109, 115 (D. Minn. 2021) (citing *Planned Parenthood v. Rounds*, 530 F.3d 724 (8th Cir. 2008)).

**A.    Plaintiffs have standing to seek prospective relief.**

Defendants claim that Plaintiffs lack standing because they supposedly face no immediate threat of irreparable injury. ECF 46 at 24. Defendants make this claim only by turning a blind eye to several facts that differentiate the instant action from the authorities upon which they rely. Applying Eighth Circuit precedent on imminence, this Court recently concluded that press and observers faced imminent First Amendment injury due to a confluence of factors also present here: "(1) the [defendants'] repeated conduct in contravention of Plaintiffs' constitutional rights; (2) the ongoing protests  . . .  and (3) Plaintiffs' intention to continue [their] press coverage of the protests." *Goyette*, 338 F.R.D. at 119-20.

**1.    Plaintiffs' intention to continue exercising their First Amendment rights renders Defendants' authorities inapposite.**

This case involves Plaintiffs who actively seek to interact with Defendants to serve as watchdogs and who have declared their intention to continue to observe, gather information, and protest ICE activity. *See, e.g.*, ECF 1-1 (Tincher Decl.) ¶ 19; ECF 1-2 (Biestman Decl.) ¶ 14; ECF 1-3 (Lee Decl.) ¶ 17; ECF 1-4 (Webb Decl.) ¶¶ 12-13. That

2

renders Plaintiffs the polar opposite of the plaintiffs in cases cited by Defendants, who had no desire or future intention of seeking out law enforcement interaction. On the contrary, those plaintiffs sought to *avoid* any such situations. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 108, 111 (1983) (finding it speculative that plaintiff "will be arrested in the future and provoke the use of a chokehold by resisting arrest"); *Smook v. Minnehaha Cnty.*, 457 F.3d 806, 816 (8th Cir. 2006) (no standing for injunction on prison intake procedures because "[t]here is no assertion that the plaintiffs expect to commit additional minor offenses"). Because Plaintiffs have an active intent "to continue to be present at ongoing protests . . . the risk of recurrence of their injuries is not speculative in the way it was in *Lyons* or *Vasquez Perdomo*." *L.A. Press Club v. Noem*, 799 F. Supp. 3d 1036, 1060 n.14 (C.D. Cal. 2025).

Given this critical factual context, multiple courts have rejected Defendants' claims that observer and protester plaintiffs lack standing for prospective relief from ICE's unconstitutional practices. *See id.* at 1059-61; *Chicago Headline Club v. Noem*, No. 25 C 12173, 2025 WL 3240782, at *73 (N.D. Ill. Nov. 20, 2025). These courts have also recognized that the "First Amendment injuries" at issue in this and other ICE-related disputes "sharply differ[] from the substantive due process injury asserted in *Lyons*," because a "chilling of First Amendment rights can constitute a cognizable injury." *L.A. Press Club*, 799 F. Supp. 3d at 1061; *accord Chicago Headline Club*, 2025 WL 3240782, at *74.

3

**2.    Defendants are escalating their presence in Minnesota and imminent harm is likely to result.**

The imminence of Plaintiffs' injuries here assumes even greater urgency given Defendants' recent behavior. Defendants note that the Seventh Circuit expressed "reservations" about standing while staying the injunction issued in Chicago. ECF 46 at 27. Yet they neglect to mention the Seventh Circuit's *reasoning* for questioning the imminence of future harm: the court was "aware of public reporting suggesting that the enhanced immigration enforcement initiative may have lessened or ceased, which could affect both the justiciability of this case and the propriety of injunctive relief." Order, *Chicago Headline Club v. Noem*, No. 25-3023 (7th Cir. Nov. 19, 2025).

By contrast, Defendants are ramping up their operations in Minnesota. On Monday, January 5, 2026—the same day Defendants filed their brief claiming no imminent risk of harm—public reporting surfaced that Defendants are increasing federal law enforcement presence by *two thousand* officers.[1] The day this brief is being filed—Wednesday, January 7, 2026—an ICE agent shot and killed a woman in Minneapolis.[2] Federal agents' increased presence and the escalating encounters between those agents and Minnesota citizens further supports the non-speculative risk of harm that exists and persists while ICE's operations in this District continue.

---

[1] Nicole Sganga & Camilo Montoya-Galvez, *2,000 Federal Agents Deploying to Minneapolis in Immigration Crackdown, Fraud Probe*, CBS News (Jan. 5, 2026 at 10:24 PM), available at https://www.cbsnews.com/amp/news/minneapolis-federal-agents-crackdown/.

[2] Star Tribune staff, *Live: ICE agent shoots, kills woman in Minneapolis* (Jan. 7, 2026), available at https://www.startribune.com/ice-raids-minnesota/601546426

### 3. Defendants ignore their own statements and adjudicated examples of their prior unconstitutional acts.

Defendants do not dispute that maintaining an unconstitutional policy can confer standing, as it greatly increases the likelihood of imminent future harm to the Plaintiffs. Rather, they claim that "Plaintiffs have not shown that DHS has a general policy of retaliation or excessive force." ECF 46 at 28.[3] As the *L.A. Press Club* court pointed out, "Defendants may not 'avoid liability by pointing to a pristine set of policies.'" 799 F. Supp. at 1067 (quoting *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1075 n.10 (9th Cir. 2016)). Instead, "[a] policy or custom of retaliation may be inferred from widespread practices or evidence of repeated constitutional violations and the absence of evidence that officers were discharged or reprimanded for retaliatory actions." *Id.* (cleaned up).

Based on the record before it, the *L.A. Press Club* court concluded "that Defendant Noem ratified Defendants' practice of meeting First Amendment protected activities with force," which "raise[d] serious questions as to retaliation." *Id.*; *see also* ECF 1 (Compl.) ¶ 52 (Noem stating "[t]he more they protest and commit acts of violence against law enforcement officers, the harder ICE is going to come after them."), at ¶ 54 (Noem stating "violence" against ICE officers includes "videotaping them, where they're at when they're out on operations.") Defendants have doubled down on their unlawful practices. Over the

---

[3] When assessing Plaintiffs' standing at the preliminary-injunction stage, this Court "assumes the plaintiff's allegations are true and views them most favorably to the plaintiff." *Iowa Migrant Movement for Justice v. Bird*, 157 F.4th 904, 913 (8th Cir. 2025). Because this Court must assume the truth of Plaintiffs' allegations for purposes of assessing standing at this early stage, Defendants' reliance on Defendant Easterwood's declaration in support of their standing argument is improper and should be disregarded. *See* ECF 46 at 17.

past few months, Defendants have characterized following and recording federal law enforcement officers as "obstruction of justice" and promised to prosecute people who engage in this activity "to the fullest extent of the law."[4]

Other courts have seen through Defendants' attempts to minimize and sterilize their conduct, concluding that "federal agents acted pursuant to a common and widespread practice of violating the First Amendment rights of journalists, legal observers, and protestors." *L.A. Press Club*, 799 F. Supp. 3d at 1067. The *L.A. Press Club* court reviewed an "avalanche of evidence before [it]," including "detailed and credible declarations from nearly 50 journalists, legal observers, and protestors." *Id.* at 1045, 1067. Defendants' widespread practices and pattern of behavior, adjudicated by other courts and further supported by the 20 declarations in the current record, further distinguish this case from the authorities cited by Defendants. *See Park v. Forest Serv. of U.S.*, 205 F.3d 1034, 1038–39 (8th Cir. 2000) (finding no standing where there was not evidence "of a pattern of noncompliance" with the Constitution). Contrary to Defendants' assertions, this is not a case where a "small, unnamed minority of policemen" are acting outside the bounds of the law. ECF 46 at 15. This is a case where hundreds of federal agents are following orders— and violating constitutional rights in the process.

