UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Susan Tincher, John Biestman, Janet Lee, Lucia Webb, Abdikadir Noor, and Alan Crenshaw, on behalf of themselves and other similarly situated individuals, | File No. 25-cv-4669 (KMM/DTS) |
| Plaintiffs, | Minneapolis, Minnesota January 13, 2026 9:00 a.m. |
| vs. | |
| Kristi Noem, Secretary, U.S. Department of Homeland Security (DHS); Todd Lyons, Acting Director, U.S. Immigration and Customs Enforcement (ICE); Marcos Charles, Acting Executive Associate Director, Enforcement and Removal Operations (ERO), ICE; David Easterwood, Acting Field Office Director, ERO, ICE Saint Paul Field Office; John A. Condon, Acting Executive Associate Director, Homeland Security Investigations (his); The Department of Homeland Security; Unidentified Federal Agencies; and Unidentified Federal Agents; in their official capacities, | |
| Defendants. | |

---

BEFORE THE HONORABLE KATHERINE M. MENENDEZ
UNITED STATES DISTRICT COURT JUDGE
**(MOTION HEARING)**

Proceedings reported by certified stenographer; transcript produced with computer.

**APPEARANCES**:

For the Plaintiffs:

Ciresi Conlin LLP
KYLE W. WISLOCKY, ESQ.
JACOB F. SIEGEL, ESQ.
225 South Sixth Street
Suite 4600
Minneapolis, MN 55402

The Law Office of Kevin C. Riach
KEVIN C. RIACH, ESQ.
125 Main Street Southeast
Suite 339
Minneapolis, MN 55414

American Civil Liberties Union of Minnesota
ALICIA L. GRANSE, ESQ.
CATHERINE AHLIN-HALVERSON, ESQ.
TERESA J. NELSON, ESQ.
P.O. Box 14720
Suite 1400
Minneapolis, MN 55414

Forsgren Fisher
CAITLINROSE H. FISHER, ESQ.
REBECCA ROGERS, ESQ.
VIRGINIA R. McCALMONT, ESQ.
JACKSON EVERT, ESQ.
ROBERT J. GILBERTSON, ESQ.
225 South Sixth Street
Suite 1500
Minneapolis, MN 55402

For the Defendants:

United States Department of Justice
JEREMY S.B. NEWMAN, ESQ.
KATHLEEN JACOBS, ESQ.
1100 L Street Northwest
Suite 11400
Washington, DC 20005

Court Reporter:

JANELL GRUBER, RMR, CRR, CRC
PAULA RICHTER, RMR, CRR, CRC
LYNNE KRENZ, RMR, CRR, CRC
300 South 4th Street, Box 1005
Minneapolis, Minnesota 55415

**P R O C E E D I N G S**

**(IN OPEN COURT)**

THE COURT: All right. Good morning, everyone.

We are here for oral argument in Tincher, et al. versus Noem, et al.

Let's get appearances on the record, first on behalf of the plaintiffs.

MR. WISLOCKY: Thank you, your Honor.

Kyle Wislocky of Ciresi Conlin appearing on behalf of the plaintiffs. With me today is Jacob Siegel, also Ciresi Conlin. Along with a team of numerous counsel from firms Forsgren Fisher, Riach Law, and the ACLU of Minnesota. Also present in the court today are named plaintiffs John Biestman, Janet Lee and Lucia Webb.

THE COURT: Okay. Thank you very much. Please be seated.

And it's my understanding that, Mr. Wislocky, you're going to handle the argument today; is that correct?

MR. WISLOCKY: Yes, it is, your Honor.

THE COURT: Okay, very good. And here on behalf of the defendants.

MR. NEWMAN: Jeremy Newman, U.S. Department of Justice-Civil Division.

MS. JACOBS: Kathleen Jacobs, U.S. Department of

Justice-Civil Division.

THE COURT: Okay. And it is my understanding that you're each going to be handling -- welcome, please be seated -- that you're each going to be handling part of the argument. Mr. Newman as to merits and Ms. Jacobs as to standing?

MS. JACOBS: Yes, your Honor.

THE COURT: Okay, very good. I tend to just ask a bunch of questions, so there may be some, you know, awkwardness where you say, my colleague will address that when he takes a turn. I'm totally fine with that. So let me get my documents all set in front of me here.

Okay. Let's go ahead and get started. I'll have the plaintiffs go first, if you would, Mr. Wislocky. Come on up to the podium, I have some questions for you.

Okay, give me some guidance about how to assess the evidence in this case. What's the quantum I'm looking for? What analytical framework do I apply to the evidence? I'm not talking about the law that we'll be discussing as well. I'm talking about how do I assess the evidentiary record before me?

MR. WISLOCKY: Thank you, your Honor.

So the evidentiary record before you, I think in large part is not -- not in dispute in terms of material facts that are needed for the Court to make a decision at

this preliminary injunction stage. As the Court is aware, all plaintiffs need to show is a fair chance of prevailing on the merits.

THE COURT: And how do you -- how do you quantify that? What do you think fair chance of prevailing means? Is it less than preponderance but more than de minimus? Can you give me any guidance for how to assess that.

MR. WISLOCKY: I think the suggestion of the Court is well-taken. I certainly do think it's less than a preponderance of the evidence. I'm not sure it's particularly relevant in this instance, because I think even if the Court were to apply preponderance of the evidence standard at this stage, plaintiffs have shown a likelihood of success on the merits by that preponderance of the evidence, but I think should the Court conclude otherwise, as long as there's a fair chance, which, yeah, it's a different standard than preponderance, and so, you know, we're not at summary judgment here. This is a preliminary stage to meet where the preliminary injunction would just maintain the status quo.

As I mentioned before in assessing the evidence, I think in large part the --

THE COURT: Well, it's actually, just to be clear, it's not really maintaining the status quo, because it's your position that the status quo has widespread First

Amendment retaliation and Fourth Amendment violations.

MR. WISLOCKY: It's a fair point, your Honor, and I should be clear. From our perspective, the status quo in America should be that individuals are free to practice their First and Fourth Amendment rights without fear of retaliation or unlawful seizures or other Fourth Amendment violations. And so, it is true that right now without this Court's intervention those rights are being violated and there is an imminent risk of them being violated again in the future, but the general status quo should be that we have a system of limited government and a Bill of Rights that the government respects.

THE COURT: Okay.

MR. WISLOCKY: So from our perspective, that should be the what's maintained by the preliminary injunction pending determination of the merits.

THE COURT: So one of the sort of more granular questions around this quantum of evidence inquiry is this divergence I have between the evidence offered on behalf of the plaintiffs and the evidence offered on behalf of defendants. I have sworn declarations from each of the named plaintiffs, and then I have -- I should have counted them before I took the bench, but many individually-sworn declarations from non-named plaintiffs about things that either they themselves encountered or that named plaintiffs

encountered and that they have firsthand knowledge of.

In contrast, I have a single declaration from the defendants, which is very lengthy, and in which the Affiant describes having reviewed a lot of resources from video to police reports to speaking to officers and agents, although without any specific attribution. And I don't have those documents, police reports, or videos or specific declarations.

You criticize this in your briefing, but we know that the Rules of Evidence don't apply or don't apply in the same way at this stage. So help me understand the import of this sort of evidence gap or difference in the record before me.

MR. WISLOCKY: Absolutely, your Honor.

I would note for -- as I mentioned, I mean, there are six named plaintiffs here. Two of those plaintiffs were arrested, three of those plaintiffs were seized after following ICE vehicles in their vehicle -- in their cars, and one of those plaintiffs was retaliated against by being peppered sprayed.

I think for the individuals that were exercising a First Amendment right to access information about the government's public movements and/or lawfully operating their vehicles on public roads, I don't believe there's any material fact disputes at all with respect to that. The

government freely admits that those individuals were driving cars. Those -- the government recognizes that they did, in fact, seize those individuals for operating their vehicles on public roads and lawfully. The government has no evidence whatsoever in any of the sources that you referenced that would indicate that those individuals acted unlawfully in terms of not following --

THE COURT: Well to be clear, the government doesn't exactly make the concession that you suggest. They don't offer specific facts of specific conduct by the drivers based on any attributable descriptions, but they generally talk about breaking traffic laws and following closely, causing accidents, doing damage and things like that. So it isn't -- I would say it probably goes too far to suggest they don't rebut the facts.

MR. WISLOCKY: Respectfully, your Honor, I disagree. I think with respect to plaintiffs Biestman, Lee and Webb there is no evidence in the record that any of them did anything unlawful. They were operating their motor vehicles on public roads and they were in full compliance with local traffic laws. That's the evidence that's in their declarations, and defendants have not put any quantitive evidence whatsoever to show that they were not. We're talking not general questions about could someone theoretically operate their vehicle in an unlawful manner.

We're talking about a Fourth Amendment seizure that occurred and as well a retaliation against First Amendment activity in those particular instances. So even at this preliminary stage the government could, if they had such evidence, have put forward evidence to show that they had reasonable suspicion that criminal activity was afoot to effect those seizures. They have failed to do so. They don't have any person who indicates that anyone was behaving unlawfully and that that was the cause of their detention or seizures.

THE COURT: Okay. Do I have before me any video related to the Biestman and Lee stop?

MR. WISLOCKY: Not in the record at this time, no.

THE COURT: Okay. I want to move off of this quantum of evidence question. Is there anything else you want to say about it?

MR. WISLOCKY: The only -- the only other point I would like to make, your Honor, is that I know that the Court listed off a brief sampling of the evidence. There's also video evidence, I do believe -- you know, it's in the reply brief, but the evidence of Mr. Noor's arrest is on video. I think it flatly contradicts the -- from our perspective, the untrue statements that are in the Easterwood declaration or at least unsupported by evidence, so I would add that.

THE COURT: I have two. Am I correct in thinking

that I have two separate videos of the incidents surrounding Mr. Noor's arrest, one from somewhat earlier in the encounter -- in the encounter, that video paired with the 911 call, and then I have an additional video that I think I have from two different sources that is taken more from the perspective of someone on the street; is that correct?

MR. WISLOCKY: I think it is, your Honor. Although, to my understanding in that initial video that you describe as being earlier in the encounter, I don't believe Mr. Noor appears in that video.

THE COURT: Correct. I didn't see him either. That was one of my questions. He doesn't appear to be in that video.

What, if anything, can you share with me about the timing relationship between those two videos? Are they happening at the same time? Does one come first and then the other -- how does that work?

MR. WISLOCKY: The honest answer is I'm not sure, your Honor. My understanding has been that the first video was from earlier in -- the video that Mr. Noor does not appear in was from earlier in time. But, you know, I have to be honest with the Court, I haven't done a forensic examination of those two social media videos to know exactly which one occurred at which point in time.

THE COURT: Are they of the same street or

separate streets?

MR. WISLOCKY: I'm not -- I'm not sure, your Honor.

THE COURT: Okay. Okay. Anything else you want to say about anything related to video evidence?

I guess one additional question I have for you. I have, you know, both sides pointing me to video that is in mainstream news sources, NPR is a -- cited multiple times.

I can't look at the Star Tribune or frankly even the New York Times without seeing additional photographs and videos about things going on in encounters between ICE and law enforcement here in Minnesota.

What, if any, role can those, you know, sources play in my analysis? Oh, good, I'm having a virus scan as we speak on my computer. The timing is stellar.

MR. WISLOCKY: Better safe than sorry, your Honor.

THE COURT: Yeah, right. Go ahead.

MR. WISLOCKY: Yeah, I think it's fair for the Court to look at obviously any of the evidence that's in the record, not just the -- the individual videos that we've put forward but all of the declarations. I don't think the Court took -- to rule in plaintiffs' favor on this preliminary injunction stage, I do not think the Court needs to go and do any sort of independent research into the New York Times or other sources that are out --

THE COURT: And to be clear, I'm -- just to be clear, I'm not trying to do independent research. In fact, I'm trying not to do independent research, but when I click on my news apps, I'm seeing things. You're not suggesting that those things should inform my decision.

MR. WISLOCKY: That's correct, your Honor. We're not asking the Court to look beyond what's been cited in the record here. Both parties, as the Court has noted, have cited certain news articles and, you know, public media sources, social media sources. Those are in the record. I think on the basis of what's been submitted in the briefing and on the docket, it's very clear that this is an ongoing emergency, frankly, for plaintiffs, observers, and protesters' ability to exercise their rights, and on the basis of that information alone, the Court can find imminence of harm that is likely to reoccur.

THE COURT: Okay, thank you. I want to talk about standing for a few minutes.

It's my understanding that your response to the defendants' arguments on standing is sort of twofold.

