UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

| | |
|---|---|
| SUSAN TINCHER, JOHN BIESTMAN, JANET LEE, LUCIA WEBB, ABDIKADIR NOOR, and ALAN CRENSHW, *on behalf of themselves and Other similarly situated individuals,* <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive Associate Director, Enforcement and Removal Operations (ERO), ICE; DAVID EASTERWOOD, Acting Field Office Director, ERO, ICE Saint Paul Field Office; JOHN A. CONDON, Acting Executive Associate Director, Homeland Security Investigations (HSI); The Department of Homeland Security; Unidentified Federal Agencies; and Unidentified Federal Agents; *in their official capacities,* <br><br> Defendants. | Case No. 25-cv-04669 <br><br><br><br><br><br><br><br> **DECLARATION OF KYLE C. HARVICK** |

_____

1. I am employed by U.S. Customs and Border Protection (CBP). CBP is charged with enforcing the Nation's immigration laws in order to protect national security and uphold the integrity of the immigration system. As part of this mission, CBP Border Patrol agents and officers are responsible for preventing the unlawful entry of individuals into the United States, apprehending those who attempt to enter illegally or who have violated the immigration laws in accordance with applicable laws. Through these activities, CBP seeks to secure the border, disrupt human smuggling and trafficking networks, and ensure consistent enforcement of the immigration laws of the United States.

2. I am the Patrol Agent in Charge, El Centro Station. In this role, I oversee Border Patrol Operations for the El Centro Station, with responsibility for 35 miles of land border; a permanent traffic checkpoint; 320 employees; a fleet of 160 government vehicles, and an annual budget of approximately $800,000.00. I have been in this position since 2023.

3. I entered on duty with the U.S. Border Patrol on September 10, 2000, with my first duty assignment in the El Paso Sector. In 2015-2016, I served as Acting Assistant Chief within the Strategic Planning and Analysis Directorate, Operational Requirements Management Division in Washington, D.C. I have also served as the Deputy Patrol Agent in Charge of the Yuma Sector Border Patrol Station and the first Customs and Border Protection Advisor to Israel, where I was responsible for facilitating in-country liaison with various Israeli Law Enforcement entities and Ministry of Defense agencies. I have served in the El Centro Sector since 2021, including service as the Professional Standards Assistant Chief Patrol Agent.

4. Currently, for the Minneapolis operation ("Operation Metro Surge"), I am Deputy Incident Commander, and I operate out of the Border Patrol Incident Command Post (ICP) located at 1 Federal Drive Forn Snelling, MN 55111 In this position, I have operational oversight and am responsible for all U.S. Border Patrol assets and operations in the greater Minneapolis area. I ensure the Border Patrol Agents have all the proper equipment and supplies to do their job. I oversee personnel, logistics, referrals for criminal prosecutions, the execution the of the Agency's use of force policy, and tactical information gathering. I report to the Incident Commander or act as the Incident Commander in his absence. The ICP is the lowest level operational headquarters for CBP personnel in support of Operation Metro Surge in Minnesota.

5. Use of force by CBP officers and agents is governed by the CBP Use of Force policy. The CBP Use of Force policy addresses the deployment of less-lethal devices and outlines the circumstances in which they may be utilized. Crowd control devices and less-lethal munitions are utilized during civil disturbances. Due to the dynamic situations encountered during these events, giving warnings and/or commands and time for a subject or subjects to comply may not always be feasible. Under CBP policy, chemical irritants may be utilized when an individual is engaging in active resistance. Active resistance is a type of resistance where a subject physically opposes an officer's or

agent's control efforts.  Assaultive resistance under CBP policy is defined as resistance characterized by a level of aggression or violence that causes or has the potential to cause physical injury to the officer/agent, others, or self.  This includes a subject's attempts, or apparent intent, to make physical contact in an attempt to control or assault the officer/agent.

