UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
_____

|  |  |
|---|---|
| SUSAN TINCHER, JOHN BIESTMAN, JANET LEE, LUCIA WEBB, ABDIKADIR NOOR, ALAN CRENSHAW, ABIGAIL SALM, RYAN DOXSEY, MARGARET WOOD, THE NEWSGUILD-COMMUNICATIONS WORKERS OF AMERICA, and STATUS COUP NEWS, o*n behalf of themselves and other similarly situated individuals,* | Case No. 25-cv-4669 (KMM/DTS) |
| Plaintiffs, |  |
| v. | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive Associate Director, Enforcement and Removal Operations (ERO), ICE; DAVID EASTERWOOD, Acting Field Office Director, ERO, ICE Saint Paul Field Office; RODNEY SCOTT, Commissioner, U.S. Customs and Border Protection (CBP); GREGORY BOVINO, Chief Border Patrol Agent, CBP; JOHN A. CONDON, Acting Executive Associate Director, Homeland Security Investigations (HSI); THOMAS HOMAN, DHS Executive Assistant Director of Enforcement and Removal; The Department of Homeland Security; Unidentified Federal Agencies; and Unidentified Federal Agents; *in their official capacities*, |  |
| Defendants. |  |

For their First Amended Complaint, Plaintiffs state and allege as follows:

## **INTRODUCTION**

1. Over the past two months, Department of Homeland Security (DHS) officials have engaged in cruel, arbitrary, and frequently unlawful actions as part of a coordinated deportation campaign in Minnesota. In response, Minnesotans from all walks of life have exercised their First Amendment rights to observe and document public DHS activities, and to express their disdain for DHS agents' misconduct. But DHS officials cannot tolerate being recorded, observed, or criticized. They have systematically retaliated against Minnesotans who engaged in these constitutionally protected activities. They have d seized observers and protesters, including United States citizens, and held them incommunicado for hours. They have pepper sprayed, violently subdued, and aimed assault rifles at observers and protesters. And they have followed observers to their homes in order to intimidate them. This retaliatory campaign against constitutionally protected expression is just one more instance of the federal campaign to besiege cities across the United States in an unprecedented attack on civil liberties.

2. The more than 100 sworn declarations submitted in support of this First Amended Complaint tell a story of widespread cruel, immoral, and unconstitutional conduct by DHS agents. These agents feel immune from consequences for their actions. And that is not surprising. They have been emboldened to violate the First and Fourth Amendment rights of Minnesotans by the highest leaders of the executive branch.

3.      This lawsuit aims to vindicate the rights of the Minnesotans who have been victimized by their own government simply for exercising their First Amendment rights, to end the impunity that fuels the worst of DHS's misconduct, and to ensure that Minnesotans can observe, document, assemble, and criticize DHS's activities, safely and unburdened by the fear of retaliation.

## PARTIES

4.      Plaintiff Susan Tincher is a resident of the Near North neighborhood, Minneapolis, Hennepin County, in the state of Minnesota. She has lived in Minneapolis for 30 years. She was arrested on December 9, 2025, after attempting to gather information about and express her objection to DHS's activities in her neighborhood.

5.      Plaintiff John Biestman lives in the Linden Hills neighborhood of Minneapolis with his wife Janet Lee. He is 69 years old and retired from a career as a banker. He was seized in his car at gunpoint after attempting to gather information about and express his objection to DHS's activities near the Church of the Assumption of the Blessed Mary in Richfield, Minnesota.

6.      Plaintiff Janet Lee is a 67-year-old resident of the Linden Hills neighborhood of Minneapolis and is married to Plaintiff John Biestman. She is a speech-language pathologist. She was seized at gunpoint on December 7, 2025, with Biestman, after attempting to gather information about and express her objection to DHS's activities.

7.      Plaintiff Lucia Webb is a 31-year-old resident of the Powderhorn neighborhood of Minneapolis. She is the Operations Director at a local non-profit. On

December 3, 2025, she was monitoring and protesting DHS agents' tactics from her car, when she was stopped by armed and masked agents and threatened with arrest.

8.      Plaintiff Alan Crenshaw is a 35-year-old resident of Uptown in Minneapolis, Minnesota, and a student in the Urban Studies department at the University of Minnesota. On December 9, 2025, he was observing, recording, and protesting DHS's presence in the Cedar Riverside neighborhood when ICE agents violently arrested a United States citizen. He was later pepper sprayed for exercising his right to gather information, assemble, and protest DHS's unconstitutional activities.

9.      Plaintiff Abdikadir Abdi Noor is a 43-year-old resident of Fridley, Minnesota. He is Somali American and has been a United States citizen for approximately 20 years. On December 15, 2025, he was tackled and arrested after protesting and speaking out about ICE agents' tactics near the Karmel Mall in Minneapolis.

10.     Plaintiff Abigail Salm is a resident of the Elmwood neighborhood of St. Louis Park, Minnesota who works for a Fortune 500 company. She was forcibly arrested for observing and attempting to record DHS agents.

11.     Plaintiff Ryan Doxsey is a 42-year-old software engineer who resides in Richfield, Minnesota. He was seized and threatened for observing and recording DHS agents.

12.     Plaintiff Margaret Wood is a resident of Minneapolis, MN. She was sprayed with a chemical irritant directly in the face in retaliation for recording DHS's enforcement activities.

13.     Plaintiff NewsGuild - Communications Workers of America ("TNG-CWA") is the largest labor union representing journalists and media professionals in North America, including workers in Minnesota and the District of Minnesota. TNG-CWA is dedicated to supporting quality journalism, defending democracy, and improving workplace conditions for workers in the news industry. In reporting on the protest of federal Immigration enforcement in Minnesota, several members of TNG-CWA were retaliated against for engaging in newsgathering, observing, documenting, and recording DDHS agents. As a result, local and national staffers have had to divert time and resources from their typical labor representation to focus their time on supporting members who have been harmed while reporting on the protests in Minnesota. TNG-CWA's headquarters is in Washington, DC.

14.     Plaintiff Status Coup is a progressive independent reporting network and media outlet that features investigative and on-the-ground reporting on politics, corruption, the working class, social justice, and the environment. Its journalists covering the DHS immigration enforcement activities in Minnesota have been exposed to chemical irritants or flashbangs, assaulted, and intimidated by federal immigration agents.

15.     Defendant Kristi Noem is Secretary of the United States Department of Homeland Security (DHS). DHS is a Cabinet-level Department of the United States government. Its stated missions include anti-terrorism, border security, immigration, and customs. On information and belief, Secretary Noem directed Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO), Homeland Security Investigations (HIS), and Customs and Border Protection (CBP) to engage in enforcement

actions in the Twin Cities metro area and authorized agents to use dangerous militarized methods that have targeted observers and protesters exercising their First Amendment rights.

16.     Defendant Todd Lyons is the Acting Director and the senior official currently performing the duties of the Director of the United States Immigration and Customs Enforcement (ICE) agency housed within DHS. Its stated purpose is to "[p]rotect America through criminal investigations and enforcing immigration laws to preserve national security and public safety." ICE has three operational components: (1) ERO, which arrests and removes non-citizens who present a danger to public safety or national security, as well as those who enter the country illegally; (2) HSI, which investigates federal crimes; and (3) the Office of the Principal Legal Advisor, which litigates immigration removal cases.

17.     Defendant Marcos Charles is Acting Executive Associate Director of Enforcement and Removal Operations within ICE. ICE employees are among the federal officers who have engaged in a pattern and practice of unconstitutional conduct against individuals gathering information about, and protesting the conduct of, DHS agents in Minnesota.

18.     Defendant David Easterwood is the Saint Paul Field Office Acting Director of Enforcement and Removal Operations within ICE. ICE employees are among the federal officers who have engaged in a pattern and practice of unconstitutional conduct against individuals gathering information about, and protesting the conduct of, DHS agents in Minnesota.

19.    Defendant Rodney Scott is the Commissioner of U.S. Customs and Border Protection ("CBP"). CBP is an agency within DHS. CBP employees are among the federal officers who have engaged in a pattern and practice of unconstitutional conduct against individuals gathering information about, and protesting the conduct of, DHS agents in Minnesota.

20.    Defendant Greg Bovino is the Chief Patrol Agent of the U.S. Border Patrol's El Centro Sector. U.S. Border Patrol is a law enforcement sub-component of CBP. After leading similarly violent and unlawful immigration enforcement efforts in Los Angeles and Chicago in 2025, Defendant Bovino was assigned to lead and direct CBP immigration enforcement activity in Minnesota and directed federal officers to use excessive force against protesters and information gatherers and used such force himself.

21.    Defendant John A. Condon is the Acting Executive Associate Director for Homeland Security Investigations (HSI). HSI is described as "the principal investigative component of the Department of Homeland Security (DHS)."[1] HSI employees are among the federal officers who have engaged in a pattern and practice of unconstitutional conduct against individuals gathering information about, and protesting the conduct of, DHS agents in Minnesota.

22.    Defendant Thomas Homan is the White House Executive Associate Director of Enforcement and Removal Operations. On January 26, 2026, Defendant Homan assumed operational command of immigration enforcement operations in the Minnesota.

---

[1] *ICE Leadership*, U.S. Immigration and Customs Enforcement (last visited Dec. 17, 2025), https://www.ice.gov/leadership.

23.     Defendant United States Department of Homeland Security is a department of the executive branch of the United States government, responsible for coordinating immigration enforcement actions. ICE is a component agency within the Department of Homeland Security, tasked with investigating immigration and customs violations and enforcing immigration laws in the interior of the U.S. Homeland Security Investigations (HSI) and Enforcement and Removal Operations (ERO) are the primary operational branches within DHS. CBP is a component agency within DHS tasked with responsibility for border security and enforcement at and between ports of entry.

24.     Unidentified Federal Agencies are unidentified agencies or departments of the U.S. government whose employees or agents, acting under color of federal law and within the scope of their employment and duties with the respective agencies by which they are employed or for which they are agents, are participating in the unlawful conduct described in this Complaint.

25.     Unidentified Federal Officer Defendants are unidentified agents and officers of federal agencies, including DHS, ICE, ERO, HSI, and CBP acting under color of federal law and within the scope of their employment and duties with the respective agencies by which they are employed or for which they are agents, are participating in the unlawful conduct described in this Complaint.

26.     Each of the individual defendants is sued in their official capacity.

## JURISDICTION

27.    This Court has subject matter jurisdiction over Plaintiffs' claims of violation of federal constitutional rights under 28 U.S.C. §§ 1331 and 1343 because Plaintiffs' causes of action arise under the United States Constitution and 28 U.S.C. §§ 2201 and 2202.

## FACTUAL ALLEGATIONS

### I.    DEFENDANTS HAVE VIOLATED THE CONSTITUTIONAL RIGHTS OF OBSERVERS, JOURNALISTS, AND PROTESTERS AROUND THE COUNTRY.

28.    In the summer of 2025, the Trump Administration began deploying federal forces, including ICE agents and other federal law enforcement officers, to cities across the United States as part of the Trump Administration's ramped-up efforts to deport individuals from the United States.

29.    In every city that has been besieged by an influx of federal immigration agents, everyday citizens have dedicated themselves to observing, documenting, and protesting DHS's immigration enforcement activities. As discussed below, in city after city, these observers and protesters have been met with gratuitous uses of force, threats, detention, and intimidation by Defendants and their agents, all in an attempt to chill, discourage, prevent, and retaliate against protesters and observers from exercising their First Amendment rights.

#### A.    Defendants Violated the First Amendment Rights of Observers, Journalists, and Protesters in Los Angeles.

30.    ICE and other federal agents deployed to Los Angeles in June 2025. After residents of Los Angeles rallied en masse to observe, document, and protest this stepped-up immigration enforcement activity, federal forces engaged in a pattern and practice of

retaliation, including by responding with tear gas, pepper balls, chemical spray, less-lethal weapons, and other tools and tactics of force, fear and intimidation:

31.    On June 14, 2025, multiple federal agents arrested a man from a church parking lot in Downey. The church pastor approached the agents in the parking lot and told them they did not have permission to be on church property. She asked to see their warrant and for their identifying information. They refused to provide her with any information. As she was holding up her phone, attempting to videorecord the agents, a federal agent pointed a gun at her.

32.    On June 17, 2025, federal agents carried out an immigration raid at a bus stop near a shopping center in Pasadena. Community members and advocates gathered at the shopping plaza when they heard the news about the raid. Shortly thereafter, a federal agent drove through the parking lot of the shopping plaza. When a community member went up to the car to photograph the license plate, a masked federal agent pulled a gun on the man taking the photograph.

33.    On June 19, 2025, Job Garcia was videorecording federal agents during an arrest in the parking lot of the Home Depot in Hollywood when federal agents tackled him to the ground. The agents arrested him and held him in detention for more than twenty-four hours.

34.    On June 19, 2025, a person driving past a market saw four masked federal agents detaining a group of men in Santa Ana. When the onlooker rolled down their window and began to record video, one of the masked agents raised a handgun and pointed it at him while another agent yelled, "You better get out of here."

35.    On June 20, 2025, federal agents fired tear gas at about half a dozen people videorecording and observing an arrest in Pico Rivera.

36.    On June 23, 2025, federal agents detained a young woman working as a street food vendor outside of the Home Depot in Marina Del Rey. Several community members gathered where the raid was taking place. They videorecorded the agents, asked the agents to provide their warrant and identification numbers, and provided information about legal rights to the young woman. After the agents put the woman in their unmarked car, they fired at least two rounds of tear gas near where the community members who had been videorecording were standing, and then sped off.

37.    On June 27, 2025, federal agents fired tear gas at a crowd of bystanders who were videorecording them arresting a fruit seller in downtown Los Angeles.

38.    On July 7, 2025, federal agents pointed guns at people who were standing on the sidewalk videorecording them as they conducted a show of force operation in MacArthur Park, in Los Angeles.

39.    On August 20, 2025, federal agents reportedly injured a man while detaining him at the Russell Fischer Car Wash in Huntington Beach. He was transported to the hospital for treatment. A crowd of concerned community members gathered in the hospital parking lot to await information. While they were there, federal agents drove through the parking lot. As a community member was videorecording the agents in their car, the agent sitting in the passenger seat pulled out a gun and pointed it at the person who was videorecording.

40.     On August 28, 2025, dozens of federal agents violently detained people in front of the CARACEN Day Labor Center next to the entrance to the Westlake Home Depot. Agents threw tear gas canisters and shot pepper balls at community members who were videorecording them during the raid.

41.     Journalists, observers, and protestors challenged the policy, pattern, and practice of retaliation against individuals for photographing, filming, livestreaming, or otherwise recording law enforcement and immigration enforcement activity in *Los Angeles Press Club v. Noem*, No. 2:25-cv-05563 (C.D. Cal. 2025) (Vera, J.).

42.     On September 10, 2025, the court granted their motion for a preliminary injunction. *See Los Angeles Press Club et al. v. Noem, et al*., Case No. 25-cv-05563, 2025 WL 2658327 (C.D. Cal. Sep. 10, 2025).

43.     The court wrote: "officers from the Federal Protective Services, Immigration and Customs Enforcement, and U.S. Customs and Border Protection unleashed crowd control weapons [on journalists, observers, and protesters] with surprising savagery." *Id.* at *2.

44.     The preliminary injunction order found that Defendants had been targeting "journalists and peaceful legal observers far from any protestors or bad actors." *Id.* at *30. It also found that the plaintiffs' expert witness "convincingly opines that deploying force against individuals who are ostensibly journalists or legal observers, 'standing to the side, not interfering with law enforcement, is not necessary to restrain violent protestors." *Id.*

45.     The court stated: "[T]he avalanche of evidence before the Court—along with federal officials' statements—suggests that federal agents acted pursuant to a common and

widespread practice of violating the First Amendment rights of journalists, legal observers, and protesters. . . . The record also suggests that Defendant Noem ratified Defendants' practice of meeting First Amendment protected activities with force." *Id.* at *33-34.

46.    The court concluded: "federal agents' indiscriminate use of force . . . will undoubtedly chill the media's efforts to cover these public events and protesters seeking to express peacefully their views on national policy. . . . Indeed, under the guise of protecting the public, federal agents have endangered large numbers of peaceful protesters, legal observers, and journalists—as well as the public that relies on them to hold their government accountable. The First Amendment demands better."

