UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| SUSAN TINCHER, JOHN BIESTMAN, JANET LEE, LUCIA WEBB, ABDIKADIR NOOR, and ALAN CRENSHAW, *on behalf of themselves and other similarly situated individuals*,<br><br>Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive Associate Director, Enforcement and Removal Operations (ERO), ICE; DAVID EASTERWOOD, Acting Field Office Director, ERO, ICE Saint Paul Field Office; JOHN A. CONDON, Acting Executive Associate Director, Homeland Security Investigations (HSI); The Department of Homeland Security; Unidentified Federal Agencies; and Unidentified Federal Agents; *in their official capacities*,<br><br>Defendants. | Case No. 25-cv-04669-KMM-DTS<br><br>**DECLARATION OF PERCIVAL BOYLE** |

I, Percival Boyle, declare as follows:

1.   I am 27 years old and reside in Olympia, Washington, where I have lived since 2017. I work as a house painter and landscaper.

2.   I traveled to Minneapolis from January 16-19, 2026, specifically because of concern about the federal government's "Operation Metro Surge," which had resulted in

increased activity by DHS officers and U.S. Immigration and Customs Enforcement ("ICE") occurring in the city. This was my first time visiting Minneapolis. I traveled with my friend, Zach St. John, who lives in Olympia, Washington, and who has previously spent time in Minneapolis.

3. I am making this declaration based on my personal observations and firsthand experiences described below.

4. On Saturday, January 18, 2026, at around 3:20 pm, I was participating in community patrols in the Northeast Minneapolis area with other observers documenting ICE activity. I was a passenger in the vehicle driven by Zach.

5. We became aware that a blue Ford Edge associated with ICE was moving through the area. The vehicle had tinted windows, out-of-state plates, and four individuals inside wearing tactical gear.

6. We began following the blue Ford Edge at a safe distance as it moved through Northeast Minneapolis. It was clear the agents knew they were being observed: they began driving erratically, taking multiple fast turns in an apparent attempt to shake us. This continued for approximately 15 minutes.

7. The Ford Edge eventually turned onto 23rd Street NE, a residential street. As we followed, we saw that additional ICE agents from another direction had boxed in a civilian vehicle.

8. When we arrived, the Ford Edge had stopped in the middle of the street and parked directly behind the civilian vehicle, thereby blocking the road. We parked parallel on the left side of the road, got out of our car, and began filming from the sidewalk. The

agents we had been following positioned themselves between us and the other agents who were pulling a man out of the civilian vehicle. There were other observers standing and filming on the sidewalk on both the left and right side of the road.

9. I observed at least three other agents standing guard in front of us and next to the Ford Edge, preventing us from getting closer to witness to document the abduction. One agent continuously pointed a taser directly at us. He appeared to be a white, middle-aged man wearing a green hooded sweatshirt, gray sweatpants, a tactical vest labeled "ERO" and "POLICE", a holster, and a black mask covering his face below his eyes.

10. The other two agents stood next to the Ford Edge were each holding pepper spray in their hands. One appeared to be a Latino male in his 20s, wore a black mask over his entire face and head (with only his eyes uncovered), tan or khaki pants, sneakers, a dark colored hooded sweatshirt, and a tactical vest labeled "ERO" and "POLICE". The other agent appeared to be a Black male in his 20s, wore a black mask over his entire face and head (with only his eyes uncovered), a dark hooded Lakers sweatshirt, sneakers, and a tactical vest labeled "ERO" and "POLICE".

11. We were standing approximately 15 feet from the abduction. The agents blocking us from the blue Ford Edge were roughly 10 feet in front of us.

12. The man being detained was being forcibly shoved into a black Ford SUV by other agents. He appeared to be Latino. He was struggling and trying to remain standing while agents forced him into the vehicle while handcuffed. Later, I observed the agents shackling his ankles inside the vehicle. It was extremely cold—likely below 10 degrees Fahrenheit.

13. The agents detaining the man all wore tactical vests labeled "ERO" and "POLICE." They wore badges, radios, pistols in holsters, masks, and carried pepper spray.

14. None of the agents I observed wore tactical uniform clothing; they were dressed in street clothing. Their appearance, mannerisms, and tactics resembled a kidnapping.

15. We shouted at the agents to remove their masks and told them they were kidnapping someone. We also identified ourselves as peaceful observers and asserted our right to film.

16. The agent holding the taser pointed it in our direction and threatened at least twice, "I will light you up." This threat is audible on video.

17. Wanting to document the detention, I moved toward the sidewalk on the opposite side of the street, which was closest to the SUV where the man was being restrained. I remained on the sidewalk and stepped only slightly off it solely to obtain a clearer view for filming.

18. Another observer attempted to film from this angle as well. We were standing stationary, with our hands visible, filming, and not impeding or interfering with the agents. We made no sudden movements or gestures. We were maintaining a non-threatening presence as observers to document government conduct from a public space and from a safe distance.

19. The agent in the Lakers hooded sweatshirt suddenly ran toward us and pepper sprayed us, including the other observer directly in the face at close range.

20. The agent yelled "get back" as he approached to attack us. We had no opportunity to comply with this command before we were pepper sprayed. As the video shows, the agent had not finished yelling this command when he began spraying the other observer.

21. We were the only observers positioned with a clear, unobstructed view of the abduction, and we were the only ones actively filming from that vantage point. No other observers were pepper sprayed. Based on what I observed, the agent ran toward us and deployed pepper spray specifically because we were peacefully documenting the arrest from a position where we could see clearly what the agents were doing.

22. The observer next to me was severely struck with the spray at close range. His face and hair were completely covered and he became incapacitated. A street medic provided immediate aid.

23. The agents then entered their vehicles and drove away. They left the detained man's vehicle sitting in the middle of the street. After the agents left, community members arrived at the scene, including the detained man's sister. We learned that someone attempting to move the victim's vehicle located his permanent resident card and other documents inside.

24. Zach and I both recorded video and took photographs of the encounter with the agents, including images of the Ford Edge and the scene.

25. I have not experienced further interactions with ICE after returning to Washington.

26. I have no criminal history.

27. I am more committed to documenting ICE and law enforcement activity to protect our freedoms.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed on __1/23/2026__ in Thurston County, Washington.

_____
Percival Boyle