UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| SUSAN TINCHER, JOHN BIESTMAN, JANET LEE, LUCIA WEBB, ABDIKADIR NOOR, and ALAN CRENSHAW, *on behalf of themselves and other similarly situated individuals*,<br><br>Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive Associate Director, Enforcement and Removal Operations (ERO), ICE; DAVID EASTERWOOD, Acting Field Office Director, ERO, ICE Saint Paul Field Office; JOHN A. CONDON, Acting Executive Associate Director, Homeland Security Investigations (HSI); The Department of Homeland Security; Unidentified Federal Agencies; and Unidentified Federal Agents; *in their official capacities*,<br><br>Defendants. | Case No. 25-cv-04669-KMM-DTS<br><br>**DECLARATION OF CHRISTIAN GLANVILLE** |

I, Christian Glanville, declare as follows:

1. I am 32 years old and reside in Northeast Minneapolis, Minnesota, where I have lived for approximately nine years. I work as a museum employee. I have no criminal history.

2. I make the following declaration based on personal knowledge.

3.  I have been concerned about the presence of U.S. Immigration and Customs Enforcement ("ICE") agents in my community resulting from the federal government's "Operation Metro Surge."

4.  On Friday, January 23, 2026, I engaged in peaceful, non-interfering observation of ICE agents near my children's Waite Park Elementary school. I did so because parents in our community were concerned that ICE activity near an elementary school could traumatize students, disrupt childcare operations, and jeopardize the safety of students and families. I did nothing unlawful or obstructive. My actions were limited to observing from public streets, documenting events, and communicating safety information to other parents.

5.  At approximately 10:30 a.m., I received a message from another parent indicating that an ICE agent was present near the school. I drove to the school area. Although regular school was not in session, extended childcare was operating through the Minneapolis Parks and Recreation, staffed by individuals who were not the usual employees of the school. This raised serious concern among parents, including me, that staff might not know the proper safety protocols in the event ICE agents approached or entered the building.

6.  Upon arrival, I observed a light Jeep Wagoneer with heavily tinted windows idling near the school's main entrance. I parked 8–10 feet away, rolled down my window, and monitored the vehicle for several minutes. I could see motion inside but could not identify the individuals due to the tint. The inability to see who was inside due to the heavy tint increased my concern, particularly because this was occurring just feet from a childcare

2

entrance. Other parents began arriving and coordinating positions to avoid blocking exits while maintaining observation.

7. The Wagoneer drove off and was followed by another parent. I later learned that the parent who followed it was led back to their house by the ICE vehicle. The fact that an ICE vehicle intentionally led a parent to their home was extremely alarming and suggested that agents were monitoring and intimidating observers, rather than conducting ordinary law enforcement activity.

8. Soon after, I observed a second, nearly identical Wagoneer which was also an ICE vehicle—this one without heavy tint and with Illinois plates. Mistaking it for the first, I followed it towards a liquor store parking lot before returning to the school after receiving reports of a third ICE vehicle at the school: a blue/green Subaru Outback containing four men in tactical gear.

9. Over the next 30–45 minutes, I alternated between monitoring these vehicles and returning to school grounds. At various points, at least five separate ICE vehicles—including a black Suburban and a white Ford Explorer—were circling the neighborhood. Parents coordinated via messages and agreed to maintain a visible presence around school grounds to deter escalation. Our presence was strictly non-confrontational and limited to watching from public streets.

10. Around noon, a white pickup truck circled the school area twice before parking. The driver—a roughly 50-year-old man dressed in plainclothes and a Yankees baseball cap—claimed he had heard that ICE was in the area. He took photos of each patrolling parent. I did not believe this individual was an ICE agent. I interpreted his

3

conduct as possible agitation. His photographing of each parent added to the sense that individuals who were lawfully and peacefully observing ICE were themselves being monitored.

11.    Later in the afternoon, events escalated significantly. I observed the white Ford Explorer ICE vehicle rapidly accelerating in reverse toward an observer's vehicle, creating an imminent collision risk. The maneuver was abrupt and aggressive, and I believed in that moment that the observer's vehicle could be struck.

12.    I witnessed ICE agents exit a black Suburban and confront an observer two cars ahead of me. I began honking continuously to draw attention. Shortly afterward, reports circulated that ICE agents in the black Suburban were pointing firearms at observers who had come outside to peacefully and safely observe, document, and whistle alerts.

13.    While running toward another escalating scene, I saw agents forcibly placing an observer into the Subaru. The agents yelled for 20–30 seconds and then began driving away with their windows down. One agent leaned far outside the window holding what appeared to be a gas canister or flash-bang device and yelled at observers. I was roughly 15 feet away, parallel to the vehicle, filming the encounter. What appeared to be a whistle was thrown by an observer and hit the back of the ICE vehicle, after which the Subaru stopped briefly. The whistle did not strike any person, and I did not observe any injury or property damage as a result.

14.    Despite this, the agent's response—lifting most of his body out of the vehicle while holding what appeared to be a chemical or explosive device—was extremely frightening. He looked as though he was going to throw it at the observers, which would

4

have been completely uncalled for and unjustified. Ultimately, he did not, and the vehicle drove away.

15. I returned to my vehicle and encountered the black Suburban again. I followed it briefly and then returned to the school grounds to coordinate with parents to form a healthy perimeter around the school for pick-up time. We did not further encounter ICE at the school that day.

16. At all times during my encounters with federal agents, I remained peaceful and maintained a safe distance. I did not interfere with, obstruct, impede, or threaten any federal agent. I never approached any agent, vehicle, or operation. Nothing about my behavior could have justified further interest in me or my home by ICE.

17. After returning home, my wife informed me that the black Suburban drove down our alley behind our house the following morning. The alley is narrow and only used by residents or people for a specific reason to be there. The next day, I personally observed the same black Suburban pass by our house twice within a ten-minute window, moving slowly enough that it was clear it was surveying our home. This was deeply unsettling, as there was no legitimate reason for an ICE-associated vehicle to be in our alley or circling our home.

18. There was absolutely no legitimate reason for this ICE-associated vehicle to repeatedly appear so close to my home on two consecutive mornings. This conduct, occurring immediately after I engaged in peaceful observation of ICE activity, felt like targeted surveillance. It severely escalated my fear that I was being watched or singled out for retaliation. The only thing that distinguished me from other observers was that I had

5

openly and peacefully observed and recorded ICE operations the day before, including following vehicles from a safe distance. The Suburban's repeated return—three separate times—sent a direct and chilling message: that simply watching federal agents could endanger me and my family. This has had a lasting impact on my sense of safety, privacy, and security in my own home and neighborhood. The idea that federal agents might be watching our house has left me feeling constantly on edge.

19. These events have caused severe and ongoing fear, anxiety, and disruption to my daily life. The fact that ICE-associated vehicles appeared not only at my children's school but then at my home—moving slowly and in a manner consistent with surveillance—has left me feeling paranoid, anxious, hypervigilant, and fearful for my family's safety. I immediately asked my wife and children to temporarily relocate because I no longer believed our home was safe. Since then, I have struggled to sleep, work, and carry out normal routines due to the fear that federal agents may be monitoring me.

20. Despite my intention to continue observing, I am concerned that exercising my rights may prompt federal agents to target or monitor me personally.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed on 1/28/2026 in Hennepin County, Minnesota.

DocuSigned by:
Christian Glanville
C08D26C5D6094E0...

Christian Glanville