UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| SUSAN TINCHER, JOHN BIESTMAN, JANET LEE, LUCIA WEBB, ABDIKADIR NOOR, and ALAN CRENSHAW, *on behalf of themselves and other similarly situated individuals*,<br><br>Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive Associate Director, Enforcement and Removal Operations (ERO), ICE; DAVID EASTERWOOD, Acting Field Office Director, ERO, ICE Saint Paul Field Office; JOHN A. CONDON, Acting Executive Associate Director, Homeland Security Investigations (HSI); The Department of Homeland Security; Unidentified Federal Agencies; and Unidentified Federal Agents; *in their official capacities*,<br><br>Defendants. | Case No. 25-cv-04669-KMM-DTS<br><br>**DECLARATION OF JESSICA KIRBY** |

I, Jessica Kirby, declare as follows:

1. I am a 37-year-old resident of Blaine, Minnesota. I work for a financial institution. I make this declaration based on my personal knowledge.

2. I am extremely concerned and distressed by the federal government's aggressive immigration enforcement actions in the Twin Cities. What the federal

government is doing to people—many of whom are legally present in our community—isn't right. It isn't legal and it's not fair. I feel called to observe ICE and other federal immigration authorities' behavior in public, to document what I see, and to disseminate my observations to others in the community. I have the constitutional right to do this. I am white and so it is safer for me to do this work than it is for other community members who are at higher risk. It is my obligation to others who are more vulnerable to do what I can to keep our community safe.

3. At approximately 2 p.m. on February 6, 2026, I was observing federal immigration authorities from my car in North Minneapolis. I heard from another observer that she had been surrounded by a federal convoy, with some vehicles in front of her car and some behind her, and that they were shepherding her back to her home. I drove toward her house to observe what was happening. At all times, I drove safely and in compliance with the traffic laws.

4. By the time I got to her house, several vehicles full of agents were already there. I, along with several other observers, pulled over to watch from a safe distance. The agents, wearing tactical gear and patches that said "Police" threatened to arrest us. They told me it was my "final warning." This didn't make any sense because I hadn't done anything that would justify an arrest: I kept a safe distance from all federal agents, I drove carefully, and I did not to get in the agents' way.

5. The agents, in four unmarked vehicles, left the observer's home and I, along with observers in two other cars, followed at a safe distance. The convoy broke, with one unmarked vehicle going in one direction and the other three going in another. One other

2

observer and I followed the group of three unmarked vehicles in our own cars, driving carefully and leaving plenty of space between the unmarked vehicles and ourselves.

6. We followed until the unmarked vehicles parked. We wanted to give the agents space, so we drove a few blocks past where they stopped. I circled back around and parked about a block and a half away from the agents on North 21st Avenue. I positioned my car so that I was facing the agents.

7. One of the unmarked vehicles suddenly drove right at my car, very fast. I was stunned. I put my car into gear hoping to turn right and get out of the way, but I had only traveled a few feet, at low speed, and the ICE vehicle was coming right at the front of my car. I slammed on the brakes and threw the car into park. If I had not done so, the unmarked vehicle would have rammed me. My car was nose-to-nose with the unmarked vehicle, although I had barely moved out of the parking spot. At least two other unmarked vehicles were close behind the first.

8. At least seven agents rushed out of the vehicles toward me. They had their guns drawn and pointing at me. One agent was standing in front of my car; he pointed a gun at me through the windshield. I instantly thought of Renee Good's last moments.

9. Another agent rushed to the driver's side and reached into my open driver's side window and attempted to open the door to pull me out of the car. I tried to roll the window up, screaming that they had no right to do this and that it was illegal, but the agent smashed the window, caving it in and showering me with broken glass.

10. I was terrified the agents would shoot me, so I got out of the car voluntarily and did not resist as the agents handcuffed me. I heard an agent say something like, "Get

3

the AR!" By this time, bystanders had started appearing on the sidewalk and other observers in cars had arrived. The agents were screaming at them also.

11. The agents placed me in the back of a dark SUV. I did not resist. They left my car on the side of the road, still running.

12. The agents started to drive toward the Whipple Building with me in the backseat. A female agent sat in the back with me, videotaping me.

13. An observer was following the vehicle as it headed back toward Whipple. We got off the highway and the agents in the vehicle that I was in waited for others to join them. Together, the agents detained that observer and her passenger also. I saw the agents point guns at her and one agent was holding an AR. They put her in the back of the SUV with me and they put her passenger in another vehicle. They left her vehicle in the road.

14. When we arrived at Whipple, agents stood us up facing the wall and took our jewelry, wallets and other items we had with us. They sat each of us at a desk and took our names, social security numbers and addresses.

15. Then, I was brought into a holding cell. The agents took off the handcuffs but shackled my ankles. After a while, the other observer who had been in the back of the SUV with me was brought into the cell.

16. After some time, it felt like hours, we asked to use the bathroom. The agents wouldn't take us to the bathroom right away.

17. Eventually they did allow me to use the bathroom when they took me for "processing." The agents took my fingerprints and a cheek swab, I assume for DNA. They did not have a warrant and did not ask for or receive my consent to take my DNA.

4

18. The agents returned me to the cell. After a few hours, I was brought out of the cell and read my rights. I refused to speak with agents without a lawyer. I was permitted to make a call to the National Lawyers Guild.

19. The agents took me back to the cell, which now contained four people, including me. The agents gave us each an Uncrustable sandwich and a granola bar. They did not give us water. When we asked for water, we were given three bottles to share between us and some cups. There was no running water in the cell.

20. Around 10 p.m., we were told that we were being released. The agents took us out of the cell and returned some of our belongings. I noticed that my wallet was missing. I asked for my wallet back and the agents insisted they never took a wallet from me. They told me that I would have to call them another time to try to get my wallet back.

21. The agents walked me to the door of the building and left me outside without my wallet. I was not permitted to call anyone before they walked me out. I didn't have my phone with me when I was arrested so I had no way to call for a ride, nor any money to pay for one since the agents did not return my wallet to me. Volunteers helped me get home.

22. The next day, agents called me to tell me they found my wallet. I am still figuring out how to get it back since I am unwilling to go back to the Whipple Building. I cancelled the cards that were inside.

23. I later saw pictures of my smashed car posted by a Facebook user called "Donald Trump for President." The post called me a "violent degenerate." This is not true. I am not violent. I was driving safely at all times. I did not resist this obviously unlawful

5

arrest. I am not a degenerate. I am a suburban working mom looking out for my community. The agents who smashed my car window, pointed guns at me, and detained me for hours for no reason are violent.

24. Although this experience was unsettling, it has not changed my conviction to continue to observe federal agents within the confines of the law.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed on February 9, 2026, in Anoka County, Minnesota.

_____
Jessica Kirby