UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| SUSAN TINCHER, JOHN BIESTMAN, JANET LEE, LUCIA WEBB, ABDIKADIR NOOR, ALAN CRENSHAW, ABIGAIL SALM, RYAN DOXSEY, MARGARET WOOD, STATUS COUP NEWS, and THE COMMUNICATIONS WORKERS OF AMERICA, o*n behalf of themselves and other similarly situated individuals,* | Case No. 25-cv-04669 (KMM/DTS) **DECLARATION OF JONATHAN KOENIG** |
| Plaintiffs, v. KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive Associate Director, Enforcement and Removal Operations (ERO), ICE; DAVID EASTERWOOD, Acting Field Office Director, ERO, ICE Saint Paul Field Office; JOHN A. CONDON, Acting Executive Associate Director, Homeland Security Investigations (HSI); The Department of Homeland Security; Unidentified Federal Agencies; and Unidentified Federal Agents; *in their official capacities*, Defendants. | |

I, Jonathan Koenig, declare as follows:

1. My name is Jonathan Koenig. I currently live in Saint Louis Park, a suburb of Minneapolis. I am 40 years old.

2. I have lived in Minnesota for the last three years and the Twin Cities area for the last year and a half. I am an attorney. I work with veterans, helping them appeal benefit application denials.

3. I feel devastated by what is happening to my community right now. I am sad about how people are being abducted and deported by the Federal Government, and by the direction in which our country is headed. But, living in the Twin Cities area, I have been very impressed with how my community is organizing, coming together, and protesting lawfully and peacefully despite what is happening.

4. Following the Federal Government's operations in Minnesota, I wanted to find a way to protest against what the government is doing in this area. I joined a community group chat to discuss how we could legally and safely observe federal agents' activities, because observing can change how ICE agents behave. Even if I am just documenting abuses, it can provide some recourse. Conducting these observations has felt meaningful to me.

5. On January 26, 2026, at approximately 9 AM, I left my home in St. Louis Park to conduct legal observations of federal agent activity. I was driving my Ford F150, which is registered in my name. This was my second time conducting observations in my neighborhood. I had not seen any federal agent activity on my first time.

6. After a few hours of driving around my neighborhood, I began to head for home. Along the way, I passed by Tierra Encantada, a Spanish Immersion daycare in St. Louis Park. As I drove by, I saw a Ford Expedition pull up to the daycare. It had California plates and two people in the front seats who looked like federal agents inside. They were wearing tan vests and had covered their faces using gaiter-style masks. The time was approximately 11:00 AM.

7. Upon seeing the federal agents, I turned my vehicle around and parked. I saw that the federal agents were parked, idling in their car, outside the preschool. I got out of my vehicle and walked around until I could see the agents' rear license plate. I relayed the license plate number to my neighbors, who told me that that license

plate had been associated with federal agents previously. One of my neighbors responded that they would alert the preschool.

8. I then returned to my vehicle and sat there, observing the federal agents. As I watched, a man came out of the preschool and talked briefly to the federal agents. The man then walked back into the preschool. After the conversation, the federal agents began to drive away.

9. I then followed the federal agents as they drove down Excelsior Boulevard in St. Louis Park, heading northeast. I followed as they pulled into a Whole Foods parking lot and drove around and out of the parking lot. I called my neighbors and asked for another observer to come out to observe as well.

10. I then continued to follow the federal agents as they drove down Excelsior Boulevard. Throughout, I followed at a reasonable distance and at a safe, controlled speed. The federal agents were driving at a casual pace, so this was not difficult.

11. As we drove, another observer came and began following me.

12. After a few blocks of driving along Excelsior Boulevard, the other observer reported via our community chat that there was another vehicle occupied by federal agents following them as well. I was now situated between two vehicles carrying federal agents.

13. I continued following the federal agents in front of me as they turned right onto Monterey Drive. As I turned onto Monterey Drive, I saw the agents pull over onto the right shoulder of the road. I drove by them.

14. I then pulled into an elevated parking structure along Monterey Drive. The second vehicle of federal agents, which had been following the second legal observer, followed me inside. As it did so, it activated its emergency lights. I slowed down to approximately a mile an hour, going through the crowded parking structure.

