## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| SUSAN TINCHER, JOHN BIESTMAN, JANET LEE, LUCIA WEBB, ABDIKADIR NOOR, and ALAN CRENSHAW, *on behalf of themselves and other similarly situated individuals*, | Case No. 25-cv-04669-KMM-DTS |
| Plaintiffs, | **DECLARATION OF LAUREN LARSON** |
| v. | |
| KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive Associate Director, Enforcement and Removal Operations (ERO), ICE; DAVID EASTERWOOD, Acting Field Office Director, ERO, ICE Saint Paul Field Office; JOHN A. CONDON, Acting Executive Associate Director, Homeland Security Investigations (HSI); The Department of Homeland Security; Unidentified Federal Agencies; and Unidentified Federal Agents; *in their official capacities*, | |
| Defendants. | |

I, Lauren Larson, declare as follows:

1.      I am forty-one years old and live in Robbinsdale, Minnesota. I am providing this declaration to describe what I personally saw and experienced during immigration enforcement activity in my neighborhood and the impact these events have had on me.

2. On Sunday, January 11, 2026, at approximately 10:50 a.m., I arrived with my husband near the intersection of 49th/50th Street and Russell Street in North Minneapolis to observe and record reported immigration enforcement activity that was occurring in the area. There were approximately 50 other observers in the neighborhood present to record the activities of federal immigration authorities.

3. Immediately upon arriving in the area I observed two unmarked vehicles parked on Russell Street, which I believed to be federal immigration agents based on their uniforms and masks. I also observed additional vehicles I believed to be containing federal immigration authorities continuously driving through the area. In total, I observed between four and six vehicles

4. At this time many observers were using whistles and shouting to announce the presence of federal immigration authorities in the area. Most people I observed remained calm, although I spoke with others who were so concerned with agents becoming violent with observers that she contemplated calling local police. I did not observe anyone touching vehicles or physically obstructing the agents. To the contrary, if anyone started to get too close I witnessed multiple instances of other observers telling them to back up and not get too close to the vehicles.

5. Many specifically asked agents for identification, badges, or any proof of their authority. I never heard or witnessed the agents do so. We were later able to identify the agents as immigration authorities through their physical appearance: wearing vests marked "POLICE," masks, and other tactical gear. I observed people attempting to take photographs of the agents and record the license plates of their vehicles. Most of the license

Docusign Envelope ID: 421A1210-920B-458A-A9C3-58984CFEBA2D

plates were from New York state, and some even had odd numerals that appeared to be handwritten.

6.     Suddenly, one of the vehicles that had been circling Russell Street stopped and remained stationary in the middle of the street for some time. Then, suddenly, the agents rolled down the vehicle's window and sprayed a chemical irritant (pepper spray) at those observers standing near the driver's side window.

7.     Specifically, the agent first targeted his pepper spray at one individual who had been shouting at the agents but not blocking or impeding the vehicle's path. He continued to spray the irritant at a second individual who was also present and attempting to deescalate the scene and assist the first individual recover from being sprayed with chemical irritants.

8.     I then observed the agent target a third individual with his pepper spray. From what I could tell, this third individual did not appear to be shouting or impeding the agents' vehicles in any way; they were simply recording the interaction on their phone. The agent rolled the vehicle's window back up and the vehicle sat stationary on Russell Street for maybe 15-20 minutes.

9.     There was no reason for the agent to deploy chemical irritants against any of the observers, least of all this last individual recording the scene.  Indeed, from what I observed, neither the agents nor their vehicle was in danger; the observers had been present for some time, and nothing was escalating that would have necessitated force.

10.     As best I could tell, the vehicle remained stationary for what felt like 15-20 minutes before federal immigration agents began staging outside one of the houses on

Russell Street, preparing to enter the dwelling. At this time, one agent directed me and other observers to stand farther back and indicated where we should stand. I did not hear agents announce themselves or state that they possessed a judicial warrant before entering the home. Instead, I observed from my vantage point agents immediately breach the door and enter the house. Attached as Exhibit 1 is a true and accurate copy of a picture reflecting my view of agents as they entered the home.

11.     As the federal agents emerged, I observed agents take a man I later found learn to be Garrison Gibson from the home. I and others were permitted a moment to comfort family members who were visibly distressed, including helping to keep people warm in the sub-zero winter weather. Throughout this time, federal agents were pointing firearms, weapons that appeared to use "less-lethal" munitions, and chemical irritants at everyone in the vicinity.

12.     When I went to check on Mr. Gibson's family, one of the family members was holding the warrant displayed by the agents who forcibly entered their home. I asked to see it to verify it was the correct type of warrant and was horrified to see that it was only an administrative warrant—not a judicial warrant signed by a judge. The agents, in other words, had no authority to break down the door. This made me feel sick. I couldn't believe this could happen. I took a photograph of that administrative warrant, a true and accurate copy of which is attached as Exhibit 2. After a few minutes, I left the scene.

13.     Watching federal immigration agents enter a home without a judicial warrant was deeply concerning and distressing to me. Although I have never practiced law, I graduated from law school from Hamline Law School in 2011 and have worked in a legal-

Docusign Envelope ID: 431A1210-020B-458A-A9C3-58084CFEBA2D

adjacent field for many years. The rule of law – the grounding principle of our democratic order – depends on the basic assumption that the government will follow the law. It was terrifying to consider that agents either did not understand or did not care about the limits the Constitution imposes on searches and seizures. In my view, what I observed degraded not just bedrock legal principles, but a sense of community and trust we place in our government and our society.

14.     I worry that the agents I observed lacked training in the governing law, in safe and lawful crowd management, and in the appropriate use of so-called "less-lethal" measures. And it terrifies me that agents appear to be specifically targeting those exercising their First Amendment expressive rights—voicing opposition to the agents' wrongful conduct and recording their interactions. The ideal of lawful, accountable policing felt, in that moment, like it was dying.

15.     Yet I also witnessed a glimmer of hope. It was inspiring to see neighbors protecting neighbors, community members caring for one another, and people engaging civically under frightening circumstances.

16.     In the days after these events, I was emotionally devastated. I cried and spent days on the couch. I felt traumatized and powerless. These emotions have persisted, though they are accompanied by a resolve to continue bearing witness and to support my community.

17.     All told, I am fearful to go out and continue observing the lawless actions of federal immigration authorities as they terrorize our communities. Yet I have long believed

it is my responsibility to show up, speak up, and bear witness to injustice. I will persist, as best I can, despite the intimidating nature of the agents' response to community support.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed on _____1/23/2026_____ in Hennepin County, Minnesota.

Lauren Larson

Docusign Envelope ID: 421A1210-920B-458A-A9C3-58094CFEBA2D

# EXHIBIT 1

## To the Declaration of Lauren Larson



# EXHIBIT 2

## To the Declaration of Lauren Larson

