UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| SUSAN TINCHER, JOHN BIESTMAN, JANET LEE, LUCIA WEBB, ABDIKADIR NOOR, and ALAN CRENSHAW, *on behalf of themselves and other similarly situated individuals*, | Case No. 25-cv-04669-KMM-DTS |
| Plaintiffs, | **DECLARATION OF ETHAN O'BRIEN** |
| v. | |
| KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive Associate Director, Enforcement and Removal Operations (ERO), ICE; DAVID EASTERWOOD, Acting Field Office Director, ERO, ICE Saint Paul Field Office; JOHN A. CONDON, Acting Executive Associate Director, Homeland Security Investigations (HSI); The Department of Homeland Security; Unidentified Federal Agencies; and Unidentified Federal Agents; *in their official capacities*, | |
| Defendants. | |

I, Ethan O'Brien, declare as follows:

1.      I have lived in Northeast Minneapolis for approximately 15 years. I am 48 years old. I work as a communications manager at a university in the Twin Cities.

2.      I make the following declaration based on personal knowledge.

3. I have been concerned about the presence of U.S. Immigration and Customs Enforcement ("ICE") agents in my community resulting from the federal government's "Operation Metro Surge."

4. On Sunday, January 18, 2026, I was at home with my family when I received an alert that there was a live ICE abduction occurring near a cross street close to my home. I immediately drove to the location with my whistle and phone.

5. When I arrived, the individual being detained was already in the backseat of the ICE vehicle on a residential street between NE 23rd Avenue Minneapolis and NE Jackson Street.

6. When I exited my car, I immediately began recording on my phone from the sidewalk closest to where the man was being restrained. The victim's vehicle was positioned diagonally in the street. An ICE vehicle was blocking the victim's car and obstructing traffic.

7. The victim was lying down in the backseat of the ICE vehicle. One ICE agent was sitting on one of his legs while the victim's other leg was draped over the agent's lap. Another ICE agent was positioned near the victim's head. The victim's body appeared twisted upward toward the ceiling of the vehicle in a way that looked extremely uncomfortable and concerning.

8. I took a few steps forward because I believed I was witnessing excessive force and abuse and that the victim could be seriously harmed by the ICE agents and I wanted to document it and obtain a clearer view. I was several feet away from the ICE vehicle and standing to the side of the vehicle—not in front of the vehicle, not behind it,

and not impeding or interfering with any actions by the ICE agents. The victim was already inside the vehicle, and I had no intention of interfering. I was only recording what I observed.

9. I was approximately four to five feet away from the victim and the ICE agents and had stepped perhaps two steps off the sidewalk. When I saw the victim's face twisted upward, I became worried the agents might break his neck. I continued silently recording. Other bystanders were screaming, whistling, and creating noise, but I remained completely silent.

10. Another observer attempted to film from this angle as well. We were standing still, with our hands visible, filming, and not impeding or interfering with the agents. We made no sudden movements or gestures. We were maintaining a non-threatening presence as observers to document government conduct from a public space and from a safe distance. At no point did I engage with the agents, speak, raise my hands, or make any movement that could be interpreted as threatening or interfering.

11. Suddenly, a third ICE agent in a Lakers hooded sweatshirt and a ski-mask approached from the opposite side of the ICE vehicle. I had not even noticed him before he stepped forward. Without warning and without any change in our behavior, he ran toward us and pepper sprayed us, including spraying me directly in the face at extremely close range—approximately two feet.

12. The agent yelled "get back" as he approached to attack us. We had no opportunity to comply with this command before we were pepper sprayed. The spray

3

reached my face before his words were even finished. Because the spray occurred simultaneously with his command, compliance in moving was physically impossible.

13. We had not received any prior instructions or warnings from ICE to move or get back. Had I been warned to move, I certainly would have complied. I was not there to do anything illegal or to impede officers, and I have always been taught to remain calm and record.

14. We were the only observers positioned with a clear, unobstructed view of the abduction, and we were the only ones actively filming from that vantage point. No other observers were pepper sprayed. Only those of us closest to the ICE vehicle with a direct view inside were targeted. I believe I had the clearest view of the victim at the time I was sprayed directly in the face.

15. The agent's actions felt indiscriminate and dehumanizing—like spraying cockroaches. I was standing approximately two steps off of a public sidewalk, I was peacefully documenting the arrest from a safe distance, and there was no justification for extending pepper spray toward me.

16. The pain from the pepper spray was instantaneous—within seconds, it felt like my face and body had been set on fire. I could not open my eyes. The burning was immediate, overwhelming, and completely incapacitating. The pepper spray was sticky and adhered directly to my eyes, neck, hands, chest, face, and hair. I immediately stepped backwards on the sidewalk and dropped to my knees because I did not want to remain close to the roadway without being able to see.

4

17. I tried to keep recording, but the pain was too severe to continue. Community members quickly surrounded me and poured water over my eyes while I lay back. A street medic arrived at my side, helped remove my coat, and began flushing my eyes with cups. The extreme cold weather—well below freezing—intensified the burning and made the decontamination process much more painful and difficult.

18. Two strangers escorted me to a nearby establishment to be indoors. The medic decontaminated my clothes, cleaned my glasses, and wiped down my phone. Community members bagged my pepper-sprayed clothes, provided donated replacements, and called my spouse. She drove me to the Emergency Room at a nearby hospital.

19. I received medical treatment at the ER. The treatment included numbing drops and a 45-minute eyewash using plastic contact-lens devices connected to saline drips. These devices had to be held in place while the saline continuously flushed my eyes, which was extremely painful. The treatment also included repeated wiping of my face, neck, chest, and hands with wipes. My eyes and body were examined for scratches, chemical burns, and other damage. I was at the hospital for approximately 2.5 hours and left with prescription medications for injuries.

20. The physical pain and burning lasted for more than 36 hours. During that time, I experienced waves of burning that intensified anytime the skin re-moistened or heated up. The pepper spray also burned parts of my body where I had been sweating, including my hands, neck, and chest. The runoff from the hospital eyewash caused additional burning as it mixed with remaining spray.

21. Since the incident, I have experienced compounding psychological effects. I have sought therapy, spoken with my healthcare provider, and struggled with sleep—both due to physical burning sensations and psychological distress. I experienced headaches for days afterward and have felt generally fearful. I have had difficulty concentrating at work and am considering taking a leave of absence because it has become difficult to function in my role. The incident occurred two blocks from my home and near our neighborhood school, which heightens the distress.

22. I intend to continue observing immigration enforcement activities, but this experience has had a profound impact on my sense of safety. I have experienced intrusive memories of the event and heightened startle responses.

23. I have no criminal history.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed on 1/26/2026 in Hennepin County, Minnesota.

Ethan O'Brien