UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| SUSAN TINCHER, JOHN BIESTMAN, JANET LEE, LUCIA WEBB, ABDIKADIR NOOR, and ALAN CRENSHAW, *on behalf of themselves and other similarly situated individuals*,<br><br>Plaintiffs,<br>v.<br><br>KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive Associate Director, Enforcement and Removal Operations (ERO), ICE; DAVID EASTERWOOD, Acting Field Office Director, ERO, ICE Saint Paul Field Office; JOHN A. CONDON, Acting Executive Associate Director, Homeland Security Investigations (HSI); The Department of Homeland Security; Unidentified Federal Agencies; and Unidentified Federal Agents; *in their official capacities*,<br><br>Defendants. | Case No. 25-cv-04669-KMM-DTS<br><br>**DECLARATION OF**<br>**C▇▇▇ R▇▇▇** |

I, C▇▇▇ R▇▇▇, declare as follows:

1. I am a 25-year-old resident of the Whittier neighborhood in the City of Minneapolis, County of Hennepin, Minnesota, where I have lived for a year. I currently work as a Planning Analyst for a metro county, but I am also a public policy graduate student.

2. I care deeply about my community, including my immigrant neighbors. I have been concerned about the overwhelming presence of aggressive federal immigration agents in my community. I have observed the way that the recent immigration enforcement push in Minneapolis is tearing apart families in my community and disrupting daily lives.

3. I feel called to action because I believe it is important to draw public attention to the illegal and immoral actions of federal authorities. I protest to express my dissent because I can see that dissent matters and can make a difference. I believe our voices are important.

4. I make the following declarations based on my personal knowledge.

5. On the morning of January 23, 2026, at approximately 11:00 AM, I was driving through the Uptown area of Minneapolis with my partner, M▮▮ G▮▮. We observed a Jeep Wagoneer and could see that there were four men inside wearing tactical gear, including vests and masks.

6. We followed the Wagoneer at a safe distance for approximately 5 minutes and were about halfway down the block facing north on Aldrich Avenue between and West 23rd Street and West 22nd Street when the Wagoneer abruptly stopped in front of our car.

7. Four agents—two of whom were masked, but all of whom wore military-style dress with yellow "Border Patrol" insignia—then exited the Wagoneer and approached my car. Two agents stood next to the driver's side where I was seated, and two agents stood next to the passenger side where my girlfriend was seated. We were surrounded.

8. Around the same time, a Toyota Rav-4 appearing to contain three additional agents arrived.

9. The agents who had surrounded my car began yelling at us to roll our windows down. I could see that the agent on the passenger side was filming us through the car windows.

10. We did not lower our windows because we were terrified, but the agents screamed at us through the closed window. Immediately after this occurred, I wrote down what one agent screamed at us: "This is United States Border Patrol. You cannot fucking follow us. This is your first and final warning. If you continue to follow us, I will pull you out of your fucking car."

11. At all times, I was driving safely, in compliance with the traffic laws and under the speed limit. I remained at a safe distance from the Wagoneer. I was not obstructing or interfering with anyone. I was merely observing activities on a public roadway. I did not say a single word to the agents during the interaction.

12. The agents then returned to their vehicle and departed northbound on Aldrich Avenue. Fearful of not complying with the agents' demand given my prior observations of federal agents' retaliatory actions against observers, I disengaged and drove off in a different direction.

13. Later that same morning, at approximately 11:55 AM, I learned that a confrontation between observers and federal immigration agents was developing near West 27th Street and Park Avenue in the Uptown neighborhood. My partner and I drove to the area, parked nearby and proceeded on foot to observe and document the interaction. When

3

we arrived, we observed seven agents—including some of the same agents that had threatened us earlier that morning—attempting to pull a woman by her neck out of her car. The woman was bleeding and we could see that her driver's side window had been smashed. The level of force that the agents were using against an injured woman was offensive and appeared to me to obviously unnecessary. The interaction was emblematic of the overaggressive and forceful nature of federal authorities engaging members of the public who express dissent about their immoral actions.

14. The next morning, January 24, 2026, at approximately 8:40 AM, my girlfriend and I were getting coffee at a bakery near Lyndale Avenue S and West 26th Street in the Uptown neighborhood in Minneapolis when we learned that heavy immigration enforcement activity had been reported in the area and there was a need for observers.

15. We decided to drive to the area of reported activity to observe. We were driving east on Franklin Avenue when we encountered a maroon Dodge Durango taking a right to travel south down Nicollet Avenue. I visually confirmed that four federal agents were inside the vehicle based on their military style of dress and insignia.

16. We followed the Durango at a safe distance down Nicollet Avenue for four blocks to East 27th Street, where the Durango abruptly made an illegal U-turn and parked on the east side of Nicollet Avenue in front of Glam Doll Donuts. By this point, the time was approximately 8:50 AM.

