UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

SUSAN TINCHER, JOHN BIESTMAN,
JANET LEE, LUCIA WEBB,
ABDIKADIR NOOR, and ALAN
CRENSHAW, *on behalf of themselves and
other similarly situated individuals*,

        Plaintiffs,

v.

KRISTI NOEM, Secretary, U.S.
Department of Homeland Security (DHS);
TODD LYONS, Acting Director, U.S.
Immigration and Customs Enforcement
(ICE); MARCOS CHARLES, Acting
Executive Associate Director,
Enforcement and Removal Operations
(ERO), ICE; DAVID EASTERWOOD,
Acting Field Office Director, ERO, ICE
Saint Paul Field Office; JOHN A.
CONDON, Acting Executive Associate
Director, Homeland Security
Investigations (HSI); The Department of
Homeland Security; Unidentified Federal
Agencies; and Unidentified Federal
Agents; *in their official capacities*,

        Defendants.

Case No. 25-cv-04669-KMM-DTS

DECLARATION OF
MCKENNA WALKER

I, McKenna Walker, declare as follows:

1. I am a 27-year-old resident of the City of St. Cloud in Stearns County, Minnesota, where I have lived for about 3 to 4 years. At my previous job, I worked in youth recreation services, and I am currently seeking similar community-oriented roles.

2. I make the following declaration based on personal knowledge.

3. On January 17, 2026, some friends of mine messaged me asking if I wanted to join them at a U.S. Immigration and Customs Enforcement ("ICE") protest near the Whipple Building in Minneapolis. I have been concerned about the presence of ICE in Minnesota, so my partner and I agreed to go.

4. We arrived at the Whipple Building shortly after noon. There were perhaps 150-200 protestors spread along the sidewalk, opposite the Whipple Building's parking lot on the other side of Federal Drive. I stood with my friends on the sidewalk in front of the tennis center there. ICE had set up a perimeter consisting of cement barriers topped with chain link fencing. Two police or DHS cars with police-like insignia were positioned at a gate at the entrance to the Whipple Building parking lot.

5. As far as I saw, the protest was entirely peaceful. Protestors were handing out food, playing music, talking to one another, and generally making community. The temperature that day was below zero, so roughly every 45 minutes or so, my friends and I would return to our car to warm up.

6. Around 1 p.m., a vehicle that appeared to be ICE agents leaving the Whipple Building drove up Federal Drive, driving very close to the curb on the side with protesters. One protester near the curb stuck their hand out and made contact with the ICE vehicle's mirror. It was not a hard hit, and seemed as if it may have been accidental.

7. At this point, perhaps between around 30 federal agents came out from behind the Whipple Building perimeter in a line and pushed protesters farther back on the sidewalk. Some wore green military-style dress and carried holstered firearms. Others wore black riot-style gear equipped with large batons. Almost all wore ventilator masks and bore police or DHS insignia. After pushing the crowd back on the sidewalk, the agents retreated behind the Whipple Building perimeter. A true and correct image of these agents, captured by a friend accompanying me at the protest via their cell phone, is below:



8. Once the agents retreated, protesters carried on protesting. The protest became louder but remained entirely peaceful.

9. Later around 4:20 pm, between 25 to 50 federal agents once again exited the Whipple Building perimeter and began pushing protesters back. Protesters were yelling at the agents, but nothing was thrown and there was no other conduct that could have been interpreted as aggression. People were complying with moving back farther away from Federal Drive when suddenly and without warning, one of the agents sprayed a protester in the face with mace at point blank range.

10. The agents began shoving the crowd and yelling "get back." There was no time to react to the agents' order before being shoved. I was a few rows behind the front row of people, closest to the agents. The people in front of myself repeatedly fell on me as they were pushed down by the agents. Eventually, I found myself on the ground with 5 or 6 people who had fallen on top of me.

11. From within this dog pile, I felt somebody grab my ankle. I reflexively shook their hand off. They proceeded to yank my leg and pull me out of the dog pile, dragging me several feet. One of my boots was pulled off in the process. Between 5 to 8 ICE agents jumped on top of me to seize me. I asked the agents to please get off me and told them that I was having a panic attack and could not breathe, but in response they only mocked me.

12. The agents then handcuffed me. I asked if I could put my boot back on, but the agents only threw the boot back in front of me and said something to the effect of "go ahead," knowing I couldn't because my hands were restrained. They marched me across Federal Drive to the Whipple Building area while I was only wearing one boot in subzero weather.

13. Nobody informed me of why I was being arrested, nor did anyone inform me of my rights.

14. The agents led me around the Whipple Building to what looked like a large garage. They were continuously shoving me on the way there—at one point into a planter in front of the Whipple Building—even though I was complying. Additionally, they appeared to intentionally guide me through puddles in the parking lot, and the sock on the foot without a boot became completely soaked in the subzero weather.

15. When we got to the garage, two women wearing dark green clothing cut the string cinching the hood of my coat, took my stud earrings, and took my glasses. I demanded my glasses back because they are prescription, and the agents returned them.

16. After taking my belongings, the agents let me to the other side of the garage where a white folding table labeled with piece of paper taped to it said, "agitator, assault." I had not done anything violent, let alone assaulted anyone. I was never presented with evidence of this, nor have I received a citation to date.

17. The agents then marched me through a few more doors and led me to a holding cell, which I would guess was 10x10 feet in area. Two other people were in the cell. The agents undid my handcuffs—but did not undo my leg shackles—and detained me in the cell.

18. One agent asked me if I would like to speak with them about the incident. I told them that I would not unless I had a lawyer, and the agent left.

19. I remained in the holding cell for about 2 to 3 hours, when I was called out to fill out some paperwork. This paperwork asked me to provide personal information such as my home address, employment status, and my gender. The agents also requested that I

3

provide a buccal swab, but I insisted that I would not provide one without a warrant. Eventually the agents acquiesced. During this encounter, one of the agents offhandedly told me that I would be released within "30 minutes."

20. The agents returned me to my holding cell. After another hour, I began banging on the door, asking for a phone call. After about 30 minutes, the agents permitted me to make a phone call, and after another 30 minutes, I was finally released and told by an agent that I was "not getting [my] phone back, by the way." ICE did not return my phone upon leaving the Whipple Building; they told me that it was being kept as evidence and that I would likely receive it in another 1 to 3 months, or I could call the Whipple Building to find out more information.

21. I have a number of dark, painful bruises from the way agents handled me during this incident. In addition to the physical symptoms, I have struggled sleeping and had nightmares about my detention. Moreover, these events have triggered my PTSD, causing increased bouts of flashbacks. While I am frightened, I intend to continue supporting my community through other means in speaking out against ICE.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed on Wednesday, Jan 28, 2026 in Stearns County, Minnesota.

*McKenna Walker*
McKenna Walker

2