UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

SUSAN TINCHER, JOHN BIESTMAN,
JANET LEE, LUCIA WEBB,
ABDIKADIR NOOR, and ALAN
CRENSHAW, *on behalf of themselves and
other similarly situated individuals*,

Plaintiffs,

v.

KRISTI NOEM, Secretary, U.S.
Department of Homeland Security (DHS);
TODD LYONS, Acting Director, U.S.
Immigration and Customs Enforcement
(ICE); MARCOS CHARLES, Acting
Executive Associate Director,
Enforcement and Removal Operations
(ERO), ICE; DAVID EASTERWOOD,
Acting Field Office Director, ERO, ICE
Saint Paul Field Office; JOHN A.
CONDON, Acting Executive Associate
Director, Homeland Security
Investigations (HSI); The Department of
Homeland Security; Unidentified Federal
Agencies; and Unidentified Federal
Agents; *in their official capacities*,

Defendants.

Case No. 25-cv-04669-KMM-DTS

**DECLARATION OF
ANDREW WOLD**

I, Andrew Wold, declare as follows:

1.     I am a resident of the City of Bloomington, County of Hennepin,

Minnesota.

2.     I am 40 years old.

3.     I work in Operations/Supply Chain in the medical device industry.

4.      I make the following declaration based on personal knowledge.

5.      I have been concerned about the presence of U.S. Immigration and Customs Enforcement ("ICE") agents in my community.

6.      Because of my concern regarding the presence of ICE in my community, I have exercised my First Amendment rights to observe and record ICE activity on a number of occasions.

7.      Because I have engaged in constitutionally-protected observation of ICE activity, I am familiar with the appearance of vehicles driven by ICE agents.

8.      On Saturday, January 17, 2026, at approximately 1:00 p.m., I was driving eastbound on Interstate-494 in Minneapolis, Minnesota, on my way to drop my mother off at the Minneapolis-Saint Paul International Airport.

9.      At or around the exit to Interstate-35 West, I noticed an unmarked, beige Dodge Durango (the "Durango"), with Minnesota "Critical Habitat" license plates, antennas, police wheels, and tinted windows, that was also driving eastbound on Interstate-494. At that point, the Durango was in the right lane of Interstate-494, and my vehicle was one lane to the left of the Durango.

10.     Based on my knowledge of the appearance and driving patterns of ICE vehicles, at that time I formed the belief that the Durango was an ICE vehicle.

11.     Based on my belief that the Durango was an ICE vehicle, I slowed down my vehicle and legally maneuvered my vehicle into the right lane of Interstate-494 to follow behind the Durango at a safe distance. My intention in doing this was to observe ICE activity. This was an exercise of my First Amendment rights.

12.    After I moved my vehicle behind the Durango, the Durango began driving erratically and appeared to break many traffic laws.

13.    I continued to follow the Durango down Interstate-494 at a safe distance until the Durango maneuvered as if it was going to take the exit for Terminal 2 to the Minneapolis-Saint Paul International Airport at 34th Avenue South (the "Terminal 2 Exit").

14.    Rather than following the Durango when it was seemingly about to exit the Interstate, I continued driving down Interestate-494 past the Terminal 2 Exit.

15.    As I passed the Terminal 2 Exit, however, the Durango braked suddenly, slung back onto Interstate-494, and positioned itself behind my vehicle.

16.    The Durango turned on flashing red-and-blue law enforcement lights to initiate a stop of my vehicle.

17.    In response to the Durango turning on its flashing red-and-blue law enforcement lights, I pulled my vehicle over and stopped on the right shoulder of Interstate-494 just east of the Terminal 2 Exit. The Durango pulled over and stopped behind my vehicle.

18.    At that point, I did not feel that I was free to leave the encounter because an ICE agent had pulled over my vehicle.

19.    At 1:06 p.m., I used my phone to record a video of my encounter with the ICE agent (the "first agent") who had been driving the Durango. This was an exercise of my First Amendment rights.

20. The first agent exited the driver's side of the Durango and approached the passenger side of my vehicle, which was the side of my vehicle where my mother was sitting.

21. When the first agent approached, my mother rolled down the window.

22. The first agent wore tactical gear, a vest that had the word "POLICE" on its front, and a mask.

23. The first agent held up a phone with its camera facing inside my vehicle's open passenger window. I believe that the agent was filming our encounter.

24. The first agent told my mother and I, "Hey, you guys are being recorded. I'm not going to have that that you're going to be following me whatever the things I do. You're impeding, you're following us. I'm giving you—I'm just warning."

25. While the first agent spoke, I interjected to inform the agent that it was legal for me to follow his vehicle at a safe distance and to record him.

26. The first agent responded: "It's against the law. You can't be following me cause I'm doing an investigation. You have no idea what I'm doing."

27. I again informed the first agent that I was legally permitted to follow him at a safe distance.

28. In response, the first agent said, "no," repeatedly, then said forcefully: "If you're impeding with my investigation, you're wrong, sir."

