UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| SUSAN TINCHER, JOHN BIESTMAN, JANET LEE, LUCIA WEBB, ABDIKADIR NOOR, and ALAN CRENSHAW, *on behalf of themselves and other similarly situated individuals*,<br><br>　　　　　　Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive Associate Director, Enforcement and Removal Operations (ERO), ICE; DAVID EASTERWOOD, Acting Field Office Director, ERO, ICE Saint Paul Field Office; JOHN A. CONDON, Acting Executive Associate Director, Homeland Security Investigations (HSI); The Department of Homeland Security; Unidentified Federal Agencies; and Unidentified Federal Agents; *in their official capacities*,<br><br>　　　　　　Defendants. | Case No. 25-cv-04669-KMM-DTS<br><br>**DECLARATION OF MARGARET WOOD** |

　　　　I, Margaret Wood, declare as follows:

　　　　1.　　I am a resident of the Powderhorn Park Neighborhood, City of Minneapolis County of Hennepin, Minnesota.

　　　　2.　　I am at least 18 years old.

　　　　3.　　My occupational background is in recruiting.

1

4. I make the following declaration based on personal knowledge.

5. I have been concerned about the presence of U.S. Immigration and Customs Enforcement ("ICE") and other federal immigration agents in my community since Operation Metro Surge began in December 2025. But in January of this year, I decided I needed to get involved.

6. January 14, 2026, was the first time I went out observing in a vehicle. At first, I was out alone, but then I picked up a buddy and we drove around south Minneapolis. After a while, we ended up behind a vehicle we believed belonged to ICE because the license plate was one that other people in our chat had seen on a car with agents in— it didn't have a front license plate and the windows were heavily tinted. The car was a Black Wagoneer with rear GA plates SAR7673. My friend was driving my car, but it was very important to us that he obey traffic laws. We—unlike the federal agents all over the state— were not going to cause any more havoc in my neighborhood.

7. After we had been behind the Wagoneer for about 15 minutes, honking occasionally, I noticed that we were headed to my house. The Wagoneer turned into my alley and stopped behind my house, which is clearly marked in the back with my house number. We didn't follow them into the alley, but we could see them idling there. After a minute or so they drove to the front of my house and idled on the street. We parked a bit further down from my house, watched them, and then decided to try to drive past the Wagoneer. As we were doing this, we saw two masked agents in tactical vests and sunglasses looking at us. The agents pulled up in front of us and tried to box us in. I saw what looked like an agent start to open their driver's side door. While this was happening,

2

another vehicle had been trying to drive down the road towards us, and when they realized two agents were in the vehicle in front of them, they started honking. A few neighbors had also come outside and were whistling and yelling. The agents did not end up getting out of the Wagoneer. They just left.

8. We decided to be done for the day because it was really unnerving to know that federal agents knew where I lived and essentially went there to intimidate me.

9. Then, on January 21, 2026, I was a backseat passenger in a car with some fellow observers. We ended up behind two cars we believed belonged to immigration agents because of the window tint and license plates. I didn't notice the driver of our car speeding or breaking traffic laws or doing anything to impede immigration enforcement. But we were threatened with arrest anyway.

10. The two cars ahead of us stopped on a residential street, and two men in masks and tactical vests got out of the farthest of the two cars in front of us. The two masked men approached the car in front of us first and spoke with the people in that car. Then they approached our car, with one agent on either side of our car. The agent at the driver's side window told us that what we were doing was a violation of 18 USC 111. A true and complete copy of the video of these events taken by the front passenger is attached to this declaration as Exhibit A. We didn't say anything back and he left.

11. Afterwards, we discussed what had happened. Because we knew we weren't doing anything wrong, we decided to keep observing. We started driving behind another vehicle we believed to belong to federal immigration agents for the same reasons as before. The car was a Black Chevy Suburban with MI plates EWT2968. We kept a distance and I

didn't notice the driver break any traffic laws—we just drove behind them so we could document what they were doing and update our community about their activities. Their vehicle pulled over on a residential street and gestured that we should go past them. We did the Minnesota wave indicating that no, they should go ahead. Their gestures got more aggressive until they suddenly drove into the middle of the road and idled there. Then they revved their car and reversed, maybe to try to box us in like they'd done to me on January 14. A true and complete video of these events as captured by the front passenger is attached to this declaration as Exhibit B. As they reversed, they ran into a parked car. Instead of stopping to leave a note, they just left. We left a note on the car that had been hit and let them know we had video of what had happened to their car.

