UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| SUSAN TINCHER, JOHN BIESTMAN, JANET LEE, LUCIA WEBB, ABDIKADIR NOOR, and ALAN CRENSHAW, *on behalf of themselves and other similarly situated individuals*,<br><br>Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive Associate Director, Enforcement and Removal Operations (ERO), ICE; DAVID EASTERWOOD, Acting Field Office Director, ERO, ICE Saint Paul Field Office; JOHN A. CONDON, Acting Executive Associate Director, Homeland Security Investigations (HSI); The Department of Homeland Security; Unidentified Federal Agencies; and Unidentified Federal Agents; *in their official capacities*,<br><br>Defendants. | Case No. 25-cv-04669-KMM-DTS<br><br>**DECLARATION OF SHAMSO IMAN** |

I, Shamso Iman, declare as follows:

1. I am thirty-four years old, and I have been a resident of Northeast Minneapolis for the past three years. Before that, I lived in St. Cloud, where my family still resides.

2. I work as a licensed drug and alcohol counselor, and I am also attending school for clinical social work. I have no criminal history.

3. I make the following declaration based on personal knowledge.

4. I have been concerned about the presence of U.S. Immigration and Customs Enforcement ("ICE") agents in my community resulting from the federal government's "Operation Metro Surge."

5. I am submitting this declaration to describe two encounters I had with ICE agents—one in Minneapolis and one in St. Cloud. During both encounters, I did nothing unlawful or obstructive. I was engaged in observing, documenting, and following ICE agents from a safe distance for the purpose of making sure my community was safe. The only reason ICE targeted me and my family was because I exercised my constitutional right to observe and document their actions. Their actions were unjustified and clearly intended solely to intimidate, retaliate, and harm me for engaging in protected First Amendment activity.

6. The first incident occurred in Northeast Minneapolis on Sunday, January 18, at approximately 2:28 p.m. I was about to leave my home when I heard neighbors whistle—the signal we use to alert one another that ICE is present in the neighborhood. When I stepped outside, I saw an ICE vehicle parked near my home, in a residential area where families and children were present, which immediately caused concern.

7. I parked behind it and attempted to honk, but when my horn stopped working, I quickly went back to my house to dress in warmer clothes so I could safely remain outside in the frigid winter temperatures to observe ICE. I returned outside. Several of my

neighbors were already out observing and documenting the ICE vehicle parked on the side of the street. One observer told me that one of the ICE agents was Black.

8. When I approached the ICE vehicle, I saw clearly with my own eyes that the agents had "ICE" on their vests. They were in tactical gear, vests, wearing masks, and had pepper spray and guns. There were three agents—two in front and one in the back—inside the vehicle. The agent sitting in the passenger seat was a Black man. I stood on the sidewalk parallel to his window. I positioned myself on the sidewalk, plainly visible, with my hands in view, and made no movements toward their vehicle.

9. I expressed my disbelief and disapproval to them. I said to him, "Are you fucking kidding me? You're Black. Do you know what ICE does to Black people?" I was standing a few feet away from the side of their vehicle. I did not touch their car, maintained a safe distance from their vehicle, remained on the public sidewalk, and did not attempt to interfere, threaten, harm, or impede with their actions in any way. My hands were visible.

10. The ICE agent did not say anything to me. Instead, he lowered his window, and pepper sprayed me directly in the face at extremely close range. At no point did ICE give any kind of warning, order, or instruction—not even a verbal "back up"—before pepper spraying me. Had the agent issued even the simplest verbal instruction, I would have complied immediately. I was not there to do anything illegal or to impede officers. I was only there to exercise my First Amendment right to free speech. Instead, he chose force without any attempt at communication or de-escalation.

11. The pepper spray hit and entered my mouth, throat, stomach, eyes, neck, face, and covered my jacket. Although the agent directly aimed the pepper spray at my face,

some of the pepper spray went in the direction of an observer standing next to me. Without another word, the ICE agents then drove away.

12. There were several other observers in the area also whistling, documenting, and protesting the ICE vehicle and agents. No other observers were pepper sprayed. I believe I was singled out and pepper sprayed solely because of my speech. My words expressed a non-threatening and protected political viewpoint. The agent's response was a direct retaliation to my protected speech and expression.

13. There was no justification for his using pepper spray toward me. His use of force was sudden, aggressive, and entirely unnecessary. His attack was unwarranted and was clearly meant to punish and intimidate me for speaking out.

14. The pain from the pepper spray was instantaneous—within seconds, it felt like my face and body had been set on fire. I could not open my eyes. The burning was immediate, overwhelming, and completely incapacitating. The pepper spray was sticky and adhered directly to my eyes, mouth, neck, face, and hair. The burning was unlike anything I had experienced.

