UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| SUSAN TINCHER, JOHN BIESTMAN, JANET LEE, LUCIA WEBB, ABDIKADIR NOOR, AND ALAN CRENSHAW, *on behalf of themselves and other similarly situated individuals*, <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive Associate Director, Enforcement and Removal Operations (ERO), ICE; DAVID EASTERWOOD, Acting Field Office Director, ERO, ICE Saint Paul Field Office; JOHN A. CONDON, Acting Executive Associate Director, Homeland Security Investigations (HSI); The Department of Homeland Security; Unidentified Federal Agencies; and Unidentified Federal Agents; *in their official capacities*, <br><br> Defendants. | Court File No. 25-cv-04669 (KMM/DTS) <br><br><br> **DECLARATION OF GREG SULLO** |

I, Greg Sullo, declare under penalty of perjury pursuant to the laws of the United States, that the following is true and correct:

1. I am a 42-year-old resident of South Minneapolis. I work in communications.

2. Like many others, I have been horrified over the last several months by ICE's illegal and immoral activities across the country. Since ICE stepped up its aggressive

enforcement in Minnesota, I have served several times as a legal observer. In my view, the legal observer role has both a protest function—my presence communicates my disapproval of ICE's inhumane treatment of members of our communities—and it facilitates documentation and dissemination of information about ICE's activities to the public.

3. During the afternoon of December 10, 2025, I was serving as an observer at the Whipple federal building. I was in my car at the south Metro Transit lot that overlooks the Whipple building observing individuals that I understood to be ICE agents going in and out of the building. I observed these individuals get into vehicles, some of which had no license plates and I documented this to make a record for the community.

4. As I sat in my car, a black SUV drove up to me and parked at the entrance of the parking lot. I understood the person inside the car to be an ICE agent or personnel from some affiliated federal agency. The person conspicuously took a photograph of my face and of my windshield and then drove away. It was my impression that the person wanted me to know that he was taking these photographs, to let me know that he knew who I was and to intimidate me.

5. Sometime later that afternoon, while I was still in the south parking lot observing, I heard from others that federal law enforcement officers were making the rounds in the nearby north parking lot. I wanted to avoid a confrontation, so I went to move my car just as a dark SUV pulled into the south parking lot. This vehicle, which I understood to be a federal law enforcement vehicle, followed me as I left the parking lot and got onto Highway 62. The vehicle followed me for approximately four miles before

changing course. My impression was that this too was designed to intimidate me because I was, at all times, driving extremely carefully and in compliance with all traffic laws.

6. On the morning of December 16, 2025, my friend Luke Mielke and I were in his car in the Metro Transit lot observing the ICE staging area near the Whipple building. Again, our purpose in being there was to observe ICE and to disseminate information about their public activities.

7. We saw some vehicles leave the Whipple building, including a dark colored Dodge Charger and a black SUV. The black SUV had no license plates. It was our assumption that these vehicles were being used by ICE or some other federal law enforcement agency.

8. We wanted to continue to observe ICE's activities in public, so we followed the vehicles in Luke's car, at a safe distance, driving carefully and obeying the speed limit. The vehicles took a long and circuitous path through St. Paul and into the northern suburbs. At some point on the highway, the position of the vehicles shifted, and the Charger was in front of us and the black SUV was behind us.

9. When the Charger exited the highway, we did as well, following at a safe distance. Very near the highway exit, the Charger turned onto a side road to access a Walgreens parking lot. We followed and turned into the parking lot.

10. The black SUV, now behind us, turned on its flashing lights to indicate that we were being pulled over. Luke pulled the car into a parking space and the black SUV pulled in behind us, blocking us in. By this point, the Charger had circled around and had stopped in front of Luke's car so that we were boxed in.

11. An ICE agent got out of the black SUV. I know that he was an ICE agent because he was wearing a badge around his neck that said ICE. The agent approached the driver's side window and Luke opened the window wide enough that we could hear the agent and he could hear us.

12. The agent asked for our identification. We asked if he really needed it and he did not demand identification or press the issue. The agent lectured us for several minutes. He repeatedly referenced a federal statute, 18 U.S.C. § 111, and accused us of breaking that law. He told us that ICE doesn't just do immigration enforcement, the agency enforces a lot of other federal laws also, including Section 111. Luke asked if we were free to go and the agent said no; we were being detained. He also said that it didn't matter if they got our IDs because they had our license plate number and could identify us. Eventually, the agent let us go, but he threatened that if he caught us again, we would be arrested.

13. At the time, I wanted to record this interaction on my phone. However, I was afraid that doing so would escalate the agent, so I did not record.

14. This interaction was unsettling. In fact, it was upsetting enough that we decided to be done observing for the day. I am more cautious now than I was before, but I will continue to protest and observe ICE's activities.

Dated: 1-6-25  
County: Hennepin

_____  
Greg Sullo