UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| SUSAN TINCHER, JOHN BIESTMAN, JANET LEE, LUCIA WEBB, ABDIKADIR NOOR, and ALAN CRENSHAW, *on behalf of themselves and other similarly situated individuals*,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive Associate Director, Enforcement and Removal Operations (ERO), ICE; DAVID EASTERWOOD, Acting Field Office Director, ERO, ICE Saint Paul Field Office; JOHN A. CONDON, Acting Executive Associate Director, Homeland Security Investigations (HSI); The Department of Homeland Security; Unidentified Federal Agencies; and Unidentified Federal Agents; *in their official capacities*,<br><br>　　　　　Defendants. | Case No. 25-cv-04669-KMM-DTS<br><br>**DECLARATION OF CHEYENNE WILSON** |

I, Cheyenne Wilson, declare as follows:

1.　I am 31 years old and reside in the Summit Hill area of Saint Paul, Minnesota. I have lived in the Twin Cities since 2020, and in Summit Hill for approximately two years. Prior to that, I lived in Morris, Minnesota.

2. I am a nurse working in a progressive care unit and I also engage in advocacy for survivors of sexual assault. I am a traditionally published author of "We Are the Evidence: A Handbook for Finding Your Way After Sexual Assault".

3. I am making this declaration based on my personal observations and firsthand experiences described below.

4. On Tuesday, January 13, 2026, at approximately 11:15 a.m., I was a passenger in a vehicle driven by my partner, Robert Dubay.

5. We were aware of the federal government's "Operation Metro Surge," which had resulted in increased activity by DHS officers and U.S. Immigration and Customs Enforcement ("ICE") agents in our community, including near Robert's children's school on the East Side of St. Paul. The school, which primarily serves Hmong families, has received threatening emails. We have been helping by providing books and toys to families who are afraid to leave their homes.

6. While stopped at the red light at University Avenue and Hamline Avenue, I observed two vehicles—each carrying two individuals in tactical gear—run the red light. The first vehicle was a larger tan SUV with tinted windows. The second vehicle was a white Jeep with tinted windows.

7. Their appearance, equipment, and erratic driving behavior alarmed us, and I was concerned about the safety of people in the community.

8. Out of concern and to observe, we followed their vehicles at a safe distance of approximately three car lengths behind. I was not attempting to (and did not) interfere or communicate with them.

2

9. The vehicles proceeded to make a right turn onto Lexington and executed a loop. We continued to maintain a safe following distance, remaining approximately three car lengths behind.

10. We eventually ended up at or near Hubbard Street and Lexington Parkway. Our car was facing west on Hubbard.

11. At that point, the second of the two vehicles—the white Jeep—slammed on its brakes and stopped in front of us, while the first vehicle kept driving. We stopped behind the Jeep.

12. Two individuals exited the Jeep and approached our car—one at the driver's side (my partner's side) and one at the passenger's side (my side). They each carried a window breaker and a side-arm.

13. The individual approaching Robert's side appeared to be a white male in his mid-40s, with white stubble, wearing a hat, and not wearing a mask (though he had a neck scarf). I recall seeing the word "POLICE" on Velcro near his gear.

14. The individual who approached my side appeared younger, a white male in his 20s–30s with a dark beard/mustache. I recall seeing "DHS" on his gear and "ERO" on the back. He did not speak.

15. I have recorded and maintained the video footage of the encounter with the agent who approached the driver's side of the vehicle. Additionally, below are two photographs that I took of the other agent located near the Jeep.





16. I did not see visible badge numbers on either agent who approached our vehicle, and they did not identify their agency before issuing threats.

17. We kept our doors locked and windows up and began recording on our phones. Throughout, I did not speak to them; I narrated on video.

18. The driver's side agent was the only one who spoke to us. When he walked up to Robert's window, he immediately ordered Robert to "open the window." Robert shook his head "no" and held up his phone to show that he was recording.

19. The driver's side agent then lifted a window breaker in his hand, leaned in toward the window, and stated, in substance: "If you continue to follow us, you will be removed from your vehicle. We will arrest you."

20. While he was speaking, the agent aimed his window breaker directly at Robert's window and gestured as though he would use it to break the window open.

21. He then repeated: "You will be removed from your vehicle. This is your one warning."

22. His tone was firm, sharp, and forceful—more like he was barking orders than giving any kind of lawful instruction. He did not make any attempt to deescalate or to explain the situation. Instead, his demeanor made the encounter feel more menacing, increasing my fear and making the interaction feel threatening and intimidating.

23. Robert asked the agent for his badge number. Instead of identifying himself, he repeated the threat and stated "55-50," as best we recall. Both agents then returned to their vehicle and left.

24. During this encounter, we were located on a quiet residential road with no pedestrians, traffic, or other cars around. The isolation of the area made the encounter feel especially scary and intimidating. I believe the agents intentionally led us to this secluded area so there would be no witnesses.

25. At no point did we obstruct, interfere with, or attempt to interfere with the agents. We had been safely following their vehicles at a reasonable distance out of our concern for the safety of our community and neighborhood. We were not driving aggressively, blocking their path, attempting to communicate with them, or doing anything that could reasonably be viewed as a threat.

26. We were shaken by the encounter and turned into the Como Pool parking lot to calm down.

27. After approximately ten minutes, we began driving home, traveling north on Lexington, when a silver/gray truck began driving erratically behind us.

28. The silver/gray truck followed us closely for around ten minutes, refusing to use turn signals, accelerating into turns to stay with us, and shadowing our movements. The driver appeared to be a middle-aged white male with a beard and a baseball cap.

29. The driver did not appear to be wearing tactical gear, and I could not determine whether he was affiliated with ICE or law enforcement.

30. Out of fear, we did not go directly home. We eventually pulled off to the side of the road and waited until the vehicle was no longer visible.

31. Since this incident, Robert and I have seen ICE vehicles/agents at least a dozen times in the area, including while dropping his kids off at school.

32. I have circulated our video footage. Based on additional publicly shared videos, I believe that the same driver's-side agent who confronted us was also recorded in a separate incident where he asked another driver/observer, "Haven't you learned your lesson yet?" in connection with the killing of Renee Good, and he appears to smack the observer's phone in that video.

33. Since our encounter with the agents, I have felt more on edge, experienced trouble sleeping, and increased vigilance (checking locks, windows, and installing/using cameras). I avoid driving alone. The encounter has had a lasting effect on my daily life and sense of safety.

34. I have discussed this situation with my therapist and relied on support from our community.

35. I have altered my daily routine (driving together, using dash camera and Ring camera, additional home security) and sometimes avoid visiting certain neighbors out of fear that our license plates could bring unwanted attention to them.

36. I am more committed to documenting ICE and law enforcement activity to protect our neighbors.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed on 1/23/2026 in Ramsey County, Minnesota.

Signed by:
[signature]
B5F4F2F31F03445...
Cheyenne Wilson