UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

SUSAN TINCHER, JOHN BIESTMAN,
JANET LEE, LUCIA WEBB,
ABDIKADIR NOOR, and ALAN
CRENSHAW, *on behalf of themselves and
Other similarly situated individuals,*

      Plaintiffs,

v.

MARKWAYNE MULLIN, Secretary, U.S.
Department of Homeland Security (DHS);
TODD LYONS, Acting Director, U.S.
Immigration and Customs Enforcement
(ICE); MARCOS CHARLES, Acting
Executive Associate Director,
Enforcement and Removal Operations
(ERO), ICE; DAVID EASTERWOOD,
Acting Field Office Director, ERO, ICE
Saint Paul Field Office; JOHN A.
CONDON, Acting Executive Associate
Director, Homeland Security
Investigations (HIS); The Department of
Homeland Security; Unidentified Federal
Agencies; and Unidentified Federal
Agents; *in their official capacities,*

      Defendants.

Case No. 25-cv-04669-KMM-DTS

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR
JURISDICTIONAL DISCOVERY**

_____

**INTRODUCTION**

Plaintiffs' Motion for Jurisdictional Discovery relies on a facially deficient affidavit that fails to offer a single specified reason for their motion as required by controlling Eighth Circuit caselaw and Rule 56 itself.  Instead, Plaintiffs leap to the conclusion that because Defendants lodged a factual attack, Plaintiffs are entitled to jurisdictional discovery pursuant to Rule 56.  Citing a portion of that Rule, Plaintiffs seem to ignore the rest of the relevant text: "[i]f a nonmovant shows by affidavit or declaration that, *for specified reasons*, it cannot present facts essential to justify its opposition, the court may . . . allow time . . . to take discovery." (*emphasis added*).  Here, Plaintiffs' affidavit fails to provide a single specified reason in support of their request for jurisdictional discovery.  In fact, Plaintiffs' affidavit is so conclusory and facially deficient that it is not even necessary to consider whether or not they have satisfied the more specific requirements of Eighth Circuit authority interpreting the Rule.  *See Johnson v. United States*, 534 F.3d 958, 965 (8th Cir. 2008) (requiring an affidavit describing: (1) what facts are sought and how they are obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful (internal citations omitted)).

Additionally, Plaintiffs' request for jurisdictional discovery is even more puzzling because the factual information that Plaintiffs complain "is not contained within Plaintiffs' First Amended Complaint or otherwise available to Plaintiffs" is an undisputed fact— Operation Metro Surge has concluded.  As discussed below, the declarations submitted in support of the motion to dismiss detail the conclusion of Operation Metro Surge, a fact

1

upon which Plaintiffs relied in their Motion for Indicative Ruling (ECF No. 237) and Motion to Dissolve the Preliminary Injunction (ECF No. 276), thus, obviously available to Plaintiffs. Given this, and that Plaintiffs have alleged no wrongful conduct unrelated to Operation Metro Surge, the discovery that Plaintiffs seek, including a Rule 30(b)(6) deposition, is unnecessary, overbroad, and unduly burdensome. For the reasons stated herein, Plaintiffs' Motion for Jurisdictional Discovery should be denied.

## BACKGROUND

On December 17, 2025, the original Plaintiffs filed their Complaint in this matter. *See* Compl., ECF No. 1. Plaintiffs' allegations and claims centered on Operation Metro Surge, which Plaintiffs described as "Defendants' stepped-up operations in Minnesota" that "began on December 4, 2025." *Id.* ¶ 62. Plaintiffs claimed that during Operation Metro Surge, Defendants had violated their First Amendment and Fourth Amendment rights. *See id.* ¶¶ 190-212. Plaintiffs sought to represent a putative class of "[a]ll persons who do or will in the future record, observe, and/or protest against the DHS immigration operations that have been ongoing in this District since December 4, 2025." *Id.* ¶ 179.

