UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| SUSAN TINCHER, JOHN BIESTMAN, JANET LEE, LUCIA WEBB, ABDIKADIR NOOR, ALAN CRENSHAW, ABIGAIL SALM, RYAN DOXSEY, MARGARET WOOD, THE NEWSGUILD-COMMUNICATIONS WORKERS OF AMERICA, and STATUS COUP NEWS, on behalf of themselves and other similarly situated individuals,<br><br>*Plaintiffs*,<br><br>v.<br><br>MARKWAYNE MULLIN, Secretary, U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive Associate Director, Enforcement and Removal Operations (ERO), ICE; DAVID EASTERWOOD, Acting Field Office Director, ERO, ICE Saint Paul Field Office; RODNEY SCOTT, Commissioner, U.S. Customs and Border Protection (CBP); GREGORY BOVINO, Chief Border Patrol Agent, CBP; JOHN A. CONDON, Acting Executive Associate Director, Homeland Security Investigations (HSI); THOMAS HOMAN, DHS Executive Assistant Director of Enforcement and Removal; The Department of Homeland Security; Unidentified Federal Agencies; and Unidentified Federal Agents; in their official capacities,<br><br>*Defendants*. | No. 25-cv-4669 (KMM/DTS)<br><br><br><br>**[PROPOSED] MEMORANDUM OF *AMICUS CURIAE* FORMER EMPLOYEES OF THE SPECIAL LITIGATION SECTION OF THE CIVIL RIGHTS DIVISION OF THE U.S. DEPARTMENT OF JUSTICE IN SUPPORT OF PLAINTIFFS AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

**TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE ...................................................................................1

SUMMARY OF ARGUMENT............................................................................................1

ARGUMENT ........................................................................................................................2

    I.    The United States has taken enforcement actions against law enforcement agencies for patterns or practices that violate First Amendment rights.......................................3

        A.  Observing Public Police Activity..............................................................................8

        B.  Recording Public Police Activity..............................................................................9

        C.  Criticizing Police .....................................................................................................11

        D.  Senior leadership can foster a pattern or practice of unconstitutional law enforcement activity...............................................................................................15

    II.    Federal law enforcement agencies—including DHS, ICE, and CBP—are subject to the same constitutional standards that DOJ enforced against other law enforcement agencies...............................................................................................................16

CONCLUSION...................................................................................................................19

i

## TABLE OF AUTHORITIES

**Cases**                                                                                  **Pages**

*ACLU of Illinois v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) ...................................................... 4

*American Association of University Professors v. Rubio*,
    780 F. Supp. 3d 350 (D. Mass. 2025) ........................................................................ 18

*American-Arab Anti-Discrimination Committee v. Meese*,
    714 F. Supp. 1060 (C.D. Cal. 1989)......................................................................... 18

*American-Arab Anti-Discrimination Committee v. Reno*,
    70 F.3d 1045 (9th Cir. 1995) ........................................................................... 17, 18

*Barron v. City of Baltimore*, 32 U.S. (7 Pet.) 243 (1833) .................................................. 16

*Chestnut v. Wallace*, 947 F.3d 1085 (8th Cir. 2020) ........................................................ 4

*Chicago Headline Club v. Noem*, No. 1:25-cv-12173, 2025 WL 3240782
    (N.D. Ill. Nov. 20, 2025) ........................................................................................ 17

*City of Houston v. Hill*, 482 U.S. 451 (1987) ..................................................................... 3

*Copeland v. Locke*, 613 F.3d 875 (8th Cir. 2010)............................................................. 5

*Dickinson v. Trump*, No. 3:25-cv-2170, 2026 WL 279917 (D. Or. Feb. 3, 2026)............. 17

*Fields v. City of Philadelphia*, 862 F.3d 353 (3d Cir. 2017)............................................... 4

*Fordyce v. City of Seattle*, 55 F.3d 436 (9th Cir. 1995) ..................................................... 4

*Gainor v. Rogers*, 973 F.2d 1379 (8th Cir. 1992) ............................................................. 5

*Gitlow v. New York*, 268 U.S. 652 (1925)......................................................................... 17

*Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011) .................................................................... 4

*Green v. City of St. Louis*, 52 F.4th 734 (8th Cir. 2022) .................................................... 5

*Hartman v. Moore*, 547 U.S. 250 (2006)........................................................................... 4

*Irizarry v. Yehia*, 38 F.4th 1282 (10th Cir. 2022).............................................................. 4

*Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011 (9th Cir. 2009)... 3

*Los Angeles Press Club v. Noem*, 799 F. Supp. 3d 1036 (C.D. Cal. 2025) ....................... 17

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ......................................................... 17

*Norwell v. City of Cincinnati*, 414 U.S. 14 (1973) ............................................................ 11

*OPAWL – Building AAPI Feminist Leadership v. Yost*, 118 F.4th 770 (6th Cir. 2024) ..... 18

*Permoli v. Municipality No. 1 of City of New Orleans*, 44 U.S. (3 How.) 589 (1845)...... 16

*Philadelphia Yearly Meeting of Religious Society of Friends v. United States Department of Homeland Security*, 767 F. Supp. 3d 293 (D. Md. 2025) ........................................ 19

