UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

SUSAN TINCHER, JOHN BIESTMAN, JANET
LEE, LUCIA WEBB, ABDIKADIR NOOR,
ALAN CRENSHAW, ABIGAIL SALM, RYAN
DOXSEY, MARGARET WOOD, THE
NEWSGUILD-COMMUNICATIONS
WORKERS OF AMERICA, and STATUS
COUP NEWS, *on behalf of themselves and
other similarly situated individuals*,

        Plaintiffs,

    v.

MARKWAYNE MULLIN, Secretary, U.S.
Department of Homeland Security (DHS);
TODD LYONS, Acting Director, U.S.
Immigration and Customs Enforcement
(ICE); MARCOS CHARLES, Acting
Executive Associate Director, Enforcement
and Removal Operations (ERO), ICE;
DAVID EASTERWOOD, Acting Field Office
Director, ERO, ICE Saint Paul Field Office;
RODNEY SCOTT, Commissioner, U.S.
Customs and Border Protection (CBP);
GREGORY BOVINO, Chief Border Patrol
Agent, CBP; JOHN A. CONDON, Acting
Executive Associate Director, Homeland
Security Investigations (HSI); THOMAS
HOMAN, DHS Executive Assistant Director
of Enforcement and Removal; The
Department of Homeland Security;
Unidentified Federal Agencies; and
Unidentified Federal Agents; *in their
official capacities*,

        Defendants.

No. 25-CV-4669 (KMM/DTS)


**PLAINTIFFS' BRIEF IN
OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**

_____

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

BACKGROUND ............................................................................................................................2

     A.    Defendants turn their attention to Minnesota and immediately begin inflicting constitutional injuries ..................................................................................2

     B.    Defendants' unconstitutional conduct escalates in early 2026 ....................3

     C.    Defendants' unconstitutional conduct has continued after the announced end of Operation Metro Surge ..........................................................7

ARGUMENT ...............................................................................................................................11

     I.    The Court has jurisdiction over Plaintiffs' claims ...........................................11

          A.    Standing should be determined as of the filing of the lawsuit.... 12

          B.    Each Plaintiff has standing to bring claims against Defendants. 14

               1.  Plaintiffs are experiencing an ongoing chill to their First Amendment rights ............................................................................ 14

               2.  Plaintiffs are likely to experience future violations of their First and Fourth Amendment rights. ........................................ 16

          C.    Defendants' voluntary cessation of Operation Metro Surge does not moot Plaintiffs' claims ..........................................................................21

          D.    Defendants' Rule 12(b)(1) motion should not be granted without affording Plaintiffs jurisdictional discovery ........................................25

     II.    Plaintiffs have stated several claims for relief ................................................26

          A.    Plaintiffs have sufficiently alleged First Amendment retaliation claims .....................................................................................................................27

               1.  Plaintiffs have engaged in protected First Amendment activities .....................................................................................................28

2.  Plaintiffs have plausibly alleged that their protected First Amendment activities were the but-for cause of Defendants' adverse actions ......................................................... 34

B.   Crenshaw and CWA have sufficiently alleged Fourth Amendment claims ............................................................................................... 40

C.   Plaintiffs have sufficiently alleged a civil conspiracy claim .......... 43

D.   Plaintiffs properly seek declaratory relief ......................................... 45

CONCLUSION ................................................................................................................ 45

## TABLE OF AUTHORITIES

Page

*Allied Servs., LLC v. Smash My Trash, LLC,*
153 F.4th 600 (8th Cir. 2025)................................................................................ 45

*Already, LLC v. Nike, Inc.,*
568 U.S. 85 (2013)..................................................................................................... 24

*ACLU of Ill. v. Alvarez,*
679 F.3d 583 (7th Cir. 2012) ............................................................................... 30

*Baude v. Leyshock,*
23 F.4th 1065 (8th Cir. 2022)..........................................................26, 32, 35, 40

*Bonenberger v. St. Louis Metro. Police Dep't,*
810 F.3d 1103 (8th Cir. 2016) ........................................................................43, 44

*Brandy v. City of St. Louis,*
75 F.4th 908 (8th Cir. 2023) ............................................................................... 38

*Brower v. Cnty. of Inyo,*
489 U.S. 593 (1989)...........................................................................................40, 41

*Burbridge v. City of St. Louis, Mo.,*
430 F. Supp. 3d 595 (E.D. Mo. 2019)................................................................. 44

*California v. Hodari D.,*
499 U.S. 621 (1991)................................................................................................. 40

*Chestnut v. Wallace,*
947 F.3d 1085 (8th Cir. 2020)........................................................................30, 33

*City of Houston v. Hill,*
482 U.S. 451 (1987)................................................................................................. 28

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983)........................................................................14, 18, 22, 23

*City of Mesquite v. Aladdin's Castle, Inc.,*
455 U.S. 283 (1982)................................................................................................. 23

*Cole v. Lockman,*
No. 21-CV-1282 (PJS/DLM), 2024 WL 328976
(D. Minn. Jan. 29, 2024)................................................................................................. 42

*Colten v. Kentucky,*
407 U.S. 104 (1972).................................................................................................29, 31

*Copeland v. Locke,*
613 F.3d 875 (8th Cir. 2010) .......................................................................................... 36

*Dakotans for Health v. Noem,*
52 F.4th 381 (8th Cir. 2022) ........................................................................................... 15

*Davis v. Fed. Election Comm'n,*
554 U.S. 724 (2008)......................................................................................... 12, 24, 25

*Dreith v. City of St. Louis, Mo.,*
55 F.4th 1145 (8th Cir. 2022)................................................................................. 34, 36, 38

*Dundon v. Kirchmeier,*
85 F.4th 1250 (8th Cir. 2023)......................................................................................... 41

*First Nat'l Bank of Boston v. Bellotti,*
435 U.S. 765 (1978)................................................................................................29, 34

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
528 U.S. 167 (2000) .......................................................................................12, 21, 22, 24

*Garcia v. City of Trenton,*
348 F.3d 726 (8th Cir. 2003) .......................................................................................... 27

*Glik v. Cunniffe,*
655 F.3d 78 (1st Cir. 2011)............................................................................................. 30

*Green v. City of St. Louis,*
52 F.4th 734 (8th Cir. 2022) ......................................................................................26, 38

*Hoyland v. McMenomy,*
869 F.3d 644 (8th Cir. 2017) .......................................................................................30, 36

*Hussen v. Noem,*
---- F.Supp.3d ----, 2026 WL 657936 (D. Minn. Mar. 9, 2026)............................... 19

iv

*In re Pre-Filled Propane Tank Antitrust Litig.*,
    893 F.3d 1047 (8th Cir. 2018)..................................................................................... 14

*Keup v. Sarpy Cnty.*,
    159 F.4th 533 (8th Cir. 2025)..................................................................................... 41

*Laney v. City of St. Louis, Mo.*,
    56 F.4th 1153 (8th Cir. 2023)..................................................................................... 27

*L.A. Press Club v. Noem*,
    --- F.4th ----, 2026 WL 889142 (9th Cir. Apr. 1, 2026).............................. 14, 16, 40

*Lozman v. Riviera Beach*,
    585 U.S. 87 (2018).......................................................................................................... 35

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)........................................................................................ 12, 19, 25

*Marks v. Bauer*,
    107 F.4th 840 (8th Cir. 2024)................................................................................41, 42

*Missourians for Fiscal Accountability v. Klahr*,
    830 F.3d 789 (8th Cir. 2016) ................................................................................15, 24

*Mizokami Bros. of Arizona v. Mobay Chem. Corp.*,
    660 F.2d 712 (8th Cir. 1981) ..................................................................................... 43

*Molina v. City of St. Louis*,
    59 F.4th 334 (8th Cir. 2023) ..................................................................................30, 31

*Naucke v. City of Park Hills*,
    284 F.3d 923 (8th Cir. 2002) ..................................................................................... 28

*Ness v. City of Bloomington*,
    11 F.4th 914 (8th Cir. 2021) ..................................................................................... 29

*Nieters v. Holtan*,
    83 F.4th 1099 (8th Cir. 2023)................................................................................. *passim*

*Nieves v. Bartlett*,
    587 U.S. 391 (2019)........................................................................................27, 30, 34, 35

*O'Shea v. Littleton,*
    414 U.S. 488 (1974) ............................................................................. 14, 16, 19

*Osborn v. United States,*
    918 F.2d 724 (8th Cir. 1990) .............................................................. 26

*Park v. Forest Serv. of U.S.,*
    205 F.3d 1034 (8th Cir. 2000) ........................................................ 14, 16

*Patton v. Fitzhugh,*
    131 F.4th 383 (6th Cir. 2025) ............................................................ 13

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n,*
    460 U.S. 37 (1983) ............................................................................. 28

*Peterson v. Kopp,*
    754 F.3d 594 (8th Cir. 2014) ........................................................... 34, 40

*Quraishi v. St. Charles Cnty., Mo.,*
    986 F.3d 831 (8th Cir. 2021) .............................................................. 38

*Reg. Home Health Care, Inc. v. Becerra,*
    19 F.4th 1043 (8th Cir. 2021) ........................................................... 45

*Rizzo v. Goode,*
    423 U.S. 362 (1967) ........................................................................... 19

*Royal Canin U.S.A., Inc. v. Wullschleger,*
    604 U.S. 22 (2025) ............................................................................. 13

*Smith v. Bacon,*
    699 F.2d 434 (8th Cir. 1983) ........................................................... 43, 44

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ........................................................................... 25

*Stevenson v. Blytheville Sch. Dist. No. 5,*
    762 F.3d 765 (8th Cir. 2014) .............................................................. 24

*Thurairajah v. City of Fort Smith,*
    925 F.3d 979 (8th Cir. 2019) ............................................. 27, 32, 35, 36

*Tirado v. City of Minneapolis,*
521 F.Supp.3d 833 (D. Minn. 2021) ................................................................................ 44

*Torres v. Madrid,*
592 U.S. 306 (2021) ........................................................................................................ 41

*United States v. Mendenhall,*
446 U.S. 544 (1980) ........................................................................................................ 40

*United States v. Stokes,*
62 F.4th 1104 (8th Cir. 2023) ........................................................................................ 37

*Walker v. City of Pine Bluff,*
414 F.3d 989 (8th Cir. 2005) .......................................................................................... 30

*Watson v. Boyd,*
119 F.4th 539 (8th Cir. 2024) .......................................................................... 27, 34, 36

*Welch v. Dempsey,*
51 F.4th 809 (8th Cir. 2022) .......................................................................................... 38

*White v. Walsh,*
649 F.2d 560 (8th Cir. 1981) ...................................................................................43, 44

*Willis v. Mills,*
141 F.4th 905 (8th Cir. 2025) ........................................................................................ 36

*Wolk v. City of Brooklyn Center,*
107 F.4th 854 (8th Cir. 2024) ........................................................................................ 38

## Constitutions

U.S. CONST. amend. I ........................................................................................................ 27

U.S. CONST. amend. IV........................................................................................................ 40

## Statutes and Rules

18 USCA § 111 ........................................................................................................... 2, 3, 6

28 USCA § 1746 ............................................................................................................... 20

**Other Authorities**

Wright & Miller, *Federal Practice and Procedure* § 3531
(3d ed.) ....................................................................................................................... 13

## INTRODUCTION

In the summer of 2025, the federal government began deploying federal immigration agents to cities across the country as part of a nationwide campaign to deport and terrorize immigrants. In each city that has been targeted by this campaign, residents have exercised their First Amendment rights to observe, record, protest, and disseminate information about the federal agents who have occupied their streets. And in each city, agents have met these residents with unlawful arrests, excessive force, targeted use of chemical irritants, and grotesque intimidation tactics. Plaintiffs are among those who have exercised their First Amendment rights and who have been met with retaliation and unconstitutional seizures for doing so.

