UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| SUSAN TINCHER, JOHN BIESTMAN, JANET LEE, LUCIA WEBB, ABDIKADIR NOOR, and ALAN CRENSHAW, *on behalf of themselves and other similarly situated individuals*, | Case No. 25-cv-04669 |
| Plaintiffs, | **DECLARATION OF JORDAN CHARITON** |
| v. | |
| KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive Associate Director, Enforcement and Removal Operations (ERO), ICE; DAVID EASTERWOOD, Acting Field Office Director, ERO, ICE Saint Paul Field Office; JOHN A. CONDON, Acting Executive Associate Director, Homeland Security Investigations (HSI); The Department of Homeland Security; Unidentified Federal Agencies; and Unidentified Federal Agents; *in their official capacities*, | |
| Defendants. | |

---

I, Jordan Chariton, declare as follows:

1

1. I am the founder and CEO of Status Coup, which is a plaintiff in the above-captioned action. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. Status Coup is a progressive independent reporting network and media outlet that features investigative and on-the-ground reporting on politics, corruption, the working class, social justice, and the environment. Our mission is to put journalists on the ground to talk to people to find out what is really happening across America and uncover stories that would otherwise be missed by large corporate media outlets. Status Coup has over 5,000 paying members and its popular YouTube channel generates ad revenue based on video views.

3. Status Coup's in-field and investigatory reporting requires that its journalists be embedded into the events they are covering. In the context of protests, this means Status Coup journalists have to be in close proximity to the skirmish lines among police and protesters.

4. In the United States, where we are all protected by the First Amendment, Status Coup should be able to send its journalists to cover events without asking them to risk being shot at, assaulted, seized, or removed from an area they are allowed to be under the law. During the past several months, that just isn't the case, as Status Coup journalists have faced increased danger from federal agents. Federal agents have regularly threatened force and used force in a way that interferes with Status Coup's reporting.

5. As the CEO and founder of Status Coup, I run our day-to-day operations and am in near constant contact with the journalists on the ground. I review the vast majority of the video and other content that our journalists record, and coordinate with them while they live-stream events. I see in real time what they experience on the ground.

6. Status Coup has expended significant resources in covering the federal government's treatment of protesters and people of color in NYC, D.C., Florida, Chicago, Los Angeles, Charlotte, and other cities as part of the Trump Administration's heightened "immigration enforcement." That expenditure has only increased since the so-called "Operation Metro Surge" began in Minnesota in early December. All five journalists employed and/or contracted with Status Coup have spent significant time in Minnesota and all five have been subjected to intimidation and force by federal agents since they arrived on the scene.

2

7. For example, JT Cestkowski, one of our reporters, arrived in Minnesota in early December. On December 6, 2025, he was in a car with another independent local journalist, when they came upon an unmarked vehicle with masked men inside. After briefly following that vehicle, another unmarked vehicle behind them turned on its emergency lights and then drew up abruptly in front of them, blocking them from moving. The masked men inside the vehicle pointed a phone at their car, took pictures and drove away. The next day, December 7, Cestkowski and the same journalist were in Richfield, where they had heard ICE agents were staging to arrest people at a church with a Spanish-language service. They came upon some unmarked vehicles with masked men that they presumed were ICE agents in a nearby parking lot. The unmarked vehicles with masked men drove over to their car and boxed it in for several minutes. After the agents left, Cestkowski learned of a couple who had been threatened with automatic rifles by agents who were upset that the couple was following them nearby. Cestkowski and the other journalist interviewed the couple, John Biestman and Janet Lee, also plaintiffs in this matter, about their experiences.

8. Toward the end of December 2025, Cestkowski told me that things were much worse on the ground in Minnesota than they had been in Chicago because of the size and scale of the operation. Based on the footage I've seen and the reports I've heard from my employees, this is true.

9. On Sunday, January 11, 2026, Cestkowski and Status Coup camera person Jon Farina were live-streaming at the federal Whipple Building, interviewing protesters and filming the federal agents posted there. They were wearing press credentials and carrying their professional recording equipment. During an interview, federal agents shot pepper balls and deployed pepper spray directly into the crowd and at Cestkowski and Farina. Both Cestkowski and Farina were affected by the chemical irritants and had to stop the interview. Later that day, Cestkowski and Farina were again livestreaming at the Whipple Building. As Cestkowski interviewed a citizen who had been arrested for observing and recording ICE agents, Farina was hit by pepper balls. Shortly thereafter, as Cestkowski was interviewing a teenager, both he and the teenager were hit by pepper balls. I watched these events as they happened.

10. On January 13, Status Coup freelance journalist Zach Roberts and Farina were at the Whipple Building covering the protest there. As they live-streamed, I watched as federal agents poured out of the building and without warning began deploying munitions into the crowd, including at Roberts and Farina. Both felt the effects of flash bangs and tear gas. Farina and Roberts were standing near other members of

3

the press, wearing press credentials, and carrying professional camera equipment. The agents fired the munitions indiscriminately into the group of press and protesters, who were simply standing there and peacefully exercising their First Amendment rights.

11. On January 14, Roberts and Farina went to cover the protest that had gathered in the aftermath of a shooting in North Minneapolis. While Roberts was interviewing a woman, federal agents suddenly fired flash bangs and tear gas cannisters into the area, a piece of which struck Roberts in the head. That night, as Farina and Roberts continued to cover the protest, agents followed a pattern: every 15 minutes or so they would fire more munitions into the crowd for no reason and then retreated. Roberts and Farina were subjected to tear gas several times over the course of their coverage. Farina's foot was injured by an unknown projectile fired by federal agents.

