# EXHIBIT A

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| SUSAN TINCHER, JOHN BIESTMAN, JANET LEE, LUCIA WEBB, ABDIKADIR NOOR, ALAN CRENSHAW, ABIGAIL SALM, RYAN DOXSEY, MARGARE WOOD, THE NEWSGUILD-COMMUNICATIONS WORKERS OF AMERICA, and STATUS COUP NEWS, *on behalf of themselves and other similarly situated individuals*,<br><br>        Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS); TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement (ICE); MARCOS CHARLES, Acting Executive Associate Director, Enforcement and Removal Operations (ERO), ICE; DAVID EASTERWOOD, Acting Field Office Director, ERO, ICE Saint Paul Field Office; JOHN A. CONDON, Acting Executive Associate Director, Homeland Security Investigations (HIS); The Department of Homeland Security; Unidentified Federal Agencies; and Unidentified Federal Agents; *in their official capacities*,<br><br>        Defendants. | Case No. 25-cv-04669 (KMM/DTS)<br><br><br><br>**FAITH LEADERS AND ORGANIZATIONS' MEMORANDUM OF AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES............................................................................................ii

STATEMENT OF INTEREST ...................................................................................... 1

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 2

    I.      Arresting Faith Leaders Substantially Burdens Their First Amendment Rights.. 2

    II.     Faith Leaders Have Also Faced Retaliation in the Exercise of Their Rights ....... 7

    III.    Operation Metro Surge's Targeting of Houses of Worship is Inflicting Irreparable Harm on The Free Exercise of Religion. .............................................. 8

           a.     The Targeting of Houses of Worship Has Required Faith Leaders to ....... Cancel Services or Transition to Online Services. .................................... 9

           b.     Faith Leaders Have Had to Invest in and Increase Security to Ensure the Safety of Congregants. ............................................................................ 11

           c.     Faith Leaders Have Expanded Food Programs and Community Services in Response to Operation Metro Surge ....................................................... 13

CONCLUSION ........................................................................................................ 15

# TABLE OF AUTHORITIES

### CASES

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ............................................................................................... 8

*Emp't Div. of Hum. Res. of Or. v. Smith*,
494 U.S. 872 (1990) ........................................................................................... 3, 5

*Kedroff v. St. Nicholas Cathedral*,
344 U.S. 94 (1952) ............................................................................................... 8

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022). ............................................................................................ 9

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
591 U.S. 732 (2020) ............................................................................................. 8

*Phila. Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*,
767 F. Supp. 3d 293 (D. Md. 2025)...................................................................... 12

*Richmond Newspapers, Inc. v. Virginia*,
448 U.S. 555 (1980) ........................................................................................... 3, 5

*Roberts v. U.S. Jaycees*,
468 U.S. 609, 618, 622 (1984) ............................................................................. 5

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020) ............................................................................................... 9

*Terminiello v. Chicago*,
337 U.S. 1, 4 (1949). ............................................................................................ 7

**SECONDARY SOURCES**

Aki Nace & Conor Wight, *Clergy members arrested at MSP while protesting ICE in Minneapolis*, CBS NEWS (Jan. 23, 2026) ..........................................................4

Giovanna Dell'Orto, *Thousands rally against immigration enforcement in subzero Minnesota temperatures*, THE ASSOCIATED PRESS (Jan. 23, 2026) ...............................4
Heather Hahn, *US Pastors Stand Against Federal Crackdown*, UM News (Jan. 26, 2026) ...................................................................................................4

**INTERVIEWS**

Virtual Interview with Father Dale Korogi, Pastor and Executive Director, Ascension Catholic Academy, in Minneapolis, Minnesota (Feb. 11, 2026) ...........................*passim*

Virtual Interview with Rabbi Eva Cohen, Or Met, Minnesota Congregation for Humanistic Judaism (Apr. 5, 2026) ...................................................................... 4, 6, 7

Virtual Interview with Rabbi Marcia Zimmerman, Senior Rabbi, Temple Israel in Minneapolis, Minnesota (Feb. 5, 2026).............................................................9, 10, 14

