**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

|  |  |
|---|---|
| SUSAN TINCHER, et al.,<br><br>  Plaintiffs,<br><br>   v.<br><br>MULLIN, et al.,<br><br>  Defendants. | No. 25-cv-4669 (KMM/DTS) |

**PROPOSED BRIEF OF AMICI CURIAE REPORTERS COMMITTEE
FOR FREEDOM OF THE PRESS AND 23 NEWS AND
MEDIA ORGANIZATIONS IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

Mark R. Anfinson, MN Bar No. 2744
Uptown Professional Building
3109 Hennepin Avenue South
Minneapolis, MN  55408
Telephone:  612-827-5611
*mranfinsonlaw@gmail.com*
*Counsel of Record*

Lisa Zycherman*
Gabriel Rottman*
Mara Gassmann*
 *Of Counsel
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005

Telephone: (202) 795-9300
Facsimile: (202) 795-9310
*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Civil Procedure 7.1, amici certify as follows:

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

The Associated Press is a global news agency organized as a mutual news cooperative under the New York Not-For-Profit Corporation law.  It is not publicly traded.

The Atlantic Monthly Group LLC is a privately-held media company, owned by Emerson Collective and Atlantic Media, Inc.  No publicly held corporation owns 10% or more of its stock.

CBS Broadcasting Inc. is a wholly owned subsidiary of Paramount Global. Paramount Global is a wholly owned subsidiary of Paramount Skydance Corporation, a publicly traded company.

The Center for Investigative Reporting, Inc. is a California non-profit public benefit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code.  It has no statutory members and no stock.

Courthouse News Service is a privately held corporation with no parent corporation and no publicly held corporation holds more than 10 percent of its stock.

1

First Amendment Coalition is a nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

The Intercept Media, Inc., publisher of The Intercept, is a non-profit non-stock corporation. It has no parent, subsidiaries, or affiliates.

The International Documentary Association is a not-for-profit organization with no parent corporation and no stock.

The Media Institute is a 501(c)(3) non-stock corporation with no parent corporation.

MediaNews Group Inc. is a privately held company. No publicly-held company owns ten percent or more of its equity interests.

The National Freedom of Information Coalition is a nonprofit organization that has not issued any shares or debt securities to the public, and has no parent companies, subsidiaries, or affiliates that have issued any shares or debt securities to the public.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

New England First Amendment Coalition has no parent corporation and no stock.

2

New England Newspaper and Press Association, Inc. is a non-profit corporation. It has no parent, and no publicly held corporation owns 10% or more of its stock.

The New York Times Company is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company owns 10% or more of its stock.

News/Media Alliance represents the newspaper, magazine, and digital media industries, including nearly 2,200 diverse news and magazine publishers in the United States and internationally. It is a nonprofit, non-stock corporation organized under the laws of the commonwealth of Virginia. It has no parent company.

Newsday LLC is a Delaware limited liability company whose members are Tillandsia Media Holdings LLC and Newsday Holdings LLC. Newsday Holdings LLC is an indirect subsidiary of Cablevision Systems Corporation. Cablevision Systems Corporation is (a) directly owned by Altice USA, Inc., a Delaware corporation which is publicly traded on the New York Stock Exchange and (b) indirectly owned by Altice N.V., a Netherlands public company.

Online News Association is a not-for-profit organization. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

3

Reuters News & Media Inc. is a Delaware corporation whose parent is Thomson Reuters U.S. LLC, a Delaware limited liability company. Reuters News & Media Inc. and Thomson Reuters U.S. LLC are indirect and wholly owned subsidiaries of Thomson Reuters Corporation, a publicly-held corporation, which is traded on the New York Stock Exchange and Toronto Stock Exchange. There are no intermediate parent corporations or subsidiaries of Reuters News & Media Inc. or Thomson Reuters U.S. LLC that are publicly held, and there are no publicly-held companies that own 10% or more of Reuters News & Media Inc. or Thomson Reuters U.S. LLC shares.

The Seattle Times Company: The McClatchy Company, LLC owns 49.5% of the voting common stock and 70.6% of the nonvoting common stock of The Seattle Times Company.

The Society of Environmental Journalists is a 501(c)(3) non-profit educational organization. It has no parent corporation and issues no stock.

