UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------

Susan Tincher, John Biestman,    )   File No. 25-cv-4669
Janet Lee, Lucia Webb,           )          (KMM/DTS)
Abdikadir Noor, and Alan         )
Crenshaw, on behalf of           )
themselves and other similarly   )   Minneapolis, Minnesota
situated individuals,            )   May 4, 2026
                                 )   9:12 a.m.
         Plaintiffs,             )
                                 )
vs.                              )
                                 )
Markwayne Mullin, Secretary,     )
U.S. Department of Homeland      )
Security (DHS); Todd Lyons,      )
Acting Director, U.S.            )
Immigration and Customs          )
Enforcement (ICE); Marcos        )
Charles, Acting Executive        )
Associate Director,              )
Enforcement and Removal          )
Operations (ERO), ICE; David     )
Easterwood, Acting Field         )
Office Director, ERO, ICE        )
Saint Paul Field Office; John    )
A. Condon, Acting Executive      )
Associate Director, Homeland     )
Security Investigations (his);   )
The Department of Homeland       )
Security; Unidentified Federal   )
Agencies; and Unidentified       )
Federal Agents; in their         )
official capacities,             )
                                 )
         Defendants.             )
------------------------------------------------------------

BEFORE THE HONORABLE KATHERINE M. MENENDEZ
UNITED STATES DISTRICT COURT JUDGE
**(MOTION HEARING)**

Proceedings reported by certified stenographer;
transcript produced with computer.

PAULA K. RICHTER, RMR-CRR-CRC
(612) 664-5162

**APPEARANCES**:

For the Plaintiffs:          Forsgren Fisher
                             CAITLINROSE H. FISHER, ESQ.
                             REBECCA ROGERS, ESQ.
                             VIRGINIA R. McCALMONT, ESQ.
                             225 South Sixth Street
                             Suite 1500
                             Minneapolis, MN 55402

                             Ciresi Conlin LLP
                             JACOB F. SIEGEL, ESQ.
                             225 South Sixth Street
                             Suite 4000
                             Minneapolis, MN 55402

                             American Civil Liberties Union
                             of Minnesota
                             ALICIA L. GRANSE, ESQ.
                             P.O. Box 14720
                             Suite 1400
                             Minneapolis, MN 55414

                             Fredrikson & Byron
                             PARI McGARRAUGH, ESQ.
                             60 South Sixth Street
                             Suite 1500
                             Minneapolis, MN 55402

For the Defendants:          United States Department of
                             Justice
                             KATHLEEN JACOBS, ESQ.
                             JEREMY S.B. NEWMAN, ESQ.
                             1100 L Street Northwest
                             Suite 11400
                             Washington, D.C. 20005

Court Reporter:              PAULA K. RICHTER, RMR-CRR-CRC
                             300 South Fourth Street
                             Box 1005
                             Minneapolis, Minnesota 55415

## P R O C E E D I N G S

### IN OPEN COURT

THE COURT: Good morning, everyone. Sorry, again, to keep you waiting. I was printing out my questions and sort of fell into yet another mootness versus standing rabbit hole.

Let's get appearances on the record, first on behalf of the plaintiffs.

MS. FISHER: Good morning, Your Honor. Caitlinrose Fisher appearing on behalf of the plaintiffs. I'm joined by my colleagues, Rebecca Rogers, Virginia McCalmont, as well as co-counsel Pari McGarraugh, Alicia Granse, and Jacob Siegel, and there are additional counsel from Fredrikson & Byron and the ACLU of Minnesota with us here in court.

THE COURT: Okay. Very good. And tell me who's taking what, if we get there?

MS. FISHER: Your Honor, I will be engaging in the mootness versus standing rabbit hole with you and my colleague, Rebecca Rogers, is prepared to address the 12(b)(6) issues.

THE COURT: Okay. Welcome to both of you. Thank you.

And here on behalf of the defendant, the

government respondents?

MS. JACOBS:  Good morning, Your Honor.  Kathleen Jacobs here from the Civil Division Federal Programs Branch of the Department of Justice, and I'm joined by my colleague, Jeremy S. Newman.  And I will be addressing the 12(b)(1) issues, and if we get to them, Mr. Newman will be addressing the 12(b)(6).

THE COURT:  Great.  Thank you very much.

Okay.  Let's start with you.  It's Jacobs, right?  Ms. Jacobs?

MS. JACOBS:  Yes.

THE COURT:  Okay.  Very good.

So I'll be candid, I've read a bazillion cases in the last like 72 hours, and I've spent a lot of time trying to tease out some of the tensions in the case law surrounding standing, how standing operates as a practical matter in a case where there's solely a request for injunctive relief, temporal questions related to standing, how standing and mootness work together, and tensions in the case law between the Eighth Circuit's analysis and the Supreme Court's analysis.  Also, to be frank, tensions between what the Supreme Court says they're doing and what the Supreme Court is doing.  And so I'm making an apology right now that these are going to be some pretty theoretical, maybe deep-divey type questions.

MS. JACOBS:  Sure.

THE COURT:  But let's start a little bit on the easier side with thinking about fact issues as they bear on standing.  So you are making a factual attack to both standing and in support of mootness; is that correct?

MS. JACOBS:  Yes, Your Honor.

THE COURT:  Okay.  And so tell me what facts you are disputing that the plaintiffs have raised with respect to standing.

MS. JACOBS:  Well, Your Honor, I think whenever -- there's more or less two issues that have come to light in my also review and analysis of the relevant case law where the plaintiffs have argued that the -- for standing purposes, the analysis is confined to the first amended complaint.  I think as an initial matter, defendants' position is even considering the facts limited to the first amended complaint, that they fail to establish standing for purposes of Article III jurisdiction.  That is that from the time of the original -- well, that is that the first amended complaint indicates that Operation Metro Surge will be ending; that from the initial complaint to the subsequent complaint, over two months, despite Operation Metro Surge being in full swing, there were no subsequent allegations of any plaintiff --

THE COURT:  So none of these -- not to

interrupt -- I guess I'm going to be interruleing a lot, so I'll just own it.  To interrupt, you're describing your framing and characterization of facts that they have alleged, and I guess my preliminary question is not so much that.  It is, are there facts that they allege that you dispute as opposed to the legal conclusions?  Like you've described no recurrence as to individual plaintiffs between the two complaints.

Are there facts that you dispute or that you think are in dispute when we're talking about standing and mootness, or is it more that everyone is kind of agreeing on the relevant facts and disagreeing on the weight or usefulness of those facts?  Do you understand my question?

MS. JACOBS:  Well, and perhaps if you could clarify for me.  I want to make sure that I do correctly understand.

I think that throughout, you know, the preliminary injunction, throughout -- things that have been submitted by the defendants, I don't think that we're necessarily agreeing that all of the allegations that plaintiffs -- I mean, we understand that there's allegations.  I don't think that we are in agreement that those violations existed.

THE COURT:  Not expecting you to concede that.  More focusing on the temporal-type issues and the likelihood of recurrence-type issues, rather than whether what went

down went down as it's alleged in the FAC.

MS. JACOBS:  I do believe that we are in dispute over whether there's a reasonable likelihood of future injury in that even at the announcement and the ending of Operation Metro Surge, the plaintiffs' potential risk of future injury becomes so hypothetical and conjectural that they cannot first maintain Article III standing, but subsequently, I mean, talking about them both kind of similarly, if, you know, for purposes of mootness, they've been unable to establish that there is additionally any live controversy to exist now that Operation Metro Surge --

THE COURT:  Let's hit pause.  You just said in the question of mootness, they have been unable to establish.  You bear the burden on mootness, correct?

MS. JACOBS:  Yes, Your Honor.  I apologize.

THE COURT:  That's okay.

MS. JACOBS:  I'm trying to take them both together.

THE COURT:  And I'm trying not to fall into the same trap.

They bear the burden of standing.  You bear the burden on mootness.

MS. JACOBS:  Yes.

THE COURT:  As well as the burden of establishing that the voluntary cessation exception does not apply?

MS. JACOBS:  Correct.

THE COURT:  Okay.  So presumably that is where we do get into some factual disputes about, for instance, Mr. Easterwood's declaration about immigration agents that are now in Minnesota being focused on other things, the incarcerated people who are undocumented and taking those folks into custody or fraud investigation, things like that. So that is a factual area that appears to be in dispute or that you are raising facts about the termination or change.

Is there anything else like that that you can think of that's factually critical for either -- I guess it's for mootness at this point.

MS. JACOBS:  I mean, I believe that the main -- well, obviously, Your Honor, the fact that Operation Metro Surge has ended, that there has been such a significant drawdown of surged agents and officers, I mean, I would agree that that is what is in dispute and that is one of the main points, aside from the fact that even based on plaintiffs' allegations, I mean, aside from generally just disputing many of the allegations, that they have not been able to establish Article III standing and that it kind of -- it goes into somewhat of the mootness argument because there is no likelihood of subsequent harm, especially in light of what has occurred in the ending of Operation Metro Surge.

THE COURT: So is there anything in the factual record before me from the government that says they will not come back?

MS. JACOBS: I don't necessarily -- well, the operation has ended. I don't necessarily believe that -- well, what's in the factual record is that there was an announcement to the end, that Operation Metro Surge has drawn down. I think -- and I do have updated numbers if the Court would like.

THE COURT: Sure. I am curious about that. Thank you.

MS. JACOBS: Yes. So in the Easterwood declaration, there had been a decrease in immigrations and customs enforcement from 3,000 down to under 500. I will refrain from trying to do math on the fly here, but under 500. And then subsequent to that, as recently as last week, it has now drawn down to under 300 officers related to Immigration and Customs Enforcement. And then the Customs and Border Protection was originally 1,029, and it is still zero. Now, that has been -- not that they're doing at the airport, typical assigned Customs and Border Protection, but there has not been surge resources related to Operation Metro Surge. That number is zero.

THE COURT: Okay. Thank you.

So one of the -- but you've provided facts about

the announcement of the drawdown and then the subsequent proof in the pudding of the drawdown in terms of numbers and attestations of types of enforcement activity that are ongoing with those numbers, but you don't have anything in the record -- I'm just making sure I understand my record -- that says, we can't do it again, we won't do it again, we won't do Operation Metro More Surging, or we will not again do these kind of at-large arrests that we saw.  We don't have any declarations or attestations of a plan for the future not to resume these activities.

MS. JACOBS:  Well, Your Honor, in terms of law enforcement, I think that that's a tricky situation.  I agree that there has been no definitive statement that there will never be a surge of law enforcement resources in the Twin Cities area for any purpose.  What I --

THE COURT:  Well, that's an overstatement of what I'm talking about here.

MS. JACOBS:  Okay.  I apologize.

THE COURT:  That's all right.

MS. JACOBS:  I guess I mean for the immigration enforcement purposes.

