**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| Susan Tincher, et al., | No. 0:25-cv-4669 (KMM/DTS) |
| Plaintiffs, | |
| v. | **ORDER** |
| Markwayne Mullin, et al., | |
| Defendants. | |

---

This matter is before the Court on Defendants' Motion to Dismiss the Amended Complaint (Dkt. 253) and Plaintiffs' Motion for Jurisdictional Discovery (Dkt. 264). For the following reasons, the Motion to Dismiss is granted and Plaintiffs' Motion for Jurisdictional Discovery is denied. Plaintiff Ryan Doxsey is given leave to file a Second Amended Complaint.

## I. BACKGROUND

### A. Procedural History

Plaintiffs Susan Tincher, John Biestman, Janet Lee, Lucia Webb, Abdikadir Noor, and Alan Crenshaw (collectively, "Original Plaintiffs") initiated this case by filing a Complaint ("First Complaint") (Dkt. 1) on December 17, 2025. The Original Plaintiffs each observed or protested U.S. Immigration and Customs Enforcement ("ICE") activity taking place in and around the Twin Cities during Operation Metro Surge ("OMS" or "Operation"), an immigration enforcement campaign which saw the assignment of thousands of law enforcement agents to Minnesota for the purpose of arresting

undocumented immigrants. They alleged that, although they remained law abiding when engaging in those protected activities, Defendants subjected them to the use of chemical irritants, intimidation (including by pointing firearms at them and appearing at their homes), detention, and arrest, in violation of their First and Fourth Amendment rights. The First Complaint was accompanied by Declarations from each of the six Original Plaintiffs as well as eight Declarations of similarly situated nonparties, and the pleading sought class-wide declaratory and injunctive relief. The Original Plaintiffs then moved for a temporary restraining order, which the Court converted to one for a preliminary injunction.[1]

After briefing and a hearing, the Court granted the Motion and issued a Preliminary Injunction on January 16, 2026. (Dkt. 85.) Based on the record before it, the Court concluded that the Original Plaintiffs had standing to assert their First and Fourth Amendment claims and had met their burden to establish the *Dataphase*[2] factors for injunctive relief. (*See generally id.*) The Preliminary Injunction limited Defendants and their agents from engaging in certain conduct on an ongoing basis. (*See id.* at 81–83.)[3] Defendants appealed the Preliminary Injunction to the United States Court of Appeals for

[1] In the meantime, the Original Plaintiffs filed additional declarations on behalf of nonparties, including that of Abigail Salm, who was later added a named Plaintiff in the Amended Complaint.

[2] *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981).

[3] Unless otherwise noted, all page numbers refer to the CM/ECF pagination.

the Eighth Circuit and sought a stay of the injunction pending appeal, which was granted on January 21, 2026. *Tincher v. Noem*, 164 F.4th 1097, 1098 (8th Cir. 2026).

Not long after, on February 12, 2026, Defendants announced that OMS was ending. (Dkt. 136 ¶ 283.) Specifically, Defendant Thomas Homan, one of the leaders of OMS, stated at a press conference that OMS had concluded and the number of federal agents in Minnesota was being reduced. (*See* Dkt. 241-2 at 5 ("I have proposed, and President Trump has concurred, that this surge operation conclude."); Dkt 241-2 at 3 ("But as far as the immigration surge, it's over.").) Following these announcements, Plaintiffs asked this Court to vacate the Preliminary Injunction on mootness grounds. (*See* Dkts. 240, 279.) On April 8, 2026, the Court dissolved the Preliminary Injunction, concluding it had become moot when OMS ended. (Dkt. 324.)

**B. Amended Complaint**

On February 13, 2026, the day after Defendants' announcement ending OMS, Plaintiffs filed an Amended Complaint. (Dkt. 136); *see* Fed. R. Civ. P. 15(a)(1). Along with the Original Plaintiffs, the Amended Complaint names as Plaintiffs Abigail Salm, Ryan Doxsey, Margaret Wood, The Newsguild-Communications Workers of America ("CWA"), and Status Coup News (subset collectively, "New Plaintiffs"). Commissioner Rodney Scott, Agent Gregory Bovino, and Thomas Homan were also added as Defendants.[4] The Amended Complaint asserts four claims on behalf of a putative class:

[4] Kristi Noem was once again named as a Defendant in the Amended Complaint. She has been automatically replaced by current Secretary of Homeland Security Markwayne Mullin as a Defendant pursuant to Federal Rule of Civil Procedure 25(d).

(1) First Amendment; (2) Fourth Amendment; (3) Civil Conspiracy; and (4) a claim for a declaration of rights under the Declaratory Judgment Act, 28 U.S.C. § 2201. The Amended Complaint seeks only prospective relief, specifically a permanent injunction enjoining certain conduct, a declaration that Defendants' acts violated the First and Fourth Amendments, and an order requiring Defendants to expunge their records related to immigration enforcement in Minnesota.

* * *

On March 6, 2026, Defendants moved to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Dkt. 253.) They argue that the end of OMS extinguished any case or controversy and Plaintiffs, therefore, lacked standing to obtain prospective relief. Alternatively, Defendants assert that the case has become moot for the same reasons. (Dkt. 258 at 10–17.) Defendants also contend that Plaintiffs have failed to state a claim upon which relief can be granted. (*Id.* at 17–27.) Plaintiffs disagree with each of these arguments. (Dkt. 294.)