---

[4] C.J. Ciaramella, *DHS Says Recording or Following Law Enforcement 'Sure Sounds like Obstruction of Justice*," Reason (Dec. 22, 2025 at 12:22 PM), available at https://reason.com/2025/12/22/dhs-says-recording-or-following-law-enforcement-sure-sounds-like-obstruction-of-justice (last visited Jan. 6, 2026).

**4.    Defendants fail to engage with large swaths of the record before the Court to argue there is no risk of imminent injury to Plaintiffs.**

Defendants largely ignore declarations from members of the putative class who are not named as Plaintiffs in the case, falsely claiming that the "events" described therein "have nothing to do with the named Plaintiffs' claims," ECF 46 at 58, and "do not shed light on whether *Plaintiffs* are likely to succeed on the merits of their claims," *id.* at 41. Having overlooked such corroborating record evidence of their unconstitutional actions, Defendants strain to recast their repeated behavior as "isolated incidents" or "one-off occasions." *Id.* at 24, 26. But there is nothing "isolated" about Defendants' conduct, as discussed above.

Here again, Defendants made an identical argument regarding nonparty declarations in *L.A. Press Club*. 799 F. Supp. 3d at 1060. As that court correctly explained, "the experience of other journalists, legal observers, and protesters bears directly on the operative question of whether Plaintiffs will again be wronged in a similar way." *Id.* (cleaned up). This Court should reach the same result.  Indeed, the evidence here is stronger, as the declarations of non-named Plaintiffs here are nonetheless members of the putative class, unlike in *L.A. Press Club*, where no class relief was sought.

The *L.A. Press Club* court also concluded that "risk of future injury [was] not speculative," where an "ongoing, sustained pattern of conduct . . . resulted in numerous injuries to members of the press" since the action was filed. 799 F. Supp. 3d at 1059; *see also Goyette*, 338 F.R.D. at 119 (holding that risk of First Amendment violations was "no longer speculative or a mere possibility" because "protests have continued and the harm

exists"). So too here, where Plaintiffs have submitted additional declarations showing events after the filing of the complaint that underscore the ongoing nature of the threat of harm. *See* ECF 33 (Hennes Decl.) (detailing ICE unreasonably using force against an observer on December 29, 2025); ECF 35 (Holboy Decl.) (detailing ICE seizing individual on December 20, 2025 to threaten arrest for First Amendment activity). This evidence disproves Defendants' argument that "there is no indication that 'the same' events will occur" in the future. ECF 46 at 27.

**B.    Plaintiffs are likely to succeed on the merits of their retaliation claim.**

As explained in Plaintiffs' opening brief, each element of Plaintiffs' retaliation claim is met for each named plaintiffs (and for additional members of the putative class). ECF 18 at I.A. Defendants' opposition challenges very few of those elements, after selectively viewing the record and ignoring applicable law, and does not undermine the need for injunctive relief.

**1. Plaintiff Tincher was retaliated against for her First Amendment activity.**

Defendants nowhere contest that Tincher was engaged in First Amendment protected activity, nor that being arrested would chill a person of ordinary firmness. *See* ECF 46 at 31-34. The lone elements they contest are whether Tincher's expression was the but-for cause of her arrest and whether Defendants had probable cause to effect an arrest. *Id*. Defendants fail to show that Plaintiffs lack a fair chance of prevailing on this claim.

Before dedicating pages to trying to explain how arresting the non-violent Tincher could be permissible, Defendants dedicate one line of their brief to the utter fabrication—not that Tincher was actually violent or assaulted anyone—but that she "attempt[ed] to

8

physically assault an officer," which could have justified her arrest. *Id.* at 31. This contention is entitled to no weight whatsoever, as it lacks any evidentiary basis. Defendants' declarant Easterwood does not state that he was at the scene or has firsthand knowledge of Tincher's arrest. *See* ECF 47 (Easterwood Decl.) ¶ 24. By contrast, Plaintiffs have three individuals who were present on that day who uniformly state that Tincher was non-violent. *See* ECF 1-1 (Tincher Decl.) ¶ 9; ECF 1-10 (Rollins Decl.) ¶ 14 ("I did not observe Ms. Tincher make any threatening gestures toward agents or take any action to endanger or impede the agents before, during, or after her detention."); ECF 1-12 (Sorensen Decl.) ¶ 10 ("[Tincher's] hands were down and she had neutral body language. She was not doing anything indicating she was a threat of any kind."). The baseless assertion of an assault attempt is entitled to no weight whatsoever.

Defendants' main argument is that Tincher approached a perimeter Defendants had established and was "asked multiple times to step back" from that perimeter (which she never breached). *Id.* at 31. From this, they claim "the most plausible inference is that Tincher was arrested because she ignored multiple commands to back up." *Id.* at 33. *Hoyland v. McMenomy*, 869 F.3d 644 (8th Cir. 2017) (which Plaintiffs discussed at length in their opening brief, *see* ECF 18 at 33-34, and Defendants did not address at all) undercuts this argument entirely. In *Hoyland*, the Eighth Circuit held that an individual who is arrested for speaking to police effecting another arrest while remaining in a place he or she has every right to be states a valid retaliation claim. 869 F.3d at 657-58. That is true even if the individual "disobey[s]" officer commands to move or leave the area. *See id.* Indeed, as the dissent highlighted, "[a]fter Hoyland emerged from the house" to criticize officers,

"he refused seven times to comply with police commands." *Id.* at 659. That conduct is far more egregious than Tincher asking a single question to officers, from outside the perimeter they had established, in the span of 15 seconds or less. ECF 18 at 35.

Relatedly, Plaintiffs are likely to prevail on the element that officers lacked probable cause. Defendants retreat to claiming that, even if "the officers were mistaken that she was impeding their efforts or was committing a violation of § 18 U.S.C. 111, that would not establish a retaliation claim." ECF 46 at 34. Here again, *Hoyland* is instructive, as the Eighth Circuit there held that officers lacked even "arguable probable cause" to believe a crime of forcible interference had occurred by an individual remaining where they have a right to be. *See Hoyland,* 869 F.3d at 652-54 (rejecting that officer's "fear of an ambush" rendered arrest reasonable, noting "[h]owever reasonable the command for Hoyland to go back inside may have been, his refusal to do so did not constitute obstruction"). The Minnesota obstruction statute at issue there is more permissive than 18 U.S.C. 111, since unlike the federal statute, the Minnesota statute does not require force as a necessary element in all cases. *See id.* at 652-53.