One is that we have factual averments from the specific named plaintiffs, and frankly from the -- I think it's 30-some declarants, that they intend to continue engaging in what they view as their protected First Amendment rights to observe and protest and engage in

speech.

So unlike, for instance, *Lyons*, or a case alleging excessive force during arrest, they are much more likely to be in the circumstance where this would happen again, giving them sort of personally meaningful likelihood of having similar things occur.

It's my understanding you've got kind of a second argument or a second point, which is that First Amendment injuries are ongoing and occur from the chilling, regardless of whether there is going to be a second or a third encounter with law enforcement.

Am I understanding your general standing position correctly or am I missing something important there?

MR. WISLOCKY: I think it's slightly more nuanced on that last point that your Honor just mentioned. I think that the First Amendment injuries of chilling protected expression are not wholly divorced from future encounters. This is not a situation which plaintiffs are staying at home, saying that they've been chilled, and that that is a First Amendment injury that supports their standing for perspective relief. Rather, plaintiffs are continuing to go out into the community and are being chilled there due to a reasonable and I think very well-founded fear of future retaliation.

On that point, I would point the Court to the

second Crenshaw declaration which is in the record. And in that instance, Mr. Crenshaw, who's a named plaintiff who was previously pepper sprayed, went back out more recently and witnessed others being pepper sprayed. The question at this stage is, is it above the speculative level that a plaintiff might face the same type of unconstitutional activity that they faced in the past? And seeing another person pepper sprayed and the chilling effect that that could have on speech I think clearly raises this above the speculative level.

Further on the first point of the general, you know, contrast with the *Lyons* situation, I think it's important to emphasize that these are not plaintiffs that are roving around aimlessly, thinking maybe I'll be able to find ICE and protest them. They are -- the protesters and observers are part of an organized movement of individuals that are seeking to protect their community and their neighbors. They're on chat device -- chat systems as is shown in a number of the declarations and, you know, when ICE activity is identified by the community, they show out. And so that's the situation in which, again, it's not speculative that when they're there, given the widespread practices and frankly policies of DHS to target protesters, it's far above the speculative level that they face the risk of the same encounters again.

THE COURT: Okay. Thank you.

Let's talk about the First Amendment claims here. You have Count 1 and Count 2. Count 2 is First Amendment retaliation in your complaint. I'm not sure I understand the parameters of Count 1, and I don't see as much focus in the briefing about how I'm supposed to assess Count 1. Help me -- help me through that.

MR. WISLOCKY: Well, part of the First Amendment rights in Count 1 would be a right to assembly. That is addressed in our opening brief that those rights of assembly have been interfered with.

Admittedly in the brief, we -- I agree with your Honor, the focus is more on the retaliation piece, but there is separate from that a right to assembly that we're asserting, so I think that would fall under Count 1.

THE COURT: And what is the alleged conduct that interferes with the right to assemble?

MR. WISLOCKY: Well, in any number of the -- the same retaliatory actions are also interfering with the right to assemble.

So when individuals operate their vehicles lawfully on public roads and then they're pulled over, have guns pointed in their face, told they're going to be arrested, that very well may have the effect of stopping them from continuing to engage in their First Amendment

protected activity. It also may stop them, and this is borne out in the declaration, from wanting to go to another meeting or go by themselves, now they want to get together with someone else and to go at some future date instead of when they were intending to go. So that's -- I think that there's a lot of overlap admittedly between the two, but I would also note that we have the viewpoint discrimination claim in our briefing. That squarely addresses --

THE COURT: Is that part of claim 1 in your -- in your mind?

MR. WISLOCKY: Yes, that would be a First Amendment to be free from viewpoint discrimination. So Count 1 is addressed in the briefing there as well.

THE COURT: Okay. And you -- you're pointing me for relevant framework to your opening brief rather than your reply where it doesn't really grapple with this particularly; is that fair to say?

MR. WISLOCKY: Well, I think we addressed both viewpoints, discrimination in the reply and retaliation in the reply as well, but yes, the framework I was just discussing is the -- the structure of the opening brief, yes, your Honor.

THE COURT: And when you refer to your discussion in the reply, you're talking about pushing back on the case law, marshalled by the defendants related to basically

executive branch interaction with reporters.

MR. WISLOCKY: That's correct your Honor.

THE COURT: Okay. Are you alleging that there is a First Amendment right to follow law enforcement in your car?

Let's assume for the purpose of this conversation that the person following law enforcement is honoring all traffic laws, is not following too closely, and is not attempting to interfere with the conduct that law enforcement is engaging in. Is it your position that there is a protected First Amendment right to do that or that that does not constitute a crime sufficient to support a stop?

MR. WISLOCKY: It's both, your Honor. There -- I wouldn't necessarily describe it as a First Amendment right to follow law enforcement in a car. I think that the First Amendment right that's protected is to gather information about the operations of public officials in public. I also think it's a form of protest to be present where public officials are.

I think if the Court looks back to first principles in a number of Supreme Court decisions, for example, in *First National Bank of Boston vs. Bellotti*, the Court said, "That the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit the government from limiting the stock of

information from which members of the public may draw."

So I think where there's an example of someone gathering information about where ICE is traveling to, and then ICE tells them, you're not allowed to follow us, that's exactly what that is. That's limiting the information available to the public about where ICE is operating.

THE COURT: Well, it's certainly true that even when there is a protected First Amendment right, it's subject to reasonable limitations, whether it's strict scrutiny and assessing something for being narrowly tailored and serving a legitimate government interest or whether we talk about time, place, and manner constraints. The fact that someone has a right to gather information about the activities of their government doesn't make that without limitation.

So is the limit that ICE seems to be advocating for on, you can't follow us in your car, an unreasonable one by your assessment, or is that not a policy at all so they can't invoke it? What's your response to that idea?

MR. WISLOCKY: I don't think it's a -- I think it's just a retaliation and an unlawful seizure, that they don't have probable cause -- or reasonable suspicion, rather, to believe there's any illegality, so it's a violation of Fourth Amendment, and ICE is fully aware that people are following them in order to facilitate protest

activity. That's in the record where an officer told one of the declarants, You have to find another way to protest. You can't follow us.

So I don't think it's either. To the extent this -- the Court were looking through this -- looking at this conduct through the lens of if it's a reasonable time, place, or manner restriction, I don't believe it is reasonable. This is an example. Again, the Court is asking me to assume what the record bears out, which is that the individuals are driving lawfully on public roads. Those are traditional public fora. There's -- there's no basis for the officers in this case or defendants in this case to say that people in Minnesota aren't allowed to drive their cars lawfully on public roads.

I also will note that their claimed basis for doing so is an alleged interference of some kind that has no evidence in the record to back it up. This goes back to what we were discussing before. They say as a general matter, basically a conclusory statement, that it interferes with ICE operations if people drive behind their car. They don't put any evidence in the record as to how that's the case. They've not come forward and said ICE was going on this operation on this day and because someone was driving lawfully behind my vehicle obeying the rules of the road, I wasn't able to achieve my enforcement objectives. That's

pure speculation. There is -- they don't even say it. If they did, it would be speculation, but it's not even in the record. They don't say, we were -- had an operation to remove this alien.

THE COURT: They do describe -- they do describe this incident. It doesn't seem to be tethered to one of the things described by the named plaintiffs, but the incident with the driver on December 22nd, paragraph 28.

MR. WISLOCKY: This is paragraph 28 of the Easterwood declaration?

THE COURT: I'm sorry, yes, of the Easterwood declaration, the government's declaration.

They talk about conducting surveillance in a marked government vehicle, noticed a vehicle following them. The vehicle continued to pursue, pulled up alongside the stopped government vehicle, rolled down his window, began yelling and had a holstered firearm. Withdrew the firearm, put it on the dashboard.

MR. WISLOCKY: Yes, and that was the end of the interaction. The person was then brought --

THE COURT: Arrested.

MR. WISLOCKY: -- by local authorities.

THE COURT: Mm-hmm.

BY MR. WISLOCKY: So this example that is in the Eastwood declaration proves plaintiffs' point, not

defendants'.

In the event of actual criminality or an actual threat that officers are faced with, this evidence in the record shows that they're perfectly capable of dealing with that threat in an appropriate manner at that time, and that they don't need to suppress other peaceful, lawful First Amendment activity or violate the Fourth Amendment on a prophylactic basis when there isn't an imminent threat of harm or use of force.

You know, even in paragraph 28, which they describe involving this incident of an individual allegedly removing a firearm from their waistband, ICE still doesn't say that their enforcement operations were negatively impacted by that example. They say instead that they were able to draw their service weapons and the person -- individual dropped the gun and that was essentially the end of the interaction.

THE COURT: So you're -- you're suggesting -- we're kind of back to the evidence question, that their general statements in this declaration that this following conduct is interfering with their ability to do their job is not enough. They have to proffer specific instances of where following conduct interfered with their ability to do their job.

MR. WISLOCKY: Absolutely, your Honor. If ICE is

going to say we're seizing people because they're interfering with us, they have to show how they're -- how they've been interfered with. They have not done that. They haven't even attempted to do that. My suspicion is because they cannot. Simply driving a vehicle behind an ICE vehicle, and even if you then go into a chat device and say, hey, I'm headed in this direction and this is where ICE is going, that information does not inhibit ICE's ability to question individuals they think may be removable, to detain and remove anyone. It has no effect whatsoever on ICE's legitimate law enforcement operations.

THE COURT: Okay. So let's talk about sort of plaintiff by plaintiff, and you kind of hinted that -- at that already.

For the people who were subject to stops while driving, in your assessment, that interferes with their right -- their freedom of observation or gathering information about the government and their freedom of speech or simply their sort of observation and gathering?

MR. WISLOCKY: I would say it's both, your Honor. It certainly, as mentioned before, limits the stock of information on which the public may draw. It's a step in the speech process. If someone has the goal of saying, I want to observe ICE, make sure that they are behaving lawfully, make sure that they're not abusing members of my

community and my neighbors, they need to -- I'm going to do that by telling people where ICE is headed so that people can show out to -- we can have protest activity, which is obviously core First Amendment activity, and then ICE prevents people from following them, that has the effect as well of stopping this -- a step in the speech process that's necessary for individuals to effectively protest.

I would also mention that, you know, in *Brown vs. State of Louisiana* the Supreme Court said that there's a First Amendment right by "silent and reproachable presence in a place -- I apologize, your Honor, "to protest by silent and reproachable presence in a place where the protester has every right to be." Again, we're here talking about individuals operating their vehicles lawfully on public roads, which are traditional public fora. They have every right to drive their cars in Minnesota down the roads. So I think it's a form, admittedly a mobile one, but a form of presence and protest.

Again, as I mentioned before, ICE is aware. Even the Easterwood declaration says protesters driving behind -- driving behind ICE cars. So it's not a question that these are people engaged in both protest and observation activity.

THE COURT: So for, for instance, Mr. Noor, who was arrested, the rights at issue are the right to protest, the right to engage in speech during the protest, and right

of assembly?

MR. WISLOCKY: Yes, your Honor. I think Mr. Noor was engaged in all of those.

THE COURT: He was not recording or -- I mean, he was observing, but he wasn't recording. We have Ms. Tincher who was observing, and engaged in speech, as well as I guess assembly.

Were there others assembled at the time of Ms. Tincher's arrest?

MR. WISLOCKY: Yes, there were. The record in evidence shows there were approximately seven individuals from the community who were present at the time of Ms. Tincher's arrest.

THE COURT: Okay.

MR. WISLOCKY: And yes, your Honor, that's correct. She -- I would say by asking the question, Are you ICE, which is what the evidence shows Ms. Tincher asked, she was seeking information from the government about their operations. Her declaration's very clear. She, you know, did not understand who these people were or why they were taking someone away, and so I think that is both information gathering under the First Amendment that's protected.

I think it's also a form of -- of protest activity for an individual to ask law enforcement to identify themselves, you know, who are you, what's your badge number,

et cetera, is a form of protest activity that the Eighth Circuit has recognized.

THE COURT: One of the points that the defendants make is the idea that this -- this sort of protest activity is brand-new. At least they say as to the following in the car. What's your response to that?

MR. WISLOCKY: I'm not sure that there's record evidence to really back that up. I understand the Easterwood declaration says that. Having built out a record on our end of prior incidents of individuals following, that's not to say that there wouldn't be evidentiary examples of that occurring as the course of this litigation proceeds, but the fact that individuals are perhaps protesting in a new way or are gathering information in a way that hasn't happened before does not remove that activity of its First Amendment protected character.

Obviously there's new things coming along all the time, the internet, chat groups, et cetera. Individuals are entitled under the First Amendment to use new technologies, to use new techniques, to practice traditional First Amendment activities such as protests, such as taking steps in the speech process, enhancing the stock of information which public can draw and the like.