6. The CBP Use of Force Policy defines less-lethal force as force that is not likely or intended to cause serious bodily injury or death.  The use of less-lethal devices or weapons is meant for situations where empty-hand physical techniques are not sufficient, practical, or appropriate.  Less-lethal equipment used by CBP officers and agents includes Oleoresin Capsicum (OC) spray (also referred to as pepper spray), collapsible straight batons, Electronic Control Weapons (ECWs and also referred to as TASERs), compressed air launchers that include the Pepperball Launching System (PLS) and FN303, munition launchers that include the 40MM, and Controlled Noise and Light Distraction Devices (CNLDD and commonly referred to as a "flash-bang").  Smoke canisters may also be used for crowd control purposes.

7. Following their initial academy training, CBP law enforcement personnel receive additional on-the-job training and periodic refreshers on a full range of topics, including eight hours of Use of Force training, which is conducted quarterly by all Border Patrol agents.  Additionally, officers and agents are required to obtain certifications for the use of each CBP authorized less-lethal device they carry and must complete an annual recertification on them each fiscal year.  CBP also offers Mobile Field Force (MFF) training which includes additional specialized training on crowd control operations.  MFF I training includes crowd control familiarization, basic formations, and gas mask proficiency. MFF II training expands into shield and baton proficiency, multiple formations and movement, CS gas exposure, and mass arrest procedures.

8. The statements contained in this declaration are based upon my personal knowledge and information made available to me in the course of my official duties, consisting of internal, evolving situation reports, preliminary reports in CBP's Enforcement Action Statistical Analysis and Reporting (E-STAR) System, as well as some of the body worn camera footage of CBP personnel present at these incidents.  This declaration is based on my preliminary assessment of the developing body of documentation on the incidents below.

9. In early January, in support of U.S. Immigration and Customs Enforcement (ICE), CBP personnel began deploying to Minneapolis to assist ICE Enforcement and Removal Operations (ERO).  As part of Operation Metro Surge, CBP personnel, along with personnel from partner federal agencies, participate in a variety of different law enforcement actions in and around Minneapolis.  These enforcement actions primarily revolve around immigration enforcement authorities granted under Title 8 of the U.S. Code but may also involve enforcement of certain portions of the U.S. criminal code under Title 18.

A.	**Events of January 7, 2026, in the vicinity of Roosevelt High School**

10. On January 7, 2026, Border Patrol agents dressed in full rough duty uniform with U.S. Border Patrol insignia and traveling in an 8-vehicle convoy were conducting enforcement operations in support of Operation Metro Surge in Minneapolis, Minnesota. Around 1530 hours, agents became aware of a single-occupant, black Toyota truck closely following the convoy. The occupant of the vehicle was later identified as Suzanne Etherington-Gillian. Shortly before 1631 hours, the vehicle operated by Etherington rammed the rear vehicle in the agency convoy and attempted to flee the scene. Agency vehicles followed Etherington's vehicle after being rammed to effectuate an arrest under 18 U.S.C. § 111.

11. While in pursuit of Etherington's vehicle, agents observed Etherington driving at high rates of speed, driving into the other lane of traffic, and driving through red lights. Etherington drove through a school zone, then turned around and led the agency vehicles back towards the school. At approximately 1631 hours, agents boxed in Etherington's vehicle at 28th Avenue South and 40th Street East. Agents exited their vehicles, approached Etherington's vehicle, and arrested her.

12. While some agents arrested Etherington, others secured the perimeter to investigate the 18 U.S.C. § 111 charge. At the same time, a crowd began to gather adjacent to Roosevelt High School. To facilitate a swift investigation, agents attempted to prevent the crowd from encroaching on the scene of Etherington's vehicle and arrest. Agents instructed the gathering crowd to stay back and to maintain distance from the perimeter. Many individuals in the crowd were verbally argumentative and failed to comply with the agents' instructions to stay back from the established perimeter. Several individuals continued walking at agents or refused instructions to back up.

13. The crowd grew and became increasingly agitated as agents attempted to maintain a perimeter around the arrest scene. Agents repeatedly instructed the crowd to stay back and keep a reasonable distance. Despite these instructions, several unidentified individuals in the crowd continued to encroach on agents while shouting insults, objections, and profanities. Near the school building, a few individuals, including members of the school's staff returned to the area near the Etherington arrest after being previously ushered away by agents. Agents attempted to reestablish the perimeter by walking at them and directing them towards the designated area using appropriate and purposeful prods, in accordance with the Agency's Use of Force policy. One of the individuals responded with combative shoves and pushes on one of the agents. Upon noticing the escalating situation, other agents quickly assisted in attempting to arrest one of the instigators. Another one of the school staff members, later identified as Quentin Williams (Williams), attempted to intercede by pushing and shoving back on agents and

putting his body in the way of the intended arrestee, interfering with the arrest, Williams was placed under arrest for impeding federal law enforcement officer.