47.    On January 8, 2026, the court denied the government's motion to dismiss. *See Los Angeles Press Club et al. v. Noem, et al*., Case No. 25-cv-05563, 2026 WL 103972 (C.D. Cal. Jan. 8, 2026).

48.    The court found that the plaintiffs had established standing because they alleged that "[p]rotests against the Department of Homeland Security ("DHS") continue" and that "at those protests, Defendants target or fire indiscriminately upon peaceful protestors, legal observers, and journalists." The court also found that plaintiffs had alleged that "absent continuing injunctive relief, they will limit their First Amendment activities for fear of suffering further injuries." In addition, the court took notice of the fact "that DHS has used similar force as that alleged here against journalists and protestors in cities like Chicago," which "undercut Defendants' argument . . . that all of their alleged unlawful conduct is far in the past and unlikely to be repeated."

13

49.     The court also found that the plaintiffs had "plausibly and sufficiently alleged a decision to adopt a policy with regards to how DHS treats the recording of its agents."

**B.      Defendants Violated the First Amendment Rights of Journalists and Protesters in Portland.**

50.     In June 2025, as federal civil immigration enforcement was intensifying nationwide, the Portland, Oregon, ICE facility become the focal point of at least eight months of sustained, nonviolent protest. Despite peaceful conduct by journalists and protesters, Defendants portrayed the building as "under siege," authorizing "full force" to suppress dissent.

51.     Thereafter, the Trump Administration drove an escalating false narrative about Portland protesters as "antifa terrorists." For example, DHS posted a false video claiming that "antifa terrorists" had stormed the Portland ICE building using video footage from Chicago.[2]

52.     But protests in response to ICE activities in Portland are best characterized as creative nonviolence, incorporating art, humor, music, dancing, inflatable costumes, fleece animal onesies, semi-naked bike rides, neon-clad aerobics classes, prayer, pizza delivery, and even knitting.

53.     Nevertheless, on September 27, 2025, President Trump used his false narrative to justify a "full force" assault against protesters. Federal officers, including DHS,

---

[2] Drew Harwell and Joyce Sohyun Lee, *We Checked DHS's Videos of Chaos and Protests. Here's What They Leave Out*, Wash. Post (Oct. 29, 2025), https://www.washingtonpost.com/investigations/2025/10/29/trump-administration-misleading-videos/.

ICE, and CBP agents, unleashed violence against journalists and protesters—deploying dangerous and aggressive tactics including exploding tear gas canisters, pepper-ball rifles, flash-bang grenades, impact munitions and even "snatch-and-grab" tactics—all intended to subdue and suppress people and to retaliate against them for exercising their First Amendment rights.[3]

54.    The rampaging federal officers injured journalists and protesters in Portland and prevented them from continuing to engage in their constitutionally protected dissent and truthful reporting.

55.    On November 21, 2025, a group of journalists and protesters filed a putative class action seeking to stop DHS's pattern and practice of violating their First Amendment rights. As detailed in their complaint, each plaintiff was targeted and injured by federal force in response to peacefully protesting DHS's tactics or reporting on those protests.[4]

56.    On January 27, 2026, plaintiffs filed a motion for a temporary restraining order arising out of Defendants' ongoing unconstitutional conduct in Portland. The motion and its supporting declarations describe application of Defendants' retaliatory policy and practice against journalists and protesters, including the unlawful use of force and chemical irritants.

---

[3] *Dickinson (a.k.a. "the Portland Chicken") et al. v. Trump et al.*, ACLU Oregon (Nov. 21, 2025), https://www.aclu-or.org/cases/dickinson-et-al-v-trump-et-al/.

[4] Complaint, *Dickinson, et al. v. Trump, et al.* No. 3:25-cv-02170-SB (D. Or. Filed Nov. 21, 2025), *available at* https://www.aclu-or.org/cases/dickinson-et-al-v-trump-et-al/?document=Dickinson-%28aka-the-Portland-Chicken%29-et-al-v-Trump-et-al#.

57.    On February 3, 2026, the court granted the temporary restraining order. *See Dickinson v. Trump*, Case No. 25-cv-05563, 2026 WL 279917 (D. Or. Feb. 3, 2026). The court found that the plaintiffs were likely to prevail on their claim of First Amendment retaliation. In particular, the court found that "several protestors and press have described being directly targeted with force in the head and other areas of the body without warning and despite posing no threat nor creating a[n] . . . obstruction." The court also noted that the fact "that some protestors . . . may have engaged in criminal or non-criminal violations will not insulate Defendants' actions from First Amendment liability." Finally, the court indicated that "a policy or custom of retaliation" could be inferred from the fact that "senior officials have publicly condoned" "DHS violence against protestors."

### C.    Defendants Violated the First Amendment Rights of Observers, Journalists, and Protesters in Chicago.

58.    On September 6, 2025, President Trump posted on social media a photograph of the Chicago skyline on fire and with military helicopters, titled "Chipocalypse Now," The post said: "I love the smell of deportations in the morning…" and "Chicago [is] about to find out why it's called the Department of WAR." Later that week, DHS announced the launch of Operation Midway Blitz, the agency's heightened immigration enforcement operation in Chicago.

59.    Over the course of Operation Midway Blitz, community members and others sought to document federal agents conducting their duties in public. In response, federal agents have engaged in a pattern and practice of retaliating against individuals for observing and recording their activity:

16

60.    On September 18, 2025, in the Humboldt Park neighborhood, as Arely Barrera was driving around the area, she parked 50–100 feet away from ICE agents making an arrest to document their actions. As she photographed what they were doing, ICE agents in a vehicle without plates drove up to her, blocked her in her parking spot, and aggressively photographed her and threatened her with arrest.

61.    On October 1, 2025, in Cicero, Illinois, a CBP agent approached and aimed a gun at Leslie Cortez because she and other residents had been observing and recording immigration agents at a distance.

62.    On October 10, 2025, Jo-Elle Munchak got out of her car to wordlessly and peacefully record an arrest by a federal immigration agent in the Uptown neighborhood of Chicago. After she got back in her car to continue home, federal agents stopped her, banged on her windows, demanded she get out, and aimed a gun at her head, threatening her that if she did this again she would be detained.

63.    On October 25, 2025, residents learned that federal agents had parked in a staff lot at Allen Elementary in Aurora. Ruben Morales, a concerned citizen who documents federal immigration activity in the area, approached an unmarked vehicle and motioned for the driver to roll down the car's windows. An agent in the back seat rolled down the window and yelled at Morales to move away from the vehicle. Morales complied, putting his hands in the air, turning around, and walking away. An agent then approached Morales from behind, pepper sprayed the back of Morales' head, and tackled Morales to the ground. Morales felt multiple punches, after which he was handcuffed and detained by federal agents.

64.     Jessi Olazaba, another Aurora resident, witnessed the assault on Morales. She filmed, blew a whistle, and shouted for the agents to leave. As she tried to record the license plates of the vehicle into which agents placed Morales, an agent approached Olazaba, knocked off her glasses, pepper sprayed her, and pushed her backwards so that she hit her head on the curb.

65.     Benjamin Squires, a pastor at Bethel Lutheran Church and a volunteer greeter at Warren Township High School ("WTHS") in Gurnee, Illinois, was greeting students at the entrance of WTHS's O'Plaine Road campus, when he observed DHS agents detaining two men. As Squires attempted to record the scene, prompted by his faith to do so, an agent threatened to pepper spray Squires. As Squires walked back toward the school, the agent again threatened Squires and others gathered in the parking lot with pepper spray.

66.     ICE attacked clergy, in prayer, outside the Broadview facility in Chicago. In a scene captured on video, Reverend David Black extended his arms toward the officers with palms outstretched in a traditional Christian posture of prayer and blessing. Without warning or any orders or requests to disperse, agents fired pellets of pepper spray on the Reverand's arms, face, and torso. The DHS official who reviewed footage of this attack concluded that the uses of force against clergy, like the one in this instance, "were within policy and were effective in controlling the crowd."

67.     Defendants seized and threatened legal observers who were merely following DHS vehicles in a lawful and careful manner and not impeding their operations. At one point, a DHS agent threatened an observer with federal charges based on this protected First Amendment activity: "You know what you're doing is illegal and you could be

arrested for impeding law enforcement . . . following law enforcement, honking and harassing agents is impeding law enforcement."

68. ICE agents also shot and nearly killed a legal observer following ICE agents to document their misconduct. The victim in that instance, Marimar Martinez, was initially charged with attempted murder. The charges were dropped after body-worn camera footage showed the agent saying "do something bitch" immediately before the shooting and text messages sent in the aftermath revealed the agent boasting, "I fired 5 rounds and she had 7 holes. Put that in your book boys."[5]

69. ICE's own body-worn camera ("BWC") footage submitted in conjunction with litigation addressing its misconduct shows ICE agents violently attacking peaceful, law-abiding protesters with flashbang grenades, tear gas, and pepper balls. *See, e.g., Chicago Headline Club, et al. v. Noem, et al.*, No. 25 cv 12173, 2025 WL 3240782, at *6 (N.D. Ill. Nov. 20, 2025).

70. Multiple federal judges who heard testimony and received evidence related to Defendants' First Amendment violations in Chicago determined that Defendants lacked credibility when denying responsibility for those violations. *See, e.g., Illinois v. Trump*, No. 25-cv-12174, 2025 WL 2886645, at *5 (N.D. Ill. Oct. 10, 2025) (noting a "troubling trend of Defendants' declarants equating protests with riots and a lack of appreciation for the wide spectrum that exists between citizens who are observing, questioning, and

---

[5] Melissa Gira Grant, *Trump and ICE Want You to Think Renee Nicole Good Deserved It*, TNR (Jan. 13, 2026), https://newrepublic.com/article/205199/renee-good-shooting-misogyny.

criticizing their government, and those who are obstructing, assaulting, or doing violence"); *Chicago Headline Club* at *9-13 (documenting numerous false statements by ICE agents and officials).

## II. DEFENDANTS' HAVE CONSISTENTLY CONFIRMED THEIR UNCONSTITUTIONAL PATTERNS AND PRACTICES.

71.    The events in LA, Chicago, and Portland are not outliers. Since at least June 2025, the Trump administration has maintained a policy and practice of targeting and retaliating against individuals who gather information about, record, and protest federal agents conducting their law enforcement or immigration enforcement duties in public.

72.    On the afternoon of June 7, 2025, Defendant Noem addressed the protesters exercising their First Amendment rights in Los Angeles in a post on X, stating: "A message to the LA rioters: you will not stop us or slow us down."

73.    On the evening of June 7, 2025, President Trump authorized the deployment of 2,000 National Guard troops to Los Angeles. In a Truth Social post that same evening, he wrote: "These Radical Left protests, by instigators and often paid troublemakers, will NOT BE TOLERATED."

74.    On June 10, 2025, in response to the rising protests in Los Angeles regarding ICE and DHS abuses, Defendant Noem stated: "The more that they protest and commit acts of violence against law enforcement officers, the harder ICE is going to come after them."[6]

---

[6] Fox News, *Train Wreck Mayor": Kristi Noem Slams LA Official*, Fox News (June 10, 2025) https://www.youtube.com/watch?v=ymYIXrH9pjg.

75.     When talking about the military parade held on June 14, 2025, President Trump said that any protesters would be "met with very big force." He described protesters as "people who hate our country."[7]

76.     On June 14, 2025, the DHS Federal Protective Services Intelligence Operations Division issued an Assessment titled "Recent Anti-Law Enforcement Tactics Used in Unlawful Civil Arrest," which identified "livestreaming . . . interactions [with officers]" as a method of threatening law enforcement officers. It also stated: "Social media is also being utilized as a format for individuals to share videos to get more people involved in their ideological movements . . . ."

77.     On July 11, 2025, Defendant Lyons gave an interview in which he stated that by criticizing ICE, individuals on "the left" were "putting a bullseye on ICE."

78.     In a July 12, 2025, press conference, Defendant Noem stated that "violence is anything that threatens [ICE officers] and their safety. So it is doxing them, it's videotaping them, where they're at when they're out on operations . . . ."

79.     Defendant Noem further falsely described reporting on locations of immigration enforcement agents as illegal because it "is actively encouraging people to avoid law enforcement activities and operations."

80.     On September 9, 2025, DHS Assistant Secretary for Public Affairs Tricia McLaughlin said, in an official statement, that "videotaping ICE law enforcement and

---

[7] TIME, *Trump Warns, Military Parade Protests Will Face 'Very Big Force*,' YouTube (June 10, 2025), https://www.youtube.com/watch?v=kuKjAIBP8go&t=52s.

posting photos and videos of them online is doxing our agents," adding, "[w]e will prosecute those who illegally harass ICE agents to the fullest extent of the law."

81.    On September 25, 2025, President Trump issued National Security Presidential Memorandum-7 ("NSPM-7"), "Countering Domestic Terrorism and Organized Political Violence." NSPM-7 directs the National Joint Terrorism Task Force ("JTTF") and its local offices to coordinate and supervise a comprehensive national strategy "to investigate, prosecute, and disrupt entities and individuals engaged in acts of political violence and intimidation." But in defining the problem of "political violence" and so-called "domestic terrorism," the memo conflates examples of serious criminal conduct with First Amendment-protected beliefs and activities, claiming that "[c]ommon threads animating this violent conduct include anti-Americanism, anti-capitalism, and anti-Christianity; support for the overthrow of the United States Government; extremism on migration, race, and gender; and hostility towards those who hold traditional American views on family, religion, and morality."[8]

82.    Commenting on NSPM-7, Defendant Bondi said, "You know what law enforcement has told us under President Trump's leadership? He's taken the handcuffs off law enforcement. They can do their jobs now, thanks to you, President Trump."

83.    According to internal FBI documents, in response to NSPM-7, "the FBI implemented [an] Interagency Task Force consisting of several federal agencies jointly

---

[8] Donald J. Trump, *Countering Domestic Terrorism and Organized Political Violence*, (Sept. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/09/countering-domestic-terrorism-and-organized-political-violence.

seated at FBI Headquarters to investigate networks linked to anarchist violent extremism and evaluate the national landscape of reported threats." The same documents indicate that as of late 2025, the FBI had opened a number of criminal and domestic terrorism investigations "in response to observed threats against immigration enforcement activity," including in the field offices encompassing Minnesota and Maine.[9]

84.    Also on September 25, 2025, Defendant Lyons gave an interview to Glenn Beck in which he stated: "we had protests this weekend in Chicago . . . we're focusing on people supporting these groups . . . these are professional agitators." During the interview, Defendant Lyons indicated that it would use HSI investigators to investigate protesters and legal observers.[10]

85.    On October 3, 2025, during a pep talk for DHS agents in Chicago, Defendant Noem told DHS agents: "So today, when we leave here, we're going to go hard. We're going to hammer these guys that are advocating for violence against the American people. What they are doing is advocating to harm not just you and your colleagues but your families. And they're doxing your identities and victimizing people every day by the way that they're talking, speaking, who they're affiliated with, who they're funded with, and

---

[9] *United States: Threat Activity Targeting Government Personnel or Facilities Related to Immigration Enforcement Efforts*, https://s3.documentcloud.org/documents/26385855/14-nov-2025-fbi-report-re-anti-ice-organizing-nspm-7.pdf

[10] *Glenn's Tough Message to the ICE Shooter's Mom, Guests: Todd Lyons & Dr. Jay Bhattacharya* (Sept. 25, 2025**),** https://pod.wave.co/podcast/the-glenn-beck-program/glenns-tough-message-to-the-ice-shooters-mom-guests-todd-lyons-dr-jay-bhattacharya-92525

what they're talking about as far as consequences for what we're doing by protecting this country. So we're going to go out there and we're going to make sure that there's consequences for the way that they're behaving and that we're going to prosecute them. We're going to bring them to justice. We're not taking this anymore. All right, the president is sick of it. I'm sick of it."

86.    On October 4, 2025, Defendant Lyons gave an interview to Fox News in which he falsely stated that anti-ICE protesters were "ready to do battle." In a separate interview on November 14, 2025, discussing the protests in Chicago, Defendant Lyons stated, "We're not going to be stopped by these anarchists, these violent protesters that are protesting our law enforcement mission."