15. At almost the same moment, another vehicle of federal agents sped around the parking structure from the opposite direction, coming towards me. It boxed me in. I stopped. Only a few seconds had gone by since the first vehicle had activated its emergency lights.

16. I then put my vehicle in park and put my hands up. It was now approximately 11:20 AM. I was not sure if the agents had any basis to lawfully pull me over. I then saw four federal agents, guns drawn and pointing at me, running hard towards

my vehicle. I was stunned. I thought I was in imminent threat of death. I was thinking that, if I did anything wrong in that moment, they would shoot me. They came up shouting commands, telling me to turn off my car, put my hands on the wheel, and roll down my window. I did what they said.

17. After I had rolled down my window, the agents, who were masked and wearing tan camouflage, told me to turn my vehicle off. I did so. They told me to get out of the car. I did so.

18. The agents then put me up against my truck. They began frisking me, asking me if I had any weapons. I said no. A few of the agents were filming me on their cellphones. One of them asked me who I had been talking to on the phone. Another asked why I had been following them. They asked who was telling me to be out there and asked if I was getting paid to be out there.

19. I told the federal agents that I was encouraged to observe by other members of the community. One of the agents responded, "We are going to need those names right now." I told him that I did not know the names of the other people on the group chat. They did not press me after that. I had multiple agents yelling different things at me as they filmed me with their phones.

20. One of the agents then told me to give him my ID. I told him that it was in my pocket. He reached into my pocket and took out my wallet. The agents told me that I was interfering with their operation and violating federal law. They told me that I was violating 18 USC § 111. They told me that this was my "first and last warning." They handed my ID back to me. Another said, "We have what we need now."

21. Throughout the interaction, I tried to stay very calm and polite. I was afraid for my life. At one point, one agent whispered to me, "Just don't resist, just don't resist."

22. As some of the federal agents questioned me, other agents went through the cab of my truck. They did not ask my permission before searching my car or tell me the basis for their search.

23. Eventually, after approximately three minutes, the federal agents told me that I was free to go. One of them told me to get out of there. He added that the agents now knew who I was.

24. I got in my car and drove away. I was very pent up. I drove around the area for a bit. The federal agents followed me as I drove around, so I drove to a parking lot and parked. I felt hyperaware and very scared.

25. This encounter thoroughly intimidated me. The image of masked agents running at me with guns pointed at my head was terrifying. Following the murder of Alex Pretti, I was terrified. In that moment, my body tensed up, ready to take their fire. I thought about how angry my partner would be when they learned I was dead. I did not understand how the situation had escalated to this.

26. Following this incident, at least right now, I would not go out and observe federal agents again. For me, the personal risk is too high. Two days ago, I learned that Alex Pretti had been beaten up by federal agents a week before he was killed. I do not want the same thing to happen to me on my second time. The risk at this point is not worth it.

27. Despite what happened to me, I still plan to go to large group protests and support other individuals who have experienced ICE trauma. There are a lot of us now, and we need to support each other.

28. The first forty-eight hours after the incident were pretty rough. I have not been sleeping. I have had a lot of intrusive thoughts. The incident keeps running through my head. I have mostly been staying inside. I feel scared when I go out in my vehicle, because the agents know what car I drive now.

29. Since the incident, I often feel hypervigilant when driving. If a car is following me for more than a couple of lights or for some distance on the highway, I slow down and see if the vehicle will pass me or otherwise try to see what type of vehicle it is. I generally worry that I am being followed and often scan surrounding vehicles, looking for large, unmarked SUVs.

30. Although I am too scared to go back out there right now, I am proud of my work observing federal agents. On Wednesday, January 28, 2026, I learned that the preschool outside of which I had found the federal agents had not known that the federal agents were there before I warned them. They were grateful that I had warned them. I felt particularly strongly about helping them. It is a preschool. Kids should be able to go to school without worrying about masked agents of the state. By being there, I offered them a modicum of security and support.

I declare under penalty of perjury that everything I have stated in this document is true and correct.

Dated and signed on January 30, 2026 in Hennepin County, State of Minnesota.

_____
Jonathan Koenig