17. I then took a left into a parking lot just south of Glam Doll Donuts, where I observed a second Dodge Durango idling in the parking lot. I observed four more federal

immigration agents inside that vehicle, bringing the total number of agents I could see at the scene to at least eight.

18. Still shaken from my interaction with federal agents the day prior, I began to grow uneasy with the growing presence of federal agents in the area.

19. From inside my parked car, I observed two agents exit an SUV parked in front of Glam Doll Donuts and unsuccessfully attempt to enter the building. It appeared to me that the door was locked.

20. The two agents were walking back toward their SUV when they noticed that my girlfriend and I were observing from our car. My sense of unease continued to grow but I felt compelled to stay and observe the unfolding situation.

21. To distance ourselves from the agents in the parking lot, I moved my car across the street to the west side of Nicollet Avenue.

22. Additional observers had arrived by this point and were blowing whistles. Given our interaction with federal immigration officers the day prior, my girlfriend and I decided it would be safer to get out of my vehicle and join the other observers on foot. We exited my vehicle at approximately 8:54 AM. My girlfriend was recording the scene on her phone.

23. We observed the Durango exit the parking lot and drive away, but three additional vehicles carrying federal agents arrived shortly after. At this point, I counted sixteen agents on the scene.

24. We crossed to the west side of Nicollet to observe the crowd of agents standing in front of Glam Doll Donuts. One of the agents noticed us and began approaching

quickly, shaking a can of chemical irritant at us in a threatening manner. There was no reason to threaten us, as we were a significant distance away from the agents activity down the block and we were not interfering with anyone or behaving in a physically aggressive manner.

25. Nevertheless, we retreated south down Nicollet each time the agent attempted to close the distance between us. I did continue to exercise my right to observe and to express my dissent and disapproval of the agents' actions.

26. I looked to my left to the west side of Nicollet Avenue and saw that more observers had arrived on the scene and were using their phones to record the agents from a safe distance. I heard these observers identify themselves as such and saw them holding phones.

27. One of these observers was a bearded man who wore tan pants, a brown or green jacket, a black hat, and sunglasses. I later learned this man's name is Alex Pretti.

28. I observed several agents approach and threaten these observers, including Mr. Pretti, in the same manner they had threatened my girlfriend and me just moments before—that is, aggressively approaching peaceful observers who had been observing from a safe distance.

29. One of the agents approached Mr. Pretti and put his hand on Mr. Pretti's chest, pushing him back from the street toward the sidewalk as Mr. Pretti continued to record with the phone in his hand. I specifically recall hearing Mr. Pretti tell the agents, at least twice, that he was a legal observer on public property and that he was allowed to be there.

30. Around the same time, I saw a nearby observer in a long black jacket fall. It was my impression that she slipped on a patch of ice. Two or three agents descended upon the observer, held her to the ground, and started to handcuff her. I could hear her screaming. I was shocked to see so many agents respond so aggressively to a woman who had done nothing more than fall on a patch of ice on a subzero winter day in Minnesota.

31. Other agents approached the east side of the street where my girlfriend and I stood. A masked agent shook a can of pepper spray at me in a threatening manner, shouting, "Get back! Get Back!" We continued to move backward as they approached to maintain a safe distance.

32. Looking back toward the west side of Nicollet Avenue, I saw a federal agent shove an observer to the ground. I observed Mr. Pretti try to help her up. As he was doing so, more federal agents approached, and sprayed chemical irritants directly in the woman and Mr. Pretti's faces.

33. The agents pulled Mr. Pretti away from the woman and tackled him to the ground. I watched as at least four agents punched, kicked, and hit Mr. Pretti in the head several times with a can of chemical irritant. I did not observe Mr. Pretti strike anyone or brandish a weapon.

34. I moved into the middle of the street to observe the federal agents' increasingly aggressive behavior.

35. Suddenly I heard three gunshots ring out, after which I saw Mr. Pretti lay motionless on the street. This was followed by several more shots in quick succession.

36. I observed the agents backing away from Mr. Pretti's body while at least one agent continued to point his weapon at Mr. Pretti's body. The agents did not immediately render to aid to Mr. Pretti.

37. I dialed 911 and was speaking to dispatch even as a federal agent threatened me with a can of chemical irritant. I stayed on the scene until state first responders arrived.

38. Following witnessing Mr. Prett's killing on January 24, 2026, my fear and anxiety has been pervasive. I feel paranoid and distracted from work or my other everyday responsibilities. Every time I leave my home, I have a physical anxiety reaction. Even in the safety of my own home, I am hypervigilant at home because I am fearful that federal immigration authorities know who I am and how to find me and will take retaliatory action against me. I have had to take a break from exercising my right to protest because I am fearful that federal authorities will take retaliatory action against me.

39. I am afraid to be identified by federal agents because I have heard that some witnesses to Mr. Pretti's killing were detained and I sincerely fear retaliation.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed on January 29th, 2026 in Hennepin County, Minnesota.


C█████ R█████