29. I informed the first agent that I was not impeding anything.

30. The first agent then said, "I am just giving you a warning, alright?"

31. The first agent then left, and I stopped recording the encounter.

4

32.    I believe that the first agent acted in the way that he did, using the Durango to follow and initiate a stop of my vehicle, approaching my vehicle, and warning my mother and I not to continue following him, in order to intimidate and threaten me so that I would not continue to exercise my First Amendment rights.

33.    On Sunday, January 18, 2026, at approximately 6 p.m., I was driving my vehicle in Bloomington, Minnesota, returning to my home after running errands.

34.    Because I have been engaged in constitutionally-protected observation of ICE activity around my community, I am aware that ICE agents have been staying in hotels in and around Bloomington, Minnesota.

35.    For that reason, on my way home, I drove past some of the hotels in and around Bloomington, Minnesota, in order to observe ICE activity. This was an exercise of my First Amendment rights.

36.    I drove past the Hilton Garden Inn at 5140 American Boulevard West, Bloomington, Minnesota 55437 (the "Hilton"), and observed a truck (the "truck") idling in the parking lot with a man in plainclothes (the "second agent") sitting in the driver's seat.

37.    The truck was a white Dodge Ram with no front license plate, a rear license plate with a camera-blocking filter on it, and dark, tinted windows.

38.    Based on my experience observing ICE activity, at that time I formed the belief that the truck was an ICE vehicle, and the man in the truck's driver's seat was an ICE agent.

5

39.    I pulled into the Hilton parking lot, drove slowly and safely, and used my phone to take a picture of the second agent through my vehicle's closed window. This was an exercise of my First Amendment rights.

40.    The second agent saw me take a picture of him. The second agent then put the truck in drive and began following my vehicle through the Hilton parking lot.

41.    When my vehicle reached the front of the parking lot, the second agent accelerated his truck in an attempt to cut my vehicle off. The second agent's erratic driving nearly resulted in his truck colliding with my vehicle.

42.    I left the Hilton parking lot, and the second agent continued to follow closely behind me in his truck as I turned south down American Boulevard West. I then turned east onto West 82nd Street, which curves south and turns into Stanley Road. I then turned west onto West 84th Street. I then turned north onto Highway 100, where I stayed in the right lane. The second agent continued to follow closely behind me in his truck this entire time.

43.    The second agent drove his truck erratically as he followed me north down Highway 100. He appeared to break many traffic laws. The truck tailgated my vehicle and then swung into the lane to the left of my vehicle, pulling up alongside my vehicle.

44.    Once the second agent maneuvered his truck alongside my vehicle, the second agent took out a phone and pointed the phone's camera at my vehicle and me. I believe that the second agent was filming our encounter.

45.    The second agent rolled down his window and began yelling something towards me as he continued recording the encounter. I did not roll down my window, so I did not hear what the second agent said.

46.    The second agent then accelerated the truck and maneuvered the truck in front of my vehicle very abruptly, cutting me off and nearly hitting my vehicle with the truck at freeway speeds.

47.    The truck then exited Highway 100 at West 77th Street.

48.    The encounter then ended.

49.    The erratic driving of the second agent was particularly dangerous because it was snowing the evening of Sunday, January 18, 2026.

50.    After my encounter with the second agent, I returned home.

51.    I believe that the second agent acted in the way that he did, following me, driving erratically, attempting to cut off my vehicle with the truck, recording me, and yelling at me, in order to threaten and intimidate me so that I would no longer exercise my First Amendment rights of observing and recording ICE activity.

52.    Approximately an hour and a half after my encounter with the second agent, at or around 7:30 p.m. on January 18, 2026, my wife received a call on her cell phone from an unknown phone number.

53.    My wife did not pick up the call, but the caller left a voicemail. The voicemail simply stated: "We have your information."

54.    I believe that the second agent obtained information related to me, including my wife's phone number, after filming my license plate during our encounter.

7

55.    I believe that either the second agent or some other ICE agent called my wife's phone number because it was affiliated with my name. I believe that they left that voicemail in order to let me know that they had my information, and in order to threaten and intimidate me so that I would no longer exercise my First Amendment rights of observing and recording ICE activity.

56.    After receiving this threatening voicemail, my wife and I contacted the Bloomington Police Department to file a police report.

57.    My family and I have been negatively affected by my encounters with the ICE agents on January 17 and 18, 2026.

58.    Because of the threatening phone call that ICE made to my wife's phone, my wife and I have been upset and worried that ICE has our personal information. The fact that ICE has our personal information makes us fearful for our safety and the safety of our children.

59.    Following my encounters with ICE, I have been more diligent in checking my doorbell camera at the end of each day to see if any suspicious activity is occurring at or around my home, including whether ICE vehicles have driven by my home. I am also more cautious when I engage in constitutionally-protected observation of ICE activity, including being more vigilant than I normally would be, to ensure that ICE agents do not follow me home.

60.    Although I know that the ICE agents' actions were intended to threaten and intimidate me so that I would no longer exercise my First Amendment rights, I intend to

8

continue exercising my First Amendment rights to observe and record ICE activity so that I can help my community.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed on ___2/5/26___ in Hennepin County, Minnesota.

_____
Andrew Wold