12. On Thursday, January 29th, around 9:00 AM, I began observing in my neighborhood with two other fellow observers in a car. I was in the backseat, keeping an eye on the community chat of other observers.

13. At around 9:45 AM, we learned through our community chat that federal immigration agents were in the process of detaining someone only a five-minute drive away from where we were. We decided to drive to the location listed in the chat, which was East 19th Street between Park and Portland Avenues.

14. When we pulled onto East 19th Street there were roughly three or four observers already present from what I could see from the car. I had met two of them before.

15. I could hear whistling, honking, and the sound of a man yelling in Spanish.

16. The yelling was coming from behind a metal fence in the front yard of a house further west down East 19th Street from where I was in the car. This house siding is painted two colors, tan at the top and turquoise on the bottom half. It has white trim.

17. There was a wrought-iron fence about 4 feet tall around most of the yard. I had a clear line of vision both above the fence and through the bars.

18. I saw two federal immigration agents behind that metal fence. They were wearing masks as well as hoodies underneath tactical vests that said "Police."

19. These agents were restraining the man I had heard yelling in Spanish.

20. A third federal immigration agent, also masked, wearing the same tactical gear as well as a hoodie pulled up over a Minnesota Twins baseball cap, was standing against the fence outside of the yard. He was watching the other two agents restrain the man in the yard and watching the observers outside of the yard. He was holding something in his hand, I couldn't see what it was.

21. One of the observers, whom I had met before, was filming the agents and the man being restrained. This observer was standing on the southwest side of the yard away from the fence. In the area where the observer was standing, there was an empty lot covered in snow.

22. At that point I was still in the car. My phone was on an audio call with other observers, so I took the phone of one of my fellow observers who was in the car with me to film and got out of the car. I walked quickly west on East 19th along the sidewalk past the three agents and the man being restrained towards the observer I knew.

23. I started filming when I got closer to this other observer. A true and complete copy of this video is attached to this declaration as Exhibit C. We were facing east to film the two agents restraining the man inside of the yard, and the third ICE agent standing against the fence outside of the yard. We had a clear view of what was happening.

24. It was loud. At one point the third agent who was standing outside of the fence in the Minnesota Twins baseball hat turned in our direction and said something that I couldn't understand at the time. I then asked him whether he felt good about doing what he was doing. He did not respond and he sort of turned away from me.

25. The two agents restraining the man in the yard were both on their knees leaning over the man. The man was face down in the snow with his hands behind his back. He appeared to be in handcuffs. He was yelling in Spanish.

26. At one point, one of the agents put his knee on the man's back and leaned on top of him.

27. The man being restrained seemed to be trying to turn onto his back. One of the two agents spun the man around and kneeled on his back again and pushed his face and stomach into the snow.

28. I do not know why the agent pushed him into the snow. It was clear, at that point, that the man was already in handcuffs.

29. As I was filming, I realized none of the other observers seemed to be paying attention to what the man being restrained was saying. I yelled out to him to ask what his name was, but there was a lot of other noise. I thought I was too far away for him to hear me.

30. I walked towards the fence, towards the man being restrained. I wanted to get close enough for him to hear me.

31. I was at the southwest corner of the fence and asked the man being restrained for his name. I was still filming. I leaned my phone over the fence to best record what he was saying because it was so loud.

32. He was able to lift his face out of the snow and look me right in the eye and say what I thought was his name, maybe something like Diego.

33. At that point, I didn't see the third agent. He had been addressing other observers nearby. Shortly after the man said what I thought was his name, I heard the third agent address me from about one foot away on my right.