15. My neighbors witnessed the entire thing and recorded parts of it. They came to help me immediately, flushing my eyes. I then walked home where I continued to wash my face and body. I tried repeatedly to wash the pepper spray off my jacket for several hours. However, the residue penetrated the material, and it continues to burn my skin to this day whenever I touch it.

16. I experienced intense pain, headaches, stomach pain, and lingering symptoms the next day. I ultimately went to the doctor for treatment.

17. The second incident occurred two days later in St. Cloud on January 20, 2026, at approximately 11:20 a.m. My sister and I heard that ICE was operating in the area of the Global Market, a neighborhood with a large Somali community. We decided to observe them from our vehicle because we grew up there and knew the streets well. I drove my sister's car while she sat in the passenger's seat.

18. We observed an ICE vehicle with agents in full ICE gear—vests, identification, and tactical equipment—as they looped around the Global Market area. They drove a black Suburban SUV. We followed them from a safe distance of about two car lengths, whistling to alert others.

19. The agents left the market area and continued circling, apparently trying to lose us. My sister and I stayed back, recording. At all times, we maintained a safe distance in our vehicle, did not interfere with, obstruct, impede, block, approach, or threaten any ICE agents. We never got out of our vehicle to approach any agent, vehicle, or operation. Nothing about our behavior could have justified further interest in us or our home by ICE.

20. Despite maintaining a safe distance and engaging only in lawful observation, one of the agents instructed us to stop following them. My sister and I informed the agent that we are U.S. citizens and that we were exercising our constitutional rights to observe and document their actions. Despite that, the agents deliberately photographed our faces and license plate, an action that felt targeted and punitive. This was the moment it became clear they intended to identify us personally.

21. The license plate for my sister's car is associated with the home address of our mother's house.

22. The agents then led us directly back to our mother's house, which is where little children who are our family members also reside. Once there, the ICE vehicle drove slowly back and forth in the cul-de-sac in a way that clearly appeared to be surveillance. They circled repeatedly at a speed suggesting they were scrutinizing the home and anyone inside it.

23. Another ICE vehicle (white Jeep) arrived shortly thereafter, and then the two vehicles stationed themselves at the entry and exit to the cul-de-sac, thereby completely blocking us and preventing us from leaving the neighborhood. We took video footage of this and preserved that footage.

24. None of the ICE agents ever spoke to us or explained their actions. They simply watched us, recorded us, and repeatedly circled our mother's home.

25. There was no lawful justification for ICE to look up our license plate, obtain our mother's address, lead us to that home, block the street, or survey the property, including where little children live. Their actions were deeply unsettling. We had not committed any crime. We had not interfered with them. We had only observed them from a safe distance.

26. Their conduct—surveilling a family home, photographing us, circling repeatedly, and creating a physical blockade—was deliberately intimidating and deeply traumatizing, particularly because young children and family members reside in that home.

27. It was clear to both me and my sister that ICE was retaliating against us because we had lawfully followed and observed them. Their behavior escalated only after we began following them at a safe distance. The decision to obtain our license plate, go to

our family home, and conduct surveillance there had no purpose other than to retaliate against us for exercising our constitutional rights.

28. If we had not chosen to lawfully observe and record them, they never would have targeted us or our family in this terrifying way. Their actions sent a direct and chilling message: simply watching federal agents could endanger me and my family. This has had a lasting impact on my sense of safety, privacy, and security. The idea that federal agents might be watching me and my family has left me feeling constantly on edge.

29. After they left, I experienced a panic attack. We called 911, but law enforcement told us there was nothing they could do.

30. Since these events, my mental health has severely declined. I have spoken to my therapist about the fear, panic, and hypervigilance I now experience daily. I have struggled to eat or sleep after the incidents and still battle intense worry that ICE may try to retaliate against me for exercising my constitutional rights or target me again. These events have caused severe and ongoing fear, anxiety, and disruption to my daily life.

31. Despite everything ICE has done to me, I intend to continue peacefully observing because there are people more vulnerable than I am, and I believe it is our duty as Americans to stand up for the Constitution.

32. But there is no question that these encounters have taken a significant toll on my mental health, my sense of safety, and my daily life. ICE's actions were unjustifiable, excessive, and meant solely to intimidate me for engaging in protected First Amendment activity. They served no legitimate law-enforcement purpose. They targeted me only

because I exercised my constitutional rights under the First Amendment, and their conduct has had lasting, harmful effects on me and my family.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed on  1/29/2026  in Hennepin County, Minnesota.

Shamso Iman