The day after they filed the Complaint, Plaintiffs moved for a Temporary Restraining Order. *See* Pls.' Mot. for TRO, ECF No. 16. The Court converted the motion into a motion for Preliminary Injunction. *See* Minutes of Status Conference, ECF No. 24. Following briefing and argument, the Court granted the motion in part and denied it in part and issued a preliminary injunction ("PI"). *See* Order, ECF No. 85 ("PI Order"). The PI "applies to individual Plaintiffs and to all persons who do or will in the future record, observe, and/or protest Operation Metro Surge and related operations that have been

ongoing in this District since December 4, 2025." *Id.* at 81, ¶ 1. It "applies to Defendants and their officers and agents operating in the District of Minnesota to conduct immigration enforcement activities as part of Operation Metro Surge." *Id.* at 81, ¶ 2. It enjoined covered federal officers and agents from several categories of action relating to retaliation, arrest, and use of crowd dispersal tools against "peaceful and unobstructive" protestors, and from stopping or detaining vehicles under certain circumstances. *Id.* at 82, ¶ 3.

Defendants appealed the PI to the Eighth Circuit, *see* Notice of Appeal. ECF No. 87. Defendants asked the Eighth Circuit to stay the PI pending appeal, and the Eighth Circuit stayed the PI. *See Tincher v. Noem*, 164 F.4th 1097 (8th Cir. 2026). The Eighth Circuit concluded that "the government has made 'a strong showing' that its challenge to the injunction 'is likely to succeed on the merits,'" describing the injunction as "too broad" and "too vague." *Id.* at 1099 (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). The court reasoned, *inter alia*, that it was improper to extend injunctive relief to "a broad uncertified class" that "has *no* chance of getting certified." *Id.*

"On February 12, 2026, Defendant Homan held a press conference announcing that the 'surge operation' in Minnesota had been successful and would end." First Am. Compl. ¶ 283, ECF No. 136 ("FAC"); *see also* Wislocky Decl. Ex. 1, ECF No. 241-1 (news article about February 12 press conference quoting Homan as stating: "I have proposed, and President Trump has concurred, that this surge operation conclude").

The next day, on February 13, 2026, Plaintiffs filed the FAC. The FAC added several Plaintiffs and Defendants and made some additional factual allegations. *See*, *e.g.*, FAC ¶¶ 10-14, 19-20, 22, 119-136. The FAC acknowledged that the government

3

announced that Operation Metro Surge "would end" and that "there may be fewer agents on the ground." *Id.* ¶¶ 283, 285.  Yet all of the factual allegations in the FAC regarding interactions between federal officers and agents and members of the public that form the basis of Plaintiffs' legal claims concern events that occurred during Operation Metro Surge. *See generally id.* ¶¶ 119-281.

The same day Plaintiffs filed the FAC, they also filed a motion in the Eighth Circuit to stay the appeal of the PI, which had been proceeding on an expedited briefing schedule. *See* Plaintiffs'-Appellees' Motion to Stay Proceedings, *Tincher*, No. 26-1105 (8th Cir. Feb. 13, 2026).  Plaintiffs sought the stay so that they could file a motion in this Court to dissolve the PI, or alternatively for an indicative ruling, stating that "[w]ith the Surge now at an end, the injunction granted by the district court—which applied specifically to Operation Metro Surge—will never again be effective." *Id.* at 2.  The Eighth Circuit granted the motion and stayed the appeal.  Order, *Tincher*, No. 26-1105 (8th Cir. Feb. 19, 2026).

Plaintiffs then moved in this Court for an indicative ruling that the Court would dissolve the PI as moot if the Eighth Circuit remanded for that purpose.  Pls.' Mot. for Indicative Ruling Pursuant to Fed. R. Civ. P. 62.1, ECF No. 237.  In support, Plaintiffs argued that a clear demarcation existed between "Operation Metro Surge" and "post-Surge operations," and because the PI purportedly applied "only to Operation Metro Surge," the PI was moot.  Pls.' Mem. of Law in Supp. of Mot. for Indicative Ruling Pursuant to Fed. R. Civ. P. 62.1, at 2, ECF No. 240.  Defendants opposed.  Defendants disputed that the terms of the PI applied only to Operation Metro Surge, and also argued that if such a clear demarcation exists between Operation Metro Surge and conduct after Operation Metro

4

Surge, then the entire case is moot "because the allegedly wrongful conduct purportedly justifying injunctive relief—alleged wrongdoing during the surge—is over." Defs.' Opp'n to Pls.' Mot. for Indicative Ruling, ECF No. 245.