*Small v. McCrystal*, 708 F.3d 997 (8th Cir. 2013) .............................................................. 4

*Smith v. City of Cumming*, 212 F.3d 1332 (11th Cir. 2000)................................................ 4

*Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007) ................................................................ 18

*Thurairajah v. City of Fort Smith*, 925 F.3d 979 (8th Cir. 2019) ...................................... 4

*Tinius v. Choi*, 77 F.4th 691 (D.C. Cir. 2023) .................................................................... 3

*Turner v. Lieutenant Driver*, 848 F.3d 678 (5th Cir. 2017) ............................................... 4

*Walker v. City of Pine Bluff*, 414 F.3d 989 (8th Cir. 2005) ................................................ 3

**Codes**

34 U.S.C. § 12601 .......................................................................................................... 1, 5

**Other Authorities**

Griffin Edwards & Stephen Rushin, *De-Policing: An Updated Empirical Analysis of Crime & Federal Police Reform*, 82 Wash. & Lee. L. Rev. 703 (2025)................... 6, 7

*Investigation of the Baltimore City Police Department*, United States Department of Justice Civil Rights Division (Aug. 10, 2016), https://perma.cc/9APH-FQQH ("BPD Report")............................................................................................. 10, 12, 13

*Investigation of the City of Minneapolis & the Minneapolis Police Department*, United States Department of Justice Civil Rights Division & United States Attorney's Office District of Minnesota Civil Division (June 16, 2023), https://perma.cc/MLZ7-FJVT ("MPD Report").........................................................5, 8, 9, 10, 13, 15

*Investigation of the City of Phoenix and the Phoenix Police Department*, United States Department of Justice Civil Rights Division (June 13, 2024), https://perma.cc/LFB7-KS6F ("PhxPD Report") ................................. 9, 10, 11, 12, 14

*Investigation of the Ferguson Police Department*, United States Department of Justice Civil Rights Division (Mar. 4, 2015), https://perma.cc/JEM6-WYVN ("Ferguson Report")............................................................................. 10, 11, 12, 16

*Investigation of the Lexington Police Department and the City of Lexington, Mississippi*, United States Department of Justice Civil Rights Division & United States Attorney's Office For the Southern District of Mississippi (Sep. 26, 2024), https://perma.cc/TR77-SLBB ("LPD Report")............................................................. 8

*Investigation of the Louisville Metro Police Department & Louisville Metro Government*, United States Department of Justice Civil Rights Division & United States Attorney's Office Western District of Kentucky Civil Division (Mar. 8, 2023), https://perma.cc/M4Y5-8478 ("LMPD Report")............................................. 10, 13, 14

*Investigation of the Puerto Rico Police Department*, United States Department of Justice Civil Rights Division (Sep. 5, 2011), https://perma.cc/3Z9Z-RDF3 ("PRPD Report")..................................................................................... 13, 16

*Investigation of the Seattle Police Department*, United States Department of Justice Civil Rights Division & United States Attorney's Office Western District of Washington (Dec. 16, 2011), https://perma.cc/66V8-AKUL ("SPD Report") .......................... 12, 13

Stephen Rushin, *Structural Reform Litigation in American Police Departments*, 99 Minn. L. Rev. 1343 (2015) ..................................................................... 6

*The Civil Rights Division's Pattern & Practice Police Reform Work: 1994-Present*, Civil Rights Division, United States Department of Justice (Jan. 2017), https://perma.cc/XQN2-E2WL ..................................................................... 7

United States Department of Justice, *Civil Rights 30th Anniversary Celebration of 34 U.S. Code § 12601* (last updated Feb. 5, 2025), https://perma.cc/6GVE-4ZHD........... 7

United States Department of Justice, Justice Manual § 8-2.260 (2018) ............................ 6

United States Department of Justice, Justice Manual § 8-2.262 (2022) ............................ 6

iv

## INTEREST OF AMICUS CURIAE

Amici curiae are 39 former career civil servants who worked in the Special Litigation Section of the Civil Rights Division of the U.S. Department of Justice (DOJ).[1] The Special Litigation Section has primary responsibility for, among other things, enforcing the Violent Crime Control and Law Enforcement Act of 1994, 34 U.S.C. § 12601, which authorizes the Attorney General to seek equitable and declaratory relief to eliminate a pattern or practice of illegal conduct by law enforcement agencies. Amici have occupied various roles within the Special Litigation Section, including serving as investigators, trial attorneys, deputy chiefs, and chief. Amici have also worked across nine presidential administrations, Republican and Democratic alike, and devoted a cumulative 390 years to enforcing this and other federal civil rights statutes. Amici file this memorandum to draw the Court's attention to previous analogous matters in which the United States has found that local law enforcement agencies have engaged in patterns or practices of unconstitutional activity that violate the First Amendment rights of protesters and others whom they police and to explain that federal law enforcement agencies are subject to the same constitutional standards as any other.

A full list of amici can be found in Appendix A.