Defendants now seek to deprive Plaintiffs of judicial protection from Defendants' unconstitutional conduct. In their motion to dismiss, Defendants repeatedly reject Plaintiffs' allegations in favor of their (unsupported and non-credible) version of the facts, and they argue that issues that are typically reserved for the factfinder should instead be dismissed outright. At this early stage of litigation, Plaintiffs' allegations control and those allegations more than plausibly allege First and Fourth Amendment violations. Defendants' recent decision to refocus their immigration efforts elsewhere has not erased the live controversy before the Court. Defendants maintain an above-average immigration presence in Minnesota and have continued to violate the constitutional rights of those engaging in peaceful protest and information gathering even after the end of Operation Metro Surge. Because

Plaintiffs will continue to experience constitutional harms without court intervention, Defendants' motion to dismiss should be denied.

## BACKGROUND

**A.    Defendants turn their attention to Minnesota and immediately begin inflicting constitutional injuries.**

In December of 2025, the federal government turned its immigration enforcement attention to Minnesota. (Doc. 136 ¶ 94.) Over the course of a few weeks, the number of federal agents patrolling the State increased from approximately 80 to more than 3,000—a roughly 3,650% increase. (*Id.* ¶ 96; Doc. 255 ¶ 8.) With this dramatic increase in agents came an equally dramatic increase in violence. Federal agents arrested, beat, threatened, and intimidated countless observers,[1] peaceful protesters, and journalists simply for exercising their First Amendment rights. (Doc. 136 ¶¶ 114–63, 170–83, 190–98, 208–11, 214, 219–26, 228, 233–43, 246–50, 253–63, 265, 272–79.) Meanwhile, high-ranking officials throughout the federal government encouraged federal agents to use force against observers, peaceful protesters, and journalists as part of an increasingly obvious policy of retaliation against protected First Amendment activity. (*Id.* ¶¶ 7–92.) And federal agents began using 18 U.S.C. § 111—the federal obstruction statute—as carte blanche to arrest, threaten, and intimidate peaceful observers. (*Id.* ¶¶ 261, 284.)

---

[1] Unless specified otherwise, the term "observers" in this brief refers to individuals who observe, document, and/or disseminate information about the conduct of federal immigration agents.

Committed to upholding our Constitution and protecting the people of Minnesota, a group of plaintiffs filed suit on December 17, 2025, on behalf of themselves and a proposed class of "persons who do or will in the future record, observe, and/or protest against" federal immigration enforcement operations in the District of Minnesota. (*Id.* ¶¶ 286–87.) The plaintiffs included Susan Tincher and Abdikadir Noor, who were violently arrested for protesting and observing Department of Homeland Security ("DHS") agents during immigration enforcement operations. (*Id.* ¶¶ 164–83, 229–44.) They included John Biestman, Janet Lee, and Lucia Webb, who were seized in their vehicles—in some cases at gunpoint—by DHS agents who assured them that lawfully observing federal officials was a felony, punishable under Section 111. (*Id.* ¶¶ 184–214.) And they included Alan Crenshaw, who was pepper sprayed at point blank range by a DHS agent in a moving vehicle for the crime of attending a protest (collectively with Tincher, Noor, Biestman, Lee, and Webb, "Initial Plaintiffs"). (*Id.* ¶¶ 215–28.)

This Court is very familiar with the experiences of these Initial Plaintiffs. Each has been subjected to unconstitutional retaliation and/or unlawful seizure. Their allegations—which were credited by the Court at the preliminary-injunction stage—are discussed at length in the Preliminary Injunction Order. (Doc. 85 at 4–25, 37.)

**B.    Defendants' unconstitutional conduct escalates in early 2026.**

In 2026, things got worse, not better. One week into the new year, a DHS agent shot and killed a protester and observer: Renee Good. (Doc. 136 ¶ 119.) This killing

set off a wave of protests that rippled throughout the country and inflamed tensions in the Twin Cities. Local observers, peaceful protesters, and journalists came out to exercise their First Amendment rights. (*See id.* ¶¶ 123–28.) Federal agents responded by retaliating against all manner of peaceful observers, in some instances explicitly invoking Ms. Good's killing to try to intimidate and silence them. (*See id*. ¶¶ 123–28, 247; Doc. 164 ¶ 31.)

Just two weeks after Ms. Good was killed, DHS agents shot and killed another observer and protester: Alex Pretti. (Doc. 136 ¶¶ 130–32.) The reaction was immediate and deeply felt. Protesters flooded city streets, demanding changes to the government practices that allowed two U.S. citizens to be shot and killed on public roadways for exercising their constitutional rights. (*Id.* ¶¶ 119–281). Meanwhile, observers and journalists documented these scenes. (*Id.*) And yet again, many were met with unrelenting and unrepentant force. (*See id.* ¶¶ 133–36, 149–52, 155–56.)

Given these ongoing harms, Plaintiffs filed their First Amended Class Action Complaint ("Amended Complaint") on February 13, 2026, adding five new plaintiffs. These new plaintiffs include Abigail Salm, Ryan Doxsey, Margaret Wood, The NewsGuild – Communications Workers of America ("CWA"), and Status Coup News (collectively, "Additional Plaintiffs," and with the Initial Plaintiffs, "Plaintiffs"). Each Additional Plaintiff alleges new but familiar harms.

Plaintiff Salm was lawfully observing and recording DHS agents shortly after the killing of Renee Good when one agent approached her and said, "Have y'all not

4

learned your lesson?" (*Id.* ¶¶ 246–47.) She asked, "What lesson am I supposed to have learned?" He responded, "Following federal agents," and grabbed her phone out of her hand. (*Id.* ¶ 247.) When Salm asked for her phone back, the agent placed her under arrest, slammed her on the hood of her car, and handcuffed her. (*Id.* ¶ 248.) The agent then grabbed Salm by her collar hard enough to choke her and asked, "Is this how you want to die? With a fucking bullet in your skull?" Salm sat handcuffed on the ground, in the cold, for some time, despite needing medical care for a chronic condition. (*Id.*) She will continue to protest and observe DHS's immigration operations in Minnesota, but she will no longer do so by herself. (*Id.* ¶ 251.)

Federal agents have intimidated Plaintiff Doxsey multiple times for observing and recording their official activities. (*Id.* ¶ 253.) In one instance, Doxsey was lawfully following a DHS vehicle when the vehicle turned around and drove directly at his car. (*Id.* ¶¶ 254–56.) An agent inside stepped out and gave him "one warning to stop impeding." (*Id.* ¶ 256.) The agent then took a photo of Doxsey's license plate and face and told him that he would be added to a list of domestic terrorists. (*Id.* ¶ 257.) On another occasion, Doxsey lawfully followed a DHS vehicle for some time before returning home. (*Id.* ¶ 258.) When he arrived, the DHS vehicle was parked in front of his house. (*Id.*)

Federal agents have also retaliated against and intimidated Plaintiff Wood multiple times since the beginning of the year. (*Id.* ¶ 259.) In one instance, a DHS vehicle she was lawfully following led her directly to her home. (*Id.* ¶ 260.) On another

occasion, a DHS vehicle she was lawfully following stopped and agents approached her car to tell her that she was violating Section 111. (*Id.* ¶ 261.) On a third occasion, Wood was observing DHS agents as they arrested a man who was speaking Spanish. (*Id.* ¶ 262.) The man was on the ground and handcuffed, and there was a fence between him and Wood. (*Id.*) Wood moved closer to the fence to hear what he was saying, and an agent pepper sprayed her in the face. (*Id.*) Only after he started spraying her did he say, "Get back." (*Id.*)

Finally, the members of CWA, a union that represents members of the media, and journalists with Status Coup, a news organization, have been subjected to a wide variety of First and Fourth Amendment violations in accordance with Defendants' policies, practices, and customs of retaliation. (*Id.* ¶¶ 264–81.) Some members of CWA have been hit with tear gas canisters, while others have been pushed and threatened with arrest for their newsgathering activities. (*Id.* ¶ 265.) Meanwhile, every journalist at Status Coup has been a victim of physical assault, the unlawful use of chemical irritants, or unlawful intimidation tactics because of their reporting. (*Id.* ¶¶ 272–79; *see also* Decl. of Jordan Chariton ("Chariton Decl.").)[2]

The experiences of these named plaintiffs are not outliers. Defendants have subjected scores of Minnesotans to similarly disturbing, and unconstitutional, conduct. (*Id.* ¶¶ 114–163.)

---

[2] Simultaneously filed with this brief is the declaration of Jordan Chariton, the founder and CEO of Status Coup News. This declaration was inadvertently not filed with the Amended Complaint.

**C.      Defendants' unconstitutional conduct has continued after the announced end of Operation Metro Surge.**

On February 12, 2026, so-called "Border Czar" and Defendant Tom Homan held a press conference announcing that Operation Metro Surge would come to an end. (Doc. 136 ¶ 283.) In his statements, and consistent with previous statements by high-ranking DHS officials, Homan described peaceful protesters and observers as "agitators." (*Id.* ¶ 284; *see also id.* ¶¶ 71–93.) He said that any drawdown would be conditioned on "a reduction in 'unlawful and violent agitator activity.'" (*Id.* ¶ 285.) He also said that a "small footprint" of DHS officers would remain for "when agitators get out of control." (*Id.*) In other words, although Homan indicated that there may be fewer agents on the ground, he reaffirmed that DHS agents would continue to respond to Minnesotans observing, documenting, or protesting their activities. (*Id.*)

Agents' behavior has not changed since the announced end of Operation Metro Surge. Federal agents have continued to engage in a pattern of retaliatory and intimidating conduct against peaceful observers and protesters. Below are examples of conduct occurring after Homan's announcement on February 12, 2026—conduct that is described in detail in sworn declarations submitted with this brief:

- A federal agent drew his gun and pointed it at an observer[3];

---

[3] (Decl. of V.J.M. ("V.J.M. Decl.") ¶¶ 5–10.)