12. On January 24, Cestkowski and Farina went to live-stream the response to the killing of Alex Pretti by federal agents on Nicollet and 27th. They were again wearing press credentials and carrying professional equipment. They and several other journalists were gathered in an area where they had a good view and where federal agents had asked them to stand. Suddenly and without warning, federal agents deployed munitions directly at the crowd of journalists covering the unfolding events. The journalists were blanketed with tear gas. To me, the scene resembled a foreign war zone. I almost called them to tell them to shut down our broadcast for fear that federal agents would begin shooting live rounds. Jon Farina, who covered January 6, said this was worse. JT was speechless after, only able to share with me that the violence by federal agents toward journalists and protesters was like nothing he'd ever seen or experienced.

13. On January 26, Status Coup reporter Tine-Desiree Berg was covering a protest at the Home2Suites hotel in Minneapolis with Jon Farina. Both were wearing press credentials and Farina was carrying his large camera. At one point, the people remaining at the hotel were mostly press covering what had happened earlier. One agent shot pepper balls at the reporters, who were identifying themselves as members of the media. Other agents threw tear gas cannisters into the press crowd. While Berg and Farina stood on a sidewalk filming, another agent suddenly grabbed Berg and threw her to the ground. The photo below is a screen shot of the video Farina shot and we shared on our site.

4



14. On February 2, 2026, Berg was out reporting with camera person Will Allen-DuPraw. As they drove through south Minneapolis, they came upon federal agents wearing vests that said "ERO" trying to get into someone's home. There were several protesters and observers there. DuPraw was able to film an agent deliberately trying to harm a protester by opening his car door into her. Berg and DuPraw saw the same convoy of federal agents again nearby and once again decided to get out of their car and film. They were wearing press credentials and carrying their professional equipment. They stood about 10-15 feet from agents approaching a car they had stopped. One agent told our journalists that they were not allowed to follow them because it was impeding their operations. They were given a "warning" not to continue to follow the agents because it was an obstruction of their operations.

15. As the CEO of Status Coup I am concerned that these incidents will only continue. I myself have reported in violent scenes, including the 2016 and 2017 protests of the Dakota Access Pipeline in North Dakota. There, I experienced similar so-called "less lethal" ammunition shot and launched at myself, other journalists, and unarmed peaceful protesters. What I've seen my team subjected to is similar to what occurred at Standing Rock—in some cases, even worse. I've seen coverage of other reporters being shot with pepper balls at close range. I've seen coverage of other journalists being pulled over for doing their jobs to gather information and cover

what the agents are doing in recent days. And the treatment of "non-press" people who are recording by federal agents also has me concerned that our journalists will be subjected to the same intimidation. But as the CEO of Status Coup, I also need to make sure these events are being covered. Our journalists will continue to cover these events as they happen because that is our mission.

16. When our journalists are injured or seized in some way by federal agents that necessarily frustrates the news gathering function of Status Coup. We are an organization of journalists, and each journalist now faces risks that going out to cover federal agents will come with physical and emotional injury.

17. This is a serious problem because it prevents Status Coup journalists from gathering and disseminating the news—the basis of our business model and our reason for existing. When federal agents fire munitions at, shove, threaten, and intimidate our journalists, that takes time away from coverage of the story they are there to cover. One of the largest sources of income for Status Coup is the licensing of videos captured of newsworthy events. For example, one of our journalists captured the historic footage of the January 6, 2021, attack on Capitol Hill police officer Daniel Hodges by supporters of President Trump as he was violently crushed. We licensed this video to news outlets around the world, making a lasting journalistic contribution to society and garnering significant licensing revenue for our company. To capture these historic events, journalists have to be able to be at the right place at the right time. When federal agents interfere with Status Coup journalists, they are putting their thumbs on the scale and making it impossible for this kind of journalism to be sustainable.

18. When federal agents assault, fire munitions at, and interfere with Status Coup's journalists, it also forces us to redirect our time towards addressing their unlawful actions. To protect our journalists, we are forced to use time to advocate for our employees' safety that could otherwise go towards making and distributing content. Status Coup has released videos illustrating unlawful interference by law enforcement in the past as a tool to advocate for safety. If we release those videos to advocate for their safety, we can't then necessarily generate licensing revenue from it. But even that documentation has been insufficient to protect our journalists here in Minnesota—apparently our documentation of federal agents' practices in Chicago, Los Angeles, and beyond has not been enough to change their behavior here. The problems have gotten so out of hand that Status Coup is now forced to

join a lawsuit to enable our journalists to do their jobs in safety. Nothing else has worked. This lawsuit will require that even more resources be diverted from our mission, and as a small outfit, every hour we cannot spend engaged in journalism is a material detriment to our mission.

19. Federal agents all over Minnesota are interfering with the very thing that makes Status Coup what it is—dynamic and responsive to fast-moving current events in a way traditional outlets are not. People engage with Status Coup because they want to see uncut, unfiltered, in-the-trenches journalism. That can't happen if our journalists are forced to be a block away from protests because masked agents do not want press there to cover them. This can't happen if our journalists are waiting to be released from jail simply for gathering information or are in the hospital because they've been thrown to the ground, hurt by chemical irritants, or even shot.

20. Independent media is vital to the health of our democracy. It captures a breadth and depth of information that large corporate outfits are incapable of covering. Embedding journalists into the heart of the story to do this work is resource intensive, making every minute of our journalists' time invaluable.

I declare under penalty of perjury that everything I have stated in this document is true and correct.

Dated and signed on Feb 10, 2026 _____ in Union County, State of New Jersey.

*Jordan Chariton*
Jordan Chariton (Feb 10, 2026 19:09:26 EST)

Jordan Chariton