Virtual Interview with Reverend Anthony Galloway, Pastor, of Wayman AME Church in Minneapolis, Minnesota (Feb. 21, 2026)................................................... 3, 4, 7

Virtual Interview with Reverend Dr. Pamela Ngunjiri, St. James African Methodist Episcopal Church, in St. Paul, Minnesota (Feb. 25, 2026) ...................................*passim*

Virtual Interview with Reverend Jered Weber-Johnson, Dean, East Metro Region of the Episcopal Church, in Minneapolis, Minnesota (Feb. 23, 2026)............................*passim*

Virtual Interview with Reverend Mariah Tollgaard, Senior Minister, Hamline Church United Methodist in Saint Paul, Minnesota (Feb. 19, 2026)..................................*passim*

Virtual Interview with Reverend Robert Two Bulls, Vicar of All Saints, All Saints Episcopal Indian Mission, (Feb. 20, 2026)............................................................ 11, 13

Virtual Interview with Stacey Smith, Presiding Elder, African Methodist in St. Paul and Minneapolis, Minnesota (Feb. 20, 2026)......................................................................7

**STATEMENT OF INTEREST**

Amici curiae represent the interests of religious leaders from various faiths in Minnesota, united in their belief that houses of worship should be free from government interference. Amici have a central interest in protecting congregants' ability to gather for communal worship without fear of government interference stemming from the Department of Homeland Security's enforcement actions across the state. Amici provide this Court with evidence of the irreparable harm that current immigration enforcement operations impose on the First Amendment rights of Minnesotans.

**INTRODUCTION**

Since the beginning of Operation Metro Surge, thousands of Department of Homeland Security ("DHS") agents have employed aggressive police tactics within Minnesota that infringe upon constitutionally protected rights, erode public trust in law enforcement, and undermine public safety. Federal agents have resorted to dangerous and aggressive tactics including use of tear gas, pepper balls, chemical spray, flash-bang grenades, impact munitions, snatch-and-grab tactics, and other weapons against U.S. citizens and immigrants alike. These operations have forced faith leaders to navigate circumstances that transformed the Twin Cities into a place of communal trauma.

Empowering agents to use "full force" to carry out their law enforcement duties further contributes to the First Amendment violations occurring today. Faith leaders across the state have expressed that DHS agents have targeted Minnesotans—immigrants and non-immigrants alike—at and even while en route to, their respective houses of worship. These actions have had a stark chilling effect on the First Amendment rights of faith leaders

1

and their congregants and led to violent encounters, including unlawful assaults, searches, and seizures.

Contrary to the claims set forth in Defendants' Motion to Dismiss, Plaintiffs state a claim that Defendants' actions have violated the First Amendment rights of the people of Minnesota. Considering the tangible impact that Defendants' actions have had and continue to have on Amici, and the resulting trauma and systemic infringement on their constitutional rights, we urge this Court to deny Defendants' Motion to Dismiss.

## ARGUMENT

Amici urge this Court to deny Defendants' motion to dismiss and to vindicate the First Amendment rights of Amici and all Minnesotans, and to send a clear message that retaliation for exercising such rights will not be tolerated. This memorandum addresses the impact of Defendants' immigration enforcement actions on Amici's First Amendment rights, including arrests of faith leaders and people of faith engaged in peaceful demonstration and protest—resulting in faith leaders being unable to carry forth their ordinary pastoral duties—infringement on the rights of people of faith to freely exercise their religion, and the chilling effect of federal law enforcement's surveillance activity on people of faith.

## I.    Arresting Faith Leaders Substantially Burdens Their First Amendment Rights.

Faith leaders occupy a unique position relative to the government and the public, deriving their authority from enduring moral and spiritual commitments. Like the Southern Christian Leadership Conference in the Civil Rights Era, faith leaders hold our society to

2

a standard of dual accountability—confronting the state with a moral compass and free from partisan objectives, while guiding the public without merely echoing its demands.