Society of Professional Journalists is a non-stock corporation with no parent company.

Vox Media, LLC has no parent corporation. NBCUniversal Media, LLC, a publicly held corporation, owns at least 10% of Vox's stock.

4

## STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE

Amici curiae are the Reporters Committee for Freedom of the Press (the "Reporters Committee"), The Associated Press, The Atlantic Monthly Group LLC, CBS Broadcasting Inc., The Center for Investigative Reporting, Courthouse News Service, First Amendment Coalition, The Intercept Media, Inc., International Documentary Assn., The Media Institute, MediaNews Group Inc., National Freedom of Information Coalition, National Press Photographers Association, New England First Amendment Coalition, New England Newspaper and Press Association, Inc., The New York Times Company, News/Media Alliance, Newsday LLC, Online News Association, Reuters News & Media Inc., The Seattle Times Company, Society of Environmental Journalists, Society of Professional Journalists, and Vox Media, LLC (collectively, "amici").

Amici are news and media organizations that report on—or represent the interests of journalists and media outlets that report on—law enforcement activity and public protests in U.S. cities. Amici therefore have both a unique perspective on and practical experience with covering law enforcement activity and mass demonstrations. Amici write to emphasize that a First Amendment right to gather the news and to report on public events exists and to underline why crowd-control

5

tactics must be tailored to preserve the crucial role of observers, including the news media, during law enforcement interactions with the public.

**INTRODUCTION**

The role of the press in observing and documenting public law enforcement activity and mass demonstrations is vitally important in our system of government. Rigorous protection of journalists' ability to report on these events is essential if the press is to fulfill its constitutional function to ensure the government is accountable to the people and serve as the "powerful antidote to any abuses of power by governmental officials." *Mills v. Alabama*, 384 U.S. 214, 219 (1966).

Further, the record in this case supported the conclusion that Defendants used crowd-control tactics, including the indiscriminate use of chemical agents, against observers, *Tincher v. Noem*, No. 0:25-CV-4669 (KMM/DTS), 2026 WL 125375, at *21 (D. Minn. Jan. 16, 2026), as other federal courts have similarly found, *see infra* pp. 13–14. When the government unleashes crowd-control tactics and tools indiscriminately on persons observing police conduct in public spaces, who are not participating in any violent unrest, such steps can have an extraordinary chilling effect on constitutionally protected newsgathering and, consequently, on the public's access to reporting on matters of public concern. The government in its Motion to Dismiss argues that no First Amendment issue is raised. Amici write in support of Plaintiffs' opposition to the motion to dismiss and to further underline the issues at stake should the Court adopt such a view.

Amici urge the Court to deny the government's motion and allow the Plaintiffs' claim to proceed.

## ARGUMENT

**I.     The First Amendment protects the right to observe and report the news.**

There is no dispute that observing and recording government activity in person in public spaces is vital to safeguarding the work of the press. *See, e.g., Quraishi v. St. Charles Cnty.*, 986 F.3d 831, 838–39 (8th Cir. 2021) (describing "[r]eporting [as] a First Amendment activity" and collecting cases); *Brown v. Kemp*, 86 F.4th 745, 779 (7th Cir. 2023) (physical proximity is "essential to carry out . . . protected monitoring and recording"). As the federal district court in *Goyette v. City of Minneapolis* explained in an order limiting the use of tear gas and other tactics against journalists, "[t]he potential harm arising from suppressing press coverage of the protests is great and the public interest favors protecting" the First Amendment activity. 338 F.R.D. 109, 120–21 (D. Minn. 2021). These "[c]onstitutional rights are not diminished during a period of 'chaotic unrest.'" *Id.* (citing *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 120–21 (1866)).