THE COURT:  Yeah, in that realm.

MS. JACOBS:  Yes.  But I think that the end of Operation Metro Surge and the subsequent, you know, huge drawdown -- even just for Immigration and Customs

Enforcement, we're talking over 90 percent -- drawdown, we've had information that they're going to be operating, you know, still in some Immigration and Customs Enforcement but also related to other issues --

THE COURT:  You've got to slow down just a little bit.

MS. JACOBS:  Sorry.

THE COURT:  That's all right.  I do the same thing.

MS. JACOBS:  So I don't know that from the defendants' perspective there has to be an absolute 100 percent definitive say on behalf of the government that something couldn't occur in the future.

THE COURT:  So let's talk about *Lyons*.  *Lyons* is a fascinating case.  It's older.  I mean, it's 1983.  And in *Lyons* -- obviously, we've talked about *Lyons* in the standing context.  It was something we discussed a lot when we were talking about the preliminary injunction.  I distinguished *Lyons* from a standing perspective at that time.  I know the government disagreed.

But today I'm struck by *Lyons'* discussion on mootness.  And they make really short shrift of the government's invocation of mootness, saying that the case is not -- so in *Lyons* there were two kinds of chokeholds at issue.  One kind had been subject to a ban in any

circumstance, and the other kind had been subject to a moratorium.  And neither of those were enough for the Supreme Court to find mootness through voluntary cessation because they said that the moratorium by its terms is not permanent, intervening events have not irrevocably eradicated the effects of the alleged violation, and basically they say there's no guarantee that they couldn't change their mind and do it again.  So it's a pretty robust requirement.

Here, we have the government doing kind of the opposite.  They are saying -- Mr. Homan said at the time that he announced the drawdown, that we can come back at any time.  And there's nothing in this record that the defendants have said, We have changed our policy, We won't be doing the sorts of things that are complained about in the complaint.  In fact, the government is robustly defending the legality of what was complained about in the complaint and has done so at every stage.  And you don't point to a single official saying, We won't come back or we won't do this again.

So how do I get to voluntary cessation -- or how do I get to mootness despite the voluntary cessation burden on the government in a case like this?  It's more than just, we've stopped.

MS. JACOBS:  Well, Your Honor, I think that the

evidence that is part of the record suggests that -- and as Mr. Homan said, is that it was ending and it has come to an end. We've submitted subsequent information that's specific to Operation Metro Surge. It has drawn down to such -- well, it has ended. But then even the presence of surged agents and officials have declined to such an amount that it would be wholly hypothetical and conjectural, you know, for purposes of the *Lyons* standard, for plaintiff to encounter an officer or agent again, let alone that they allege any type of injury but --

THE COURT: But that's standing. I mean, this is where I'm kind of trying to tease these concepts out, because for some reason, this jurisprudence talks about standing being decided at the moment of the filing of the complaint -- and here, we'll talk in a minute about which date that is -- and mootness kind of being how standing lives during the life of the case. And mootness is your burden.

So it's a strange gap where you have to prove that it is moot -- or demonstrate that it is moot, and you have to demonstrate that if it is moot because of something your clients have done, that there is no likelihood of recurrence. It's a pretty high standard.

MS. JACOBS: Well, Your Honor, just as a brief statement on -- for purposes of mootness, to the extent the

Court would be considering that it be dismissed on that basis, I mean, I think that there is one relevant point to make in that, you know, presumably it would be without prejudice, but the factual predicates on the ground here in Minnesota that would affect -- that have consistently shown not to subsequently affect the plaintiffs would have to change to a degree that it would be most appropriate for there to be a subsequent separate lawsuit.

But for purposes of --

THE COURT: Wait. I'm sorry. I didn't quite understand. Can you explain that?

MS. JACOBS: Well, Your Honor, I mean, Operation Metro Surge has ended, so to the extent there would be any subsequent law enforcement action that would elicit, you know, complaints by the plaintiffs, there's kind of two things here. One is that the plaintiffs have not alleged subsequent injuries in the, you know, five months now that we have been within this litigation. But then even presumably, you know, we can't look into the future to necessarily say that the exact same circumstances would require a similar law enforcement presence. So I think the most appropriate recourse at that time would be the filing of a subsequent lawsuit by, you know, presumably different plaintiffs that would arise in connection to that litigation.

But on the -- I apologize.  I'm looking through my notes.

So, Your Honor, I think that there is some distinction to be made.  I think that you had stated that there has to be some definitive statement that it's not going to reoccur --

THE COURT:  No, not necessarily.  That's kind of -- it's not like there was a statement in *Lyons*.  There were policies implemented that revoked the practice, so there was like a governmental disavowal.  Here, we certainly don't have that, but we also don't have any statements -- in fact, we have a statement saying we could come back.  I didn't mean to so narrowly cabin that there's only one way you could prove it.

But here, like we have these extensive battles going on in Congress and with the executive about the funding of DHS.  I'm not looking to fall into, you know, political talk, but there's a lot of conversation about whether there's going to be any admission that the conduct that ICE agents engaged in while they were in Minnesota was unlawful or not.

So we don't even have a sort of government consensus or even a suggestion by defendants acknowledging that what happened was unlawful that would give -- that's one of the ways courts have followed voluntary cessation --

or cessation -- now I'm going to forget how to -- cessation of the conduct is they've acknowledged wrongdoing and repealed the conduct. That's one way. Or a change in policy is one way. I would think an express disavowal would be one way.

I'm not saying it has to be any one of those. I'm saying, though, that you have to do something other than just, we stopped, because if it is just "we stopped," then mootness and standing are indistinguishable and the voluntary cessation exception has no teeth.

MS. JACOBS: Well, I think that what -- the way that we've distinguished it here is that, you know, the standard requires that there's -- no reasonable expectation remains that the alleged injury will reoccur.

And here, you know, there has been a statement of an ending, and I think that -- of an ending of Operation Metro Surge. That has only been shown through repeated steps, declarations indicating the drawdown, and then also the lack of plaintiffs' allegations subsequent to that drawdown.

So I think for purposes of no reasonable expectation --

THE COURT: But that standard is -- I'm not trying to be pedantic, but the no reasonable expectation that it's going to recur, all of that language comes from the standing

universe, which I want to talk about in a minute.  The mootness universe, which imports the standing language in mootness also has the voluntary cessation exception, where if the way we don't have the likelihood of recurrence, which let's credit for the purpose of this conversation as of today, let's say no likelihood.  They couldn't make a standing showing as of today.  Let's hypothesize that. That's not enough to get a mootness dismissal if the reason that is true is voluntary cessation.  That's what I'm trying to kind of push you on here.

MS. JACOBS:  Yes.  Well, and, Your Honor, I mean, the defendants do believe that in light of the end of the surge, it was announced as an end, it has subsequently only been shown to be an end.  And, you know, as evidenced by that, the lack of subsequent allegations by plaintiffs. Plus, and there's a distinction that I'd like to make as it relates to the Eighth Circuit produce case which does provide leeway to the government for purposes of voluntary cessation.  And there's various cases throughout the country.  I think they state it differently, whether it's a benefit of the doubt or, you know, deference -- deferential standard.

But in that case -- well, in 2020 -- or I'm sorry, excuse me.  Let me take a breath.

THE COURT:  Let's talk about *Prowse* for a minute.

*Prowse* was an interesting case.  And that is an Eighth Circuit case that does suggest this sort of lightened standard for voluntary cessation for the government, and it talks about numerous Eleventh Circuit cases.  I'm going to talk about *Prowse* with opposing counsel for sure.

But one of the things the *Prowse* court said is the defendants there have expressly stated that *Prowse* will continue to receive hormone therapy so long as her treating medical professionals determine that hormone therapy is clinically indicated or recommended for her.

So under these circumstances, the prison administrators have established that the unconstitutional conduct could not be reasonably expected to recur.

So the defendant said, We are not going to do X again.  We are not going to cut off her treatment unless her doctors tell us to.  We are not going to reimpose -- so in *Prowse*, although they do have that softening language, they have an express commitment not to resume the complained of practice.

MS. JACOBS:  Unless something changes, such as by her healthcare providers, to change --

THE COURT:  As opposed to what the -- the case was about, it's not about the healthcare providers.  It's about in the face of a prescription, the BOP was refusing.  And the avowment is we will no longer refuse unless her doctor

tells us to.  So it is a 100 percent change of the contested policy.

MS. JACOBS:  Well, I guess I would say Operation Metro Surge has ended, and there's no reasonable expectation that -- you know, that Operation Metro Surge will necessarily reoccur at this time, but unless the conditions on the ground were to change, then I think that that's where the reservation of the federal government, law enforcement, that there could be potential, you know, future instances. But then that's where, from defendants' position, it would be most appropriate for a subsequent lawsuit, assuming that the Court would be dismissing without prejudice, because it's likely to involve different plaintiffs, different facts on the ground to necessitate a different law enforcement action.  But what has been stated is that Operation Metro Surge is over.

THE COURT:  Okay.  Thank you very much.

Other than *Murthy* -- hang on one second.  Sorry.

MS. JACOBS:  Your Honor, can I make one quick clarifying point?

THE COURT:  Of course.  Give me one second to see if my computer is working.  Okay.  It is.

I had interrupted you when you brought up *Prowse* and you were trying to finish a point, and I got us derailed, so feel free to finish that one too.

MS. JACOBS: Yes. Well, I wanted to just to make sure to note, you know, for the Court, you know, there's the *Fikre* decision. I believe it's *FBI vs. Fikre*. So that case does, in a one-line statement, essentially say that the government is held to the reasonable expectation that no subsequent injury will recur for purposes of voluntary cessation. But I do want to refine that point that that's a 2024 decision. You know, and in consideration of *Prowse*, that it is defendants' position that once the government meets that initial showing, then it is generally -- that *Prowse* would still apply and that the government would receive some amount of leeway for purposes of voluntary cessation. Does that make sense?

THE COURT: No. Can you say it one more time?

MS. JACOBS: Yes.

THE COURT: My fault, not yours.

MS. JACOBS: No, no, no.

So I wanted to make sure that the Court is aware of the distinction that I intend to make as it relates to the *Fikre* decision and the *Prowse* decision. *Fikre* occurred in 2024 and essentially it's still making its way, I think, through the lower courts from the Supreme Court wherein it does state that for purposes of voluntary cessation, that the government is held to the similar burden of that there's no reasonable expectation that the alleged injury will

recur.

However, I do think that given that numerous circuits acknowledge there to be some leeway or deferential treatment of the government in terms of voluntary cessation, it is the defendants' position that while yes, we have to show that there's no reasonable expectation that subsequent -- that the alleged subsequent injuries will recur, that once that showing is made, then the government, for purposes of voluntary cessation, would then be provided the leeway as stated in *Prowse*.