Plaintiffs filed a Motion for Jurisdictional Discovery on March 13, 2026. (Dkt. 264.) Plaintiffs' Motion seeks, in relevant part, leave to obtain discovery from Defendants relating to whether the circumstances in Minnesota have changed in a way that undermines standing or renders the case moot, as Defendants allege. (*Id.*) Defendants oppose this Motion, arguing that Plaintiffs have not made the showing necessary for preliminary discovery and that their draft discovery requests are overbroad and unduly burdensome. (Dkt. 289.)

The Court held a hearing on May 4, 2026 and took these Motions under advisement. The Court then requested supplemental briefing from the parties regarding the point at which Plaintiffs' standing should be assessed—whether the Court should consider Plaintiffs' standing at the time the First Complaint was filed, the filing of the Amended Complaint, or some other time or collection of times. (*See* Dkt. 339.) Both parties filed briefs on that issue. (Dkt. 344 (Plaintiffs' brief); Dkt. 345 (Defendants' brief).) The Motion to Dismiss and the Motion for Jurisdictional Discovery are now ripe for decision.

## II. MOTION TO DISMISS

Defendants move to dismiss this case for lack of jurisdiction, arguing that the end of OMS deprives the Plaintiffs of standing and renders moot any case or controversy. Additionally, they move to dismiss the Amended Complaint for failure to state a claim. As explained below, the Court grants Defendants' Motion to Dismiss because Plaintiffs lack standing to pursue the relief they seek. Accordingly, the Court does not address whether the case has become moot, whether the voluntary cessation exception to mootness applies,[5] or whether Plaintiffs have stated a plausible claim for relief.

[5] Because both standing and mootness are jurisdictional issues, *Sisney v. Kaemingk*, 15 F.4th 1181, 1194 (8th Cir. 2021), the Court can decide to address them in either order, *Acheson Hotels, LLC v. Laufer*, 601 U.S. 1, 4 (2023) (citing *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007)). But "[a]s an analytical matter, whether [the plaintiff] had standing the day she filed her suit is logically antecedent to whether . . . later actions mooted the case." *Acheson Hotels*, 601 U.S. at 8–9 (Thomas, J., concurring).

**A. Legal Standard**

On a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), a court "must distinguish between a 'facial attack' and a 'factual attack'" on the court's jurisdiction. *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). A facial attack asserts that "the complaint fails to allege sufficient facts to support subject matter jurisdiction." *Davis v. Anthony, Inc.*, 886 F.3d 674, 679 (8th Cir. 2018) (quoting *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009)). On a facial attack, "the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn*, 918 F.2d at 729 n.6 (citations omitted). On the other hand, a factual attack "occurs when the defendant challenges the veracity of the facts underpinning subject matter jurisdiction," allowing the court to consider matters outside pleadings and without Rule 12(b)(6) safeguards. *Davis*, 886 F.3d at 679 (quotations omitted). Both parties agree that the issue now before the Court is a factual attack, and both sides have submitted evidence in support of their respective positions.[6]

**B. Standing**

Article III of the Constitution limits federal courts to deciding "Cases" and "Controversies." U.S. Const. art. III, § 2. The case-and-controversy prerequisite requires

[6] In resolving a factual jurisdictional dispute, the Court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case," *Flores v. United States*, 689 F.3d 894, 900 (8th Cir. 2012), and an evidentiary hearing is not necessarily required, *Fabisch v. University of Minn.*, 304 F.3d 797, 801 (8th Cir. 2002).

a plaintiff to demonstrate that she has constitutional standing to bring her claims. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."). For a plaintiff to establish the "irreducible constitutional minimum" of Article III standing, they must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (quotation omitted). An injury in fact must be both "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotation omitted). Each Plaintiff must "demonstrate they have standing for each claim they bring and for each form of relief they seek." *Webb ex rel. K. S. v. Smith*, 936 F.3d 808, 814 (8th Cir. 2019); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (explaining that a plaintiff must demonstrate standing to obtain injunctive relief or damages). If a plaintiff lacks standing to sue, a federal court lacks subject matter jurisdiction over the action. *Quiles v. Union Pac. R.R. Co., Inc.*, 4 F.4th 598, 603 (8th Cir. 2021).

Here, Plaintiffs seek only prospective injunctive relief. Therefore, they must show "an ongoing injury or . . . an immediate threat of injury." *Frost v. Sioux City*, 920 F.3d 1158, 1162 (8th Cir. 2019) (quotation omitted); *TransUnion*, 594 U.S. at 435 ("[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial."). However, if the risk of future harm is too speculative, there is no Article III standing. *Arc of Iowa v. Reynolds*, 94 F.4th 707, 711 (8th Cir. 2024). Past injuries alone

cannot establish standing for prospective relief unless they are accompanied by "continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974); *see Rinne v. Camden Cnty.*, 65 F.4th 378, 386 (8th Cir. 2023) (same). But "[p]ast wrongs [are] evidence bearing on 'whether there is a real and immediate threat of repeated injury.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *O'Shea*, 414 U.S. at 496); *Murthy v. Missouri*, 603 U.S. 43, 59 (2024) ("[B]ecause the plaintiffs are seeking only forward-looking relief, the past injuries are relevant only for their predictive value.") (citing *O'Shea*, 414 U.S. at 495–96).