### 2. Plaintiff Noor was retaliated against for his First Amendment activity.

Plaintiff Noor was arrested after peacefully protesting ICE and telling them that their treatment of others, including a pregnant woman, was wrong. ECF 1-5 (Noor Decl.) ¶¶ 8, 12-13. Defendants recognize that Noor was engaged in First Amendment protest activity when he was arrested, but they claim that because other demonstrators "turn[ed] violent," Noor's activities "lose their protected quality." ECF 46 at 34. Defendants are

10

wrong. The proper response to violence in a crowd of protesters is to arrest those who have acted violently, not to suppress legitimate First Amendment activity. *See L.A. Press Club*, 799 F. Supp. 3d at 1066 (collecting cases).

Unable to justify Noor's arrest, Defendants again resort to fabrication, claiming falsely that Noor was "thr[o]w[ing] rocks and ice at ICE officers." ECF 46 at 34, citing ECF 47 (Easterwood Decl.) ¶ 27. As with Tincher's arrest, Easterwood does not say he was present at or has firsthand knowledge of Noor's arrest. Nonetheless, Easterwood's declaration corroborates the allegations in the Complaint that no one was being assaulted, undercutting Defendants' fabrication that Noor was arrested for violence. *Compare* ECF 1 ¶ 73 (local law enforcement left scene "after confirming that no bystanders were attacking agents") *with* ECF 47 (Easterwood Decl.) ¶ 27 ("Local authorities arrived to briefly assist with crowd control . . . . However, lacking what they perceived to be an emergency, local authorities left soon thereafter.").

Yet the Court need not credit Noor's declaration alone. Video of Noor's arrest has been posted to social media websites, and is referred to in the Easterwood declaration. *See id.* ¶ 27 n. 12. That video, attached hereto as Ex. 1, shows the leadup to Noor's arrest starting around the 7:30 mark. Noor is wearing a white winter cap, striped white and black jacket, and khaki pants. Around the 7:40 mark, Noor is seen pushing other protesters back from officers, exactly as he described in his declaration. ECF 1-5 (Noor Decl.) ¶ 12. Thereafter, he is seen speaking in protest to officers, until around the 8:13 mark, at which point he is pushed back by an officer. Noor retreats and is walking backwards at the 8:25 mark before being violently taken to the ground by officers at the 8:30 mark. At no point

11

during this exchange was Noor violent, throwing objects, assaulting or impeding officers, or engaging in any of the other conduct Defendants assert. Apart from their false claims of violence, Defendants offer no other probable cause to arrest Noor. *See* ECF 46 at 34-36.

Defendants' claimed explanation for the arrest—that Noor was "at the front of the crowd vocally directing it," ECF 46 at 35, and appeared to Defendants to be "[l]eading some of these protesters," ECF 47 (Easterwood Decl.) ¶ 27—*supports* Plaintiffs' retaliation claim rather than disproving it. Those materials confirm that Noor was singled out from a group of non-violent protesters because of Defendants' perception that he was leading protest activity. Defendants do not, and cannot, argue that leading a protest or directing other protesters to behave non-violently, as Noor did, is not protected under the First Amendment.

### 3. Plaintiffs Biestman, Lee, and Webb, and numerous other declarants were retaliated against for their First Amendment activity.

In reciting facts surrounding the retaliation Defendants took against Plaintiffs Biestman, Lee, and Webb, as well as declarants Clark, Page, Kellermeyer, and Leon, Defendants omit various critical details. ECF 46 at 36-39. Defendants claim that, "after the drivers stopped, ICE officers approached those vehicles." *Id.* at 37. But Plaintiffs and the putative class members did not magically "stop"—they were seized by various methods, such as being pulled over, boxed in, and having automatic weapons drawn on them. Nor do Defendants mention intimidation tactics, such as appearing at individuals' homes or threatening them with arrest. Defendants never contend that these methods and tactics would not chill a person of ordinary firmness.

Instead, Defendants argue that there is no "*First Amendment* right to observe police officers," relying on *Molina v. City of St. Louis*, 59 F.4th 334 (8th Cir. 2023). ECF 46 at 26. But *Molina* does not demonstrate that Plaintiffs' activities lack First Amendment protection. As part of its qualified immunity analysis, *Molina* "assume[d]" that such a right exists, and held merely that any such right was not "clearly established" in 2015. *Id.* at 338. Of course, Plaintiffs here need not show their right to gather information was "clearly established" in order to obtain relief from this Court. Far from holding there is no right to observe police, *Molina* left open the possibility that such a right exists and simply did not reach the question. *Id.* at 340 n.2. Additionally, the *Molina* court declined to consider the very right Plaintiffs have squarely presented here: "a right of 'access to information about how our public servants operate in public.'" *Id.* at 340 n.3. Plaintiffs have cited various authorities in support of that right, ECF 18 at 18-20, which stand wholly unrebutted by Defendants' Opposition.

It is undisputed that Defendants took adverse action by seizing Plaintiffs and members of the putative class because they were following ICE to gather information about ICE's whereabouts. Defendants neglect to mention that they know that following vehicles is a form of protest activity, as confirmed by Easterwood's declaration discussing "**protesters'** pursuit of government vehicles." ECF 47 (Easterwood Decl.) ¶ 29 (emphasis added), and Defendants' contemporaneous statements to members of the putative class. *See, e.g.*, ECF 36 (Mielke Decl.) ¶ 10 ("The agent then lectured us about how we needed to find a 'legal' way to protest, despite the fact that we had broken no laws."). This knowledge undercuts Defendants' claim of innocent, non-retaliatory motives.

Defendants' proffered innocent explanation for taking the adverse actions is "officers' genuine concern that the drivers were impeding their law enforcement efforts and causing a safety hazard by following them." ECF 46 at 38-39. This contention lacks any evidentiary support. To support the idea of a "safety hazard," Defendants concoct facts not in the record. The Easterwood declaration avers as a general matter that some "protesters' pursuit of government vehicles" can "cross into erratic, aggressive driving," ECF 47 (Easterwood Decl.) ¶ 29, yet the record is devoid of any allegation that Plaintiffs Biestman, Lee, or Webb did anything of the sort; Easterwood's declaration does not mention any of the three individuals. *See id.* Rather, the unrebutted evidence in the record is that Plaintiffs drove cautiously on public roads and obeyed local traffic laws. ECF 1-2 (Biestman Decl.) ¶ 3; ECF 1-4 (Webb Decl.) ¶ 4.

To support the idea that Plaintiffs were "impeding their law enforcement efforts," Defendants claim that traveling lawfully on public roads, following law enforcement from behind, at a safe distance, without restricting law enforcement movement or preventing them from going anywhere, "impedes ICE officers from effecting arrests." *See* ECF 46 at 38. Such a claim defies belief. More fundamentally, the record contains zero evidence that any law enforcement effort was adversely affected in any way by an individual observing ICE's movements. Defendants have not presented *any* evidence to show that an operation, attempted arrest, or any other ICE action was impeded or interfered with because an observer or protester followed an ICE vehicle. Thus, there is no evidence that the conduct of Plaintiffs Biestman, Lee, or Webb had any such effect, as would be necessary to substantiate the supposedly innocent belief that the officers who seized them (and in the

14

case of Biestman and Lee, pointed deadly automatic weapons at them) did so because they thought their efforts were being impeded. Simply put, there is no evidence that Plaintiffs and the putative class impeded or interfered with law enforcement. Instead, Plaintiffs and the putative class were (and are) observing law enforcement "to protest," "to bear witness to ICE's cruelty," and "to disseminate information about what [they have] observe[d]." ECF 1-3 (Lee Decl.) ¶ 17; *see also* ECF 1-1 to 1-7.