THE COURT: Is it your position that recording and observing go hand in hand? We don't have a named plaintiff

who was told to stop recording that I can tell. We have declarant -- a declarant who's certainly told to stop -- there's alleged interference with their ability to record and there's mention made of people recording. Is the mention enough to be retaliation for recording in your opinion?

MR. WISLOCKY: Yeah, I would say yes, your Honor. Recording and observing do go hand in hand.

I don't think the First Amendment requires anyone to pull out their phone and make a video in order to enjoy First Amendment protection. Obviously, traditionally before the existence of phones and recording devices, members of the press and public were able to observe and then go and, you know, publish an article in a newspaper about what they observed, and that was the entirety of observation activity. So I don't think recording has any sort of talismanic significance under the First Amendment.

All of the plaintiffs, including, for example, Mr. Noor were observing, and obviously upon being seized and violently thrown to the ground and removed and held in shackles for hours down at the Whipple Building is no longer able to observe ICE activity. So whether or not Mr. Noor or any of the named plaintiffs were themselves holding a phone to make a video doesn't mean that they weren't engaged in protected First Amendment observation activity.

THE COURT: Has Mr. Noor or Ms. Tincher been charged with anything?

MR. WISLOCKY: Not to my knowledge, your Honor.

THE COURT: Okay. So law enforcement, would you agree, is allowed to establish a perimeter around an ongoing law enforcement activity?

MR. WISLOCKY: If there's a legitimate need for that in order to effectuate a legitimate law enforcement operations, yes.

THE COURT: Okay. And is it your position here that they are establishing perimeters that are being disrespected, that the perimeters they're establishing are unreasonable, or that people are being retaliated against without crossing a perimeter?

MR. WISLOCKY: Certainly the latter, your Honor. People have been retaliated against without crossing the perimeter.

Ms. Tincher's arrest -- and the record is really undisputed that there was a police perimeter that was established at the site of Ms. Tincher's arrest. Ms. Tincher never breached that perimeter. That's undisputed, and that she was arrested. It appears to be defendants' position that I guess when there's a police perimeter established, there's some sort of penumbra or emanation that if you come near it in some undescribed way

you've committed a crime that supports probable cause for arrest. I think that's totally free of any resemblance of the law or facts in this case, but yeah, that's the only instance at least of the named plaintiffs where there was a perimeter established and the perimeter was not breached.

THE COURT: Okay. I want to talk a little bit about the injunctive relief that you're asking for.

My first question is: We often see matters related to First Amendment retaliation and Fourth Amendment arrest without probable cause or without reasonable suspicion arising in the 1983 context and arising after the incident as part of a case that generally would result in damages.

Here, 1983 doesn't apply. Instead, we are in the realm of *Bivens*. So what remedy -- let's take as a hypothetical Mr. Crenshaw, what remedy does Mr. Crenshaw have aside from forward-looking injunctive relief for what he describes as being retaliated against for his exercise and his First Amendment rights? Does *Bivens* cover First Amendment retaliation?

MR. WISLOCKY: Your Honor, I would say on the pleadings at this stage, none of the plaintiffs are yet seeking any sort of *Bivens* or 1983 money damages. So I'm not -- I would -- I have to be honest with the Court and say I haven't analyzed fully those unasserted claims at this

point in time.

THE COURT: The reason I'm asking is I'm trying to understand, the government sort of hints at least at one point that the solution is for people who claim that their rights have been violated to allege that after the fact, and I'm trying to decide whether that relief is even available.

MR. WISLOCKY: Well, I think those remedies would be cumulative. They're not exclusive. Certainly the plaintiffs here may well have damages claims and may well amend and seek to allege those damages claims, but that's not in the record before the Court right now.

Even if there were damages claims, that would not act as a bar to prospective relief where there is a showing of imminent risk of jury for future retaliation or future unconstitutional violations. So I don't think it has particular relevance here. I think the Court's free to assume that those individuals do have damages -- or could have damages, remedies for individual violations of their constitutional rights, and that operates as -- as no bar and no reason not to enter into an injunction in this case.

THE COURT: In -- you've submitted two proposed orders. The second one is narrower and more tailored than the first. Which one are you asking me to adopt?

MR. WISLOCKY: We're asking you to adopt the latter proposed order, the narrower proposed order.

THE COURT: Okay. That's, I think, docket 36 or 38, something like that.

In that proposed order, you seek a limit on the use of chemical irritants against members of the class who are not posing a threat of imminent harm. Let me quote it directly so I don't mischaracterize it.

MR. WISLOCKY: That's right, your Honor, it's section 1(b).

THE COURT: Yes. No mention is made of the use of chemical irritants to disperse -- hypothetically speaking, to disperse a crowd who is not obeying a dispersal order or to disperse protesters who are crossing a perimeter or blocking traffic, or hypothetically again, interfering with an arrest.

Is it your position that absent a threat of imminent harm my injunction should prohibit the use of chemical irritants in those circumstances?

MR. WISLOCKY: Well, I think we have to read it in context, your Honor.

The section on dispersing, which I think your Honor is -- some of your question gets to, is under 1(a) and the proposed injunction has an exception for dispersing to occur if the officers have probable cause to believe an individual has committed a crime.

THE COURT: Unrelated to -- okay. So I'm trying

to understand. Let's -- let's engage in a hypothetical that I know you contest any of these individual plaintiffs engaged in, which you're asking me for injunctive relief that goes beyond the individual plaintiffs. And one of the cautions in the law is a workable, not overly restrictive, not vague, and narrowly tailored to the harms alleged.

So in this hypothetical, we have a protest that becomes chaotic. Things are being thrown at officers, but they can't tell where the things being thrown are coming from. Cars are not being allowed to pass. Certain protesters have fallen over and are having a difficult time standing up, or law enforcement has fallen over and can't stand up, but they lack probable cause as to a specific individual, and they are saying, Get back! Get back! We need to get these cars through. You need to stop this unruly protest. (A) would not allow them to use a chemical irritant under that circumstance; correct?

MR. WISLOCKY: Let me make sure I understand the question, your Honor. You're asking about --

THE COURT: I'm trying to.

MR. WISLOCKY: -- section (a) or section (b) or both?

THE COURT: Okay. Your proposed injunction.

MR. WISLOCKY: Understood.

THE COURT: The way I read your proposed

injunction, it allows the use of chemical irritants if defendants have probable cause to believe that a person has committed a crime unrelated to refusal to obey a dispersal order. They are allowed to use chemical irritants on a member of the class who is posing a threat of imminent harm to a law enforcement or another person, and they're allowed to use chemical irritants if they give two separate warnings. Presumably (c) is modified by (a) and (b), so this would foreclose the use of chemical irritants to enforce a dispersal order?

MR. WISLOCKY: I don't know that it would foreclose it, your Honor. In the situation you described of a chaotic situation where there's violence occurring, I think, frankly, there would be a risk of imminent harm in that circumstance that may well permit officers to use chemical irritants consistent with our proposed injunction.

That said, you know, if the Court has concerns around abilities to control truly chaotic situations of the type that are not in the record, I understand that you're -- the Court's preface to this question was not related to the six incidences of these named plaintiffs, because that's simply not what's occurring here. These aren't situations where people are being pepper sprayed in chaotic circumstances. These are situations where it's a discreet retaliatory act.

THE COURT: Then why doesn't -- why isn't that what you're asking me to do, to ban the use of chemical irritants in targeted retaliation for exercising First Amendment rights?

MR. WISLOCKY: Well, that's what we've attempted to propose, your Honor. I think that is -- in my perspective that is 1(b), that they can't use chemical irritants on members of the class if they're not posing a threat of imminent harm.

THE COURT: Let's imagine a scenario where we don't have rocks or ice or people falling down, but we have a crowd that has completely blocked in vehicles that are attempting to leave the scene. Would this language permit the use of chemical irritants to disperse a crowd who is refusing to leave to allow the vehicles to go through?

MR. WISLOCKY: Yes, it would.

THE COURT: Which part?

MR. WISLOCKY: Well, the -- in the example of individuals blocking vehicles that they can't get through, that would be a -- I would assume -- I would assume that vehicles need to get through for some law enforcement purpose, and so there would be potentially a forcible obstruction with law enforcement in that case, in which case there's the ability to disperse.

THE COURT: But we don't have forcible -- I'm not

trying to be pedantic here. I'm really spending a lot of time thinking about if I grant injunctive relief what it looks like, and I don't see any -- anything in here that talks about obstructing law enforcement. It focuses on harm. In fact, it specifically says, Unrelated to failing to obey a dispersal order.

MR. WISLOCKY: Fair enough, your Honor, and I would say, you know, again, we -- we spent a lot of time and borrowed in part some of this language from other injunctions that courts have ordered, because we thought that makes it more workable in part; but to the extent the Court has concerns about the grant of injunctive relief and you feel -- we tried to put in a number of exceptions for law enforcement here. Individuals under 1(b) who are not posing a threat of harm; under 1(c), they don't have to give warnings if the threat is so serious and imminent that a warning's infeasible.

THE COURT REPORTER: I'm sorry. Can you slow down, Counsel.

MR. WISLOCKY: I apologize. I apologize.

THE COURT REPORTER: "1(c), they don't have to give..."

MR. WISLOCKY: 1(c), they do not need to give the warnings unless the threat is so serious and imminent that a warning is infeasible. Under 1(d), they're permit --

they're permitted to point firearms at individuals that pose an immediate threat of death or serious bodily injury. But to the extent the Court doesn't feel that the examples that have been -- that the carve-outs and exceptions that we've placed in our proposed order are sufficient to narrowly tailor the grant of injunctive relief to the incidents in the record here, the Court can and should add additional language to your order, to the Court's order.

So if you want to add -- instead of saying "imposing a threat of imminent harm" you say, "or obstructing law enforcement," we have no objection to that, your Honor.

THE COURT: Okay.

You talk about how I can issue an injunction as to all protesters and observers without certifying a class, because doing so is necessary to give full injunctive relief to the six named plaintiffs, and you talk about how sort of unworkable it is to -- if I issued an injunction, I'm sorry, as to the six named plaintiffs that we don't know how the defendants would not violate that, because the -- is that your argument? Because the six named plaintiffs might be not readily distinguishable to law enforcement, and so they might get swept up in one of the activities that are prohibited as to the six named plaintiffs? Is that your argument?

MR. WISLOCKY: In broad strokes, yes, your Honor.

THE COURT: Okay. So it feels -- in *LA*, the part of the injunction that was stayed by the Ninth Circuit is as to protest -- protesters, as opposed to members of the media, as far as I can tell what was stayed and what was not stayed, injunctive relief to protesters aside from the named plaintiffs.

In *Chicago*, injunctive relief was broadly granted as to protesters and stayed by the Seventh Circuit.

In *Goyette*, which is a District of Minnesota case, injunctive relief was granted as to media. I'm discerning some principle here that there is a greater thought-about ability -- let me back up. What am I supposed to make of that? You're asking me to grant the injunctive relief as to all protesters. Let's put aside class certification for a moment, and I can't find an example -- I've probably forgotten it in the 100 plus cases I've been reading in the last few days -- of that kind of injunctive relief being affirmed by a Court of Appeals on protester conduct. So what's your best authority for the idea that I can and should do that post *CASA*, which narrows, which reminds, which educates about the danger of overbroad injunctive relief absent class findings? And we're going to talk about class in a minute, but I'm just focusing on your first argument here, which is that I can do this in an effort to

give full relief to the six named plaintiffs.

MR. WISLOCKY: Understood, your Honor. The best authority would be the *AARP vs. Trump* case from the Supreme Court in the last term. That case --

THE COURT: Preceded *CASA*.

MR. WISLOCKY: Yes, by about a month, your Honor, and it's cited -- it's cited in -- multiple times in concurrences and other parts of *CASA*. *CASA* doesn't set that decision aside. It's a decision from last term. Certainly if the Supreme Court in *CASA* intended to overturn its holding in *AARP*, it would have said so. *CASA* says nothing of the sort, and on the contrary, for example, Justice Kavanaugh's concurrence in *CASA* cites to *AARP* and recognizes that courts can grant statewide relief to classes and that may resemble the injunctions that are -- I apologize, can grant statewide relief to classes consistent with the ruling in *CASA*.

Also mentions -- Justice Kavanaugh's concurrence also mentions the courts remain free to grant relief to a putative class in appropriate circumstances, which is -- essentially the holding of *AARP*. So it is true that *CASA* did inform the traditional equitable authority of the Court, as your Honor has noted, but *CASA* cannot be read in isolation.