14. As the agents attempted to depart with Etherington and Williams, several individuals stood in the roadway, in front of the government vehicles at the head of the convoy facing northbound on 28th Avenue. Agents instructed the individuals standing in the roadway to move so that the vehicle could leave. The individuals refused to stand aside. Agents continued to instruct the individuals to move. At this time, one of the individuals in the roadway, later identified as Ilan Wilson Soler (Soler), used a pressurized metal cannister, similar to a fire extinguisher, to spray agents and two government vehicles with an unknown, white, paint-like substance. Soler then threw the metal canister at an agent, striking her in the knee (see below pictures) and ran south on 28th Avenue, back towards the crowd that had gathered near the school, colliding with an Agent, before Soler was apprehended by additional agents.

 (injury photos from January 8)

 (injury photo from January 9)

15. The crowd quickly encircled the scene of Soler's arrest. Several agents tried to establish a perimeter between the crowd and the agents arresting Soler, instructing the crowd to stay back and keep distance from the arrest scene. Many members of the crowd were shouting profanities and insults, blowing whistles, and getting in the faces of agents maintaining the perimeter. Several unidentified individuals began throwing unknown objects at the arresting agents. To protect the agents affecting the arrest from potentially dangerous projectiles, another agent immediately deployed a short-range chemical munition to create a buffer between the increasingly hostile crowd and the arresting agents. This limited CS deployment was effective in clearing the immediate area of individuals throwing projectiles. At the same time, while the agents attempted to arrest Soler, an individual later identified as Nitzana Bella Flores (Flores) dove at the arresting agents and threw her body on top of Soler to interrupt the arrest. Several agents pulled Flores off Soler. Agents commanded Flores to put her hands behind her back and tried to gain control of her as she thrashed around and wrestled her hands away from agents. To regain control, agents deployed Oleoresin Capsicum (OC) spray on Flores, which was effective in allowing the agents to take Flores into custody without further incident. Flores was decontaminated by agents in the field, and no injuries were reported nor was medical attention requested.

16. Although members of the crowd continued to verbally harass the agents, they were able to depart the scene shortly after Flores was put into a vehicle. The four individuals apprehended by agents during the events at 28th Avenue South and 40th Street East were turned over to the Federal Bureau of Investigation for further processing.

B.   **Events of January 8, 2026, at the Whipple Building**

17. On January 8, beginning around 0700 hours, a large crowd gathered at the Whipple Building, located at 1 Federal Drive in St. Paul, Minnesota to protest the increased federal law enforcement activity in Minnesota. CBP and other federal law enforcement agencies were on-site to manage the crowd and ensure that the building's occupants were able to carry out their duties safely and efficiently in an uninterrupted fashion. The crowd of protesters eventually grew to approximately 500 people.

18. Between 0730 and 0800 hours, the crowd positioned itself in the roadway leading to a main vehicle entrance of the Whipple Building, thereby obstructing a main vehicle entrance with an automated barrier gate. Agents instructed the crowd to back up to the sidewalk and move out of the vehicle entrance. Individuals ignored commands to move back, some physically pushing or shoving against agents who were attempting to direct the crowd out of the roadway and to the sidewalk by creating a riot line. Many individuals also closed in within a few feet of the agents, shouting insults and obscenities, shaking fists and middle-fingers in agents' faces, and mocking them. As the crowd grew, individuals continued to flood into the roadway, preventing vehicle access to the federal

building. Some of these protesters physically pushed against agents that were attempting to maintain a secure area and instructing individuals to stay back.

19. At approximately 0700 hours, an individual, later identified as Caleb Likely (Likely), ignored commands to move back and to keep the entrance gate clear. Likely continued to obstruct the entrance and approached agents in an aggressive manner, and agents arrested Likely for impeding law enforcement operations.