87.    In October 2025, DHS spokeswoman Tricia McLaughlin stated that videotaping ICE agents constituted "illegal harass[ment]" and would be prosecuted.[11]

88.    In November 2025, while being deposed in the Chicago litigation, Defendant Bovino stated he had never seen protesters who were not "violent rioters" and that he supported his agents "going hard" against protesters.[12] Bovino also testified that he has

---

[11] Matthew Cunningham-Cook, DHS Says Making and Posting Videos of ICE Agents is "Violence", Ctr. for Media and Democracy (Sept. 9, 2025), https://www.exposedbycmd.org/2025/09/09/dhs-says-making-and-posting-videos-of-ice-agents-is-violence/.

[12] Jon Seidel, *Plaintiffs' Lawyers: Bovino Views Protesters as 'Violent Rioters,' Tells Officers to 'Go Hard' Against Them*, Chic. Sun Times (Nov 4, 2025), https://chicago.suntimes.com/public-safety/2025/11/04/plaintiffs-lawyers-bovino-views-protesters-as-violent-rioters-tells-officers-to-go-hard-against-them.

instructed his officers to arrest protesters who make hyperbolic comments in the heat of political demonstrations, even though such statements are protected speech.

89.    On December 22, 2025, in response to a request from *Reason* asking if DHS considered following or recording a federal law enforcement officer to be obstruction of justice, the DHS Office of Public Affairs responded: "That sure sounds like obstruction of justice. Our brave ICE law enforcement face a more than 1150% increase in assaults against them. If you obstruct or assault our law enforcement, we will hunt you down and you will be prosecuted to the fullest extent of the law."

90.    On January 9, 2026, during a Fox News interview, Defendant Lyons said "No group should be going around following law enforcement, trying to give their location away, let them know what they're doing."

91.    On January 10, 2026, Reuters reported that two ICE officials said that ICE has been tracking the names of protesters in an internal database for several months. According to the report, "The government database contains names, photos, actions that provoked suspicion, locations and license plates, the officials said, adding that the effort was intended to spot patterns that could lead to charges." DHS's response included the following statement: "We do of course monitor and investigate and refer all threats, assaults and obstruction of our officers to the appropriate law enforcement."

92.    In January 2026, McLaughlin provided a statement to *Wired* that said: "videoing our officers in an effort to dox them and reveal their identities that is a federal crime and a felony."

93.    In sum, Defendants have a well-documented policy, pattern, and practice of retaliation against people who are exercising their First Amendment rights to gather information about, record, and protest DHS agents. It is thus no surprise that Defendants' stepped-up enforcement presence in Minnesota has been accompanied by widespread First Amendment violations.

## III.    DEFENDANTS' CRUEL, ARBITRARY, AND OFTEN UNLAWFUL IMMIGRATION ENFORCEMENT IN MINNESOTA HAS SPURRED OBSERVERS AND PROTESTERS TO ACT.

94.    Defendants' stepped-up enforcement operations in Minnesota—initially "Operation Metro Surge"—began on December 4, 2025.

95.    Operation Metro Surge started in the Twin Cities Metro area and later expanded statewide.

96.    DHS initially detailed ICE agents, including those from ERO and HSI. In January, Defendants deployed thousands more federal immigration agents into Minnesota, including CBP agents led by Greg Bovino. At one point, more than 3,000 DHS agents were conducting enforcement activity on the streets of the Twin Cities Metro and beyond, reportedly the largest immigration enforcement operation ever. Today, there are still more than 2,000 agents in Minnesota.

97.    Consistent with their behavior in Los Angeles, Portland, Chicago, and elsewhere, DHS agents conducting immigration enforcement activities in Minnesota have engaged in a wide swath of unlawful conduct against Minnesotans, including everything from racial profiling and unlawful, warrantless arrests of United States citizens to rampant

traffic violations, not to mention the widespread First and Fourth Amendment violations detailed in this Complaint.

98.    DHS agents have been racially profiling Somali Americans, Latinos, Asians, and Native Americans, resulting in unconstitutional and unlawful detention of numerous United States citizens.

99.    On December 10, 2025, federal immigration agents tackled and arrested a young Somali American man named Mubashir in Minneapolis and detained him for several hours. Mubashir repeatedly shouted to the agents that he had his ID, but agents refused his offer to show them his passport card on his phone, instead driving him to the Whipple Building where he was held for a period until he was finally released. During the drive, the agents told the man that he was their first "takedown," indicating that poorly trained, inexperienced, and unsupervised DHS agents had been turned loose on the streets of Minneapolis to terrorize Minnesotans.

100.    Notably, in contradiction to DHS' public statements that its agents in Minneapolis are arresting the "worst of the worst criminal aliens," child molesters and violent criminals, DHS has been raiding job sites, businesses, and even targeting work trucks with ladders and other construction gear, in order to arrest and deport individuals from their place of employment while they are engaged in work activities that directly benefit their community.

101.    In another incident, on December 15, 2025, DHS agents in Minneapolis detained a woman, dragging her, handcuffed, across a frozen road and kneeling on her back despite being told by numerous bystanders that she was pregnant.[13]

102.    DHS agents called law enforcement during this arrest, claiming that bystanders were attacking them as they assaulted and detained a woman who was reportedly pregnant. In a call to the Hennepin County Sheriff's Office, an ICE supervisor pleaded for help: "we only have a few officers, but we have 60 to 70 agitators that are fighting us."[14] This hyperbolic statement was patently false. Both the Minneapolis Police Department and the Hennepin County Sheriff's Office responded to DHS's calls, but left the scene within minutes after confirming that no bystanders were attacking agents and no one was being assaulted.[15]

103.    Agents have also conducted, or attempted to conduct, warrantless arrests. For example, on December 5, 2025, DHS agents entered the Hola Arepa restaurant without a warrant and attempted to obtain access to the restaurant's kitchen, apparently to effectuate an arrest. Staff demanded that if the agents had no warrant that they leave the property

---

[13] WCCO Staff, *ICE Agents Clash with Dozens of Residents in Streets of South Minneapolis*, CBS News (Dec. 15, 2025), https://www.cbsnews.com/minnesota/news/ice-agents-south-minneapolis-clash-protests/.

[14] Hennepin County Sheriff's Office, *Audio from Call to Non-Emergency Line 12-15-2025*, Facebook, https://www.facebook.com/reel/1866499360622494.

[15] Jon Collins, *ICE Agents Call for Backup During Minneapolis Traffic Stop, Bystanders Hurl Insults and Snowballs*, MPR News (Dec. 16, 2025), https://www.mprnews.org/story/2025/12/15/ice-agents-call-for-backup-during-minneapolis-traffic-stop.

immediately. Because the agents lacked a warrant to do what they were trying to do, they left.[16]

104.    On December 9, 2025, Augsburg University President Paul Pribbenow reported that DHS agents arrested an Augsburg University student on the Augsburg campus without a warrant to enter the property. President Pribbenow stated: "It was done on private property, without a warrant. From our perspective, it's illegal."[17] While agents were arresting the individual, they aimed weapons at and threatened students and staff who had gathered to observe and document DHS's warrantless arrest.

105.    DHS agents have also put the health and safety of Minnesota children at risk with their overzealous enforcement activities. On December 6, 2025, DHS agents pulled a Minneapolis man from his car minutes after he picked up his three young children from daycare. The children cried as the DHS agents left them alone in their car without their father. Fortunately, a family member was several blocks away, learned about the incident and was able to come and assist the children.[18]

---

[16] Brianna Kelly, *Minneapolis Restaurant Hola Arepa Resists Attempted ICE Raid*, Bring Me The News (Dec. 5, 2025), https://bringmethenews.com/minnesota-news/minneapolis-restaurant-hola-arepa-resists-attempted-ice-raid.

[17] Brianna Kelly, *Augsburg University President Decries 'Illegal' Arrest of Student by Ice Agents*, Bring Me The News (Dec. 9, 2025), https://bringmethenews.com/minnesota-news/augsburg-university-president-decries-illegal-arrest-of-student-by-ice-agents.

[18] Progressive Power, *ICE Officer Feels Threatened by Children Crying Minneapolis 12-06-25*, Facebook (Dec. 8, 2025), https://www.facebook.com/usaprogressive/videos/ice-agent-in-an-american-flag-mask-orders-crying-children-to-/2993495500821843/.

106.    DHS agents tackled and handcuffed a 13-year-old boy while they arrested and drove off with his father. The father and son had left their house to move the family car due to a snow emergency. The boy suffered from the medical condition of abnormal heartbeat and had to receive care at St. Francis Regional Medical Center after the incident. Medical records document the boy's "chest wall pain" and abrasions of both wrists.[19]

107.    DHS agents have made movies documenting their performative cruelty in our community, disrupting lives and traumatizing children and adults alike. For example, on the morning of December 11, 2025, armed DHS agents filming one of their propaganda videos blocked a school bus full of children who had to sit on their bus, wait, and watch as DHS agents filmed themselves in a purported "operation."[20]

108.    Finally, DHS vehicles have been driving throughout the Twin Cities in a dangerous manner, with reckless disregard for traffic laws and for the safety of Minnesotans on the streets.

109.    For example, on the morning of December 7, 2025, an ICE vehicle (a Ford Explorer) cruising around the Church of the Assumption of the Blessed Virgin Mary, apparently waiting to arrest churchgoers as they left morning services at the church, drove erratically and ran a red light.

---

[19] Conor Wight, *Video Captures 13-Year-Old Boy Being Detained by ICE in Eden Prairie*, CBS News (Dec. 11, 2025), https://www.cbsnews.com/minnesota/news/eden-prairie-ice-teen-detained-with-dad/.

[20] Peter Wagenius, *My Daughter's School Bus Was Delayed This Morning Because Armed ICE Agents*, Bluesky (Dec. 11, 2025 8:06 AM), https://bsky.app/profile/peterwagenius.bsky.social/post/3m7pqn3cbls2p.

110.    Unsurprisingly, DHS agents' reckless driving throughout the metro area has resulted in multiple crashes and injuries to Minnesotans.[21]

111.    Federal agents' unlawful, unconstitutional, and distasteful conduct has inspired widespread protests throughout the Twin Cities Metro area, as well as a surge in people gathering information about and documenting DHS activity in their cities and neighborhoods. Defendants have met this upswell of First Amendment protected conduct and expression with a systematic campaign of unconstitutional retaliation.

## IV.    DEFENDANTS HAVE RESPONDED TO SCRUTINY AND CRITICISM WITH RETALIATORY VIOLENCE, SEIZURES, AND ARRESTS.

112.    As detailed below, consistent with their behavior in Los Angeles, Portland, Chicago, and elsewhere, DHS agents have engaged in pervasive unconstitutional retaliation against observers, journalists, and protesters in Minnesota. This unconstitutional retaliation includes, among other things:

- unlawful seizures and arrests;

- improper and dangerous use of chemical irritants;

- the pointing of firearms and other weapons;

- threats and intimidation tactics, including following or leading individuals to their homes; and

- physical assault.

---

[21] *See, e.g.*, Lydia Morrell, *Woman Injured in Car Crash with Federal Agents in Minneapolis*, KARE11 (Jan. 30, 2026), https://www.kare11.com/article/news/local/woman-injured-in-car-crash-with-federal-agents-in-minneapolis/89-b531a7d3-c5d4-499f-8d75-0e0c10b6cca0.

113.    The obvious purpose of this campaign of retaliation is to suppress the exercise of First Amendment rights to observe, record, and criticize DHS officials engaged in public enforcement activities.

### A.    DHS has infringed on the constitutional rights of pedestrian observers and protesters.

114.    Since December 2025, people in Minnesota have taken to public sidewalks and streets to gather information about DHS' rampant unconstitutional conduct, protect their neighbors, and express their horror at the tactics being used as part of DHS' immigration operations in Minnesota. In response, they have been met with unconstitutional and retaliatory force, threats, seizures, and arrests, as described below:

115.    On December 9, 2025, Minneapolis resident Joseph Mitchell went to observe DHS activity, which was occurring a few blocks from his home in the Cedar Riverside neighborhood. When Mitchell arrived at the scene, he saw numerous DHS vehicles with flashing lights, and a group of protesters gathered, including some of his neighbors, who were blowing whistles and shouting at the DHS agents. Mitchell saw an ICE agent repeatedly brandish a tear gas canister out her car window at protesters and observers who were not impeding or interfering with the DHS activity. The agents began to drive away and had a clear roadway to do so but then stopped, got out of the car, and gratuitously pepper sprayed protesters and observers who were standing on the sidewalk exercising their First Amendment rights.[22]

---

[22] *See generally* Declaration of Joe Mitchell (Dkt. 1-14).

116.   On December 10, 2025, Minneapolis Park Board member-elect Dan Engelhart was observing DHS activity at the Cedar-Riverside neighborhood. Engelhart saw agents harassing his friend, a Somali community leader and U.S. citizen named Bihi. Shortly thereafter, Bihi, Engelhart and others were following agents around the Cedar-Riverside apartment building complex, documenting, observing, and protesting DHS activity. When the agents later drove away, and as Bihi was standing at the edge of the road and protesting, an agent pepper sprayed Bihi in the face when driving by.[23]

117.   On December 10, 2025, Claire Smith observed masked DHS agents outside a fast-food restaurant in south Minneapolis. Multiple people were filming, observing, and protesting the presence of the agents. DHS agents left their vehicles blocking traffic, shoved observers and protesters out of their way, and filmed observers and protesters.[24]

118.   On December 15, 2025, DHS agents attempting to detain a woman sprayed a crowd of observers and protesters with pepper spray, even though the observers and protesters were behaving lawfully and not impeding the DHS agents. One legislator—Minnesota State Representative Aisha Gomez—was pepper sprayed, along with a CBS news crew.[25] When DHS agents summoned MPD and the Hennepin County Sheriff to the scene, claiming that protesters were attacking them, MPD and HCSO quickly ascertained

---

[23] *See* Declaration of Dan Engelhart (Dkt. 1-7); Declaration of Riley Kellermeyer (Dkt. 1-11).
[24] *See generally* Declaration of Claire Smith (Dkt. 34)
[25] WCCO Staff, *ICE Agents Clash with Dozens of Residents in Streets of South Minneapolis*, CBS News (Dec. 15, 2025), https://www.cbsnews.com/minnesota/news/ice-agents-south-minneapolis-clash-protests/.

that no one was harming the DHS agents and promptly left the scene. Another agent tased an observer peacefully trying to document this casual cruelty.[26]

119.    On January 7, 2026, ICE agent Jonathan Ross shot and killed Renee Good. Just hours later, ICE and CBP agents chased an individual from a Metro Transit bus stop onto the grounds of Roosevelt High School in Minneapolis, Minnesota. Students, school staff, and people who lived in the neighborhood gathered to observe, gather information, record, and protest DHS' conduct. ICE and CBP agents used unnecessary, excessive, and retaliatory force against those present to gather information and protest the operation at Roosevelt High School. DHS agents unnecessarily brandished their weapons and pointed them toward a crowd.

120.    DHS agents also indiscriminately pushed, shoved, and threw observers and protesters to the ground as a show of force and intimidation.[27] Hennepin County resident Ann Kreitman saw agents detaining another peaceable, law-abiding observer and information gatherer, shoving her into a snowbank, as seen in this photo:[28]

---

[26] *Id.*
[27] Declaration of Christopher Lee Beal (Dkt. 58); *see also* Declarations of Brooke Johnson, Kirsten Koerth (Dkt. 65); Hallie Patterson (Dkt. 68).
[28] Declaration of Ann Kreitman (Dkt. 66).



121.    South Saint Paul resident Cory Ryan was also at the Roosevelt High School incident and documented observers, recorders, and protesters being aggressively taken into custody for no reason, such as the individual in this photograph:[29]



---

[29] Declaration of Cory Ryan.

122.    Defendant Bovino was present at the Roosevelt High School incident and observed his agents' lawless behavior, but he did not intervene or take any steps to curb the agents' violent and unconstitutional conduct. Instead, he ratified and encouraged it.