34. I heard him say, "Ma'am," and felt a wetness on my face and neck—it was pepper spray. He had not even finished his sentence before he sprayed pepper sprayed in my face. Then he said, "get back."

35. Another observer there was filming as the agent sprayed me. A true and complete copy of that video is attached as Exhibit D.

36. My body reacted first in shock, and my eyes closed. The pepper spray covered the right side of my face, neck, and hair. Then I sort of stumbled backward. I felt hands gently pull me further away from the agent and I heard the voice of one of the observers whom I had met before leading me.

37. This observer guided me to the car they had arrived in and sat me down in the car. I am not entirely sure where the car was parked because I could not see where I

was, but I believe I was in the back seat of a parked car with the door open. It sounded like one or two other observers were next to me outside of the car.

38. I recognized one of the other observers by their voice and he said he used to be an EMT. He started to try to flush the pepper spray from my eyes with water.

39. I remember him asking me whether I could open my eyes to better flush them out. When I tried, it caused me excruciating pain and I had to stop.

40. My eyes, the right side of my face, right ear, and right side of my neck felt like they were burning. I kept asking for more water to ease the pain and wash the pepper spray off.

41. The observer said he did not want to give me any more water because of how cold it was outside. It was around five degrees Fahrenheit. The observer was concerned that I could get hypothermia and freeze if we used any more water on my skin.

42. The observer said he was going to close the doors of the car to try to warm me up. I remember my body starting to shake uncontrollably, and I started to panic about what damage the pepper spray may have caused my eyes since I still couldn't see.

43. I don't know how long the doors of the car stayed closed, but I do not think it was much longer than a minute or two. I can't remember whether I opened the car door or whether an observer did, but at that point, the people I had come with found me and got me back to their car. We drove straight back to my house.

44. When I got home, one of my friends called to check in on me. He had heard about what happened from one of the observers. He said I needed to get in the shower quickly to wash the pepper spray off. He also texted me some additional instructions about

8

what to do with my clothes. I called another friend who walked me through information she found online about what to do after being pepper sprayed.

45. I followed their instructions and put all the clothes I had been wearing in a garbage bag and tied it up.

46. I took a shower wearing goggles. This was to make sure any pepper spray still left on my skin did not get back into my eyes while being washed off.

47. The pepper spray that had been in my hair seemed to reactivate during the rinse. I started coughing. Some of it must have gotten into my ear, which started burning again.

48. I could not stop coughing throughout the entire shower.

49. Throughout the day, my face felt tight and tingly. I showered twice more throughout the day.

50. I am heartbroken for everyone who has been detained by these federal agents and I am angry about the way the federal agents are treating the people they are detaining and the people who are observing them.

51. I went out observing again that afternoon because I can't just sit quietly and watch injustice happen. After Renee Good wast shot and killed, I remember hearing the eyewitness to her death on MPR and then contrasting that with DHS' account of what happened. DHS called her a domestic terrorist right afterwards, they didn't even wait to investigate at all. It showed there was no regard for the truth. No regard for a proper investigation. No regard for doing something about a public execution committed on our streets. No concern that someone was shot and killed by a federal agent.

9

52. DHS also doesn't always tell the truth about who they're stopping, detaining, and arresting "for immigration purposes" either. There are many videos and stories of people being detained and stopped on the side of the street based on their accents and what they look like. There are many stories and videos of US citizens and people with legal status being detained. They aren't the worst of the worst—they're just people.

53. The only way to fight this misinformation is for us to be out there documenting. The videos and the pictures tell the true story. If we don't have videos, we'd be lied to even more. This is particularly true when these agents are going around masked. What are they trying to hide?

54. We live in a democracy that's built on a constitution that gives us rights. One of those rights is the freedom to protest. One of those rights is to petition the government about our grievances. And I have a grievance. They are discriminating against members of my community. They are terrorizing people standing up for their neighbors. That's not right.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed on  Feb 12, 2026  in Hennepin County, Minnesota.

*Margaret Wood*
Margaret Wood (Feb 12, 2026 10:47:55 CST)

Margaret Wood