The Court granted the motion and issued an indicative ruling "that it would grant a motion to dissolve the [PI] as moot if the Court of Appeals remands for that purpose." Order at 9, ECF No. 246. The Court "ha[d] no trouble finding that OMS [Operation Metro Surge] is over." *Id.* at 6 n.3. It "conclude[d] that the Injunction is now moot because OMS has ended," *id.* at 6, construing the PI as being "expressly tied to the ongoing nature of OMS," *id.* at 7. The Court noted "the tension in Plaintiffs' position[s]" that "the Injunction is moot," yet "there nevertheless remains a live case or controversy in the Amended Complaint," and indicated that "[t]he Court will cross that bridge when it comes to it." *Id.* at 9.

After the indicative ruling, the Eighth Circuit remanded the appeal "to the district court for the limited purpose of allowing the district court to rule on Plaintiff's [*sic*] motion to dissolve the preliminary injunction." Order, *Tincher*, No. 26-1105 (8th Cir. Mar. 12, 2026). Plaintiffs then moved to dissolve the PI, *see* Pls.' Mot. to Dissolve the Prelim. Inj., ECF No. 276, and Defendants opposed, *see* Defs.' Opp'n to Pls.' Mot. to Dissolve the Prelim. Inj., ECF No. 287. That motion is pending.

Meanwhile, Defendants moved to dismiss the FAC and (after consulting with the Court regarding scheduling) noticed a hearing for May 4, 2026. *See* Defs.' Mot. to Dismiss First Am. Compl., ECF No. 253; Notice of Hearing for Defs.' Mot. to Dismiss First Am. Compl., ECF No. 257. Defendants sought to dismiss most of Plaintiffs' claims for failure

5

to state a claim, *see* Mem. of Law in Supp. of Defs.' Mot. to Dismiss First Am. Compl. at 17-27, ECF No. 258, and all of Plaintiffs' claims for lack of subject-matter jurisdiction, *id.* at 10-17. Regarding jurisdiction, Defendants argued that Plaintiffs lacked standing to seek prospective relief because their allegations of conduct during Operation Metro Surge, even if ultimately proven, would not establish a likelihood that Plaintiffs would suffer violations of their rights in the future, after the conclusion of Operation Metro Surge. *Id.* at 10-15. Defendants also argued that the case was now moot, because Plaintiffs' claims rested wholly on Defendants' alleged conduct during Operation Metro Surge, which has now concluded. *Id.* at 15-17.

In support of their Motion to Dismiss, Defendants submitted two declarations that confirmed the conclusion of Operation Metro Surge (as alleged in the FAC) and described how Defendants had effectuated that conclusion. Customs and Border Protection's (CBP) Lead Field Coordinator for Operation Metro Surge explained that each of the more than 1,000 CBP officers and agents who had surged to Minnesota as part of Operation Metro Surge had departed by February 23, 2026. Amended Decl. of Marty C. Raybon Sr. ¶¶ 8-11, ECF No. 284. The Acting Field Office Director of the St. Paul Field Office of U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO), explained that approximately 3,000 ERO officers and ICE Homeland Security Investigations (HSI) agents were detailed to the St. Paul Field Office during Operation Metro Surge. *See* Second Decl. of David Easterwood ¶ 8, ECF No. 255. "Following the conclusion of Operation Metro Surge," as of March 4, 2026, ERO had approximately 47 ERO officers detailed to the St. Paul Field Office, focusing on the detention and removal

6

of "priority aliens who are incarcerated within federal, state, and local prisons and jails." *Id.* ¶¶ 9-10.  As of March 4, 2026, HSI had 435 agents detailed to the St. Paul Field Office, who were focused on "developing criminal investigations – particularly targeting fraud, money laundering, and public safety priorities."  *Id.* ¶¶ 9, 11.