## SUMMARY OF ARGUMENT

When Congress passed the Violent Crime Control and Law Enforcement Act of 1994, 34 U.S.C. § 12601, it delegated power to the Attorney General to seek civil remedies

---

[1] Unless expressly noted otherwise, Amici sign this memorandum in their personal, individual capacities and not as representatives of their current employers or any other affiliations.

1

to address patterns or practices of unlawful conduct by state and local law enforcement agencies on behalf of the United States.  Since then, the United States has undertaken civil enforcement actions against law enforcement agencies that it has found systematically violate the First Amendment rights of the people they police by repeatedly engaging in certain acts, like using force against peaceful protesters and observers of law enforcement activity, deploying chemical agents indiscriminately on gatherings, and allowing officers to openly deride First Amendment rights.  The Constitution applies with equal force to federal, state, and local law enforcement.  Thus, the First Amendment standards that the United States has articulated in these matters cover all federal law enforcement agencies, including the Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), and U.S. Customs and Border Protection (CBP).

## ARGUMENT

This case concerns the intersection of immigration enforcement by federal government officials and the First Amendment.  Plaintiffs allege that Defendants have engaged in a pattern or practice of violating the First Amendment rights of observers, journalists, and protesters during immigration enforcement operations in Minnesota. Am. Compl. ¶¶ 112–163, ECF No. 136. Specifically, Plaintiffs allege that DHS agents have deployed chemical agents and less-lethal weapons against individuals engaging in First Amendment activity who were not impeding or interfering with DHS activity, often at close range.  *Id.* ¶¶ 115–16, 118, 123–25, 127–28, 131, 133–34, 138–39, 158, 160.  Plaintiffs further allege that DHS agents have subjected individuals to physical assault or arrest or brandished their firearms in retaliation for their First Amendment activities.  *Id.* ¶¶ 117,

2

119–21, 123, 126–27, 135–36, 158–59, 161–62. In addition, Plaintiffs allege that DHS agents have used the aforementioned tactics and others to prevent individuals—including members of the press—from observing or recording DHS's activities. *Id.* ¶¶ 124, 127, 129–30, 135–36, 146–55, 158, 160–61, 163. As discussed below, those allegations implicate several interrelated First Amendment rights that have been the subject of enforcement by the Special Litigation Section of DOJ's Civil Rights Division.

## I. The United States has taken enforcement actions against law enforcement agencies for patterns or practices that violate First Amendment rights.

"The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill*, 482 U.S. 451, 462–63 (1987); *see also, e.g.*, *Tinius v. Choi*, 77 F.4th 691, 703 (D.C. Cir. 2023) ("The right to gather together in public spaces, call out injustice, and demand action is fundamental to a free and democratic society. Throughout our history, the people and groups that make up our fractious pluralism have shown up and spoken out. The First Amendment protects those rights."); *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1021 (9th Cir. 2009) (finding the law well established that the First Amendment protects a fundamental right "critical to the functioning of our democratic system"). These principles apply with particular force to the right to observe, record, and criticize law enforcement officials engaged in their public duties. "In a democracy, public officials have no general privilege to avoid publicity and embarrassment by preventing public scrutiny of their actions." *Walker v. City of Pine Bluff*, 414 F.3d 989, 992, 993 (8th Cir. 2005) (denying qualified immunity for an unlawful

arrest because "public police activity invariably draws a crowd of interested but benign on-lookers" and it is "preposterous" that non-interfering observer prevented police from carrying out lawful functions).

Moreover, "[e]very circuit court to have considered the question has held that a person has the right to record police activity in public." *Chestnut v. Wallace*, 947 F.3d 1085, 1090 (8th Cir. 2020); *see also id.* ("[I]f the constitution protects one who records police activity, then surely it protects one who merely observes it—a necessary prerequisite to recording."); *Irizarry v. Yehia*, 38 F.4th 1282, 1294 (10th Cir. 2022); *Turner v. Lieutenant Driver*, 848 F.3d 678, 690 (5th Cir. 2017); *Fields v. City of Philadelphia*, 862 F.3d 353, 359–60 (3d Cir. 2017); *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012); *Glik v. Cunniffe*, 655 F.3d 78, 82–83 (1st Cir. 2011); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995). For those who wish to express opposition, "[c]riticism of law enforcement officers, even with profanity, is protected speech." *Thurairajah v. City of Fort Smith*, 925 F.3d 979, 985 (8th Cir. 2019). When an individual engages in any of these protected activities, without more, retaliation by force, arrest, or prosecution is prohibited. *Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[T]he law is settled that[,] as a general matter[,] the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out.") (citation omitted).

The Eighth Circuit "in particular has been quite forthright in upholding the right of citizens to engage with officers while they perform their duties." *Chestnut*, 947 F.3d at 1090–91; *see, e.g., Small v. McCrystal*, 708 F.3d 997, 1008–09 (8th Cir. 2013) (denying

4

qualified immunity to officers who arrested and prosecuted witnesses who expressed verbal "displeasure" about an arrest); *Copeland v. Locke*, 613 F.3d 875, 880 (8th Cir. 2010) (denying qualified immunity because "[n]o reasonable police officer could believe that he had arguable probable cause" to arrest an individual for verbally challenging an officer during a traffic stop); *Gainor v. Rogers*, 973 F.2d 1379, 1388 (8th Cir. 1992) (denying qualified immunity to officers who arrested a man carrying a cross after he argued with them).