7

- Federal agents have threatened to arrest observers, or have enlisted local law enforcement to make such threats, issue "warnings," or otherwise intimidate or impede observers[4];

- Federal agents have driven aggressively at observers' vehicles and have been "brake-checking" observers[5];

- Federal agents have led observers to their home addresses or parked outside their home after an observation has concluded[6];

- Federal agents have boxed in observers' vehicles[7];

- Federal agents have followed observers[8];

- Federal agents have taken photos and videos of observers,[9] sometimes posting them online or otherwise using them for retaliatory and intimidating purposes[10];

- Federal agents have made threatening statements to observers, such as "keep following us and see what happens," giving the "one and only

---

[4] (Decl. of Nate Braunhut ("Braunhut Decl.") ¶¶ 12–16, 19; Decl. of Noel Dittbenner ("Dittbenner Decl.") ¶¶ 10–11; Decl. of Joanna Searles ("Searles Decl.") ¶¶ 8–15; Decl. of Michael Khalili ("Khalili Decl.") ¶¶ 13, 17–20; Decl. of Alison Sill ("Sill Decl.") ¶ 22; Decl. of M.B. ("M.B. Decl.") ¶¶ 12–14.)

[5] (Decl. of Francis Cave-LaCoste ("Cave-LaCoste Decl.") ¶ 12; V.J.M. Decl. ¶ 9; Searles Decl. ¶¶ 6, 8; Braunhut Decl. ¶ 7, 11; Decl. of Collette Adkins ("Adkins Decl.") ¶ 22; Decl. of Paula Thomsen ("Thomsen Decl.") ¶ 12–14, 16–18; Decl. of Amanda Thompson ("Thompson Decl.") ¶ 7–8; M.B. Decl. ¶¶ 7–10.)

[6] (Braunhut Decl. ¶ 9; Decl. of Bethany Krutzfeldt ("Krutzfeldt Decl.") ¶ 6; Thompson ¶¶ 12–13; Decl. of Tammy Moothedan ("Moothedan Decl.") ¶¶ 11–12; Dittbenner Decl. ¶ 13–14.)

[7] (M.B. Decl. ¶¶ 9–10; Cave-LaCoste Decl. ¶¶ 12, 18; Decl. of Kelsey McFarlane ("McFarlane Decl.") ¶¶ 10–16; Moothedan Decl. ¶ 5; Thompson Decl. ¶ 9–10; M.B. Decl. ¶¶ 9–10.)

[8] (Decl. of Jonathan Sussman ("Sussman Decl.") ¶¶ 22–24.)

[9] (Cave-LaCoste Decl. ¶¶ 13, 16, 18, 19; Dittbenner Decl. ¶¶ 8–9; McFarlane Decl. ¶¶ 14; Khalili Decl. ¶¶ 7, 12; Sill Decl. ¶ 21; Thompson Decl. ¶ 9–10; M.B. Decl. ¶ 8.)

[10] (Decl. of Connor Johnson ("Johnson Decl.") ¶¶ 9, 13; *see* Khalili Decl. ¶¶ 12, 14.)

warning," and yelling and swearing at observers, asking them "why are you following me?"[11]

As one Declarant summarizes, she continues to see "federal immigration enforcement activity, but there [is] less public knowledge of it than during the height of Operation Metro Surge." (Dittbenner Decl. ¶ 6.)

The retaliation and intimidation extend beyond observers' immediate interactions with federal officers. In one incident, less than 24 hours after an observer was photographed by federal agents, the observer received an email notification that his Global Entry clearance status was revoked without explanation or prior notice. (Khalili Decl. ¶¶ 12–15.) His wife (who was not present during the observation of the federal agents) received the same notice several hours later. (*Id.*)



Mar 18, 2026

RE: Your Global Entry Program Membership #155800703

Dear MICHAEL KHALILI:

Thank you for your participation in the Global Entry program of U.S. Customs and Border Protection (CBP).

Global Entry is a voluntary program available to travelers that pass a comprehensive background investigation. Applicants found to be ineligible for Global Entry participation may still be permitted to enter into the United States although they will not be permitted to use the Global Entry dedicated lanes.

We regret to inform you that your membership in Global Entry has been revoked for the following reason(s):
Your Global Entry has been revoked.

If you believe the decision was based upon **inaccurate or incomplete information**, you may be eligible to request

(*Id.*, Ex. A (highlighting added).)

---

[11] (McFarlane Decl. ¶¶ 12–13; Khalili Decl. ¶ 10.)

Other retaliatory actions are so extreme and bizarre, they would be hard to believe without photographic evidence. For example, federal agents boxed in an observer at a gas station, milled around the back of her vehicle with guns visible, and took the air valve off her rear tire, deflating it. (Moothedan Decl. ¶¶ 13–17.) Below is a photograph the observer took of the federal agent kneeling by her back tire while she remained in her vehicle.



The observer was terrified while this was happening. (*Id.*) She did not exit her vehicle until a friend of hers arrived. (*Id.*)

10

These observers are concerned for their neighbors. (Krutzfeldt Decl. ¶ 5; Braunhut Decl. ¶ 3.) They want to observe and document federal immigration enforcement activity to ensure that others have access to the facts. (Sill Decl. ¶ 3.) They want to document and disseminate what they observe because they believe federal agents are less likely to act unlawfully if they are being watched. (Searles Decl. ¶ 4; Khalili Decl. ¶ 3.) And they want to ensure that their communities, particularly the most vulnerable members of their communities, remain safe. (V.J.M. Decl. ¶ 2.)

Plaintiffs share these concerns and, for their part, intend to continue protesting, observing, documenting, recording, and communicating with others about federal immigration agents in their community. (*See, e.g.*, Doc. 1-1 ¶ 19; Doc. 1-2 ¶ 13; Doc. 1-3 ¶ 17; Doc. 1-4 ¶ 12; Doc. 102 ¶ 20; Second Decl. of Susan Tincher ("Second Tincher Decl.") ¶ 14.) They do this so that their government cannot lie to the public about what it is doing in Minnesota. As one declarant explains: "The only way to fight . . . misinformation is for us to be out there documenting. The videos and pictures tell the true story. If we don't have videos, we'd be lied to even more." (Doc. 137 ¶ 53.)

## ARGUMENT

I.      **The Court has jurisdiction over Plaintiffs' claims.**

Defendants seek the dismissal of Plaintiffs' claims based on standing and mootness. The Court should not grant Defendants' motion on either of these justiciability grounds, and certainly not without giving Plaintiffs the benefit of jurisdictional discovery.

11

**A.     Standing should be determined as of the filing of the lawsuit.**

Defendants first challenge Plaintiffs' standing to bring this lawsuit. Standing consists of three elements: (1) an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical ("injury in fact"); (2) a causal connection between that injury and the complained-of conduct ("traceability"); and (3) a likelihood that the injury will be redressed by a favorable decision ("redressability"). *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). A plaintiff must establish standing as to each claim and each form of requested relief. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). An associational plaintiff derives standing from that of its members who "would otherwise have standing to sue in their own right." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000).

Although Defendants do not take issue with these general legal principles, they fail to identify the relevant moment in time at which the three standing elements (injury in fact, traceability, and redressability) must be satisfied. Standing is not reevaluated each day in a case's lifecycle, as Defendants' brief implies. The relevant question is "whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed.*" *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (emphasis added). Standing's focus on the time of filing is reflected in both Supreme Court and Eighth Circuit precedent. *See Friends of the Earth*, 528 U.S. at 184 (analyzing standing at the "time the complaint was filed"); *Disability Support All. v.*

12

*Heartwood Enters., LLC*, 885 F.3d 543, 545 (8th Cir. 2018) ("Standing is determined as of the commencement of the lawsuit."); *see also, e.g.*, *Patton v. Fitzhugh*, 131 F.4th 383, 392 (6th Cir. 2025) ("[W]hen a plaintiff has filed an amended complaint, standing is measured by when the plaintiff initiated the suit, but as explained by allegations in the operative complaint.").[12] It is also reflected in leading treatises. *See, e.g.*, Wright & Miller, 13A Fed. Prac. & Proc. Juris. § 3531 (3d ed.) ("[I]t is commonly said that standing must exist at the time an action is filed . . . .").

Given this temporal focus, Defendants' emphasis on "the conclusion of Operation Metro Surge and accompanying drawdown of federal officers and agents" misses the mark. (Doc. 258 at 8.) The Initial Plaintiffs filed suit on December 17, 2025, with the Class Action Complaint ("Initial Complaint"). (Doc. 1.) For Additional Plaintiffs, the action commenced on February 13, 2026, with the filing of the Amended Complaint. It is the filing dates—December 17, 2025, and February 13, 2026—that

---

[12] The Supreme Court's recent decision in *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22 (2025), which holds that the existence of federal-question jurisdiction must be determined based on the operative (i.e., amended) pleading, does not suggest otherwise. *Royal Canin* stands only for the proposition that the plaintiff, as master of the complaint, may determine the claims at issue and thereby influence the existence of a federal question. *See* 604 U.S. at 36 n.5 (distinguishing jurisdictional inquiries that depend on "the claims and parties" that the plaintiff includes in the operative complaint from "the actual 'state of things' relevant to jurisdiction—meaning, the facts on the ground"). The Supreme Court did not mention, let alone explicitly overrule, its precedent that says standing is determined as of the time of the initial filing. Even if it had, however, and the relevant time period for all Plaintiffs were the time of filing the amended pleading, each Plaintiff still would have established standing to bring his or her claims.

should inform the Court's standing analysis, not the subsequent events now invoked by Defendants.

### B.  Each Plaintiff has standing to bring claims against Defendants.

Defendants primarily dispute whether Plaintiffs have established an "injury in fact." When a party seeks injunctive relief, the "'injury in fact' element of standing requires a showing that the plaintiff faces a threat of ongoing or future harm." *Park v. Forest Serv. of U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–05 (1983)). An ongoing harm, on the one hand, and a threat of future harm, on the other, are two distinct ways "for plaintiffs seeking prospective injunctive relief to establish standing." *L.A. Press Club v. Noem*, --- F.4th ----, 2026 WL 889142, at *4 (9th Cir. Apr. 1, 2026); *see also In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1054 (8th Cir. 2018) (similar). This Court has already thoroughly addressed why each of the Initial Plaintiffs has standing to pursue their claims based on ongoing harm to their First Amendment rights or the threat of future constitutional violations. (Doc. 85 at 40–47.) Similar reasoning applies to each Additional Plaintiff.