Amici's First Amendment rights have been violated. Some have been subject to surveillance and intimidation by immigration officials. Others have faced baseless arrest and detention at protests for attempting to preserve the delicate balance between the public and law enforcement, while respecting the nation's long tradition of nonviolent protests. The connection between the right to assemble and the right to freely exercise one's religion accords even greater First Amendment protection for faith leaders in the fulfillment of their religious obligations. *See Emp't Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 881–82 (1990); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 577 (1980). Notably, Amici have had to alter how they manage their houses of worship and provide charitable resources to the public due to law enforcement action.

Outside the Minneapolis-St. Paul International Airport and the Bishop Henry Whipple Federal Building, pastors stood with journalists and members of the public in protest of Operation Metro Surge.[1] As federal officers clad in black riot gear began making arrests, members of the clergy moved to the frontline, donning their clerical attire. Federal

---

[1] Virtual Interview with Reverend Dr. Pamela Ngunjiri, St. James African Methodist Episcopal Church, in St. Paul, Minnesota (Feb. 25, 2026)**Error! Bookmark not defined.** [hereinafter, "Ngunjiri Interview"]; Virtual Interview with Reverend Mariah Tollgaard, Senior Minister, Hamline Church United Methodist in Saint Paul, Minnesota (Feb. 19, 2026) [hereinafter, "Tollgaard Interview"]. In preparing this memorandum, the undersigned conducted these and other interviews with faith leaders between February 5, 2026 and April 5, 2026.

officers arrested both Minnesotans engaged in protest and members of the clergy as well.[2]

Outside the airport, officers arrested roughly 100 clergy members,  including Reverends Tollgaard and Weber-Johnson. [3] Outside the Whipple Building, Reverend Anthony Galloway noted that immigration officials released a list of people they planned to arrest en masse, including journalists and protesters.[4] When members of the clergy appeared in court after their arrest, the federal government said they were "a violent risk that needed to be detained."[5] Both the arrests and description of faith leaders as "violent" runs the risk of chilling the free exercise of religion. Rabbi Cohen has attended protests throughout her life and generally is "not fearful of attending protests." During the height of the operation, however, Rabbi Cohen would not attend protests at the Whipple Building because of the intensity which federal agents would face off with protestors.[6]

---

[2] Virtual Interview with Reverend Anthony Galloway, Pastor, of Wayman AME Church in Minneapolis, Minnesota (Feb. 21, 2026) [hereinafter, "Galloway Interview"].

[3] Tollgaard Interview**Error! Bookmark not defined.**; Virtual Interview with Reverend Jered Weber-Johnson, Dean, East Metro Region of the Episcopal Church, in Minneapolis, Minnesota (Feb. 23, 2026) [hereinafter, "Weber-Johnson Interview"]; *see also* Heather Hahn, *US Pastors Stand Against Federal Crackdown*, UM News (Jan. 26, 2026), https://www.umnews.org/en/news/us-pastors-stand-against-federal-crackdown. [hereinafter "Tollgaard Article"].

[4] Tollgaard Article; Aki Nace & Conor Wight, *Clergy members arrested at MSP while protesting ICE in Minneapolis*, CBS NEWS (Jan. 23, 2026), available at: https://www.cbsnews.com/minnesota/news/clergy-members-arrested-minneapolis-st-paul-international-airport/; Giovanna Dell'Orto, *Thousands rally against immigration enforcement in subzero Minnesota temperatures*, THE ASSOCIATED PRESS (Jan. 23, 2026), available at: https://www.wcax.com/2026/01/23/minnesota-gears-up-mass-anti-immigration-enforcement-protest-despite-sub-zero-temperatures/.

[5] Galloway Interview.

[6] Virtual Interview with Rabbi Eva Cohen, Or Met, Minnesota Congregation for Humanistic Judaism (Apr. 5, 2026) [hereinafter, "Cohen Interview"].