Journalists "conduct newsgathering activities in proximity to police officers every day," *Reps. Comm. for Freedom of the Press v. Rokita*, 147 F.4th 720, 728 (7th Cir. 2025), and the First Amendment squarely protects their right to do so, *see,*

8

*e.g.*, *Ness v. City of Bloomington*, 11 F.4th 914, 923 (8th Cir. 2021) (holding that "acts of taking photographs and recording videos" on "matters of public controversy" are "entitled to First Amendment protection"), even where others on the scene of an event might be engaged in criminal activity, *see Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 834 (9th Cir. 2020) (holding that reporters "cannot be punished for the violent acts of others"). Because law enforcement may not subject journalists to detention, arrest, or use of force for the unlawful acts of other individuals present during protest activity, a tailoring of the police response—even with respect to the use of otherwise lawful crowd-control tactics—is appropriate. *See Quraishi*, 986 F.3d at 839 ("deploying a tear-gas canister at law-abiding reporters" in retaliation for their reporting obviously violates the Constitution); *Index Newspapers*, 977 F.3d at 827–28 & n.4 (retaliatory use of "pepper balls, tear gas, and paint-marking munitions" against journalists violates the First Amendment); *see also Hartman v. Moore*, 547 U.S. 250, 256 (2006) (noting that First Amendment prohibits government officials from retaliating against individuals for engaging in First Amendment activity).

When crowd-control tactics are not driven by an invidious motive, they still must be "narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels [of] communication." *Ward v. Rock Against*

9

*Racism*, 491 U.S. 781, 791 (1989). In accordance with this requirement, any force used must be "*necessary* to address the violations and transgressors." *Bell v. Keating*, 697 F.3d 445, 459 (7th Cir. 2012). Instead of a police response that indiscriminately lumps every bystander together, "the proper response to potential and actual violence is for the government to ensure an adequate police presence . . . and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure." *Collins v. Jordan*, 110 F.3d 1363, 1372 (9th Cir. 1996). In other words, crowd-control tactics cannot be said to be narrowly tailored when they sweep in journalists and other observers—whose own conduct poses none of the risks the government claims the authority to prevent—for the unlawful conduct of third parties.

Defendants have argued that there is no First Amendment right to observe law enforcement and appear to believe that no degree of tailoring here was required. They argue instead that the government need not address threatening or disruptive protestors separately from observers and the press and may utilize crowd-control devices indiscriminately so long as no one is "singled out for their speech." Mem. in Supp. of Defs.' Mot. to Dismiss First Am. Compl. at 18 (Dkt. No. 258). But in addition to the recent protest cases cited above, the Supreme Court has made clear in numerous contexts that the Constitution prevents the

10

government from restricting one person's rights because a stranger wants to break the law nearby. A demonstrator, for instance, may not be held liable for violence she did not authorize or incite, *see NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 926–27 (1982); members of an association with lawful aims may not be prosecuted for *un*lawful ones they lack the intent to further, *see Scales v. United States*, 367 U.S. 203, 222 (1961); and a speaker may not be charged the bill for a heckler's reaction, *see Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134–35 (1992). As a result, police can deal with a large group of individuals as a unit only when they have probable cause to believe that "the group was *acting* as a unit." *Bernini v. City of St. Paul*, 665 F.3d 997, 1003–04 (8th Cir. 2012) (emphasis added). At the very least, whatever the facts of any given case, no reasonable officer could think that a journalist appearing to be "by himself" and "taking photographs" was in fact acting in concert with rioters. *Nieters v. Holtan*, 83 F.4th 1099, 1107 (8th Cir. 2023).

Moreover, law enforcement officers are never entitled to simply *ignore* the burden their actions impose on lawful newsgathering and reporting, and courts have consistently required them to demonstrate that even content-neutral crowd-control measures satisfy the demands of narrow tailoring. *See, e.g.*, *Marcavage v. City of Chicago*, 659 F.3d 626, 631 (7th Cir. 2011) (evaluating whether "officers'

11

directives to keep moving" were narrowly tailored); *Menotti v. City of Seattle*, 409

F.3d 1113, 1130–37 (9th Cir. 2005) (evaluating whether curfew order was

narrowly tailored); *Sabel v. Stynchcombe*, 746 F.2d 728, 731 (11th Cir. 1984)

(evaluating whether arresting and prosecuting demonstrators was narrowly

tailored); *Edrei v. City of New York*, 254 F. Supp. 3d 565, 578 (S.D.N.Y. 2017),

*aff'd sub nom.*, *Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018) (evaluating whether

use of less-lethal weapon was narrowly tailored); *Goyette*, 338 F.R.D. at 116–17

(evaluating whether "general dispersal orders" were narrowly tailored).  The same

basic obligation applies here.