THE COURT:  So *Fikre* is a 2024 Supreme Court case.

MS. JACOBS:  Yes.

THE COURT:  Postdates *Prowse*.

MS. JACOBS:  It does.  And so that's the -- it's a distinction to be made of -- you know, it's -- and I wanted to make sure that the Court was aware of both decisions and the postdating.  And the interpretation that defendants believe is most appropriate is that while the government is held to the standard for voluntary cessation, that doesn't wholly negate the leeway and the deference that has been provided for throughout the circuits, and I think that it's still somewhat undefined in that sense.  But, you know, arguing *Prowse*, I wanted to make sure that the Court is aware of that distinction.

THE COURT:  Got it.  Got it.  Okay.  Thank you.

Other than *Murthy*, can you point to a Supreme Court case where the court used post-filing conduct to address standing, post-filing factual developments to address standing?

I'll be candid, I find *Murthy* a little bit mystifying because it says point-blank, we assess at the moment of filing, right? Although in *Murthy*, the moment that they were most interested in is the moment that Ms. Hines joined the case, and that's August of 2022. So that did buy them a few additional months from the March of 2022 or the May of 2022 original filing date to fold in some additional conduct.

But the *Murthy* court talks not as much about post-filing, but it does talk about 2023 and 2024 conduct in support of its finding on standing. And *Murthy* is not doing mootness. It says this question begins and ends with standing.

So is there any Supreme Court case that does something similar besides *Murthy*?

MS. JACOBS: Well, Your Honor, I guess I would -- I would have to go down that specific rabbit hole as well. I think what the -- for purposes of *Murthy*, I think the most important language in the clarifying point made by the Supreme Court for prospective relief specifically is that it needed to be demonstrated that in the near future, that the

harm would recur.

So I do not have a citation for you right now. It's certainly something I could submit subsequently. But I think that the language of that decision requiring there be consideration in the near future provides the post-complaint considerations -- or provides that it's appropriate to consider in cases involving prospective relief what would be occurring in the near future of the complaint.

THE COURT: But the question is at least generally viewed to be theoretical, like what the complaint convinces us is likely to happen in the near future. And if the whole what happens after is proof of what's likely to happen were true, then we wouldn't have this constant reiteration of the standard that standing is assessed at the moment of the complaint.

So I feel -- I don't know if *Murthy* is just doing a fudge factor or if they really did sort of stop their analysis at the moment of Ms. Hines joining the complaint and are just referring to the subsequent conduct to prove that they were right in their prediction. I can't quite understand. But they specifically say, I mean, all the standard language about what standing has to show. "The plaintiff bears the burden of establishing standing as of the time she brought the lawsuit and maintain it thereafter." As of the time she brought the lawsuit.

Okay. I guess an additional question -- so you can't point to any other *Murthy*-like conduct from the Supreme Court.

And then we have *Park*, right?

MS. JACOBS: Yes.

THE COURT: That's the Park vs. Park [sic] Service. That's the Rainbow Family case --

MS. JACOBS: Correct.

THE COURT: -- where in 1996 there's the checkpoint that apparently the government conceded was unconstitutional. By the time the case gets to the Eighth Circuit, it's 1999 or 2000.

They have -- they say that it was purely speculative in 1996 that it was going to recur, despite the fact that everybody seems to agree that it did recur annually the next three years. They say standing doesn't allow us to consider that decided moment of the filing.

So if that's true -- and we're talking about standing, not mootness -- everything that's happened since February 13th doesn't matter, right?

MS. JACOBS: I think for purposes of standing for prospective relief, I think that *Murthy* has evolved that standard to where the Court can consider facts of -- you know, as I had stated, to establish standing, they must demonstrate a substantial risk that in the near future.

So I understand that *Park* confined to the first amended -- or to the complaint. I don't recall if it was first amended or not. But for purposes of *Murthy*, I think that there has been a distinction made for prospective relief wherein the Supreme Court has stated that --

THE COURT: But they don't say that in *Murthy*, right? They just kind of quietly do a little bit of it, but they don't -- do they ever say that subsequent conduct in *Murthy* informs their analysis, which they say is made as of the moment of the complaint -- or the moment of the most compelling plaintiff joining the complaint. They -- Hines. Both sides -- both the majority and dissent seem to agree that this one person has the strongest standing claim, and so for the purposes of their analysis, they all just talk about her mostly.

So they might do a little bit of that, although to be honest, it's only at the end of the analysis. They talk overwhelming about 2021 and 2022. They talk about August 2022 as the operative date because that's when Ms. Hines joins the lawsuit. And then they just put in a little splash of 2023 and 2024, but they never say that that means that it's an ongoing assessment of standing.

MS. JACOBS: So that court -- I'm looking at page 69 of that opinion where it does state, you know, But we must confirm that each government defendant continues to

engage in challenged conduct, which is in this case coercion and significant encouragement, not mere communication.  And I think that -- I mean, I think generally throughout that opinion, you know, how is -- and what's it going to occur in the future to be considered without occurring -- without considering facts that are occurring in the future.

So I don't necessarily -- you know, I have the case in front of me and I could come through it.  I don't necessarily recall that there's an explicit, you can consider things after the complaint.  But I do believe through the reasoning and -- I do believe through the reasoning of that case and given that it was specifically stated for purposes of prospective relief, that the Court did, in fact, consider information subsequent to the complaint.

So it is defendants' position that it is appropriate.  I think I've already stated that defendants -- it is also our position that even if the Court were to cabin its consideration to the first amended complaint, we still believe that it's insufficient alone, without taking the additional information -- or the subsequent factual developments into consideration.

THE COURT:  What's your best case for the idea that the relevant date here is February 13th as opposed to December 17th, or that the relevant question is February

13th for everybody as opposed to December 17th?  I mean, honestly, that feels correct to me as well, but I'm trying to understand where that lives in the law.

MS. JACOBS:  Sure.  And, you know, I think throughout my -- that's not necessarily -- I guess to rattle off a case at this moment, I think throughout the cases that I've reviewed and that we reviewed in preparation of our motion, you know, perhaps it's one of those things that seem to be common practice of the operative complaint being the one that was considered.  So I hesitate to, you know, point to a specific case outside of our briefing, but just --

THE COURT:  Okay.  That's fine.

I had another couple of questions.  Can I ask you what you think this means?  Hang on.  I made the mistake of not numbering my pages.  It's the worst.

So they do it in *Murthy*.  They do it in a bunch of cases.  But in *Murthy* the Court says, after saying the plaintiff bears the burden of establishing standing as of the time she brought the lawsuit and then it says, "must support each element of standing with the manner and degree of evidence required at the successive stages of the litigation."

So let's put a pin in our conversation right now, which is motion to dismiss based on the face of the complaint.  Does that mean, in your mind, that when we get

to summary judgment, hypothetically speaking -- let's say I denied the motion to dismiss, we get to summary judgment -- we're no longer looking at whether there was standing at the time of the complaint.  We are then looking at whether there is standing for injunctive relief at the time of summary judgment or trial.  Is that what you think that means, or do you think that means something different?

MS. JACOBS:  Your Honor, do you have the page number?

THE COURT:  Honestly, I'm looking at the *Murthy* opinion from the Supreme Court, but it's pretty far up.  It's in A, but they say it over and over.  They say this in -- the Eighth Circuit says it, the Supreme Court says it, "must support each element of standing with the manner and degree of evidence required at the successive stages of the litigation."

And I'm trying to understand whether that is suggesting that standing is something that must be continuously proven, or is that that you view the showing of standing through the evidentiary framework of each stage of the litigation?

But it's not really fair to expect you to answer that if you don't have the quote before you.  What do you think happens at summary judgment?  Let's put it like that.  Since this is purely injunctive, not damages, an injunctive

relief requires a showing of the possibility of future harm. Am I deciding that question as of that moment, or am I deciding that question as of February 13th, 2026?

MS. JACOBS:  Yeah.  Your Honor, I would think that it would be at the moment of the -- within the summary judgment briefing based on the briefing at summary judgment and what's occurring at that time.

THE COURT:  Okay.  I just have a couple more questions for you.

So one of the things that I think is a little unique here is the claims related to Mr. Doxsey.  He alleges that ICE told him that he is being placed in a database for domestic terrorists.  And then there's a supplemental nonparty declaration that somebody and their spouse had their global entry suspended because of -- they believed, because of their participation in protest activity.

Unlike these conversations that we've generally been having, without saying it out loud, about the arrests and the, you know, retaliation in the context of protests at the moment of the protest, these are allegations of kind of ongoing harm as First Amendment retaliation.  And so they're not ameliorated, arguably, by the end of Operation Metro Surge.  They're not mitigated by the reduction in officers on the ground because they're ongoing, despite the termination of the operation.

Do you have a specific mootness or standing observation or argument about that ongoing presence in a database or similar allegations?

MS. JACOBS:  Your Honor, may I just have one moment?

THE COURT:  Of course.  Take your time.

(Counsel confer.)

MS. JACOBS:  Well, Your Honor, I mean, as we had stated in our brief as it relates to nonparty declarations and then also as -- you know, I know that in the order on the preliminary injunction, the Court had relied on a statement arising out of *Chicago Headline* for consideration of nonparty declarations.  Related there, obviously, the *Chicago Headline* case has subsequently ended as moot, and even the Seventh Circuit, subsequent to the finding of mootness without prejudice, issued a subsequent opinion on that decision.  So for purposes of nonparty declarations, we do not believe that they are applicable for purposes of standing.

And, you know, this allegation by Doxsey of a statement by an agent -- I guess, an uncontested -- or I mean, there hasn't been any evidence that that has actually occurred to plaintiff -- that the actual being put on a list of --

THE COURT:  Yeah, but we're not at the evidence

stage.  No disrespect.  We're at the allegation stage.  And the allegation is that your clients told him that this was happening.  So at least at this stage I have to accept as true the allegation that some defendant told him he was going into a database of domestic terrorists.  Whether it's true or not is an important factual question.

MS. JACOBS:  I'm sorry, Your Honor.  Could you repeat your original question?

THE COURT:  I'm just trying to -- a lot of your arguments about mootness and standing have to do with, appropriately so, with the bulk of the claims in the complaint, which have to do with these at-large arrests and the at-large protests by observers and protesters in the kind of unique setting of Operation Metro Surge, right?  But there are some parts of this complaint that are not that, and the most clear one which has an allegation of ongoing harm is this being put in a database one.

And I referenced the global entry, you're right, it's a nonparty allegation.  It is included in the complaint.  It isn't just a nonparty declaration outside of the complaint, but it isn't a party.  We can quibble whether I agree that that bears no relevance.  But at a minimum, we have a plaintiff saying he was told he was being put in a database for domestic terrorists.  It feels like that is meaningfully different in terms of likelihood of recurrence

because that's actually alleging ongoing harm.