Whether Plaintiffs have standing to pursue this action is less straightforward than it might initially appear because of the change in the relevant factual landscape over the relatively brief history of this case. The Court must first sort out which timeframe is relevant to the question of standing before analyzing whether the Plaintiffs meet their burden.

***When Standing is Assessed***

In general, standing is to be assessed as of the filing of the complaint. *See Park v. Forest Serv. of U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000) (analyzing standing "[a]t the time that [the plaintiff] filed her complaint for relief"). Plaintiffs argue that because two Complaints have been filed, the Court should take a bifurcated approach, with the Original Plaintiffs' standing assessed as of the date of filing of the First Complaint, while the New Plaintiffs' standing should be determined at the filing of the Amended Complaint. (Dkt. 344.) Defendants argue that all Plaintiffs' standing should be determined at the time of the Amended Complaint. (Dkt. 345.) This question matters a great deal in this case, as

the First Complaint was filed during the heart of OMS, when the events at issue were ongoing throughout the Twin Cities, while the Amended Complaint was filed after the end of the Operation had been announced and as it was winding down. After all, the past injuries allegedly experienced by Plaintiffs during OMS had a greater predictive value of a threat of repeated harm when the Operation was still underway.

While the caselaw exploring this issue is not entirely clear, based on the weight of authority, the Court concludes that standing for all Plaintiffs should be assessed from the time of the Amended Complaint's filing. While the Supreme Court has never addressed the issue directly, it has held, generally, that "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473–74 (2007) (determining whether the court had jurisdiction under the False Claims Act). The Court affirmed this principle as recently as last year. *Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22 (2025) (holding that a post-removal amendment of the complaint eliminating federal-question claims deprived the court of jurisdiction over supplemental state law claims); *id.* at 32 (quoting *Rockwell Int'l*, 549 U.S. at 473–74). Such an approach also appears to be the practice of the high court, as well as other lower courts, even in cases where the issue is not addressed explicitly. *See County of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991) (assessing standing "at the time the second amended complaint was filed"); *see also Crawford v. Lamantia*, 34 F.3d 28, 32 (1st Cir. 1994) (concluding that the plaintiff, who "may have had standing . . . when he brought this action," lost standing "by the time he filed his amended complaint"); *Maniar v.*

*Mayorkas*, No. 19-cv-3826 (EGS), 2023 WL 2709040, at *13 (D.D.C. Mar. 30, 2023) ("While standing is generally determined at the time the suit is initiated, . . . when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction.") (cleaned up) (collecting cases). *But see Boitnott v. Border Foods, Inc.*, 361 F. Supp. 3d 858, 864 (D. Minn. 2019) (noting that "courts within the Eighth Circuit are not in clear agreement on this issue") (collecting cases).

Plaintiffs rely on authority stating, generally, that standing is to be assessed "at the time the *action commences*." *E.g.*, *McNaught v. Nolen*, 76 F.4th 764, 769 (8th Cir. 2023) (quoting *Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 169 (2000)) (emphasis added). Plaintiffs therefore argue that standing should be assessed at the point when each individual Plaintiff joined the suit. But *Rockwell*'s reasoning cuts against this line of argument:

> The rule that subject-matter jurisdiction "depends on the state of things at the time of the action brought," does not suggest a different interpretation [of the relevant text]. The state of things and the originally alleged state of things are not synonymous; demonstration that the original allegations were false will defeat jurisdiction. So also will the withdrawal of those allegations, unless they are replaced by others that establish jurisdiction. Thus, when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction.

549 U.S. at 473–74 (citations omitted). The Court reads this language to encourage consideration of the procedural landscape at the time of the amendment and foreclose the bifurcated approach Plaintiffs seek. What's more, the measure-at-amended-complaint

approach comports with the "well-established" and broad principle "that an amended complaint supersedes an original complaint and renders the original complaint without legal effect." *Allen v. Amsterdam*, 132 F.4th 1065, 1068 (8th Cir. 2025) (quoting *In re Atlas Van Lines, Inc.*, 209 F.3d 1064, 1067 (8th Cir. 2000)), *cert. denied sub nom. Brooks v. Allen*, 146 S. Ct. 886 (2025); *Royal Canin*, 604 U.S. at 35 ("If a plaintiff amends her complaint, the new pleading 'supersedes' the old one: The original pleading no longer performs any function in the case.") (quotation omitted).

Admittedly, some cases in this area that have emphasized the amended complaint's importance in evaluating whether a court has subject-matter jurisdiction have done so in a distinct procedural context. They have evaluated subject-matter jurisdiction based on the allegations in an amended complaint that eliminates all federal claims after a defendant has removed the case from state court given the presence of a federal question in the original pleading. *E.g.*, *Royal Canin*, 604 U.S. at 35. But it is clear that requirement of focusing on the amended complaint does not apply so narrowly. The Eighth Circuit very recently held that a court cannot "ignore the amended complaint" when evaluating the issue of standing, explaining that the "adequacy of the injury now rests on what [the amended complaint] alleges." *Minn. Voters All. v. Ellison*, No. 24-3094, 2026 WL 2443854, at *2 n.2 (8th Cir. Aug. 20, 2026) (citing *In re Atlas Van Lines, Inc.*, 209 F.3d at 1067).