Plaintiffs explained in their opening brief that Declarant Leon was retaliated against for taking photos of ICE's seizure and pointing guns at Plaintiffs Biestman and Lee. ECF 18 at 37. In response to having taken these photos, "[t]hree or four vehicles pulled up" and "[f]our ICE agents came running up to the car, and pointed assault weapons at" Leon and her husband. ECF 14 (Leon Decl.) ¶ 18. They also directly referenced Leon's recording, saying "Record this. Now get out your little phone and record this." *Id.* ¶ 28.

Defendants ignore this episode, presumably because they are aware there is no possible justification for officers seizing, threatening with arrest, and pointing assault weapons at individuals who peacefully, from a distance, record ICE activity while on foot. This evidence of retaliation stands unrebutted, and further supports the entry of injunctive relief. So too does another retaliatory intimidation tactic that Defendants remain silent on: the evidence that ICE agents visited Declarant Kellermeyer's house in order to intimidate her. ECF 1-11 at 4-6.

Nor do Defendants offer any justification for their retaliation by pointing automatic weapons at Plaintiffs Biestman and Lee, Declarant Leon, or others. Defendants claim as a general matter that "[a]n officer is justified in drawing his weapon when he is justifiably

concerned for his safety." ECF 46 at 62. Nowhere in their briefing or Easterwood's declaration do Defendants claim that the individual officers who drew guns on Plaintiffs and putative class members harbored safety concerns at all, let alone "justifiabl[e] concern[s]." Plaintiffs' arguments about retaliation through pointing guns at protesters and observers (and the unreasonableness of such action) again stand unrebutted.

### 4. Plaintiff Crenshaw was retaliated against for his First Amendment activity.

Defendants do not contest that Plaintiff Crenshaw was engaged in protected activity, nor do they contest that being pepper sprayed in the face would chill a person of ordinary firmness. Instead, they contest that the use of pepper spray was animated by retaliatory purpose, claiming that "officers deployed chemical irritants as a measured crowd control mechanism," and that "Crenshaw was incidentally exposed to irritants because he was intermixed with an unruly, violent, and obstructive crowd." ECF 46 at 39.

Defendants' arguments fail. As the *L.A. Press Club* court explained when faced with identical ICE tactics and justifications, "the presence of some violent individuals among" protesters "does not give Defendants a blank check to employ unrestricted use of crowd control weapons." 799 F. Supp. 3d at 1064 (concluding that Defendants' excessive use of chemical irritants "evinces strong and persuasive evidence of retaliatory intent").

At most, Defendants have alleged that they were justified in spraying Crenshaw in the face—while driving away from him unimpeded—because the scene was chaotic. That argument runs headlong into the Eighth Circuit's ruling in *Dreith v. City of St. Louis, Missouri*, 55 F.4th 1145 (8th Cir. 2022). *Dreith* was discussed extensively in Plaintiffs'

opening brief, ECF 18 at 32-33, including as applied to Crenshaw, *id.* at 36, yet is unaddressed by Defendants. *Dreith* likewise involved a chaotic protest situation, with officers engaged in a physical struggle with protesters while attempting to leave an area; nonetheless, the Eighth Circuit found a triable issue as to whether deployment of pepper spray "without warning" against a protester who was non-violent and had violated no law was retaliatory. *Dreith*, 55 F.4th at 1149 (quotation omitted). The binding *Dreith* holding thus ends the matter.

Ignoring facts, Defendants claim that Crenshaw was not "singl[ed] out" because using "pepper spray indiscriminately" is not retaliatory. ECF 46 at 40 (quoting *Aldridge v. City of St. Louis, Missouri*, 75 F.4th 895, 899 (8th Cir. 2023) & *Stearns v. Wagner*, 122 F.4th 699, 703 (8th Cir. 2024)). But in *Aldridge*, the Eighth Circuit found it significant that the officer made a "wide arc" while deploying the pepper spray, as it showed "no individual was targeted for his or her speech." *Aldridge*, 75 F.4th at 899. Similarly, in *Stearns*, the officer "did not fire at a specific person, but indiscriminately fired into a group of people." *Stearns*, 122 F.4th at 703. Here, in contrast, the evidence is that Crenshaw was sprayed individually in the face; there is no evidence that the officer deploying the drive-by pepper spray used it on anyone else. *See* ECF 1-6 (Crenshaw Decl.) ¶ 13. Crenshaw had been actively recording ICE and voicing his displeasure at ICE arresting an American citizen prior to being sprayed, including recording ICE license plates. *Id.* ¶¶ 4, 5, 9. He also explained that the agents were "frustrated with us being there and filming them" and wanted to "get back at us," further supporting a retaliatory intent. *Id.* ¶ 5. Finally, while Defendants now claim that the use of pepper spray was necessary as a crowd control

measure, they offer no explanation for why a car driving away from the scene, unimpeded, would need to reach out the window to individually spray Crenshaw.

Because Crenshaw, like the plaintiff in *Dreith*, was individually singled out and sprayed while non-violently protesting, Plaintiffs are likely to succeed on the merits in showing he was retaliated against for recording and protesting ICE.

### C.    Plaintiffs are likely to succeed on the merits of their viewpoint discrimination claim.

It is a "fundamental principle of the First Amendment" that Defendants may not "punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys." *Matal v. Tam*, 582 U.S. 218, 248 (2017) (Kennedy, J., concurring). Plaintiffs' viewpoint discrimination claim alleges that Defendants did precisely that: suppressed Plaintiffs' First Amendment protected activity while permitting those aligned with the administration to speak. Because such conduct is anathema to the Constitution, Defendants do not even attempt to defend it.

Instead, in arguing that Plaintiffs will not succeed on their viewpoint discrimination claim, Defendants rely on a straw man, suggesting that Plaintiffs complain that "Defendants occasionally gave exclusive or preferable access to journalists whose viewpoints align with the administration." ECF 46 at 43. That is not Plaintiffs' claim. Rather, Plaintiffs' claim is that Defendants brought down the full force of the federal government to stop Plaintiffs from speaking in public while simultaneously permitting others with different messages to engage in the same conduct.

Unsurprisingly, in defending their actions, Defendants rely solely on two inapposite cases. The first concerns whether the administration could restrict the Associated Press

18

from some of the most sensitive government locations, including the Oval Office, Air Force One, and the East Room. *Associated Press v. Budowich*, No. 25-5109, 2025 WL 1649265, at *1 (D.C. Cir. June 6, 2025) (per curiam). Because the special panel concluded that those locations were "not fora at all," it concluded the government could exclude the Associated Press from those locations. *Id.* This holding does not bear on the circumstances in this case. The speech here is not occurring in the Oval Office; it's occurring on public streets and sidewalks—"quintessential public forums . . . which by long tradition or by government fiat have been devoted to assembly and debate" and where the government's ability to regulate speech is most restricted. *Burson v. Freeman*, 504 U.S. 191, 196 (1992) (plurality opinion) (quoting *Perry Educs. Ass'n v. Perry Local Educators' Assn.*, 460 U.S. 37, 45 (1983)). Viewpoint discrimination is not permitted in a public forum. *See, e.g., Gerlich v. Leath*, 861 F.3d 697, 709 (8th Cir. 2017) (explaining that the government may not engage in viewpoint discrimination even in a *limited* public forum).