I would also mention to the Court that in both the

Seventh Circuit and Ninth Circuit case, I think it's worth emphasizing, those were temporary stays pending the appeal. They were not merits, you know, determinations overturning the injunctions in full. Those cases are still working their way through the appellate process. And in the --

THE COURT: Is there any part -- I'm sorry to interrupt, but is there any part of the lines drawn by the Ninth Circuit in that temporary stay? Was I wrong about the lines drawn?

MR. WISLOCKY: No, you weren't, your Honor. I just wanted -- that was actually the point that I was -- I was just about to turn to --

THE COURT: Great.

MR. WISLOCKY: -- but at -- in the *LA Press Club* case, they did not have class allegations at the time of the issuance of the injunction, and so the lines drawn by the Ninth Circuit to not -- to not extend that injunction to protesters who were not themselves plaintiffs is a clearly different situation from here, where protesters and observers are the core of our -- of our class.

THE COURT: Okay. Let's talk a little bit about the class aspect. I've been reading *Barbara vs. Trump*, which is a -- just one second -- which is the post *CASA* birthright citizenship case out of the district of New Hampshire. Are you familiar with it? I don't want to put

you on the spot with a case you aren't ready on.

MR. WISLOCKY: I'm sorry to say I'm not, your Honor, but I'm happy to hear whatever questions your Honor has, and I'll be as helpful as I can.

THE COURT: I'm using it as an example, so maybe that's still productive.

In *Barbara*, the judge issued essentially a nationwide injunction post-*CASA* after making the Rule 23 findings. There was beforehand a motion for class certification and I think briefing on the Rule 23 findings. Then he issued a separate order certifying a class. It was actually two classes. They were narrower than the classes that the plaintiffs had sought, but they were nonetheless nationwide and widespread. And that was appealed to the First Circuit. I'm having a hard time figuring out exactly the line that the First Circuit drew, but they expressed agreement with the District Court in the Rule 23 analysis.

Here, I don't have any briefing or any analysis that helps me make the Rule 23 findings. In *CASA*, part of the reason I think that *CASA* sort of blessed or left open the possibility that Rule 23 alleviates some of the concerns that the *CASA* court was motivated by is because of those findings being required.

How am I supposed to certify a class based on the record that I have? Issues of commonality, issues of

numerosity, issues related to them sharing more important things in common than other issues that might interfere, issues of having these individual six plaintiffs being class representatives, am I supposed to just make that finding at this stage?

MR. WISLOCKY: I'm not suggesting that you make the full Rule 23 findings at this stage without the benefit of the parties briefing those issues, your Honor, and that's not what we're -- what we're seeking. What we're seeking is a temporary injunction -- a preliminary injunction on a temporary basis to maintain the status quo while those merits issues are being determined. That's what was discussed in *A.A.R.P. vs. Trump*, a putative class that can receive the benefit of a temporary preliminary injunction to prevent irreparable injury to constitutional rights while the merits are determined.

That said, to the extent -- I'm picking up in the Court's concerns around the fact that there hasn't yet been a class certification process, plaintiffs are prepared and stand ready to move forward in an extremely expeditious manner with what we would hope for would be expedited discovery and service of class certification and would love nothing more than to be before your Honor on these class issues imminently to -- you know, after conducting some discovery that will bear on those issues of commonality

on -- certainly on issues of their -- defendants' policies and how they're treating the class as a group of protesters and observers in the case of Minnesota.

And if the Court prefers, one option to the Court could be to grant an injunction as to the six plaintiffs who are named and set an expedited schedule for discovery from the government and for class certification briefing, and then once those Rule 23 findings are made, to extend the -- to extend the full protection of the preliminary injunction to the full class on the basis of all the strictures of Rule 23. That's another option.

Again, in our view under *AARP vs. Trump,* this Court has legal authority to enter an injunction now on a temporary basis and then proceed with those merits questions, but if the Court disagrees, we would ask the Court to enter an injunction for the six named plaintiffs and, again, move the case pretty aggressively in terms of discovery and class certification schedule.

THE COURT: Okay. What geographic limitations do you think I should apply to an injunction? What temporal limitations should I apply to an injunction? At least one of the facts contained in the opening complaint, not a named plaintiff if I remember correctly, preceded the surge. But the bulk of your allegations have to do with the surge, the Operation Metro Surge. Should that be the timeframe that

governs this injunction and what's the geography?

MR. WISLOCKY: Yes, your Honor. The problem of the complaint is about Operation Metro Surge. It is true that there were some references to earlier events, including the earlier events in L.A. and Chicago which, in our view, should inform -- the findings of those Courts around defendants' documented retaliation and violations of the Constitution should inform your finding here. So I don't think it's fair to say we should only look for evidentiary purposes or for informing the Court, but I don't --

THE COURT: Yeah, I didn't mean to suggest that.

MR. WISLOCKY: Understood, your Honor.

So in terms of the timeframe, yes, I think as long -- we are in unprecedented times in this case. The government -- the DHS themselves have described this operation as the largest immigration operation ever in the country, what's going on right now in Minnesota with respect to ICE. So the temporal limitations should last as long as these ICE operations are continuing.

In terms of geographic limitations, we propose this judicial district, which as the Court knows, is the State of Minnesota. It is true that for the named plaintiffs and for a number of the declarations, they are focused on the metro area, but again, there are -- there's evidence out there of operations in Rochester, in St. Cloud,

in Carver County, in different places. I don't know that those are all documented in the record at this time. We've been continuing to submit additional declarations to try to keep up with, frankly, the emergency situation on the ground with every single day new instances of violations and retaliation. And we're doing the best job we can to document everything, find declarants, and put that evidence in front of the Court.

But I think it's perfectly appropriate to set a statewide injunction. To the extent the Court concludes there's a narrower geographic region, you know, that's supported by the evidence, plaintiffs are open to the Court entering injunction on that basis as well.

THE COURT: Okay. The last question I have for you, and then I'm going to pivot to opposing counsel.

Let's assume -- if I either grant or deny preliminary injunctive relief -- I think the answer's probably the same either way -- what do you think the next steps are in this litigation?

MR. WISLOCKY: Whether you grant or deny the injunctive relief, I imagine there will be an appeal. In the instance of a grant, I would imagine there's going to be an appeal. My understanding is that would not entirely divest this Court of jurisdiction in the event of an appeal of a preliminary injunction, and so the next steps should

still be what I had mentioned to the Court earlier, which is expedited discovery into the government's policies.

I'll note the government has produced some discovery in the Chicago litigation, so I don't think it would be very burdensome for the government to reproduce that material and supplement it with additional relevant evidence to speak -- that speaks to the situation in Minnesota and the events that have occurred post their submission of that discovery.

And as I mentioned, plaintiffs are prepared to move forward very aggressively with class certification as well. We do -- we would like to have the benefit of that expedited discovery to inform those class certification issues. So I think those are the next steps, and I think those are the next steps whether there's an appeal for a preliminary injunction or not.

THE COURT: Okay. Anything you want to point out that you think I might be overlooking or that you need to clarify after -- you know, a few days after the briefing or anything else you want to share at this point?

MR. WISLOCKY: I want to mention to the Court, just by going back to what we had discussed earlier, it's my understanding there is no *Bivens* actions for a First Amendment -- no *Bivens* relief for a First Amendment retaliation claim.

THE COURT: I thought that --

MR. WISLOCKY: Okay.

THE COURT: -- might be the case, and if that's the case, does that mean that the retaliatory conduct of ICE is beyond the reach of the law, absent an injunction?

MR. WISLOCKY: I think it does, your Honor. I think -- again, any remedies that do exist would be nonexclusive, but right now the remedy that we're familiar with and we're asking the Court is for an injunction to protect First Amendment rights. Every single day of -- like, whether it's a chill or a viewpoint discrimination or retaliation, is an irreparable injury to plaintiffs and, frankly, a harm to our society. That's the whole purpose of the First Amendment is to encourage debate, encourage information gathering, recording, et cetera.

THE COURT: Okay. Anything else?

MR. WISLOCKY: Not at this time, your Honor.

THE COURT: Okay. Thank you.

We are going to take about a ten-minute recess, and then we'll pivot to questions for the defense. I want to -- our court reporter is working very hard. So we'll be back in just a few minutes. Thank you very much.

(Recess taken at 9:58 a.m.)

* * * * *

(10:11 a.m.)

**IN OPEN COURT**

THE COURT: All right. Why don't we begin with Mr. Newman. Hang on just one second.

MR. NEWMAN: Sure.

THE COURT: Okay. We're going to start probably at the same place that I began with opposing counsel and talk about the evidentiary record.

MR. NEWMAN: Yes.

THE COURT: So when we first spoke about setting a schedule for this case, I denied the plaintiffs' request for a much, much more expedited ruling, because the government told me, or you and your colleagues told me that you needed time to gather information. And it's clear you've gathered information, but I don't have any sworn declarations from anybody with first-hand knowledge of any of the events that are at issue in either the complaint or the motion for preliminary injunction or the declarations at all. What am I supposed to do with that? Why doesn't that weigh pretty heavily against the factual narrative put forth by the defendants?

MR. NEWMAN: So I don't think it does, your Honor. And so we submitted the declaration of Mr. Easterwood. He's the acting field office director of the ICE office in St. Paul. And, you know, he said in his declaration he was

submitting it on the basis of personal knowledge and reasonable inquiry and information that he learned from other people and from reviewing records. And so I think when he's talking generally about what's going on in Minnesota, that's based on his personal knowledge of leading that office, and when he's talking about specific instances where he wasn't there, it's -- you know, it's based on, you know, review of records and other individuals. And that's --

THE COURT: But I don't know -- let's use as an example the arrest of Mr. Noor; right?

MR. NEWMAN: Yeah.

THE COURT: There is this -- this assertion that Mr. Noor was throwing ice or snow or other items. I don't know whether Mr. Easterwood had police reports from four officers on the scene, one of whom said Mr. Noor was throwing things, three of whom said that he wasn't. I don't know whether the general -- I don't know the source of the information. There's nothing I can test. I have a sworn declaration from person 1, and I have a hearsay-level summary that doesn't tie it -- I don't have body-worn camera video. I don't have those police reports. I don't have a declaration from any officer, even anonymized. I didn't have a request to allow -- I know there's a concern on the part of the defendants about protecting the identity of

their officers, so that could have been handled through anonymization. I don't have anything specific, so I don't know how to test a general hearsay description against a specific sworn declaration and two videos.

MR. NEWMAN: So I just have a few points on that, your Honor. So one point is all of -- all of defendants' declarations are hearsay, too. They're out of court, and I know you -- you can argue this is hearsay, this is double hearsay, but --

THE COURT: Or triple. I don't know how many levels of hearsay in Mr. Easter -- maybe Mr. Easterwood spoke to the supervisor on the scene on the day of Mr. Noor's arrest, who said to him, Oh, yeah, I talked to some of our officers, and at least one of them thought he was throwing ice. That's triple hearsay. I have no idea.

MR. NEWMAN: So I think, your Honor, that -- so first of all, in Noor's specific case, there is -- there is video that Mr. Easterwood cited.

And in the -- I want to correct something that -- that the other side said. In the earlier video, video 9 of the declaration, Noor does appear to be present in that video from about a minute 23 to about a minute 25. It's very quickly, and I -- I'm just saying this based on he -- you can see in the video there's someone who's wearing the same distinct clothing that Noor is wearing in the later

video. You know, I will say that the video -- the earlier video, you can see the snow and ice flying from all directions. It's -- because the video is focused on the officers taking the barrage, it doesn't show who's throwing -- who's throwing it, other than it appears to be going from all directions.

But I think more broadly, while -- while -- while I -- I would submit that your Honor should -- should credit Mr. Easterwood's declaration, which is competent evidence at the preliminary injunction stage, in a sense I think that your Honor does not need to -- need to resolve factual disputes, because -- because in -- by and large, I think even if the Court credits plaintiffs' versions of events, their claims are not likely to succeed on the -- on the merits. And so -- so taking --

THE COURT: So let's talk about Biestman, or Biestman, and Lee.

MR. NEWMAN: Yes.

THE COURT: Their sworn testimony in declaration form is that they were observing all traffic laws, following law enforcement, and stopped without cause. Why isn't that likely to succeed on the merits?

MR. NEWMAN: So, your Honor, I think with the -- so first of all, I thin it's a little bit different on the First Amendment and the Fourth Amendment. On First

Amendment, you know, the Eighth Circuit said in *Molina*, There's no clearly-established First Amendment right to observe the police, and --

THE COURT: Let's talk about that in a minute.

MR. NEWMAN: Okay, okay.

THE COURT: I want to talk about that. Keep going, though.