20. Around 0800 hours, an individual, later identified as Joshua Snyder, pushed and shoved agents, who then arrested him for assaulting federal agents.

21. Around 0830 hours, federal law enforcement deployed pepper balls to break up the hostile crowd occupying the entrance area.

22. And around 1130 hours, an individual, later identified as Sagirah Zakiyah Shahid (Shahid), punched an agent. CBP agents subsequently arrested Shahid for assaulting a federal agent.

23. Between 1100 and 1230 hours, the large crowd had again encroached on the gates of the property. Agents attempted to walk them back by forming a moving line and shouting commands to move back. Although many in the crowd were verbally aggressive, they were still following the commands to move back. Other individuals refused to move and continued shouting threats and obscenities at agents, and some became physical by laying hands on agents, pushing against agents with their bodies, or shoving them.

24. Around 1200 hours, an individual later identified as Mohamed Farah Ahmed (Ahmed), ignored commands to back away from the entrance gate to the federal property. As agents attempted to move Ahmed back, Ahmed struck agents with his arm. Ahmed was arrested for assault on a federal agent.

25. Around 1215 hours, an individual, later identified as Patrick Cassidy (Cassidy), threw an object at agents. Cassidy resisted agents' attempt to arrest him for assault though agents were ultimately able to effectuate the arrest.

26. An individual, later identified as Michaela Hollabough (Hollabough), ignored commands from federal law enforcement agents and officers to step back and continued to attempt to gain access to a secure area. Hollabough verbally threatened to hit an agent and proceeded to use the flagpole that she was carrying to substantiate the present danger of the threat. Soon after, the flagpole carried by Hollabough made contact with an agent. At the time, and in light of the threat Hollabough had made, the agent believed it to be an intentional strike, and the volatility of the surrounding crowd escalated the altercation. Agents apprehended Hollabough for assaulting a federal agent, however Hollabough was subsequently released after initial processing.

27. Around 1500 hours, an individual, later identified as Mason Rollins (Rollins), refused to back away from the vehicle entrance gate despite repeated commands from federal law enforcement to do so. The crowd behind Rollins was growing agitated and gained some ground with Rollins positioned near the front. Federal law enforcement agents and officers approached Rollins in an effort to get him to move back, at which point he began actively resisting. A CBP agent deployed a targeted burst of OC spray from a handheld cannister on Rollins to gain compliance while shouting "OC deployed." Although Rollins continued to resist by shoving agents, federal law enforcement agents and officers were ultimately able to complete the arrest. While CBP personnel initially assisted in gaining control of Rollins, CBP did not effectuate his arrest.

28. An individual, later identified only as Rachel (last name unknown) approached the area where agents and officers were arresting Rollins and tried to push past them, swatting at agents. Rachel was taken to the ground by federal law enforcement agents and officers and refused to surrender her arms for handcuffing. A CBP agent deployed a targeted burst of OC spray on Rachel, after which she became compliant, and was placed in handcuffs. CBP agents assisted in this arrest but were not the primary arresting officers.

29. CBP did not deploy any CS grenades or 40mm chemical munitions at the Whipple Building on January 8.

30. The actions undertaken by CBP law enforcement personnel are informed by their experience and the comprehensive training they receive at various stages of their careers. During the CBP Officer Basic Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, and the U.S. Border Patrol Agent Basic Training program in Artesia, New Mexico, trainees receive comprehensive tactical, operational, and legal training throughout the course of the months-long training curriculum. During this time, they receive approximately 100 hours of legal instruction that is prepared and presented by attorneys within the CBP Office of Chief Counsel. This legal training provides law enforcement personnel with the framework necessary to recognize violations of the laws they enforce and to take appropriate law enforcement actions. Legal topics covered include criminal law, criminal procedure, courtroom testimony, customs law, asset forfeiture, immigration law, use of force, nationality law, and report writing. Following their time at the Basic Academies, CBP law enforcement personnel receive additional on-the-job training and periodic refreshers on a full range of topics, including eight hours of Use of Force training is conducted quarterly by all Border Patrol Agents.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief, and in accordance with the preliminary information I have reviewed.

Executed this 15th day of January, 2026, at Fort Snelling, Minnesota.

                                                                                      _____
                                                                                      Kyle C. Harvick