123.    On the morning of January 8, 2026, protesters gathered at the Whipple building to express their horror at DHS and the killing of Renee Good. Even though the protesters were peaceful, and behaving lawfully, DHS agents threatened and inflicted violence upon them. Around 8:00 a.m., agents fired tear gas into the crowd of protesters without giving any warning. At one point, when the crowd and a line of CBP officers were facing each other, one officer drew his firearm and pointed it directly into the face of the protester standing in front of him. The officer held the pistol in the protester's face for several seconds before re-holstering it. Agents also violently shoved peaceful protesters, including a 63-year-old woman who ambulated with a cane and was trying to walk away in accord with DHS directions. Bovino observed and ratified this conduct.[30]

124.    On January 9, 2026, Richfield resident Troy Carillo was observing and documenting DHS activity in Bloomington, as he recorded agents unlawfully hassling and detaining a woman with lawful status. An agent who had threatened him with pepper spray for recording DHS two days earlier jumped out of a car and said, "Back the fuck up, you're

---

[30] Declaration of Bridgette Reisinger; Declaration of Theresa Del Rosario (Dkt. 61); Declaration of Thomas Ett (Dkt. 62); Declaration of Todd Dahlstrom; Declaration of Daniel Ehrlich; Declaration of Sandra Taylor.

impeding," to which Carillo responded, "No, you back the fuck up, I'm walking away." The agent then pepper sprayed Carillo directly in the eyes.[31]

125.    On January 11, 2026, forty-one-year-old Robbinsdale resident Lauren Larson was observing and gathering information about DHS activity in North Minneapolis with roughly 50 other peaceful observers and protesters. The group of peaceful observers and protesters saw DHS agents bash down an individual's door with a battering ram and without presenting any warrant. Throughout the incident, ICE and CBP agents pointed less-lethal weapons, pepper spray, and firearms at the crowd of observers and protesters, and deployed chemical irritant at close range. Witnesses observed a DHS agent pepper spraying an individual who was documenting and recording their conduct directly in the face. A law school graduate, Larson was shocked to see such blatant and gratuitous violations of the constitutional rights of the home resident as well as the peaceful observers and protesters at the scene.[32]

126.    On January 13, 2026, 34-year-old Minneapolis attorney Taylor Volkman was observing and protesting DHS activity at the intersection of 37th Avenue South and Lake Street with others. After detaining someone, four DHS agents exited a vehicle and ran at the group of observers. Two agents grabbed an observer wearing a gray coat and aggressively threw him to the ground. Another agent shoved a female observer hard enough that she fell to the ground. The agents pinned the observer in the gray coat to the ground,

---

[31] Declaration of Troy Carillo (Dkt. 60).

[32] Declaration of Lauren Larson.

punched him in the face, and handcuffed him. They placed him in the ICE vehicle and drove off. The gray coat individual had not been interfering with or impeding the ICE agent, only criticizing and insulting them.[33]

127.    On January 15, 2026, John Abernathy, an independent photographer, went to the Whipple Building to document a veteran-led protest of federal immigration enforcement. Abernathy carried multiple pieces of camera equipment. At one point, as Abernathy had his back to agents and was recording the protest activity, agents tackled him to the ground. They tried to confiscate his phone and camera. While Abernathy was already on the ground and subdued, an agent pepper sprayed him directly in the face. Agents then dragged him into the Whipple Building and gave him a citation for spraying people with bear spray, though they could provide him with no evidence that he had done so.[34]

128.    On January 17, 2026, McKenna Walker went to the Whipple Building to protest. While she was there, Walker saw heavily armed federal agents continuously push peaceful protesters back several times. She saw no one throw things at the agents or otherwise use violence. Suddenly and without warning, an agent pepper sprayed a protester in the face at point blank range. Then the other agents began shoving the crowd and yelling "get back." Walker and the other protesters had no time to react to the agents' directions, and people fell on top of each other. Walker found herself underneath several other people,

---

[33] Declaration of Taylor Volkman.

[34] Declaration of John Abernathy. Others present at Whipple that day were sprayed with chemical irritants without warning and despite engaging in no violence. *See* Declaration of Timothy Brandon; Declaration of Alexander Engel; Declaration of Coral Thacker.

when someone grabbed her foot. After she shook the hand off, agents pulled her out of the dog pile and dragged her several feet, pulling off her boot in the process. The agents handcuffed her and brought her inside the Whipple building. The agents took her property and then led her to a table for "agitators." They demanded a DNA sample. Walker was held for several hours before being released without charges.[35]

129.    On January 21, 2026, CBP agents led a group of protesters and observers to Mueller Park, in Minneapolis' uptown neighborhood.[36] With no warning or direction from the agents, and despite the fact that the observers and protesters were behaving lawfully and peacefully, the agents began to launch tear gas and other chemical munitions into the crowd.[37] Defendant Bovino slapped the phone out of the hand of one observer and protester, and walked up to a second peaceful observer and shoved her in retaliation for recording DHS activity:[38]

---

[35] Declaration of McKenna Walker.

[36] Declaration of Ian Lockhart.

[37] *See* Declaration of Sawyer Miedema (describing use of tear gas on peaceful protesters in Mueller Park); Declaration of Eirik Wurst.

[38] Declaration of Ian Lockhart.



130.     On January 24, 2026, Minneapolis school social worker M.G. and her partner C.R. were following ICE agents in her neighborhood to document their activity. They followed a maroon Dodge Durango down Nicollet Avenue until it made an illegal U-turn and parked in front of Glam Doll Donuts. Eventually, they left to join other observers on foot near Glam Doll Donuts. Even though they were simply observing and recording from the sidewalk, and not interfering or impeding the agents, one agent threatened M.G. and C.R. with a can of chemical irritant, shaking the can as if he was going to discharge it at them. M.G. continued to record. She and C.R. saw that, on the other side of Nicollet Avenue, other observers had arrived on the scene and were using their phones to record the agents from a safe distance. One of these observers was Alex Pretti.[39]

131.     M.G. and C.R. watched as DHS agents threatened the observers, including Pretti, with chemical irritants, similar to the way they had been threatened—that is,

---

[39] Declaration of C.R; Declaration of Tiffany Carlson (Dkt. 106).

aggressively approaching peaceful observers and protesters who had been observing and recording from a safe distance. One of the agents approached Pretti and put his hand on Pretti's chest, pushing him back from the street to the sidewalk as Pretti recorded the agent with his phone in his hand.[40] A DHS agent shoved a female observer to the ground. Pretti tried to help the observer up. As he did, more agents approached and sprayed chemical irritants directly into the faces of Pretti and the woman on the ground. The agents pulled Pretti away from the woman and tackled him. At least four agents punched, kicked, and hit Pretti in the head several times with a canister of tear gas. Pretti did not strike anyone, nor did he brandish a weapon.

132.    M.G. moved into the middle of the street to observe, distressed by the agents' aggressive behavior. Three gunshots rang out, followed by several more in quick succession. Pretti lay dead in the street. M.G. told C.R. to call 911. As he did, agents threatened them with chemical irritants. Unsurprisingly, the DHS agents' killing of Alex Pretti has deeply traumatized M.G. and C.R. and left them afraid that their own government will retaliate against them simply for speaking out about what they witnessed.[41]

133.    A 38-year-old Minneapolis resident and real estate agent Dylan Linet was also present at the scene of Pretti's killing shortly after it occurred. Roughly 50 observers and protesters were at the scene when he arrived. Linet saw a line of protesters faced off across from a line of DHS agents. The protesters were vocal but peaceful; Linet did not see any protesters pushing or throwing anything at the agents. Suddenly, without warning or

---

[40] Declaration of C.R.
[41] *Id.*

provocation, the DHS agents attacked the group of peaceful protesters. Agents fired multiple flash-bang grenades at the protesters, resulting in deafening explosions throughout the crowd. Agents opened fire on the fleeing protesters with less-lethal weapons, shooting people in the back and causing them to fall over as they were running.[42]

134.    During this unprovoked attack by DHS agents, an agent fired a flash bang grenade directly into the face of peaceful 73-year-old protester Leon Virden, breaking Virden's jaw in multiple places and requiring extensive reconstructive surgery. Below is a picture of Virden shortly after agents hit him with a flash bang:[43]



135.    On January 24, 2026, Steven Paul Saari, a 40-year-old Minneapolis resident and marine combat veteran, went to the site of Pretti's killing to visit and observe the site. He saw DHS agents and a few people protesting and observing the agents. Shortly after

---

[42] Second Declaration of Dylan Linet (Jan. 25, 2026).
[43]    *Support    Leon's    Recovery    and    Community    Aid*, https://www.gofundme.com/f/support-leons-recovery-and-community-aid.

arriving, Saari was standing on the sidewalk watching the agents when he noticed some heavily armed CBP agents scrutinizing him. Even though he was doing nothing more than observing, agents roughly arrested him at the barrel of a gun, handcuffed him, and drove him to the Whipple Building. Agents collected a DNA sample from Saari without his consent, cloned his cell phone, photographed him, and kept him for 7–8 hours before releasing him without charges.[44]

136.    Minneapolis resident Haley Lipo Zovic walked from her home to the site of Pretti's killing on the morning of January 24. She was with her husband. They went to observe the DHS response to the killing and related protests. She saw protesters chanting and yelling at DHS agents, but no violence or protesters throwing items. She was filming the DHS agents with her phone, roughly 15 feet from the line of federal agents, when an agent threw a metal gas canister at her head. Lipo Zovic's balaclava was singed and stained with blood. When her husband removed it, her hair was matted and bloody, but the wound was actively bleeding. It continued to bleed for hours and was ultimately stapled shut at urgent care.[45]

137.    The incidents above are not isolated. They reflect a persistent pattern and practice of infringing on the First and Fourth Amendment rights of peaceful individuals attempting to gather information about, and protest, DHS' immigration efforts in Minnesota.

138.    One particularly dangerous pattern and practice is the deployment of pepper spray directly into the face of individuals in retaliation for observing, recording, and

---

[44] Declaration of Steven Paul Saari II.
[45] Declaration of Haley Lipo Zovic.

protesting DHS' tactics in Minnesota.[46] For instance, a DHS agent even approached one observer from behind, reached around her left side, put the nozzle of his pepper spray under her glasses, and sprayed her directly in the eye at point-blank range.[47] Another individual was pepper sprayed at such close range and with such ferocity that he had to be taken to the ER for treatment, and the physical pain and burning from the spray lasted more than 36 hours.[48]

139.    The images below are illustrative of this troubling and dangerous practice:

a.    On January 7, 2026, at Roosevelt High, an agent emptied a canister of tear gas directly into the face of a handcuffed protester at extremely close range, into her eyes and nose;[49]

---

[46] *See, e.g.*, Declaration of Dylan Linet (Jan. 16, 2026); Declaration of Shamso Iman; Declaration of Greta Graves; Declaration of Percival Boyle; Second Declaration of Dylan Linet (Jan. 25, 2026); Declaration of Clayton Kelly; Declaration of Christopher Lee Beal, ¶¶ 6-7 (Dkt. 58); *see also* Declaration of Brooke Johnson, Declaration of Kirsten Koerth (Dkt. 65); Declaration of Hallie Patterson (Dkt. 68); Declaration of Mary Hackman, ¶¶ 4–9 (Dkt. 37); Declaration of Asa Hatten; Declaration of Krista Murphy-O'Connor; Declaration of Fionn Warren.
[47] Declaration of Melanie Mallon.
[48] Declaration of Ethan O'Brien.
[49] Declaration of Cory Ryan.





b. On January 12, 2026, DHS officers deployed pepper spray against lawful observers and protesters in Minneapolis, as seen in this video screenshot;[50]

---

[50] Amanda Moore, *Big Clase This Afternoon Between DHS Agents and Protesters in a Residential Street in Minneapolis, Following a DHS Agent Hitting Another Vehicle*, (Jan. 12, 2026), https://bsky.app/profile/noturtlesoup17.bsky.social/post/3mcar3wmv222t.



c. On January 13, 2026, a bystander photographed a DHS agent gratuitously pepper spraying a peaceful, law-abiding observer at 34th and Oakland in Minneapolis;[51]



---

[51]    *E.g.,*  Neph   Sudduth,   Facebook   (Jan.   14,   2026), https://www.facebook.com/photo/?fbid=10103372218100092&set=gm.26407984585470 918&idorvanity=471797229516342.

d. On January 21, 2026, a CBP officer pepper sprayed a peaceful protester and observer in South Minneapolis directly in the face at very close range as seen in the below photograph.[52]



140. Close-range use of chemical irritants is a violation of manufacturers' warnings and standard law enforcement training. Exposure to high concentrations of riot-control chemical agents can cause permanent injury, disability, and even death. Additionally, the use of these riot-control agents in a close-range manner has the effect of immobilizing the target.

141. An HSI agent deployed to Minnesota, Richard Berger, recently acknowledged under oath, in a sworn affidavit filed in another case, that discharging OC

---

[52] *See* Declaration of Sawyer Miedema (describing individual pepper sprayed at point blank range by CBP).

spray (a type of tear gas) directly into the face of an individual at close proximity can cause serious and permanent bodily harm.[53]

142.    DHS agents have also engaged in a persistent pattern and practice of quelling First Amendment protected activities through the use of force, unlawful seizures, and intimidation tactics.[54] One protester, heckling and filming agents, was tackled to the ground and arrested with such force that he had three broken ribs.[55]

**B.    DHS has infringed on the constitutional rights of mobile observers.**

143.    The unique nature of DHS' operations in Minnesota, which involve numerous agents in rental cars and vans, traveling independently or in small groups throughout the metro area, makes observation of DHS activity dependent on mobile observers.

144.    Minnesotans have used their vehicles as platforms to observe and gather information about DHS' activity in the state, often by safely following DHS vehicles as they engage in enforcement operations.

---

[53] Affidavit of Richard Berger (Dkt. 1-1), *United States v. Johnson*, Case No. 26-mj-0081 (D. Minn., filed Jan. 26, 2026).

[54] Declaration of Rachel Landsem; Declaration of Marianna Garcia; Declaration of Katie Story; Declaration of Jeanelle Austin; Declaration of Taylor Burks; Declaration of Clayton Kelly; Declaration of Mary Hackman (Dkt. 37); Declaration of Zoë Cantu (Dkt. 97); Declaration of Todd Dahlstrom; Declaration of Daniel Ehrlich; Declaration of Carla Hennes (Dkt. 33).

[55] Declaration of Benjamin Sullivan-McKone; *see also* Declaration of Reece Kapla (describing the incident and confirming Sullivan-McKone's story).

145.    DHS agents have been explicit that they consider these mobile observers to be impeding and violating federal law.[56]

146.    Mobile observers have been subject to unconstitutional and violent conduct by Defendants and their agents, in retaliation for mobile observers' exercise of their First Amendment rights.

147.    For example, DHS agents have used their vehicles to box-in and seize the vehicles of mobile observers as a means of intimidating them into ceasing their First Amendment protected activity.[57] Sometimes agents get out of their cars, holding or with their hands on service weapons, after boxing in a mobile observer.[58] In several instances, agents have threatened to break a mobile observer's windows and told them to stop following the agents.[59]

148.    On January 23, 2026, 28-year-old resident of the Whittier neighborhood in Minneapolis and school social worker M. G. was observing DHS activity in her neighborhood. She and her partner were following a DHS vehicle when it stopped abruptly in front of her car. M.G. had been obeying traffic laws and driving at a safe distance from the DHS vehicle. Three masked, armed agents approached her car, yelling. One yelled

---

[56] *See generally* Declaration of Imogen Page (Dkt. 1-9); Declaration of Jonathan Koenig; Declaration of Collete Adkins; Declaration of Katharine Tinucci; Declaration of J.W.

[57] *See generally* Declaration of Imogen Page (Dkt. 1-9); Declaration of Lori Kaplan; Declaration of Bergen Fuglestad; Declaration of Jonathan Koenig; Second Declaration of Claire Smith; Declaration of Andrew Wold.

[58] *E.g.*, Declaration of John Biestman (Dkt. 1-2); Declaration of Janet Lee (Dkt. 1-3); Declaration of Flannery Clark (Dkt. 1-8); Declaration of Beatriz Leon (Dkt. 14).