On March 13, 2026, Plaintiffs filed the instant Motion for Jurisdictional Discovery, ECF No. 264.  Plaintiffs seek leave to serve seven requests for production of documents, including "[a]ll Documents and Communications referring or relating to the planning, objectives, initiation, execution, wind-down, and conclusion of Operation Metro Surge," Declaration of Virginia McCalmont, Ex. A, ECF No. 268-1, at 8 (Request No. 2), and "[a]ll Documents and Communications Defendants referenced or relied upon in drafting any filing Defendants submitted in this case," *id.* (Request No. 7).  Plaintiffs also seek leave to depose Marty C. Raybon Sr., David Easterwood, and "a Rule 30(b)(6) representative from an agency and on topics to be identified by Plaintiffs."  Proposed Order, ECF No. 269, at 2.

On March 17, 2026, this Court entered an order denying Plaintiffs' motion for jurisdictional discovery in part.  Order, ECF No. 272.  The Court ordered that "Plaintiffs must respond to the Motion to Dismiss without additional jurisdictional discovery," but that "Defendants must respond to the Motion [for jurisdictional discovery] in due course." *Id.*  The Court explained that "[t]he need for jurisdictional discovery would be addressed at" the same May 4, 2026, hearing set for Defendants' Motion to Dismiss.  *Id.*

**LEGAL STANDARD**

Trial courts have discretion to decide whether to allow jurisdictional discovery, and the Eighth Circuit "review[s] . . . the denial of a request for [jurisdictional] discovery utilizing an abuse of discretion standard." *Johnson*, 534 F.3d at 964. "Courts look to decisions under Rule 56 for guidance in determining whether to allow discovery on jurisdictional facts." *Id.* at 965. "To request discovery under [former] Rule 56(f) [current Rule 56(d)][1], a party must file an affidavit describing: (1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful." *Id.* "[S]peculation or conclusory assertions" "that jurisdictional discovery 'would likely' reveal" facts material to jurisdiction are insufficient to justify jurisdictional discovery. *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 598 (8th Cir. 2011) (quoting *Dever v. Hentzen Coatings, Inc.,* 380 F.3d 1070, 1074 n. 1 (8th Cir. 2004)).

**ARGUMENT**

**I.     The Court Should Deny Plaintiffs' Request for Jurisdictional Discovery**

The Court should deny Plaintiffs' request for jurisdictional discovery because Plaintiffs have not shown that such discovery is necessary to reveal disputed facts that would be material to the Court's jurisdiction. The essential facts that demonstrate the

---

[1] A reorganization of Rule 56 in 2010 "carrie[d] forward" the former Rule 56(f) into subdivision (d) "without substantial change." Fed. R. Civ. P. 56, Advisory Committee Notes on Rules—2010 Amendment.

Court's lack of jurisdiction are not in dispute. *See Beck v. United States*, 125 F.4th 887, 892 (8th Cir. 2025) ("Additional jurisdictional discovery is not needed if the 'facts necessary to resolving the jurisdictional inquiry' are known and undisputed.") (quoting *Viasystems*, 646 F.3d at 598). Plaintiffs acknowledge that Defendants surged immigration enforcement resources to Minnesota for Operation Metro Surge, *see* FAC ¶ 94, and all of Plaintiffs' allegations of misconduct concern incidents during Operation Metro Surge, *see id.* ¶¶ 119-281. Yet Plaintiffs also acknowledge that the government announced that Operation Metro Surge would end on February 12, 2026, *id.* ¶ 283, and Plaintiffs themselves have argued "that the surge is 'over'" in support of their request for an indicative ruling, ECF No. 240, at 2. Although Defendants' declarations in support of their Motion to Dismiss provide more detail to confirm how Defendants have effectuated the end of Operation Metro Surge, *see generally* Amended Raybon Decl.; Second Easterwood Decl., these declarations essentially confirm what Plaintiffs have already alleged.[2] These facts are not in dispute.