When these rights are violated, the harms are not limited to the individuals directly affected by government action. The law recognizes that such reprisals risk chilling the constitutionally protected speech of others. *See, e.g.*, *Green v. City of St. Louis*, 52 F.4th 734, 739 (8th Cir. 2022). As the United States has emphasized:

> The First Amendment reflects a "profound national commitment" to the principle that "debate on public issues should be uninhibited, robust, and wide-open." Police retaliation against speech is antithetical to this commitment: "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."

*Investigation of the City of Minneapolis & the Minneapolis Police Dep't*, U.S. Dep't of Just. C.R. Div. & U.S. Att'ys Off. Dist. of Minn. Civ. Div., at 48 (June 16, 2023), https://perma.cc/MLZ7-FJVT ("MPD Report") (quoting *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964) and *City of Houston v. Hill*, 482 U.S. 451, 463 (1988)).

Given the societal importance of these principles, the responsibility for their enforcement is not limited to private plaintiffs. In 1994, Congress passed what is now 34 U.S.C. § 12601, which prohibits law enforcement officers from "engag[ing] in a pattern or

5

practice of conduct . . . that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States," 34 U.S.C. § 12601(a), and provides the Attorney General a cause of action to "obtain appropriate equitable and declaratory relief to eliminate the pattern or practice" when there is "reasonable cause to believe" that an unlawful pattern or practice exists, 34 U.S.C. § 12601(b). Since Section 12601's enactment, the Special Litigation Section has been responsible for its enforcement. U.S. Dep't of Just., Just. Manual § 8-2.260 (2018) ("The Special Litigation Section is responsible for investigating and prosecuting cases under . . . 34 U.S.C. § 12601 . . . ."). During amici's federal tenure, the Special Litigation Section investigated numerous pattern or practice complaints and worked with local police departments to come into compliance with federal law.

DOJ's Section 12601 investigations are extremely thorough. *See* Stephen Rushin, *Structural Reform Litigation in American Police Departments*, 99 Minn. L. Rev. 1343, 1367–69 (2015); U.S. Dep't of Just., Just. Manual § 8-2.262 (2022). DOJ staff and experts spend considerable time in the relevant jurisdiction, interviewing officers and community members, gathering data, and reviewing departmental records, news reports, court records, and other evidence. *See* Griffin Edwards & Stephen Rushin, *De-Policing: An Updated Empirical Analysis of Crime & Federal Police Reform*, 82 Wash. & Lee. L. Rev. 703, 721–22 (2025). Once the investigation is complete, DOJ typically releases a lengthy report detailing its findings, along with the evidence showing a pattern or practice of unlawful behavior, which is commonly referred to as a "Findings Report." *Id.* at 722.

If DOJ issues findings indicating an ongoing violation of Section 12601, it will then try to craft a negotiated remedy with the police department. *Id.* at 723. Although the United States could decide to pursue litigation, most Section 12601 cases are resolved via consent decree or settlement agreement. *Id.* Generally, the parties will implement their reform agreements subject to oversight by a federal district court judge. *Id.* The federal district court will not release the law enforcement agency from oversight until it has demonstrated substantial compliance with the terms of the consent decree. *Id.* This remedial process typically lasts several years. *Id.*

Since 1994, DOJ has opened more than 80 pattern or practice investigations into some of the nation's largest law enforcement agencies, made findings, and entered over 40 consent decrees. *See* U.S. Dep't of Just., *Civil Rights 30th Anniversary Celebration of 34 U.S. Code § 12601* (last updated Feb. 5, 2025), https://perma.cc/6GVE-4ZHD; *see also The Civil Rights Division's Pattern & Practice Police Reform Work: 1994-Present*, C.R. Div., U.S. Dep't of Just., at 3 (Jan. 2017), https://perma.cc/XQN2-E2WL.

In multiple recent matters, DOJ has investigated local police departments and made findings that they engaged in a pattern or practice of violating the First Amendment rights of individuals. In these cases, the United States issued a Findings Report identifying specific patterns of conduct that trespass on constitutionally protected rights of free expression and assembly. Many of the actions of local law enforcement agencies that the United States found violated constitutional rights are substantively indistinguishable from the alleged conduct of DHS officials as described in the Amended Complaint.