### 1.    Plaintiffs are experiencing an ongoing chill to their First Amendment rights.

The first way that a party may establish standing for prospective injunctive relief is by showing ongoing harm. An ongoing harm is a "continuing, present adverse effect[]" that results from the practice that is sought to be enjoined. *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974).

Courts have recognized that ongoing harms are particularly common in the First Amendment context, where there is the risk of chill and self-censorship. This is why the "First Amendment standing inquiry is 'lenient' and 'forgiving.'" *Dakotans for Health v. Noem*, 52 F.4th 381, 386 (8th Cir. 2022). One confronted with a "credible threat of future prosecution suffers from an ongoing injury from the . . . chilling effect on [their] desire to exercise [their] First Amendment rights." (Doc. 85 at 43 (quoting *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 794 (8th Cir. 2016)) (alteration in original).)

Plaintiffs have plausibly alleged that Defendants' conduct had a chilling effect on the exercise of their First Amendment rights as of December 17, 2025, and February 13, 2026. (*See* Doc. 136 ¶¶ 303–04.) As the Court previously recognized, the Initial Plaintiffs alleged that they "have been subject to a variety of retaliatory behavior by Defendants, including traffic stops, arrests, the indiscriminate use of chemical irritants, and pointing of firearms." (Doc. 85 at 43.) The Additional Plaintiffs have experienced similar and, in many instances, even more disturbing retaliatory conduct. (Doc. 136 ¶¶ 245–81.) These experiences have impacted Plaintiffs' behavior. Take Ms. Salm, for example, who will no longer observe and protest DHS' immigration operations alone. (*Id.* ¶ 251; *see also, e.g.*, Doc. 1-3 ¶ 17 ("I have been more cautious since this experience because I fear that ICE agents will physically harm me."); Doc. 1-4 ¶ 12 ("I'll try not to go out alone . . . .").) This is just the sort of "continuing, present adverse effect[]" that provides standing to seek prospective injunctive relief.

15

*See O'Shea*, 414 U.S. at 496; Doc. 85 at 43 (stating that Defendants' conduct "undoubtedly gives rise to an objective chill of First Amendment rights").

The Ninth Circuit's recent decision in *Los Angeles Press Club* supports this conclusion. There, the Ninth Circuit rejected the government's argument that the plaintiffs lacked standing to seek prospective injunctive relief. 2026 WL 889142, at *4. That court explained that "adverse changes to First Amendment activities, when adopted because of fear of government punishment, demonstrate chilled and diminished First Amendment speech." *Id.* There, as here, the plaintiffs alleged that they or their members were altering their behavior "to the detriment of their news coverage and other First Amendment activities." *Id.* And there, as here, those chills were sufficient to confer standing. *Id.*

### 2. Plaintiffs are likely to experience future violations of their First and Fourth Amendment rights.

Plaintiffs have also sufficiently alleged the second basis for standing to seek prospective injunctive relief—a sufficiently imminent threat of future harm. To meet this standard, the plaintiff must show that the "injury or threat of injury" is "real and immediate, not conjectural or hypothetical." *O'Shea*, 414 U.S. at 494 (internal quotations and citation omitted). The term "immediate" in the standing context does not carry the same meaning it might in a self-defense case. Even an "annual event is sufficiently temporally proximate to be considered an 'immediate' threat and therefore to support standing for injunctive relief." *Park*, 205 F.3d at 1038.

16

The question, then, is whether as of December 17, 2025, and February 13, 2026, there was a sufficiently high probability that the Plaintiffs would experience further violations of their First and Fourth Amendment rights, even "within one year of commencing suit." *Id.* The Eighth Circuit has held that "among the most relevant considerations" to determine the likelihood of future harm "are statements of future intent and patterns of past practice." *Id.* Each of these considerations supports standing here.

*Past Practices.* As the Amended Complaint alleges and this Court has previously recognized, "Plaintiffs have established an ongoing, persistent pattern of Defendants' chilling conduct." (Doc. 85 at 44; *see generally* Doc. 136.) This pattern is reflected not only in the allegations relating to the Plaintiffs in the Initial and Amended Complaints, but also in the non-party declarations that have been submitted with each pleading. (*See* Doc. 136 ¶¶ 114–63 (discussing and citing declarations); *see also* Second Adkins Decl. ¶¶ 22–35; V.J.M. Decl. ¶ 9; M.B. Decl. ¶¶ 7–10; Dittbenner Decl. ¶¶ 8, 10–14; Johnson Decl. ¶¶ 12–13; Khalili Decl. ¶¶ 6–15, 18–20; Cave-LaCoste Decl. ¶¶ 12–18; Searles Decl. ¶¶ 8–14; Moothedan Decl. ¶¶ 6–17; Kruzfeldt Decl. ¶ 6; Braunhut Decl. ¶ 9–16; McFarlane Decl. ¶¶ 7–17; Sussman Decl. ¶¶ 6–24; Sill Decl. ¶¶ 4–24; Thompson Decl. ¶¶ 7–13; Second Thomsen Decl. ¶¶ 7–18.) These declarations "detail similar, if not more egregious, injuries to rights . . . for engaging in protected activity." (Doc. 85 at 44.) Plaintiffs have also included substantial allegations about Defendants' practice of unlawfully seizing individuals for lawfully following DHS vehicles.

17

(Doc. 136 ¶¶ 143–63; *see also* Doc. 85 at 45–46.) These past practices support standing here.

*Future Intent.* The future intentions of both Plaintiffs and Defendants likewise support standing. Plaintiffs have consistently affirmed their intention to continue to observe DHS operations and to engage in other First Amendment activity. (*See* Doc. 136 ¶¶ 198, 213-214, 251; Second Tincher Decl. ¶ 14.) Defendants have no repentance for their conduct and instead stand by its constitutionality. (*See* Doc. 85 at 46–47.) The Amended Complaint documents multiple statements by Defendants and other high-ranking government officials that evince a future intent to retaliate against those who protest, observe, and record DHS agents. (Doc. 136 ¶¶ 71–93.) As the Court said at the preliminary-injunction stage, "the record adequately illustrates that Defendants . . . will continue to make[] a common practice of conduct that chills observers' and protesters' First Amendment rights." (Doc. 85 at 44.) The Amended Complaint only bolsters the allegations and record on this issue. The parties' future intentions show that future constitutional injuries are far from speculative.

In arguing otherwise, Defendants primarily invoke *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). (Doc. 258 at 12.) But *Lyons* is inapposite, as this Court has previously recognized. In *Lyons*, the plaintiff had no plan to reencounter police or "break the law again." (*Id.* at 46 (citing *Lyons*, 461 U.S. at 103, 106). The defendant police department, for its part, disclaimed any future intention of placing Lyons in a chokehold again, and in fact imposed (and then extended) a moratorium on the

18

challenged chokeholds. *Lyons*, 461 U.S. at 100 & n.4. The parties' relative future intentions are flipped here. Each Plaintiff, eager to exercise their constitutional rights and protect their neighbors and communities, has a future intention to "continue to observe and follow federal agents." (Doc. 85 at 46.)[13] Plaintiffs' standing does not turn on an assumption that Plaintiffs will "break the law," something that courts are loathe to assume. (Doc. 85 at 46); *see, e.g., O'Shea*, 414 U.S. at 496 ("But here the prospect of future injury rests on the likelihood that respondents will again be arrested for and charged with violations of the criminal law . . . ."). And far from repudiating the actions of its agents, Defendants uniformly "maintain that the actions of their officers are a lawful response to ongoing widespread protest activity." (*Id.* at 71; *see also* Doc. 136 ¶¶ 71–93); *see also Rizzo v. Goode*, 423 U.S. 362, 374 (1967) (recognizing class wide relief is appropriate where there is "no mistaking that the defendants proposed to continue their unconstitutional policies against the members of [a] discrete group").

_____

[13] That Plaintiffs intend to engage in future encounters with DHS as they protest and observe DHS' activities makes the situation here different from *Hussen v. Noem*, another case from this District that addressed standing for preliminary injunctive relief. ---- F.Supp.3d ----, 2026 WL 657936, at *42 (D. Minn. Mar. 9, 2026). The court in *Hussen* concluded that the plaintiffs lacked standing for prospective injunctive relief but recognized that other courts had reached different conclusions when the plaintiffs were unable to "avoid repeating the quotidian conduct" that led to a stop by DHS. *Id.* (quoting *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F.Supp.3d 1, 33–36 (D.D.C. 2025)). Here, Plaintiffs will continue to engage in the conduct that gives rise to DHS' retaliatory conduct, and there have been multiple post-filing interactions between Plaintiffs and DHS. (*See, e.g.*, Doc. 136 ¶ 228; Doc. 102; Second Tincher Decl.) Additionally, *Hussen* resolved the issue at the preliminary-injunction stage, when a plaintiff must "make a clear showing" that he or she has standing. 2026 WL 657936, at *29 (quoting *Murthy v. Missouri*, 603 U.S. 43, 58 (2024)). That same standard does not apply in the motion-to-dismiss context. *Lujan*, 504 U.S. at 561.

Defendants also highlight "the conclusion of Operation Metro Surge and accompanying drawdown of federal officers and agents" to argue that Plaintiffs' claims of future injury "are too speculative to support standing." (Doc. 258 at 13.) But standing must be assessed as of December 17, 2025, and February 13, 2026. *See supra* Section I.A. No drawdown had occurred as of either date—there were still 2,000 DHS agents in Minnesota as of February 13, 2026. (Doc. 136 ¶ 96; *see also, generally*, Docs. 255, 284.) Although the ultimate drawdown and other post-filing events may be relevant to mootness, *see infra* Section I.C., they are not a basis for concluding that Plaintiffs lack standing.

Even if the Court were to consider post-filing events to assess standing, these events support Plaintiffs' standing. Ms. Tincher was threatened with arrest for following and observing a DHS vehicle months after filing suit. (*See* Second Tincher Decl. ¶ 13.) Ms. Webb was similarly threatened with arrest while observing federal agents from a car after filing suit. (Doc. 102 ¶¶2, 16.)[14] According to Defendants' untested declarations, nearly 500 DHS officers remain on detail in the St. Paul ICE field office, more than six times the usual 80 officers. (Doc. 255 ¶¶ 8–9.) Many declarants have described unconstitutional conduct directed toward protesters and observers that post-dates the announced end of Operation Metro Surge. *See supra*

---

[14] Defendants have challenged Ms. Webb's account, but in a declaration that lacks a named signature, that is inconsistent with video evidence regarding the timing of different events, and that was not made under penalty of perjury. (Doc. 126); *see also* 28 U.S.C. § 1746. Moreover, even if their account were accurate, it would not change the unconstitutionality of their conduct.