For faith leaders across the nation, their sincerely held religious beliefs require them to guide, support and stand up for their community. There is a venerable tradition of religious leaders who shape the civic conscience, bridging the gap between faith-based mandates and the public pursuit of justice. From the Quakers' early petitions for abolition of slavery to the Southern Christian Leadership Conference's mobilization of civil rights, Minnesota's faith leaders today follow a long tradition of answering the same moral mandate that the First Amendment was designed to safeguard. The drafters of the First Amendment recognized that "the right of assembly was regarded not only as an independent right but also as a catalyst to augment the free exercise of other First Amendment rights." *Richmond Newspapers*, 448 U.S. at 577 (noting an exchange during the ratification of the Bill of Rights that "[i]f the people could be deprived of the power [to assemble] under any pretext whatsoever, they might be deprived of every other privilege contained in the clause."). Moreover, the Supreme Court has long recognized that the "freedom of association receives protection as a fundamental element" of the freedom of religion. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618, 622 (1984). In fact, free exercise protections are heightened when combined with other constitutional rights, such as the freedom of assembly. *See Emp.'t Div.*, 494 U.S. at 881–82. No doubt, blanket arrests of protestors chill the free speech of activists, but they also impose an additional burden on faith leaders who seek to freely exercise their sincerely held religious beliefs that call on them to meet the pastoral needs of the community, and to speak out against immoral, unethical and unjust actions.

Faith leaders across the Twin Cities have answered the moral call to protest Operation Metro Surge alongside their congregants and communities. Many faith leaders define their participation in these demonstrations as the fullest expression of their pastoral obligations.[7] Faith leaders have also helped organize interfaith, nonviolent protests.[8] When federal law enforcement adopted aggressive tactics that escalate tensions, faith leaders often stepped into the breach and positioned themselves on the front lines to de-escalate tensions, shifting authorities "from riot mode" to public safety mode.[9] Faith leaders create space in protests for reprieve by bringing food and prayer to provide comfort to people in need and to diffuse frustration levels and anxiety among protesters. Yet, the federal government has argued that their blanket arrests were necessary because they posed a "violent risk."[10]

Minnesota's history of faith-led protests demonstrates that pastors and clergy have long stood on the frontlines of movements demanding justice for those unable to speak for themselves. For among the Amici, a central tenet of their faith is that "[a]ll people are God's people, and it is our responsibility to take care of one another."[11] Rabbi Cohen describes the Judaic concept of "*tikkun olam*, meaning 'repairing the world' is a guiding value. World-repair involves standing up for injustice that undermines the dignity of fellow human beings." Hence she stated, "Defending the dignity and rights of immigrants

---

[7] *See, e.g.*, Ngunjiri Interview; Tollgaard Interview.

[8] Ngunjiri Interview.

[9] Galloway Interview.

[10] *Id.*

[11] Ngunjiri Interview.

6

specifically is a core precept this reflected in thirty-six instances that the Torah stresses the necessity of caring for 'the stranger'"[12] Reverend Weber-Johnson recognized some of his community members were fearful of exercising their right to protest given the risk of mass arrests noting: "It is not about us. Most of the people we serve do not have the privilege to be arrested. So, I was just serving."[13] After having direct contact with law enforcement as an arrestee and as a faith leader, Reverend Weber-Johnson is concerned about the destabilizing effect that immigration enforcement officials have had on his congregants.[14]

## II.    Faith Leaders Have Also Faced Retaliation in the Exercise of Their Rights.

Immigration and Customs Enforcement (ICE) has also engaged in retaliatory enforcement tactics directly aimed at infringing faith leaders' religious practices. For some faith leaders, retaliation has impacted what they say publicly and online.[15] Presiding Elder Smith explicitly stated that they "don't want to be on the list" and do not want the families they serve to be monitored because of their public statements. Faith leaders described hesitation to speak out after witnessing the targeting of other religious centers.[16] Pastor Galloway acknowledged that many faith leaders and their congregations have been doxxed.[17] The First Amendment does not permit the government to censor or punish

---

[12] Cohen Interview.

[13] Weber-Johnson Interview.

[14] *Id.*

[15] Virtual Interview with Stacey Smith, Presiding Elder, African Methodist in St. Paul and Minneapolis, Minnesota (Feb. 20, 2026) [hereinafter, "Smith Interview"]; Cohen Interview.