There can be no doubt that law enforcement's use of arrest and

indiscriminate government force, particularly chemical agents like pepper spray

and tear gas, which can act to prevent observation and recording entirely, is a

threat to the press's ability to do its job.  Excessive and indiscriminate force can

chill journalists in their first-hand newsgathering and stymie their ability to obtain

information from other observers.  *See Goyette*, 338 F.R.D. at 120 (citing *Index

Newspapers*, 977 F.3d at 835); *see also, e.g.*, *L.A. Press Club v. Noem*, No. 2:25-

CV-05563-HDV-E, 2025 WL 2658327, at *17 (C.D. Cal. Sept. 10, 2025); *Burdett

v. Reynoso*, No. C-06-00720 JCS, 2007 WL 2429426, at *28 (N.D. Cal. Aug. 23,

2007); *Landers v. City of New York*, No. 16-CV-5176 (PKC) (CLP), 2019 WL

12

1317382, at *8 (E.D.N.Y. Mar. 22, 2019); *Goyette v. City of Minneapolis*, No. 20-CV-1302 (WMW/DTS), 2021 WL 5003065, at *13 (D. Minn. Oct. 28, 2021), *superseded*, No. 20-cv-1302 (WMW/DTS), 2022 WL 370161 (D. Minn. Feb. 8, 2022).  Nor can there be any question that there is a First Amendment right to observe, record, and report public events such as the ones that occurred here.

**II.     Reporting on protest activity and the police response thereto can be dangerous, and the excessive or indiscriminate use of force against journalists can chill news reporting on matters of public concern.**

Newsgathering and reporting are some of the primary conduits by which the public receives information about government activity.  It is thus imperative that journalists be able to safely and effectively cover law enforcement operations in public places, including the police response to mass demonstrations.  Yet the predictable result of the use of indiscriminate crowd-control techniques is to prevent peaceful observation of government operations and to impede journalists from providing fulsome coverage of newsworthy events.  Journalists cannot do their jobs when they are arrested and removed from the scene or when they are unable to observe due to chemical agents, such as pepper spray or tear gas, or other physical injuries.  Beyond the facts of this particular case, or other recent cases in which allegations have focused on excessive force that have impeded journalists from doing their jobs, crowd-control tactics such as the use of tear gas and less-

13

lethal munitions have long exposed journalists to the risk of severe and lasting physical harm, ranging from concussions to broken bones and in tragic instances even death. *See, e.g.*, Reps. Comm. for Freedom of the Press, *Press Freedoms in the United States 2020*, at 8 (May 3, 2021), https://perma.cc/9JPW-V558 (tallying hundreds of physical attacks on reporters in 2020, most at the hands of law enforcement officers during public assemblies); Raul A. Reyes, *Prominent Latino Journalist Ruben Salazar, Killed 50 Years Ago, Tackled Racism, Identity*, NBC News (Aug. 28, 2020), https://perma.cc/V3VP-AHAJ (recognizing Ruben Salazar, veteran *Los Angeles Times* reporter and bureau chief, who died after being struck with a tear gas canister fired by police while covering a protest against the Vietnam War). When those harms force journalists from the scene of newsworthy protests, the government's indiscriminate use of crowd-control techniques has an "immediate and irreversible" impact on the right to gather and report the news, much like any classic prior restraint. *Cf. Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Indeed, some journalists might reasonably avoid going to protest scenes altogether to avoid physical harm—exactly the sort of chilling effect against which the First Amendment guards. *See Index Newspapers*, 977 F.3d at 826.

The demonstrations in this case are particularly challenging for the news media to cover. Unlike large, scheduled protests, these smaller, spot protests move

14

around the city as immigration enforcement officers detain, question, and sometimes arrest individuals. *Tincher*, 2026 WL 125375, at \*34. Observers, including journalists, monitor and record these events, but as reports have indicated, law enforcement has attempted to interfere in their newsgathering. *See* Associated Press, *Federal Officers Push AP Reporters Back to Their Car as They Document Operation*, YouTube (Jan. 28, 2026), https://bit.ly/3ZImnOT (reporting that agents forced Associated Press journalists into their vehicle off the public sidewalk, under threat of arrest, despite reporters identifying themselves and stating their intent to record from a safe distance); J. Patrick Coolican, *Society of Professional Journalists: Photographers Say They Were Targeted by St. Paul Police*, Minn. Reformer (Nov. 26, 2025), https://bit.ly/4rSpDTC (reporting that Reuters, Sahan Journal, and Minnesota Public Radio photojournalists were allegedly targeted when hit by chemical irritants while covering protests).