MS. JACOBS:  Of whether or not he would, I guess, today remain in --

THE COURT:  In the database of domestic terrorists.

MS. JACOBS:  I guess, Your Honor, I mean, you know, there's the statement that he alleges was made by the agent.  And then outside of that, there's, you know, no known subsequent information to show that he is actually in the database, and I certainly -- I would not have that before me today to address.

But as far as the nonparty declarations, while they may be a part of the complaint, you know, for purposes of *Park* and *Spokeo*, you know, the injury in fact element of standing requires a showing by the plaintiff faces a threat of ongoing future harm.  And, I mean, I think that it goes into our position here today that Operation Metro Surge is over, and the likelihood of encountering agents related to Operation Metro Surge by any of the plaintiffs, that that is hypothetical and conjectural.

But outside of like the specific allegation of whether or not any potential list were to have occurred outside of just, you know, an alleged statement by an agent, I don't have information today on -- you know, specifically to Plaintiff Doxsey's statement.

THE COURT: And I'm not looking for information, because that would be facts.

MS. JACOBS: Sure.

THE COURT: I'm trying to understand your -- would you concede that, as alleged, being placed in a database of domestic terrorists in alleged retaliation for First Amendment conduct would be an ongoing harm even after the agents have left, aside from everything else in this complaint?

MS. JACOBS: I think given that we are -- if the Court's position is that we're confined to the allegations of the complaint, then I think that defendants would require a subsequent opportunity to specifically respond to these specific allegations rather than conceding, you know, what would have occurred between a particular individual --

THE COURT: I'm not asking you to concede facts. I'm asking you whether you agree -- at this stage, we have to accept the complaint as true. I understand if this case goes forward, there will be discovery. It may be untrue. But as alleged, somebody exercised their First Amendment rights and was told that they were being placed in a database for domestic terrorists. They allege that that is retaliating against them for First Amendment conduct.

All of your arguments about mootness and standing focus on the fact that the agents are gone and, therefore,

there are not at-large arrests and concomitant protest activity leading to alleged excessive response to protest activity, which is what the rest of the complaint is about. And so if I credit your arguments, all of that is gone now. That's moot or didn't have standing in the first place or some combination of the two.

This isn't that. This doesn't matter that the agents are gone. It doesn't matter that the officers have -- that the operation stopped, because it is ongoing.

So I'm asking you if you have a specific mootness or standing argument as to that part. I don't want you to concede the facts, because of course you couldn't. What I want you to concede or not concede is, is it correct that your standing arguments don't cover that allegation? Like let's say I granted the motion to dismiss in part and left that part of the case alive. What can you point me to that there is mootness as to that allegation, which is a plaintiff, not a third-party declarant? You can mull this over and talk and reply, if that would be helpful.

MS. JACOBS: That would be very helpful. Thank you, Your Honor.

THE COURT: Thank you.

MS. JACOBS: Is that all?

THE COURT: I think that's all. Anything else you want to say?

MS. JACOBS:  Well, one thing, Your Honor, in light of -- I think when we're considering the motion to dismiss or the standing piece, I do think that it's significant to the extent -- and I'm not saying that it is -- obviously I'm not correcting my arguments that it would not be moot or that the plaintiffs would not have standing as it relates to some of the components within DHS.  However, I do think that it is important to note that Customs and Border Protection has, you know, maintained that there are zero officers surged to the area.  So to the extent the Court were to consider a partial dismissal, I would think that it would be appropriate to specifically exclude the component of Customs and Border Protection.

THE COURT:  Okay.  Thank you.

Why don't we take a quick break because I think this will take a little bit of time, and I want to give Paula a break and myself a quick break.  Why don't we take five to ten minutes and then come back and we'll get started with questions for the plaintiffs.

(Recess taken 10:05 a.m. until 10:19 a.m.)

THE COURT:  All right.  Sorry to put you back on the hot seat when you thought you were done.

I read *Fikre* while we were on the break.  I had glanced at it before, but I re-read it for real, and I think I need to re-hear your argument about how the Eighth

Circuit's decision that the government gets a little bit of a pass in voluntarily -- in proving -- I mean, not a pass. I'm not trying to overstate your argument. But that the government is held to a less robust showing with respect to voluntary cessation than private parties, because it sure doesn't seem like that from *Fikre*, and I wonder -- I feel like you were trying to give me a line of analysis that I wasn't understanding and I'd love to hear it again.

MS. JACOBS: Sure. Your Honor, I have it before me as well, and so I would -- I want to make sure that I'm not -- okay. So in that case, the Court stated that to show a case is truly moot, a defendant must prove no reasonable expectation remains that it will return to its old ways. And it, you know, just as kind of a broad, general assertion, it states that that much holds for government defendants, no less than for private ones.

So I do -- the point that I was making is that there has been, throughout various circuits, and as we briefed as it relates to *Prowse*, that there has been somewhat of a deferential standard applied. I think that that -- or the way that I'm understanding that to be is that the government does have to show that there's no reasonable expectation that, you know, what had occurred in the past would reoccur.

I think given the end of Operation Metro Surge,

given the fact that there's been no subsequent allegations of plaintiffs, the reduction of the officers and agents, I do believe that the government has met that standard. And I think that when we were looking at specifically this case, it kind of throws in that language, and then I think that to me it suggested -- or at least in light of all of the other cases that have held that there is some kind of deferential or leeway standard, they're in our brief and in the Eleventh Circuit briefing that *Prowse* adopted. I don't know necessarily that this language in this case forecloses all leeway subsequent to that showing, so I think --

THE COURT: This is a case that has an express disavowment, which we do not have in our case. But in the *Fikre* case, the government specifically delisted him and said in an affidavit, We will not relist him based on what we know right now. And the Supreme Court says, That's not enough for voluntary cessation, and the robust showing applies with equal force to private entities and the government.

So I really wonder if Judge Kelly in the Eighth Circuit, in the case where she cites the Eleventh Circuit cases, would reach that same decision -- could reach that same decision in the wake of this 2024 opinion?

MS. JACOBS: So I think that some of the facts are important in this case, and that was that Mr. Fikre was

placed on a -- he was requested to be a government informant as it relates to a specific religious organization. He declined to do so and was -- I don't recall if he was asked to be an informant before or after he was placed on the No Fly List, and then -- but they wouldn't provide the specific justification as to why he was placed on the list. And so I think that the suggestion was is that if he returned to what he had been doing in the past, that while they had taken him off the list, they couldn't say that necessarily he wouldn't be placed on it again in the future.

I think that there is some distinction to be made is that in this case, the government has definitively said that Operation Metro Surge has ended and --

THE COURT: But they've also said, We can come back. And they haven't said they won't come back and they haven't said that anything they did they wouldn't do again, which is where this is starting to feel analogous, because the Supreme Court in *Fikre* says, the fact that they could do it again and they haven't -- even though they said they're not putting him back on under current circumstances, they haven't said they won't put him back on under future circumstances, that's not enough.

MS. JACOBS: I think, though, there's a distinction to be made as it relates to a singular individual being placed on a list by monitored activity by

the government that is likely to repeat itself.  Like the same action, the No Fly List.  If he's conducting in this, you know, religious organization -- if he's acting within this religious organization as he had in the past, it's unclear -- if I recall correctly, it's unclear what got him placed on the list in the first place or it wasn't like explicitly stated.

I think a distinction can be made that here, the operation has ended.  I don't think that it's reasonable to assume that there can be a foreclosure on potential law enforcement actions in the future depending on the facts on the ground at that time.

And so I think that from the defendants' perspective, the suggestion is that any subsequent operation would rely on subsequent factual predicates, and then the plaintiffs at that time, they can bring a lawsuit as it relates to that.  But for purposes of this litigation and dealing with law enforcement, I mean, the surge has ended.  We can't predict necessarily what's going to occur in the future in the enforcement of those laws.  I don't think it would be reasonable to assume that the government could absolutely foreclose a future operation of any kind.  But what it has done is it has said that Operation Metro Surge --

THE COURT:  Well, it's not so much that the

government has to disavow a future operation.  It's that unless the government does, the case isn't moot.  It's not saying that you lose the case.  You might be vindicated -- your clients might be vindicated that what they did was lawful.  It's that the case isn't moot, absent a more robust disavowal than in *Fikre*.  And we don't have any disavowal here.  We actually have Mr. Homan saying, We could come back.

MS. JACOBS:  And the defendants' position is that would be based on separate factual predicates that would necessitate a new lawsuit, but as far as Operation Metro Surge, it has ended.

THE COURT:  All right.  Thank you.  Thanks for that.  I wish I had been a little more prepared so I could have talked to you about that the first time I had you up here.

MS. JACOBS:  No.  Thank you.

THE COURT:  And let me ask you, Mr. Newman, most of my questions, as you know, are focused very much on the standing mootness issues.  Is there anything you want to flag that isn't in the briefing or that seems important with respect to the merits?

MR. NEWMAN:  Yeah.  Thank you, Your Honor.  I'll be brief, but I do want to make three points.

THE COURT:  Okay, great.

MR. NEWMAN:  First of all, I think at a minimum, Your Honor should dismiss the First Amendment claims of the mobile observers who were following in vehicles.  Your Honor noted in Footnote 24 of your preliminary injunction opinion that none of the case law that Your Honor had found clearly supports a conclusion that that's protected First Amendment activity.  The plaintiffs have had plenty of time to try to look for cases.  They haven't found any.  The closest they came was a case, *Thurairajah* --

COURT REPORTER:  What was the case?

MR. NEWMAN:  *Thurairajah v. City of Fort Smith*, where a passing motorist yelled a profanity at an officer as he drove by.  So that's far afield and that's the best that they could come up with.

So in our view, this is -- following an officer on roadways is not First Amendment protected activity.  They haven't found any case law to support that.  And so at a minimum, I think that those plaintiffs should be dismissed, which is also relevant to one of the standing issues that Your Honor raised with Mr. Doxsey.  Because if you look at those allegations, he was following an officer, and after he was stopped for following the officer is when the officer made that remark about, you know, that he would be added to a database, although there's no allegation in the complaint that he actually was added to the database.  But if Your

Honor concludes that the act of following is not protected First Amendment activity, then I think that that would take care of Mr. Doxsey's First Amendment retaliation claim, which could have an effect on how Your Honor sees the standing analysis.

THE COURT:  Okay.  Point two.

MR. NEWMAN:  Okay.  Point two just is a more general matter.  I'm not going to, you know, rehash all of our other merits arguments, but I just wanted to make the general point that, you know, we acknowledge that Your Honor had preliminary analysis that was against our position on a number of the other 12(b)(6) issues, and I just wanted to underscore that, of course, a preliminary injunction is preliminary and we think that it's particularly warranted to take a careful look at these issues in light of the fact that the Eighth Circuit issued an opinion that said that we had a strong likelihood of succeeding on our appeal.