Applying this precedent, the Court analyzes all Plaintiffs' standing as of the February 13, 2026 filing of the Amended Complaint.

***Consideration of Events Post-Dating the Filing of the Amended Complaint***

The Court must answer a second question before proceeding with the substance of the standing review. Defendants argue that, although standing is assessed at the time of the filing of the Amended Complaint, the Court is nonetheless allowed to consider events that occurred after its filing, events that they argue further undermine Plaintiffs' arguments for standing.

Again, this question does not solicit an easy answer. On the one hand, an inverse of this argument has been squarely rejected by Eighth Circuit in *Park v. Forest Service of the United States*, 205 F.3d 1034 (8th Cir. 2000). There, the plaintiff alleged in her 1996 complaint for injunctive relief that she had been subjected to an unconstitutional checkpoint within a National Park. *Id.* at 1036. At summary judgment, she introduced evidence that the same conduct had recurred at least twice in the years since the complaint was filed. *Id.* at 1037. But the Eighth Circuit concluded that the later facts could not affect its analysis: "We do not think that [the plaintiff] may use evidence of what happened after the commencement of the suit to make this showing [of a real and imminent threat of harm]." *Id.* Drawing on the Supreme Court's reasoning of *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992), the Eighth Circuit concluded that "if redressability may not be established by a development that occurs after the commencement of the litigation, neither may an injury-in-fact." *Id.* at 1038. *Park* has subsequently been applied to restrict the examination of standing to the facts that existed at the time of a complaint's filing. *See Steger v. Franco, Inc.*, 228 F.3d 889, 893 (8th Cir. 2000) (rejecting the plaintiff's argument that his post-filing visits to a building could establish an imminent threat of future harm

because "standing is based on the facts as the existed at the time the lawsuit was filed") (citing *Park*, 205 F.3d at 1037); *Hussen v. Noem*, 822 F. Supp. 3d 944, 984 (D. Minn. 2026) ("In the Eighth Circuit, evidence that postdates the complaint generally cannot be used to support standing to seek injunctive relief.") (citing *Park*, 205 F.3d at 1037).

On the other hand, although *Park* appears to remain good law, the Defendants point to *Murthy v. Missouri*, 603 U.S. 43 (2024), in support of their contrary position. The *Murthy* plaintiffs brought suit during the COVID pandemic alleging that the federal government was pressuring social media platforms to censor their content, but the Supreme Court vacated the lower court's injunction on standing grounds. In two ways, *Murthy* arguably muddied the waters of whether post-complaint facts can impact standing. First, the Court restated part of the legal standard in a way that, though oft-repeated, perhaps raises more questions about temporal limitations than it answers:

> The plaintiff bears the burden of establishing standing as of the time she brought the lawsuit and maintaining it thereafter. She must support each element of standing with the manner and degree of evidence required at the successive stages of the litigation.

*Murthy*, 603 U.S. at 58 (cleaned up). This language suggests that standing is determined not just by the events surrounding the filing of the complaint but could also be affected by later factual developments and reconsidered based on those new facts at later stages of the case.

More critically, the *Murthy* Court appears to have considered conduct that occurred after the filing of the Complaint in its standing analysis. While the complaint was filed in 2022, in the Court's 2024 opinion, it repeatedly analyzed the issue of standing by

referencing events that occurred later in 2022 and in 2023. *See e.g.*, *id.* at 66–67, 71. The Court observed that, in light of the changed government practices as the pandemic wound down, "[i]t is very difficult for [a plaintiff] to show that she faces future harm that is traceable" to the defendants. *Id.* at 71–72. Defendants cite other, non-binding cases that appear to do the same thing. (Dkt. 345 at 7–9.) *Murthy*'s clear reliance on post-complaint facts is hard to square with a bright-line rule that post-Complaint conduct can have no bearing on the standing analysis.[7]

Ultimately, however, the Court need not fully resolve this complicated but important question here. Even considering solely the facts that existed as of February 13,

[7] *Murthy*'s procedural posture may have something to do with its consideration of post-complaint factual developments. Indeed, other courts, including this one, have looked at similar evidence when determining the propriety of preliminary injunctive relief. *See, e.g.*, *Giambalvo v. Suffolk County*, 155 F.4th 163, 186 (2d Cir. 2025) (instructing the district court to "re-assess the standing issue based upon further development of the record on remand"); *Does 1-9 v. Dep't of Just.*, No. 25-cv-325 (JMC), 2025 WL 1984428, at *2 (D.D.C. July 17, 2025) (considering "subsequent filings alerting the Court to new factual developments" in assessing standing); *Frazier v. Graves*, No. 4:20-CV-00434-KGB, 2022 WL 273458, at *13 (E.D. Ark. Jan. 28, 2022) (assessing standing "on the record before [the court] at this stage of the proceeding"); *cf. Chicago Headline Club v. Noem*, No. 25-3023, Dkt. 28 at 2 (7th Cir. Nov. 19, 2025) (observing that post-filing reports of reduced immigration enforcement in Chicago could undermine the "propriety of injunctive relief").