The other case that Defendants rely on, *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410 (4th Cir. 2006), is not a viewpoint discrimination case at all. Instead, it is a retaliation case that addresses whether a governor could direct staff to refuse to answer questions from a particular reporter. The Fourth Circuit concluded that, "in the circumstances of this case, no actionable retaliation claim arises when a government official denies a reporter access to discretionarily afforded information or refuses to answer questions." *Id.* at 418. Again, this holding is inapposite. The basis for Plaintiffs' content and viewpoint discrimination claim is not that Defendants refused to grant them an interview. Instead, it is that Defendants have attempted to shut down Plaintiffs' right to speak and assemble and record

19

in public places simply because Defendants disagree with the message. *See, e.g.,*
*Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 828 (1995).

### D. Defendants' seizures were unreasonable and therefore violate the Fourth Amendment.

Nearly across the board, Defendants do not dispute that Plaintiffs were seized within
the meaning of the Fourth Amendment. *See, e.g.*, ECF 46 at 33-34, 44-45. Defendants
instead hang their hat on the "reasonableness" of the seizures. *See id.* at 33-34. Defendants'
arguments require adopting a version of events that is contradicted by the record and
deeming "reasonable" actions that are far from it.

Plaintiffs and Defendants are in agreement on most key Fourth Amendment
principles. A warrantless arrest is a type of seizure that requires probable cause that a crime
has or will be committed. ECF 46 at 44–45. Other investigatory stops are seizures that
require reasonable suspicion of criminal activity. ECF 46 at 34. And "reasonableness" is a
"touchstone" of the Fourth Amendment. ECF 46 at 33 (quoting *Furlow v. Belmar*, 52 F.4th
393, 400 (8th Cir. 2022)). What Defendants conveniently gloss over is that reasonableness
is judged *objectively*, with "no role" for a particular officer's, or even a particular agency's,
"[s]ubjective intention." *Whren v. United States*, 517 U.S. 806, 813 (1996). Measured by
this objective standard, Plaintiffs are likely to prevail in showing that Defendants have had
no basis for believing the peaceful observers and protesters have been committing crimes.

***Tincher.*** Defendants do not once grapple with Plaintiffs' binding authority that the
use of force "is a necessary element of any § 111 violation." *Compare* ECF 18 at 45
(quoting *United States v. Schrader*, 10 F.3d 1345, 1349 (8th Cir. 1993), *with* ECF 46 (never
citing *Schrader*). Instead, Defendants argue that Tincher attempted to physically assault

officers—an assertion that, as discussed above, is unsupported and false. *See supra* at I.B.1. Defendants alternatively argue that her cries for "help" violated 18 U.S.C. § 373, ECF 46 at 35, which prohibits solicitation of another to commit a federal felony crime of violence. *See United States v. Korab*, 893 F.2d 212, 214 (9th Cir. 1989). Although Defendants are not clear what violent federal felony they think Tincher may have been inciting, it seems likely they are once again referring to Section 111. A cry for help is not a call for violence. Nor is there an objective basis for an officer to think so. Tincher was one of a small group of peaceful protesters and observers. ECF 1-10 (Rollins Decl.) ¶ 16 (at most seven observers present). Plaintiffs are likely to prevail on their claim that Tincher was arrested without probable cause.

*Noor.* Defendants attempt to justify Noor's arrest by painting Noor as the instigator of a violent crowd. As discussed above, Easterwood's second-hand report of Noor's so-called violent behavior is contradicted by the first-hand knowledge of Noor and the very video evidence that Defendants cite. *See supra* at I.B.2; Ex. 1. Defendants alternatively argue that Noor could reasonably have been deemed guilty by proximity, because he was near others engaging in sometimes physical conduct. That is not how probable cause works. Probable cause may not be a high bar, "*[b]ut it is a bar*." *Bell v. Neukirch*, 979 F.3d 594, 603 (8th Cir. 2020). And it is an important one, "designed 'to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime.'" *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). Defendants needed to have probable cause that Noor himself was engaging in a crime. Noor's "mere propinquity to others independently suspected of criminal activity does not, without more, give rise to

probable cause." *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). The indiscriminate arrest of a peaceful protester such as Noor violates the Fourth Amendment.

**Biestman, Lee, Webb and other non-parties seized in cars.** Defendants treat the next three Plaintiffs and related non-party declarants as a group, perhaps in a bid to gloss over the semiautomatic firearms pointed at Biestman and Lee at close range. Defendants confirm that federal officers have been seizing individuals that follow ICE vehicles. ECF 47 at ¶ 29. Yet as discussed above, Easterwood says nothing about the driving of any particular Plaintiff or Declarant, and there is no evidence that any Plaintiff or Declarant drove in a violent, illegal, or aggressive manner, which would be needed to support a seizure. *See supra* at I.B.3.

Apparently, Defendants deem the mere act of following and observing an officer's car aggressive. The law does not support this illogical leap. Minnesota law prohibits following closely behind only those emergency vehicles that are "traveling in response to an emergency." Minn. Stat. § 169.18, subd. 8(c); *see also* Minn. Stat. § 169.011, subd. 3 (defining "emergency vehicle"). Minnesota law further requires an emergency vehicle responding to an emergency call to "sound its siren or display at least one lighted red light to the front." Minn. Stat. § 169.03, subd. 2. This requirement to drive with lights and sirens is "absolute, certain, and imperative." *Vassallo ex rel. Brown v. Majeski*, 842 N.W.2d 456, 463 (Minn. 2014). Defendants have not and cannot argue that any of the vehicles being observed were responding to an emergency, let alone had their lights and sirens activated. Nor, apart from Minnesota's emergency-vehicle statutes, have Defendants provided any explanation for how the mere act of following an officer could provide "a particularized

and objective basis for suspecting" forcible obstruction. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted). As discussed above, Defendants offer no evidence that any enforcement has been obstructed by Plaintiffs. *See supra* at I.B.3. And Plaintiffs had every right to follow, record, and observe the law enforcement officers, just like the peaceful observers in *Chestnut v. Wallace*, 947 F.3d 1085, 1090 (8th Cir. 2020), and *Walker v. City of Pine Bluff*, 414 F.3d 989, 992-93 (8th Cir. 2005). Plaintiffs are likely to prevail on their claim that Defendants' seizure of those following and observing ICE vehicles is unreasonable and violates the Fourth Amendment.