MR. NEWMAN: Okay. But -- so I think with a -- with a brief traffic stop for the Fourth Amendment purposes, there's got to be reasonable suspicion, and I think that the -- the officers are not making these decisions in a vacuum. They're making it in this environment where -- and I think this is reflected in the record, this is reflected in plaintiffs' declarations -- that cars are -- are chasing ICE vehicles all over town, and they're doing it, as my friend on the other side said, for the purpose of making it so that -- so that they can show out, that they can draw large crowds to wherever the ICE vehicles are going. And we've seen from the record that, unfortunately, a lot of times when the large crowds get to where the ICE vehicles are going, there are -- you know, crowds are acting violently, they're assaulting officers, they're --

THE COURT: But there always has to be reasonable, articulable suspicion under that full body of cases that the person being stopped was engaging in the unlawful conduct,

not that other people not being stopped were engaging in the unlawful conduct.

So -- and multiple Eighth Circuit cases caution about the limits of the mistaken belief in probable cause. *Hoyland*, for instance, cabins the use of a mistaken belief regarding the obstruction of justice as a defense to First Amendment retaliation. So here, I don't have anybody saying there was even a mistaken belief that Lee and Biestman were breaking traffic laws. I have Mr. Easterwood saying that other people were breaking traffic laws.

Do you have any authority for the idea that that supports a *Terry* stop of someone else?

MR. NEWMAN: Well, I think that I would say that there's plenty of case law that says -- that says that you look at the totality of the circumstances. Officers have wide latitude.

And I think that -- that there's also, you know -- I think that there's plenty of evidence in the record, and from both Easterwood's declaration about people following erratically, causing car crashes, damaging vehicles, to even, you know, the plaintiffs on the -- plaintiffs' declarations about how -- when -- when the crowds swarm to these locations, that they -- they obstruct, they assault, they throw things at the officers. And so I think that that -- that that broader context feeds into the -- to the

officers' reasonable suspicion.

THE COURT: Okay. But the reasonable suspicion has to be as to the person being stopped; right? And there's nothing in the record before me to support reasonable suspicion as to the people being stopped here.

MR. NEWMAN: So I think what you have in the record, so you -- you have -- you have plaintiffs' declarations, and, you know, I think, you know, for example, with Ms. Webb's declaration, she does a lot -- she follows them down the freeway, apparently faster than surrounding traffic. She says, you know, not significantly faster but apparently faster than --

THE COURT: But she says she's obeying the law.

MR. NEWMAN: Yeah, but she also said that she followed them back to the Whipple Building and into the crowd of vehicles gathered outside the Whipple Building, and I think that that, for instance, it's -- it's very reasonable to stop someone and -- you know, and ask, why are you following us back to our -- our building, you know, where the --

THE COURT: What's -- help me -- help me understand that. You think that there is reasonable suspicion of a crime from a car following law enforcement to the Whipple Building, or are you saying that I can kind of read between the lines and assume that the following was

actually more obstructive than she says it was?

MR. NEWMAN: So -- so I think -- I think that it's -- I think that it's both, your Honor. I think that -- that the -- you know, that the following conduct itself raises some -- some suspicion. The surrounding context --

THE COURT: Suspicion of what?

MR. NEWMAN: Suspicion of -- of impeding -- impeding law enforcement.

THE COURT: Are you talking about 111?

MR. NEWMAN: Yes. Yes, your Honor.

THE COURT: Okay. So in the Eighth Circuit, and I think almost in every circuit, 111 requires force --

MR. NEWMAN: Yeah.

THE COURT: -- as to each -- each of the verbs. I don't know how else to put that. Each of the different means of committing a 111 violation; right? So you think there's reasonable suspicion of a violation of 111 involving forceful interfering if someone is following law enforcement, obeying traffic laws at a legally appropriate distance?

MR. NEWMAN: So -- so I think that it -- it is part of the -- part of the broader -- broader context of, you know, these -- where the -- you know, that -- that the -- these officers are -- are being, you know, followed all the time for -- for the -- often for the purposes of

summoning crowds who will -- who will physically interfere with -- with law enforcement.

THE COURT: So let's take an analogy maybe a little out of this following so that I can try to understand the line you're drawing.

MR. NEWMAN: Yeah.

THE COURT: Let's imagine a situation where there is a neighborhood where people are known to sell drugs and -- sell drugs on the street, sell fentanyl on the street corner. It is your position that you have reasonable suspicion to stop someone in that circumstance because the general environment has people selling drugs. So you could kind of infer or sort of apply suspicion as to another person, suspicion as to a *Terry* stop of a different person, because of the environment?

MR. NEWMAN: I put it -- I'd put it a little bit differently.

THE COURT: Okay.

MR. NEWMAN: The officer -- the officer can -- if -- if a person is behaving in a similar way to -- to a way that -- that people who -- who are engaged in criminal behavior in that area in that time are often behaving, then that, as part of the totality of the circumstance analysis, may feed the officer's reasonable suspicion, and I think that's kind of what's -- what's going on here.

And I'd also just say that with -- you know, there's -- if -- if you -- you know, we believe that the -- that the -- you know, that the officers' actions in these instances were justified, and my colleague will get at this later, but if you believe that, you know, maybe one -- this stop here or this stop here wasn't justified, the answer isn't a broad injunction on all of DHS throughout the State of Minnesota.

THE COURT: You cited *Molina* for the idea that there isn't a right to observe or right to record. Talk to me about *Ness* where the Eighth Circuit in 2022 said, "We hold Ness's photography and video recording is speech."

MR. NEWMAN: Well, so -- so I think that that's --

THE COURT: It's not overruled. It's not even mentioned in *Molina*, and *Molina* is certainly dealing with clear establishment; right? Is the law clearly established? I know that in a footnote, the author in *Molina* describes some skepticism about whether it can be expression, but I've still got *Ness*. Are you familiar with *Ness*?

MR. NEWMAN: I -- only -- only vaguely.

THE COURT: It's the case where a lady was filming in a park.

MR. NEWMAN: Yes.

THE COURT: And video recording kids in a park because she claimed that it demonstrated that a community

group was using more than its share of the park.

MR. NEWMAN: Yeah, yeah. So I think that those are -- those are very different -- those are very different circumstances. You know, one is actually creating a -- creating a video or taking a photograph is -- is -- is different, and -- and I think that -- that *Molina* certainly -- *Molina* deals with somebody standing and watching the police, and it doesn't deal with anyone, you know, creating a photograph or creating a video.

And even though *Molina* is a qualified immunity case, if you read the Court's reasoning in *Molina*, I think that it's -- it's pretty clear that they believe that the precedent supporting the idea that there's a First Amendment right to support the police was very doubtful if it's --

THE COURT: What about *Quinlan*?

MR. NEWMAN: So, your Honor, I think that -- I think that it's -- it's -- there is a distinction, I think, between -- between observing -- you know, between standing and watching, which is *Molina*, and creating a photograph and recording. And I would say that following vehicles -- following a law enforcement vehicle in a car --

THE COURT: So I hear you saying following is different, and I'm happy to discuss that separately, but you started the conversation by saying there's no right to observe or record. I don't mean to misquote what you said.

So that's what I'm trying to drill down on.

What about -- what about *Walker*, *Walker* which talks about no probable cause to arrest a man for observing the police or --

MR. NEWMAN: Yeah, so those -- so *Molina* actually distinguished those cases, and what they -- and that gets at the distinction between the First Amendment and the Fourth Amendment cases. So when I say -- when I say that there's no First Amendment right to observe the police, it doesn't mean that observing the police is a crime. It doesn't mean that observing the police is -- is cause for a seizure. It just means that they're not engaged in First Amendment activity that could give rise to a First Amendment retaliation claim.

And so what *Molina* said about *Walker* and *Chestnut* was that those cases, someone was seized because they were just standing and watching police at a distance, and the Eighth Circuit held that those seizures were not reasonable. That was not about a First Amendment right.

THE COURT: So it's your position there is no First Amendment protection for observing the police?

MR. NEWMAN: I think that's the fair -- so *Molina* directly held --

THE COURT: *Molina* directly assumed -- right, it holds --

MR. NEWMAN: But I think that the -- so I think that that qualified immunity holding establishes two things. One --

THE COURT: That in 2015, it wasn't clearly established.

MR. NEWMAN: Right, right, right. One is that it wasn't clearly established, meaning that it's -- essentially, you'd be breaking new ground. And I think that if you -- if someone fairly reads the reasoning of *Molina*, that -- I think it's clear that the Eighth Circuit panel did not believe that there was a First Amendment right to observe the police.

THE COURT: So you believe there is no First Amendment right to observe the police?

MR. NEWMAN: I think that's the fairest reading of *Molina*.

THE COURT: Okay. Let's talk about -- so with respect to ICE in cars, it's your position that there is reasonable suspicion for the stop, not because of anything these individual drivers did, but because of the broader thing going along with people following the ICE officers and causing difficulty for them and danger and accidents.

MR. NEWMAN: It's a mix, your Honor, and I think honestly it's -- it varies based on each incident. I think that -- that, you know, for example, in -- you know, for --

I think -- I think in certain examples that there's -- there's more suspicion based -- and so in all these instances they're following, and in certain instances there's greater suspicion based on the way that they're -- that they're following.

THE COURT: How about Biestman and Lee?

MR. NEWMAN: So Biestman and Lee, in all candor, I think that's the one where we're relying most on the argument that --

THE COURT: On the broader context.

MR. NEWMAN: On the broader, right.

THE COURT: All right. I appreciate your candor there.

Okay. Can you talk to me about paragraph -- in Easterwood declaration, we've got some photographs of damage done to vehicles by following. Page 15, what is in the record to help me understand how that vehicle got damaged?

MR. NEWMAN: So I think that -- I think that what you -- and so I think that what you have are in -- in paragraph 29. He says, There have also been instances where individuals have caused vehicular crashes, injuring both ICE, police officers and public safety due to erratic driving behavior --

THE COURT: But we don't know, for instance, if this accident occurred during an interaction where they were

trying to stop somebody and arrest that person for -- or take somebody into custody for removal proceedings and that person drove evasively or whether this damage was done because of an observer/protester. I can't tell. Like, for instance, page 17, which has "ICE" spray painted on cars, that's certainly not done by a follower similar to the -- that's a different example.

MR. NEWMAN: So it's a fair point, your Honor. I just want to point to what the text of the declaration says leading up to these photographs. So there is -- there's paragraph 29 which focuses on the erratic driving and says, "Photos provided below."

Then there's paragraph 31 which says that -- that "While carrying out their official duties, ICE officers have" --

COURT REPORTER: I'm sorry, Counsel. Can you slow down and --

MR. NEWMAN: Sorry, sorry. "While carrying out their official duties, ICE officers have faced increasing acts of aggression and violence against them, not only from protesters, but also from those subject to targeted arrests." These actions of -- "These acts of aggression involved have often led to significant damage to government property and vehicles. Below are photographs illustrating some of the damage."

THE COURT: So I don't know which are which here.

MR. NEWMAN: I think -- I think that's fair, your Honor.

THE COURT: Okay. One of the things that is alleged as retaliatory conduct is ICE officers drawing guns when they approach a car of a follower. Would you agree the law requires some particularized concern about officer safety in order to permit drawing guns?

MR. NEWMAN: Yes, your Honor. I think there -- I think there's a -- I think the test that the case law says, the reasonableness test, and there needs to be -- it needs to be based on -- on, you know, fear, but that's assessed under a reasonableness test and, you know, including there can be situations in which it's reasonable to draw a firearm while trying to ascertain the level of danger that someone poses.

THE COURT: So you think the law allows drawing a firearm in a case where somebody is following law enforcement at -- following traffic laws, appropriate speed, not too close, the law allows the officer to draw firearms because the law blesses the concern that they are in danger?

MR. NEWMAN: I think --

THE COURT: In that scenario. I'm not talking about other cases or, you know, other instances. I'm talking about that scenario.

MR. NEWMAN: I think it comes down to the -- to the reasonableness of the -- of the officer' belief that they either are in danger or at least -- or at least may be in danger for -- you know, for the purposes of -- in trying to -- trying to ascertain the level of danger.

THE COURT: Did the plaintiffs allege that guns were drawn with Biestman and Lee?

MR. NEWMAN: I believe that they do, and they might be -- I may be wrong, but I think they may be the only plaintiffs to allege that. I think there's maybe one or two of other nonparty declarants to allege that.

THE COURT: So in Biestman and Lee -- and I appreciate your earlier candor -- we don't have suggestions of aggressive activity, unsafe driving, close following, speeding, and it's your position that guns drawn in that circumstance are supported by the record before me?