[59] Declaration of Danielle Welch; Second Declaration of Claire Smith; *see also* Declaration of Jacob Jester (threatened with being shot in the face).

through M.G.'s window: "This is United States Border Patrol. You cannot fucking follow us. This is your first and final warning. If you continue to follow us, I will pull you out of your fucking car."[60]

149.    On January 29, 2026, a St. Peter resident was following DHS vehicles and documenting their enforcement activity in the city.[61] The resident was driving a safe distance from DHS vehicles and observing traffic laws, when an DHS vehicle dangerously cut her off in the middle of traffic. Three DHS agents emerged from the vehicle and immediately drew their firearms and pointed them at the resident for no reason, as seen in the below photograph:



---

[60] Declaration of M.G.

[61] Hannah Yang, Matt Sepic & David Schaper, *St. Peter Police Chief Intervened and Got Federal Agents to Release Resident, Sources Say*, MPR News (Jan. 31, 2026) https://www.mprnews.org/story/2026/01/30/st-peter-police-chief-intervenes-prevents-federal-agents-from-arresting-resident.

150. The agents approached the resident's vehicle and demanded she get out of her car. When she refused, the agents opened her door and dragged her out. They had no warrant or probable cause to stop or arrest this resident, let alone sufficient grounds to threaten the use of deadly force. The incident was captured on the resident's dash cam video. As the DHS agents were leaving St. Peter and headed for the Whipple Building with this resident in the DHS vehicle, the St. Peter Chief of Police interceded, ended the arrest, and prevented the DHS agents from taking this individual to the Whipple Building.

151. Dozens of other mobile observers have experienced similar unconstitutional seizures and arrests.[62]

---

[62] *See, e.g.,* Declaration of Kaia Hirt (describing detention and threat of arrest); Declaration of Briana Mork (describing being photographed by agents and threatened with arrest); Declaration of Sawyer Plotz (describing detention, threats of arrest and intimidation); Declaration of Jestin Stoffel (describing unconstitutional stop, threats of arrest and photographs taken of his license plates); Declaration of Shamso Iman (describing unconstitutional stop, threat of arrest, and photographs taken of her face and car); Declaration of Cheyenne Wilson (describing unconstitutional stop and threats of arrest); Declaration of Maeve Doyle (same); Declaration of Katherine Henly (same); Declaration of Greg Sullo (same); Declaration of Luke Mielke (Dkt. 36) (same); Declaration of Gabrielle Holboy (Dkt. 35) (same); Declaration of Gwen Sierks (same); Declaration of Wesley Burdine (Dkt. 59) (same); Declaration of Nathaniel Meierpolys (same); Declaration of Seren Erden-Medlin (same); Declaration of Rebecca J. Dankowski (describing multiple unconstitutional stops and threats of arrest and violence); Declaration of Kyle Dekker (describing multiple unconstitutional stops and threats of arrest, along with dangerous "boxing in" attempts by ICE vehicles); Declaration of Adam Check (describing threat of unlawful arrest); Declaration of Andrea Drozdowski (describing being boxed in by ICE vehicles and threatened with unlawful arrest); Declaration of Andrew Onken (describing being boxed in by ICE vehicles and threatened with arrest); Declaration of Robert Dubay (same); Declaration of David Burns (same); Declaration of Cassandra Grythe (similar); Declaration of Grace Steinmetz (describing being boxed in by ICE vehicles and arrested); Declaration of Collette Adkins (observing such behavior); Declaration of Christian Glanville (observing various seizures, uses of force, and intimidation tactics by federal immigration agents); Declaration of Kristin Bergquist (describing being led to her home by a federal immigration agent).

152.    DHS agents also have obtained the home addresses of individuals who are following them to document their misconduct.[63] On information and belief, they are obtaining these home addresses by running their license plates through a law enforcement database and then engaging in further retaliatory and chilling conduct.

153.    For example, on December 7, 2025, Minneapolis resident Riley Kellermeyer, a thirty-two-year-old biologist, was in South Minneapolis to observe and document DHS activity. Kellermeyer saw an SUV with dark black windows and Texas plates that she believed to belong to immigration agents. She decided to follow the car to report its whereabouts and activities to the community. When Kellermeyer got home, a DHS vehicle with Indiana plates was pulled up next to her house, suggesting that the agents were waiting for her. Afraid for her safety, she decided not to stop at her home and kept driving. The DHS vehicle pulled away from Kellermeyer's home and began following her. She decided to drive to a public place for safety and went to the nearby Quarry Shopping Center parking lot. Once she was in the parking lot, the DHS vehicle pulled in front of her to block her path. An agent rolled down the driver's side window. She screamed at Kellermeyer to "stop fucking following them" and that Kellermeyer would be arrested if she continued to observe them.[64]

154.    On January 10, 2026, Richfield resident Nicole Cleland was following DHS vehicles in her community. Cleland was following a safe distance behind the vehicles and

---

[63] *E.g.*, Declaration of Elizabeth Jackson (Dkt. 63); Declaration of David Burns; Declaration of Ryan Doxsey; Declaration of Christian Glanville; Declaration of Dan Merley.

[64] Declaration of Riley Kellermeyer (Dkt. 1-11).

observing traffic laws. At one point, the DHS vehicles stopped in the road, making it impossible for Cleland to proceed. A CBP officer exited one of the vehicles and approached Cleland's car. The agent addressed Cleland by name and told her that CBP had facial recognition technology and that his body camera was recording. The CBP officer told Cleland she was impeding his work and that she would be arrested if she continued. The agent returned to his vehicle and drove away; Cleland drove off in the opposite direction. Three days later, Cleland received an email notice that her Global Entry/TSA-Pre Check had been revoked. Cleland has been a member of the Global Entry program since 2014, without incident prior to this retaliatory cancellation.[65]

155.    On the evening of January 26, Emily Beltz, a 44-year-old Edina resident and project manager for a clinical research organization, was observing DHS activity in her neighborhood and following DHS vehicles in her car. She followed a DHS SUV into a parking lot. The SUV stopped suddenly, and Beltz stopped behind it. Someone leaned out of the SUV and photographed Beltz. Beltz started to drive away. The SUV then spun around and sped at Beltz's car as if the SUV was going to run into Beltz. Right before the SUV hit Beltz, it braked hard. A female agent leaned out of the SUV front passenger window and yelled, "Emily, Emily we're going to take you home." The agent repeated Beltz's name several times, stated Beltz's home address, and then said again that the agents were going to take her home. The SUV pulled out of the parking lot; Beltz drove in the

---

[65] Declaration of Nicole Cleland (Dkt. 98).

opposite direction. After driving a block, Beltz noticed that the SUV was following her. Terrified, Beltz went to a restaurant and waited several hours before finally driving home.[66]

156.    Dozens of mobile observers have experienced similar threatening and retaliatory behavior.[67]

157.    Defendants have also subjected mobile observers to the same kinds of assaults, unlawful arrests, and uses of excessive force that they have employed against pedestrian observers and protesters.[68]

158.    For example, on January 11, 2026, Minneapolis resident and middle school special education teacher Brandon Siguenza was following and observing DHS activity in Minneapolis with his wife Patty. After following agents, safely and lawfully, for several

---

[66] Declaration of Emily Beltz.

[67] *See, e.g.,* Declaration of Judith Levy (Dkt. 67) (describing agents photographing car and license plate and leading declarant to her home); Declaration of Noah Levy (same); Declaration of Connor Fradenburgh (describing ICE agents leading him to his home); Declaration of Rachel Landsem (same); Declaration of Dan Merley (describing ICE agents leading him to his home and filming his house); Declaration of Daniel Woo (describing ICE leading him to his home); Declaration of Katherine Henly (describing ICE agents leading her to her home and then taking numerous pictures of her home with a large, professional looking camera); Declaration of Shamso Iman (describing being led back to her mother's house and subject to additional ICE harassment there); Declaration of Samuel Rosemark (describing being led back to mother's house where car was registered and laughing agents taking pictures of the house and Rosemark's car); Declaration of Kyle Dekker (describing being led to his home and agents photographing his home); Declaration of Chelsea Brink (describing being led back to her home and photographs being taken of her home and car); Declaration of A.L. (describing ICE vehicle showing up at her home after she had been observing it and idling in front of her driveway while she hid in her home); Declaration of Andrew Onken (describing that, two days after he was observing federal immigration activity, ICE agents showed up at 6:20 a.m. at the residential location where a special education bus picks him up daily for his work as a special education assistant); Declaration of Christian Glanville (similar); Declaration of Jessica Kirby (describing federal agents boxing in her car, breaking her car window, and arresting her).

[68] *See, e.g.*, Declaration of Megan Peterson; Declaration of Matthew Carlson.

blocks, a DHS SUV stopped in the middle of traffic in front of Siguenza's car. Several masked agents in tactical gear got out. One agent warned Siguenza that he and Patty were impeding them. Another shot pepper spray into the vent of Siguenza's car. A third was recording them on his phone. The agents got back into their SUV, and Siguenza continued to follow them. They drove roughly 20 feet and stopped again. The agents surrounded Siguenza's car and told him he and Patty were under arrest. Without any warning, the agents smashed Siguenza's window and Patty's window simultaneously. Siguenza kept his hands up as shattered glass fell around him. He continued to record with his phone in one hand until an agent knocked the phone out of Siguenza's hand. An agent then opened the car door, unhooked Siguenza's seat belt, and dragged Siguenza out of the car. The agent told Siguenza he was arrested for "impeding operations." They handcuffed Siguenza and drove him to the Whipple Building. Per Siguenza: "This doesn't feel like law enforcement. It feels like terror."[69]

159.    On January 13, 2026, DHS agents arrested an autistic woman with a traumatic brain injury who was driving past a DHS raid on her way to a doctor's appointment. She began honking her horn and shouting at DHS to register her displeasure. DHS vehicles blocked her in, and she could not drive away. DHS agents smashed her window, cut her out of her seat belt, and dragged her off as seen in the below photos:[70]

---

[69] Declaration of Brandon Siguenza (Dkt. 99); *see also* Declaration of Patty O'Keefe.

[70] *ICE in Minneapolis: Scenes from the Streets*, Reuters (Jan. 13, 2026), https://www.reuters.com/pictures/ice-minneapolis-scenes-streets-2026-01-13/.





160.    On January 16, 2026, Minneapolis resident Jeremias Salazar-Fayant was observing and documenting immigration enforcement activity in Richfield. Salazar-Fayant was parked by the LomaBonita Market, observing this activity, when federal agents in a black Durango pulled up and stopped right next to him. A CBP agent on the passenger side

rolled down his window, pulled out his firearm, pointed it directly at Salazar-Fayant, and said: "I will shoot you." Frightened, Salazar-Fayant decided to leave the area and drive home. The black Durango was in front of Salazar-Fayant's car, and when he would signal a turn, the black Durango would make the same turn. After driving like this for five minutes, the black Durango stopped in front of Salazar-Fayant, blocking him from going forward. The same CBP agent who had threatened to shoot Salazar-Fayant got out of the black Durango and walked toward Salazar-Fayant's car. When he was within 5-10 feet of Salazar-Fayant's car, he pulled out a gun and shot 10 rounds of pepper balls at Salazar-Fayant's windshield and under the car. The pepper ball chemical irritant got into the car through the vents and incapacitated Salazar-Fayant, rendering him incapable of driving home. He continues to have difficulty breathing.[71]

161.    On January 20, 2026, retired WCCO TV reporter and Minneapolis resident Mark Butcher was observing DHS activity in Columbia Heights. Butcher was following a DHS vehicle from a safe distance, observing traffic laws, when two DHS vehicles boxed him in, preventing him from driving further. Agents approached his car. Butcher rolled down his window and recorded them as they approached. One of the agents grabbed the phone out of Butcher's hand. The agents pushed Butcher into the side of his truck and handcuffed him. One of the agents took Butcher's phone and began deleting videos Butcher had taken. Butcher had open heart surgery in April 2025 and was concerned for his health.

---

[71] Declaration of Jeremias Salazar-Fayant. DHS agents have also sprayed pepper spray through open windows into cars driven by observers and protesters. *See* Declaration of Luis Ramirez Orozco; Second Declaration of Claire Smith.

In distress, he asked the agents to take him to a hospital. Rather than bring Butcher to the nearby University of Minnesota hospital, agents drove him all the way to Abbott Northwestern in South Minneapolis. Tests performed in the ER determined that Butcher had suffered cardiac tissue damage during his arrest and delayed transfer to the hospital.[72]

162.    On January 23, 2026, a group of clergy in a bus was making a pilgrimage from George Floyd Square to Renee Good's memorial. DHS vehicles were following and surveilling the bus full of clergy. Behind the DHS vehicles, several observers were following at a safe distance to ensure that DHS did not assault or interfere with the bus full of clergy. A DHS vehicle stopped in front of the observers and agents walked back to the observer vehicle, smashed the window, and pulled the observers out of their car yelling at them that they were impeding and obstructing law enforcement.[73]

163.    DHS's conduct has not been limited to citizen information gatherers. For example, on January 6, 2026, Minnesota journalist Chris Juhn was reporting on DHS activities for local news organization Sahan Journal. Juhn was following an SUV containing DHS agents in Minneapolis. He drove safely and lawfully as he followed the vehicle. The SUV pulled into a shopping center parking lot, and Juhn followed. The SUV stopped. Three DHS agents exited the SUV and approached Juhn's vehicle. One agent photographed Juhn's license plate as Juhn took pictures of the agents. The agent

---

[72] Declaration of Mark Butcher.

[73] Mother Jones, *Ice Attacked an Observer after they Tailed a group of Clergy on a Spiritual Pilgrimage*, Bluesky (Jan. 23, 2026), https://bsky.app/profile/motherjones.com/post/3md5ej7ld552g.

approached Juhn's window, and Juhn showed him his press pass. The agent photographed

Juhn's face, as seen in the photo below:[74]



## V.  DEFENDANTS VIOLATED PLAINTIFFS' FIRST AND FOURTH AMENDMENT RIGHTS.

### A.  Plaintiff Susan Tincher

164.    Susan Tincher is a resident of the Near North neighborhood in Minneapolis.

She has lived in Minneapolis for 30 years. Tincher and her husband Jim have two children,

and together they run a small consulting business.

---

[74] Declaration of Christopher Juhn (Dkt. 64).

165.   On December 9, 2025, Tincher woke up a little before 6:30 a.m. when she heard alerts on her phone that an ICE arrest was happening in her neighborhood.

166.   Tincher drove a few minutes over to the intersection of 21st and Oliver Avenues in North Minneapolis with the intent to observe and record what she saw happening.

167.   When she arrived, she saw several people she believed to be ICE agents standing outside a house. They were wearing bullet-proof vests, some of which said "POLICE" and "ERO." Several agents were wearing masks. Tincher could not see any names or badge numbers on the individuals' clothing.

168.   Tincher did not see the ICE agents arresting anyone or doing anything more than talking to each other. It looked like they had set up a perimeter around the house.

169.   There were no protesters in the area. There were a few other people observing at a safe distance from the agents, on the sidewalk or in the street.

170.   Tincher got out of her car and walked toward the house, just trying to get a sense of what was happening. While Tincher was about 6 feet from the officers on the perimeter—and still on the public sidewalk—she asked one of the agents, "Are you ICE?" The agent walked towards her. When the agent had closed most of the gap between them and was about one or two feet from Tincher, she told Tincher to "get back." Tincher then heard few other officers nearby say something to the effect of "Get back!" and "Take her down!"

171.   Within seconds, agents hustled toward Tincher, grabbed her, and pulled her to the ground. While she was on the ground, face down in the snow, agents handcuffed her.

The agents told her that she was being arrested for obstructing a federal officer. But she had not been obstructing anyone and was just standing there. She had not even taken out her phone to record yet.

172.    While Tincher was still on the ground, she told nearby observers her name and then started yelling for help because she was afraid she was being kidnapped by the agents. They were arresting her for no reason.

173.    A camera crew embedded with the ICE agents filmed her arrest.

174.    The agents put Tincher in the truck that she had seen earlier and they drove away just a few minutes after 6:30 a.m. While she was in the truck, agents pulled on her jacket so hard it left a red mark on her neck.