---

[2] Plaintiffs are incorrect to state that the Court has found that Easterwood has submitted an inaccurate declaration in this case. *See* Mem. 6. Plaintiffs cite a snippet of this sentence in the Court's preliminary injunction ruling: "As to substance, Director Easterwood's declaration offers a partial counter-factual narrative of the events leading up to the arrests of Tincher and Noor (*id.* ¶¶ 24, 27), and a more generalized discussion of the December 9, 2025, encounter between protesters and ICE officers during which Crenshaw was sprayed with a chemical irritant (*id.* ¶ 25)." PI Order at 38. In context, the phrase "counter-factual narrative" meant that he provided a factual narrative that countered and was different from the narrative provided by Plaintiffs. Yet the Court explicitly reserved judgment on whether Plaintiffs' or Defendants' portrayals of events were accurate. *See id.* at 40 ("It may ultimately be that Defendants could persuade a factfinder through admissible evidence that their version of events is more believable, but that issue is not before the Court now, and Plaintiffs are not required, at this stage, to clear the hurdle of proving a likelihood of success on the merits of their claims beyond a fair chance of doing so.") (citation omitted).

To the extent that Plaintiffs contend that they need information about whether Defendants are engaging in conduct after the conclusion of Operation Metro Surge that they allege violates individuals' constitutional rights, Plaintiffs have the demonstrated ability to obtain such information from sources other than Defendants.  Plaintiffs have submitted more than 130 declarations about alleged interactions between federal immigration officers and agents and members of the public occurring from December 2025 through early February 2026, including from more than 100 non-parties.  *See* ECF Nos. 1-1 – 1-14, 14, 33-37, 53-2, 53-3, 58-69, 97-99, 102, 105, 106, 108, 137, 140-228, 232.  By the time the Court hears this motion, it will have been almost three months since Defendants announced that Operation Metro Surge would end.  The litigation up to this point demonstrates that if Defendants were acting in a way that Plaintiffs contend violates the constitutional rights of observers and protestors of immigration operations, Plaintiffs would have the ability to obtain evidence regarding such activity.  Notably, since the end of Operation Metro Surge, Plaintiffs have not come forward with any specific evidence or allegations of allegedly unconstitutional actions by federal officials against any of the named Plaintiffs.  The absence of any such evidence, which would be in Plaintiffs' possession if it existed, undercuts the foundation for any jurisdictional discovery in this case.

Plaintiffs argue incorrectly that jurisdictional discovery is automatic when Defendants submit factual evidence in support of a jurisdictional motion to dismiss.  *See* Pls.' Mem at 4, ECF No. 267 ("Because Defendants rely on evidence outside the First Amended Complaint, the motion raises a factual attack on this Court's jurisdiction.

10

Plaintiffs are entitled to test the basis of Defendants' factual attack through jurisdictional discovery.") (citations omitted).    Even where defendants raise a factual attack on jurisdiction, to obtain jurisdictional discovery, plaintiffs must show that the evidence they seek is "reasonably expected to raise a genuine issue of material fact relevant to whether the district court had subject matter jurisdiction." *Johnson*, 534 F.3d at 965.  In particular, plaintiffs "must file an affidavit describing," among other things, "what facts are sought and how they are to be obtained" and "how these facts are reasonably expected to raise a genuine issue of material fact." *Id.*  Plaintiffs' declaration falls short of this standard. Although Plaintiffs' declaration attaches the proposed discovery requests, it does not explain how these requests will reveal evidence that will raise a genuine factual dispute about the end of Operation Metro Surge.  Instead, it merely states in conclusory terms that "Plaintiffs require discovery to obtain facts 'essential to justify [their] opposition' to Defendants' motion to dismiss on standing and mootness grounds."  McCalmont Decl. ¶ 9 (quoting Fed. R. Civ. P. 56(d)).

The affidavit must also show "what efforts the affiant has made to obtain" evidence relevant to jurisdiction, and "why the affiant's efforts were unsuccessful." *Johnson*, 534 F.3d at 965.  Again, the declaration simply states without further explanation that Plaintiffs need "factual information" that is not "otherwise available to Plaintiffs."  McCalmont Decl. ¶ 8.  Yet "conclusory assertions" "that jurisdictional discovery 'would likely' reveal" facts relevant to jurisdiction are insufficient to justify jurisdictional discovery. *Viasystems*, 646 F.3d at 598 (quoting *Dever*, 380 F.3d at 1074 n.1).

In sum, the Court should decide Defendants' motion to dismiss on the present record.  Plaintiffs have not carried their burden to show that the sweeping discovery they seek is necessary to resolve the jurisdictional arguments in Defendants' motion. Accordingly, Plaintiffs' motion should be denied.