## A. Observing Public Police Activity

Watching law enforcement officers do their jobs in public is a basic freedom in American society. No person should be compelled to avert their eyes upon encountering government officials engaging in official duties in the public square. To that end, DOJ has consistently recognized in its Findings Reports that "people have the right to observe police officers' conduct and express views about it, even if it causes an officer a momentary distraction" so long as "it does not actively interfere with police conduct." MPD Report at 53. DOJ has also found that law enforcement agencies violate the law when they retaliate against observers. Among other instances, DOJ has criticized the Lexington, Mississippi Police Department for "threaten[ing] with force or arrest" people who "try to protect their constitutional rights by keeping a close eye on officers." *Investigation of the Lexington Police Dep't & the City of Lexington, Miss.*, U.S. Dep't of Just. C.R. Div. & U.S. Atty's Off. for the S. Dist. of Miss., at 42 (Sep. 26, 2024), https://perma.cc/TR77-SLBB ("LPD Report"). It has described multiple instances in which Lexington Police Department officers pointed weapons at, threatened, and arrested bystanders. *Id.* at 42–43. Likewise, in its Findings Report about the Phoenix Police Department, DOJ found a pattern or practice of First Amendment violations that included an incident where police arrested a man whom they believed to be a legal observer (but was actually an amateur photographer) and supported serious charges against him and other protesters with false statements.

8

*Investigation of the City of Phx. & the Phx. Police Dep't*, U.S. Dep't of Just. C.R. Div, at 76–77 (June 13, 2024), https://perma.cc/LFB7-KS6F ("PhxPD Report").

The allegations in the Amended Complaint describe retaliation against observers by federal agents comparable—or even more severe—than what DOJ has found to constitute a pattern or practice of First Amendment violations by local police departments. For example, Plaintiffs describe an incident in which Steven Paul Saari, a Minneapolis resident, visited the site of Alexander Pretti's killing and observed DHS agents there. Am. Compl. ¶ 135. Despite doing nothing more than watching, CBP agents pointed guns at him, "roughly" arrested him, and then detained him for multiple hours, during which time they collected DNA from him without a warrant or consent and extracted information from his cell phone before releasing him without charges. *Id.* Plaintiffs allege numerous incidents in which DHS, ICE, and CBP agents gratuitously pepper sprayed people who were doing nothing more than observing their public actions, *e.g.*, *id.* ¶¶ 115–16, 118, and a pattern of retaliating against "mobile observers"—people who follow federal agents in their vehicles to watch them—in a number of different ways, including boxing observers in, cutting them off in traffic, threatening them, and pointing guns at them without justification, *id.* ¶¶ 147–155.

## B. Recording Public Police Activity

"Just as people have a right to observe public police interactions, people have a right to record officers' activities as well." MPD Report at 53 (citing *Chestnut*, 947 F.3d at 1090); *see also* PhxPD Report at 83 ("The First Amendment protects the right to peacefully film police officers performing their duties in public."). DOJ found that the Minneapolis

9

Police Department engaged in a pattern or practice of violating the First Amendment because "MPD officers interfere with individuals' right to record police activity by arresting them, destroying their recording equipment, and retaliating with force." MPD Report at 53–54. DOJ similarly condemned the Louisville Metro Police Department's retaliatory use of force against a teen girl who recorded police activity, and then her father who recorded the use of force, because "the First Amendment protects the right to video record the police." *Investigation of the Louisville Metro Police Dep't & Louisville Metro Gov't*, U.S. Dep't of Just. C.R. Div. & U.S. Att'ys Off. W. Dist. of Ky. Civ. Div., at 57 (Mar. 8, 2023), https://perma.cc/M4Y5-8478 ("LMPD Report"); *see also Investigation of the Balt. City Police Dep't*, U.S. Dep't of Just. C.R. Div., at 119 (Aug. 10, 2016), https://perma.cc/9APH-FQQH ("BPD Report") (expressing "serious concerns that BPD officers interfere with individuals who attempt to lawfully record police activity"); *Investigation of the Ferguson Police Dep't*, U.S. Dep't of Just. C.R. Div., at 26 (Mar. 4, 2015), https://perma.cc/JEM6-WYVN ("Ferguson Report") (finding officers "routinely infringe on the public's First Amendment rights by preventing people from recording their activities," including by "claim[ing] without any factual support that the use of camera phones endangers officer safety"). DOJ also found that the Phoenix Police Department arrested, used force, or ordered people to leave who were peaceably filming police activity at a distance. In one incident, a shirtless man who presented no threat was filming police at the tail end of a protest. PhxPD Report at 83. A Phoenix officer targeted him with multiple rounds of pepperballs and continued to hit the protestor even after he fell to the ground. *Id.* In another, officers surrounded and pointed guns at a man who was filming

them from his car, then arrested him and cited the filming as justification. *Id.* In its similar finding about the Ferguson Police Department, DOJ described incidents, including during "large-scale public protest[s]" like the scenarios that form the basis for this litigation, where officers ordered protesters to stop recording them and arrested protesters en masse for continuing to do so. Ferguson Report at 27–28.

These activities parallel numerous allegations in the Amended Complaint. For example, Plaintiffs describe dozens of incidents in which federal agents pointed guns, fired tear gas, threatened to arrest, or used force against people attempting to record or photograph them in public spaces. *See, e.g.*, Am. Compl. ¶¶ 31–40, 61–62, 65, 124–25, 127, 129–30. In just one example, Plaintiffs allege a federal agent confronted a woman who was attempting to record the license plate of a federal vehicle after agents had assaulted another person. The agent allegedly "knocked off her glasses, pepper sprayed her, and pushed her backwards so that she hit her head on the curb." *Id.* ¶ 64. In another, police tackled an independent photographer who was recording protest activity, then sprayed him directly in the face with pepper spray. Afterwards, they issued him a citation containing fabricated charges. *Id.* ¶ 127. Defendant Gregory Bovino, the leader of the Minneapolis deployment, personally retaliated against individuals for recording DHS activity by slapping a phone out of one individual's hand and shoving another. *Id.* ¶ 130.