20

Background, Section C. Plaintiffs' future harms are not speculative—they have been realized by Plaintiffs and others in the months since Plaintiffs filed suit.

### C.   Defendants' voluntary cessation of Operation Metro Surge does not moot Plaintiffs' claims.

Defendants alternatively argue that, for similar reasons that "Plaintiffs lack standing, this case is also moot." (Doc. 258 at 15.) The justiciability doctrines of standing and mootness are related, but meaningfully "distinct[]." *Friends of the Earth*, 528 U.S. at 191–92 (discussing different functions). Parroting their standing arguments, Defendants' mootness argument emphasizes the announced end of Operation Metro Surge and the subsequent drawdown of troops. In other words, the only reason Defendants contend that this case is moot is because of their own voluntary, post-filing conduct.

At the outset, it is important to clarify the scope of Plaintiffs' claims. Plaintiffs' claims and requested injunctive relief extend to "DHS's immigration enforcement operations in Minnesota." (Doc. 136 at 97.) The claims are not based "solely on Defendants' alleged conduct during Operation Metro Surge," as Defendants assert. (Doc. 258 at 16.) This argument conflates the injunction that the Court entered (which was specifically tethered to Operation Metro Surge) and Plaintiffs' allegations, which concern Defendants' immigration enforcement activities in Minnesota more generally.

Turning to the merits, Defendants' mootness argument fails for at least three reasons. First, it fails because there are ongoing effects from Defendants' actions. *See*

21

*Lyons*, 461 U.S. at 101 (explaining a case is not moot where "[i]ntervening events have not irrevocably eradicated the effects of the alleged violation" (internal quotation marks and citation omitted)). There is an ongoing chill to Plaintiffs' First Amendment rights. *See supra* Section I.B.1. Plaintiffs have also alleged that Defendants have collected their and others' personal information and then used that information in a variety of intimidating and retaliatory ways, such as leading them back to their homes. (*See, e.g.*, Doc. 136 ¶¶ 257–58, 260.) Plaintiffs' prayer for relief includes a request for "[i]mmediate expungement of any and all records created by Defendants about Plaintiffs during the course of DHS' immigration enforcement operations in Minnesota." (Doc. 136 at 97.) Because there are ongoing effects from the alleged constitutional violations that an injunction could remedy, this case is not moot.

Second, even if there were not ongoing effects from Defendants' unlawful conduct, this is not the rare case in which Defendants' voluntary cessation of the challenged conduct suffices to establish mootness of the case as a whole. The Supreme Court has cautioned that "the standard . . . for determining whether a case has been mooted by the defendant's voluntary conduct is stringent." *Friends of the Earth*, 528 U.S. at 189. A case may be mooted by a defendant's voluntary cessation of a challenged practice only "'if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)). The party asserting mootness bears the "'heavy burden of persua[ding]' the court that the

challenged conduct cannot reasonably be expected to start up again." *Id.* (quoting *Concentrated Phosphate Export Ass'n*, 393 U.S. at 203). Evidence that the challenged conduct will not "*necessarily* happen again" is insufficient. *Strutton v. Meade*, 668 F.3d 549, 556 (8th Cir. 2012) (emphasis added).

Defendants have not carried their heavy burden of showing that it is absolutely clear that their unconstitutional conduct will not recur. *Lyons* demonstrates the point. In *Lyons*, even a citywide moratorium on the challenged chokehold practice did not moot the case "because the moratorium [was] not permanent and [could] be lifted at any time." *Lyons*, 461 U.S. at 101; *see also, e.g.*, *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) (explaining that a "city's repeal of the objectionable language would not preclude it from reenacting precisely the same provision" in the future). There is not even a "moratorium" here on the unconstitutional conduct. Defendants stand by their illegal conduct, and the declarations submitted with this brief demonstrate that Defendants' unconstitutional conduct through their remaining agents has continued long after the official end of Operation Metro Surge. *Supra* Background, Section C. Defendants have also affirmed that, even after the end of Metro Surge, they will respond to so-called "agitators," a term Defendants use to encompass peaceful protesters and observers. (Doc. 136 ¶ 285.) Defendants could fulfill this threat and redeploy more federal agents to Minnesota, and they have said that they will do so "if [they] need to." Sophie Brams, *Homan on ICE Minneapolis Pullback: 'If We Need To Come Back, We'll Come Back'*, The Hill, (Feb. 13, 2026),

https://thehill.com/homenews/administration/5736982-homan-minneapolis-ice-pullback/. That is far from an "unconditional and irrevocable" covenant not to engage in unconstitutional retaliation and seizures. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 93 (2013).

Finally, even if Defendants were correct that Plaintiffs' Amended Complaint was limited to "Operation Metro Surge" and Defendants had carried their burden on the issue of voluntary cessation, this is just the type of circumstance that is "capable of repetition, yet evading review" that presents an exception to mootness. *See Friends of the Earth*, 528 U.S. at 190. The capable-of-repetition exception to the mootness doctrine "applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Davis*, 554 U.S. at 735 (internal quotation marks omitted).[15] The question is "whether the controversy was *capable* of repetition and not . . . whether the claimant had demonstrated that a recurrence of the dispute was more probable than not." *Missourians for Fiscal Accountability*, 830 F.3d at 795 (quoting *Honig v. Doe*, 484 U.S. 305, 318 n.6 (1988) (emphasis in original) (alteration in original)).

---

[15] This exception would not apply to the preliminary injunction appeal. As the Eighth Circuit has explained, the capable-of-repetition-but-evading-review exception to mootness does not apply to an interlocutory appeal where the merits of the underlying claim can be reviewed after final judgment. *See Stevenson v. Blytheville Sch. Dist. No. 5*, 762 F.3d 765, 770 (8th Cir. 2014). Such issues would not evade review. *Id.*

Defendants' immigration operations around the country have at times been short-lived and, as the preliminary-injunction proceedings here and in Chicago demonstrate, too short to allow for complete adjudication of the claims. Because Defendants could commence another enforcement operation in Minnesota in the future that, once again, is too short in "duration . . . to be fully litigated prior to cessation or expiration," *Davis*, 554 U.S. at 735, the mootness exception for conduct that is capable of repetition yet evading review would apply in any event.

**D.**    **Defendants' Rule 12(b)(1) motion should not be granted without affording Plaintiffs jurisdictional discovery.**

One final justiciability point merits discussion, and that is the issue of jurisdictional discovery. Plaintiffs acknowledge that they bear the burden of proof as to standing, but the quantum of necessary proof is usually determined by the stage of the proceeding. *See Lujan*, 504 U.S. at 561. "At the pleading stage," as is the case here, "general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.*; *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (stating that "at the pleading stage, the plaintiff must clearly . . . allege facts demonstrating each element" of standing (alteration in original) (internal quotation marks omitted)).

Defendants openly admit that, rather than taking issue with the sufficiency of Plaintiffs' allegations, their jurisdictional arguments turn on "factual attack[s]" that rely on declarations beyond the scope of the pleadings. (Doc. 258 at 9; *see also* Doc. 289.) For the reasons stated above, even these "factual attack[s]" fail. *See supra* Section I. If the Court concludes otherwise, however, it should not accept Defendants'

dismissal arguments under Federal Rule of Civil Procedure 12(b)(1) without giving Plaintiffs the opportunity to take jurisdictional discovery. (*See generally* Doc. 267); *see also Steinbuch v. Cutler*, 518 F.3d 580, 589 (8th Cir. 2008) (stating that the "district court should not have dismissed [an] action . . . without permitting [plaintiff] to take some jurisdictional discovery"). The Court could also have an "evidentiary hearing . . . at which witnesses may testify" on the justiciability issues, as even the case cited by Defendants recognizes. *Osborn v. United States*, 918 F.2d 725, 730 (8th Cir. 1990); *see also* Doc. 258 at 9 (invoking *Osborn*). Whatever path the Court takes, it should not dismiss Plaintiffs' complaint under Rule 12(b)(1) without affording Plaintiffs their requested jurisdictional discovery into Defendants' factual bases for challenging standing and invoking mootness.

## II.      Plaintiffs have stated several claims for relief.

Defendants additionally move to dismiss Plaintiffs' claims in part for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). "In order to survive a motion to dismiss, a plaintiff must 'state a claim to relief that is plausible on its face.'" *Green v. City of St. Louis*, 52 F.4th 734, 738 (8th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In reviewing a motion to dismiss for failure to state a claim, the Court must accept as true the factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *See Baude v. Leyshock*, 23 F.4th 1065, 1069 (8th Cir. 2022).

### A.     Plaintiffs have sufficiently alleged First Amendment retaliation claims.

Defendants first challenge Plaintiffs' claims under the First Amendment. The First Amendment protects "the freedom of speech, [and] of the press; [and] the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. AMEND. I. These constitutional guarantees "'prohibit[] government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)).

To state a First Amendment retaliation claim, a plaintiff must allege that (1) the plaintiff "engaged in protected First Amendment activity," (2) the government "took an adverse action that would chill a person of ordinary firmness from continuing in that protected activity," and (3) "there was a but-for causal connection between" the injury and the retaliatory animus. *Nieters v. Holtan*, 83 F.4th 1099, 1110 (8th Cir. 2023). Defendants challenge just the first and third elements.[16] Because

---

[16] And for good reason. The Eighth Circuit has recognized that each of the alleged adverse actions would chill a person of ordinary firmness from continuing to engage in protected First Amendment activity. *Thurairajah v. City of Fort Smith*, 925 F.3d 979, 985 (8th Cir. 2019) (an arrest is "an action that would chill continued activity by a person of ordinary firmness"); *Watson v. Boyd*, 119 F.4th 539, 557 (8th Cir. 2024) (pulling a gun on a person and threatening to shoot a person "easily satisfies the ordinary firmness test"); *Laney v. City of St. Louis, Mo.*, 56 F.4th 1153, 1157 (8th Cir. 2023) (there is no "dispute that the use of pepper spray would chill a person of ordinary firmness from speaking out" (quotation omitted)); *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003) (using "the punitive machinery of government in order to punish [a person] for speaking out" by imposing "concrete consequences" like parking tickets would chill a person of ordinary firmness).

Plaintiffs' factual allegations, taken as true, show that Defendants retaliated against Plaintiffs for engaging in protected First Amendment activity, Plaintiffs have stated a claim for First Amendment retaliation.

### 1. Plaintiffs have engaged in protected First Amendment activities.

Plaintiffs allege that they have engaged in a variety of protected First Amendment activities. (Doc. 136 ¶¶ 164–281.) These activities include (1) assembling in public to protest federal immigration enforcement actions; (2) observing federal immigration agents while they are performing official duties; (3) recording information about federal immigration agents and immigration enforcement actions that Plaintiffs observe, and (4) disseminating information obtained while observing and recording federal immigration agents and immigration enforcement actions. (*Id.*; *see also* Doc. 85 at 48.)