[16] Smith Interview; Cohen Interview.

[17] Galloway Interview.

speakers for engaging in the very demonstrations and protests the amendment was designed to protect. *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949).

### III.   Operation Metro Surge's Targeting of Houses of Worship is Inflicting Irreparable Harm on The Free Exercise of Religion.

As many Amici note, some Minnesotans are no longer attending religious services due to personal safety concerns. Other faith leaders have been forced to step outside their traditional pastoral roles in response to the current crisis. Houses of worship across Minnesota serve as sites for service and prayer, study, mutual aid, community formation, and spiritual practice that occupy a uniquely protected position under the Constitution. Yet, Operation Metro Surge has made worship a risk that many are now unwilling to take. Faith leaders have been forced to divert designated church resources toward increased security measures, and some have had to take the extraordinary step of cancelling their services. The harm inflicted upon faith leaders is a fundamental alteration of their ability to fulfill their pastoral duties within their communities.

Defendants' actions have had a stark impact on the way that faith leaders function, people of faith congregate, and houses of worship operate, all in tension with the Constitution. Indeed, the First Amendment forbids the government from taking actions that restrict the free exercise of religion by interfering with an individual's ability to observe or practice their faith, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), or by interfering with the ability of a church to manage its internal affairs, *see,*

8

*e.g.*, *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020) (explaining internal management decisions that are essential to a religious institutions' mission are protected by the First Amendment); *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952). The Free Exercise Clause most importantly "protect[s] the ability of those who hold religious beliefs of all kinds to live their faith in daily life through 'the performance of, or abstention from, physical acts." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022). Nevertheless, Defendants have used their claim of an immigration crisis as a pretext to infringe on the rights of Minnesotans; but even in times of crisis, the "[g]overnment is not free to disregard the First Amendment." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 21 (2020) (Gorsuch, J., concurring). Amici have a strong interest in protecting their congregants' ability to gather for communal worship without fear of government interference stemming from discretional ICE enforcement practices.

### a. The Targeting of Houses of Worship Has Required Faith Leaders to Cancel Services or Transition to Online Services.

For many faith communities, in-person communal worship is not a matter of convenience; it is a core tenet of their faith. Some religious practices simply cannot be undertaken in isolation or virtually, such as communion and baptisms.[18] Many faith leaders have expressed the importance of religious life to the community and citizens of Minnesota,

---

[18] Tollgaard Interview ("I can't actually give communion online. The sacraments, you can't fully participate in unless you come in person."); Virtual Interview with Father Dale Korogi, Pastor and Executive Director, Ascension Catholic Academy, in Minneapolis, Minnesota (Feb. 11, 2026) [hereinafter, "Korogi Interview"] ("Because of their fear, they do not come to mass and they feel like they are not doing their religious duty because they cannot take communion.").

noting the distinct power that religion has to unify the diverse cultures within the state.[19]

Hence, by saturating areas surrounding the sanctuaries with unidentified federal agents and

unyielding surveillance, DHS has erected a digital and physical barrier to these sacraments.

Throughout Minneapolis and St. Paul, religious leaders recognize that many of their

members are fearful of commuting to church, and some institutions have seen reduced

attendance at church services. In one service, Father Korogi saw an eighty-percent decline

because of Operation Metro Surge, describing congregants as being subjected to a "chilling

effect—to walk down the street as a free person and not looking back over your shoulder–

is an assault on human dignity."[20] Father Dale Korogi, who serves a predominantly Latino

population at the Church of the Ascension, chose to cancel some religious events and

individual counseling sessions, citing concern about the safety of the members of the

church.[21] Congregants of Father Korogi's church have remarked that their souls feel at risk

due to the federal action that has caused them to fear leaving their homes to attend religious

services.[22]

ICE agents' activities are breeding fear among individuals who regularly attend

religious services, as well as those for whom attending church in-person is a central aspect

---

[19] Korogi Interview; Tollgaard Interview; Virtual Interview with Rabbi Marcia Zimmerman, Senior Rabbi, Temple Israel in Minneapolis, Minnesota (Feb. 5, 2026) [hereinafter, "Zimmerman Interview"].