Beyond the severe injuries inflicted on reporters themselves, excessive uses of force that prevent observers such as journalists from covering newsworthy events deprive the public of valuable information, giving rise to an additional First Amendment harm. "[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts[.]"

15

*Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491 (1975); *see also Rokita*, 147 F.4th at 733–34 & n.9 (observing that "plaintiff media organizations rely on information and observations from ordinary citizens going about their day as source material"). Protests—and the government's responses to them—are matters of paramount public concern. The Framers considered the "right of peaceable assembly . . . to lie at the foundation of a government based upon the consent of an informed citizenry." *Bates v. City of Little Rock*, 361 U.S. 516, 522–23 (1960). The more recent cases establishing the right to observe and record government activity from a public sidewalk further cement the First Amendment interest. *See supra* pp. 9–10. Accordingly, from the Boston Tea Party to the civil rights movement to modern mass demonstration activity like the nationwide protests in 2020, the exercise of First Amendment assembly rights has become "deeply embedded in the American political process." *See Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 294 (1981). And without eyewitnesses like the press on the scene of these newsworthy events, the public's understanding of those events would necessarily be incomplete.

The concern is hardly a new one. The Kerner Commission, empaneled by President Lyndon B. Johnson to study civil unrest in the 1960s, closely examined news coverage of riots during that era and its shortcomings. The study observed

16

that the government's control over information about the reality of the riots had contributed in part to a misleading public sense of the extent of violence, noting that reporting on official estimates of property damage had left "an indelible impression of damage up to more than 10 times greater than actually occurred." *See Report of the National Advisory Commission on Civil Disorders* 202 (1968), https://perma.cc/D3J2-SFGQ.  In one incident, journalists able to reach a scene themselves realized that what government officials had characterized as "nests of snipers" were, in fact, "the constituted authorities shooting at each other." *Id.* at 205.  Across the board, where reporters were forced to rely on "police and city officials [as] their main—and sometimes their only—source of information," coverage was skewed in favor of those sources. *Id.* at 207.  "But more first-hand reporting in the diffuse and fragmented riot area," the Commission concluded, could have "temper[ed] easy reliance on police information and announcements." *Id.*

A similar dynamic was of course present in the wake of the protests that erupted in the summer of 2020.  In keeping with their function as "surrogates for the public," *see Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (plurality opinion), journalists provided extensive first-hand coverage of those protests, *see, e.g.*, *The 2021 Pulitzer Prize Winner in Breaking News Reporting:*

17

*Staff of the Star Tribune, Minneapolis, Minn.*, Pulitzer Prizes, http://bit.ly/ 4olAKCP (last visited Apr. 13, 2026) (collecting coverage); *The 2021 Pulitzer Prize Finalist in Breaking News Reporting: Staff of The Courier-Journal, Louisville, Ky.*, Pulitzer Prizes, http://bit.ly/4olF84L (last visited Apr. 13, 2026) (collecting coverage).  And often, that reporting provided a sharp contrast to official government accounts.  *See, e.g.*, Alex Horton, *In Violent Protest Incidents, a Theme Emerges: Videos Contradict Police Accounts*, Wash. Post (June 6, 2020), https://perma.cc/UTU8-5VX7 (collecting "inaccurate or outright misleading" official statements later undermined by the press or public's first-hand videos).

As each example illustrates, the press serves a critical function when covering protest activity in keeping with the "special and constitutionally recognized role of that institution in informing and educating the public." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 781 (1978).

The detentions, arrests, or uses of force, including chemical irritants, against mere observers, as surveyed previously by this Court, would, if permitted to stand, limit the ability of all observers, including the news media, to monitor what is taking place.  Without reporters on the scene, the public's understanding of important events of widespread concern would be impoverished and crucial First

18

Amendment rights diminished.  The case should proceed for development of the factual record.