And even though the Eighth Circuit's opinion mostly focused on scope of relief, I do think that some of it touches on the merits.  I mean, they -- they determined that it would be improper to enjoin officers from using pepper spray and similar tools, even on peaceful and unobstructive conduct, because the officers faced a fast-changing mix of peaceful and obstructive conduct, making it difficult for them to decide who crossed the line.

And I think that that's obviously not determinative but perhaps suggestive of how they might have viewed the merits on the retaliation claims.

And also, the plaintiffs asked the Eighth Circuit to vacate the stay opinion when the appeal was mooted and the Eighth Circuit denied that. So I think that given how things have developed, it's worth giving those issues careful consideration.

And then my third and final point, I just wanted to call Your Honor's attention to a recent opinion of the Ninth Circuit in a case involving ICE protests. The case is *Dickinson v. Trump*, the Westlaw cite is 2026 W.L. 1133353. It's a Ninth Circuit opinion from a week ago, and it stayed a preliminary injunction issued by the district court in a case involving protests at the ICE facility in Portland, Oregon. And there were protests that involved a mix of lawful protests and some unlawful and obstructive activity, and the officers responded with a mix of, you know, pepper spray, tear gas, arrests, some of the similar force that was used in this case. And the Court held that they were not likely to succeed on their First Amendment retaliation claim, essentially noting that because the officers have a right to respond to unlawful activity when they're faced with these volatile scenes, that's not sort of a sufficient hook to find retaliation. So I just wanted to call that to

Your Honor's attention.

THE COURT:  Excellent.

MR. NEWMAN:  Thank you.

THE COURT:  Thank you very much.

Okay.  Ms. Fisher, do you agree that I assess standing as of February 13th?

MS. FISHER:  Not totally.  So we agree as to the additional plaintiffs that February 13th is the correct date.  As for the initial six plaintiffs, we think it's December 17th.

THE COURT:  What's your best case law for that idea?

MS. FISHER:  I actually think it's probably *Murthy*, which like you, I find complex in many ways.

THE COURT:  But in *Murthy*, it was a generous reading, right?  In *Murthy*, they were given the benefit of that date by focusing on the claims of the -- not trying to saddle *Murthy* with the early -- or saddle Ms. Hines with the earlier date.

You're asking for the opposite.  You're asking for me to view in amber the claims of the people who were in the cases of December 17th while you get to benefit from amending on February 13th.

MS. FISHER:  So I agree that it is the opposite.  I still think, taking a step back, *Murthy* is instructive in

that it restates the general principle that it is the time of filing that governs and then specifies for Ms. Hines a different rule. So I, again, acknowledge that it's the inverse, but the fact that the Court goes out of its way to note that something different applies to Ms. Hines suggests to me that the inverse can be true. And I do think that the best part of the opinion for focusing on August 2022 is Footnote 10. I think that's where the Court really hones in on that.

I don't have -- so we don't have a Supreme Court case that I can point to that I think addresses this issue, but the best case that we're aware of to date is the one from the Sixth Circuit, the patent case, where the Sixth Circuit does say, When there is an amended pleading, explicitly, we judge standing by the date of the initial complaint but in view of, you know, whatever the amended claims and allegations are at the date of amendment. Again, I acknowledge not Eighth Circuit, not Supreme Court, but that is the case that we found that most directly addresses that distinction.

THE COURT: So I want to kind of jump to a question that's not really briefed, but I'm thinking through the implications of how this works. Would you agree that at the stage of summary judgment, I have to decide the case whether there is a likelihood of recurrence at that time?

MS. FISHER:  So I think this gets to the questions -- or your colloquy with Ms. Jacobs regarding, you know, what does it mean when the cases say, you know, it depends on whatever the level of evidence is at the subsequent stage of the proceedings.  I think that that's just a matter of what level of proof are we talking about?  Is this a fact dispute at trial?

THE COURT:  But it can't be -- I mean, yes, I think you're probably right to an extent, but it can't be that I would issue an injunction in two years, hypothetically speaking, because two years ago your clients alleged the looming threat of irreparable harm if I find at the time of the injunction that there is no longer a looming threat of irreparable harm.

MS. FISHER:  So we think that gets to the difference between what is ultimately the appropriate remedy here, which isn't briefed right now, undoubtedly will be a question down the line.  Of course, injunctive relief is equitable.  We will have to make sufficient proof that it is in the interest of equity for this Court to exercise its discretion to enter an injunction.

But in terms of standing --

THE COURT:  And I can't -- but it feels like this matters because I'm having a hard time -- let's say, hypothetically, that I believe that today you would lack

standing but that the government is challenged in showing voluntary cessation.  I am nonetheless supposed to have this case proceed for two years, hypothetically speaking, maybe longer, maybe less, discovery and everything else, knowing that if you lack standing today as to these plaintiffs, because standing has to be shown to each and every plaintiff, likelihood of recurrence for each claim that that plaintiff is on, that I'm not going to be able to issue injunctive relief on behalf of your clients because that standard couldn't be met in two years if it can't be met now, but I'm supposed to let it keep going if they can't pinky swear to the level of voluntary cessation that they won't resume.

MS. FISHER:  Yes, I think that under the law, the Supreme Court has been clear that voluntary cessation does not moot a claim for injunctive relief.  That comes right out of *Lyons* and a whole host of other cases.  Probably the best case for this what might be somewhat counterintuitive and uncomfortable proposition is Davis vs. -- I think it's the FEC, because there -- it is a summary judgment case, and the Court is still asking:  At the time of summary judgment, was there standing when plaintiff filed suit?  And that really mattered because that was an election context and the election had passed.  And the Court said, yes, there was standing.  There was a different mootness analysis, but

that's -- even though that's in the summary judgment context years later.

And of course that sets aside the separate issue, Your Honor. That's assuming that there are no ongoing and present adverse effects, which we strongly disagree with.

THE COURT: Go ahead. I didn't mean to interrupt.

MS. FISHER: So focusing -- so I guess I can turn to that.

THE COURT: Well, let's stick on the theoretical for a little bit. What's your response to post -- so I'm trying to think about what relevance, if any, to apply to post-filing allegations in the declarations that you've provided. So you've provided declarations about conduct that continues after February 13th, but you're also taking the position that the government can't benefit from -- you know, air quotes, benefit in their jurisdictional argument from developments after February 13th. So how am I supposed to hold those two things together?

MS. FISHER: So Your Honor does not have to consider those, and we don't think it's appropriate to consider those for purposes of assessing standing. This is one of those places where we think --

THE COURT: So why did you give them to me?

MS. FISHER: Because there's also a mootness challenge here, and so -- which is a factual challenge --

THE COURT: Right.

MS. FISHER: -- as has been conceded, and so we are simply needing the record with countervailing facts. And again, we think, if anything, if the Court were inclined to find mootness or even a lack of standing here based on factual challenges, that's the sort of thing where it would be appropriate, in our view, necessary for there to be jurisdictional discovery. I don't think that the Court has to get there because, again, looking at whether we've plausibly alleged injury in fact as of, you know, whether it's December 17th or February 13th, we think the answer is yes. So those declarations are intended to respond to the mootness allegations, not standing.

THE COURT: Okay. That's helpful. Thank you.

What do you think the Court meant in *Carney vs. Adams*, 2020, when they said, "The plaintiff bears the burden of establishing standing as of the time you brought this lawsuit and maintaining it thereafter"?

MS. FISHER: So I will admit, Your Honor, I have not revisited *Carney* in a while, so I can't speak to the specific allegations or issues in that case.

But as a general matter, I think this is something that the Supreme Court talks about in *Friends of the Earth*. Sometimes courts are not as clear and clean with the language distinguishing between standing and ongoing

justiciability as they otherwise should be, and so the way that we would view that sort of a statement is yes, a case must remain -- you know, there must remain a live controversy. But here, when standing is assessed as of the date of the filing, what matters is whether the case then becomes moot thereafter.

And I apologize that I'm not --

THE COURT: No, no, no. Like *Arizonans For Official English*, "To qualify as a case fit for federal court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."

MS. FISHER: An actual case or controversy, agreed, and that's where mootness comes in. But you weigh that against the statements in *Friends of the Earth*, *Lujan* itself, *Davis vs. FEC*, where the Court is saying for standing, for that part of the justiciability analysis, we're looking at time of filing.

THE COURT: So your point is whenever they say -- or you're suggesting that whenever they say this idea of ongoing controversy, they are referring to mootness analysis, and if the ongoing controversy has ceased because of the conduct of the defendant, then we have to explore more. There has to be a robust certainty of nonrecurrence.

MS. FISHER: Correct, Your Honor. We think that

that's the fairest way to reconcile and read those cases together.  And, again, I think it's most -- it's consistent if the Court looks at the fact that standing is being assessed as of the date of filing, even if the Court is analyzing standing at the time of summary judgment, in Davis, after a final judgment, which was the situation in, let's see here, I think *Friends of the Earth* itself, the Court is still looking at standing as of the date of filing.  *Clapper* is the summary judgment case.  Date of filing is the question.

THE COURT:  And I have to assess -- you know, it's this heightened showing -- for voluntary cessation, it's a heightened showing that the conduct will not recur as to each individual plaintiff, not as to a broad swath, right?  So that's part of what *Fikre* is about, because it is as to that specific plaintiff.  It's not sort of a policy-level thing.

So I have to find that the government meets its burden of establishing that it is not -- these things are not going to recur -- a pretty high burden when read through the voluntary cessation lens -- as to the individual plaintiffs.

MS. FISHER:  Correct.  We don't dispute that, and --

THE COURT:  So I have to weigh the odds that now

that -- I mean, to be candid, now that OMS is over and they've left and their officers are not engaging in the at-large arrests, regardless of the number of officers we have here, the conduct that underlies this complaint, aside from the ongoing database stuff, is overwhelmingly gone.  I have to assess the likelihood that, hypothetically speaking, Ms. Tincher gets subject to resumption of specific retaliation that's the same type as she did in the complaint.

MS. FISHER:  And to be clear, you're talking about in the mootness context?

THE COURT:  Yes.  I still have to granularly tie it to each plaintiff and their claims.  Not the big, might they come back or might they do this again.  It's Ms. Tincher.

MS. FISHER:  Yes.  And we think *Lyons* is, as your court -- as the Court noted earlier, really instructive on that point because here, you have the flip side where if -- first of all --

THE COURT:  But *Lyons* disagrees with me in an important way that I think matters here, because *Lyons* allows that individual-level granularity to undermine standing.  So they say not enough on mootness, just of this partial disavowal of the chokehold policy.

MS. FISHER:  Yes, but --

THE COURT:  But they don't agree that there's this risk of recurrence in *Lyons* that I found here in the first stage.