the date of the filing of the Amended Complaint, the Plaintiffs lack standing for their claims.[8]

***Analysis***

Applying this framework to the allegations in the Amended Complaint, the Court concludes that Plaintiffs[9] fail to meet their burden of establishing that they have standing to seek future injunctive relief. Because OMS has ended, Plaintiffs simply cannot allege

[8] Perhaps the complications related to analyzing Plaintiffs' standing could be sidestepped by framing the issue as one of mootness, which is often described as standing over time. *See, e.g.*, *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 68 n.22 (1997) ("Mootness has been described as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).") (quotation omitted). However, this approach would require consideration of the voluntary cessation exception to the mootness doctrine. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) ("[A] defendant cannot automatically moot a case simply by ending its unlawful conduct once sued."). The Supreme Court requires defendants—including the government—to satisfy a high bar to secure dismissal of a case for mootness when the reason the facts have changed is their own conduct. *See West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 719 (2022) (describing the "burden" to moot a case as "heavy" where "the only conceivable basis for a finding of mootness in the case is [the Defendants'] voluntary conduct") (quoting *Friends of the Earth*, 528 U.S. at 189) (quotation marks omitted); *see also Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024) (collecting cases). Although it appears that this case is moot in the ordinary sense of the word, the government does not even attempt to give the Court the assurances it would need to avoid the voluntary cessation exception. *See Fikre*, 601 U.S. at 241 (requiring a defendant to show that the challenged practice "cannot reasonably be expected to recur") (quotations omitted). To the contrary, Defendants do not concede wrongdoing, make no promise not to resume the conduct at issue, and instead insist they may come back to Minnesota with a similar operation in the future. *See* Fox News, Homan on Ending ICE in Minneapolis: We'll Come Back if We Need To, YouTube at 3:05 (Feb. 13, 2026), https://www.youtube.com/watch?v=PHz73XDApp0 (last visited Aug. 11, 2026) ("If we need to come back, we'll come back.").

[9] Unless otherwise noted, the Court uses "Plaintiffs" in this subsection to refer to all named Plaintiffs regarding all claims, aside from Ryan Doxsey's allegations regarding his placement on a domestic terrorist list. *See infra* (discussion of Ryan Doxsey).

an imminent risk of harm necessary to pursue prospective injunctive relief. *TransUnion*, 594 U.S. at 435.

In its January 16, 2026 Preliminary Injunction Order, the Court concluded that Plaintiffs had standing to pursue emergency injunctive relief, pointing to the intersection of the crisis-like atmosphere created by OMS and the nature of Plaintiffs' allegations. The circumstances described in the First Complaint were unique to OMS and had not been seen before or since in Minnesota. ICE officers were conducting immigration enforcement operations throughout the Twin Cities, at times stopping individuals on the street or in cars whom they suspected of being undocumented and at other times looking for specific persons to arrest. Protesters routinely gathered at the locations of these law enforcement operations or followed ICE officers from one scene to another so that they could observe, record, and protest their activities. In response to these protests and observer activity, the agents allegedly pulled over, detained, pepper sprayed, or otherwise retaliated against Plaintiffs, violating their First and Fourth Amendment rights. The record presented dozens of nearly identical episodes like this from both Plaintiffs and Declarants. OMS operations also appeared to be increasing at the time of the Preliminary Injunction Order, and Plaintiffs almost all attested that they would continue to protest the agents' presence.

In that context, the Preliminary Injunction Order observed:

> At the time the Complaint was filed, Operation Metro Surge had already been ongoing for two weeks. In the month since then, it has grown almost exponentially, with widespread estimates that there are now 3,000 immigration enforcement officers operating in Minnesota, most of them in the Twin Cities. And in the meantime, members of the Twin Cities communities, including the named Plaintiffs and members of

> the putative class, have continued to observe, record, and protest the presence and actions of the immigration officers participating in the operation. There is no sign that this operation is winding down—indeed, it appears to still be ramping up.

(Dkt. 85 at 70–71.) This led the Court to conclude that Defendants were engaged in "an ongoing, persistent pattern" of misconduct against protestors like Plaintiffs. (*Id.* at 44.) The Court relied heavily on this reality in its standing analysis, determining that the individual Plaintiffs' one or two past instances of harm combined with their intent to keep protesting and the ongoing nature of the massive law-enforcement operation were sufficient to establish an imminent threat of injury due to Defendants' pervasive unlawful conduct.

Nearly a month later, when Plaintiffs filed the Amended Complaint on February 13, 2026, the scope of the Operation had changed in key ways. At a February 12 press conference, "Border Czar" Tom Homan announced "that the 'surge operation' in Minnesota had been successful and would end." (Dkt. 136 ¶ 283); *see* Border Czar Tom Homan Holds News Conference in Minneapolis, at 13:49–13:54 (C-SPAN, Feb. 12, 2026) [hereinafter "C-SPAN"], https://www.c-span.org/program/news-conference/border-czar-tom-homan-holds-news-conference-in-minneapolis/673337 (last visited Aug. 11, 2026) ("I have proposed, and President Trump has concurred, that this surge operation conclude.").