***Crenshaw and the remaining declarants***. It is only in the case of Crenshaw and others who have been sprayed with chemical irritants that Defendants argue there was no Fourth Amendment seizure. Defendants' argument misconstrues Plaintiffs' position. Plaintiffs do not assert that these individuals were seized because pepper spray and other less-lethal munitions were deployed for purposes of crowd control. Plaintiffs' argument is that Defendants deployed the chemical irritants and other materials for the express purpose of seizing and stopping the movement of specific, nonviolent protesters and observers. This distinction between general crowd control and specific targeting is recognized in even the cases that Defendants cite. In *Puente v. City of Phoenix*, the Ninth Circuit noted that the plaintiffs there had "produced no evidence that the chemical deployments at issue . . . were undertaken with an objective intent to restrain, such as, for example, by targeting an immobilizing level of force at selected individuals." 123 F.4th 1035, 1053 (9th Cir. 2024). The evidence that was missing in *Puente* is exactly what is present here. Federal officers have been directing chemical irritants at peaceful bystanders in a targeted and debilitating

23

way. ECF 1-6 (Crenshaw Decl.) ¶¶ 11, 13. This deployment of chemical irritants has not been reasonable. The individuals targeted with chemical irritants have been standing to the side and not impeding federal officers. *See generally id.*; ECF 1-14 (Mitchell Decl.) ¶¶ 26–27. There has been no need for any force—and certainly not the debilitating force that flows from chemical irritants and other less lethal munitions.

## II.    The remaining equitable factors favor Plaintiffs and the putative class.

Defendants devote two paragraphs of their nearly 60-page brief to the "remaining equitable factors"—namely, irreparable harm, the balance of equities, and the public interest. *See* ECF 46 at 40–41. Defendants assert—with virtually no factual or legal support—that "Plaintiffs face no threat of immediate and irreparable harm" and that "the balance of the equities decisively favors the government." *Id.* at 40. For the reasons below, Defendants' arguments are not persuasive, and these factors instead decisively favor Plaintiffs and the putative class.

### A.    If an injunction is not entered, Plaintiffs and the putative class face imminent and irreparable harm.

Defendants' practice of responding to peaceful protests with violence, when coupled with Plaintiffs' sworn intention to continue protesting Defendants' widespread and ongoing operations in Minnesota, make clear that Plaintiffs and the putative class face imminent and irreparable harm if an injunction is not entered. In arguing otherwise, Defendants characterize Plaintiffs' interactions with federal agents as "a smattering of one-time isolated past incidents" which fail to establish a serious risk of future constitutional injury. ECF 46 at 41. In other words, Defendants' irreparable-harm argument—like their standing argument—rests on the assertion that Plaintiffs "offer only speculation" that their First and

Fourth Amendment rights are likely to be violated again in the near future. *See id.* Defendants' argument mischaracterizes the facts of this case and ignores the robust body of law in which this and other courts have already concluded that a pattern of constitutional violations by law enforcement officers during ongoing protests raises the risk of future harm above the speculative level.

Contrary to Defendants' assertions, the Plaintiffs in this case do not allege a "smattering" of "one-time" incidents. ECF 46 at 41. Plaintiffs allege a coordinated effort to intimidate and retaliate against peaceful observers and protesters on a massive scale. *See, e.g.*, Compl., at Introduction; ¶¶ 61, 65. As discussed above, Plaintiffs' sworn intention to continue to observe and protest ICE activity renders this case fundamentally different from those of the cases on which Defendants rely, which typically involve a one-time and completed interaction between an individual member of the public and a law enforcement officer, such as a routine traffic stop. *See supra* at I.A.1.

Proving that Defendants' reliance on single-incident cases is misplaced, this and other courts have consistently held that recurring violations of constitutional rights during ongoing protests can create a risk of harm that is not "speculative or a mere possibility," but rather imminent and irreparable such that injunctive relief is appropriate. *Goyette*, 338 F.R.D. at 119-20. In fact, in the cases involving Defendants' near-identical tactics in other cities, the courts expressly found that Defendants' conduct is "anything but isolated" and "does not assure the [c]ourt that DHS recognizes the wrongfulness of its actions and will guard against future violations." *L.A. Press Club*, 799 F. Supp. 3d at 1070; *see also Chicago Headline Club*, 2025 WL 3240782, at *87 (plaintiffs were likely to suffer irreparable harm

because the alleged violations were "ongoing" and monetary damages were "insufficient to compensate them"). So too here. Because Defendants have engaged in a pattern of constitutional-rights violations and because protests are ongoing, there is a "clear and present need for equitable relief" to avoid additional irreparable harm. *See Goyette*, 338 F.R.D. at 119.

The imminence of irreparable harm is demonstrated by ICE's escalating presence in Minnesota, *see supra* at I.A.2, Defendants' policies targeting protesters, *id.* at I.A.3, and continued incidents of unconstitutional conduct, *id.* at I.A.4. While not practical for Plaintiffs to document every violation of rights via declaration, every day brings new reports of Defendants' abuses. Given Defendants' repeated, documented violations of observers' and protesters' First and Fourth Amendment rights, the risk of additional, irreparable harm is imminent and non-speculative. The only bulwark against such harm is preliminary injunctive relief.

## B.    The balance of equities favors Plaintiffs and the putative class.

In addition to showing that they face imminent and irreparable harm, Plaintiffs and the putative class have also shown that a preliminary injunction would serve the public interest without hindering law enforcement activity.

In cursory fashion, Defendants argue that "an injunction would irreparably harm the government and the public interest." ECF 46 at 41. Defendants make three assertions (in three sentences) to support this argument. First, Defendants contend that an injunction would "improperly constrain[] officers' ability to respond to disruptive and violent protests in Minnesota, thereby endangering the safety of officers and the public alike." *Id.* But the

26

great weight of the evidence shows that Plaintiffs and putative class members are engaged in *lawful*, *nonviolent* protests, and are being met with unconscionable force. *See* ECF 1, 1-1 to 1-15, 33–37. If anyone is "endangering the safety of . . . the public," it is Defendants. *See L.A. Press Club*, 799 F. Supp. 3d at 1046 ("[U]nder the guise of protecting the public, federal agents have endangered large numbers of peaceful protestors, legal observers, and journalists.").

Second, Defendants argue that an injunction would "interfere[] with lawful enforcement of the Nation's immigration laws." ECF 46 at 41. But "[t]he government cannot suffer harm from an injunction that merely ends an unlawful practice or . . . avoid[s] constitutional concerns." *Mohammed H. v. Trump*, No. 25-1576, 2025 WL 1170448, at *4 (D. Minn. April 22, 2025) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). Relatedly, "'[i]t is always in the public interest to prevent the violation of a party's constitutional rights.'" *Goyette*, 338 F.R.D. at 120 (quoting *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)). Defendants' bare assertion that an injunction would prevent them from enforcing the law is not persuasive.

Finally, Defendants contend that an injunction would "turn[] the separation of powers on its head by installing this Court as the overseer of every crowd-control and use-of-force decision that federal law-enforcement officers in Minnesota make in the context of often tense, uncertain, and rapidly evolving situations." ECF 46 at 41 (quotation omitted). In making this argument, Defendants attempt to give their unlawful conduct the air of legitimacy. The Court should not be fooled. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177

(1803). And as James Madison wrote more than two hundred years ago, "'[t]he greatest security . . . against a gradual concentration of the several powers in the same department, consists in giving those who administer each department, the necessary constitutional means, and personal motives, to resist encroachments of the others.'" *Mistretta v. United States*, 488 U.S. 361, 381 (1989) (quoting The Federalist No. 51, p. 349 (J. Cooke ed. 1961)). If Defendants had their way, they would be the creators, enforcers, and interpreters of the law. Fortunately, the Framers had a different structure in mind. In this structure, the Court decides whether conduct is constitutional and, if not, whether to award equitable relief to enjoin that conduct. Because Plaintiffs and putative class members face imminent and irreparable harm, and because the balance of equities tips sharply in their favor, preliminary injunctive relief is warranted here.