MR. NEWMAN: I think -- I think that it was -- you know, it's -- it's judged under a reasonableness test, and I think -- I think that -- that, you know, again, we're, you know, of this -- this overall climate of following, leading to dangerous activity, I think it's reasonable for officers to be concerned about their safety when people are following them. But, again -- but, again, your Honor, and we'll get to the scope of relief later, that if -- if you believe that there may have been one instance where, you know, perhaps it

wasn't justified to do something, I think the answer isn't a broad injunction against all DHS officers throughout the state.

THE COURT: Would you agree that conduct can comprise First Amendment retaliation even if it doesn't comprise a Fourth Amendment violation as in *Dreith*?

MR. NEWMAN: Yes. Yes, I think they're analytically different claims.

THE COURT: Okay. So pepper spray -- hypothetically, just to understand the position, pepper spraying a protester can comprise First Amendment retaliation, even if it isn't an attempted seizure that would trigger Fourth Amendment analysis?

MR. NEWMAN: So here we --

THE COURT: But I'm just asking the broad question first. Okay.

MR. NEWMAN: Yes, yes.

THE COURT: Okay. Go ahead. What were you going to say?

MR. NEWMAN: But here -- here we dispute vigorously the idea that pepper spray here was used in retaliation to speech, and I think that --

THE COURT: Are you talking about the Crenshaw incident?

MR. NEWMAN: I'm talking about the Crenshaw

instance. And, you know, in the -- in the Crenshaw, even -- and this is another one of these cases where I do think you should credit the Easterwood declaration, but even if you go purely off of the Crenshaw declaration, I think -- I think it doesn't support his claims. He acknowledges there was a large crowd. There was a traffic jam. ICE officers were having trouble getting -- getting out. He acknowledges that he heard some -- some ICE officers warning people to move before pepper spraying them. He acknowledges he saw people throwing snowballs at the ICE officers before pepper spray was --

THE COURT: But he also says at the time of the pepper spray, the vehicle was moving past them. So those alleged justifications are not embraced in his narrative.

MR. NEWMAN: I -- I don't think that's -- that's quite right, your Honor. I think --

THE COURT: It's not what he says or it's not what happened?

MR. NEWMAN: Both. I think -- I think in terms of --

THE COURT: How am I supposed to know what happened here? I don't have -- I don't have specifics in Easterwood's declaration from the office -- you know, individual officer descriptions. I don't have video of this one; right?

MR. NEWMAN: No. And -- and also just a note on that, in general, ICE officers do not have body cameras.

THE COURT: Okay.

MR. NEWMAN: And --

THE COURT: Do some of the officers in these interactions have a body-worn camera?

MR. NEWMAN: So I don't want to get too far ahead of myself. My understanding is that -- is that ICE officers generally do not, and including ICE officers in this area, generally do not have body cameras. Some -- some other DHS officers might, but at least -- at least the -- my understanding of the incidents involving the plaintiffs is that they -- they involved ICE officers who -- it's my understanding that they did not have body cameras.

THE COURT: So it's -- I appreciate -- this was on my list of things to ask you. I should have done it already. It's your belief -- and I understand we're in early days, so not -- that there isn't body-worn camera video of any of the specific named plaintiffs' interactions?

MR. NEWMAN: I -- I believe that's right, and I would -- I would expect that that's the case, yes.

THE COURT: We have at least one case, it might be Biestman and Lee, where there was a claim that the officer was recording using their phone. I might be mixing that up. Are there any other videos in the government's possession of

these interactions?

MR. NEWMAN: I don't know, your Honor.

THE COURT: Okay. But I got you off track. You were sharing with me that in -- with respect to the Crenshaw interaction, that the Easterwood declaration actually specifically refutes the suggestion that the spray was deployed after the concerns were allayed.

MR. NEWMAN: So this incident is addressed at paragraph 25 --

THE COURT: Thank you.

MR. NEWMAN: -- of the Easterwood declaration, and it says that, "Protesters gathered; obstructed traffic, impeded vehicle progress; threw snowballs, ice, projectiles; kicked and hit government vehicles. ICE officers issued multiple verbal commands, including over the public address system for protesters to move back and warned of chemical munitions, and protesters refused to comply. And to safely advance, ICE officers deployed OC sprays to disperse the crowd that was blocking the street."

THE COURT: And to deter further aggression and advancement from protesters --

MR. NEWMAN: Yes.

THE COURT: -- they sprayed.

MR. NEWMAN: Yes. But I think also even if, you know, under the -- under the -- Mr. Crenshaw's narrative, I

think he sets forth, you know, there were multiple instances of pepper spray. At least the -- at least the blocking in his narrative is before the first instance, and the throwing the snowballs is before the second instance.

And also, you know, I think if -- you know, he -- I think -- I think that the fairest -- I think that the fairest reading under -- honestly, under either -- either account is that -- is that pepper spray was used as a crowd control mechanism and -- and not to retaliate against Mr. Crenshaw for any -- any of his speech. And, you know, the Eighth Circuit held in *Aldridge* in that instance, that use of pepper spray as a crowd control mechanism is an obvious alternative explanation to being used as retaliation against speech, and I think that that holds here.

THE COURT: Let's talk about *Aldridge* a little bit. I've been thinking quite a bit about that case.

MR. NEWMAN: Yeah.

THE COURT: It focuses on this single out idea, not in the discussion of whether pepper spray can be retaliatory but whether there's sufficient evidence to meet the causal link. *Aldridge* precedes the "but for," but they're applying sort of a "but for" threshold for proof. And *Aldridge* kind of stands for the idea that if there is an alternative explanation, then it undermines but-for causation for retaliation.

Would you agree -- this is a hypothetical, I'm not trying to tie it to Crenshaw or anything else -- that you can retaliate against a group of protesters for the First Amendment protected action of protesting without singling them out, and if you can prove that that is what happened -- let's imagine a situation where a law enforcement yelled something like "I hate protesters," and we have peaceful protesters behind a barrier, protesting peacefully, and the officer sprays them with pepper spray. The fact that the spray attached to many doesn't change their retaliatory conduct. That's not what *Aldridge* stands for; right?

MR. NEWMAN: I think I'm going probably to fight the next step of where you're going with this, but I think I do agree with that hypothetical, which is very different from where we're at here.

THE COURT: Okay. I just was trying to make sure that "singled out" doesn't import some idea that it has to be as to an individual person. It has to be clearly caused by the protected conduct.

MR. NEWMAN: But I think -- I think the difference here is that where the "singled out" really does work is where, you know -- and pepper spray is not a precision weapon. It's a saturation weapon, and -- it's a saturation, you know, less lethal force. And where there's a crowd where some people are standing peacefully and other people

are engaging in obstructive or violent behavior and the people who are standing peacefully are -- are incidentally exposed to pepper spray when it's used as a crowd control mechanism, that's not singling out that person for their protected speech. And that's, I think, where it really does work.

THE COURT: Okay. Thank you.

Are you the person to talk to about the scope of injunctive relief or would that be your colleague?

MR. NEWMAN: Ms. Jacobs will address that.

THE COURT: Okay. Let me see. You didn't address *Dreith*, *Ness*, or *Hoyland*, as far as I remember. Anything you want to say about any of those three cases?

MR. NEWMAN: No, your Honor, other than -- other than just that I think that they -- that they -- they all involve very -- very different factual circumstances and -- and, you know, it's -- you know, retaliation and Fourth Amendment, for that matter, is very vast certain analysis.

THE COURT: Okay. Thank you very much. Anything else you want to say about your stuff before we hear from your colleague?

MR. NEWMAN: Yeah. So just -- so a few things. First of all, I just wanted to note for the record that we object to consideration of the 12 declarations that were submitted yesterday. We object to them being considered as

part of the record on this PI motion, just because we haven't had the opportunity to -- to respond to them.

On -- on -- on Mr. Crenshaw, I believe he -- he admits that he was standing in the street, and he said that he was sort of standing --

COURT REPORTER: I'm sorry. I didn't understand that. He said what?

MR. NEWMAN: He said he was standing in the -- in the muck, and so he, I believe, admits to being in the street.

THE COURT: But you're not suggesting that being on the -- you're not a Minnesotan; right?

MR. NEWMAN: I'm -- I'm in Illinois and I --

THE COURT: Okay, so you understand.

MR. NEWMAN: -- by being in --

THE COURT: You're not suggesting in a hypothetical that somebody standing on the street side of the giant pile as opposed to the sidewalk side of the giant pile, but otherwise not doing anything to interfere with traffic going by, merits deployment of -- you're not taking the position that the streets aren't a public forum? You're taking the position that blocking traffic or interfering could justify pepper spray. That is, standing on the street side of the mountain, doesn't by itself justify pepper spray. We don't have an established perimeter. You're not

taking that position.

MR. NEWMAN: I think -- no, your Honor. I think the fairest -- honestly, from either the Crenshaw declaration or the Easterwood declaration, the fairest reading is that -- is that he was incidentally exposed to pepper spray when he was present in a violent, obstructive crowd.

I do -- I do want to at least briefly address Ms. Tincher's arrest, and if you have questions, I can --

THE COURT: No. Go ahead tell me what you want to share.

MR. NEWMAN: So first of all, the other side said that it's undisputed that she didn't push past the perimeter. That is absolutely disputed. It's in the Easterwood declaration that -- that after she disobeyed orders to get back, that she attempted to physically push past one of the officers to breach the perimeter and that that --

THE COURT: Why don't I have that officer's declaration before me? I mean, just to ask you point-blank, why don't I have that officer's declaration before me? I don't know how many layers of hearsay Mr. Easterwood went through to get that factual assertion.

MR. NEWMAN: No, that's fair, your Honor. I mean, look, we were -- we were, you know -- I think -- I think I

have two answers. One is that Easterwood's declaration is competent evidence on -- on a PI motion.

And then the second answer is, you know, they -- they had -- they had 20 declarations. We were -- we were responding to it over -- over the holidays. We -- we, you know, did the best we could to, you know, put together an evidentiary record for you.

THE COURT: I'm not -- I'm not disputing your hard work. I gave you all substantial extra time because you specifically told me you needed time to gather information about these cases. And it is one thing not to have answers for each of the non-plaintiff declarants, but Ms. Tincher is the lead declarant here, and you describe very specific information of an officer who claims she did a very specific thing, but I don't have any ability to assess that, because I don't have anything about an unknown level of high summary about it. That's -- that's what I'm trying to get at.

I recognize we were all working over the holidays. I -- I am trying to give a lot of latitude for the reality of this kind of quickly-evolving situation. It's also why I'm not inclined to fault the plaintiffs for continuing to bring in declarations, and I'm going to say at the end that I'm going to give you a chance to respond to the new declarations. I'm not sure -- be careful what you wish for, but -- but here, I really don't know how to -- I have this

specific factual assertion that she took an act that she denies taking, that other people deny that she took, and I can't look at it with any granularity except Mr. Easterwood saying it's true.

MR. NEWMAN: So, your Honor, I think that -- that -- that this is -- this is another one of these instances where there -- there is some -- there is some factual dispute, but there's a lot of factual agreement. And in our view, even if you go based on Ms. Tincher's account and the account of the other witnesses the plaintiffs submitted, that her -- her arrest was not retaliatory and it was justified. I mean, she -- she -- she -- she admits that, you know, she -- she came to the scene in the dark. It was 6:30 in the -- in the morning before sunrise. There were -- there was a perimeter outside the house.

One of the other witnesses, I believe Ms. Rollins, heard the ICE officers saying that they -- they suspected weapons or violence in the house, and -- and, you know, we know from Mr. Easterwood's declaration that the person who they were apprehending was a violate criminal, was convicted of robbery. But, you know, Ms. Tincher didn't know that, but she approached the perimeter and was -- was ordered multiple times to get back, and she told the press, The officer told me to get back and I didn't get back, and --

and that's when she was arrested. And she alleges that the only words that she had said at that point were, "Are you ICE?"

And I think that the fairest -- the fairest -- you know, the fairest reading of the record -- even whether or not you credit the Easterwood declaration's additional assertion she tried to push past the officer, the fairest reading is that she was not arrested in retaliation for saying, "Are you ICE?" She was arrested because the officer reasonably -- reasonably believed that she was physically impeding their operations while they were trying to apprehend a violent criminal in that house.

THE COURT: Okay. Thank you. Anything else you want to share or that captures your points?

MR. NEWMAN: That captures my points. Thank you, your Honor.

THE COURT: Okay. Thank you.

All right. Ms. Jacobs, I have a few questions for you.

MS. JACOBS: Yes, your Honor.