175.    There were three agents in the truck with Tincher. One, a woman they called "Daisy," was wearing a medic patch with the Texas flag on it. Another man was wearing a patch that said "HOU 16."

176.    The agents took Tincher to the Whipple Building near Fort Snelling. They entered through the garage, Bay 2. When agents pulled Tincher out of the truck, and walked her through the garage to be processed, the same film crew that had been recording her arrest on the street was filming her removal from the truck in handcuffs. The crew was clearly coordinating with the ICE agents that had arrested her to gather footage of the arrest and Whipple garage "perp walk" for their own propaganda purposes.

177.    Daisy and another agent extensively patted Tincher down. They told her to take off her sweater. One felt her bra underwire and cut her bra off. They removed Tincher's boots and socks, removed the handcuffs, shackled her legs, and searched her

belongings. Tincher saw them examining her driver's license. Her purse had already been cut free from her body. They cut her boot laces and ordered her to pull them out of her boots. The agents then cut Tincher's wedding ring off her finger. It was the original wedding band from her marriage 32 years ago, a treasured symbol of her relationship with her husband, and the agents showed no concern or compunction about destroying it.

178.    The agents put Tincher in leg shackles and left her in a cell for five hours. She passed the time humming spirituals and Christmas songs. "The Storm Is Passing Over" carried her through her hours of confinement.

179.    After more than five hours, the agents released Tincher. They did not give her any paperwork, but they did tell her she would be charged with obstructing a federal officer.

180.    As a result of the arrest, Tincher has bruising from the handcuffs and some swelling on her neck and bruising on her finger from being pinched by the cut ring. Her wedding ring was damaged and the agents never even returned her gloves, hat, or headband.

181.    Since Tincher's arrest, she has continued to monitor the neighborhood chat. While it was a frightening experience that would scare anybody, she plans to observe again when future ICE actions occur in her neighborhood: she wants to protect her neighborhood and her neighbors.

182.    Several neighbors witnessed Tincher's arrest, including Nicole Sorensen and Katherine Rollins. They confirm that Tincher did not assault agents, break any perimeter,

or otherwise interfere with ICE's activities.[75] Instead, they confirm that an agent left the perimeter, walked up to Tincher and grabbed her even though she was doing nothing more than observing the ICE activity.

183.    DHS spokeswoman Tricia McLaughlin responded: "Susan Tincher was arrested after she assaulted a federal agent, tried to break through a security perimeter set up for public safety, ignored lawful commands, and became violent." These statements are false and have invited online retaliation and doxxing against Tincher.

### B.    Plaintiffs John Biestman and Janet Lee

184.    John Biestman and Janet Lee live in the Linden Hills neighborhood of Minnesota. Biestman is sixty-nine-years old and retired from a career as a banker. Lee is sixty-seven years old and has worked for the past 39 years as a speech-language pathologist.

185.    On Sunday morning, December 7, 2025, Biestman and Lee heard that ICE vehicles were circling the Church of the Assumption of the Blessed Virgin Mary, a Catholic church whose morning service was just finishing up. The ICE agents apparently planned to arrest and deport people leaving church services that Sunday morning. Biestman and Lee drove to the church to observe and document ICE activity, and to express their strong disapproval of such cruel and callous behavior.

---

[75] Declaration of Katherine Rollins (Dkt. 1-10); Declaration of Nicole Sorensen (Dkt. 1-12).

186.    When Biestman and Lee arrived at the Church, there were fewer than a dozen people present who had also arrived to act as observers.  They heard cars honking and whistles, which alerted them that ICE agents were in the area.

187.    They saw an unmarked vehicle, which they suspected might belong to ICE, speeding on the street adjacent to the church. They observed this vehicle run a red light, make a U-turn and flip on interior flashing lights. They saw ICE vehicles speeding through side streets adjacent to the church, running red lights, and just generally driving recklessly.

188.    Biestman and Lee decided to follow the speeding vehicle from a safe distance in their car.  Biestman was driving lawfully and carefully, including stopping at the red light, which put some distance between the vehicle with the flashing lights and their own car.  When the light turned green, they followed the vehicle. They were not following too closely, they were not blocking, impeding or interfering with anyone, and they were driving carefully and lawfully.

189.    They followed the vehicle to nearby Roosevelt Park and made a lawful right turn into the park's parking lot. They were not blocking, obstructing or interfering with anyone.  No other observers or protesters were present in the park at that time.

190.    Immediately, they were boxed in and stopped by four unmarked ICE vehicles. Masked ICE agents surrounded their car.

191.    The agents pointed semiautomatic weapons at them at close range, demanded that they roll down their windows, and threatened them multiple times with arrest. Biestman told the ICE agents that he and Lee are United States citizens. The agents

responded that it did not matter, that they would be handcuffed and arrested. Biestman said, "What you're doing is illegal, this is like Germany 1938."

192.    One of the agents reached through the driver's side window into our car and pointed at Lee. He said, "We're going to arrest her too, we have handcuffs." Biestman asked if they had a warrant for their arrest. The agents responded that they did not need one.

193.    Lee wanted to record the interaction on her cell phone, but she was too afraid to do so. She had never had a gun pointed at her in her life, let alone multiple guns pointed at her by representatives of her own government. Instead of recording, Lee called another observer so that she would be able to hear what was happening. Lee's hands were shaking, and she could barely operate her phone.

194.    The agents continued to threaten Biestman and Lee, pointing rifles in their faces and mocking them. Several agents filmed the encounter, including Biestman's and Lee's faces and license plate. One agent commented, "We have your license plate, we know where to find you." Biestman and Lee were terrified and angry that the government would treat them this way.

195.    An ICE agent wearing a bandana with stars on it came up to the driver's side window and told Biestman and Lee that they had to leave the park immediately and not to follow the agents again. Because the ICE vehicles were blocking their car, they had to back into the street to escape further lethal threats, harassment, and intimidation.

196.    The agents did not, at any point, explain to Biestman and Lee what justified pointing guns at them and threatening them with arrest. The agents appeared angry because

Biestman and Lee were watching them, and because Biestman and Lee communicated by their presence that they did not approve of the agents' conduct.

197.    Neither Biestman nor Lee were physically aggressive at any time during this interaction.  During this incident, Lee was acutely aware that she was smaller, weaker, and older than the agents.  She specifically recalls thinking that if they made one false move, the agents would shoot and kill them. Lee is traumatized by the memory of this encounter. Since it occurred, she has felt hypersensitive to her surroundings and suspicious that she is being followed. Every time she sees a black SUV, she experiences a flash of anxiety because the ICE agents know who she is and have her license plate number.

198.    The agents' cruel, reckless and unprofessional conduct intimidated and terrified Biestman and Lee. But they plan to continue to observe, document, and express their criticism of ICE despite the agents' threats and intimidation.

199.    Biestman states: "I am a patriot and a proud American. I love my country as a place where I have been able to thrive and raise a productive family in peace until this incident. The behavior of these agents made me ashamed for my country. My own government is now acting like my enemy. I am traumatized about the incident and how my own government pointed lethal weapons at me and my wife, point blank, for no justifiable reason."

200.    Lee states: "Despite this traumatic experience, I have continued to engage in constitutional observation activities. Even though I am frightened for my safety, I feel an obligation to protest, to bear witness to ICE's cruelty and to disseminate information about what I observe. Even so, I have been more cautious since this experience because I

fear that ICE agents will physically harm me. I wish that I was braver but I have faith that my courage will grow to meet this dire occasion."

201.    Eagan resident Beatriz Leon watched from a public sidewalk across a four-lane road as the federal agents detained Biestman and Lee. While she watched and recorded the interaction described above, the agents began honking and yelling at her from across the street. Leon became nervous that the agents would target her, so she stopped taking photos and returned to her car. Shortly thereafter, several ICE vehicles pulled up next to her car. Masked agents approached her car and pointed assault weapons at Leon and her husband. They ordered Leon and her husband to roll down their windows and to put up their hands, which they did, dropping their phones to comply with the direction. The agents threatened them with detention, and one agent said: "Record this. Now get out your little phone and record this." [76]

### C.    Plaintiff Lucia Webb

202.    Webb is a 31-year-old resident of the Powderhorn neighborhood in Minneapolis, Minnesota. She has lived here since 2016. She is the operations director at a local non-profit.

203.    On December 3, 2025, Webb was monitoring a neighborhood chat for news of ICE activity because she was upset at how ICE had been treating her neighbors. Webb believed it would be important to document all the things ICE has been doing to disrupt

---

[76] Declaration of Beatriz Rudolph Leon (Dkt. 14).

life in Minneapolis, so she decided to get in her car and help observe and alert people to ICE's presence.

204.    Webb heard that ICE might be near Portland Ave. and 42nd St. in South Minneapolis, so she drove to that location. When she got there, she saw some vehicles that had very dark tinted windows and Virginia license plates. Some other observers were there looking in the windows of the cars, and they let Webb know the cars contained ICE agents.

205.    The ICE cars pulled away, so Webb followed them. They drove west on 42nd and headed toward 35W. Webb stayed a few car lengths behind the ICE vehicles – a normal driving distance. Webb did not run any red lights or ignore any traffic signals.

206.    When Webb saw ICE getting on the freeway, she reminded herself to stay calm and to be careful. She was worried because she had heard stories that day and the day before of ICE vehicles performing dangerous and evasive maneuvers, illegal turns, running red lights, and maybe even trying to get followers to get in car crashes.

207.    After Webb got on the freeway, following the ICE vehicles, she was going a reasonable speed, not faster than traffic, to keep up with the vehicles. The vehicles went south on 35W and took the exit onto Hwy 62. Webb followed them off the freeway at Bloomington and realized they were near the Whipple Building, where ICE's local operations are headquartered.

208.    Webb then noticed that there were more ICE vehicles around, and an agent was standing in the middle of the road like he was directing traffic at a construction site. Webb slowed and stopped, She wasn't quite sure what to do or where to go. She felt scared because the ICE agents were starting to interact with her and she was alone.

209.    She continued forward, though, because it seemed like the ICE agent in the road was waving her through. She followed one of the ICE vehicles into the Metro Transit Park and Ride parking lot across the street from the Whipple Building. Just then, she was surrounded by four cars. One was in front of her, and the rest were to the side. Approximately five agents walked toward Webb's car and surrounded it. She started filming.

210.    The ICE agent closest to Webb told her she had been chasing the ICE vehicle, breaking traffic laws, and running red lights. The agent said they had Webb on video breaking the law. But that was untrue—Webb had not been chasing the ICE cars, and she had not broken traffic laws. Webb told the agent that she was just trying to protect her neighbors. He accused Webb of impeding officers and said she would "be arrested for impeding" if she did not stop following the agents.

211.    Webb told the agents that she was ashamed of them for kidnapping people. It was a stressful situation for Webb to be surrounded by armed and masked agents threatening to arrest her. They insulted and mocked her.

212.    At that point, Webb was really shaken. She was physically shaking and her whole body felt red. It took her a while to collect herself before she could begin driving home. She drove home crying and upset—upset at herself for letting the agents intimidate her.

213.    Since the incident, Webb has had trouble concentrating and sleeping. She is filled with fear whenever she sees tinted windows behind her while driving. But she will continue to observe, preferably only if she has a partner to accompany her.

214.    In fact, the day after agents threatened Webb, she was out observing again, though this time in a friend's car. At around 4:00 p.m. on December 4, 2025, Webb and her friend were driving on Park Avenue following some ICE vehicles with Texas plates as part of a group of observers. Just after they turned onto 31st St., they saw another car pull a U-turn ahead of them and stop in the middle of the road, impeding traffic generally, but specifically blocking the other cars that had been following the ICE vehicles. One or two agents in masks got out of the car and aimed a gun at people who were observing on foot and then at the people in the cars that had been following the ICE vehicles. As one of the agents went back to his vehicle, he smacked one of the observer cars, and it appeared that the front end of his gun went inside that car's window.

### D.    Plaintiff Alan Crenshaw

215.    Crenshaw is a 35-year-old resident of Uptown in Minneapolis, Minnesota. He is a student in the Urban Studies department at the University of Minnesota.

216.    On December 9, 2025, Crenshaw learned that ICE was in the area of Cedar Riverside. He had heard that the Somali community was hoping to have people observe what the government has been doing to their community, and he was happy to offer that. It also felt important for him to be able to make people aware of ICE's presence in the neighborhood.

217.    Crenshaw walked to the Cedar Riverside area from campus. A person told him that ICE had just gone inside Sagal Restaurant and Coffee at 326 Cedar Ave. He followed to document what they were doing.

218.    Crenshaw got inside the restaurant just as two agents were violently slamming a young black man against the wall. He was yelling in pain and saying that he was a U.S. citizen. The agents ignored his pleas. They dragged him outside. He wasn't trying to get away from them or resisting, he just kept screaming and telling them he was a citizen.

219.    Crenshaw and some other protesters and observers followed the agents outside. One agent slammed the door on them. The agents displayed their frustration with the observers— for watching and filming them, and for telling them that what they were doing was wrong—by slamming the door on the Crenshaw and his fellow observers.

220.    Once Crenshaw was outside the restaurant, he saw the agents violently push the young man into the snow for no apparent reason. They put the young man in handcuffs and put him in one of the cars. It had black windows and Florida plates.

221.    As the observers watched ICE kidnap a United States citizen for no reason and with no warrant, they shouted at the agents and blew their whistles. Crenshaw could not believe that the agents were doing this in plain view of the observers. The agents repeatedly ignored observers' requests for their badge numbers or any identifying information.

222.    Some individuals came out of the restaurant with pictures of the young man's ID and held it up to the car to show the agents. The agents ignored them.

223.    Instead, the car pulled away. Protesters and observers followed the car, recording, blowing their whistles, and yelling. Crenshaw went to make sure he got a shot of the license plate. No one was getting in the way of the agency cars, which were moving

slowly. But as they were leaving, a window rolled down, and an arm came out and pepper sprayed the crowd with no warning. Crenshaw was about 10-15 feet away when they sprayed. The snow where they were standing was stained bright orange from the pepper spray.

224.    After those cars drove away, Crenshaw headed over to a group of people observing other ICE activity and ended up on the sidewalk at 6th St., just west of Cedar Ave. When he got there, he saw about nine ICE vehicles with lights on attempting to leave the parking lot, causing a traffic jam. It took about 20 minutes for them to exit the area. In the meantime, observers were recording, chanting, blowing whistles, and telling ICE to leave. Crenshaw saw multiple incidents of people being pepper sprayed with no warning.

225.    In one instance, a person in a brown coat and black hat was standing on the edge of the road, and a black SUV of some kind drove past, slowed, and opened the door. The person in the brown coat held their arms out to their sides, and an agent got out and sprayed them directly. The person moved away from the car, but another agent on foot came from behind them and sprayed them directly in the face again. Then the agents sprayed into the small crowd. This use of chemical weapons against observers was gratuitous: agents could have left the scene instead of retaliating against the observers, who were not blocking or impeding them.

226.    As Crenshaw stood in the muck on the side of the road in the crosswalk, another ICE car without its lights on drove past and sprayed him right in the face. He was immediately overtaken by intense pain and could no longer keep his eyes open. He felt like he couldn't breathe and was coughing very hard. He had red swelling and spots on his eyes

for about 24 hours, and he had skin tingling for a few hours. When he took a shower, the pepper spray ran back into his eyes and caused more pain and swelling.

227.    Crenshaw explains: "It is important to me that the abuses that are occurring at the hands of ICE in my community are documented. I am ashamed to live in a country where violent and angry law enforcement agents can arrest people with such brutality and for obviously racially motivated reasons."

228.    Crenshaw was also present at the January 7, 2026, incident at Roosevelt High School, in which ICE and CBP agents lawlessly assaulted legal observers. Crenshaw witnessed agents throwing observers to the ground and into the crowd. He saw agents pepper spray observers in the face who were doing nothing other than bearing witness to the violence of the government agents. Per Crenshaw: "These agents seemed even more aggressive, more violent, more cavalier about things than the ones I'd seen before. They were dressed differently, in fatigues and camo and helmets. They were decked out in more gear and had bigger weapons. . . . They all seemed comfortable just shoving people out of the way."