## II.    Plaintiffs' Discovery Requests Are Overbroad and Unduly Burdensome

The Court should also deny Plaintiffs' motion because it seeks jurisdictional discovery that is nearly boundless in scope.  As explained below, Plaintiffs' proposed discovery indicates that they are engaged in the type of "fishing expedition" that courts considering requests for jurisdictional discovery do not countenance.  *Greenbelt Res. Corp. v. Redwood Consultants, LLC*, 627 F. Supp. 2d 1018, 1028 (D. Minn. 2008).

*RFP #1.*   Plaintiffs' first request for production seeks "[a]ll Documents and Communications concerning any Plaintiff . . . regarding any government action against or involving a Plaintiff" using any form of communication "whether sent by Defendants, their agents, or any third party."  McCalmont Decl. Ex. A, at 6-7 (Request No. 2).  On its face, this request would require searches of every DHS employee's email account, cell phone, tablet, and computer, along with non-custodial documents in the possession of the agency such as formal reports and memoranda, for any reference to a Plaintiff.  This request is overbroad, unduly burdensome, and disproportionate to the needs of this case.  *See* Fed. R. Civ. P. 26(b).  Plaintiffs have not come close to justifying such an extraordinary and time-consuming agency-wide search for every document possessed by DHS that might mention a Plaintiff for the purposes of jurisdictional discovery.  Indeed, this request runs roughshod over the Eighth Circuit's instruction that jurisdictional discovery must be "tailored" to the

specific issue that requires resolution. *Steinbuch v. Cutler*, 518 F.3d 580, 589 (8th Cir. 2008).

*RFP #2.* Plaintiffs' second request for production is equally overbroad and disproportionate to the needs of this case. Plaintiffs ask DHS and every employee of DHS to produce "[a]ll Documents and Communications referring or relating to the planning, objectives, initiation, execution, wind-down, and conclusion of Operation Metro Surge." McCalmont Decl. Ex. A, at 8 (Request No. 2). "Read literally, this request is a wholly unlimited demand for each and every document generated in connection with Operation Metro Surge." Order at 8, *Minnesota v. Noem*, Case No. 0:26-cv-00190-KMM-DJF, ECF No. 147 (D. Minn. Feb. 16, 2026) (Foster, M.J.) (denying motion for similar overbroad expedited discovery about Operation Metro Surge).[3]

*RFP #3.* Plaintiffs' third request seeks "Documents sufficient to show the missions, priorities, or enforcement objectives of Federal Agents deployed to Minnesota after the end of Operation Metro Surge." McCalmont Decl. Ex. A, at 8 (Request No. 3). This unduly burdensome request seeks redundant and duplicative information that has already been provided in Defendants' declarations. *See supra*, pp. 6-7. CBP demobilized from Minnesota in late February as part of the end of Operation Metro Surge, and Plaintiffs have

---

[3] The proposed document request at issue in *Minnesota* sought "all documents relating to Operation Metro Surge." *Id.* Although Plaintiffs' Request No. 2 does not contain that language, it is hard to imagine what documents relating to Operation Metro Surge would not arguably "refer[] or relat[e]" to the "initiation," "execution," or "conclusion" of Operation Metro Surge.

provided no evidence to suggest otherwise.[4]  *See* Amended Raybon Decl. ¶¶ 8-11.  Further, Defendants have explained that, as of March 4, 2026, ICE ERO has approximately 47 ERO officers detailed to the St. Paul Field Office, focusing on the detention and removal of "priority aliens who are incarcerated within federal, state, and local prisons and jails." Second Easterwood Decl. ¶¶ 9-10.  Additionally, ICE HSI has 435 agents detailed to the St. Paul Field Office, who were focused on "developing criminal investigations – particularly targeting fraud, money laundering, and public safety priorities."  *Id.* ¶¶ 9, 11. Plaintiffs have not provided any basis to contest these sworn assertions or submitted evidence from any of their more than 100 declarants to suggest CBP and ICE are doing something different.  Accordingly, there is no need for burdensome discovery about these undisputed facts.