## C. Criticizing Police

Hand-in-hand with the right to observe and monitor government officials, the First Amendment protects the right of individuals to loudly condemn (or praise) what they see those officials doing. *See, e.g.*, *Norwell v. City of Cincinnati*, 414 U.S. 14, 16 (1973)

11

(finding that speech protesting officers' actions is protected, even if "loud and boisterous" or "annoying" to officers). As DOJ has explained, the constitutional right to be free from police retaliation for speech applies with no lesser force when members of the public protest against the police themselves. "[P]rotests with anti-police messages are entitled to the same First Amendment protection as any other demonstration." PhxPD Report at 72. Indeed, DOJ has repeatedly found that retaliation against individuals for speech critical of law enforcement violates the Constitution and federal law. In Baltimore, for example, DOJ found that the police department unlawfully stopped and arrested people for speech officers found to be "rude, critical, or disrespectful." BPD Report at 116. DOJ also found that Baltimore police "violate[d] the First Amendment by arresting individuals who question the lawfulness of their actions." *Id.* at 117. Similarly, in Ferguson, DOJ found a pattern of First Amendment violations where officers "ma[d]e enforcement decisions based on what subjects sa[id], or how they sa[id] it," and were "quick to overreact to challenges and verbal slights." Ferguson Report at 25.

These violations are especially harmful when they involve the use of force. As DOJ has explained in its Findings Report for the Seattle Police Department, "[i]t is both unconstitutional and unreasonable for officers to use force to prevent the exercise of free speech, even when such speech constitutes a verbal attack on the police." *Investigation of the Seattle Police Dep't*, U.S. Dep't of Just. C.R. Div. & U.S. Atty's Off. W. Dist. of Wash., at 14 (Dec. 16, 2011), https://perma.cc/66V8-AKUL ("SPD Report"). DOJ found that "SPD engages in a pattern or practice of using excessive force against individuals who express discontent with, or 'talk back to,' police officers." *Id.* DOJ describes two relevant

12

incidents. In one, a police officer pushed a man who was yelling at the officer, while in another, an officer punched and kneed a handcuffed man on the ground for talking back. *Id.*; *see also, e.g.*, BPD Report at 118–19 (describing "many incidents in which BPD officers believe they are justified in using force or arresting a person, based solely on profane or insulting words," including one in which a speaker's "mouth," *i.e.* his words, was listed in a report as a "weapon or means of attack"). DOJ also found that the Puerto Rico Police Department used unreasonable force in violation of the First Amendment by using "batons, chemical agents, and other physical force indiscriminately against individuals who are either participants or bystanders in protests and who pose little or no threat to officers or others." *Investigation of the P.R. Police Dep't*, U.S. Dep't of Just. C.R. Div., at 25 (Sep. 5, 2011), https://perma.cc/3Z9Z-RDF3 ("PRPD Report"). In one example, DOJ cited incidents in which officers fired gas canisters at students protesting police activity, *id.* at 27, and deployed tear gas and struck protesters with batons, including those who were attempting to disperse or had their backs to officers, *id.* at 29.

DOJ similarly found that the Minneapolis Police Department violated protesters' First Amendment rights when they engaged groups of mostly peaceful protesters with "indiscriminate uses of force [that] suggest that officers' true purpose is not to prevent criminal activity, but to retaliate against protesters for their constitutionally protected speech." MPD Report at 49. DOJ found that the Louisville Metro Police Department violated the First Amendment too during widespread protests in 2020 after officers killed Breonna Taylor. LMPD Report at 2. The Report found a pattern or practice of First Amendment violations stemming from the use of dispersal orders, force, and arrest against

13

groups of mostly peaceful protesters. *Id.* at 55. These violations also included unlawful mass arrests and retaliatory force against members of the press, along with "similar retaliatory practices against lawful verbal challenges to police action" and "protected speech that questions police conduct." *Id.* at 56. In Phoenix, DOJ extensively documented that department's use of force against protestors, including incidents in which officers failed to warn protestors before shooting projectiles, used munitions against people who were departing the scene of protests, and made little effort to distinguish between peaceful protestors and those engaged in unlawful acts. PhxPD Report at 73–74. They used excessive force against protestors who were not a threat, approaching them with weapons drawn and immediately ordering them to lie face down on the ground. *Id.* at 74. Even more concerning, Phoenix police "singled out specific protestors for arrest because of expressive activities." *Id.* at 78. For example, before protests, "the lieutenant in charge would distribute flyers to officers with protestors' names and pictures" and "direct officers to record certain protestors on video to document their alleged violations." *Id.* at 79. In a training for officers on crowd control techniques, an instructor made crude jokes about a protestor who had been struck in the groin with a projectile, "boast[ing] that PhxPD executed search warrants on the protestor's home and workplace, causing him to become 'jobless and homeless at the same damn time'" and showing news footage of the incident with music intended for comic effect. *Id.* at 85.