Defendants do not argue that the first, third, or fourth categories of activities are not protected by the First Amendment. (*See* Doc. 258 at 18–19.) Nor could they reasonably do so. Public streets "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). The right to criticize public officials is sacrosanct. *City of Houston v. Hill*, 482 U.S. 451, 461 (1987); *see also Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002) ("Criticism of public officials lies at the very core of speech protected by the First Amendment." (quotation

28

omitted)). And courts have long recognized the right to record and disseminate information about public officials, because these actions "afford[] the public access to discussion, debate, and the dissemination of information and ideas." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978). As the Eighth Circuit succinctly put it, "[t]he acts of taking photographs and recording videos are entitled to First Amendment protection because they are an important stage of the speech process that ends with the dissemination of information about a public controversy." *Ness v. City of Bloomington*, 11 F.4th 914, 923 (8th Cir. 2021).

What remains then is Defendants' sole argument on the first element of Plaintiffs' First Amendment retaliation claim: that the Plaintiffs who were following DHS vehicles "were not engaged in protected First Amendment activity." (Doc. 258 at 18.) To support this assertion, Defendants retread familiar ground. They contend that the Supreme Court's decision in *Colten v. Kentucky*, and the Eighth Circuit's decision in *Molina v. City of St. Louis*, affirmatively reject the right to observe law enforcement officers who are performing official duties. (*Id.* (citing 407 U.S. 104 (1972) and 59 F.4th 334 (8th Cir. 2023)).) Unfortunately for Defendants, their position is inconsistent with prevailing caselaw.

As this Court rightly concluded in its Preliminary Injunction Order, "the First Amendment protects the right to peacefully observe government officials, including law enforcement officers, who are engaged in their official duties in public." (Doc. 85 at 49–50.) Contrary to Defendants' assertion, the Eighth Circuit precedent the Court

29

cited amply supports this conclusion. (*See* Doc. 258 at 19 & n.4); *see also, e.g.*, *Ness*, 11 F.4th at 923 (explaining that "[t]he acts of taking photographs and recording videos are entitled to First Amendment protection"); *Chestnut v. Wallace*, 947 F.3d 1085, 1090 (8th Cir. 2020) (acknowledging an individual's "clearly established right to watch police-citizen interactions at a distance and without interfering"); *Hoyland v. McMenomy*, 869 F.3d 644, 656 (8th Cir. 2017) (rejecting argument that plaintiff did not have a right to observe a traffic stop), *abrogated in part on other grounds by Nieves*, 587 U.S. 391; *Walker v. City of Pine Bluff*, 414 F.3d 989, 993 (8th Cir. 2005) (explaining that it is "clearly established" that a peaceful onlooker to a traffic stop cannot be arrested "for obstruction of governmental operations or for any other purported crime"). So do the precedents of other appellate courts, as this case has recognized. (Doc. 85 at 50 (quoting *Fields v. Philadelphia*, 862 F.3d 353, 359 (3d Cir. 2017)).[17]

Defendants' cited authority does not change the equation. *Molina v. City of St. Louis* is a qualified-immunity case that turned on whether the right at issue was

---

[17] *See also, e.g.*, *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 597 (7th Cir. 2012) (stating that the First Amendment protects "gathering . . . information about the affairs of government," including secret recordings of police officers); *id.* (stating that the First Amendment "prohibit[s] government from limiting the stock of information from which members of the public may draw" (quoting *Bellotti*, 435 U.S. at 783)); *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) ("It is firmly established that the First Amendment's aegis extends further than the text's proscription on laws 'abridging the freedom of speech, or of the press,' and encompasses a range of conduct related to the gathering and dissemination of information*."); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) ("The First Amendment protects the right to gather information about what public officials do on public property.").

clearly established. 59 F.4th at 340. The Eighth Circuit does not read *Molina* as Defendants do. In a case decided *after Molina*, the Eighth Circuit reversed summary judgment on an unlawful seizure claim in part because the plaintiff—a journalist who was covering a protest—had a "clearly established right to watch police-citizen interactions at a distance and without interfering." *Nieters*, 83 F.4th at 1108 (quotation omitted).

*Colten v. Kentucky* is also inapposite. In *Colten*, the Supreme Court held that there is "no constitutional right to observe the issuance of a traffic ticket or to engage the issuing officer in conversation." 407 U.S. at 109. But context matters. In *Colten*, the Supreme Court considered whether a Kentucky statute prohibiting "public inconvenience, annoyance or alarm" violated an unruly onlooker's right to free speech. *Id.* at 108–09. The onlooker in question had pulled over to the side of the road behind a police officer issuing a traffic citation with "no purpose other than to cause inconvenience and annoyance." *Id.* at 109. The onlooker also impeded public safety by stopping on a crowded roadside strip and refusing police instructions to leave the area. *Id.* Because the onlooker had "no constitutional right to observe" in these circumstances, the Court held that the statute was constitutional *as applied to the onlooker. Id.* at 109–10. Defendants' cherry-picked language does not apply to the very different circumstances at issue here.

In the alternative, Defendants contend that any "First Amendment right to stand and observe police officers . . . would not extend to chasing them on roadways."

31

(Doc. 258 at 19.) This argument cannot be reconciled with Plaintiffs' allegations, which must be accepted as true at the motion-to-dismiss stage. *See Baude*, 23 F.4th at 1069. The Plaintiffs who drove or rode in vehicles behind DHS agents alleged that they lawfully *followed* the agents—not that they *chased* them. (Doc. 136 ¶¶ 188, 255, 258, 260, 261; *see also* Doc. 85 at 37 (crediting Initial Plaintiffs' accounts).) Defendants' unsupported and improper factual spin on Plaintiffs' allegations violates the well-established Rule 12(b)(6) standard and provides an independent basis for rejecting their argument that the mobile observers did not engage in protected First Amendment conduct.

Even setting that issue aside, the mobile observers' conduct readily falls within the scope of the First Amendment. The First Amendment protects the "right to watch police-citizen interactions *at a distance* and *without interfering*." *Nieters*, 83 F.4th at 1108 (emphasis added) (quotation omitted). Although this standard envisions meaningful separation between an observer and a police-citizen interaction, it does not limit observation to one stationary place. In *Thurairajah v. City of Fort Smith*, for example, the protected conduct occurred while the plaintiff was in a moving vehicle. 925 F.3d 979, 985 (8th Cir. 2019). This makes sense, as stationary observing can easily evolve into mobile observing. The experiences of Biestman and Lee illustrate this point. Biestman and Lee originally intended to "observe and document ICE activity" at a Catholic church that was a target of immigration enforcement operations. (Doc. 1-2 ¶ 2; *see also* Doc. 1-3 ¶¶ 3–4.) Once they arrived, they "saw ICE

32

vehicles speeding through side streets adjacent to the church" and "began following." (Doc. 1-2 ¶ 3; *see also* Doc. 1-3 ¶¶ 6–8.) These Plaintiffs' First Amendment rights did not end at the church—they traveled with Plaintiffs Biestman and Lee as long as they were engaged in protected activity.

That mobile observers share the same First Amendment protections as stationary ones is supported by the bases for these protections. Mobile observers do not just passively *observe* federal immigration agents; they do so in order to *disseminate information* about the agents' actions "to ensure that their duties are carried out responsibly." *Chestnut*, 947 F.3d at 1092. For instance, Plaintiffs Biestman and Lee followed DHS agents "to observe *and document* [their] activity." (Doc. 1-2 ¶2 (emphasis added); *see also* Doc. 1-3 ¶4; M.B. Decl. ¶¶ 4–5; Khalili Decl. ¶¶ 8–9; Searles Decl. ¶¶ 5–6.) Likewise, Webb has followed DHS agents on multiple occasions to "document" their activity and communicate it to her neighbors. (*See* Doc. 1-4 ¶¶ 2–4; *see also* Doc. 102 ¶¶ 2–4, 8; Doc. 105 ¶¶ 5, 7.) And Plaintiff Doxsey has followed DHS agents around Richfield schools to "share information about ICE presence" with families living nearby. (Doc. 160 ¶¶5–8.) Multiple witnesses observe for the same reason—to document and disseminate information.[18] Mobile observers are at times

---

[18] *See, e.g.,* Doc. 1-11 ¶ 2; Doc. 36 ¶ 2; Doc. 60 ¶¶ 4, 8; Doc. 63 ¶¶ 4, 5; Doc. 67 ¶¶ 5, 6; Doc. 99 ¶ 28; Doc. 143 ¶ 2; Doc. 144 ¶ 3; Doc. 151 ¶ 4; Doc. 154 ¶ 11; Doc. 167 ¶¶ 5–6; Doc. 168 ¶ 6; Doc. 171 ¶ 4; Doc. 183 ¶ 2; Doc. 184 ¶ 4; Doc. 189 ¶ 2; Doc. 194 ¶ 2; Doc. 200 ¶ 3; Doc. 202 ¶ 2; Doc. 206 ¶ 4; Doc. 211 ¶ 1; Doc. 216 ¶ 2; Doc. 221 ¶ 4; Doc. 223 ¶ 2; Doc. 224 ¶ 6; Doc. 225 ¶ 6; Doc. 227 ¶ 3; M.B. Decl. ¶ 3; Dittbenner Decl. ¶ 6; V.J.M. Decl. ¶ 3; Khalili Decl. ¶ 3; Krutzfeld Decl. ¶ 5; Searles Decl. ¶ 4; Sill Decl. ¶ 3. )

exercising three First Amendment rights at once: (1) the "right to watch police-citizen interactions at a distance and without interfering," *Nieters*, 83 F.4th at 1108; (2) the right to record information about public officials performing official duties, *Bellotti*, 435 U.S. at 783; and (3) the right to share that information with the public, *Ness*, 11 F.4th at 923. Because their conduct fits squarely within the First Amendment, it should be afforded the constitutional protection it deserves.

### 2. Plaintiffs have plausibly alleged that their protected First Amendment activities were the but-for cause of Defendants' adverse actions.

Plaintiffs have also sufficiently alleged that "there was a but-for causal connection between" their injury and Defendants' retaliatory animus. *See Nieters*, 83 F.4th at 1110. Far from being amenable to resolution on a motion to dismiss, "causal connection is generally a jury question." *Peterson v. Kopp*, 754 F.3d 594, 603 (8th Cir. 2014) (quotation omitted), *abrogated in part on other grounds by Nieves*, 587 U.S. 391. Courts consider several factors when analyzing this element, including "[t]emporal proximity," *Watson*, 119 F.4th at 557, and whether the plaintiff was peaceful, law-abiding, and compliant, *see Dreith v. City of St. Louis, Mo.*, 55 F.4th 1145, 1149 (8th Cir. 2022).