[20] Korogi Interview; Ngunjiri Interview.

[21] Korogi Interview ("People feel safe when they get *here,* but it is about commuting. They do not take the risk of commuting because they will run into ICE on their way home."); Tollgaard Interview.

[22] Korogi Interview.

of their faith.[23] Individual congregants are forced to weigh the risks of violence, harassment, and detention, which hinder their right to freely exercise their faith. Reverend Ngunjiri finds that "now there are people second guessing themselves on whether to come to church."[24] This fear has not only kept congregants away but has forced faith leaders to rethink how they operate their places of worship. Reverand Two Bulls described how their volunteer observers who had been stationed outside moving inside to ease congregants' fears, and doors being locked during food giveaways — measures he felt they "shouldn't have to" take "because they are a church."[25]

### b.     Faith Leaders Have Had to Invest in and Increase Security to Ensure the Safety of Congregants.

Opening the doors of houses of worship to *all* people is a founding principle of faith that reflects the physical expression of welcome, refuge, and community. As the scripture commands, "your gates shall be open continually; day and night they shall not be shut." Isaiah 60:11. Yet Operation Metro Surge has forced faith leaders to close their doors due to fears of DHS agents occupying their parking lots, circling their buildings, and surveilling those who seek only to worship.[26] In January 2026, Father Korogi's congregation canceled their in-person service due to the presence of potential ICE vehicles in their parking lot.[27]

---

[23] Zimmerman Interview.

[24] Ngunjiri Interview.

[25] Virtual Interview with Reverend Robert Two Bulls, Vicar of All Saints, All Saints Episcopal Indian Mission (Feb. 20, 2026) [hereinafter, "Two Bulls Interview"].

[26] Tollgaard Interview; Ngunjiri Interview; Korogi Interview.

[27] Korogi Interivew.

Amici and other faith leaders have felt compelled to devise new safety and security measures in response to the increased presence of ICE officials near their houses of worship, and to address the fear congregants have about attending religious services during Operation Metro Surge.[28] Throughout the Twin Cities, faith leaders have posted signage stating "no federal law enforcement" to dissuade ICE officials from occupying their parking lots.[29] Moreover, faith leaders have also recognized an increased presence of ICE on days of service.[30] With this increased presence, many religious service attendees—and several religious leaders themselves—have reported negative interactions with ICE.[31]

As recognized in *Philadelphia Yearly Meeting of the Religious Society of Friends v. U.S. Department of Homeland Security*, the presence of immigration officers near houses of worship imposes a substantial burden on the free exercise of religion; immigration enforcement hinders the ability of individuals to freely attend church and engage in communal worship as required by their religions. 767 F. Supp. 3d 293, 334 (D. Md. 2025), *appeal docketed* No. 8:25-cv-00243 (4th Cir. May 6, 2025); s*ee also New England Synod v. U.S. Dep't of Homeland Sec.*, 4:25-cv-40102, 2026 WL 412329 (D. Mass. Feb. 13, 2026) (enjoining immigration enforcement actions near houses of worship). Reverend

---

[28] Weber-Johnson Interview; Tollgaard Interview; Korogi Interview; Two Bulls Interview .

[29] Ngunjiri Interview; Tollgaard Interview.

[30] Korogi Interview.

[31] Tollgaard Interview ("[ICE agents] follow the grocery store delivery drivers that the church uses to assist families."); Ngunjiri Interview (noting that, while driving, her granddaughter witnessed ICE vehicles three times in one day and one incident where an ICE agent left their car to question an individual at a train station); Weber-Johnson Interview ("My children have had some interactions, and they were tailed by ICE all the way home after babysitting.").