## CONCLUSION

For the foregoing reasons, amici respectfully urge the Court to deny Defendants' motion to dismiss.

Dated: April 13, 2026                     Respectfully submitted,

/s/ *Mark Anfinson*
Mark Anfinson, MN Bar No. 2744
Uptown Professional Building
3109 Hennepin Avenue South
Minneapolis, MN  55408
Telephone:  612-827-5611
*mranfinsonlaw@gmail.com*
*Counsel of Record for Amici Curiae*


Lisa Zycherman*
Gabriel Rottman*
Mara Gassmann*
  *Of counsel
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310

*Counsel for Amici Curiae*

19

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this filing complies with the requirements of Local Rules 7.1(f) and 7.1(h).  It was prepared by using Microsoft Word for Office 365, in 14-point Times New Roman font.  The word count for all text, including headings, footnotes, and quotations, and the addendum hereto, is 5,113 words.

/s/ *Mark Anfinson*
Mark Anfinson
*Counsel of Record for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2026, I caused the foregoing Proposed Brief of Amici Curiae the Reporters Committee for Freedom of the Press and 23 News and Media Organizations to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send notices of such filing to all counsel of record.

/s/ *Mark Anfinson*
Mark Anfinson
*Counsel of Record for Amici Curiae*

## ADDENDUM: INDIVIDUAL AMICUS CURIAE
## STATEMENTS OF INTEREST

The Associated Press ("AP") is a news cooperative organized under the Not-for-Profit Corporation Law of New York. The AP's members and subscribers include the nation's newspapers, magazines, broadcasters, cable news services and Internet content providers. The AP operates from 280 locations in more than 100 countries. On any given day, AP's content can reach more than half of the world's population.

The Atlantic Monthly Group LLC is the publisher of The Atlantic and TheAtlantic.com. Founded in 1857 by Oliver Wendell Holmes, Ralph Waldo Emerson, Henry Wadsworth Longfellow and others, The Atlantic continues its 160-year tradition of publishing award-winning journalism that challenges assumptions and pursues truth, covering national and international affairs, politics and public policy, business, culture, technology and related areas.

CBS Broadcasting Inc. produces and broadcasts news, public affairs and entertainment programming. Its CBS News Division produces morning, evening and weekend news programming, as well as news and public affairs newsmagazine programs, such as "60 Minutes" and "48 Hours." CBS Broadcasting Inc. also

A-1

directly owns and operates television stations across the country, including WCBS-TV in New York City, which produces daily news programming.

The Center for Investigative Reporting, Inc. is the nation's oldest nonprofit investigative newsroom in the country that runs the brands Mother Jones, Reveal, and CIR Studios. Mother Jones is a reader-supported news magazine and website known for ground-breaking investigative and in-depth journalism on issues of national and global significance.  Reveal produces investigative journalism for the Reveal national public radio show and podcast, and CIR Studios produces feature length documentaries distributed on Netflix, Hulu and other streaming channels. Reveal often works in collaboration with other newsrooms across the country.

Courthouse News Service is a California-based legal news service that publishes a daily news website with a focus on politics and law.  The news service also publishes daily reports on new civil actions and appellate rulings in both state and federal courts throughout the nation.  Subscribers to the daily reports include law firms, universities, corporations, governmental institutions, and a wide range of media including newspapers, television stations and cable news services.

First Amendment Coalition (FAC) is a nonprofit public interest organization dedicated to defending free speech, free press and open government rights in order to make government, at all levels, more accountable to the people.  The Coalition's

mission assumes that government transparency and an informed electorate are essential to a self-governing democracy.  FAC advances this purpose by working to improve governmental compliance with state and federal open government laws. FAC's activities include free legal consultations on access to public records and First Amendment issues, educational programs, legislative oversight of California bills affecting access to government records and free speech, and public advocacy, including extensive litigation and appellate work.  FAC's members are news organizations, law firms, libraries, civic organizations, academics, freelance journalists, bloggers, activists, and ordinary citizens.

The Intercept Media, Inc. is a non-profit digital media venture committed to rigorous, adversarial journalism in the public interest.