MS. FISHER:  Which makes the claim here even stronger, right?  Because even then, even in that context where there is a concern about a lack of standing, they're still saying, it wouldn't be moot if you focused just on what the defendants are saying they have stopped doing.

And here, defendants can't point to a single case where -- something factually analogous where they say, We will return.  We're leaving a footprint here specifically to deal with agitators.  We've alleged throughout the complaint that the term "agitators" is synonymous with the sorts of people engaging in protected activity, like plaintiffs.  And so there is both no disavowal.

There is also, unlike *Lyons*, standing by the legality of the conduct, right?  And unlike *Prowse*.  And *Fikre*, I agree, I think that it supports this issue.  Like Your Honor, apologies, we probably should have brought it to the Court's attention, but --

THE COURT:  It seems like a really good case, and I'm sort of mystified that I'm just stumbling upon it myself.

MS. FISHER:  Correct.  We agree it does seem incredibly supportive of the idea that the sort of voluntary

cessation here that's being alleged isn't enough if even what was alleged in *Fikre* -- or what had occurred in *Fikre* wasn't enough.

And perhaps a piece of that is that, you know, this argument that there's some sort of, we're going to give more deference to the government, I think that's something that came out more in the reply brief. But we agree with Your Honor's analysis that I don't know that *Prowse* would come out the same way today after *Fikre* and consistent with what the Court is saying.

But even just taking it a step back, we're not aware of any case where the government just stops doing what it was doing and the Court says, That's enough for mootness, right? It doesn't -- and that makes sense, given the standard that applies, right? It's in the context of injunctive relief, the Court asks, Is relief impossible? Right? I mean, here, given the ongoing harm to Plaintiff Doxsey and others, there is possible relief that can be granted. And I want to be clear, it is others and we can talk about that.

But just focusing on the voluntary cessation standard, I mean, it has to be, quote, absolutely clear, right, that they're not going to come back. There's not that sort of record here. It's the government's burden to make that clear. As the Court discussed earlier, there's no

declaration that says they won't come back, and we have public statements to the contrary.

I mean, I think mootness is also challenged here by the fact that there is relief that's possible, and I'd like to speak a little bit about expungement -- the expungement remedy for each of the plaintiffs because in our view, it is broader than just Mr. Doxsey.

Take John Biestman and Janet Lee. They were told by officers -- or agents, We have your license plate. They were filmed. Their faces were filmed.

THE COURT: In *McNaught*, that's the FAA case, the pilot getting the 14-day suspension because she does or doesn't live in Alaska and missed the request for her records. Does this ring a bell?

MS. FISHER: No, Your Honor. I'm sorry.

THE COURT: In *McNaught* -- it has to do with standing and mootness, and in McNaught, there's a 14-day suspension because she doesn't comply with I think it's an NTSB, perhaps, request for her flight records. And they're mailing the requests to the wrong place, and then she fixes her address but still doesn't comply. And then eventually she complies, and they vacate the 14-day suspension but they don't expunge it from the record.

And the Court talks about standing and mootness and describes -- it's a 2023 Eighth Circuit case. It talks

about standing and mootness.  But talks at some length about the ongoing alleged possible reputational harms from having this on her record are not enough to avoid -- I think it's to establish standing in that case, but they talk a lot about how standing and mootness are the same analysis at different times, which we quibble with on voluntary cessation.

It requires a pretty robust showing that things like, I might be listed somewhere, I might be in a database, or I might have ongoing harm from them collecting my driver's license, it requires some fairly robust showing there.

So keep going with that in mind.  That it's not enough just to say, We might -- it's different from like the plaintiff who specifically alleges that they said he's going in a database, right?  Who else specifically alleges that they're told that they're going in a database?

MS. FISHER:  No one else, and we'd be happy to provide any sort of supplemental briefing if the Court wants on that case.

I think what we have here are photographs being taken of people, right, arrest records being created, and that all occurs in the context of the broader policy-related allegations in the first amended complaint and the initial complaint.  I'm thinking about, in particular, paragraphs 81

and 91 where there are discussions about the broader sort of terrorism watch list that is being created and the -- we have alleged that the sorts of individuals that are being added to that list include individuals engaging in the sort of protected conduct that our plaintiffs have alleged.  So at the Rule 12(b)(6) standard, it's our position that that's sufficient to get over a, Have we plausibly alleged that there is some sort of record out there to be expunged?

It, of course, also occurs against the backdrop of some of the experiences of others that are referenced in the pleadings, not the declarations, but the complaint itself, including those who have experienced consequences to travel.

And also, you have the pattern of law enforcement going to people's houses, acting in intimidating ways --

THE COURT:  But not anymore.  I mean, I'm not trying to be semantic here, but there's a difference between the person being on a domestic terrorist list or the person losing their global entry -- two people losing their global entry.  Not plaintiffs, correct?

MS. FISHER:  Correct, Your Honor.

THE COURT:  But in a complaint.

MS. FISHER:  Uh-huh.

THE COURT:  Okay.  Between those and having in the past been followed home.

MS. FISHER:  So that's fair for -- we would agree,

that is a distinction when it comes to expungement.  But I think that what the following is suggestive of this is information that is being used and has historically been used for retaliatory purposes, and especially when you couple that with the allegation about this terrorism list that's being created and the instruction from high-level administrators, We want you to investigate the individuals on this list, We want you to prosecute the individuals on this list.  We think that's sufficient at the 12(b)(6) stage to say that those who have been photographed or other -- I believe that there might also be an allegation about facial recognition technology and how that is being used.  And apologies, I don't have that at my fingertip.

But looking at all of that together, it's our view that there is that sort of broad allegation and context of use, not just gathering -- or, you know, taking a picture at one moment in time, but taking a picture, keeping it in a database with the intention to use it in a harmful way in the future.

THE COURT:  Can you take a pause for just a moment and address opposing counsel's argument that the Seventh Circuit's ruling in the *Chicago Headline* case cabins, in their mind, the relevance of nonparty declarations?  I think that that's the point Ms. Jacobs was making.  I don't mean to mischaracterize it.  And I realized I hadn't brushed up

on that question.

MS. FISHER:  So we think it's -- it comes down to a question of how and when the declarations are used.  So in a -- frankly, I might disagree with that analysis because I do think that in the preliminary injunction context where plaintiffs have to show, among other things, you know, that there is this likelihood -- or sufficient -- I cannot recall the standard, but the sort of immediate harm -- immediate and irreparable harm.  In that context, I do think that the experiences of others are irrelevant.

So I guess we just disagree.  But even more to the point, those declarations are referenced in the complaint here.  They're incorporated by reference into the complaint, so they are fairly a part of the allegations that the Court can and should consider at the Rule 12(b)(6) stage.

THE COURT:  So you suggest that the Seventh Circuit's arguable downplaying of the relevance of third-party declarations doesn't apply when the third parties are discussed in the complaint even if they aren't named plaintiffs?  That there's some elevation of third-party experiences that are captured in the complaint?

MS. FISHER:  Agreed in the context of the allegations here, and that's because taking a step back, what -- you know, ultimately when it comes to standing, we're all just trying to figure out what's sufficiently

imminent, right?  What does that mean?  And I think the Supreme Court has said it's an elastic concept.  It's challenging.

And so, you know, we believe that what's helpful is the Eighth Circuit's analysis in *Park* where it says, Well, let's look at the past practices and statement of future intent.  And here, we do think that that's a helpful way to look at what does -- what is sufficiently imminent, right?  It puts a little bit of meat on the bones of that.

Another way that I've been thinking about it is that it's the flip side of speculative.  And that might actually be in *Clapper* as well.

But looking at past practices, there it is relevant what the experience of others have been because it shows the policy, pattern, practice, of unconstitutional behavior that made it at the time of, you know, whether it's December 13th, which we think is the correct date for those initial plaintiffs, even if -- or December 17th, even if it's February 13th for everyone at that moment in time, was there a sufficient likelihood of some sort of future unconstitutional interaction?  Well, that's where the experience of all of these others who have been subjected to similar unconstitutional conduct is directly relevant because it bears on the past pattern, which is helpful to understanding this concept of imminence.

THE COURT:  I want to talk about chill for a minute.  We talked about chill a fair amount in the preliminary injunction stage.  I forgot to ask Ms. Jacobs about this, and I will.

One of the things about the First Amendment that's different is that there is an ongoing harm suggested in the case law simply from changing your behavior moving forward or from the concern that you will change your behavior moving forward.

Here, it's a little more difficult because the operation that this behavior was very much tied up with, the sort of more mobile grassroots protest activity arising at the scene of mobile law enforcement activity, which is the bulk of the allegations in this complaint.  That type of activity on both sides is over, largely over, but we have allegations of an ongoing deterrent effect on the plaintiffs' future conduct, whether it's because of the database or because of being scared about having been followed.

Do you think that that adds a more lenient lens for assessing sort of ongoing harm than if it were a more concrete injury?  Do you understand my question?  It feels like the Eighth Circuit is particularly open to thinking about the ongoing nature of First Amendment violations, more than ongoing nature of other kinds of violations, because

the speech is sort of deterred.

MS. FISHER:  Yes, we agree.

THE COURT:  Good answer to my terrible question.

MS. FISHER:  And, again, I think the relevance of that is different for mootness and what an ultimate appropriate remedy might be following summary judgment or trial than it is to standing, because if you look at -- you know, just take February 13th, there are still, according to the complaint, first amended complaint, 2,000 officers on the ground.  At that point, absolutely.  It's not the same situation as it is today, but that's the moment in time that chill and standing -- chill in the context of standing should be assessed.

THE COURT:  You talk about the -- I know we're not here on the motion for jurisdictional discovery but, you know, frankly, it's kind of intimately woven into this.  And you suggest that the jurisdictional discovery you'd like to take would be testing out how many officers are here and what they're doing, but also testing out sort of statements and plans and policy-level articulations of the likelihood of coming back or starting it all up again.

Am I correctly understanding what you'd like that discovery to look like?

MS. FISHER:  Yes, I think that's a fair summary. You know, the discovery is -- or the proposed request for

production at least, are attached as an exhibit to the motion for jurisdictional discovery. We do think that there's really good reason not to get there in the first place, because I believe this comes from the *Disability Support Alliance* case from the Eighth Circuit. But the Court is hesitant to go down a jurisdictional discovery path when it's so intertwined with the merits.

And here, I mean, a lot of the arguments that Ms. Jacobs has made regarding mootness or even regarding, you know, standing as of February 13th, are intertwined with ultimate remedy, the appropriateness of ultimate injunctive relief, expungement, and whereas here, every -- it's just inefficient. It doesn't make sense to go down that wormhole, separate from just proceeding with the case as a whole. We're certainly happy to do that. We'd prefer that to having a case dismissed on the basis of factual arguments that have been untested, but we don't think you have to get there.