Mr. Homan's announcement was notable in at least two ways. First, Mr. Homan stated that Defendants' immigration enforcement efforts would change qualitatively, transitioning away from at-large arrests and toward arrests in prisons and jails. Homan asserted:

> We now have the ability to arrest criminal aliens in the safety and security of jails throughout the state at the time they're being released, like we've done in other states. I've also directed the strategic placement of officers in certain areas throughout the state that can respond quickly to sheriffs that want to release somebody and notify us we need to be nearby so they don't hold them unnecessarily, so we worked on a strategic plan to reassign officers in those key locations. Arresting a public safety threat in the safety and security of a jail is safer for the alien, is safer for the officer, and safer for the community. I think we all can agree on that. It requires less resources [than] at-large operations. It just makes sense.

C-SPAN, at 5:11–6:02; *id.* at 23:15–25:42 (discussing arrests in jails and prisons)

Second, Mr. Homan announced that he was drawing down the number of federal agents in Minnesota as part of this strategic shift, with significant numbers leaving or being reassigned elsewhere, and he stated that the reduction had already begun. C-SPAN, at 13:58–14:03 ("A significant drawdown has already been underway this week, and will continue to the next week."); *id.* at 14:21–14:28 ("Law enforcement officers drawing down from this surge operation will either return to their duty stations or be assigned elsewhere to achieve just that."). He further indicated that the number of agents that would remain in Minnesota after the fact would be akin to pre-OMS personnel levels. *See id.* at 15:26–15:43 ("A small footprint of personnel will remain for a period of time to close out and transition full command and control back to the field office[.]"); *id.* at 18:43–18:46

("But we're going to get back to the footprint here, the normal footprint here[.]"); *id.* at 18:59–19:15 ("I'm not going to remove everybody out of safety of our officers but like I said, Operation Metro Surge is ending, and in the next week, we're going to deploy the officers here on detail back to their home stations or other areas of the country where they're needed.").[10]

Mr. Homan's February 12th announcement was also a continuation of a trend toward reduced immigration operations in Minnesota, all of which occurred after the Preliminary Injunction Order. Almost two weeks earlier, at Mr. Homan's first OMS-related press conference on January 29, 2026, he announced that "plans to reduce the massive force of federal immigration agents in Minnesota [were] in the works and would go forward if he [saw] adequate cooperation from local officials."[11] And the next week, he announced that he had reduced the number of federal agents in Minnesota by 700.[12] These three announcements together, spread over almost two weeks, show that the

[10] The Court notes that Plaintiffs do not dispute either the existence or significance of Mr. Homan's February 12 announcement. In fact, Plaintiffs acknowledge in the Amended Complaint that OMS had concluded and that fewer agents were going to be on the ground in Minnesota. (*See* Dkt. 136 ¶ 285.) What's more, Plaintiffs relied on the end of OMS to secure dismissal of Defendants' appeal of this Court's Preliminary Injunction on mootness grounds. (*See* Dkt. 240 at 2–4; Dkt. 241-1; Dkt. 241-2; Dkt. 279 at 2.)

[11] MPR News Staff & Estelle Timar-Wilcox, Homan Says He'll Reduce Federal Force in Minnesota if Local Officials Cooperate (MPR News, Jan. 29, 2026, 6:20 p.m.), https://www.mprnews.org/story/2026/01/29/border-czar-tom-homan-gives-first-press-conference-in-minnesota (last accessed Aug. 11, 2026).

[12] Anna Haecherl, White House Official Tom Homan Announces Drawdown by 700 Agents in Minnesota (MPR News, Feb. 4, 2026, 12:25 p.m.), https://www.mprnews.org/ story/2026/02/04/tom-homan-border-czar-immigration-surge-minnesota-press-conference (last accessed Aug. 11, 2026).

situation had meaningfully changed between the issuance of the Preliminary Injunction Order and the filing of the Amended Complaint.

These changes to the facts on the ground convince the Court that its prior determination regarding Plaintiffs' standing in connection with their request for preliminary injunctive relief does not control the outcome here. First, underlying the "ongoing, persistent pattern" of misconduct and "consistent recurrence of incidents" that shaped the Court's earlier standing analysis was the sheer number of agents deployed to the Twin Cities at that time. (Dkt. 85 at 44, 46.) Specifically, reports indicated that more than 3,000 officers had been deployed to the area and that "[t]here [was] no sign that this operation [was] winding down—indeed, it appear[ed] to still be ramping up." (*Id.* at 70–71.) Even assuming all else remained the same, the significant reduction in the number of immigration officers in Minnesota between the two Complaints greatly decreases the chance that, as of February 13, one of Plaintiffs would be again subject to the harm alleged.

Second, the tactical change to Defendants' immigration enforcement operations also differentiated the standing-related record at the time of the First Complaint from that at the time of the Amended Complaint. During the height of OMS, officers frequently conducted at-large arrests of noncitizens, which lead Plaintiffs to their distinctive follow-and-observe protest strategy. But Mr. Homan indicated that at-large arrests were largely being replaced by arrests conducted at prisons and jails. Simply put, without agents conducting widespread at-large arrests, Plaintiffs would not continue to engage in the protest strategies—or be harmed—in the ways central to this case. Together, these facts collapse the pillars on which Plaintiffs' standing for the Preliminary Injunction Order was

built. In other words, the past injuries Plaintiffs experienced are less indicative of a threat of imminent future harm given that they are less likely to be out protesting at-large immigration enforcement activities when fewer of those actions are taking place.