## III.    This Court has the power to issue an injunction protecting Plaintiffs and the putative class.

Plaintiffs have carried their burden of establishing that a preliminary injunction should issue—and this Court has the power to issue an injunction that protects not only Plaintiffs, but also the putative class of peaceful protesters and observers identified in Plaintiffs' Complaint. Plaintiffs' requested injunction is as narrowly tailored as it can be while still providing complete relief to the parties, which means that it is consistent with the Supreme Court's directives in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). And in any event, *CASA* does not preclude federal courts from issuing injunctions to protect the interests of putative classes like the one identified in Plaintiffs' Complaint. For both reasons, the injunction Plaintiffs request can and should be entered.

**A.    Due to the widespread nature of Defendants' conduct, the requested injunction is necessary to provide complete relief.**

In *CASA*, the Supreme Court held that "'universal injunctions' . . . likely exceed the equitable authority that Congress has granted to federal courts." 606 U.S. at 837. But the Supreme Court also reaffirmed the "equitable tradition" that "has long embraced the rule that courts generally may administer complete relief between the parties." *Id.* at 851 (cleaned up). Moreover, the Supreme Court recognized that administering complete relief between the parties may "sometimes advantage nonparties." *Id.* (cleaned up). Such is the case with the injunction Plaintiffs seek in this case.

The fact that Plaintiffs cannot obtain complete relief without an injunction that will benefit all peaceful protesters and observers of ICE activities in Minnesota is a problem of Defendants' own creation. Due to the deliberately widespread manner in which Defendants are using force and violating the First and Fourth Amendment rights of observers and protesters as part of an intentional strategy of intimidation, it is simply not possible to craft a preliminary injunction that only provides relief to the six named Plaintiffs. Plaintiffs are continuing to peacefully observe and protest federal agents' activities, and they intend to continue doing so in the future. *See supra* at I.A.1. During the next inevitable clash, it defies credulity to think that Defendants will ask to confirm Plaintiffs' identities before deciding whether to violate their constitutional rights. Affording complete relief to Plaintiffs thus requires protecting the rights of all peaceful observers and protesters in Minnesota, any one of whom could be a named Plaintiff at any moment in time. That makes the injunction Plaintiffs seek permissible under *CASA*. *See* 606 U.S. at 851–54.

29

Defendants contend that a pair of orders issued in *L.A. Press Club* and *Chicago Headline Club* establish that the injunction sought by Plaintiffs in this case is overbroad. Not so. As a preliminary matter, neither order is binding on this Court or even precedential in their respective circuits. *See* Ninth Circuit Rule 36–3(a); Seventh Circuit Rule 32.1(b). More substantively, neither order provides support for the notion that only an injunction applying to the six Plaintiffs is appropriate here.

The *L.A. Press Club* order left much of the non-party relief intact, maintaining the injunction as to the dispersal, threatening, or assaulting of non-party journalists and legal observers, and only removing certain crowd-control elements in connection to non-party protesters. *Compare* Order, *L.A. Press Club*, No. 25-5975 (9th Cir. Dec. 18, 2025) *with* Order Granting Pl.'s Mot. for PI at 42–43, *L.A. Press Club v. Noem*, No. 25-cv-5563 (C.D. Cal. Sept. 10, 2025). It is significant that the case in *L.A. Press Club* did not involve class allegations, and the court there expressly endorsed the idea that the widespread nature of the Department of Homeland Security's behavior meant that the injunction needed to cover non-plaintiff journalists, legal observers, and protesters because defendants would not be able to (or would not try to) distinguish plaintiffs from other journalists and observers, and that this portion of the district order was not stayed during the (ongoing) appeal. Order Granting Pl.'s Mot. for PI at 39–40, *L.A. Press Club*, No. 25-cv-5563 (C.D. Cal. Sept. 10, 2025).

While the *Chicago Headline Club* order states that the entered injunction was "overbroad," the court cautioned against "overread[ing] today's order" and expressly stated a narrower order could have been appropriate. Order at 2, *Chicago Headline Club v. Noem*,

30

No. 25-3023 (7th Cir. Nov. 19, 2025). In any event, Plaintiffs in this case seek a far narrower order that does not, for example, extend to the President and "all law enforcement officers within the Executive Branch," nor "require the enjoined parties to submit for judicial review all current and future internal guidance, policies, and directives regarding efforts to implement the order." *Id.*

The circumstances thus far of "Operation Metro Surge" and the conduct of Defendants over the last month or more make clear that federal agents are not acting in a manner that allows them to determine who they are interacting with (nor do they attempt to do so). And not only have Defendants proven themselves *unwilling* to properly identify people exercising their First Amendment rights to observe and protest, Defendant Easterwood has attested that Defendants are *unable to do so*. In his Declaration, Defendant Easterwood states ICE officers frequently do not know who they are interacting with and are often "unable to differentiate between 'protesters' and 'observers,' on the one hand, and members of the public, on the other hand." ECF 47 (Easterwood Decl.) ¶ 37. If ICE agents cannot tell who is a peaceful observer from who is not, it is self-evident that they would be unable to make the much more granular determination about whether a particular observer that they are about to intimidate, pepper spray, or arrest is one of the six named Plaintiffs.

Defendants attempt to hand-wave this reality away by assuring this Court that the "implementation burdens" for an injunction that would apply only to the six named Plaintiffs are not this Court's concern. ECF 46 at 48. Tellingly, Defendants' only legal support for this critical point is a concurrence from the Sixth Circuit. *See id.* (citing *Arizona v. Biden*, 40 F.4th 375, 398 (6th Cir. 2022) (Sutton, J., concurring)). An out-of-circuit

concurrence does not bind this Court—*CASA* does. And under *CASA*'s complete-relief rule, this Court is not required to (and should not) ignore the foreseeable result that a narrow injunction will lead to: little or no meaningful protection to the Plaintiffs because of the government's indiscriminate behavior.

**B.    Alternatively, this Court can issue relief to protect the putative class.**

As an independent basis for relief, this Court may also enter Plaintiffs' requested injunction because it is sought on behalf of a putative class. *CASA* did not affect a district court's authority to issue injunctive relief (permanent or preliminary) on a classwide basis. To the contrary, part of *CASA*'s justification for narrowing the availability of non-party relief was a concern that such relief was a "workaround" of the class-action system. 606 U.S. at 849–50; *see also id.* at 869 (Kavanaugh, J., concurring) ("To be sure, in the wake of the Court's decision, plaintiffs who challenge the legality of a new federal statute or executive action and request preliminary injunctive relief may sometimes seek to proceed by class action under Federal Rule of Civil Procedure 23(b)(2) and ask a court to award preliminary classwide relief that may, for example, be statewide, regionwide, or even nationwide.").