THE COURT: So the Eighth Circuit case law and, frankly, Supreme Court case law, captured the idea that First Amendment violations are ongoing injuries because of the nature of chilling speech. Why doesn't that give standing -- why doesn't that differentiate -- aside from the

intent to continue protesting, which is a -- sort of a separate argument, why doesn't the ongoing harm from chilled speech constitute a sufficient injury in fact for injunctive relief? Let's just talk about the six as opposed to the class on this question.

MS. JACOBS: Well, and, your Honor, I'm happy to go specifically into the declarations of plaintiffs, but so far, aside from a general legal argument related to potential chilling, each and every one of the plaintiffs themselves have said that they've continued and, in fact, infers to me that they have not in any way been chilled such that there is an ongoing harm.

THE COURT: So the -- in the retaliation case law, we've got objective, would a reasonable person be chilled, and it doesn't undermine a finding of chilling if a person of unusual fortitude personally isn't chilled. But when we're talking about standing, isn't it true that the courts have said that an ongoing injury to speech is an ongoing injury, differentiating this from *Lyons*? That's not a well-phrased question, but you understand what I'm getting at.

MS. JACOBS: Honestly, your Honor, I might ask for some clarification. Excuse me. I'm going to back to my -- so --

THE COURT: I mean, there's multiple theories of

standing here; right? There's the theory that these individual plaintiffs intend to continue exercising their First Amendment rights and, therefore, face a meaningful risk of having the same things happen -- happen to them again, whether that's unlawful arrest or spraying with, you know, pepper spray or being temporarily detained. So that, you say, is not enough to establish standing?

MS. JACOBS: No, your Honor. In -- in this case as it relates to the specific plaintiffs, that all but one, it's been well over a month. There have been significant amounts of declarations subsequently submitted. I mean, for purposes of their ability to articulate future harm that's more than speculation at this point, I don't think that the -- the individual plaintiffs get there, and it does need to be the individual plaintiffs to show that imminent future harm such as to qualify for standing.

THE COURT: Do you agree that First Amendment retaliation is beyond the scope of *Bivens*?

MS. JACOBS: Your Honor, similar to my colleague earlier, I have not specifically addressed that point or looked into that.

THE COURT: Well, let's imagine that I'm right about that and that the way the law -- we all know that the Supreme Court cautions against expansion of *Bivens* from clear and previously-recognized applications. We all know

that *Bivens* is sort of the federal version of *1983*; right? So if it is true that First Amendment retaliation can't give rise to a *Bivens* claim, and even these individual plaintiffs with their expressed intention to keep protesting can't have standing, does that put, essentially, beyond the reach of the law allegations of retaliation against protesters? What's the vehicle to -- let's say it were true that ICE was violating the rights of protesters. What's the vehicle to address that?

MS. JACOBS: Well, your Honor, I think at a fundamental level, these specific plaintiffs, the vehicle to address that would be that there is the imminent risk of future harm, which based on the allegations by the six named plaintiffs and the subsequent events, they're unable to show. And so for that purpose, you know, as stated in *Lyons* --

THE COURT: *Lyons* is a Fourth Amendment claim, and in *Lyons*, we have this situation where, if anything, the plaintiffs desperately hoped they wouldn't be in that circumstance again, that they wouldn't commit lawless activities and get subject to it. But *Lyons* is the chokehold case; right?

MS. JACOBS: Correct.

THE COURT: Do you have a *Lyons*-like case in the First Amendment retaliation context?

MS. JACOBS: I would have to -- I -- so *Rinne vs. Camden County*, your Honor. I don't have it right before me, so I have to look into. But for purposes of the Eighth Circuit, it does cite to *Lyons* for standing of prospective relief requires that plaintiffs demonstrate a real or immediate threat that they will be wronged again. That isn't a likelihood of substantial and immediate injury.

Now, that being said, for purposes of capturing it within just specifically the First Amendment I don't have that in front of me, and I can certainly submit something subsequently.

THE COURT: *Rinne vs. Camden County*, is that the case you're talking about?

MS. JACOBS: Yes, your Honor.

THE COURT: Yeah, so that's the case where they find that he has standing; right?

MS. JACOBS: Uh --

THE COURT: And they talk about, the ban is adverse action that could -- would chill a person of ordinary firmness in getting there?

MS. JACOBS: I'd have to refer back to the case, your Honor, but I -- I presume that the Court is correct.

THE COURT: I actually appreciate you -- I'm not trying to trick you, because there's a million cases here and I know nobody can get conversant in all of them. I'm

mixing them up left and right. But I'm glad you pointed this case out because it's the cite I was trying to come up with for the idea of chill being it's own harm sufficient to establish standing in an ongoing way, or it's one of those cases. I'm having a hard time finding a case that applies *Lyons* in the First Amendment context that goes your way, which is that because of *Lyons*, there isn't First Amendment standing.

*Lyons* does stand for this general important idea that past harm isn't enough to give rise to -- okay, hang on. I might be misreading *Rinne* -- *Rinne*.

It says -- I think *Rinne* had the expiration of the ban eliminating injunctive relief. But in any case, it engages with this idea of chill, and so I'm wondering what your best case is for the application of the *Lyons* paradigm in that sort of contemporary person in the context.

MS. JACOBS: Well, your Honor, I guess I would -- I mean, I certainly could follow up in that regard. You know, none of plaintiffs' allegations in any way, and if you're taking a person of ordinary firmness, assert that there is any specific chilling effect to any of the plaintiffs.

THE COURT: Okay. Okay. So the fact that a plaintiff continued to protest means that they cannot claim chill and, therefore, can't get injunctive relief?

MS. JACOBS: No, that's not necessarily what I'm saying. And as we've seen in -- I mean, particularly in the *Los Angeles Press Club*, you know, at least in that instance they presented the Court with some evidence of chill of the plaintiffs. In this instance, there is no evidence that any of the plaintiffs have any harm, such as the chilling effect, due to any of the actions by the -- or the allegations of unlawful use of force.

THE COURT: Okay.

MS. JACOBS: The allegations herein.

THE COURT: Thank you.

You're the person to talk to about the scope of the injunction?

MS. JACOBS: Correct.

THE COURT: Okay. A fair amount of your argument seems to focus on -- in the brief, seem to focus on things that were requested in the first proposed order. The second proposed order is quite a bit narrower. What do you want to say about that?

MS. JACOBS: Well, your Honor, we have -- so the second proposed order, your Honor, came in very quickly right before our filing deadline and --

THE COURT: Yeah, that's why I want to give you a chance.

MS. JACOBS: Yes, thank you. And so I think that

we have addressed some of the specific issues that we have with the case. Obviously, our position is that no injunctive relief is required at this point, but to the extent there is injunctive relief, that it should be limited only to the six named plaintiffs, particularly here because there has not been any submission or certification of any class.

THE COURT: What is your response to opposing counsel's argument about *A.A.R.P.* and how it blesses -- and, frankly, there's other Eighth Circuit cases that talk about this, too -- the provisional sort of certification of the class by providing injunctive relief?

MS. JACOBS: Well, your Honor, I think that we would dispute that position in that *CASA* and then subsequently discussing the Court's analysis as it relates to *Barbara* and the certification therein foreclose that available remedy. Certainly if there was provisional certification, you know, in the context of Barbara, which I'm somewhat familiar, then, you know, the Court -- the Court would have had them gone through the requirement of the motion for class certification and then any briefing and anything thereon.

So I think that in the post-*CASA* world that we are in, *CASA* applies, and there has to be -- I don't think that provisional certification of a class, such as what's on the

record before the Court today, is sufficient to establish injunctive relief on behalf of what we're talking about here is every person in the state of Minnesota who could potentially observe a law enforcement operation by any DHS officer within the entire state of Minnesota.

THE COURT: So *A.A.R.P.* is pre-*CASA* by a month, and it specifically talks about preliminary relief is customarily granted on the basis of procedures that are less formal and evidence is less complete than in a trial on the merits, and it -- it grants class-wide relief for the putative class members.

Your point is this isn't good law in light of what they did a month later, or your point is there's something different about the class in *A.A.R.P.* or what?

MS. JACOBS: I mean, I think my point is that the government's position is that something more than -- something more than what the plaintiffs have alleged in this instance is required before there can be Rule 23 class certification. The requirements of Rule 23 exist for the purpose of, you know, going through and making sure that there's commonality and typicality between the parties. There's at least a floor for what plaintiffs should be seeking and what the Court should order that has not been established here.

THE COURT: Okay. So one of the things opposing

counsel proposed is seeking injunctive relief as to the six named plaintiffs and then setting a process for this very thing, addressing the applicability or nonapplicability of the Rule 23 factors and whether a class or classes can be meaningfully identified here. What do you think about that process? I know you don't agree that there should be injunctive relief as to the six, but what do you think about the process?

MS. JACOBS: I'm sorry. You said -- yes. So, I mean, I think that that process would be certainly more reasonable, particularly for, you know, the opportunity to determine who all this actually encompasses, because right now, the way that the injunction is written, it applies to every person in the state and including every DHS officer in the entire state, which that, I think we said in our briefing, even would encompass, you know, Coast Guard that are on the lake or border patrol up at the border and things that are obviously not relevant to the case at hand.

But I do think to the extent that the Court is going to issue an injunction limiting it to the six individual plaintiffs and then thereafter, we can address through motions and briefing. Plaintiffs' class claim under Rule 23 I think would be more appropriate than expanding beyond the six plaintiffs.

THE COURT: Do you think that there can be limits

put on the class injunction that address some of your concerns? For instance, if the scope were not to all law enforcement currently deployed in the District of Minnesota but to all law enforcement participating in Operation Metro Surge or in immigration enforcement activities in the seven-county metro area or -- that would address some of your concerns; right?

MS. JACOBS: I mean, yes, hypothetically that would address some of the concerns; however, I would point out that the relief to plaintiffs -- complete relief to plaintiffs is the maximum relief that should be before the Court, not the minimum. So to the extent that the preliminary injunction such as the one that's been proposed here applies, the majority of it applies to citizens at large versus the six named plaintiffs. And I do think that the defendants would be able, if the Court were to issue an order, you know, related just to the six named plaintiffs, that would be the most appropriate, and there is a way to afford them complete relief that does not require an injunction on every officer operating in the state or even in Operation Metro Surge.

THE COURT: So one of the things that you highlighted in the briefing is the idea that any question of workability of an injunction as to the six named plaintiffs shouldn't deter me -- or shouldn't justify a broader

injunction I guess is how I would describe your position, because that's sort of on you; that it would be up to the defendants to figure out how to honor the injunction as to the six named plaintiffs without a broader injunctive relief. Anything more you want to share about that idea?

MS. JACOBS: Yes, your Honor. I mean, we -- you know, I'm certainly not conceding, again, that we believe that any injunction is appropriate, but there are certain things as it relates directly to the six named plaintiffs that defendants -- you know, it is their -- our obligation to make those workable and to make those appropriate and provide the complete relief should the Court order it.

For instance, as it relates to the following in the vehicles that has been discussed significantly today, it is not difficult if plaintiffs were to provide us with vehicle identification and then, you know -- because all these injunctions go with a broadcast, so we would be able to identify that these six plaintiffs are subject to this injunction; here's the information to identify them. It's something that law enforcement does routinely. And so that's just kind of one example of a potential option to limit it just to the six plaintiffs rather than, you know, even people within the Twin Cities area at large.

THE COURT: But I wouldn't spell that out. I would just, in theory, issue in -- whatever scope I found to

be supported by the evidence and the law, I would say, you cannot do X, Y, and Z as to these --

MS. JACOBS: Correct.

THE COURT: -- six plaintiffs, and you would be responsible for figuring out how to make sure that was honored?

MS. JACOBS: Correct, your Honor.

THE COURT: Okay. Let me think. I -- are you aware of whether the government possesses video evidence related to any of the specific incidents discussed by the named plaintiffs?

MS. JACOBS: I am not aware, your Honor. Similar to my colleague, I mean, certainly the -- no, I'm not aware.

THE COURT: Okay. I've watched the videos that have been offered for my review, some of which are on -- I went to Facebook, I went to some other source, and to NPR repeatedly. Some of the officers are holding phones and videoing in those videos. Can the government produce those videos to me?

MS. JACOBS: Your Honor, I can certainly follow up with our client to identify what is available --

THE COURT: Okay.

MS. JACOBS: -- and certainly --

THE COURT: Any body-worn camera or video of any of the specific alleged incidents I'd like to receive.

I'd also like to give you an opportunity to respond to the newly-filed declarations. I'm not -- because of the -- honestly, because of the fact that we are in the midst of this ongoing surge and this ongoing protest activity and ongoing allegations of similar conduct, I'm not going to prohibit the plaintiff from continuing to file declarations or from seeking to amend to add new plaintiffs or whatever they want to do, but I do want to put in a standing opportunity for the government to be able to submit information in response to those declarations. And so I'm giving you that permission right now. You may file things in response to declarations that get filed without seeking specific leave --

MS. JACOBS: Thank you.