### E.    Plaintiff Abdikadir Abdi Noor

229.    Noor is a 43-year-old resident of Fridley, Minnesota and an owner/operator of a trucking company. He is a Somali Minnesotan and has been a United States citizen for about 20 years.

230.    On December 15, 2025, Noor was with his wife Farhiya and a friend having lunch at Marhaba, a restaurant on Nicollet Ave. and 28th St. in Minneapolis. Afterwards, they went to Karmel Mall for coffee.

231.    Noor was driving on Pillsbury Ave., and had almost arrived at the mall, when he noticed some cars behind him. At first, he thought they were police and that he was being pulled over, so he stopped and pulled into a safe spot. When agents got out of the car, however, he realized they were from ICE because they were in plain clothes, wearing military vests and masks.

232.    There was another car behind the first ICE vehicle that was also stopped, with two Latinos in it. There was another ICE SUV behind them, boxing in the Latinos.

233.    Noor got out of the car and said something like "I'm not going to let you do this. I'm not going to show you anything or tell you anything." The ICE agents didn't approach Noor or his car. Instead, they went up to the other car that was boxed in, with the Latinos in it. Four agents in vests and masks surrounded the car.

234.    Noor called out to the Latino people to tell them about their constitutional rights, saying something like: "You don't have to show them anything. Don't roll down your window or unlock your door!"

235.    Another woman showed up at around that time. She also started telling the Latino people to exercise their rights and telling ICE to leave the area. After she arrived, a crowd started to gather.

236.    As the woman was standing on the sidewalk, an ICE agent grabbed her hand. Someone in the crowd grabbed her other hand, and they started to tussle. The agent managed to throw her on the ground and kneeled on her back. Someone in the crowd said she was pregnant. The crowd started yelling at ICE to let her go. Noor also told ICE to let her go.

237.    While she was pinned to the ground, other agents broke the windows of the car the Latinos were in and pulled them out. Noor did not see an arrest warrant for the people in the car.

238.    Meanwhile, the woman was still face down on the ground in the snow with an agent kneeling on her back. Noor estimates she remained in this restraint for 30 minutes. The crowd continued to tell ICE to stop hurting the woman, to let her go, and to leave. Officers looked increasingly panicked and called for backup. The majority of people there were simply yelling, but some threw snow at the other agents. Noor attempted to calm the crowd and to prevent them from throwing more snow. According to Noor, "I told the people not to throw things, we needed to save the lady, and we needed to save the agent from himself. We needed to be peaceful." Noor attempted to keep people away from the officers several times, although he continued to tell ICE to leave the woman alone.

239.    Suddenly, the agent kneeling on the woman's back dragged her violently towards his car. Protesters and observers followed, including Noor, who was trying to keep people back and trying to keep people calm. He was also telling the agents that what they were doing was wrong because he couldn't understand why they were treating the woman like that or why they would treat anyone like that.

240.    After backup arrived and the woman who had been on the ground for half an hour had managed to leave, the agents turned back toward the crowd and focused in on Noor. One of them said something like "let's get this guy" to the other agents and they advanced upon Noor. Noor heard one of them say something about ICE but wasn't sure

exactly what he was referring to. The agents grabbed Noor, threw him on the ground, and handcuffed him, causing bruises on his knees and head.

241.    At approximately 1:40 p.m., agents put Noor into a car and left the area. The agent driving, a bald man, sped at about 85 miles per hour down 35W towards the Whipple Building. He refused to allow Noor to put on a seatbelt.

242.    When they got to the Whipple Building, the agent looked at Noor's passport and said to another officer: "They all come here fraudulently. 50% are here fraudulently," echoing the racist comments made by Defendant Noem at the commencement of Operation Metro Surge. He continued to say things like "Somalis drained Minnesota" and "Somalis should go back home."

243.    Noor was shackled and left alone in a cell. At one point, officers read him his rights, and he told the officers that he wanted a lawyer. He was released without charge, paperwork, or explanation at about 6:00 p.m.

244.    According to Noor:

> If I were these people, I would figure out another way to detain people they need to detain—set an appointment, something orderly. But they're just trying to make our cities look chaotic, like World War III. People call me from Europe, from Africa, asking me "Is this really America? It looks like a third world country." The whole time I was there at the scene, I just wanted to tell the government that what they were doing to the woman, to the Latinos, to all of us, is wrong. I just wanted to tell people what their rights are in this country and under our Constitution.

**F.    Plaintiff Abigail Salm.**

245.    Abigail Salm is a resident of the Elmwood neighborhood of St. Louis Park, Minnesota. She works for a Fortune 500 company.

246.    On January 9, 2026, Salm was following and observing ICE agents near the Knollwood Mall. She was following at a safe distance and observing traffic laws. She was behind one other car that also had observers in it and was also following an ICE vehicle. After passing through a green light, the ICE vehicle two cars in front of Salm slammed on its brakes. ICE agents got out of their vehicle and walked back to the observer vehicle in front of Salm. The agents asked the driver and passenger of the other observer vehicle to get out. Salm got out of her car and walked up to record the unlawful ICE intimidation and detention of the other observers.

247.    An agent approached her and said "Have y'all not learned your lesson?" which Salm took as a reference to the recent killing of Renee Good by an immigration agent. She asked, "What lesson am I supposed to have learned?" He responded, "Following federal agents" and grabbed her phone out of her hand, as can be seen on video.[77]

248.    She demanded it back, and the agent responded, "You need to leave now or you're going to be arrested." When Salm asked why she would be arrested, he stated: "for blocking traffic." When Salm asked for her phone back again, the agent said, "ok, you're under arrest," and grabbed Salm, slammed her down on the hood of her car, and handcuffed her. The agent pushed Salm up against a nearby truck, grabbed her by her collar, and pulled hard enough that it was difficult for her to breathe. He asked "Is this how you want to die? With a fucking bullet in your skull?"

---

[77] Dom Ervolina, *ICE Agent Knocks Phone Out of Hand*, Bluesky (Jan. 10, 2026), https://bsky.app/profile/dominicervolina.com/post/3mc3b6soa222e.

249.    Salm was kept handcuffed, on the ground, in the cold despite needing medical care for a chronic condition. She still doesn't know exactly how long she was detained there. While she was cuffed, she saw one of the agents taking her phone off the hood of her car and put it in his pocket. When she asked him to give it back to her, he accused a nearby man who looked Latino of stealing the phone. Eventually, the agent agreed to give the phone back.

250.    The agents asked Salm several times if she had learned her lesson. Salm believes the lesson they wanted her to learn was not to record or stand up to federal agents, despite her right to gather information about their activities. She remains terrified that federal agents will arrest her again.

251.    Salm states she will continue to observe and protest DHS' immigration operations in Minnesota, but no longer will she do so by herself.[78]

### G.    Plaintiff Ryan Doxsey

252.    Ryan Doxsey is a 42-year-old software engineer who lives in Richfield, Minnesota.

253.    Doxsey has been intimidated at least twice by federal immigration agents for observing and recording their activities. Doxsey has a dashcam he uses to record what federal agents do around his community.

254.    On Monday, January 27, 2026, at approximately 7am, Doxsey was watching for ICE activity at a school near his house. Outside the school, he saw a white Ford

---

[78] Declaration of Abigail Salm (Dkt. 69).

Expedition with Texas license plates. The windows were tinted but he could make out that there were at least three adult men in the car. He honked briefly to alert the community and the school that ICE was in the area.

255.    Doxsey then drove behind the ICE vehicle through a residential neighborhood for about four minutes. He maintained a normal distance and observed where they went. He did not break traffic laws.

256.    On 67th St. between 13th Ave. and 14th Ave., the ICE vehicle turned around and drove directly at his car. They did not stop, so he had to reverse to maintain a safe distance. Then the vehicle turned on red and blue flashing lights, so Doxsey stopped. He continued to observe the vehicle and communicated with his neighborhood group about what was happening. One agent, dressed in tactical gear and a mask, got out of the SUV and approached Doxsey's car. The agent told Doxsey this was his "one warning to stop impeding." Doxsey said, "Ok."

257.    The agent took a photo of Doxsey's license plate and a photo of his face and said that he would be added to a list of domestic terrorists. The agent also said that if Doxsey continued following, the agent would call for backup and Doxsey would be arrested and detained. After the agent drove away, Doxsey went to another nearby school and told the office staff that ICE was in the area.

258.    On January 23, Doxsey was driving behind a vehicle he believed to be ICE. The vehicle pulled over to the side of the road and Doxsey passed them. He drove around a bit, but when he returned home shortly thereafter, the same ICE vehicle was in front of

his house. They remained in front of his house for ten minutes and then left when other observers arrived.

### H. Plaintiff Margaret Wood

259.    Margaret Wood is a resident of the Powderhorn neighborhood of Minneapolis, Minnesota. Wood has been retaliated against or intimidated by federal immigration agents multiple times since the beginning of January 2026.

260.    On January 14, 2026, Wood was observing a Black Wagoneer containing DHS agents in her car, driving carefully and not breaking any traffic laws. After about 15 minutes, the Wagoneer led Wood directly to her house.

261.    On January 21, 2026, Wood was again out observing, this time as a backseat passenger in a car containing other mobile observers. The driver of the car she was in did not speed or otherwise break traffic laws. After several minutes, a DHS vehicle stopped, and the agents approached Wood's car, told them that what they were doing was a violation of 18 U.S.C. § 111, and directed them to stop following.

262.    On January 29, 2026, Wood heard there was ICE activity on East 19th Street between Park and Portland Avenues. When she arrived, she saw masked men kneeling on a man, who was speaking Spanish. Several other observers were there, blowing whistles and filming. Wood got out of the car and began to film. There was a fence between her and the agents who had subdued the man, who was handcuffed. She moved closer to try to hear what the man was saying, hoping to get his name to document who the agents were taking. While she was filming, an agent walked up to her, said "Ma'am" and pepper sprayed her in the face. Only after he sprayed her did she hear him say "Get back."

263.    Wood's body reacted immediately to the chemical irritant: her eyes closed, the right side of her face, right ear, and right side of her neck felt like they were burning. She kept asking for more water to ease the pain and wash the pepper spray off, but an EMT that helped her was worried that pouring more water on her face was dangerous because of the freezing temperatures. Throughout the day and despite three showers, Wood's face continued to feel tight and tingly.

## I.    Plaintiff NewsGuild - Communications Workers of America

264.    Plaintiff The NewsGuild-CWA ("TNG-CWA") is an international union representing about 27,000 workers in the United States, Canada and Puerto Rico in about 500 workplaces in media, nonprofits, language interpretation, and other areas. About 21,000 of those workers work in about 300 media workplaces including The New York Times, Reuters, the Associated Press, the Wall Street Journal, and the Washington Post. In Minnesota that includes the Duluth News-Tribune, the Minnesota Star Tribune, MinnPost, Public News Service, the St. Paul Pioneer Press, the St. Paul Union Advocate and national outlets with journalists reporting from Minnesota. TNG-CWA is an affiliate sector union of the Communications Workers of America ("CWA"), which represents about 400,000 workers in print, online, and broadcast news media, telecommunications, airlines, manufacturing, education, public service, and healthcare, among others. The central purposes of TNG-CWA and CWA are to protect the rights of workers through collective bargaining and public advocacy.

265.    Many of the individual reporters and photojournalists subjected to retaliation for engaging in newsgathering are represented by the TNG-CWA, including John Autey,

a photojournalist at the St. Paul Pioneer Press, who was hit with a teargas cannister while covering the protest of Alex Pretti's shooting on January 24, 2026; and Mark Vancleave, a visual journalist at the Associated Press, who was pushed by federal agents and threatened with arrest for attempting to gather information, document, observe, and film the agents arrest an observer on a public street on January 28, 2026.

266.    Because some of the TNG-CWA's affected members, and their news organizations, report on Defendants as part of their journalism, ethical considerations that guide reporting make directly suing those organizations as individual plaintiffs complicated if not impossible. As part of its mission, TNG-CWA can engage in litigation on their behalf. Article I, Section 2 of the TNG-CWA Constitution provides:

> SECTION 2. The purpose of the Guild shall be to advance the economic interests and to improve the working conditions of its members; to guarantee, as far as it is able, equal employment and advancement opportunity in the industry and constant honesty in news, editorials, advertising, and business practices; to raise the standards of journalism and ethics of the industry; to foster friendly cooperation with all other workers; and to promote industrial unionism in the jurisdiction of the Guild.

267.    Additionally, Article III of the CWA Constitution likewise provides:

> The objects of the Union shall be: (a) To unite the workers within its jurisdiction in a single cohesive labor union for the purpose of collective effort; (b) To improve the conditions of the workers with respect to wages, hours, working conditions and other conditions of employment; (c) To disseminate information among the workers respecting economic, social, political and other matters affecting their lives and welfare; (d) To advance the interests of the workers by advocating the enactment of laws beneficial to them and the defeat or repeal of laws detrimental to them; (e) To do all things which may be necessary or proper to secure for the workers the enjoyment of their natural rights. (f) To fight discrimination and harassment in all its forms, through the incorporation of the CWA Policy on Mutual Respect into this Constitution.

268.    These foundational provisions of the CWA and TNG-CWA Constitutions undergird TNG-CWA's participation in this lawsuit. Essentially, they provide that all

TNG-CWA members agree to work together, through the auspices of their union, to ensure that members work under safe and lawful conditions.

269.    TNG-CWA members have been targeted by DHS agents in Minnesota as part of Defendants' customs and policies of retaliating against those engaged in newsgathering, observation, documentation, and recording of federal agents.

### J.    Plaintiff Status Coup

270.    Status Coup is a progressive independent reporting network and media outlet that features investigative and on-the-ground reporting on politics, corruption, the working class, social justice, and the environment. Its mission is to put journalists on the ground to talk to people to find out what is really happening across America and uncover stories that would otherwise be missed by large corporate media outlets. Status Coup has over 3,000 paying members and its popular YouTube channel generates ad revenue based on video views.

271.    Status Coup's in-field and investigatory reporting requires that its journalists be embedded into the events they are covering. In the context of protests, this means Status Coup journalists are typically in close proximity to observers and protesters.

272.    Status Coup has had journalists in Minnesota to cover federal immigration operations since early December 2025. All five journalists that have covered events in Minnesota have been victims of intimidation, physical assault, and crowd dispersal weapons at the hands of federal immigration agents.

273.    On December 6 and 7, 2026, reporter JT Cestkowski was observing ICE with another independent local journalist. Both days, ICE vehicles boxed in their car or otherwise prevented them from driving.

274.    On January 11, 2026, Cestkowski and camera person Jon Farina were filming the protests at the Federal Whipple building. They were wearing press badges and carrying professional equipment. During one interview, federal agents deployed pepper balls and pepper spray into the crowd, causing both journalists to pause their coverage. Later, both Cestkowski and Farina were hit with pepper balls while conducting interviews.

275.    On January 13, 2026, Zach Roberts and Farina were covering a protest at the Whipple Building. Federal agents came out of the building with no provocation and no warning and began deploying munitions into the crowd. Roberts and Farina were near other members of the press and were wearing press credentials and carrying professional equipment. The agents fired the munitions indiscriminately into the crowd and both journalists were affected by the chemical irritants.

276.    On January 14, 2026, Roberts and Farina were covering a protest that followed the shooting of a man by federal immigration agents. As Roberts was interviewing a community member, he was hit in the head by something, potentially a piece of a flash bang. No warning had been given to the crowd to disperse. Agents continued to deploy crowd control weapons without warning at approximately 15-minute intervals throughout the time Roberts and Farina were there, causing interruptions in their coverage of the event.

277.    On January 24, 2026, Cestkowski and Farina were covering a protest after the killing of Alex Pretti by DHS agents. They were again wearing press credentials and carrying professional equipment. DHS agents asked them and other members of the press to stand in a specific spot. Later, agents specifically targeted that area with flash bangs and tear gas. Both journalists were shocked at the level of force used against peaceful protesters and themselves.