*RFP #4*:  Plaintiffs' fourth request seeks documents protected from disclosure by the deliberative process and law enforcement privileges.  Specifically, Plaintiffs seek "[a]ll Documents and Communications referring or relating to any plans, proposals, or discussions of the continuation, resumption, expansion, or redeployment of Federal Agents to Minnesota for immigration enforcement operations following the end of Operation Metro Surge."  McCalmont Decl. Ex. A, at 8 (Request No. 4).  This request would require disclosure of pre-decisional government documents about potential future law enforcement actions in Minnesota.  But any such law enforcement planning documents, such as internal memos, draft proposals, and policy recommendations about future actions are not subject

---

[4] CBP still conducts its normal, routine operations within the District of Minnesota.

to disclosure pursuant to the deliberative process privilege and law enforcement privilege. *See Missouri Coal. for Env't Found. v. U.S. Army Corps of Eng'rs*, 542 F.3d 1204, 1211 (8th Cir. 2008) (explaining deliberative process privilege); *Kost v. Hunt*, No. Civ. 13-583 JNE/TNL, 2013 WL 5566045, at *5 (D. Minn. Oct. 8, 2013) (stating that the "the law enforcement privilege is grounded in well-established doctrine and is widely recognized by the federal courts") (quoting *In re The City of New York*, 607 F.3d 923, 942 n.18 (2d Cir. 2010)). Authorizing discovery into this category of documents would require a burdensome search and, if any responsive documents exist, inevitable privilege assertions that would likely enmesh the Court and parties in protracted litigation. There is no basis to start down this path given these burdens and the well-founded privilege concerns.

*RFP #5*: Plaintiffs' fifth request similarly overshoots the mark. It seeks "[a]ll Documents and Communications relating to formal or informal policies, guidance, directives, or training materials governing Federal Agents' interactions with journalists or members of the public who observe, document, record, photograph, or protest immigration enforcement activities in Minnesota, including (but not limited to) those governing seizures, detentions, arrests, threats or uses of force, and crowd control tactics." McCalmont Decl. Ex. A, at 8 (Request No. 5). Once again, Plaintiffs request an extraordinarily broad category of information that is completely disproportionate to the narrow issues before the Court. Training materials alone could include a wide range of documents starting with basic training materials from when officers join the agency to more recent requirements. Plaintiffs do not specify what they mean by informal policies, guidance, or directives, but that overbroad category would likely require extensive time-

15

consuming searches across a host of different data repositories and custodians, presumably including every federal officer in Minnesota.  To the extent such policies exist, it is far from clear how they would be relevant to Plaintiffs' standing, as any such policies would likely address only how DHS officers respond to specific situations they confront, not whether Plaintiffs "will again be wronged in a similar way," *Lyons v. City of Los Angeles*, 461 U.S. 95, 111 (1983).  Further, this category of documents is likely to sweep in material protected by the attorney-client and law enforcement privileges, among others.

*RFP #6*: Plaintiffs' sixth request seeks overbroad statistical information that is irrelevant to the jurisdictional issues before the Court.  Plaintiffs seek "documents sufficient to show (a) the number of Federal Agents deployed to Minnesota, and (b) the number of detentions or arrests by Federal Agents each day from November 1, 2025 to present."  McCalmont Decl. Ex. A, at 8 (Request No. 7).  First, Defendants have already provided updated information about the current number of CBP and ICE agents working in Minnesota in sworn declarations.  Production of redundant documents with that same information is unnecessary and unduly burdensome.  Second, the number of total arrests or detentions since November 2025 is irrelevant and overbroad because it would include *all* arrests or detentions, including for criminal or immigration offenses that have nothing to do with alleged protest activity.  Since the end of Operation Metro Surge, Plaintiffs have not come forward with any evidence, either from the named Plaintiffs or from the scores of non-party declarants, that a federal officer arrested them, detained them, or threatened them with arrest.  In these circumstances, there is no basis for Defendants to go to the

16

burden of searching and collecting data about immigration or fraud arrests that have nothing to do with the jurisdictional issues in this case.