The Amended Complaint alleges that Defendants engage in retaliatory activities for critical speech that mirror or exceed what DOJ has repeatedly found to constitute First Amendment violations by law enforcement. Specifically, the Amended Complaint

14

describes numerous incidents in which federal agents targeted people who were peacefully protesting federal law enforcement, often using force and less-lethal munitions. *See, e.g.*, Am. Compl. ¶¶ 69, 115–16, 118–20, 123, 128, 133, 277. For example, Plaintiffs allege that a man heckling and filming agents was tackled in retaliation, resulting in three broken ribs. *Id.* ¶ 142. In another incident, DHS agents pinned an individual to the ground, punched him in the face, handcuffed him, and arrested him for doing no more than criticizing and insulting the officers. *Id.* ¶ 126. And in another incident, when Plaintiff Lucia Webb told DHS agents that they should be ashamed for kidnapping people, the agents surrounded her, mocked and insulted her, and threatened to arrest her. *Id.* ¶ 211.

**D. Senior leadership can foster a pattern or practice of unconstitutional law enforcement activity.**

Senior law enforcement leadership plays a critical role in ensuring respect for constitutional rights or, conversely, fostering a culture of unconstitutional conduct. As DOJ has explained, a law enforcement agency's pattern or practice of violating First Amendment rights can be attributable to a "broader failure to protect speech and guard against unlawful retaliation" when leadership "fails to hold officers accountable for violating First Amendment rights," declines to scrutinize instances in which "officers have seriously injured protesters," and repeatedly expresses "contempt for First Amendment rights." *See* MPD Report at 54–55. In past investigations, DOJ has expressly condemned law enforcement remarks that "show disrespect for First Amendment rights" because when officers "regularly express this attitude, they send a message . . . that protesters are adversaries, and First Amendment rights need not be protected." *Id.* at 54–55; *see also,*

15

*e.g.*, Ferguson Report at 26 ("That FPD officers believe criticism and insolence are grounds for arrest, and that supervisors have condoned such unconstitutional policing, reflects intolerance for even lawful opposition to the exercise of police authority."); PRPD Report at 44 (finding that constitutional violations were perpetuated by Puerto Rico Police commanders justifying force and limiting accountability of units taking unconstitutional actions against protesters).

The Amended Complaint alleges that Defendants denigrate the First Amendment in a manner that sends the message that protesters are adversaries. Specifically, the Amended Complaint describes numerous instances in which Defendants, including DHS leadership, expressed contempt for those exercising First Amendment rights, including labelling them "professional agitators" and declaring that they were "ready to do battle" with protesters. Am. Compl. ¶¶ 84, 86. Additionally, the Amended Complaint alleges that Defendant Bovino claimed that he had *never* seen protesters who were not "violent rioters" and that he supported agents "going hard" against protesters. Am. Compl. ¶ 88.

## II. Federal law enforcement agencies—including DHS, ICE, and CBP—are subject to the same constitutional standards that DOJ enforced against other law enforcement agencies.

Like every other state and local law enforcement agency, DHS, ICE, and CBP must operate within the Constitution's bounds. For well over two centuries, our legal system has recognized that constitutional rights limit the federal government's ability to infringe on individuals' personal liberties. Indeed, since its ratification in 1791, the Bill of Rights was thought to apply *only* to the federal government, not the States. *See, e.g.*, *Barron v. City of Balt.*, 32 U.S. (7 Pet.) 243, 247 (1833) (Fifth Amendment); *Permoli v. Mun. No. 1*

16

*of City of New Orleans*, 44 U.S. (3 How.) 589, 606 (1845) ("The limitation of power in the first amendment of the Constitution is upon Congress, and not the states."). It was only after the Civil War and the passage of the Reconstruction Amendments that the Supreme Court gradually incorporated the Bill of Rights to apply against the states through the Fourteenth Amendment. *See, e.g.*, *Gitlow v. New York*, 268 U.S. 652, 666 (1925) (incorporating First Amendment's speech protections); *McDonald v. City of Chicago*, 561 U.S. 742, 763–64 & n.12 (2010) (incorporating Second Amendment and describing history of incorporation doctrine). It would be exceedingly strange if constitutional rights, which historically limited federal officials and only more recently applied against state officials, would now limit state officials but leave federal officials unconstrained.

Courts around the country have recognized that the First Amendment applies with full force to federal officials conducting immigration enforcement. That includes every court to consider DHS, ICE, and CBP's responses to protestors and legal observers over the past year. *See, e.g.*, *Chi. Headline Club v. Noem*, No. 1:25-cv-12173, 2025 WL 3240782, at *80–82 (N.D. Ill. Nov. 20, 2025), *vacated on other grounds*, No. 25-3023, 2026 WL 622677, at *7 (7th Cir. Mar. 5, 2026); *L.A. Press Club v. Noem*, 799 F. Supp. 3d 1036, 1062–67 (C.D. Cal. 2025), *appeal docketed*, No. 25-5975 (9th Cir. Sept. 23, 2025); *Dickinson v. Trump*, No. 3:25-cv-2170, 2026 WL 279917, at *5–7 (D. Or. Feb. 3, 2026), *appeal docketed*, No. 26-1609 (9th Cir. Mar. 17, 2026).