Defendants focus on three categories of adverse actions: (1) retaliatory arrest (retaliatory-arrest Plaintiffs); (2) retaliatory seizure of mobile observers (mobile-observer Plaintiffs); and (3) retaliatory force using chemical irritants (chemical-irritant Plaintiffs). In arguing that Plaintiffs have not shown causation, Defendants

34

repeatedly misstate the allegations and construe the facts in *their* favor, despite well-established law that directs them to do the opposite. *See Baude*, 23 F.4th at 1069 (articulating the pleading standard). When viewed in the proper light, Plaintiffs' allegations amply allege but-for causation.

Take the retaliatory-arrest Plaintiffs: Tincher, Noor, and Salm. Defendants argue that these Plaintiffs cannot show retaliatory animus because the agents who arrested them reasonably, if mistakenly, believed they had probable cause to arrest for obstruction of official duties. (Doc. 258 at 20.) It is true that, in general, "[t]he plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest." *Nieves*, 587 U.S. at 402; *see also Thurairajah*, 925 F.3d at 984–85 (explaining that a retaliatory arrest claim requires a plaintiff to show "lack of probable cause or arguable probable cause").[19] But Defendants make a fatal error: they fail to assume the truth of Plaintiffs' allegations. The retaliatory-arrest Plaintiffs' were not allegedly obstructing DHS agents or operations, impeding the flow of traffic; or otherwise interfering with official conduct or public safety, as Defendants assert. (*See* Doc. 85 at 57–60.) Instead, Plaintiff allege that they remained peaceful and law-

---

[19] There are exceptions to this general rule. For example, a plaintiff does not need to plead the absence of probable cause when her retaliatory-arrest claim is based on a *policy* of retaliatory arrest. *Lozman v. Riviera Beach*, 585 U.S. 87, 101 (2018). This exception arguably applies here, because Plaintiffs allege that Defendants have policies, practices, and customs that direct federal immigration agents to retaliate against observers, protesters, and journalists to discourage them from engaging in protected First Amendment activity. (*See* Doc. 136 ¶¶71–93; 314–17.) This exception provides another basis for rejecting Defendants' causation argument with respect to the retaliatory-arrest Plaintiffs. *See Lozman*, 585 U.S. at 101.

abiding at all times. (*See generally* Docs. 1-1, 1-5, 69.) These Plaintiffs have adequately alleged the absence of probable cause. *See Willis v. Mills*, 141 F.4th 905, 912 (8th Cir. 2025) (neither a person's "mere presence at the arrest scene," nor her "questioning" of an officer, nor her "[p]eaceful on-looking" provide probable cause to arrest); *Copeland v. Locke*, 613 F.3d 875, 880 (8th Cir. 2010) ("It is fundamental that a lawful arrest may not ensue where the arrestee is merely exercising his First Amendment rights." (cleaned up)). So, too, have Plaintiffs adequately alleged causation for the retaliatory-arrest Plaintiffs more broadly. *See Thurairajah*, 925 F.3d at 985; *Hoyland*, 869 F.3d at 657.

Next, consider the mobile-observer Plaintiffs: Biestman, Doxsey, Lee, and Webb. All of these Plaintiffs were stopped by DHS agents for lawfully following their vehicles.[20] (Doc. 136 ¶¶ 188–97, 252–58, 202–14.) These facts are sufficient to allege causation in these circumstances. *See Watson*, 119 F.4th at 556–57; *Dreith*, 55 F.4th at 1149. In arguing otherwise, Defendants again press their version of events, namely, that the mobile-observer Plaintiffs engaged in a pattern of "aggressive or dangerous behavior while following vehicles," suggesting that agents stopped them based on

---

[20] Defendants suggest that some of the mobile-observer Plaintiffs and declarants were not law abiding because they were honking while they were following DHS vehicles. (Doc. 258 at 22 n.8.) But even assuming that this type of honking is unlawful and that Defendants had the authority to make a stop on that basis (which Plaintiffs dispute), it would not preclude a finding of causation in this context. *See, e.g.*, *Watson*, 119 F.4th at 557 (plaintiff "raised a genuine issue of material fact as to retaliatory motive" despite his partial noncompliance with officer instructions); *Hoyland*, 869 F.3d at 657 (similar).

"'[their] understanding . . . of [their] official duties," however mistaken that understanding may have been. (Doc. 258 at 21–22.) But Plaintiffs' allegations do not show that the mobile-observer Plaintiffs "displayed hostile, menacing, or threatening conduct to the agents or that they created safety concerns." (*See* Doc. 85 at 67.) Quite the opposite, Plaintiffs' allegations, taken as true, show that the detaining agents did not even have *mistaken* reasonable suspicion to stop the mobile-observer Plaintiffs. *See United States v. Stokes*, 62 F.4th 1104, 1107 (8th Cir. 2023) (an officer must have "reasonable, articulable suspicion that a person is committing or is about to commit a crime" to conduct a brief, investigatory stop (quotation omitted)). The preliminary-injunction record supports this conclusion. (*See* Doc. 85 at 67.) Defendants have made it clear that they are seizing mobile observers *because* these individuals are attempting to observe officers and gather information—quintessential First Amendment conduct. *See supra* Section II.A.1.[21] Because Plaintiffs do not affirmatively plead Defendants' alternative explanation, and such an explanation is not supported in any event, Defendants' argument that the mobile-observer Plaintiffs have not adequately alleged causation falls flat.

Finally, consider the Plaintiffs who were sprayed with chemical irritants: Plaintiffs Crenshaw, Wood, CWA, and Status Coup. These Plaintiffs' allegations center

---

[21] (*See also* Doc. 1-8 ¶ 20; Doc. 1-11 ¶ 5; Doc. 36 ¶ 10; Doc. 69 ¶¶ 6–22; Doc. 144 ¶ 10; Doc. 154 ¶¶ 4–10; Doc. 155 ¶ 9, 12-14; Doc. 159 ¶ 5; Doc. 161 ¶ 2; Doc. 162 ¶¶ 9–12; Doc. 178 ¶ 13; Doc. 182 ¶ 10; Doc. 183 ¶¶ 3–11; Doc. 184 ¶¶ 14–22; Doc. 194 ¶¶ 9–15; Doc. 203 ¶¶ 10–11; Doc. 210 ¶ 9; Doc. 222 ¶ 19–21; Doc. 223 ¶¶ 6–11; Doc. 224 ¶¶ 23–30; Johnson Decl. ¶ 9.)

on Defendants' unlawful use of chemical irritants to punish and deter protected First Amendment activity. (Doc. 136 ¶¶ 138, 223–26, 262–63, 265, 272–78.) To establish the requisite causal connection in these circumstances, plaintiffs "must show that they were singled out because of their exercise of constitutional rights." *Quraishi*, 986 F.3d at 837 (quotation omitted). That is precisely what Plaintiffs allege. (Doc. 136 ¶¶ 216–26, 262.) Plaintiffs also allege that the chemical-irritant Plaintiffs were not given orders to back up or disperse and, if they were, they were not given the opportunity to comply. (*Id.* ¶¶ 223–26, 262, 265, 274–78.) These allegations amply allege that Defendants' retaliatory animus was the but-for cause of these Plaintiffs' physical and constitutional injuries. *See, e.g.*, *Wolk v. City of Brooklyn Center*, 107 F.4th 854, 860 (8th Cir. 2024) (plaintiff's allegation that he was pepper sprayed before being given an opportunity to comply with an officer's orders was sufficient to survive a motion to dismiss on his First Amendment retaliation claim); *Green v. City of St. Louis*, 52 F.4th 734, 740 (8th Cir. 2022) (plaintiff's allegation that she was not committing a crime when she was tear gassed was sufficient to survive a motion to dismiss on her First Amendment retaliation claim); *Brandy v. City of St. Louis*, 75 F.4th 908, 916 (8th Cir. 2023) (similar); *Welch v. Dempsey*, 51 F.4th 809, 813 (8th Cir. 2022) (similar); *Dreith*, 55 F.4th at 1149 (similar); *Quraishi*, 986 F.3d at 838–39 (similar).

Defendants argue that the chemical-irritant Plaintiffs failed to show retaliatory animus because there is an "'alternative explanation'": the agents used chemical

38

irritants "'as a crowd control mechanism rather than" to retaliate against particular protesters. (Doc. 258 at 22–23 (quoting *Aldridge v. City of St. Louis, Mo.*, 75 F.4th 895, 899–900 (8th Cir. 2023)). Not so. The Amended Complaint and declarations referenced throughout sufficiently allege that the chemical-irritant Plaintiffs were neither violent nor obstructive; they were peaceful and compliant. (Doc. 136 ¶¶ 115–16, 118, 123–25, 127, 129, 131, 138–41, 223–26, 262–65, 274–78; Chariton Decl. ¶¶ 9–13.) Plaintiffs allege that they were given no warning or no opportunity to comply with a warning. (*Id.*) And many of these Plaintiffs were pepper sprayed at point-blank range in violation of manufacturer warning and standard law enforcement training, sometimes even as agents were driving away unhindered. (*Id.*; *see also id.* ¶ 140.) Taken together and construing inferences in Plaintiffs' favor, these allegations plausibly allege an alternative other than the one hypothesized by Defendants: namely, that Defendants have engaged in the intentional use of excessive force against protesters, observers, and the press, as the Ninth Circuit recently concluded based on similar allegations. *See L.A. Press Club*, 2026 WL 889142, at *5 (rejecting defendants' alternative explanation of legitimate law enforcement because the district court's "well-supported factual findings" showed "that [d]efendants targeted protesters, journalists, and legal observers with indiscriminate force").

In urging the Court to adopt their version of the facts, Defendants turn the motion-to-dismiss standard on its head and create a heightened pleading standard where none exists. The fact that Defendants repeatedly invoke an "alternative

39

explanation" underscores the sufficiency of Plaintiffs' allegations. (*See* Doc. 258 at 19, 22–23.) A motion to dismiss is not the time to adjudicate two alternative explanations—that is reserved for fact discovery or trial. *See Peterson*, 754 F.3d at 603. Defendants' motion to dismiss Plaintiffs' First Amendment claims on the causation element should be denied.

### B. Crenshaw and CWA have sufficiently alleged Fourth Amendment claims.

The Fourth Amendment prohibits unreasonable seizures. U.S. CONST. AMEND. IV. "A Fourth Amendment seizure occurs when an officer restrains the liberty of an individual through physical force or show of authority, such that a reasonable person would have believed that he was not free to leave." *Baude*, 23 F.4th at 1071; *see also United States v. Mendenhall*, 446 U.S. 544, 554 (1980). A seizure is an "application of physical force to restrain movement, even when it is ultimately unsuccessful." *California v. Hodari D.*, 499 U.S. 621, 626 (1991).