Tollgaard's church "felt the impact immediately after Trump's Executive Order took away the protection," as ICE agents would sit in church parking lots leaving congregants—citizens and immigrants alike—to "live in constant fear and have for the most part just stayed at home."[32] Furthermore, Father Korogi's congregation expressed grave concerns about ICE officials circling their church during their services.[33] Reverend Two Bulls describes that:

> When ICE first came in, they were all over. The observers let you know of ICE presence—honking or whistling . . . having to lock our doors and have observers around our buildings . . . that's not right. If you are Latino . . . there is a church down the block from us, and I don't think they're meeting. If they are, they must be doing it quietly, because I haven't seen anything.[34]

Predominantly minority religious institutions, and minority congregants writ large, feel increasingly targeted—a sentiment noted by religious leaders and institutions of all backgrounds.[35]

### c. Faith Leaders Have Expanded Food Programs and Community Services in Response to Operation Metro Surge.

Federal immigration enforcement has impacted faith leaders' charitable work. Faith communities have invited public organizations to inform their congregants of the legal rights if immigration agents stop them.[36] Faith communities have expanded their charitable

---

[32] Tollgaard Interview.

[33] Korogi Interview.

[34] Two Bulls Interview.

[35] Weber-Johnson Interview ("I have colleagues whose parishes are literally under attack. They feel themselves—their very personhood is being attacked."); Tollgaard Interview.

[36] Weber-Johnson Interview; Tollgaard Interview; Korogi Interview.

outreach to support congregants who lost their jobs and are fearful of leaving their homes.[37] As a result, faith communities have rapidly created new programs to meet the surge of those in need of food and other necessities, stretching "benevolent funds" and "coalition resources" that were once used to sustain their ministries.[38] Reverend Babington-Johnson reported "there weren't enough resources for some people. People walking past the church would say they were hungry or don't have clothing."[39] Father Korogi noted their congregation was "sought out on almost a weekly basis, by people asking for food and clothing. In response, we began the process of re-establishing our food closet, to meet the needs of the community."[40]

Immigration enforcement is placing additional hardship on these charitable services as delivery drivers are continually harassed and tracked by agents. Delivery drivers for Father Korogi's food programs would be "at a stop sign and someone will get out of a car to run their license plates."[41] Rabbi Zimmerman noted that immigration officers often take down license plates numbers and use facial recognition to track individuals providing food resources or participating as observers.[42] Father Korogi has adopted new measures to keep their food delivery drivers protected from surveillance of immigration officers.[43] Thus,

---

[37] Korogi Interview; Babington-Johnson Interview; Ngunjiri Interview; Two Bulls Interview.

[38] Galloway Interview; Babington-Johnson Interview; Korogi Interview.

[39] Babington-Johnson Interview.

[40] Korogi Interview.

[41] Korogi Interview.

[42] Zimmerman Interview.

[43] Korogi Interview.

immigration enforcements tactics extend beyond protests and even houses of worship, to disrupt the broader charitable resources that faith communities provide to those in need.

**CONCLUSION**

Communities of all faiths across Minneapolis and St. Paul have seen their neighbors harassed, abducted, detained, and, in some cases, killed in a matter of weeks. Immigration enforcement officials have significantly impacted faith leaders, people of faith, and the way people worship and come together at a time that has been characterized by fear, confusion, and chaos. The ongoing immigration enforcement throughout Minnesota targets religious institutions, especially those in communities of color. Amici's first-hand accounts of how communities of faith are negatively affected by federal officials' unprecedented immigration enforcement campaign support the denial of Defendants' Motion to Dismiss.

Dated:  April 6, 2026

**MASLON LLP**

By: */s/ Samantha H. Bates*
    Samantha H. Bates (#0395002)
    Anna Petosky (#0388163)
225 South Sixth Street, Suite 2900
Minneapolis, MN  55402
(612) 672-8200
Email: samantha.bates@maslon.com
      anna.petosky@maslon.com

*and*

**HOWARD UNIVERSITY SCHOOL OF
LAW CIVIL RIGHTS CLINIC**

John M. Powers (*pro hac vice forthcoming*)

15

Kristen Clarke
2900 Van Ness Street NW
Washington, DC 20008
(202) 806-8082
Email:  john.powers@howard.edu
        kristen.clarke@howard.edu

**ATTORNEYS FOR AMICUS FAITH
LEADERS AND ORGANIZATIONS**

16