The International Documentary Association (IDA) is dedicated to building and serving the needs of a thriving documentary culture.  Through its programs, the IDA provides resources, creates community, and defends rights and freedoms for documentary artists, activists, and journalists.

The Media Institute is a nonprofit foundation specializing in communications policy issues founded in 1979.  The Media Institute exists to foster three goals: freedom of speech, a competitive media and communications industry, and excellence in journalism.  Its program agenda encompasses all

A-3

sectors of the media, from print and broadcast outlets to cable, satellite, and online services.

MediaNews Group is a leader in local, multi-platform news and information, distinguished by its award-winning original content and high quality local media. It is one of the largest news organizations in the United States, with print and online publications across the country.

The National Freedom of Information Coalition is a national nonprofit, nonpartisan organization of state and regional affiliates representing 45 states and the District of Columbia.  Through its programs and services and national member network, NFOIC promotes press freedom, litigation and legislative and administrative reforms that ensure open, transparent and accessible state and local governments and public institutions.

The National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution.  NPPA's members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry.  Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in

A-4

all its forms, especially as it relates to visual journalism.  The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

New England First Amendment Coalition is a non-profit organization working in the six New England states to defend, promote and expand public access to government and the work it does.  The coalition is a broad-based organization of people who believe in the power of transparency in a democratic society.  Its members include lawyers, journalists, historians and academicians, as well as private citizens and organizations whose core beliefs include the principles of the First Amendment.  The coalition aspires to advance and protect the five freedoms of the First Amendment, and the principle of the public's right to know in our region.  In collaboration with other like-minded advocacy organizations, NEFAC also seeks to advance understanding of the First Amendment across the nation and freedom of speech and press issues around the world.

New England Newspaper and Press Association, Inc. ("NENPA") is the regional association for newspapers in the six New England States (including Massachusetts).  NENPA's corporate office is in Dedham, Massachusetts.  Its purpose is to promote the common interests of newspapers published in New England.  Consistent with its purposes, NENPA is committed to preserving and ensuring the open and free publication of news and events in an open society.

A-5

The New York Times Company is the publisher of The New York Times and operates the news website nytimes.com.

The News/Media Alliance represents over 2,200 diverse publishers in the U.S. and internationally, ranging from the largest news and magazine publishers to hyperlocal newspapers, and from digital-only outlets to papers who have printed news since before the Constitutional Convention.  Its membership creates quality journalistic content that accounts for nearly 90 percent of daily newspaper circulation in the U.S., over 500 individual magazine brands, and dozens of digital-only properties.  The Alliance diligently advocates for newspapers, magazine, and digital publishers, on issues that affect them today.

Newsday LLC ("Newsday") is the publisher of the daily newspaper, Newsday, and related news websites.  Newsday is one of the nation's largest daily newspapers, serving Long Island through its portfolio of print and digital products.  Newsday has received 19 Pulitzer Prizes and other esteemed awards for outstanding journalism.

The Online News Association is the world's largest association of digital journalists.  ONA's mission is to inspire innovation and excellence among journalists to better serve the public.  Membership includes journalists, technologists, executives, academics and students who produce news for and

A-6

support digital delivery systems.  ONA also hosts the annual Online News Association conference and administers the Online Journalism Awards.

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider.  Founded in 1851, it is committed to the Trust Principles of independence, integrity and freedom from bias.  With unmatched coverage in over 16 languages, and reaching billions of people worldwide every day, Reuters provides trusted intelligence that powers humans and machines to make smart decisions.  It supplies business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

The Seattle Times Company, locally owned since 1896, publishes the daily newspaper The Seattle Times, together with the Yakima Herald-Republic and Walla Walla Union-Bulletin, all in Washington state.

The Society of Environmental Journalists is the only North-American membership association of professional journalists dedicated to more and better coverage of environment-related issues.

Society of Professional Journalists ("SPJ") is dedicated to improving and protecting journalism.  It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and

A-7

stimulating high standards of ethical behavior.  Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

Vox Media, LLC owns New York Magazine and several web sites, including Vox, The Verge, The Cut, Vulture, SB Nation, and Eater, with 170 million unique monthly visitors.

A-8