THE COURT: Okay. Let me see what else I've got for you.

Would you agree that aside from the exceptions, mootness is the standing question asked later in a case?

MS. FISHER: That is not something that, candidly, I have thought about, but it's -- I'm hesitant, having not spent time thinking about it, but it seems logically correct

to me.

THE COURT:  Like wouldn't that explain some of this language about -- I mean, the Supreme Court kind of says this a few times, right?  Like mootness is standing later or mootness -- standing is the beginning, mootness is the ongoing.

MS. FISHER:  Uh-huh.

THE COURT:  So if there were not case law about the exception for voluntary cessation, then a plaintiff would have to redemonstrate standing at every stage of the case, regardless of why the conduct stopped.

MS. FISHER:  Perhaps, Your Honor.  And I think that's why so many mootness cases where this issue arises are focused on the exceptions because otherwise that would be both profoundly unfair and wildly inefficient, because what the Court has said is, We don't want defendants to just be able to change what's happening on the ground, end one lawsuit, and then have to deal -- it's like whack-a-mole, have to deal with it in the next lawsuit, so --

THE COURT:  So the defendants suggest that's kind of what the plaintiffs did here with respect to the preliminary injunction.  That the plaintiffs secured a preliminary injunction, faced the music at the Eighth Circuit, vacated the preliminary injunction, but want to keep going with the case in order to do a little bit of

whack-a-mole.  At least that's what the government's position was with respect to both the indicative ruling and the motion to vacate the injunction itself.

MS. FISHER:  And we strongly disagree.  We were simply applying the terms of the injunction by its meaning.  The Eighth Circuit in *Stevenson* and other cases has said an injunction can become moot and a case as a whole may not be.  And we're not the ones --

THE COURT:  Which case says that?

MS. FISHER:  I believe it's the *Stevenson* decision, Your Honor.  And apologies, I don't have the full name at my fingertips, but I could probably get it.  If Your Honor will just give me a moment.

THE COURT:  Sure.  Yes.

MS. FISHER:  *Stevenson vs. Blytheville School District*.  We cite it in Footnote 15 of our response brief.  Eighth Circuit 2014, 762 F.3d 765.

And more to the point, we're not the ones that control the facts here, and we're not the ones that controlled the timing here.  It was the defendants.  You know, -- this goes to testing things, but I would note that, you know, Mr. Homan, he arrived in Minnesota on January 26th.  On February 11th, this Court issued a scheduling order that put our deadline to file an amended complaint on that Friday, and Homan announced that the surge would end

the next day, before the amended complaint was filed. That's just interesting timing that, as a party, I would want to test.

But we -- I would also note that we didn't file the motion to vacate in the Eighth Circuit immediately after Homan's announcement that the surge would end.  That followed the announcement on February 20th that the surge was actually over -- or apologies.  We didn't move for an indicative ruling until the announcement that the surge was actually over.

THE COURT:  Okay.  Thank you.

So in *Chicago Headline Club vs. Noem*, again, a Seventh Circuit case, and I think I'm referring here to the case that is staying the injunction -- the decision staying the injunction, not the later decision.  They base concern -- they express concerns about Article III standing based on developments that postdate both the complaint filing and the preliminary injunction.

MS. FISHER:  Yes, Your Honor, and that occurred in expedited context.  Stay orders aren't binding even in subsequent merits decisions, so that wouldn't even bind the merits panel of the Seventh Circuit.

I think I view that statement in the context of people moving quickly and perhaps the same thing wouldn't be said in a full merits opinion, especially where the issue

was presented as it is here.

In that case, there wasn't really any disagreement between the parties that the circumstances had changed on the ground and there wasn't this sort of, are we looking at standing or mootness?  So it also just wasn't an issue, and there may not have been as much need to pay attention to the precise words that were used.

THE COURT:  I think there's a lot of sort of interchange about standing and mootness, honestly, in the case law.

I want to briefly touch on the evading review and capable of repetition exception.  Do you have a Supreme Court case or an Eighth Circuit case applying this in the context of government conduct in a law enforcement setting?

MS. FISHER:  Not at my fingertips, Your Honor, and possibly not in the briefing.  I do think that the context here is unique in that you have what has been happening across the country.  You can even just take Chicago as an exemplar --

THE COURT:  But -- I was thinking this myself.  We do not get to talk about policy-level stuff.  My ruling will not have anything to do with if I grant -- if at the end of the day you got an injunction.  It would opine about the law, and it would enjoin future conduct as to the plaintiffs, right?  I am not allowed to think about the fact

that this same conduct has happened in other cities.  I am supposed to apply this evading review as to these plaintiffs, correct?

MS. FISHER:  Yes, Your Honor, but I think what may happen -- what has happened -- so yes, Your Honor, I think that that's fair.  We don't yet have an example for where the government has gone back to the same city twice, I would agree with that.

And, you know, there is a reason that we lead with voluntary cessation.  I think that that is the easier ground to resolve mootness on.  But we do think that in the unique context here where you have this pattern of essentially wreaking havoc, disregarding rights, and then when the courts start catching up or when public opinion starts catching up, shutting things down.  And that's what we've seen in state after state.  That's why this is a unique context where we think it may fall into that capable of repetition, yet evading review, but we don't think the Court has to reach that issue.

THE COURT:  And I think your answer was no.  I'm not trying to hammer that.  But you can't think of a case in a law enforcement operation -- or a law enforcement setting?  I mean, we see this in elections cases, which are sort of uniquely -- they fit this bill very well.  I remember the case in law school having to do with pregnancy.  But I can't

think of a case off the top of my head dealing with this in the context of like a law enforcement operation.  Even in the sort of protests around the murder of George Floyd or the Occupy Wall Street, which are, you know, spikes in constitutional questions about response to protester conduct but don't seem to have this issue raised.

MS. FISHER:  We would be happy to take a look.  I can't point the Court to a case.

THE COURT:  It's fine.  I was just wondering.

Okay.  I think that that's all I've got for you.  Anything you think I'm overlooking or that you want to emphasize?

MS. FISHER:  I think the only point that perhaps I have not addressed is chill in the context of a threat of prosecution, and that's where if you couple the allegations regarding use of these databases for tracking alleged domestic terrorists and couple that with allegations to potentially prosecute.  We have all of these statements where the different government agents have explicitly said, We will prosecute you for this sort of behavior.

So as the Court acknowledged -- or as the Court said, in the First Amendment context, the Eighth Circuit has indicated that chill and standing can be slightly more lenient, or perhaps it can be more easily shown.  Certainly when you have those sorts of statements threatening

prosecution, we think that's relevant, and that's something that the Court addressed in the preliminary injunction order.

So ultimately, Your Honor, these plaintiffs want to know who harmed them, at whose direction, what records still exist. We think we've amply alleged standing. We don't think that defendants have carried their burden on mootness, and we would ask for the opportunity to conduct discovery and address future issues as they arise.

Thank you.

THE COURT: Okay. Thank you.

Ms. Rogers, again, as you've seen, the majority of my focus in thinking is on these standing and mootness issues, but I'll give you a couple minutes to flag anything that you think is particularly important or that might be overlooked in the briefing with respect to the sort of merits challenges to the substantive claims.

MS. ROGERS: Yes, Your Honor. Thank you for this opportunity. First I'd like to address two of defendants' arguments on the merits, and then I'll progress to the most salient issues, those being whether mobile observing constitutes protected activity and whether Plaintiffs Crenshaw and CWA were seized.

So first addressing points -- defendants' points two and three, the first suggesting that the Court -- that

this Court look to the preliminary injunction -- or the Eighth Circuit's ruling on the preliminary injunction order, I'd just like to note that we do not believe that that is binding on the Court at this stage.  The stay order was just that, a preliminary --

THE COURT:  Their ruling in this case, I should not feel myself bound by?

MS. ROGERS:  I would say that it arose in a different context.  It was in the context of the preliminary injunction order and it specifically held -- the Court there specifically held that the defendants had a strong showing that their challenge to the injunction, which defendants note was focused on whether the -- on the scope of the relief, but it had a strong showing that the challenge to the injunction was likely to succeed on the merits, so that's very different than the inquiry here.

THE COURT:  Oh, certainly.  But I think that as a practical matter, if not a purely legally binding matter, for instance, their observation that the class is highly unlikely to ever be certified, that is not -- that is less tied to the scope of the injunction, more tied to a question that I'm going to have to answer again down the road if this case continues, and I think at my peril, I would -- let's say they'd said something more explicit.  Let's say they said, under this Court's precedent, there is no right to

observe or record.  I certainly would not be free to act as though they had not said that simply because they said it in the preliminary injunction ruling, right?

MS. ROGERS:  That is correct, Your Honor, and I'm sorry for any confusion in that regard.

THE COURT:  Oh, don't be sorry.

MS. ROGERS:  And I'll note that the Court's order did not say that.

And I guess the point I'm trying to make is that the inquiry here on the merits of the -- on the merits is -- Your Honor has the benefit of our briefing, of our record, and so the stay order we do not think is particularly relevant to the inquiry on the merits, the 12(b)(6) question.

I would also note that defendants' counsel, there was a suggestion that perhaps this Court's PI order was not relevant.  I would just note that the burden of proof for the plaintiffs was higher there, proving a likelihood of success on the merits.  Right here, it's a plausibility standard, and so our burden is lower.  And the Court, having already concluded that we're likely to succeed on the merits, refers to Fourth Amendment complaints.  That certainly has some relevance, in our view.

Addressing defendants' third point, so out of order, and pointing this Court to -- or Your Honor to

*Dickinson vs. Trump*, we would also note that in a similar case, *Los Angeles Press Club vs. Noem*, or now Mullin, that that case just survived a motion to dismiss. *Dickinson v. Trump*, the Ninth Circuit order, was, again, a ruling on the preliminary injunction, whereas there's a recent case out of the -- I believe it's the Central District of California on the motion to dismiss.

THE COURT: And that's the same -- it's the same case that gave rise to the preliminary injunction order that we talked about last time. That's the same case that give rise to this Ninth Circuit decision on the preliminary injunction order. And then in the district court, there was just an order issued denying a motion to dismiss?

MS. ROGERS: Yes, that's correct.

THE COURT: Okay. Thank you.

MS. ROGERS: And I wish I had the case cite for you.

THE COURT: No. That's fine. I'll find it.

MS. ROGERS: Okay, great.

Now moving to the sort of more substantial arguments, first, a response to defendants' arguments that the claims of mobile -- or that mobile observing is not protected activity, defendants disparaged our reliance to *Thurairajah*, which we do believe stands for the proposition that protected activity can occur in transient, but I think

that misses the larger point, which is that under the unique circumstances of this case, there is essentially no dispute that these mobile observers were engaged in a number of different types of protected activity, those being the right to observe public officials in the performance of their official duties, the right to record public officials and law enforcement officers, again, in the performance of their public duties, and their right to criticize government officials.