While Plaintiffs each allege troubling incidents of past harm at the hands of Defendants' agents, and they have supplied dozens of examples of similar misconduct in nonparty declarations, as of February 13, they could no longer establish that they face an imminent risk of harm without the "ongoing, persistent pattern" of misconduct that accompanied OMS. (Dkt. 85 at 44.) Given the changes to the facts on the ground at the time of the Amended Complaint and the announcement that OMS had concluded, the Court determines that Plaintiffs Susan Tincher, John Biestman, Janet Lee, Lucia Webb, Abdikadir Noor, Alan Crenshaw, Abigail Salm, Margaret Wood, The Newsguild-Communications Workers Of America, and Status Coup News lack standing to seek prospective relief. In short, they are no longer able to show that they are "immediately in danger of sustaining some direct injury as the result of the challenged official conduct." *The Iowa Farm Sanctuary v. Univ. of Mo. Veterinary Health Ctr.*, No. 25-2503, 2026 WL 2607233, at * 2 (8th Cir. Sept. 3, 2026) (quoting *City of Los Angeles v. Lyons*, 461 U.S.

95, 102 (1983)); *see also Lyons*, 461 U.S. at 111 (plaintiff lacks standing for prospective relief "[a]bsent a sufficient likelihood that he will again be wronged in a similar way").[13]

***Ryan Doxsey***

The Court's analysis does not end there, because the Amended Complaint alleges one area of potential ongoing and continuing harm involving Plaintiff Ryan Doxsey. Mr. Doxsey alleges he was told by immigration agents on January 27, 2026 "that [he] would be added to a list of domestic terrorists." (Dkt. 160 ¶¶ 9–10.) The Court considers this allegation separately because there is no indication that such an allegation is impacted by the end of OMS or that it has been mooted by any subsequent change in the relevant factual landscape.[14] Applying precedent, the Court concludes that although Mr. Doxsey has not sufficiently alleged a concrete harm necessary to establish standing, although he might yet do so.

To establish an injury in fact, a plaintiff's harm must be "concrete," meaning "'real,' and not 'abstract.'" *Spokeo*, 578 U.S. at 340. This harm can be tangible or intangible. *Id.* The Supreme Court delineated what showing is required to establish a concrete harm in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). There, a class of

[13] The Court has already noted the tension in the caselaw regarding whether post-complaint facts can impact standing, and that the Court need not rely on such facts here. But if it considered events after February 13, its conclusion that Plaintiffs lack standing would be strengthened, not undermined. The immigration enforcement operations that pervaded Minnesota during OMS are now indeed substantially reduced. Although some enforcement operations continue, such actions are a small fraction of what they were before, and the activities of protestors have similarly diminished.

[14] Neither party specifically addresses Mr. Doxey's claims in the briefing on this Motion to Dismiss.

plaintiffs alleged that TransUnion, a credit reporting agency, violated the Fair Credit Reporting Act ("FCRA") by mistakenly flagging their accounts as those belonging to individuals on the federal government's Office of Foreign Assets Control list, a designation provided only for "terrorists, drug traffickers, or other serious criminals." *Id.* at 417–19. Analyzing whether the two subclasses of plaintiffs had suffered a concrete harm in conjunction with the FCRA violation, the high court determined that only those plaintiffs whose incorrect reports were disseminated to third parties had alleged a concrete injury, while those whose reports were not disseminated had not. *Id.* at 432–35. The Supreme Court explained that "[t]he mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm." *Id.* at 434.

*TransUnion* is controlling here. Mr. Doxsey's allegations about being on a watch list are sparse, only stating that he was told that he "would be added to a list of domestic terrorists" for his protest activity. (Dkt. 160 ¶¶ 9–10.) But even assuming Mr. Doxsey was placed on such a list, he has not alleged any kind of concrete harm stemming from this designation, nonetheless the ongoing harm needed for injunctive relief. He does not allege that he has had or is facing any downstream consequence from the designation or that this "list of domestic terrorists" has been disseminated to a third party. The Supreme Court made clear in *TransUnion* that such sparse allegations are insufficient at this stage to establish standing. *See Flynn v. Verizon Wireless*, No. 3:22-CV-1065 (JAM), 2024 WL 2701676, at *5 (D. Conn. May 23, 2024) (applying *TransUnion* and concluding that a plaintiff who alleged that a government official labeled him a domestic terrorist lacked standing because he had "not alleged that [the official] disseminated any list that included

him, nor that she communicated his alleged status as a domestic terrorist to anyone in any way"), *aff'd in part, appeal dismissed in part*, No. 24-1562, 2025 WL 1671271 (2d Cir. Feb. 13, 2025). Other courts have also held that standing for prospective relief requires a showing of ongoing harm separate from the government's designation alone. *See Jibril v. Mayorkas*, 20 F.4th 804, 814 (D.C. Cir. 2021) (concluding that the plaintiffs had standing to challenge terrorist watchlist designation where designation impacted their travel, they "travel[led] to Jordan every two years to visit family" and they had "professed desire to continue that pattern"). Mr. Doxsey has not made such a showing here.