In fact, just last term, the Supreme Court reaffirmed that "courts may issue temporary relief to a putative class." *A.A.R.P. v. Trump*, 605 U.S. 91, 98 (2025) (per curiam). This is consistent with the long-standing practice of district courts in the Eighth Circuit. *See Howe v. Varity Corp.*, 896 F.2d 1107, 1108 n.1 (8th Cir. 1990). This relief is "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *A.A.R.P.*, 605 U.S. at 96 (quoting *Lackey v.*

*Stinnie*, 604 U.S. 192, 200 (2025)). "The purpose of such relief is merely to preserve the relative positions of the parties' pending further proceedings." *Id.* (quoting *Lackey*, 604 U.S. at 200).

Plaintiffs' Complaint contains detailed class allegations and a specifically-identified putative class. *See* ECF 1 (Compl.) ¶ 179. This Court can—and should—grant preliminary injunctive relief to the putative class as a whole immediately.

## C.    The scope of the injunction is proper and complies with the requirements of Rule 65.

The injunction satisfies the requirements of Rule 65 because it states its terms "specifically" and "describe[s] in reasonable detail" the acts that are being enjoined. Fed. R. Civ. P. 65(d)(1)(B)-(C). No more is required.

To be sure, the Eighth Circuit has concluded that "an injunction which does little or nothing more than order the defendants to obey the law is not specific enough." *Daniels v. Woodbury Cnty.*, 742 F.2d 1128, 1134 (8th Cir. 1984). But Plaintiffs' proposed order is not akin to the improper "follow-the-law" injunction in *Daniels*. In *Daniels*, the district court entered an injunction that did no more than enjoin the defendants "from further actions in violation of the due process rights of general relief applicants." *Id.* at 1132. The Eighth Circuit held that the injunction was insufficiently specific to satisfy the requirements of Rule 65(d) and remanded for the district court to enter a more specific injunction. If Plaintiffs' proposed order merely enjoined the Defendants from violating the First and Fourth Amendment rights of the class members, then the injunction would be improper, but an injunction that orders the Defendants to refrain from specific unconstitutional conduct does not implicate the prohibition on "follow-the-law" injunctions.

*Bennie v. Munn*, 822 F.3d 392 (8th Cir. 2016), explains the distinction. In *Bennie*, a First Amendment retaliation case, the requested injunction would have prohibited the government defendants from "making inquiries or taking regulatory actions based on [the plaintiff's] protected expression of his political views." *Id.* at 397. The Eighth Circuit rejected the government's argument that the requested injunction was "unenforceable" because they were "already obligated to follow the law." *Id.* Of course, as the Eighth Circuit explained, courts can enjoin illegal activity—that is the precise purpose of injunctions. Instead, the "point" of the prohibition on "follow-the-law" injunctions is that "an injunction cannot be too vague and must give 'fair and precisely drawn notice of what the injunction actually prohibits.'" *Id.* (quoting *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 669 (8th Cir. 1987). Because the proposed injunction "would be sufficiently specific for the [defendants] to know what they were not allowed to do," the prohibition on follow-the-law injunctions was not implicated. *Id.*

Here, too, the proposed order is "sufficiently specific" to give the defendants fair warning of what they are prohibited from doing. The injunction focuses on the specific unlawful activity alleged in the complaint: (1) interference with peaceful protesters (¶ 1(a)); (2) unjustified use of chemical irritants (¶¶ 1(b), (c)); (3) pointing firearms at class members engaged in peaceful activities (¶ 1(d)); (4) orders to stop making audio or visual records (¶ 1(e)); (5) threatening class members for reporting on ICE movements (¶ 1(f)); and (6) arresting or threatening to arrest class members who are engaged in protected activity (¶ 1(g)). ECF 38 ¶ 1. Admittedly, Plaintiffs seek to restrain Defendants' rampage of unconstitutional conduct, but they are not seeking an injunction merely ordering Defendants

to comply with the First and Fourth Amendments. Instead, they seek injunctive relief that is tied to Defendants' specific constitutional violations.

Ironically, in the same breath as they argue that the injunction does nothing more than "essentially directs officers to follow the Constitution," Defendants argue that it is "too prescriptive" and "resembles a federal regulation." ECF 46 at 42, 50 (citing Order, *Chicago Headline*, No. 25-3023 (7th Cir. Nov. 19, 2025). Those criticisms ring hollow in light of the two-page proposed order now pending before the Court, which is far narrower than the *Chicago Headline Club* preliminary injunction. After all, the Seventh Circuit acknowledged that the record in that case might well have supported "a more tailored and appropriate preliminary injunction that directly addresses the First and Fourth Amendment claims raised by these plaintiffs." Order, *Chicago Headline*, No. 25-3023 (7th Cir. Nov. 19, 2025). That is precisely the type of injunction that Plaintiffs seek here.

Finally, although an injunction must be "workable," there is no doubt that in the face of "a persistent pattern of police misconduct, injunctive relief is appropriate." *Allee v. Medrano*, 416 U.S. 802, 815 (1974). This Court has broad authority to exercise its "discretion and judgment" to "craft[]" a remedy to redress the specific constitutional violations in this case. *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022). The proposed order here preserves Defendants' ability to arrest lawbreakers and to use force and crowd control tactics against those who pose a risk of imminent threat. *See Goyette*, 2021 WL 5003065, at *14. It is therefore "workable" and well within the bounds of this Court's equitable discretion.

## CONCLUSION

For the foregoing reasons, the Plaintiffs respectfully request that this Court grant

Plaintiffs' Motion for a Preliminary Injunction.

Dated:  January 7, 2026                    */s/ Kyle W. Wislocky*

Teresa Nelson (#269736)
Catherine Ahlin-Halverson (#350473)
Alicia Granse (#400771)
**AMERICAN CIVIL LIBERTIES UNION
OF MINNESOTA**
P.O. Box 14720
Minneapolis, MN 55414
Tel: (651) 529-1692
tnelson@aclu-mn.org
cahlin@aclu-mn.org
agranse@aclu-mn.org

Kyle W. Wislocky (#393492)
Jacob F. Siegel (#399615)
**CIRESI CONLIN LLP**
225 S. 6th St., Suite 4600
Minneapolis, MN 55402
Tel: (612) 361-8233
kww@ciresiconlin.com
jfs@ciresiconlin.com

Robert J. Gilbertson (#22361X
Caitlinrose H. Fisher (#398358)
Virginia R. McCalmont (#399496)
Jackson C. Evert (#402214)
Rebecca Rogers (#403827)
**FORSGREN FISHER MCCALMONT
DEMAREA TYSVER LLP**
225 South Sixth Street
Suite 1500
Minneapolis, MN 55402
Tel: (612)-474-3310
bgilbertson@forsgrenfisher.com
cfisher@forsgrenfisher.com
vmccalmont@forsgrenfisher.com
jevert@forsgrenfisher.com

36

rrogers@forsgrenfisher.com

Kevin C. Riach (#389277)
**THE LAW OFFICE OF KEVIN C. RIACH**
125 Main St. SE, Suite 339
Minneapolis, MN 55414
(612) 203-8555
kevin@riachdefense.com

***ATTORNEYS FOR PLAINTIFF***