THE COURT: -- as long as it's, you know, commensurate in length. I'm not going to control -- nobody has been abusive in that way. I'm not going to control page limits unless I need to. And I'd like to have you respond to the declarations that have been filed by noon on Thursday the ones that got filed yesterday morning, if you wish to. If you don't wish to, tell me nothing's coming. Not right now. If you don't have anything to provide in response to those, tell me nothing 's coming. I'm not saying that you couldn't provide additional information after that deadline, but if you want me to consider that information in

responding to this pending motion, that is as late as I can let it go.

MS. JACOBS: Okay. Yes, your Honor. Thank you. I appreciate that opportunity.

THE COURT: Yes, of course.

Those are my questions for you. Anything else you need to say?

MS. JACOBS: I -- I apologize if my colleague might have already covered it, but I did just want to bring some clarity to the status of some of the other cases that have been relied upon. Specifically, the *Los Angeles Press Club* case, obviously there was the partial stay that's been discussed in our briefing.

And then --

THE COURT: Am I right that I read kind of a "allowing class-wide relief" as to journalists and "specific plaintiff relief" as to protesters? Is that the way you read that line?

MS. JACOBS: So yeah, your Honor, one of -- one of the specific distinctions between this case and the other cases that we've seen is that void of the journalists who are asserting a right, regardless of the lawful -- or unlawful activity of the protest to then maintain their position absent lawful dispersal orders and then, you know, continuing that activity, as opposed to here we're seeing a

lot of citizens, whether they're alerting groups to respond or whether they're part of the group responding in, frankly, some effort to interfere or deter federal law enforcement operations. But in -- just so that the Court is aware -- you might already be, so I apologize if so -- but the *Los Angeles Press Club* case, there was the partial stay and there was oral argument held on the 5th. So we are, you know --

THE COURT: Soon.

MS. JACOBS: -- awaiting a potential opinion soon.

And then as far as the *Chicago* case, and my colleague, Mr. Newman, can correct me if I'm incorrect, subsequent to that stay issued by the Ninth Circuit, the --

THE COURT: The Seventh -- oh, the First. Wait The *Chicago* case.

MS. JACOBS: Seventh Circuit. I'm sorry.

THE COURT: Seventh Circuit. I'm just going to name numbers until I land on it.

Yeah, I saw that it was remanded for possible vacatur.

MS. JACOBS: Yeah, so the plaintiffs -- or the parties have jointly moved to dismiss that case. Some of, I think, the government's belief, I -- or did you -- I might defer to Mr. Newman because he was part of that.

THE COURT: Why don't you just say things,

Mr. Newman.

MR. NEWMAN: Yeah. So in that case after the stay had issued, the plaintiffs moved to dismiss the case and basically reported that, you know, they had not received any additional complaints about allegedly unconstitutional behavior since the injunction -- since roughly the injunction had issued. And since there was a certified class, the Judge has to approve it. We didn't object. No class members objected. But the judge held a hearing on that last week, and she essentially said that she's going to take a couple more weeks to think about it, and I think on maybe the 22nd or the 23rd is going to have another hearing to decide whether to -- to grant that dismissal.

THE COURT: Okay. Thank you.

MS. JACOBS: Sorry. I just wanted to clarify.

THE COURT: Thank you for that update. I appreciate it. Some of that's hard to figure out from the docket and PACER and things like that.

MS. JACOBS: Yes.

THE COURT: Okay. Thank you.

MS. JACOBS: Thank you, your Honor.

MR. NEWMAN: Your Honor, if I --

THE COURT: Your microphone isn't on, so if you want to speak, come to the podium, if you would.

MR. NEWMAN: Just one -- one more point. If --

you know, I think I'd want -- if your Honor is, you know, ordering us to, you know, produce some discovery, I think I'd like to note our objections to producing any -- any discovery when the other -- when the plaintiffs hadn't made discovery requests, but if your Honor is ordering us to produce video that may be available, if it -- if it would -- if it would be possible to memorialize that order in writing, I think we would appreciate that, just to have compliance on our end. And then --

THE COURT: How about this: It is 11:00.

MR. NEWMAN: Yeah.

THE COURT: I will give both sides until 6:00 p.m. to file three-page letter briefs about whether I have the authority to ask for video evidence in the possession of the government that goes specifically to the incidents alleged as to the six named plaintiffs, and if not, then assume that you are ordered to do your best to get me those as soon as possible tomorrow.

MR. NEWMAN: Yes, your Honor. And then the other point is if you're -- we would also orally move that to the extent that your Honor issues any preliminary injunction, that you stay that injunction pending a potential appeal. Noting that for the record, your Honor.

THE COURT: Okay. Thank you.

All right. I'll give you just a few minutes to

respond to anything that you wish to respond to.

MR. WISLOCKY: Thank you, your Honor. Just a few very quit discrete points.

Picking up where counsel just left off on the apparent oral motion for a stay pending appeal, plaintiff would oppose any stay of any relief that this Court may enter. Defendants have not made any showing that any of the factors for a stay pending appeal have been met. Those factors are set forth, one example from the Eighth Circuit, in the *Organization for Black Struggle vs. Ashcroft* case, which is at 978 F.3d 603. I apologize for citing that for the first time, but this wasn't raised -- none of these factors were raised in their briefing.

Those factors, as I'm sure the Court is familiar, essentially mirror the factors for preliminary injunction, looking at likelihood of success on the merits. And the significant difference would be an alleged harm to the government from the lack of a stay on the irreparable harm, but otherwise, the balance of public interest and merits increase would be the same. So for the same reasons the injunction should be issued, it should -- there should be no stay.

And I'll note for the Court that the government can never be harmed by an injunction that ends an unlawful practice, so I don't believe the government's able to show

that the lack of a stay of any injunctive relief would be an injury to the government.

I'll also note that in both the L.A. and Chicago cases, the Courts did not stay their rulings for a preliminary injunction pending appeal. The District Courts did not, and this Court should not either.

I also just want to point out, it's a discrete point on the inquiry of chill and whether a chill to the First Amendment freedoms can constitute an injury. I just want to make clear that chill is not an on/off swish. It's not that someone who is chilled has to in no way engage in any activity or otherwise they're not chilled. There can be degrees to it.

Counsel a couple times said that there was no evidence of named plaintiffs being chilled. I disagree with that. In the Webb declaration, which is ECF 1-4, paragraphs 12 and 13 detail that Lucia Webb is, as she says, "I will continue to observe and tell agents what I think about their actions, although I'll try not to go out alone when I have the option to be with another person." And then the next line, 13, she says, "In fact, the next day I was out again, this time in a friend's car."

Similarly, named plaintiff Janet Lee in her declaration, which is ECF 1-3, in paragraph 17 said, "Even though I am frightened for my safety, I feel an obligation

to protest," and goes on to say, "Even so, I have been more cautious since this experience because I fear that ICE agents will physically harm me." So there is actually evidence of although plaintiffs will still engage in First Amendment protected activity, plaintiffs saying that they're altering their behavior on the basis of the retaliation and unconstitutional treatment they have faced. So I think that's -- any change is a chill.

One last piece on the injunctive relief. I note that in *CASA* Footnote 12, the Court mentioned that there may be situations where it's impossible for the Court to grant relief that's complete to plaintiffs without benefitting other individuals, and *CASA* did not foreclose that possibility. I think, you know, even to take just the one example that counsel made of, Well, we can protect just these plaintiffs if they give us their driver's licenses or -- or license plates. I don't think that's sufficient. You know, if a named plaintiff wants to follow an ICE car in their friend's or their family member's vehicle, they have a First Amendment right to do that.

THE COURT: But then -- I'm not trying to make light of this situation, but if -- if a named plaintiff were subject to a prohibited act by the defendants, you would file a motion to enforce the injunction or for sanction, and then you would say to me, This is proven to be unworkable

and, therefore, broader relief is necessary, or they're intentionally or unintentionally violate -- that's what those subsequent hearings would be about. I'm not saying I want subsequent hearings, but to be clear, it -- a little bit of the point is kind of at their peril, they risk violating a federal injunction, and so they would take significant care not to engage in retaliatory conduct if I were to issue such an injunction as to the six, and if they don't, that's kind of on them. I -- I'm trying to give *CASA* the binding weight it deserves, and I'm having a hard time seeing that your reading of the footnote doesn't kind of -- this is aside from class treatment; right? Which is really important, but your reading of the footnote kind of end runs *CASA*'s prohibition.

MR. WISLOCKY: Yeah. And from our perspective, I mean, as we set forth in the briefing, your Honor, in order to afford complete relief, it remains our position that the Court could enter an order that would restrain unconstitutional acts by defendants in order to benefit just the six plaintiffs that may well have an incidental effect on other protesters. But nonetheless, I agree with what the Court set out in terms of, you know, of course if there were to be a violation with -- if this Court were to enter an injunction with respect to the six named plaintiffs and there were to be a violation or future unconstitutional act,

absolutely we would be before your Honor.

But I would go back to, that was a compromise position that plaintiffs put forward. If the Court wants to enter temporary relief, it could also be an interim relief on a temporary basis, but it's not -- that's not the relief -- the extent of the relief we're seeking. Obviously, that's fair from our perspective, and we would hope the Court would move along the class certification process and the discovery on an expedited basis so we can have broader relief because this is a class case, and the reality is protesters and observers are being retaliated against, from our perspective, daily. And so yes, we would welcome an entry of an order with respect to the six plaintiffs, but that's not sufficient in our view to protect the constitutional rights at issue here.

THE COURT: Okay. Thank you very much. Thank you, both counsel, for -- or all counsel for answering all of my questions and engaging in a sort of broad-ranging discussion. We are going to get an order out as soon as I possibly can. And I think that -- do you need something?

MS. JACOBS: Well, your Honor just before we close out, I'd like to clarify some of the deadlines.

THE COURT: Sure. I was just going to say, I think maybe we need to clarify some of those things that I just said. Now I have to remember what I just said.

I think I gave everybody until the end of today to file letter briefs addressing whether I have the authority to seek from the government video of any of the incidents at issue.

I think it probably makes sense for this to -- I'm thinking about whether I should make this order as to both sides. If the plaintiffs have in their possession video of the incidents at issue, what is my basis for requiring the government to provide? So that's what I am seeking in put on. Do I have the authority to require both parties to provide me with video in their possession.

And I'm not looking to get into a side fight about how hard it is to get video in their possession. I'm talking about things that are known to the parties or can with sort of reasonable but quick effort. I'm not looking to create future discovery fights about a video that might materialize three weeks down the road and a fight about whether they knew about it or not. But video known to each party related to the incidents described for the six named plaintiffs, I want those to be turned over to me, but I'm going to give each side the chance to disagree with my authority to seek that, in writing, by the end of today. Letter brief is fine. I think that was item 1.

Item 2 was giving the government until noon on Thursday to respond to yesterday's filed declarations.

Did I throw something else out there that I've forgotten?

MR. WISLOCKY: You had mentioned 6:00 p.m. today and then you said the end of the day when --

THE COURT: Yeah, I'll give 6:00 p.m. I'm working well past that right now so...

MR. NEWMAN: So, your Honor, is it -- is it your intention that if you conclude that you do have the authority to -- to require the videos, that -- that you would require both sides to produce the videos that they have of the -- of the incidents involving the six named plaintiffs?

THE COURT: Yeah, that's what I'll hear in the briefs on -- and if you all want to agree on this and agree on some protocol to give me the videos that people have in their possession or for me to review them in camera, I'm open to that. I love when you guys solve problems yourselves.

MR. NEWMAN: And if your Honor does require those videos, when are we required to produce those videos?

THE COURT: Let me see what the letter briefs suggest, but I would say ideally the end of tomorrow. I'm trying to -- I don't want to make a promise I can't keep, but my goal is to have this order out Thursday, end of Thursday or first thing Friday if I can. It's complex and

I'm not making light of it, but I am trying to pack our days.

Any other things I said that need clarification in terms of the short term?

Okay. Everything else I think waits, including a discussion of whether there would be a second phase of discovery or briefing around class certification, including whether there would be a stay if I do issue injunctive relief. I think those are all borrowing worry at this point.

Okay. All right. Thank you, all, very much. We are in recess.

*(Court adjourned at 11:28 a.m.)*

* * *

I, Janell M. Gruber, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter to the best of my ability.

*s/ Janell M. Gruber* Janell M. Gruber Date: January 14, 2026
Janell M. Gruber, RMR, CRR, CRC