278.    On January 26, 2026, Tina Desiree-Berg and Farina were covering a protest at a hotel where federal immigration agents were staying. At one point, the majority of the people left were members of the press. A masked agent pointed a pepperball gun point blank at one journalist and shot others with pepperballs, while other agents deployed tear gas into the press crowd. While Berg and Farina were recording on a sidewalk, away from others, an agent came up behind Berg, grabbed her, and threw her to the ground.

279.    On February 2, 2026, Berg and camera person Allen Du-Praw were driving through south Minneapolis to cover the activity of federal agents there. They got behind an ICE convoy and got out of their vehicle to film the agents. They were wearing press credentials and carrying professional equipment. They were 10-15 feet from the agents. Nevertheless, an agent told them they were not allowed to follow them, because it constituted impeding, and warned them to stop.

280.    DHS' unlawful conduct directed toward Status Coup's journalists is a serious problem because it prevents Status Coup journalists from gathering and disseminating the news. One of the largest sources of income for Status Coup is the licensing of videos captured of newsworthy events. To capture these historic events, journalists have to be able

to be at the right place at the right time. When federal agents retaliate against Status Coup journalists for their journalistic activities, they make it impossible for this kind of journalism to be sustainable.

281.    When federal agents assault, fire munitions at, and interfere with, Status Coup's journalists, it also forces Status Coup to redirect its time towards addressing their unlawful actions. To protect its journalists, Status Coup is forced to use time to advocate for its employees' safety that could otherwise go towards making and distributing content.

## VI.    ALTHOUGH DHS HAS INDICATED THAT IT INTENDS TO END OPERATION METRO SURGE, SOME AGENTS WILL REMAIN IN MINNESOTA, AND IMMIGRATION ENFORCEMENT WILL CONTINUE.

282.    On January 26, 2026, Defendant Homan traveled to Minnesota to take command of Operation Metro Surge and Defendant Bovino was ordered out of Minnesota. This change in leadership did nothing to alter the situation on the ground. DHS agents continued to violate the constitutional rights of citizens and non-citizens alike, including by attacking, assaulting, threatening, and unlawfully arresting observers, journalists, and peaceful protesters.

283.    On February 12, 2026, Defendant Homan held a press conference announcing that the "surge operation" in Minnesota had been successful and would end. Defendant Homan did not indicate, however, that the unlawful conduct perpetrated by DHS agents would end.

284.    During the press conference, he continued to describe the overwhelmingly peaceful protesters and observers in Minnesota as "agitators." According to Defendant Homan, agents have arrested 200 of these "agitators" under 8 USC § 111. But as detailed

86

above, agents are arresting people simply for observing, recording, documenting, and protesting.

285.    Nor is there a guarantee that the number of agents will actually decrease unless Minnesotans cease engaging in activities protected by the First Amendment, as Defendant Homan conditioned the drawdown on a reduction in "unlawful and violent agitator activity." Moreover, Defendant Homan said that DHS will leave in place and a "small footprint" of personnel and CBP's "Quick Response Force," which essentially acts as a security detail for "when agitators get out of control." While there may be fewer agents on the ground, there is no indication that their response to Minnesotans documenting, observing, filming, or protesting their activities will change.

## CLASS ALLEGATIONS

286.    Under Rules 23(a) and 23(b)(1) and (2) of the Federal Rules of Civil Procedure, Plaintiffs bring this action for prospective relief on behalf of themselves and other similarly situated people who will in the future observe, record, and/or protest the conduct of ICE, ERO, HSI, CBP, and other officers enforcing immigration laws in public places within the District of Minnesota. The Plaintiff Class is defined as:

> All persons who do or will in the future record, observe, and/or peacefully protest against the DHS  immigration enforcement and removal operations that have been ongoing in this District since December 4, 2025.

287.    The Plaintiff Class contains three subclasses as follows:

a.    Plaintiffs Alan Crenshaw, Abdikadir Noor, Abigail Salm, and Margaret Wood seek to represent the Recording subclass, which consists of all persons who do or will in the future photograph, film,

livestream or otherwise record DHS immigration enforcement and removal operations that have been ongoing in this District since December 4, 2025;

b.  Plaintiffs TNG-CWA and Status Coup seek to represent the Press subclass, which consists of all persons who do or will in the future engage in newsgathering, including lawful observing or documenting, or reporting of DHS immigration enforcement and removal operations that have been ongoing in this District since December 4, 2025.

c.  Plaintiffs Ryan Doxsey, Lucia Webb, John Biestman, and Janet Lee seek to represent the Mobile Observer subclass, which consists of persons who, while lawfully driving in vehicles, do or will in the future observe, gather information about, document, and/or record DHS immigration enforcement and removal operations that have been ongoing in this District since December 4, 2025.

288.  Hundreds of ordinary Minnesotans have participated in observing and documenting immigration activity in the Twin Cities metro area over the past several weeks. The Plaintiff Class and Subclasses are so numerous, and is constantly growing, such that joinder of all the members is impracticable.

289.  As a result of the Defendants' customs and policies of retaliating against observers, journalists, and protesters, including by arresting them; targeting them with chemical irritants without constitutionally adequate justification or warning; denying them freedom of movement to  observe, gather information about, record, assemble or protest

law enforcement officers performing their duties in public; and intimidating them by threats of violence, the Plaintiff Class and Subclasses have been and will continue to be deprived of their constitutional rights under the First and Fourth Amendments.

290.    Plaintiffs' claims for prospective relief are typical of the members of the Plaintiff Class and Subclasses because the government's stepped-up immigration efforts and federal agent deployments in the Twin Cities metro are ongoing, and Plaintiffs and the Plaintiff Class and Subclass members have a reasonable fear that Defendants will continue to carry out their unconstitutional practices of arrest, deploying chemical irritants without constitutionally adequate warning, denying freedom of movement to observe, gather information about, record, assemble or protest law enforcement officers performing their duties in public, and intimidating them by threats of violence. Plaintiffs were all subjected to one or more of the violations previously enumerated, and they seek protection to prevent federal agents from repeating those violations in the future.

291.    Plaintiffs will fairly and adequately protect the interests of the Plaintiff Class and Subclasses. Plaintiffs have no conflicts involving other class members or Defendants. Plaintiffs understand their role as class representatives and their duties to the Class and Subclasses in this litigation. Plaintiffs are represented by competent and skilled counsel whose interests are fully aligned with the interests of the Class and Subclasses.

292.    Questions of law or fact are common to the Class and Subclasses. These legal and factual questions include but are not limited to:

- Whether Defendants have subjected Class and Subclass Members to a common practice of threatening Class and Subclass Members with detention or arrest and/or detaining and/or arresting Class and Subclass Members;

- Whether Defendants have subjected Class and Subclass Members to a common practice of threatening Class and Subclass Members with physical force and/or using force against Class and Subclass Members;

- Whether Defendants have subjected Class and Subclass Members to a common practice of failing to issue dispersal orders before using chemical irritants against Class and Subclass Members, and whether that practice violates the rights of Class and Subclass Members;.

- Whether Defendants have subjected Class and Subclass Members to a common practice of deploying chemical irritants in violation of their rights under the First Amendment;

- Whether Class and Subclass Members' newsgathering, documentation, and protest activities are protected under the First Amendment

- Whether Defendants' common practices would deter a person of ordinary firmness from engaging in protected First Amendment;

- Whether Defendants are retaliating against Class and Subclass Members because of the content of their speech or their activity documenting the conduct of ICE and other law enforcement agencies.

- Whether Class and Subclass Members' protected First Amendment activity is a motivating factor for Defendants' above-described common practices;

- Whether Defendants' common practices described above are justified by a compelling government interest and if so, whether those practices are the least restrictive means of advancing that interest; and

- Whether Defendants falsely arrest Class and Subclass Members in violation of the Fourth Amendment.

- Whether Defendants unlawfully seize Class and Subclass Members in violation of the Fourth Amendment

293.    Maintaining individual actions would create a risk of "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). Multiple courts issuing multiple injunctions governing the engagement and use-of-force standards for ICE would be untenable. Doing so would only contribute to a state of uncertainty and confusion that allows the constitutional violations described in the complaint to continue.

294.    This case involves "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications." Fed. R. Civ. P. 23(b)(1)(A). A ruling with respect to a single Plaintiff in this case would arguably be strong stare decisis—if not necessarily res judicata—with respect to other putative Class and Subclass members and members of the law enforcement community. There is no benefit to allowing the overwhelmingly

common issues in this case to be litigated individually. The interests of both Class and Subclass members and Defendants requires classwide treatment.

295.   Defendants have acted on grounds generally applicable to the Class and Subclasses.

296.   The questions of law or fact common to the Class and Subclass members predominate over any questions affecting only individual members, and this class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties. Moreover, the interests of Class and Subclass members in individually controlling the prosecution of a separate action is low in that most Class and Subclass members would be unable to individually prosecute any action at all.

297.   Finally, Defendants have acted or refused to act on grounds that apply generally to the Class and Subclasses, so that final injunctive relief is appropriate with respect to the Class and Subclasses as a whole. There is no allegation that Plaintiffs have been targeted because of anything unique to them as individuals. Rather, they have been repeatedly targeted because of their membership in a class of observers, journalists, and/or protesters. Plaintiffs' targeting exists only by virtue of a broader pattern and practice of unconstitutional conduct directed at observers, journalists, and/or protesters as a class. Logically, injunctive relief for the "class as a whole" is the only mechanism available to afford relief in light of conduct directed specifically to the Class and Subclasses.

## CAUSES OF ACTION

### COUNT I:
### First Amendment

298.    Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

299.    Plaintiffs and the Plaintiff Class engaged in constitutionally protected acts of information gathering, recording, and/or protesting events of public interest, including the conduct of federal agents on duty in a public place. Plaintiffs and the Plaintiff Class will continue to do so in the future.

300.    Plaintiffs and the Plaintiff Class engaged in constitutionally protected acts of assembly in public places to observe and protest Defendants' activities. Plaintiffs and the Plaintiff Class will continue to do so in the future.

301.    Defendants retaliated against Plaintiffs and the Plaintiff Class for engaging in constitutionally protected activity. Defendants' retaliation is part of a pattern or practice of unconstitutional conduct that is certain to continue absent any relief.

302.    The excessive and unlawful use of force, and the rampant constitutional violations, were so widespread, well-known, and obvious to Defendants that Defendants' continued use of excessive force against Plaintiffs and the Plaintiff Class, and continued violation of their constitutional rights, was willful and recklessly indifferent to the rights of Plaintiffs and the Plaintiff Class.

303.    Plaintiffs and the Plaintiff Class reasonably fear the continued deployment of chemical agents without warning, unlawful seizure, and excessive force, and other

means of repression and retaliation, if they continue to exercise their constitutional free speech and free assembly rights to observe, record, and/or protest DHS activity.

304. Defendants' acts would chill a reasonable person from continuing to engage in a constitutionally protected activity. On certain occasions, these acts did, in fact, chill Plaintiffs and the Plaintiff Class from continuing to gather information, record, and/or protest some current events of public interest, including conduct of federal agents on duty in a public place.

305. Plaintiffs' and class members' protected activity was and is a but for cause Defendants' adverse actions against Plaintiffs and class members. Defendants' retaliation is part of a pattern or practice of unconstitutional conduct that is certain to continue absent any relief.

306. Defendants intended to and did curb, interrupt, prevent, and chill the constitutionally protected speech of Plaintiffs and the Plaintiff Class.

307. Defendants' ongoing conduct in violation of Plaintiffs' and class members' constitutional rights and liberties has caused and is causing them irreparable harm.

## COUNT II:
### Fourth Amendment—Unlawful Seizure and Excessive Force

308. Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

309. In the manner described more fully above, Defendants violated and are violating Plaintiffs' and class members' rights to be free from unreasonable seizures,

specifically, seizure and arrests without probable cause, unreasonable termination of their freedom of movement, and excessive force under the Fourth Amendment.

310.    The force used against Plaintiffs described above was unreasonable.

311.    Plaintiffs and the Plaintiff Class reasonably fear further violation of the Fourth Amendment if they continue to gather information, record, protest, or otherwise participate in constitutionally protected activity.

312.    Defendants' ongoing conduct in violation of Plaintiffs' and class members' constitutional rights and liberties has caused and is causing them irreparable harm.

313.    In the absence of an injunction, Defendants will continue to use excessive force against and effect unreasonable seizures without probable cause on Plaintiffs and class members in violation of the Fourth Amendment.

## COUNT III:
## Civil Conspiracy

314.    Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

315.    Defendants conspired, under color of law, to deprive Plaintiffs and the Plaintiff Class of their constitutional rights.

316.    Defendants acted in concert and committed overt acts in furtherance of the conspiracy. Defendants targeted Plaintiffs and members of the Plaintiff Class, and used unlawful, excessive force to interfere with and retaliate against the Plaintiffs' and the Plaintiff Class's exercise of their constitutional rights.

317.    Plaintiffs and the Plaintiff Class reasonably fear Defendants will continue to conspire to violate the constitutional rights of Plaintiff and the Plaintiff Class.

## COUNT IV:
## Declaration of Rights, 28 U.S.C. § 2201

318.    Plaintiffs and the Plaintiff Class restate and reallege all previous paragraphs of this Complaint.

319.    In a case of actual controversy within its jurisdiction, any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought, under 28 U.S.C. § 2201.

320.    There is an actual controversy within the jurisdiction of this court, in as much as one or more federal defendants have engaged in actions endangering Plaintiffs and class members protesting federal immigration policy in the area targeted by "Operation Metro Surge." No federal authority has agreed to stop this practice.

321.    Plaintiffs are entitled to a declaration that the acts at issue are unlawful, and an injunction precluding Defendants from continuing them.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and as representatives of the class defined herein, pray for relief as follows:

A. A determination that this action may proceed as a class action under Rule 23(b)(1) or 23(b)(2) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representative and designation of Plaintiffs' counsel as class counsel;

C.  A declaration, pursuant to 28 U.S.C. § 2201, that the federal actions described in this complaint constitute violations of the First and Fourth Amendments;

D.  A permanent injunction barring Defendants from engaging in unconstitutional conduct and retaliation against class members.

E.  Immediate expungement of any and all records created by Defendants about Plaintiffs during the course of DHS's immigration enforcement operations in Minnesota.

F.  An award of such other and further relief as the Court deems equitable and just.

## **<u>JURY DEMAND</u>**

Plaintiffs demand a trial by jury of all issues triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: February 13, 2026

Kevin C. Riach (#389277)
**THE LAW OFFICE OF KEVIN C.
RIACH**
125 Main St. SE, Suite 339
Minneapolis, MN 55414
(612) 203-8555
kevin@riachdefense.com


Robert J. Gilbertson (#22361X)
Caitlinrose H. Fisher (#398358)
Virginia R. McCalmont (#399496)
Jackson C. Evert (#402214)
Rebecca R. Rogers (#403827)
**FORSGREN FISHER
MCCALMONT
DEMAREA TYSVER LLP**
1500 Capella Tower
225 South Sixth Street
Minneapolis, MN 55402
Telephone: (612) 474-3300
bgilbertson@forsgrenfisher.com
cfisher@forsgrenfisher.com
vmccalmont@forsgrenfisher.com
jevert@forsgrenfisher.com
rrogers@forsgrenfisher.com


Scarlet Kim*
Brian Hauss*
Esha Bhandari*
**AMERICAN CIVIL LIBERTIES
UNION OF MINNESOTA**
125 Broad Street
New York, NY 11238
Tel: (212) 549-2500
scarletk@aclu.org
bhauss@aclu.org
ebhandari@aclu.org

*/s/ Alicia Granse*
Alicia Granse (#400771)
Teresa Nelson (#269736)
Catherine Ahlin-Halverson (#350473)
**AMERICAN CIVIL LIBERTIES UNION OF
MINNESOTA**
P.O. Box 14720
Minneapolis, MN 55414
Tel: (651) 529-1692
tnelson@aclu-mn.org
cahlin@aclu-mn.org
agranse@aclu-mn.org


Kyle W. Wislocky (#393492)
Jacob F. Siegel (#399615)
**CIRESI CONLIN LLP**
225 S. 6th St., Suite 4600
Minneapolis, MN 55402
Tel: (612) 361-8233
kww@ciresiconlin.com
jfs@ciresiconlin.com


*Admitted pro hac vice