*RFP #7:*   Plaintiffs' final document request seeks "[a]ll Documents and Communications Defendants referenced or relied upon in drafting any filing Defendants submitted in this case," including the Raybon and Easterwood declarations.  McCalmont Decl. Ex. A, at 8 (Request No. 7).  In short, Plaintiffs are asking for every piece of privileged work product and attorney client material that counsel for defendants utilized, cited, or relied upon in writing any brief or filing in this case.  This request should be rejected out of hand.  It is a wholly improper attempt to seek privileged material from opposing counsel without even a passing attempt to explain why such information would be relevant to the limited standing issues before the Court.  Defendants should not be burdened by such an inappropriate discovery request.

*Depositions:* Plaintiffs also ask this Court for leave to take depositions of Defendants' two declarants (Easterwood and Raybon) as well as a Rule 30(b)(6) deposition of an unspecified agency with no substantive or durational limitations.  *See* Proposed Order at 2, ECF No. 269.  As set forth above, the two declarants have attested to straightforward, undisputed factual information about the status of CBP and ICE personnel in Minnesota.  Accordingly, there is no basis to subject these federal officials to open-ended seven-hour depositions that would be oppressive and unduly burdensome.  *See* Fed. R. Civ. P. 26(c)(1).  Similarly, Plaintiffs' request for a Rule 30(b)(6) deposition provides no reasonably limiting constraints, let alone explains why such a deposition is necessary.  Plaintiffs' declaration simply states that the Rule 30(b)(6) deposition would be "on topics related to Defendants'

standing and mootness arguments." McCalmont Decl. ¶ 11. But Plaintiffs do not specify what those topics are, and that limitation is not contained in the order that Plaintiffs seek from the Court. In short, Plaintiffs seek the equivalent of a blank check that would require Defendants to guess about the identity of the agency to be deposed and the topics to be covered. A deposition of this type is unduly burdensome and not warranted given the information the CBP and ICE declarants have already provided.

***

Far from the type of "limited, narrowly drawn jurisdictional discovery" that courts sometimes allow, *Yellow Brick Rd., LLC v. Koster*, No. 13-CV-2266 (JRT/LIB), 2014 WL 12932224, at *4 (D. Minn. Feb. 25, 2014), Plaintiffs seek carte blanche to obtain document and deposition discovery regarding any and every aspect of the merits of this case. Plaintiffs' inability to make any effort to tailor their proposed discovery to any professed need for evidence to resolve disputed jurisdictional facts underscores that they have failed to meet their burden.[5]

### III. If Jurisdictional Discovery Is Granted, Defendants Should Be Permitted to Take Discovery from Plaintiffs

In the event the Court permits Plaintiffs to take jurisdictional discovery, fairness requires that Defendants should be allowed to take reciprocal discovery from Plaintiffs about the factual bases for their standing. For example, if the Court permits depositions of Defendants' declarants, Defendants should be permitted to take depositions of Plaintiffs'

---

[5] In the event that any jurisdictional discovery is authorized, Defendants reserve the right to assert any and all objections and privileges to any requests that are formally served consistent with all applicable law.

18

declarants on the same terms and conditions. Similarly, document discovery should be a two-way street, with Defendants having the ability to seek documents from Plaintiffs. Defendants also believe that a reasonable number of interrogatories and requests for admission would likely be an efficient way to identify the factual bases for Plaintiffs' purported injuries and the reasons why they claim fear of future injury following the conclusion of Operation Metro Surge. To the extent Plaintiffs object to any such discovery requests, the parties can confer and bring any disputed issues to the Court's attention in accordance with the Court's rules. To be clear, Defendants' position is that no discovery is necessary for the Court to resolve the motion to dismiss. But if the Court concludes otherwise and allows Plaintiffs to take discovery, the Court should permit Defendants to take discovery as well.

## CONCLUSION

The Court should deny Plaintiffs' Motion for Jurisdictional Discovery. In the alternative, if Plaintiffs are permitted to take jurisdictional discovery, the Court should allow Defendants to take jurisdictional discovery from Plaintiffs.

Dated: April 3, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ANDREW WARDEN
Assistant Director
Federal Programs Branch

_/s/ Jeremy S.B. Newman_
JEREMY NEWMAN
KATHLEEN C. JACOBS
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 532-3114
Fax: (202) 616-8470
jeremy.s.newman@usdoj.gov

_Counsel for Defendants_

20