Courts have likewise held that foreign policy and immigration interests "do not authorize [the] political branches to subject aliens who reside here to . . . fundamentally different First Amendment . . . right[s]." *Am.-Arab Anti-Discrimination Comm. ("AADC")*

17

*v. Reno*, 70 F.3d 1045, 1056 (9th Cir. 1995), *rev'd on other grounds*, 525 U.S. 471 (1999); *see also OPAWL – Bldg. AAPI Feminist Leadership v. Yost*, 118 F.4th 770, 776 (6th Cir. 2024) ("Lawful permanent residents have First Amendment Rights."). Thus, several courts have held that noncitizens in the United States may challenge immigration enforcement actions under the First Amendment. *See AADC*, 70 F.3d at 1054–56; *Am. Ass'n of Univ. Professors v. Rubio*, 780 F. Supp. 3d 350, 381–84 (D. Mass. 2025) (rejecting government's argument that "First Amendment protections are less robust for noncitizens" in light of foreign policy and national security interests); *Am.-Arab Anti-Discrimination Comm. v. Meese*, 714 F. Supp. 1060, 1074–75 (C.D. Cal. 1989) (holding "[i]t has long been settled that aliens within the United States enjoy the protections of the First Amendment of the United States Constitution," including in the deportation context, and collecting cases).

Courts also have held that federal immigration officers must respect religious liberty in conducting immigration enforcement. In *Tabbaa v. Chertoff*, for example, the Second Circuit held that CBP operations subjecting individuals who attended religious conferences abroad to heightened reentry screenings imposed a significant burden on the right of expressive association because the searches penalized them for exercising their First Amendment right to attend such conferences and reasonably deterred people from associating at similar conferences. 509 F.3d 89, 101–02 (2d Cir. 2007). The Second Circuit ultimately held that the Government's search was justified by a compelling state interest, but it also declined to fashion a unique or lesser test for the First Amendment in the immigration context (even at the border). *Id.* at 102–105 & n.5. More recently, a court held that the rescission of guardrails around domestic immigration enforcement actions

18

near places of worship impermissibly burdened several religious communities' rights to expressive association. *Phila. Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, 767 F. Supp. 3d 293, 321–28 (D. Md. 2025). The court did not suggest any lesser First Amendment standard for immigration enforcement activities.

The same principles apply here. This Court should hold DHS, ICE, and CBP to the identical constitutional standards that state and local law enforcement agencies must meet.

## CONCLUSION

Amici respectfully requests that, in resolving Defendants' motion to dismiss, the Court enforce the same standards against federal law enforcement that the U.S. Department of Justice, including through investigations led by the Special Litigation Section, has routinely enforced against local law enforcement.

Dated: April 6, 2026

Respectfully submitted,

By: /s/ *Bradford Colbert*
Bradford Colbert (#166790)
MITCHELL HAMLINE SCHOOL OF LAW
875 Summit Ave.
St. Paul, MN 55105
Tel: (651) 290-8651
brad.colbert@mitchellhamline.edu

By: /s/ *Dana Paikowsky*
Dana Paikowsky
Renata O'Donnell
Robyn K. Bitner
Nithin Venkatraman
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
Tel: (202) 736-2200
dpaikowsky@campaignlegalcenter.org
rodonnell@campaignlegalcenter.org
rbitner@campaignlegalcenter.org
nvenkatraman@campaignlegalcenter.org

By: /s/ *Seth Wayne*
Seth Wayne
Jonathan L. Backer
Mary B. McCord
INSTITUTE FOR CONSTITUTIONAL ADVOCACY
AND PROTECTION
Georgetown University Law Center
600 New Jersey Ave. NW
Washington, DC 20001
Tel: (415) 516-4939
Email: sw1098@georgetown.edu

*Counsel for Amicus Curiae Former
Employees of the Special Litigation Section of
the Civil Rights Division of the U.S.
Department of Justice*

20

## LR 7.1 CERTIFICATE OF COMPLIANCE

The undersigned certifies that *Amicis*' Memorandum in Support of Plaintiffs and in Opposition to Defendants' Motion to Dismiss complies with D. Minn. Local Rules 7.1(f), 7.1(h), and the limitation on *Amicus* brief lengths in Rule 29(a)(5) of the Federal Rules of Appellate Procedure. The Memorandum has a total of 5,219 words in Times New Roman font size 13. It was prepared using Microsoft Office 365, which includes all text, including headings, footnotes, and quotations in the word count.

Dated: April 6, 2026                    Respectfully submitted,

                                        By: /s/ *Bradford Colbert*
                                        Bradford Colbert (#166790)
                                        MITCHELL HAMLINE SCHOOL OF LAW
                                        875 Summit Ave.
                                        St. Paul, MN 55105
                                        Tel: (651) 290-8651
                                        brad.colbert@mitchellhamline.edu

21