Defendants do not contest that the retaliatory-arrest and mobile-observer Plaintiffs were seized. (*See* Doc. 258 at 21.) Nor could they. An arrest is the prototypical seizure. *See Baude*, 23 F.4th at 1071. And a person who encounters an intentional roadblock, *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989), or "is surrounded by officers on all sides . . . would reasonably believe that he is no longer free to leave and that he has been seized," *Baude*, 23 F.4th at 1071. Defendants instead argue that just two of the Plaintiffs—Alan Crenshaw and CWA—have not sufficiently alleged Fourth Amendment claims.

40

For a force-based seizure, there must be "the use of force" coupled "with intent to restrain." *Torres v. Madrid*, 592 U.S. 306, 317 (2021) (emphasis omitted). "[T]he application of physical force to the body of a person with intent to restrain is a seizure *even if* the person does not submit and is not subdued." *Id.* at 325 (emphasis added). It is "enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Brower*, 489 U.S. at 599. A "mere touch" may constitute a seizure—"the appropriate inquiry is whether the challenged conduct objectively manifests an intent to restrain." *Torres*, 592 U.S. at 317 (emphasis omitted).

In keeping with these principles, the Eighth Circuit has "recognized a potential distinction between force used with intent to apprehend and force used with intent to disperse or repel." *Dundon v. Kirchmeier*, 85 F.4th 1250, 1256 (8th Cir. 2023). Importantly, the Eighth Circuit has held that less lethal and non-lethal force can be used to both apprehend and repel. *Keup v. Sarpy Cnty.*, 159 F.4th 533, 538 (8th Cir. 2025). For instance, in *Dundon*, the Eighth Circuit determined that protesters were not seized by tear gas, rubber bullets, or lead-filled bean bags because the officers used these tools to disperse, rather than restrain the protesters. 85 F.4th at 1254–55. The Eighth Circuit reached the opposite conclusion in *Marks v. Bauer*, 107 F.4th 840, 845–46 (8th Cir. 2024), *vacated on other grounds*, 145 S. Ct. 2733 (2025) (mem.), *remanded to*, 166 F.4th 1121 (8th Cir. 2026). In *Marks*, the Eighth Circuit held that a protester *was* seized by a pepper ball because the officer fired the

41

pepper ball to restrain the protester's movement. *Id.* There, the officer fired the projectile directly at Marks' face "[d]espite the apparent amelioration of the threat" and "[w]ithout warning." *Id.* at 843.

This case more closely resembles *Marks*. Like the plaintiff in *Marks*, Crenshaw was targeted by law enforcement officers who sprayed chemical irritants directly into his face at point-blank range. The use of chemical irritants in such "a close-range manner has the effect of immobilizing the target." (Doc. 136 ¶ 140.) The agent who pepper sprayed Crenshaw was in no apparent danger and did not issue dispersal warnings or give him (or other similarly situated Plaintiffs and class members) the opportunity to disperse before spraying chemical irritants. (Doc. 136 ¶¶ 226, 262, 265, 274, 277–78; *see also* Doc. 1-6 ¶¶ 11–13; Doc. 137 ¶¶33–35; *see generally* Chariton Decl.) Plaintiff CWA makes similar allegations. According to Plaintiffs' Amended Complaint, a CWA member was shoved and threatened with arrest. (Doc. 136 ¶ 265.) This conduct evinces an intent to restrain, not an intent to disperse. *See Marks*, 107 F.4th at 845–46; *see also Cole v. Lockman*, No. 21-CV-1282 (PJS/DLM), 2024 WL 328976, at *5 (D. Minn. Jan. 29, 2024) (finding that officers' use of pepper spray "objectively manifest[ed] an intent to restrain the [protester] plaintiffs"). Under this well-settled law and the facts of this case, Plaintiffs have sufficiently alleged that Plaintiffs Crenshaw and CWA were seized.[22]

---

[22] Defendants do not dispute that Plaintiffs have sufficiently alleged that the seizures were unreasonable.

42

### C.   Plaintiffs have sufficiently alleged a civil conspiracy claim.

Plaintiffs also allege that Defendants conspired to deprive Plaintiffs and the putative class of their constitutional rights. (Doc. 136 ¶¶ 314–17.) "A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means." *Mizokami Bros. of Arizona v. Mobay Chem. Corp.*, 660 F.2d 712, 718 n.8 (8th Cir. 1981). The principal elements are agreement between the parties to injure another and an overt act causing that injury. *Id.* When a plaintiff alleges a conspiracy to violate his constitutional rights, "[t]he factual basis need not be extensive." *Smith v. Bacon*, 699 F.2d 434, 436 (8th Cir. 1983). The question of the existence of a conspiracy is not suitable for dismissal. Instead, this question is almost always one for the factfinder and "should not be taken from the jury if there is a possibility the jury could infer from the circumstances a meeting of the minds or understanding among the conspirators to achieve the conspiracy's aims." *Bonenberger v. St. Louis Metro. Police Dep't*, 810 F.3d 1103, 1109 (8th Cir. 2016) (cleaned up).

At this early stage of litigation, Plaintiffs have sufficiently alleged a claim of civil conspiracy. In arguing otherwise, Defendants contend that Plaintiffs fail to allege the violation of an underlying constitutional right. As discussed above, Plaintiffs have stated both First and Fourth Amendment claims. *See* Section II.A–B, *supra*.

Defendants alternatively argue that Plaintiffs have not plausibly alleged an agreement. But conspiracies are by nature "clandestine." *White v. Walsh*, 649 F.2d 560,

43

561 (8th Cir. 1981). Indeed, "it is a rare case in which the plaintiff will be able to provide direct evidence of a conspiratorial agreement," *Smith*, 699 F.2d at 437, and "such evidence is not necessary to prove that a civil conspiracy existed." *White*, 649 F.2d at 561. Accordingly, "the complainant may or may not be in a position to allege with precision the specific facts giving rise to the claim." *Id.* A plaintiff adequately alleges an agreement "by pointing to at least some facts which would suggest the defendants reached an understanding to violate [their] rights." *Bonenberger*, 810 F.3d at 1109 (cleaned up).

Plaintiffs have done so here. Plaintiffs allege an agreement across federal agencies to implement policies that discourage civilians from engaging in protected First Amendment activity. (Doc. 136 ¶¶ 71–93.) This evidence comes from Defendants' statements as well as their alleged patterns and practices. Plaintiffs further allege that the agencies actually implemented these policies in Minnesota, which violated Plaintiffs' First and Fourth Amendment rights. (*Id.* ¶¶ 164–281.) These allegations are sufficient to state a claim for civil conspiracy. *Bonenberger*, 810 F.3d at 1109 (holding that because the plaintiff put forth "at least some facts" that defendants "reached an understanding to violate his rights," the question was reserved for the jury (quotation omitted)); *Burbridge v. City of St. Louis, Mo.*, 430 F.Supp.3d 595, 615 (E.D. Mo. 2019), *aff'd*, 2 F.4th 774 (8th Cir. 2021) (similar); *see also Tirado v. City of Minneapolis*, 521 F.Supp.3d 833, 846 (D. Minn. 2021) (JRT/ECW) (finding a sufficiently alleged conspiracy in a similar case).

44

**D.      Plaintiffs properly seek declaratory relief.**

Defendants are correct that "[a] claim for declaratory judgment is not a separate cause of action but a remedy for a viable underlying cause of action." (Doc. 258 at 27 (quoting *Allied Servs., LLC v. Smash My Trash, LLC*, 153 F.4th 600, 610 (8th Cir. 2025).) But Plaintiffs properly seek declaratory judgment as a remedy for Defendants' constitutional violations. *Reg. Home Health Care, Inc. v. Becerra*, 19 F.4th 1043, 1044 (8th Cir. 2021) (explaining that a party may seek declaratory judgment so long as there is an "'actual controversy'" (quoting 28 U.S.C. § 2201(a))). So long as Plaintiffs are permitted to seek declaratory judgment as a remedy for Defendants' unlawful conduct, Plaintiffs do not object to striking Count IV from their Amended Complaint.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' Motion to Dismiss.

45

Dated:  April 6, 2026

**AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA**
Teresa Nelson (#269736)
Catherine Ahlin-Halverson (#350473)
Alicia Granse (#400771)
P.O. Box 14720
Minneapolis, MN 55414
(651) 529-1692
tnelson@aclu-mn.org
cahlin@aclu-mn.org
agranse@aclu-mn.org

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
Esha Bhandari (NY #4923140), *pro hac vice*
Brian Hauss (NY #5437751), *pro hac vice*
Scarlet Kim (NY #5025952), *pro hac vice*
125 Broad Street, Floor 18
New York, NY 10004
(212) 549-2500
ebhandari@aclu.org
bhauss@aclu.org
scarletk@aclu.org

*/s/  Caitlinrose H. Fisher*
**FORSGREN FISHER McCALMONT DeMAREA TYSVER LLP**
Robert J. Gilbertson (#22361X)
Caitlinrose H. Fisher (#398358)
Virginia R. McCalmont (#399496)
Jackson C. Evert (#402214)
Rebecca R. Rogers (#403827)
1500 Capella Tower
225 South Sixth Street
Minneapolis, MN 55402
Telephone: (612) 474-3300
bgilbertson@forsgrenfisher.com
cfisher@forsgrenfisher.com
vmccalmont@forsgrenfisher.com
jevert@forsgrenfisher.com
rrogers@forsgrenfisher.com

**THE LAW OFFICE OF KEVIN C. RIACH**
Kevin C. Riach (#389277)
125 Main St. SE, Suite 339
Minneapolis, MN 55414
(612) 203-8555
kevin@riachdefense.com

**CIRESI CONLIN LLP**
Kyle W. Wislocky (#393492)
Jacob F. Siegel (#399615)
225 S. 6th St., Suite 4600
Minneapolis, MN 55402
(612) 361-8233
kww@ciresiconlin.com
jfs@ciresiconlin.com

*Attorneys for Plaintiffs and the Proposed Class*

46

**FREDRIKSON & BYRON, P.A.**
Leah C. Janus (#0337365)
Pari I. McGarraugh (#0395524)
Panhia Vang (#0399444)
Megan M. Helstrom (#0403441)
Ayesha Mitha (#504462)
60 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Telephone: (612) 492-7000
ljanus@fredlaw.com
pmcgarraugh@fredlaw.com
pvang@fredlaw.com
mhelstrom@fredlaw.com
amitha@fredlaw.com

*Attorneys for the Individual
Plaintiffs*

47