And so it is our position that mobile observers are not engaging in protected activity just simply by virtue of following.  It is following with the intent to observe, record, and disseminate information about government officials.

Admittedly, this might be a novel -- a novel recognition of protected activity, but that is because defendants' conduct is novel.  And as the Court noted, the mobile observers are mobile because the government officials, defendants, are mobile and are engaging in these -- or committing constitutional violations in transit, so in order to exercise their First Amendment rights, they necessarily have to move.

This is -- the pleading standard here is -- or reviewing a complaint is context-specific.  It requires common sense.  And we think it's a very common-sense

conclusion that protected activity -- that mobile observing at this early stage, and that we have amply alleged, that mobile observing is protected activity at this stage.

One other point on the First Amendment issue and then I'll move to the Fourth Amendment.  We just wanted to note that defendants' arguments and reliance on the obvious alternative explanations are misguided at this stage. Generally, causation is a fact question, and that makes sense because questions like whether there was an obvious alternative explanation are fact-intensive.  They generally require discovery.  So dismissal on the basis of an obvious alternative explanation is proper only if the allegations foreclose all other explanations, and that's certainly not the case here.  And then it's not changed by defendants' alternative descriptions of events, their mischaracterization of the record repeatedly as to all of the plaintiffs and the nature of their activity.

The allegation -- and a final note on that point is that it is not just the individual conduct -- or context of the individual experiences of these places, but -- plaintiffs, but it's also taken -- their allegations are in a broader context of this pattern and practice.

So to put that more plainly, plaintiffs' pattern and practice allegations further support their allegations on a retaliatory animus because we've seen, both within the

bounds of the complaint but also just broadly across the country, that defendants are engaging in this conduct, they are -- they are committing these adverse actions for retaliatory purposes.

THE COURT:  Okay.  Thank you.

And I don't think I need any conversation about the Fourth Amendment at this time.  I want to save a little bit of our time to hear rebuttal from opposing counsel.

MS. ROGERS:  Sure.

THE COURT:  Let me see.  One question I had.  So when was the motion to dismiss ruling in relation to the Ninth Circuit ruling?  Did the motion to dismiss ruling come first?  I'm talking about the *Dickinson vs. Trump* versus the *L.A. Press Club*.

MS. ROGERS:  I actually don't know the answer off the top of my head.  I think both came out relatively recently.

THE COURT:  Okay.

MS. FISHER:  Can we --

THE COURT:  Of course.  Of course.

(Counsel confer.)

MS. ROGERS:  So first, a point of clarification, which is that there are two cases out of the Ninth Circuit. The one that defendants cited is *Dickinson*.  The one that we cited is *L.A. Press Club*.  And I should clarify that --

THE COURT:  Oh, he made that clear, and I was blurring these.  *Dickinson* is Portland.

MS. ROGERS:  Yes.

THE COURT:  *L.A. Press Club* -- sorry about that. Just because they're both the Ninth Circuit doesn't mean they're both the same case.  Thank you.

MS. ROGERS:  Right.  And we do believe -- I don't have the records, but we believe that the denial of the motion to dismiss came before -- in *L.A. Press Club* but came before the stay order in *Dickinson*.

THE COURT:  Got it.  Okay.  Thank you.  Thanks for clarifying that.  My fault.  Okay.  Thank you very much.

MS. ROGERS:  Thank you.

THE COURT:  All right.  Ms. Jacobs, I'll give you the last word.

MS. JACOBS:  Your Honor, just a little bit of clarification as it relates to *L.A. Press Club*, is that the motion to dismiss was granted before subsequently, and recently the Ninth Circuit had vacated the preliminary injunction in that case.  And the motion to dismiss, if I recall correctly, which I think I do, is that the motion to dismiss decision preceded then the subsequent vacatur of the Ninth Circuit.  Now, the Ninth Circuit in that case and then in *Dickinson*, the Ninth Circuit panel was careful in drawing distinctions because, you know, it does appear that the

Ninth Circuit in *Los Angeles Press Club*, there will likely be some preliminary injunctive relief --

THE COURT: That survives.

MS. JACOBS: -- that will survive. That is ongoing. There's actually a hearing at the end -- later part of this week as it relates to class certification, and then the Court is going to be considering, you know, new potential proposed, more narrow preliminary injunction information. I don't think they're making a decision at that time. There's no current motion before the Court. But that's still ongoing. But as of right now, the preliminary injunction issued in *Los Angeles Press Club* has been vacated. And then subsequent to that is when then, just last week, the *Dickinson* opinion came out staying the preliminary injunction.

THE COURT: Great. Thank you.

MS. JACOBS: Sure.

I just have a couple of points. And you had -- I appreciate you giving me the opportunity to take a little closer look. Earlier you had requested any -- and please correct me if I misstate anything of what you'd stated -- but if there's any other authority related to the Supreme Court for post-complaint information to be considered.

THE COURT: Yeah.

MS. JACOBS: Yes. So I think it's relevant to

note that recently the *Chicago Headline Club*, which I think you might have already mentioned, but just to make sure that it's clear for the record, the Seventh Circuit had stated that when staying a broad preliminary injunction issued -- or I'm sorry, this is -- we had stated when they issued a broad preliminary injunction, the Seventh Circuit noted that lessening or ceasing of the operation in *Chicago* gave them reservations about Article III standing in that case.

And earlier you had asked plaintiffs' counsel about the declarations that they've submitted and why they should be -- or how they should be considered for purposes of this hearing, and I believe that plaintiffs' counsel had stated that it was really only in terms of the mootness argument.

I did want to draw the Court's attention to a few times in the plaintiffs' standing argument where they've relied on a subsequently submitted declaration that was submitted here. And that's the second declaration of Plaintiff Tincher. They refer to it on page 18 of the standing section, Footnote 13, and as well as on page 19, and then page 20, all within the standing argument. It's that they're relying on subsequently submitted information for purposes of future intent in their argument for standing.

So I think even by that example and those terms,

it would be certainly appropriate, in light of *Murthy*, for the Court to consider subsequent information, especially in light of the Seventh Circuit's position that the changes on the ground in Chicago or the lessening of that operation might invoke considerations of Article III standing.

THE COURT: What about -- so if standing is a fluid question that continues throughout a case, as I kind of think you're advocating, or at least that I should be informed by post-complaint, post-amended complaint conduct, if that's something that we have to continue to revisit throughout and not stopping at the time of the complaint, then doesn't that eliminate the voluntary cessation analysis under mootness? Because it would allow the government to stop its conduct and say, See, there's no standing because we stopped, without meeting the burden of voluntary cessation -- of getting around the voluntary cessation exception through the mootness doctrine.

Do you understand what I'm saying? It kind of allows a backdoor around -- I mean, if you read *Fikre*, right, the government has to establish -- the government is subject to the voluntary cessation exception. It's a high showing, high burden. Even the disavowals in that case were not enough.

If you're right about standing and that it continues to be informed by facts on the ground

post-complaint filing, doesn't that just vitiate the requirement to prove the permanence of voluntary cessation? It gives the government a much lower -- or any defendant, a much easier way around this question without meeting that robust burden.

MS. JACOBS:  Well, I think that there's a distinction to be made here with plaintiffs' allegations is that part of our argument as it relates to standing is not only that the government's actions have ceased, but it's the plaintiffs have been unable to show any subsequent risk of future injury, even from the time of the first complaint when Operation Metro Surge was in full swing, to the first amended complaint.

And then I think that there's the specific distinction that, obviously, I -- you know, the 2024 decision of *Murthy*, which essentially provides a special -- I don't know if it's an exception or it's a special consideration for cases involving prospective relief where the Court should consider in the near future if the risk of injury is likely to recur.  I don't think -- we have not just --

THE COURT:  *Fikre* is future relief.  *Fikre* is an injunction.

MS. JACOBS:  Yes, but I think that's specific to the government ending their operation -- or the government

ending whatever conduct it is at issue.

Here, for standing purposes, obviously we're alleging that Operation Metro Surge is over, but we've also alleged that plaintiffs have been unable to establish any subsequent injury in light of the fact that it's over, but also throughout the whole pleadings phase. And we do have plaintiffs who are relying on post-complaint conduct in their standing argument of the second declaration of Susan Tincher, which just to reiterate here, it was signed March 31st, but the last allegation included in that declaration was February 7th.

So I think given that they're relying on it for purposes of their standing argument, it only seems appropriate to consider the fact that after Operation Metro Surge has ceased, you know, they obviously disagree that there's a likelihood of future injury, but it's relevant from defendants' perspective that it is very clear that there is not for purposes of standing and then also in light of what we've established related to voluntary cessation.

THE COURT: Okay. Thank you.

MS. JACOBS: I do have one more point, if I might address.

THE COURT: Go ahead.

MS. JACOBS: Okay. It's related to the capable of repetition yet evading review. You know, in preparing for

all of these hearings, we all have a variety of additional work and case law, and I did come across a case that I wanted to point out for the Court.  It's an Eighth Circuit case.  I apologize.

THE COURT:  That's all right.  Take your time.

MS. JACOBS:  Okay.  Here we go.  The *Minnesota Humane Society vs. Clark*.  It's 184 F.3d 795 at 797, Eighth Circuit, 1999.  And it relates to capable of repetition yet evading review and that the exception does not apply when a party chose not to appeal a denial of its preliminary injunction or seek an expedited appeal.

I say that because here -- well, and in many of the cases that have been cited today, whether that be *Los Angeles Press Club*, *Dickinson*, *Chicago*, and this case, each of them have been subjected to review, and I don't think that's a fact that plaintiffs can escape.  But particularly here, I would say that capable of repetition yet evading review exception is unavailable to plaintiffs where they have declined to see through the ongoing and pending appeal on the basis of mootness and then, you know, subsequently moving to dissolve the preliminary injunction that they have here.

So I think the *Minnesota Humane Society* -- well, in that case, it was related to failing to seek an expedited appeal.  I think similarly here, where the plaintiffs have

aggressively sought to essentially get the case out of the Eighth Circuit, you know, presumably in light of the stay opinion, that similarly, they are -- this exception would be unavailable to them.

THE COURT: Okay. Thank you. I'll read that case.

All right. Thank you very much, Counsel. Nope, we're done. We could go on all day, but I don't want smoke coming out of my court reporter's hands or my own ears.

So thank you, all, very much. And good job on the early career argument, yay. Thank you, Counsel, for coming in from probably D.C.

We will be working on this as hard as we can and get a ruling out when we can. So thank you very much, and thanks for all of your patience with my wide-ranging theoretical questions about Article III.

(Court adjourned at 11:35 a.m.)

*     *     *

I, Paula K. Richter, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Certified by: *s/ Paula K. Richter*

Paula K. Richter, RMR-CRR-CRC