This does not mean that such real harm does not exist. For example, nonparty Declarant Nicole Cleland alleges that three days after being stopped by an immigration agent for protest activity, her Global Entry/TSA Precheck status was revoked. (Dkt. 136 ¶ 154; Dkt. 98 ¶ 15.) But Ms. Cleland is not a plaintiff to this action, and the Court cannot "conjure up unpled allegations to save" Mr. Doxsey's standing. *Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789, 796 (8th Cir. 2021). Mr. Doxsey fails to allege that he has standing.[15]

However, the Court understands that Mr. Doxsey's allegations on this point may not be fully enumerated in the Amended Complaint given its focus on the issues arising from Defendants' immediate response to Plaintiffs' protest activity. The fact that neither party addressed Mr. Doxsey's allegation in the briefing on this Motion suggests as such.

---

[15] Because Plaintiffs lack standing and thus the Court lacks subject matter jurisdiction, it does not consider the adequacy of the pleading of Plaintiffs' claims or Defendants' Rule 12(b)(6) challenge to those claims. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (detailing Rule 12(b)(6) standard).

Therefore, Mr. Doxsey is given leave to file a Second Amended Complaint fully addressing this allegation and any harm caused by it. Alternately, nothing in this Order precludes Mr. Doxsey from pursuing any claims related to his alleged placement on a domestic terrorist list in a separate action, should he choose to do so.

## III. MOTION FOR JURISDICTIONAL DISCOVERY

Finally, the Court addresses Plaintiffs' Motion for Jurisdictional Discovery. A district court may grant limited jurisdictional discovery on a Rule 12(b)(1) motion if additional facts are necessary to resolve a jurisdictional issue. *WinRed, Inc. v. Ellison*, 581 F. Supp. 3d 1152, 1165 n.6 (D. Minn. 2022) (citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978)), *aff'd*, 59 F.4th 934 (8th Cir. 2023). A motion for jurisdictional discovery should be granted where the plaintiff "offer[s] documentary evidence, and not merely speculations or conclusory allegations" in support of jurisdiction. *Steinbuch v. Cutler*, 518 F.3d 580, 589 (8th Cir. 2008). But "[a]dditional jurisdictional discovery is not needed if the facts necessary to resolving the jurisdictional inquiry are known and undisputed." *Beck v. United States*, 125 F.4th 887, 892 (8th Cir. 2025) (quotation omitted). The additional facts sought must also be "material" to the jurisdictional issues. *Id.* The decision to grant jurisdictional discovery is within the discretion of the district court. *WinRed, Inc.*, 581 F. Supp. 3d at 1165 n.6; *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 598 (8th Cir. 2011) (reviewing denial of motion for jurisdictional discovery for abuse of discretion).

Plaintiffs' Motion requests an array of information from Defendants, relating both to OMS and subsequent events. They provide six draft requests for production seeking,

among other things, all Defendants' communications about Plaintiffs, all documents and communications regarding Defendants' "planning, objectives, initiation, execution, wind-down, and conclusion of Operation Metro Surge," Defendants' internal policies, and the present number of federal immigration agents currently deployed to Minnesota as well as the cumulative number of arrests made. (Dkt. 268-1 at 6–7.) Plaintiffs also seek to hold depositions of Defendant David Easterwood, Declarant Marty Raybon, and a Rule 30(b)(6) representative.

Even assuming Plaintiffs' requests satisfy Rule 26(b)'s relevance and proportionality requirements, the facts sought are immaterial to the jurisdictional inquiry. As discussed, Plaintiffs' standing depends on, in essence, the ongoing existence of OMS, which is no longer the case. At the time of the Amended Complaint's filing, Mr. Homan had announced that OMS had concluded, Defendants' immigration enforcement strategy was changing, and that the drawdown of federal agents in Minnesota was being expedited. And as noted, Plaintiffs do not dispute that these changes were occurring. What's more, the bulk of Plaintiffs' requests seek information that post-dates the filing of the Amended Complaint, which itself may make it irrelevant to the standing inquiry. *See Park*, 205 F.3d at 1037. So, because the information sought by Plaintiffs is either immaterial or is already available and undisputed, jurisdictional discovery is inappropriate.

* * *

After careful consideration, Defendants' Motion to Dismiss (Dkt. 253) is granted and Plaintiffs' Motion for Jurisdictional Discovery (Dkt. 264) is denied. Plaintiff Ryan Doxsey is given leave to file a Second Amended Complaint, if he so chooses.

## IV. ORDER

For the reasons stated herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Dismiss (Dkt. 253) is **GRANTED**;

2. Plaintiffs Susan Tincher, John Biestman, Janet Lee, Lucia Webb, Abdikadir Noor, Alan Crenshaw, Abigail Salm, Ryan Doxsey, Margaret Wood, The Newsguild-Communications Workers of America, and Status Coup News are **DISMISSED WITHOUT PREJUDICE** for lack of jurisdiction;

3. Plaintiff Ryan Doxsey is **GRANTED** leave to file a Second Amended Complaint. Should he so choose, that Complaint must be filed **within 21 days** of this Order; and

4. Plaintiffs' Motion for Jurisdictional Discovery (Dkt. 264) is **DENIED**.

Date: September 18, 2026

*s/Katherine M. Menendez*
Katherine M. Menendez
United States District Judge